# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **COLORADO WILD HORSE** ) | |
| **AND BURRO COALITION, INC.** ) | |
| **2406 15th Avenue Court** ) | |
| **Greeley, CO 81521** ) | |
| ) | |
| **AMERICAN MUSTANG** ) | |
| **AND BURRO ASSOCIATION, INC.** ) | |
| **2406 15th Avenue Court** ) | |
| **Greeley, CO 81521** ) | |
| ) | |
| **THE CLOUD FOUNDATION, INC.** ) | |
| **a Colorado, non-profit organization** ) | |
| **107 South 7th Street** ) | |
| **Colorado Springs, CO** ) | |
| ) | |
| **FRONT RANGE EQUINE RESCUE, INC.** ) | **Civil No. _____** |
| **2200 Twylby Road** ) | |
| **Larkspur, CO 80118** ) | |
| ) | |
| **DR. DON MOORE** ) | |
| **1787 K 6/10 Road** ) | |
| **Fruita, CO 81521** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **DIRK KEMPTHORNE,** ) | |
| **in his official capacity as Secretary,** ) | |
| **United States Department of Interior** ) | |
| **1849 C Street, N.W.** ) | |
| **Washington, D.C. 20240** ) | |

**KATHLEEN CLARKE, in her**                )
**official capacity as Director, Bureau of Land**    )
**Management,**                            )
**1849 C Street, N.W.**                     )
**Washington, D.C. 20240**                 )
                                           )
**and**                                     )
                                           )
                                           )
**KENT E. WALTER, in his**                  )
**official capacity as**                     )
**Field Manager, BLM,**                     )
**White River Field Office**                 )
**73544 Highway 64**                        )
**Meeker, CO 81641**                        )

<u>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

<u>**Introduction**</u>

1. This is an action to declare illegal and set aside the Bureau of Land Management's (BLM) imminent actions to eradicate two herds of wild mustangs from their ranges -- the Piceance-East Douglas Herd and the West Douglas Herd.  These horses currently and lawfully occupy public lands in northwest Colorado and are protected under the Wild Free-Roaming Horses and Burros Act (WFHBA), 16 U.S.C. § 1331 <u>et seq.</u>  The White River Field Office (WRFO) of the BLM is taking these actions at the direction and with the consent of the Washington Field Office (WFO) of the BLM, which approved of these actions and funded this activity before 1) the WRFO issued any documentation of its plans under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 <u>et seq.</u>; <u>2)</u>  notified persons interested in these herds of wild horses or 3) sought public comment on any of its planned actions.

2.  BLM plans to begin rounding up and removing wild horses from the Piceance-East Douglas Herd Management Area immediately, and plans to adopt or sell removed animals to private parties beginning as soon as September 20, 2006.   In addition to rounding up the wild horses to permanently remove them from the range and place them in holding for adoption, in Piceance/East Douglas, BLM plans to administer a controversial, experimental contraceptive drug, Porcine Zona Pellucida (PZP), for the first time to the mares it will release back to the range.  BLM is administering this experimental drug to these wild horse mares, and releasing them back into the wild, without knowing whether they are appropriate candidates for the drug, and without conducting any follow up or monitoring of these mares to determine whether they will develop adverse reactions to the drug or how its release may otherwise affect the environment.  Plaintiffs will be moving for a preliminary injunction promptly to halt these actions unless defendants will agree to suspend this activity until the matter can be resolved on cross-motions for summary judgment.

3. In addition, defendants plan to begin rounding up and removing wild horses from the West Douglas Herd Area shortly thereafter, despite the fact that plaintiffs and others have pending protests before the Secretary of  Interior, to BLM's 2005 Amendment to its Revised Management Plan, and have been advised that protests operate to stay any activity that would be taken to pursuant to the plan.  Because all of the actions BLM will undertake are contrary to law and will result in irreparable injury to plaintiffs, plaintiffs are seeking injunctive relief.

## JURISDICTION AND VENUE

4. This case concerns a federal question and, therefore, jurisdiction is proper under 28 U.S.C. §1331. Venue is also proper under 28 U.S.C. § 1391(e). This Court may review defendants' actions and order appropriate relief under the Administrative Procedure Act, 5 U.S.C. §§701 et seq.

## PLAINTIFFS

5. The Colorado Wild Horse and Burro Coalition (CWHBC) is a non-profit Colorado corporation, organized to educate the public and wild horse and burro adopters about wild horse issues and to protect wild horses and burros, primarily in Colorado, but also in other states. CWHBC brings this suit on behalf of its members, who are interested in and affected by the Bureau of Land Management ("BLM'") activities regarding management of all the natural resources, and specifically the wild horses, in this area. The Colorado Wild Horse and Burro Coalition (CWHBC) members and supporters recreate, photograph, and enjoy viewing wild horses on public lands in Colorado. This is because they visit the area often, appreciate its natural beauty, enjoy its scenery and all of its wildlife, including wild horses, and because they are aware of its historical and archeological significance. CWHBC has participated in public land reviews and decisions regarding both Piceance-East Douglas and the West Douglas Herd Areas.

6. The American Mustang and Burro Association, Inc. (AMBA) is a national organization, dedicated to the protection and preservation of America's wild equines, service to adopters and to public and adopter education. AMBA sues on behalf of its members, some of whom are Colorado residents or visitors and who enjoy visiting

Colorado's wild horse areas to enjoy viewing wild horses and burros. AMBA has participated in public land reviews and decisions regarding both Piceance-East Douglas and the West Douglas Herd Areas.

7. The Cloud Foundation is dedicated to preventing the extinction of the Pryor Mountain Wild Horse herd and other wild horse herds on public lands, especially isolated herds with unique characteristics and historical significance. TCF was organized by Ginger Kathrens, its Executive Director. TCF sues on behalf of its supporters.

8. Front Range Equine Rescue (FRER) is a Colorado non-profit corporation established in 1997, which is dedicated to stopping the abuse and neglect of both domestic and wild horses. It is FRER's belief that ignorance is often the main cause for equine abuse rather than outright cruelty. A primary goal of FRER is to educate new, potential, and existing horse owners on basic horse care topics such as equine nutrition, first aid, farrier care, alternative therapies, and natural horsemanship training techniques. In addition, FRER has assisted hundreds of horses, including wild horses through direct rescue and its educational programs. While some horses are donated by their owners or are rescued when abandoned, many are rescued from livestock auctions to save them from slaughter. Once rescued, FRER then provides for the direct care and rehabilitation of these horses in need.

9. FRER represents its supporters' interests in protecting wild horses on the range and those who have been adopted and need to be rescued from improper adoptive homes. FRER does this by commenting on BLM actions to remove wild horses from their range and urging BLM and other responsible federal agencies to ensure that removals and any other federal actions taken with regard to wild horses are based on a legitimate need to

undertake those actions and that the horses' safety and welfare will be assured during those actions. FRER has had extensive experience preparing wild horses for adoption to private homes. FRER has found that when older wild horses are removed from the range, they have difficulty adjusting to being domesticated and therefore, there is a less of an adoption demand for these horses. TCF sues on behalf of its supporters.

10. Toni Moore and Barb Flores are residents of Colorado. Ms. Moore and Ms. Flores, and CWHBC and AMBA participated in the environmental review process for the actions challenged herein with respect to the Piceance-East Douglas herd and the West Douglas herd. These plaintiffs have the sincere desire to have BLM comply with NEPA, and not just "go through the motions," with its desired outcome already pre-determined, which violates the letter and spirit of NEPA. These individuals and organizations have been the primary advocates for and protectors of wild horses in this area. They have routinely and conscientiously commented on every proposed action by BLM affecting resources in the area, attended countless meetings where the public's input was sought and supposedly considered, kept in regular contact with local and federal agency officials and instituted administrative and federal litigation, all for the purpose of maintaining wild horses in the Piceance-East Douglas and West Douglas Herd Areas.

11. Don Moore is an equine and small animal veterinarian and has lived in or near the WRFO almost his entire life. Dr. Moore has a personal interest in viewing and enjoying wild horses in the WRRA. Having lived and worked in the area for decades, he is intimately familiar with the WRRA, its history and the presence of wild horses there. He frequently visits the public lands to see and enjoy the wild horses who live there.

12.    Ms. Moore, Ms. Flores and Ms. Kathrens and other supporters of the organizations they direct have witnessed other roundups of wild horses taken off the range and the horses' reactions to the loss of their freedom.   They often have the memories of those events return to haunt them.  They fear for the wellbeing and safety of the horses BLM plans to capture over the next few weeks.

13. Defendant BLM's actions pursuant to the DRs issued on August 1, 2006 will harm and injure the interests and aesthetic enjoyment of plaintiffs in the wild horses of the Piceance/East Douglas Herd Management Area and the West Douglas herd area by causing or threatening irreversible adverse effects to these horses.

## **DEFENDANTS**

14.    Dirk Kempthorne is the Secretary of the Department of the Interior. Pursuant to the WFHBA, he is responsible for the oversight of BLM's management of wild horses on the Nation's public lands, including the public lands of Colorado.

15.    Kathleen Clarke is the Director of the Bureau of Land Management and is responsible for implementing management decisions for wild horses in accordance with the WFHBA.

16.    Kent Walter is the Field Manager for the White River Field Office (WRRA) of BLM, and is responsible for managing the wild horses of the Piceance-East Douglas Herd Management Area and the West Douglas Herd Area in compliance with the Wild Free Roaming Horses and Burros Act and its implementing regulations.

### BLM's  MANAGEMENT OF WILD HORSES AND OTHER RESOURCES IN THE WRRA

17.    Although the WFHBA requires BLM to protect and manage wild horses where they were found at the passage of the Act in 1971 – and BLM has acknowledged that wild horses have lived in the West Douglas Herd Area (HA) since at least the 1880s -- BLM has slated wild horses in this area for total removal (zeroing out) in various land use planning documents issued pursuant to the Federal Land Policy Management Act (FLPMA), 43 U.S.C. §1701 et seq. since 1980.  BLM states that the increase in oil and gas activities in the area warrants complete eradication of a population of wild horses in this area.  As early as 1975, at least one BLM employee, and more recently, as evidenced by documents obtained under FOIA, counsel for BLM, have expressed concern that zeroing out a wild horse herd area was illegal.

18.    The 1980 land use planning document established that the area east of State Highway 139 would be the "preferred habitat" for the management of wild horses.  This area became known as the Piceance-East Douglas Herd Management Area (HMA).  At the time, the Piceance-East Douglas HMA was not slated for heavy oil/gas development, and the BLM determined that it was more convenient to manage for wild horses there.  A 1981 Grazing Management Plan and EIS carried forward these earlier decisions.

19.    In July, 1997, BLM issued its Revised Management Plan (RMP) for the WRRA.  In a 400 + page document, BLM devoted less than a full page to wild horses.  BLM states that it plans to manage for a population of zero to 50 horses in the West Douglas Herd Area for 0 to 10 years and the long term objective would be to remove all wild horses from this area.  The RMP called for BLM to manage a population of 95-140

8

horses on the Piceance-East Douglas HMA. 1997 RMP at 2-26. No discussion was devoted to the minimum population of wild horses needed to maintain genetic diversity, nor for whether BLM would seek to use fertility control on any of the wild horses there. The 1997 RMP did not discuss the interrelationship between the Piceance-East Douglas Herd Area and the West Douglas Herd Area.

20.  In large part because the 1997 RMP did not adequately address management of wild horses --- and BLM knew that its actions were subject to being set aside for this reason --- BLM began a process in 2002 of amending the RMP. The first revision to the 1997 RMP, which sought to address wild horse use of the area, was issued in 2004. The 2004 EA stated that without oil and gas stipulations --- agreements by oil and gas companies to preserve wild horse areas --- "critical wild horse habitat would be lost." The 2004 RMP Amendment was protested by numerous groups and was withdrawn by BLM.

21.  In 2005, BLM issued a second Amendment to its 1997 RMP. This amendment reaffirmed the decision BLM made in its 1997 RMP to zero out wild horses from the WDHA.

22.  Currently, the WRFO is gathering "scoping" comments on an Environmental Impact Statement (EIS)  on a proposed amendment to its 1997 Resource Management Plan (RMP). The plan amendment and associated EIS will address the potential impacts of significant increases in oil and gas development within the 1.5 million acre field office over the next 20 years. The scoping comment period has been extended until September 30, 2006 to ensure the public has sufficient opportunity to provide comments.

23.  BLM's notice about the scoping comment period for this Oil and Gas EIS provides, "The lifestyles and concerns of area residents, including the activities of grazing and hunting, will be recognized in the RMPA/EIS." While BLM's RMPA/EIS recognizes and will provide for how oil and gas development will impact grazing and hunting, BLM's current actions challenged herein with regard to wild horses threaten to eliminate wild horses from consideration as BLM analyzes oil and gas use in these areas.

24.  BLM states that a second public comment period will follow the release of the Draft Plan/EIS, currently anticipated to be in 2007 and that it anticipates a final decision record in 2008.  Unless BLM is restrained from undertaking the challenged activities herein, there will be no wild horses in the WDHA as early as this fall, 2006 and there could be no wild horses in the Piceance-East Douglas HMA by 2007.

25.  BLM, itself, as well as wild horse population experts have determined that to remain viable, a wild horse population must have a minimum of 150 individuals, which generally guarantees a Ne of 50, i.e. (those individuals who are actively passing their genes on to the next generation).

26.  After the roundups and removals of wild horses BLM could begin as early as September 17, 2006 --- unless restrained by this court --- wild horses will remain in such low numbers in Piceance-East Douglas Herd Management Area and the West Douglas Herd Area that their populations will not be viable.  Because of this, the wild horse populations in these areas will suffer irreparable genetic harm which will jeopardize their ability to survive.

27.  In 2005, the WRRA submitted its annual budget request for conducting roundups of wild horses during Fiscal Year 2006 in the Piceance-East Douglas herd

management area. When it submitted its request to the Washington office, the WRFO listed the number of wild horses it wanted to gather in Piceance-East Douglas as 175 and the number of wild horses it wanted to remove as 155, leaving 20 wild horses in the area. The WRRA has received its requested budget from BLM headquarters in Washington, D.C. to complete this roundup. On June 5, 2006, BLM issued for a 30 day comment period, its Environmental Assessment (EA), purporting to elicit comment on its contemplated roundup of these wild horses and whether it should administer PZP to the wild horse mares it planned to round up.

28.    In 2005, the WRRA submitted its annual budget request for conducting roundups of wild horses during Fiscal Year 2006 in the West Douglas Herd Area. When it submitted its request to the Washington office, the WRFO listed the number of wild horses it wanted to gather in the West Douglas Herd Area as 116 and the number of wild horses it wanted to remove as 110, leaving 5 wild horses in the area. The WRFO has received its requested budget from BLM headquarters in Washington, D.C. to complete this roundup.

29. On June 5, 2006, BLM issued for a 30 day comment period, its Environmental Assessment, purporting to elicit comment on its decision to roundup these wild horses.

30.    After receiving authorization to leave 20 wild horses in the Piceance-East Douglas Area and 6 wild horses in the West Douglas area after its roundups were completed, and after public opposition to these actions became known, BLM conducted an aerial survey of the wild horse populations in these areas. According to this survey, the Piceance-East Douglas area has counted 300 more wild horses than BLM thought it had originally and in West Douglas Creek, has counted 90 more wild horses than BLM

thought it had originally. Despite repeated requests from plaintiff representatives of CWHBC and AMBA to accompany BLM on these census missions, and to corroborate BLM's wild horse numbers, BLM has refused to allow plaintiffs' representatives to do so.

31. The actions of BLM in seeking, securing and using these funds to conduct the roundups in Piceance/East Douglas and West Douglas are in furtherance of the approach set forth in BLM's Instruction [M]emorandum, which BLM has admitted, "continues to serve as guidance to the field for the conduct of specific gather and removal decisions," Fund for Animals v. BLM, 2006 WL 2381022 (D.C.Cir. 2006).

32. Pursuant to the Instruction Memo, the WRRA Field Office submitted its request for funds to remove 155 wild horses from the Piceance-East Douglas Herd Management Area and 110 wild horses from the West Douglas Herd Area and these requests were approved. The White River Field Office will remove at least this number of wild horses.

33. When BLM conducts removals of wild horses from public lands, it continues its removal operations until at least the targeted number of animals are removed. BLM does not count the number of wild horses it has left in the area, after its removal actions are completed, nor in any way seeks to ensure that it has left a certain number of wild horses so as to ensure the genetic viability of the herd that remains.

34. The West Douglas Herd Area is denominated as such because it is the area that wild horses used as their historical range in 1971, at the passage of the Act.

35. The Piceance-East Douglas Herd Management Area, is a smaller subset of the original herd area wild horses used as their historical range in 1971. Typically, and in

this case, herd management areas are areas in which BLM has decided it will manage wild horses.  The decision to manage horses in areas smaller than their geographic range leads to the setting of smaller "appropriate management levels (AML)" of horses for these areas. The Piceance-East Douglas Herd Management Area does not represent the HA identified as being used by the horses when the Act was passed. It has been reduced to an arbitrary and capricious "preferred habitat" by BLM officials. Therefore, any wild horses "outside the HMA" are <u>inside</u> the HA, and under the law and according to the implementing regulations are not subject to removal for that reason.

36.  Since wild horses' herd areas are those areas that horses were historically occupying at the passage of the Act,  wild horses do not necessarily respect the artificial boundaries created by BLM when it establishes "herd management areas' and seeks to curtail wild horse presence in or travel within these artificially created "herd management areas."

37.  BLM often seeks to justify a roundup and removal of wild horses due to the fact that the horses have roamed outside of the herd management area.  The roundup and removal of wild horses from West Douglas and Piceance East Douglas are such removals.

38.  When BLM conducts its helicopter gathering of wild horses, the noise associated with this action, often forces wild horses out of their normal grazing areas, into areas outside of the herd management area boundaries.  When plaintiffs CWHBC and AMBA challenged a removal of wild horses from West Douglas in 2002, the Field Manager of the WRRA, James Cagney, stated in an internal memo, that BLM would conduct the roundup in any event and classify it as an "outside the HMA" roundup.

39.  If  BLM's planned roundups and removals of wild horses from Piceance-East Douglas and West Douglas, will add these wild horses to the current population of removed wild horses awaiting adoption to approximately 22,000 wild horses. This will be despite the Act's mandate that BLM only remove wild horses for which an adoption demand exists.

40.  Pursuant to the Instruction Memo, the WRFO is required to remove wild horses in the category of age 10 and older.  Pursuant to the "Burns" Rider, an appropriations Rider from December, 2004, wild horses age 10 and older removed from the public lands must be sold.  The predominant market for wild horses this age is for slaughter. The Burns Rider states that BLM is to sell wild horses 10 years of age and older without reservation, meaning that BLM may sell horses in this age category directly to slaughter.

41.  Upon realizing that they have been caught, wild horses have been known to jump or attempt to jump the six foot panels of corrals in which they are held and/or throw themselves against the panels out of fear or in a desperate attempt to escape the restrictions on their movement imposed by the corrals.  Some of these horses run head long into the barriers that restrict their escape, break their necks and die.  Others severely injure themselves in the process or are shot due to their injuries.  Still other trapped wild horses suffer from what is called "capture myopathy," in which they become depressed and despondent over being captured and/or being separated from their family members.

## IV. Porcine Zona Pellucida (PZP)

42.  Porcine Zona Pellucida (PZP) is an immunocontraceptive agent obtained from pigs.  It is administered using Freund's Complete Adjuvant (FCA), which has been

noted to cause a false positive tuberculosis test and can cause granulomas at the site of injection in a percentage of treated mares.

43. BLM has admitted that significant questions remain concerning the effects of PZP application at the population level as well as the effects on behavior, social structure, and harem dynamics of free-ranging animals. BLM has thus concluded that these questions are "best answered with field trials on wild horse herds under a research protocol," FTP at 2.

44. BLM has stated that ovarian function needs to be assessed for a large sample of mares treated for four years and that the effects of PZP and the adjuvant, FCA, on any clinical health problems (e.g. possible abscesses, ovarian damage) "need to be observed under tightly controlled conditions." BLM has also stated that PZP application may influence the seasonality of birth of foals.

45. Under BLM's FTP, the prime time of year in which to administer PZP is noted to be October through February. Pursuant to BLM's DR for Piceance-East Douglas, PZP will be administered to mares in this herd, for the first time ever. On information and belief, BLM has failed to secure prior approval to use this drug on this herd.

46. The last time BLM removed wild horses from Piceance-East Douglas was in 2002; at that time, BLM rounded up 101 horses including foals and yearlings. BLM returned 12 mares and 6 stallions to that area. BLM has waited four years to express its need to remove wild horses from the area. Its determination that it must place its decision to remove wild horses in "full force and effect," meaning that it has an urgent need to remove these wild horses, is pretextual.

## STATUTORY AND REGULATORY  BACKGROUND GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

### I.  The Wild Free-Roaming Horses and Burros Act

47.  Through the 1971 Wild Free-Roaming Horses and Burros Act (WFHBA),

16 U.S.C. §§ 1331 et seq., Congress found and declared that, "wild free-roaming horses

and burros are living symbols of the historic and pioneer spirit of the West; that they

contribute to the diversity of life forms within the Nation and enrich the lives of the

American people; and that these horses and burros are fast disappearing from the

American scene."  Upon finding this, Congress stated that its policy was that

 "wild free-roaming horses and burros shall be protected from capture, branding,

harassment, or death, and to accomplish this they are to be considered in the area where

presently found as an integral part of the natural system of public lands," 16 U.S.C. §

1331.

48.  BLM and the FS have exclusive authority under the WFHBA for the

protection of wild horses and burros on the public lands administered by those agencies,

16 U.S.C. § 1331(a).  The WFHBA requires that BLM's and FS's management activities

be at "the minimal feasible level," Id. According to BLM's own regulations, BLM must

protect wild horses and burros from unauthorized capture, branding, harassment or death

and provide these animals with humane care and treatment," 43 C.F.R.§ 4700.0-2.

49.  Under the WFHBA, wild horses are "to be considered in the area" where they

were found in 1971 "as an integral part of the natural system of the public lands," 16

U.S.C. § 1331.  These legally protected areas are known as "herd areas,"  (HAs) and are

defined as "the geographic area identified as having been used by a herd as its habitat in 1971," 43 C.F.R. § 4710.3-1.

50.  Under the WFHBA, "range," means "the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands," 16 U.S.C. §1332 (c).

51.  The Act requires the Secretary to "protect and manage wild free-roaming horses and burros as components of the public lands. . .The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands,"  16 U.S.C. §1333(a). The Act provides that, "The Secretary shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands.  The purpose of such inventory shall be to: make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals, determine appropriate management levels and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels), 16 U.S.C. § 1333 (b)(1). The Act also provides that, "Where the Secretary determines. . . that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels," 16 U.S.C. §1333(b)(2).

52.  In the 1971 WHBA, "Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people…" 16 U.S.C. § 1331.

53.  In the Senate Committee report accompanying the bill that became law the Senate noted, "The committee wishes to emphasize that the management of the wild free-roaming horses and burros be kept to a minimum both from the aspect of reducing costs of such a program as well as to deter the possibility of "zoo like" developments," S. Rep. 92-242, 92nd Cong., 1st Sess. 1971 at 2152.  An intensive management program of breeding, branding, and physical care would destroy the very concept that this legislation seeks to preserve….leaving the animals alone to fend for themselves and placing primary emphasis on protecting the animals from continued slaughter and harassment by man," Id.

## II. National Environmental Policy Act

54.  Under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., any major federal actions that significantly affects the quality of the human environment requires the preparation of an environmental impact statement. (EIS), NEPA §102(2) (C).  The language and spirit of NEPA is aimed at ensuring that an agency's single-minded approach to a proposed action is tempered by consideration of a reasonable range of alternatives, including those with fewer adverse environmental impacts than the proposed action.

55.  Agencies may decide instead of preparing an EIS, to prepare an environmental analysis (EA) first.  An EA serves three purposes: it assists in agency

decision-making on whether to prepare an EIS or Finding of No Significant Impact

(FONSI); it independently ensures compliance with NEPA even when no EIS is required;

and it facilitates the preparation of an EIS if one is required.  40 C.F.R. § 1508.9(a).

56.   NEPA requires BLM to analyze in an EA alternatives which involve

unresolved conflicts concerning alternative uses of available resources even when an EIS

is not required.  NEPA §102(2) (C)(iii).

57.  Although an EA is a "concise, public document," it must include a discussion

of the need for the proposal, alternatives, environmental impacts of the proposed action

and the alternatives and a listing of the persons and agencies consulted.  40 C.F.R. §§

1508.9(a), 1508.9(b).

58.  An EA's FONSI is only considered adequate if the agency took a "hard look"

at the problem, the agency identified the relevant areas of environmental concern, the

agency made a convincing case that the environmental impacts were insignificant as to

the problems studied and identified; and if there were significant impacts, the agency

convincingly established changes that reduced the impacts to a minimum.

59.  The Council on Environmental Quality ("CEQ"), the agency responsible for

implementing NEPA, and BLM's regulations under NEPA, requires that BLM analyze

the direct, indirect and cumulative impacts on the environment under the proposed action

and each alternative to determine if the impacts are significant.  BLM's regulations

require that this analysis be based on the best available information and should be

objective, i.e. should not reflect subjective value judgments.

60.  An EA may contain mitigation measures to avoid significant impacts that

would otherwise require the preparation of an EIS.  BLM regulations require that an EA

must identify and analyze mitigation measures which may be taken to avoid or reduce environmental harm.

61.  An EA serves an important statutory purpose beyond being an initial step toward the preparation of an EIS or a FONSI.  Independent of this requirement, an EA must discuss, in adequate detail, a reasonable range of alternatives.

62.  An agency must take a "hard look" at the alternatives and the environmental impacts of each.  An agency must consider a full range of alternatives that cover a full spectrum of possibilities and demonstrate reasoned decision-making.  It must also give a reasoned explanation for rejecting each alternative.

63. BLM regulations also require that a No-Action alternative be analyzed at the same level of detail as the proposed action.

### III. FEDERAL LAND POLICY MANAGEMENT ACT

64.  BLM must manage public lands under concepts of multiple use and sustained yield pursuant to the Federal Land Policy Management Act (FLPMA), 43 U.S.C. §1701 et seq.  FLPMA requires that the public lands planning process be accomplished through land use plans, FLPMA § 202(a).  FLPMA recognizes, however, that a land use plan does not trump the statutory command of other laws, such as the WFHBA, which requires BLM to consider wild horses as an integral part of the public lands.  FLPMA § 102(b)

65. FLPMA thus requires the BLM to manage the public lands for many purposes and for many members of the public.

### CLAIMS FOR RELIEF

### COUNT ONE
### (Violations of NEPA, NEPA Regulations and the APA)

66.  Plaintiffs incorporate by reference here the allegations of the preceding

paragraphs of this Complaint.

67.  BLM failed to prepare an EIS for its proposed actions in both Piceance-East Douglas and West Douglas even though they each, separately, and cumulatively, constitute a major federal action that will significantly affect the quality of the human environment.

68.  BLM's EA failed to provide sufficient information to decision-makers and the public, in violation of NEPA.

69.  BLM's EA and DR failed to take a hard look at the environmental consequences of its actions.

70. BLM'S EA and DR did not properly analyze nor address alternatives to administering PZP on the Piceance-East Douglas herd, including but not limited to allowing the herd to regulate its population itself or via natural controls on population.

71.  BLM's EA and DR did not properly analyze nor address alternatives to the removal of the wild horses.

72.  BLM's EA and DR did not properly analyze nor address significant gaps and uncertainty in the scientific data relating to the effects of PZP on  the individual horses and the population as a whole, including, but not limited to, causes of site injection lumps and/or abscesses, whether the drug would cause out of season births which could lead to deaths of  foals born out of season, whether infertility from the drug could last for years longer than anticipated, whether administration of the drug would cause the population to drop to levels which threaten the herd's genetic diversity and ability to survive catastrophic events,  whether administration of the drug disrupted social and behavior

activity of the bands and herd and/or whether additional funding would be needed for monitoring those horses to whom PZP had been administered.

73. BLM's EA and DR did not properly analyze nor address the cumulative impacts of the past and future planned administration of PZP with the past and future planned removals of wild horses from the range.

74. BLM's EA and DR did not properly disclose, address and meaningfully respond to contrary scientific opinion and evidence that BLM had itself gathered and that was presented to it by outside researchers, including but not limited to other scientific studies which contravene and do not support the selected alternative.

75. BLM's EAs and DRs are improperly tiered to the 1997 RMP.

76. In sum, Defendant BLM's EAs and DRs are major federal actions approved contrary to NEPA, 42 U.S.C. §4332(2)(C), and its implementing regulations. BLM failed to take the requisite hard look at the foreseeable consequences of their actions. BLM failures to comply fully with NEPA and its regulations were arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, thereby subject to reversal under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (APA).

## COUNT TWO
**(Violations of the WFHBA, WFHBA Regulations and APA)**

77.  Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

78.  BLM is not authorized to "zero out" a herd area, either directly by removing all wild horses present, or indirectly by leaving wild horses in such few numbers that they are genetically unviable.

79.  BLM's plans to zero out the West Douglas herd and to remove a significant percentage of the wild horse population of the Piceance-East Douglas Herd Management Area, leaving wild horses in numbers so few that their genetic viability is threatened, and its reliance on its 1997 RMP to take these actions violates the WFHBA.

80.  These actions  are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law,  and are thereby subject to reversal under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (APA).

## COUNT THREE

**(Violations of FLPMA, the WFHBA and the APA)**

81.  BLM has refused to acknowledge the historical use of the wild horses living in the Piceance-East Douglas HMA and the West Douglas HA.

82.  This refusal has limited the horses' range to those areas where BLM has determined it is convenient to manage them.

83. BLM is not authorized to "zero out" a herd area, either directly by removing all wild horses present, or indirectly by leaving wild horses in such few numbers that they are genetically unviable.

84. BLM's reliance on the 1997 RMP to eradicate wild horses from the West Douglas HA and to remove wild horses from the Piceance-East Douglas HMA violates FLPMA and the WFHBA.

85. These actions are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, and are thereby subject to reversal under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (APA).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter judgment in favor of plaintiffs and grant the following relief:

A. Issue a declaratory judgment that:

1. Defendant BLM's EAs and DRs for the West Douglas HA and Piceance-East Douglas Herd Area violate the National Environmental Policy Act, its implementing regulations, and the APA;

2. Defendant BLM's EA and associated DRs and the actions planned therein violate the Wild Free Roaming Horses and Burros Act, and its implementing regulations, and are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, contrary to the APA, 5 U.S.C. §706(2)(A)-(F).

3. Defendant BLM's EA and associated DRs and the actions planned therein violate FLPMA, and its implementing regulations, and are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, contrary to the APA, 5 U.S.C. §706(2)(A)-(F).

4. Defendant BLM's actions in refusing to acknowledge the legal right of the West Douglas and Piceance-East Douglas horses to lands they historically used at the passage of the Wild Free-Roaming Horses and Burros Act, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, contrary to the APA, 5 U.S.C. §706(2) (A)-(F).

B. Pursuant to the APA, 5 U.S.C. §706(2)(A), set aside and vacate BLM's EAs and DRs and enjoin any implementation of actions approved pursuant to these Decision Records.

C. Award plaintiffs their costs and expenses (including reasonable attorney, expert witness and consultant fees); and

D. Award plaintiffs such other relief as the Court deems appropriate.

DATED: September 15, 2006                    Respectfully submitted,

*Valerie J Stanley*
Valerie J. Stanley, Esquire
D.C. Bar No. 384882
329 Prince George Street
Laurel, MD 20707
Phone: (301) 549-3126
Fax: (301) 549-3228

[Verification Attached]

## VERIFICATION

Pursuant To 28 U.S.C. § 1746, I swear that the foregoing is true and correct.

Toni Hutcheson Moore

Executed this _____14th_____ day of September, 2006.