# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **COLORADO WILD HORSE AND BURRO COALITION, <u>et</u> <u>al</u>.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | **Civil No. 06CV1609 (RMC)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **DIRK KEMPTHORNE, <u>et</u> <u>al</u>.,** | ) | |
| | ) | |
| | ) | |
| **Defendants** | ) | |
| —————————————————— | ) | |

## <u>PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER</u>

Plaintiffs hereby move this Honorable Court for an order restraining defendants BLM, and all those acting in concert with them, from taking any actions pursuant to the Environmental Assessments and Records of Decision issued with regard to the Piceance East Douglas Herd of wild horses and the West Douglas Herd of wild horses. Specifically, plaintiffs move this Court to order defendants, and all those acting in concert with them, to refrain from rounding up wild horses from these herds, adopting, selling or giving away any wild horses already rounded up from these herds, and order defendants not to administer PZP to wild horse mares from the Piceance East Douglas herd until the Court issues an order resolving these matters.

Plaintiffs represent that they have spoken to Paul Lall, Esquire and Kevin Larsen, Esquire of the

Department of Justice to advise them that they would be seeking a temporary restraining order.


/s/ Valerie J. Stanley

Valerie J. Stanley
 D.C. Bar No. 384882
 329 Prince George Street
Laurel, MD 20707
(301) 549-3126


Dated: September 21, 2006

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


| | |
|---|---|
| **COLORADO WILD HORSE AND BURRO COALITION, et al.,** | ) <br> ) <br> ) |
| **Plaintiffs** | ) <br> ) |
| | ) **Civil No. 06CV1609 (RMC)** |
| **v.** | ) <br> ) <br> ) <br> ) |
| **DIRK KEMPTHORNE, et al.,** | ) <br> ) <br> ) |
| **Defendants** | ) <br> ) |
| _____ | ) |


**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**TEMPORARY RESTRAINING ORDER**

In accordance with Fed. Rule Civ. Proc. 65(b), plaintiffs hereby move this Court to issue an order temporarily restraining defendants from rounding up and removing wild horses from adjoining areas of public lands in Colorado, and preparing them for adoption and adopting or selling them to third parties until the Court can determine the issues raised in the Verified Complaint and this Memorandum, on the merits. Because BLM intends that these roundups will remove all wild horses from one area and the vast majority of wild horses from another area, these actions will cause plaintiffs irreparable harm.

As plaintiffs will explain below, defendant BLM's actions with regard to these herds represent a flagrant and very serious abuse of the process required by the National Environmental Policy Act (NEPA), 42 U.S.C. §4321 et seq., the public land planning process and a blatant disregard for Congressional intent as expressed in the Wild Free Roaming Horses and Burros Act

(WFHBA), 16 U.S.C. §1331 et seq.

In addition, as demonstrated through the Verified Complaint filed in this action, as well as the Declarations of Don Moore, Barbara Flores, Toni Moore, Ginger Kathrens and Hilary Wood, attached hereto and incorporated by reference, defendants' actions will cause irreparable injury to these individual plaintiffs and the plaintiff organizations and the members they represent, unless restrained by this court.

At the time plaintiffs filed their Complaint, they were under the impression that the White River Field Office (WRFO) of the BLM, which are one and the same as the White River Resource Area, would not be immediately carrying out its planned removal of all of the West Douglas horse herd, but were solely planning on immediately undertaking the Piceance-East Douglas roundup of horses and associated darting of wild horse mares to be returned to the area with Porcine Zona Pellucida (PZP), an experimental immunocontraceptive drug. Plaintiffs' understanding at the time of the filing of the complaint was that the roundup of the Piceance-East Douglas horses was delayed due to extreme weather in the area, which normally makes operation of a helicopter dangerous for the pilot, and movement of horse trailers to remove the captured horses impossible due to muddy conditions. On several occasions prior to the filing of this motion, the undersigned attempted to learn from counsel for BLM what the status was of the roundup operation for Piceance-East Douglas. Prior to Wednesday evening, September 20, 2006, the undersigned was advised that BLM was moving forward, however, the undersigned was not able to learn any more specifics of what actions were encompassed by that term, how many horses had been rounded up, whether any had been adopted or sold or whether any had received PZP.

On the evening of September 20, 2006, the undersigned was advised that the Piceance-East Douglas roundup was expected to be completed, weather permitting, by Friday, September 22nd, and that the West Douglas roundup would begin on Saturday, September 23rd and was expected to be completed in 3 to 7 days, weather permitting. Plaintiffs have been provided with no information

concerning the number of wild horses removed from Piceance-East Douglas, whether any wild horses have been injured or lost or have died and whether any wild horse mares and their foals have been separated. On information and belief, plaintiffs have been advised by a local resident that BLM has rounded up very young foals, who have since become orphans due to separation from their dams.

### I.  STANDARDS FOR INJUNCTIVE RELIEF

In order to succeed on a motion for preliminary injunction, plaintiffs carry the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that there will be no substantial injury to other interested parties, and (4) that the public interest would be served by the injunction; see also Born Free USA v. Norton, 2003 WL 21871640 at *3; Wash. Metro. Area Transit Comm'n v. Holiday Tours, 559 F.2d 841, 842-44 (D.C.Cir.1977). No one factor is determinative. Rather, "[t]hese factors interrelate on a sliding scale and must be balanced against each other." Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C.Cir.1998); see also CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C.Cir.1995) ("If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."). A court may accept a modified showing of the substantial likelihood of success on the merits, and grant injunctive relief upon a lesser showing of a "substantial case on the merits," where "the other three factors strongly favor interim relief." Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d at 843; cf. Cuomo v. United States Regulatory Comm'n, 772 F.2d 972, 974 (D.C.Cir.1985). Conversely, where a party can demonstrate "probable success on the merits," the party need only establish a "possibility of irreparable injury." See Wash. Metro. Area Transit Comm'n v. Holiday Tours, 559 F.2d at 841; see also Cuomo v. United States Regulatory Comm'n, 772 F.2d at 974.

### II.  FACTS

The Piceance-East Douglas Herd Management Area and the West Douglas Herd Area are

located in the White River Resource Area; they are separated by Highway 139 and the only arguable barrier to migrating wild horses between each of these areas is a fence that stretches from the southern most boundary of both wild horse herd areas along both sides of Highway 139, north of Highway 64..  This fence does not always deter wild horses traveling back and forth between these areas, nor does it deter other wildlife from migrating between these areas.

In 2005, the WRRA submitted its annual budget request for conducting roundups of wild horses during Fiscal Year 2006 in the Piceance-East Douglas Herd Management Area.  When it submitted its request to the Washington office, the WRRA listed the number of wild horses it wanted to gather in Piceance/East Douglas as 175 and the number of wild horses it wanted to remove as 155, leaving 20 wild horses to round up and release in the area. See Exhibit 1. The WRRA has received its requested budget from BLM headquarters in Washington, D.C. to complete this roundup and this roundup appears in the list of roundups to be conducted in 2006. On June 5, 2006, BLM issued for a 30 day comment period, its Environmental Assessment (EA), purporting to elicit comment on whether it should  round up these wild horses and whether it should administer PZP to the wild horse mares it planned to round up.

In 2005, the WRRA submitted its annual budget request for conducting roundups of wild horses during Fiscal Year 2006 in the West Douglas Herd Area.  When it submitted its request to the Washington office, the WRRA listed the number of wild horses it wanted to gather in the West Douglas Herd Area as 116 and the number of wild horses it wanted to remove as 110, leaving 5 wild horses in the area.[1] The 2006 Gather Schedule does not measure how many wild horses are to be left after a roundup, only the numbers that are to be rounded up and removed. The WRRA has received its requested budget from BLM headquarters in Washington, D.C. to complete this roundup. On June 5, 2006, BLM issued for a 30 day comment period, its Environmental Assessment, purporting

---

[1]  For unknown reasons, there appear to be at least 2 versions of the 2006 Gather Schedule.  The one attached hereto as Exhibit 1, provides that for the West Douglas Herd Area, BLM plans on rounding up 140 wild horses, and removing 140, leaving no wild horses in the West Douglas Herd Area.  The version quoted in the Complaint lists that 5 wild horses will be left in this area.

to elicit comment on whether it should roundup these wild horses.

After receiving authorization to leave 20 wild horses in the Piceance East Douglas Area and either 0 or 5 wild horses in the West Douglas area after its roundups were completed, and after public opposition to these actions became known, BLM conducted an aerial survey of the wild horse populations in these areas. According to this survey, the Piceance East Douglas area has 300 more wild horses than BLM thought it had originally and the West Douglas Creek area has 90 more wild horses than BLM thought it had originally. Verified Complaint ¶29. Despite repeated requests from plaintiff representatives of CWHBC and AMBA over the years to accompany BLM on these census missions, and to corroborate BLM's wild horse numbers, BLM has refused to allow plaintiffs' representatives to do so. Id. BLM's refusals to allow members of the public, including these plaintiffs, to attempt to verify the numbers of wild horses that BLM reports as living on public lands, in conjunction with plaintiffs' failures to see wild horses in these areas on their most recent trips there, Flores Decl., ¶ 15, 17 (regarding West Douglas); ¶ 2 (regarding Piceance); Kathrens Decl. At ¶ 3, Don Moore Decl. At ¶ 2), strongly suggests that, if not demonstrates, that there are in fact, few wild horses living in these areas and that they are disappearing. These facts corroborate the irreparable harm plaintiffs now face and will face in the future. See Declarations of Don Moore (Exhibit 2) at ¶ 14; Barb Flores, on behalf of AMBA (Exhibit 3) at ¶ 1; Toni Moore, on behalf of CWHBC (Exhibit 4) at ¶ 11; Ginger Kathrens, on behalf of The Cloud Foundation (Exhibit 5) at ¶ 3; and Hilary Wood, on behalf of Front Range Equine Rescue (Exhibit 6) at ¶ 7.

The actions of BLM in seeking, securing and using these funds to conduct the roundups in Piceance/East Douglas and West Douglas are in furtherance of the approach set forth in BLM's Instruction [M]emorandum, which BLM has admitted, "continues to serve as guidance to the field for the conduct of specific gather and removal decisions," Fund for Animals v. BLM, 2006 WL 2381022 (D.C.Cir. 2006), Verified Complaint ¶30. Pursuant to the Instruction Memo, the WRRA Field Office submitted its request for funds to remove 155 wild horses from the Piceance East

Douglas Herd Management Area and 110 wild horses from the West Douglas Herd Area and these requests were approved. The WRRA Field Office thus plans to remove at least this number of wild horses.

When BLM conducts removals of wild horses from public lands, it continues its removal operations until at least the targeted number of animals are removed. BLM does not count the number of wild horses it has left in the area, after its removal actions are completed, or in any way seek to ensure that it has left a certain number of wild horses so as to ensure the genetic viability of the herd that remains. Verified Complaint ¶ 30.

The Colorado Wild Horse and Burro Coalition (CWHBC), Front Range Equine Rescue (FRER), the American Mustang and Burro Association. (AMBA) and The Cloud Foundation (TCF). are organizations comprised of Colorado residents and others who enjoy viewing wild horses living free in Colorado and who are concerned by BLM's intent to eradicate wild horses from the state, as expressed in both the EA issued for the roundup of the West Douglas Creek wild horses and the EA issued simultaneously for the roundup of the nearby Piceance-East Douglas wild horse herd management area. Plaintiff Don Moore has lived in the area almost his entire adult life and has seen hundreds of wild horses in the area before and at passage of the WFHBA. See Verified Complaint, ¶¶ 5-13 [2] In addition, as a veterinarian, Dr. Moore explains that Dr. Gus Cothran, a wild horse geneticist, has determined that the West Douglas Creek horses have one of the lowest genetic variability he has seen in American wild horse herds, Moore Decl. at ¶ 4. Based on this information, Dr. Moore states that "if a significant number of wild horses are removed from the West Douglas Creek Herd at this point in time, the American public will be losing a significant historic and cultural component of western Colorado.

---

[2]   Additional facts pertinent to each of plaintiffs' legal claims are set forth below.

### III.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON THE MERITS OF THIS ACTION

#### The Wild Free-Roaming Horses and Burros Act

Through the 1971 Wild Free-Roaming Horses and Burros Act (WFHBA), 16 U.S.C. §§ 1331 et seq., Congress found and declared that, "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene."  Upon finding this, Congress stated that its policy was that  "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death, and to accomplish this they are to be considered in the area where presently found as an integral part of the natural system of public lands," 16 U.S.C. § 1331 (emphasis supplied)

The Department of the Interior, Bureau of Land Management (BLM) and the United States Department of Agriculture, through the United States Forest Service (USFS) have exclusive authority under the WFHBA for the protection of wild horses and burros on the public lands administered by those agencies.  16 U.S.C. § 1331(a).  The WFHBA requires that BLM's management activities be at "the minimal feasible level," Id. According to BLM's own regulations, BLM must protect wild horses and burros from unauthorized capture, branding, harassment or death and provide these animals with humane care and treatment," 43 C.F.R.§ 4700.0-2.

Under the WFHBA, wild horses are "to be considered in the area" where they were found in 1971 "as an integral part of the natural system of the public lands," 16 U.S.C. § 1331. These legally protected areas are known as "herd areas,"  (HAs) and are defined as "the geographic area identified as having been used by a herd as its habitat in 1971," 43 C.F.R. § 4710.3-1. The West Douglas Area is a Herd Area; it has been identified as having been used by a herd as its habitat in

7

1971, at the passage of the WFHBA.  Wild horses are protected in this area by law, and BLM's actions to rid this area of wild horses pursuant to a land use plan, no matter how recent, violate FLPMA, 43 U.S.C. § 1732 (a) ("The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans . . .except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law, it shall be managed in accordance with such law.").  In addition, BLM's own regulations, 43 C.F.R. §4700.06 ("Wild horses and burros shall be considered comparably with other resource values in the formulation of land use plans.")

Under the WFHBA, "range," means "the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands," 16 U.S.C. §1332 (c).

The Act requires the Secretary to "protect and manage wild free-roaming horses and burros as components of the public lands. . .The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands,"  16 U.S.C. §1333(a). The Act provides that, "The Secretary shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands.  The purpose of such inventory shall be to: make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals, determine appropriate management levels and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels), 16 U.S.C. § 1333 (b)(1). The Act also provides that, "Where the Secretary determines. . . that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels," 16 U.S.C. §1333(b)(2).  When read together,

8

these provisions do not authorize BLM to cut thousands of acres from wild horses' range, to make them into smaller subsets of acreage, i.e. "herd management areas." While BLM appears authorized to create Herd Management Areas under its own regulations, those same regulations provide that, "[M]anagement of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas, 43 C.F.R. § 4710.4."Herd area" is defined by regulation as "the geographic area identified as having been used by a herd as its habitat in 1971," 43 C.F.R. §4710.4. If BLM is limiting wild horses' and burros' distribution to herd management areas instead, it is technically in violation of its own regulations. In creating this Herd Management Area, BLM has restricted wild horses from using areas that were historically their herd area.

In the 1971 WHBA, "Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people…" 16 U.S.C. § 1331.

In the Senate Committee report accompanying the bill that became law, the Senate noted, "The committee wishes to emphasize that the management of the wild free-roaming horses and burros be kept to a minimum both from the aspect of reducing costs of such a program as well as to deter the possibility of "zoolike" developments. An intensive management program of breeding, branding, and physical care would destroy the very concept that this legislation seeks to preserve… .leaving the animals alone to fend for themselves and placing primary emphasis on protecting the animals from continued slaughter and harassment by man."

The WFHBA allows BLM to remove "excess" wild horses from the range so as to achieve "appropriate management levels," however, nothing in the Act authorizes BLM to cut thousands of acres from the range on which wild horses have historically lived, restrict them to artificial "herd management areas," and so limit their population by deciding that these smaller areas can only support an accompanying restricted number of wild horses. BLM did exactly this with respect to the Piceance-East Douglas Herd Management Area and its planned actions of removing wild horses are

9

in furtherance of this illegal action.  BLM also designated the Herd Area boundary for the West

Douglas Creek horses to coincide with livestock allotment boundaries without considering seasonal

migration patterns of the horses.

Under the WFHBA, BLM is also restricted in removing wild horses for which it determines

there is an adoption demand.  Currently, BLM has approximately 22,000 wild horses it has removed

from the range, and which remain in holding, awaiting adoption.  Wild horses who can adjust to

captivity are enjoyed by the people who are able to adopt them and BLM has been successful in

placing thousands of wild horses removed from the range since passage of the WFHBA.

Unfortunately, many of these captured wild horses have also been sold to slaughter and the BLM has

been enjoined from knowingly transferring captured wild horses for this purpose.  See Animal

Protection Institute v. Hodel, 860 F. 2d 920 (9th Cir. 1988).

Over the past several years, BLM has decided to reduce the total number of wild horses at the

national, state and local geographic areas.  BLM responded by establishing a "Restoration" Strategy

in 2002, which called for the removal of half of the wild horse and burro population of the United

States over the course of the next five years.  This Circuit reviewed this strategy in Fund for Animals

v. Kempthorne,  2006 WL 2381022 (D.C. Cir. 2006).  While this Circuit held that one of the

directives in that case, the Memorandum, did not constitute final agency action, and was thus not

reviewable, the government admitted before that Court that the memorandum was still in effect and

was still providing guidance to local offices on removing wild horses from the wild horse ranges in

their jurisdictions. Id. At 8. .

At the end of 2004, a rider to the Appropriations Bill for the Department of Interior was

inserted by Senator Conrad Burns of Montana.  That rider, which became law, provided that BLM

was required to sell directly, "without reservation" wild horses removed from the public lands who

were 10 years of age or older, or who had been offered for adoption three times.  As part of the

guidance from the Memorandum referred to in the Fund for Animals case comes the requirement

that BLM remove, as its second preferred age category of wild horses, those horses that are 10 years of age and older.  Thus, BLM will not place these animals for adoption, but is authorized to immediately subject to sale to buyers that will sell them to slaughter.  See Declaration of Hilary Wood at ¶ 3, noting that even wild horses over age 1 ½  to 2 years have a much more difficult time adjusting to captivity.

### The National Environmental Policy Act

Under NEPA, an agency must prepare an EIS for any proposed major federal action "significantly affecting" the quality of the human environment. 42 U.S.C. §4332(C). To determine whether an action "significantly affects" the environment, the agency must consider several factors, among them the degree to which the effects on the quality of the human environment are likely to be highly controversial or highly uncertain, the degree to which the action may establish a precedent for future actions, the degree to which the action may cause loss of significant scientific, cultural, or historical resources, and the degree to which the action may adversely affect an endangered or threatened species. 40 C.F.R. §1508.27(b).

If it is not clear whether an EIS is required, the agency must draw up an EA, defined as a "concise public document" that sets forth the evidence and analysis for proceeding with an EIS. Id. §§ 1501.4(b), 1508.9. If, based on the EA, the agency determines that an EIS is warranted, it must proceed with the EIS. Id. § 1501.4(d). If not, the agency must issue a FONSI explaining why the proposed action would not significantly affect the environment. Id. §§ 1501.4(e), 1508.13. The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." City of Olmsted Falls, Ohio v. FAA, 292 F. 3d 261, 269 (D.C. Cir. 2002) . In reviewing an agency's FONSI, courts in this circuit apply a four-part test that looks to see if the agency (1) accurately identified the relevant environmental concern, (2) took a "hard look" at the problem in preparing the EA, (3) is able to make a convincing case for its FONSI, and (4) if there was an impact of true significance,

11

convincingly established that changes in the project sufficiently reduced it to a minimum. Grand Canyon Trust v. FAA, 290 F.2d 339, 341 (D.C. Cir. 2002); Humane Society v. Hodel, 840 F.2d 45, 62 (D.C. Cir. 1988).

> A.    BLM Has Already Committed Resources to Engage in these Roundups in Violation of NEPA and the EAs and Decision Records Challenged Evidence BLM's Single Minded Approach to Eradicating the West Douglas Herd and Reducing the Piceance East Douglas Herd, Preventing a "Hard Look" at these Issues

Neither the EA issued for the Piceance-East Douglas roundup nor the EA issued for the West Douglas roundup disclose that the agency has already made an irretrievable commitment of resources to conduct these roundups, in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq..See Exhibit 7 (East Piceance EA), Exhibit 8 (West Douglas). NEPA requires that before committing resources to engage in activities, it must analyze the environmental effect of those activities. The language and spirit of NEPA is aimed at ensuring that an agency's single-minded approach to a proposed action is tempered by consideration of a reasonable range of alternatives, including those with fewer adverse environmental impacts than the proposed action. A predecisional commitment of resources prohibits the "hard look" that agencies must engage in when they consider the environmental consequences of their proposed actions. This comprehensive "hard look" mandated by Congress and required by the statute must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made. BLM's decision to amend the 1997 RMP was made to attempt to provide a more compelling justification for its decision to zero out the West Douglas Herd Area, See Exhibit 9 (2001 letter from James Cagney to Senator Wayne Allard). As the Eighth Circuit observed in Environmental Defense Fund v. Corps of Eng'rs of the U.S. Army, 470 F.2d 289, 295 (8th Cir.1972)

[t]he unequivocal intent of NEPA is to require agencies to consider and give effect to the

environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives.

Id. at 298.

BLM's irretrievable commitment of resources is evidenced by the 2006 Roundup Schedule, completed in October, 2005, which calls for both the West Douglas and the Piceance-East Douglas roundups to take place in September, 2006. BLM's issuance of these EAs, which call for the actions BLM has already committed to, and its solicitation for the public to "comment" on its already planned actions, makes a mockery of NEPA.

> **B.     BLM Must Consider its Management of Both Wild Horse Areas Together in One Environmental Document as the Two Areas are Close Geographically and the Agency Has Considered Management of One Area Related to Management of the Other**

In the 2005 West Douglas Herd Area Amendment to the White River Resource Management Plan, Kent Walter justifies the plan amendment's continued approach of zeroing out the West Douglas Herd Area of wild horses by stating that wild horses can be managed in the Piceance/East Douglas Herd Management Area. He explains,

> The Piceance/East Douglas Herd Management Area, which lies adjacent to the West Douglas Herd Area but is separated by a highway and fences, was created because it is the most suitable area where a self sustaining herd of wild horses could be managed in a manner that would result in a thriving natural ecological balance. The Land Use Plan specifies 95 to 140 animals as the initial herd size, but identifies a process for revision based on an analysis of long term grazing use by all   sources, in conjunction with climate studies and rangeland trend. Our current objective of 165 animals (in the Piceance/East Douglas Herd Management Area) is based on an analysis of long term grazing use by all sources, in conjunction with climate studies and rangeland trend.

DR at 2 (explanatory parenthetical added).

In that DR/FONSI, Mr. Walter then states,

> Furthermore, as a result of this analysis, I concur with the existing 1997 White River Resource Area Management Plan that the Piceance East Douglas Herd Management Area is the most suitable area to manage wild horses within the White River Resource Area and the decision to remove the wild horses from the West Douglas Herd Area still remains the most appropriate management decision.

DR at 2 (emphasis added).

It is impossible to square these references to the Piceance-East Douglas HMA as being the "most suitable" area to manage wild horses within the White River Resource Area and that wild horses could be managed there in a manner "that would result in a thriving natural ecological balance," with the current Gather EA, which harps on the perceived threats to a thriving natural ecological balance caused by wild horses. It appears that when the agency is considering eliminating wild horses from the West Douglas herd area, it states that the Piceance-East Douglas area is more preferred, except when the agency is considering removing horses from the Piceance-East Douglas Herd Management Area.  As Judge Urbina of this Court held, areas in geographic proximity to each other, should be considered together in one environmental document. "If an agency is involved in several actions which, cumulatively, have a significant impact on the environment, then these actions should be considered in the same environmental document." Fund for Animals v. Clark, 27 F. Supp. 2d 8, 13 (D.D.C. 1998) (citing 40 C.F.R. §1508.25(a)(2). Further, an agency should consider actions having common timing or geography in the same environmental document. 40 C.F.R. §1508.25(a) "Importantly, an agency may not segment actions to unreasonably restrict the scope of the environmental review process." Fund for Animals v. Clark at 13 (citing Found. of Econ. Trends v. Heckler, 756 F.2d 143, 159 (D.C. Cir. 1985). The agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." Grand Canyon Trust, 290 F.3d 339 at 342.

Here, not only does BLM's issuance of two separate Assessments for these areas, violate NEPA's prohibition on segmentation of related projects, but it has also worked a hardship on plaintiffs who were forced to prepare comments to both decisions that were due on the same day. See Declaration of Toni Moore at ¶ 9.

14

C.    **The Effects of Increased Oil and Gas Development within the Piceance-East Douglas Area are Now Being Analyzed by the WRFO; these Roundups Must be Stopped so that the Agency Can Consider Wild Horse Use of the AreaViolates as it Relates to Oil and Gas Development**

Defendant BLM's White River Field Office (WRFO) is experiencing increased oil and gas exploration and currently has over 250 Applications for Permits to Drill (APD). See Minutes of the Rio Blanco County Commissioners, Address by Kent Walter, BLM, attached hereto as Exhibit 8A. In partial response to this increased activity, BLM has decided that it must amend its 1997 RMP to account for this activity. It has extended until September 30, the date on which members of the public can submit scoping comments so that it may frame all issues pertinent to this Amendment. Unless restrained by this Court, there will be virtually no wild horses left in the area, thereby negating the need for BLM to consider how this development could impact wild horses.  Instead, it seems that the WRFO's actions challenged herein appear more designed to clear horses out of the way so that they are one less issue to be considered.

**Federal Land Policy Management Act (FLPMA)**

The 1980 land use planning document established that the area east of State Highway 139 would be the "preferred habitat" for the management of wild horses. See Toni Moore Decl., Exhibit 4 at ¶ 6.. This area became known as the Piceance East Douglas Herd Management Area (HMA). At the time, the Piceance East Douglas HMA was not slated for heavy oil/gas development, and the BLM determined that it was more convenient to manage for wild horses there.  A 1981 Grazing Management Plan and EIS carried forward these earlier decisions.

In July, 1997, BLM issued its Revised Management Plan (RMP) for the WRRA.  In a 400 + page document, BLM devoted less than a full page to wild horses. See Exhibit 9. BLM states that it plans to manage for a population of zero (0) to 50 horses in the West Douglas Herd Area for 0 to 10

15

years and the long term objective would be to remove all wild horses from this area.  The RMP called for BLM to manage a population of 95-140 horses on the Piceance East Douglas HMA.  1997 RMP at 2-26.  No discussion was devoted to the minimum population of wild horses needed to maintain genetic diversity, nor for whether BLM would seek to use fertility control on any of the wild horses there.

The 1997 RMP did not discuss the interrelationship between the Piceance East Douglas Herd Area and the West Douglas Herd Area.  In large part because the 1997 RMP did not adequately address management of wild horses --- and BLM knew that its actions were subject to being set aside for this reason --- BLM began a process in 2002 of amending the RMP.  See Exhibit 10, Letter from James Cagney, BLM to Wayne Allard.  The first revision to the 1997 RMP, which sought to address wild horse use of the area,  was issued in 2004.  The 2004 EA stated that without oil and gas stipulations --- agreements by oil and gas companies to preserve wild horse areas --- "critical wild horse habitat would be lost." The 2004 RMP Amendment was protested by numerous groups and was withdrawn by BLM.

In 2005, BLM issued a second Amendment to its 1997 RMP.  This amendment reaffirmed the decision BLM made in its 1997 RMP to zero out wild horses from the WDHA.  Plaintiffs CWHBC, AMBA and The Cloud Foundation filed a protest of this plan amendment in October, 2005.  That protest is still pending and it does not appear that BLM will be ruling on it, instead allowing the local office to go ahead and zero out the West Douglas herd, without giving plaintiffs the benefit of ruling on their protest.  Realizing this, BLM provided in its DR for the West Douglas round up that its 2006 action in zeroing out the West Douglas herd was in furtherance of its 1997 Resource Management Plan, the very plan that the WRFO decided it needed to amend so that its land use planning decision would not be judicially reviewed in the context of a legal challenge to a roundup.

Plaintiffs have raised the following substantive challenges to this pending 2005 Plan

16

Amendment in the protest they filed in October, 2005, and intend to further brief them at the cross motion for summary judgment stage before this Court.

The following are issues raised by plaintiffs before the Secretary:

**I.  Whether BLM's failure, since 1984,  to consider wild horses as an integral part of the sys tem of public lands in the West Douglas Herd Area, and comparably with other resource val ues, violates the WFHBA, the Federal Land Policy Management Act (FLPMA) and the Ad ministrative Procedure Act (APA)?**

**II.  Whether BLM's failure, since 1984,  to consider wild horses as an integral part of the system of public lands in the West Douglas Herd Area, and comparably with other resource values, violates the WFHBA, the Federal Land Policy Management Act (FLPMA) and the Administrative Procedure Act (APA)?**

**III. Whether BLM is authorized to plan to eradicate wild horses from the West Douglas Herd Area, an area in which they have historically roamed because the Twin Buttes Ranch Company, a livestock permittee, whose allotment comprises a portion of the West Douglas Herd Area,  claims a superior interest in those lands for its livestock operation?**

**IV. Whether the BLM's failure to provide the public with the data by which it has increased and/or changed the grazing utilization of this permittee's livestock operation, thereby decreasing available forage for wild horses,  and failure to offer the public the opportunity to comment on this data, violates NEPA?**

**V.  Whether BLM may chose to manage wild horses on specific areas of public land based upon administrative convenience?**

**VI. Whether BLM may continue to receive comment on an EA three weeks after the close of the public period for submission of comments without reopening the comment period and affording the public the opportunity to comment on the information provided after the close of the public comment period?**

**VII. Whether BLM may reduce a herd area by over a hundred thousand acres, without legal authority to do so, and without providing the public with the basis on which the agency did this?**

**VIII. Whether BLM's failure to consider the impact of increased numbers of elk and deer, and/or management of the predators of elk and deer,  have on available forage for wild horses violates the WFHBA and requires withdrawal of this EA and publication of a new EA with this information so that the public may comment?**

**IX. Whether BLM's failure to conduct a census of wild horse use of the West Douglas Herd area during each season of the year skews BLM's analysis of  how much forage is available to all species, how much forage is used by all species and use of available forage by wild horses?**

**X.  Whether BLM's presentation to the public of only two alternatives for analysis under**

NEPA, one providing for a herd of wild horses in such small numbers as to threaten their genetic viability, or the elimination of that herd of wild horses, and its failure to analyze a "no action" alternative violates NEPA's requirement for consideration of a range of alternatives to be considered by the agency?

XI. Whether BLM should have evaluated other alternatives which could accommodate both the interests of the livestock permittee and members of the public, including protesters, who desire to have the West Douglas herd of horses remain in its original herd area, as required by the WFHBA?

XII. Whether BLM's failure to consider an alternative which provided for management of a wild horse herd with genetically viable numbers in acreage of the original herd habitat violates the WFHBA and NEPA?

XIII. Whether the agency's finding of no significant impact (FONSI) is in error and necessitates the preparation of an Environmental Impact Statement (EIS)?

### IV. The Balance of Hardships and the Public Interest Favors Granting Relief to Plaintiffs

Although BLM has placed this decision in "full force and effect," to "encourage expedited completion of this project", See Exhibit 11 (Piceance East Douglas) and Ex. 12 (West Douglas), plaintiffs submit that when that statement is viewed in light of all the other circumstances surrounding these actions, that determination must be viewed as suspect. BLM's decision to zero out the West Douglas Herd has been at least ten years in the making. Entry of a TRO will not harm BLM

In addition, the public interest is expressed in the WFHBA – that of protecting wild horses and having them remain on public lands as an integral part of those lands. The public interest is also served by requiring BLM to comply not only with the letter but the spirit of its requirements.

**V.  Conclusion**

For the foregoing reasons, plaintiffs respectfully request that this Court issue a temporary restraining order against defendants' actions.

Respectfully submitted,


<u>/s/ Valerie J. Stanley</u>
Valerie J. Stanley
D.C. Bar No. 384882
329 Prince George Street
Laurel, MD 20707
(301) 549-3126


Dated: September 21, 2006

19