## DECLARATION OF TONI HUTCHESON MOORE

I, Toni H. Moore, submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order/Preliminary Injunction in <u>Colorado Wild Horse and Burro Coalition v. Kempthorne,</u>

1. I moved to Grand Junction, Colorado in November, 1976 and have lived in this area for 29 years. Since that time, I have hiked, ridden horseback, and driven four wheel drive vehicles to observe wild horses in their historic ranges in northwestern Colorado, more specifically in the public lands managed by the White River Field Office of the Bureau of Land Management.

2. The purposes of my trips have been to observe wild horses in their natural habitat. I have enjoyed watching several bands, during the late 1980s migrate throughout their range, observe the changes in the social hierarchy including the birth of foals and changing of leadership of band stallions. I have come to understand appreciate the efforts made by Congress and the President to declare wild horses one of our national heritage species. The adaptability, strength, and the very wildness of this species represents a significant and historic time in our country, as well as the cultural evolution of America. I have enjoyed taking my five children to view wild horses in West Douglas Creek and in the Piceance-East Douglas Creek and Piceance Creek areas. My childrens' appreciation and understanding of their heritage, wildlife, and those of people who lived here before us has enriched their lives and those whom they share these experiences with.

3. For approximately eight years, from 1989 to 1996, I traveled through some part of West Douglas Creek and the Piceance-East Douglas Creek areas at least three times a month enroute to work at my husband's veterinary clinic in Rangely, Colorado. There were times we would drive out in search of wild horses during the lunch hour to observe them as we had lunch. During the trips to and from Rangely and on the occasional lunches wild horses could be viewed without binoculars on both sides of Colorado 139 in the draws and gullies and were also seen south of Hwy 64 while driving east towards Meeker, Colorado. During this time, I also observed many vehicles with out-of-state license plates photographing and observing the wild horses.

4. Starting in October, 1991, I became aware that BLM sponsored meetings concerning the removals of wild horses and attended a helicopter meeting prior to the planned removal of wild horses from West Douglas Creek. It was my understanding that early snow and high winds canceled the planned removal. Following that meeting I requested to be placed on BLM's mailing list in order to be kept informed of actions and management decisions concerning this area and the herds who lived there.

5. From that time forward, I researched the Wild Horse and Burro Act, other applicable federal laws and regulations. I regularly attended public meetings, responded  verbally and in writing to issues pertinent to the management of this area and as well as the wild

horse herds that live there. In 1993, I joined the newly formed Colorado Wild Horse and Burro Coalition, whose original mission was to disseminate information between BLM and the general public. In 1995, I was appointed to the Colorado Northwest Resource Advisory Council (RAC) to represent the interests of wild horses in northwestern Colorado. In 1998, I became the Administrator for the Wild Horse and Burro Freedom Alliance, a coalition of humane and wild horse advocacy groups with approximately 9 million members.

6. Upon review of planning documents generated by the White River Resource Area/Field Office since 1991, I have found inconsistencies between the congressional mandate and land use planning documents as they pertain to wild horse management. The following is a synopsis of that information.

1971 – The Wild Horse and Burro Act passed December 16, 1971.

1974 – WRRA conducted a wild horse inventory for the entire Craig District between February 26 and March 6, 1974. The actual flight time while counting horses was 17.3 hours (Wild Horse Inventory dated April 11, 1974, Page 2, Paragraph 2). August, 1974 Helicopter Flyover Count Noted in URAs.

1975 – February Unit Resource Analysis Step III – Page WH-4, Paragraph 2, states approximately one half of the identified wild horses from the August, 1974 helicopter count were located west of the Douglas Creek Road (County Road 139) with about 10 – 15 using Texas Mountain. Paragraph 5 states "Studies have not been initiated to determine seasonal use areas. Observations have been limited to aerial surveillance. Six to ten horses can usually be found on top of Texas Mountain during the winter." Page WH-12, Paragraph 2, "Most ranchers that attended the Step II public workshops in meeker and Rangely indicated that the presence of the wild horses would be acceptable…Their primary concern was for loss of livestock forage…" Paragraph 5, "During the public meeting, it was learned that there were horses in an area that we did not census". Page WH-14 – Step II Public Workshops: "Of the three public workshops that were held on wild horses, one primarily of people from wild horse organizations. This was the meeting held in Denver…About 90% of the people who attended this meeting indicated that wildlife/wild horse habitat was the most important use of public lands." Page WH-15, "The Rangely workshop consisted of several interest groups with stockmen being in the majority. Very few questionnaires were filled out for the Rangely workshop, about 50% thought livestock forage was the most important resource and 50% thought wildlife habitat was the most important."

1979 – Management Framework Plan Recommendation – Analysis – Decision February, 1979 "1. All horses west of Douglas Creek be removed. Rationale is the increase in oil and gas activities in this area warrants removal of the horses."

1980 – Management Framework Plan Step III, Summary, December, 1980. Paragraph 1, "The MFP step III Decision presents a workable solution to the various conflicts identified under Step I Recommendation 2.1. The resolution is aimed at maintaining a viable wild horse population on 148,153 acres of public land, a reduction of 295,826… This 148,153 acre area was chosen because it has the most concentrated wild horse population (their preferred habitat)." "Key decisions to accomplish these objectives include: 1. Reserve 2,101 AUMs of forage for between 95 to 140 head of wild horses. This number is in excess of the number of wild horses in the Resource Area in 1971 at the time the Wild Horse and Burro Act was passed."

1981 – Herd Management Area Plan, Page 1, Paragraph 3, "Wild horses presently range over 443,979 acres in the Piceance Basin and Douglas Creek areas. Movement of wild horses within their range is influenced by existing fences and seasonal factors." Page 3, Paragraph 1, "The proposal to limit the herd management area to 148,153 acres of public land was established through the land use planning process…"

1981 – Grazing EIS calls for a reduction of acreage to the WRRA wild horse herds, admits this decision may not be legal.

1983 – Allotment Management Plan, Twin Buttes Allotment – August, 1983, Page 8, Paragraph 2, "Currently there are approximately 200 wild horses on the Twin buttes Allotment." Page 16, Paragraph 1, "By removal of wild horses in which case AUMs allocated to wild horses would be reallocated to livestock and wildlife."

1993 – Piceance/E. Douglas Wild Horse Removal Plan, EA-CO-017-93-045, states decisions concerning wild horse management were based on: "Manage horse herd on 140,000 acres public land…Remove all wild horses from 295,000 acres of public land and manage those areas more *intensively for livestock use*."

1995- Colorado Northwest Resource Advisory Council. In August, 1995, I was appointed by the Secretary of the Interior, to the Colorado Northwest Resource Advisory Council (NW RAC). Our first action was to assist Colorado BLM in writing Standards and Guidelines (S&G) for Livestock Grazing for our state. The Standards and Guidelines for Livestock Grazing in Colorado address Special Status Species, which include wild horses. Once S&G's for Livestock Grazing were completed the CO NW RAC then began the task of assisting the State BLM Office in writing Standards and Guidelines for Recreation. My second term ended prior to the completion of that task. Only once during my two term appointment did WRRA field personnel come before the RAC to present information on the West Douglas Creek Wild Horse Herd and the Piceance/East Douglas Creek. WRRA personnel only addressed their current management of the herd

and did not ask for advice. The Advisory Council's duties and responsibilities are advisory in nature only, and the WRRA did not request the RAC's advice. The current Colorado NW RAC was asked by the WRRA BLM office to sanction a subcommittee concerning the issues regarding the West Douglas Creek Herd, which was initiated in early 2003. The subcommittee, comprised of RAC members from oil and gas, livestock, grazing, country government, off road vehicle users and an environmental group, were not versed in wild horse law nor consulted with wild horse advocates who were.

1998 – White River Resource Area Gather Plan, Page 1, Paragraph 2 states, "through the planning process's the determination of habitat suitability has consistently been for the removal of all horses from the West Douglas Herd Area." The 1981 Grazing EIS stated the reduction of acreage was probably not legal. The WRRA has a pattern of linking wild horse "habitat suitability" to livestock grazing.

7. In 1994, I was party to an appeal of a proposed removal of wild horses from West Douglas Creek. The removal was subsequently canceled. On October 19, 1999, CO-01-97-01, I attended a hearing before the Interior Board of Land Appeals for CWHBC where we requested to be granted Intervenor status in an Appeal of the WRRA Manager's 1997 decision denying an Application for Additional Active Use and Temporarily Suspending Grazing Use for the Burke Brothers, a livestock permit holder in the Piceance-East Douglas Creek HMA. After the judge granted CWHBC intervenor status, the Burke Brothers dismissed their appeal. They stated that they did not want to give wild horse groups a platform on which to discuss Congress' mandate that wild horses be protected in the area. Since that time I have continued to comment on actions affecting the West Douglas Creek Wild Horse Herd and Piceance/East Douglas Herd located in the White River Field Office. I have also attended national and local meetings pertaining to the management of wild horses in Colorado and nationwide.

8. In 2002, an amendment to the 1997 White River RMP was initiated to address wild horse use of the area. In 2004, BLM issued its proposed amendment. That amendment was protested by plaintiffs and other environmental groups. It was withdrawn. In 2005, BLM issued a proposed Amendment to the 1997 RMP; that amendment, which calls for the zeroing out of the West Douglas herd – essentially remaking the same decision from its 1997 plan, was protested by environmental groups, as well as plaintiffs and others. The protest has been pending before the Secretary of the Interior since October, 2005. that ROD.

9. In 2006, CWHBC submitted comments against the roundup and use of PZP for the Piceance/East Douglas Creek Herd as well as comments on West Douglas Creek via counsel. Both documents came in the mail in the very same envelope, with deadlines for comments due at the same time, thereby depriving me and others the time for meaningful and thoughtful dialogue as mandated by the National Environmental Policy Act (NEPA).

The general public would have a difficult time interpreting these documents, much less fulfilling their mandate to provide meaningful comments unless they had followed this situation for years. To read these documents, one would think they are without interference or impact from the potential impacts of a growing energy industry. Even in the now dated RMP (1997) the current demands for leasing of oil, gas, and oil shale were not discussed as to the impacts on the wild horse herds.

10. If, the Bureau of Land Management were to remove wild horses from West Douglas Creek or Piceance-East Douglas for this particular roundup, or any roundup and removal without implementing the appropriate review of wild horse management (and updated Environmental Impact Statement) due to the previously unanalyzed impacts of energy development will be detrimental for many reasons.

11. The very reason I and my family travel to these areas is to enjoy observing wild horses in a habitat they have used since before the arrival of European settlers. It would be impossible to replace the cultural and historical significance they add to the landscape. The heart and soul of the law to protect America's wild free roaming horses will be broken. Congress responded to the wishes people of this country and gave management and protection guidelines to save a vanishing American icon from extinction. These guidelines have been ignored and protection avoided by the White River Field Office since the passage of the Act. The law is specific in calling for *"current monitoring and inventorying"* to identify whether or not animals should be removed to *"maintain a thriving natural ecological balance"*, yet current monitoring data of who eats what, when and where is noticeably absent in both Environmental Assessments.

12. The 22 month vaccine that BLM plans to administer to wild horse mares in Piceance-East Douglas is an experimental vaccine. The proposed used of PZP as an "experiment" for herd control has not been adequately discussed. This issue was noticeably absent from discussion in the 1997 RMP, and not adequately reviewed in the removal document. The WRFO has not discussed the impacts of cost of using this "experimental vaccine", or provided a format for post injection monitoring to keep in line with a scientific experiment, only providing for an aerial census in two years and observation from the next roundup of an absence of foals. Again, BLM is planning for a roundup in four years, without benefit of review of any monitoring and inventorying data between 2004 and 2008. BLM does not acknowledge the use of this vaccine will create a new age class of mares who will be living longer due to the fact they will not foal, thereby creating an impact the rest of the herd by what they claim is scarce vegetation.

13. To be deprived of the ability to drive only a short distance to view wild horses will have a tremendous impact on me and my family. To explain to the next generation why one law has been set aside for the benefit of easy management or vested interests is truly an American tragedy; one that will impact the local population as well as those from across the nation.

Pursuant to 28 U.S.C. § 1746, I swear that the foregoing is true and correct.

_____
Toni Hutcheson Moore

Executed this 14th day of September, 2006