UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COLORADO WILD HORSE AND BURRO COALITION, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) Civ. No. 06-1609 RMC |
| DIRK KEMPTHORNE, et al., | ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER**

In their motion, Plaintiffs allege that they are entitled a temporary restraining order because: 1) the Bureau of Land Management, ("BLM") is currently gathering and removing wild horses from BLM lands in violation of the National Environmental Policy Act ("NEPA"), the Federal Land Use and Policy Management Act ("FLPMA") and the Wild Free-Roaming Horses and Burros Act ("Wild Horses Act"); and 2) they will be irreparably harmed if any horses are removed. As discussed below, Plaintiffs' claims are meritless.

When it enacted the Wild Horses Act in 1971, Congress was concerned that wild horses were vanishing from the West. Congress wished to preserve the horses as "living symbols of the historic and pioneer spirit of the West," and directed the Secretary to provide for their protection and management. 16 U.S.C. §§ 1331. This lawsuit concerns, several hundred thousand acres in northwestern Colorado, where there are more than 675 horses on public lands in an area for which BLM has determined that the appropriate population is 190. When wild horse populations exceed the carrying capacity of the range, and when they stray outside of a designated herd area

(HA), BLM is obliged under the Wild Horses Act to remove them.  See 16 U.S.C. § 1333(b)(2); 43 C.F.R. § 4710.4.

Given the statutory mandates to manage wild horses to maintain a thriving, natural ecological balance in conjunction with other uses of public lands and to remove excess wild horses from public lands, on September 17, 2000, BLM began to implement two decisions, published on July 27, 2006 and August 1, 2006, to remove a total of 390 excess horses from the Piceance-East Douglas Herd Management Area ("East Douglas HMA") and the West Douglas Herd Area ("West Douglas HA").  To date, more than 200 horses have been gathered from the East Douglas HMA and approximately 165 have been shipped to a holding facility 300 miles away where they will be prepared for adoption.  In concert with gather plans related to the East Douglas HMA, BLM also decided to implement a program to administer an immunocontraceptive fertility control vaccine known as Porcine Zona Pellucida ("PZP") to approximately 40-60 wild mares gathered from the East Douglas HMA.  BLM based this decision upon the urgent need to reduce horse populations for range protection consistent with maintenance of population numbers supportive of a thriving natural ecological balance on the range.  In support of this decision, BLM consulted nearly two decades of scientific research which suggests that use of PZP is a humane, safe and effective tool for controlling the populations of wild horse herds.

Having waited almost two months to file a challenge to actions that were final on July 27, 2006 and August 1, 2006 respectively, Plaintiffs are not entitled to the extraordinary remedy of temporary injunctive relief.   They have failed to meet their burden of proving that they will be irreparably harmed if BLM continues with the wild horse roundup (also known as a "gather").

- 2 -

Plaintiffs' delay in waiting until September 22, 2006 to file their motion for a temporary restraining order, nearly two months after the final decisions were published, and after more than half of the East Douglas gather has been completed, severely undercuts their claim that emergency relief is warranted. Although Plaintiffs claim that they will suffer a diminished opportunity to view wild horses in their natural range, there will still be more than 185 horses on the range after the gathers are completed, providing ample opportunity for Plaintiffs to view them.

Further, Plaintiffs cannot demonstrate that BLM's action was arbitrary and capricious such that they have any chance of succeeding on the merits of their claim. Indeed, the record demonstrates that BLM conducted a thorough examination of the environmental effects of each gather. See East Douglas EA CO-110-2006-030-EA ("East Douglas EA"), and West Douglas EA CO-110-2006-166-EA ("West Douglas EA") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq. Each gather is intended to control the number of horses on the range in order to "maintain a thriving natural ecological balance," pursuant to the Wild Horse Act, 16 U.S.C. § 1333(a). The EA for each gather identified the environmental impacts of the action, considered appropriate alternatives, and properly determined that a Finding of No Significant Impact ("FONSI") was appropriate. Because Plaintiffs have neither demonstrated irreparable harm, nor shown that they are likely to meet the high standard of proving that BLM's action was arbitrary and capricious, the Court should reject Plaintiffs' belated request for emergency relief.

Finally, any delay of these gathers could harm the wild horses that Plaintiffs claim they are trying to protect. The ecology of the two areas in question cannot sustain a healthy

- 3 -

population of wild horses at their current numbers, particularly in light of the fact that BLM is

required to manage wild horses on public land in conjunction with other uses, such as

maintaining foraging habitat for wildlife and livestock grazing.  It would also impose a serious

hardship on BLM to delay these two gathers.  BLM has expended significant staff time and

financial resources to analyze the effects of the gathers in two environmental assessments,

schedule a contractor to perform the work, and arrange for adoptions and veterinarians to be

present.  If BLM is unable to commence the West Douglas gather in the next few days, the

contractor will not be able to perform the work until November or perhaps later.  If this happens,

there is much greater chance of adverse weather conditions and the project will be more

dangerous for the horses, as well as the contractor and BLM staff.

In light of these considerations, injunctive relief is inappropriate and Plaintiffs' motion

should be denied.

## STATUTORY AND REGULATORY BACKGROUND

**A.      The Wild Free Roaming Horses And Burros Act**

1.      Passage Of The Act

The years since the enactment of the Wild Horses Act have witnessed an explosion in

wild horse populations throughout the West.  In 1971, wild horses were in danger of vanishing

from the West, largely because of commercial exploitation by persons capturing them and selling

them for profit.  See 16 U.S.C. § 1331. The Wild Horses Act gave the Secretary of the Interior

("Secretary") jurisdiction over all wild horses and burros located on the public lands

administered by BLM.  16 U.S.C. § 1333(a).  The Secretary was instructed to "manage wild free-

roaming horses and burros in a manner that is designed to achieve and maintain a thriving

natural ecological balance on the public lands." Id.

BLM was so successful in implementing the Wild Horses Act, and protecting these animals, that by 1978, Congress recognized that the "numbers [of wild horses] now exceed the carrying capacity of the range. Excess numbers of horses and burros pose a threat to wildlife, livestock, the improvement of range conditions, and ultimately their own survival." H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 21 (1978). Citing this as a major management problem, Congress, through the Public Rangelands Improvement Act of 1978, Pub. L. No. 95-514, 92 Stat. 1803 (1978), amended the Wild Horses Act to authorize the removal of wild horses from the range and directed establishment of an adoption program as the primary alternative for managing overpopulations. Id.; see also 16 U.S.C. § 1333.

2.    Federal Land Management Responsibilities

Management of wild horses occurs against the larger backdrop of federal land use planning laws and regulations, most importantly, the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C.A. §§1701, et seq. (1976). Under FLPMA, BLM manages public lands in a manner "that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values," while recognizing "the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands." 43 U.S.C.A. §1701(a)(8), (12) (1976). Congress has mandated that BLM manage public lands under principles of multiple use and sustained yield. E.g., 43 U.S.C. § 1732(a).

In amending the Wild Horses Act, Congress "establish[ed] and reaffirm[ed] a national policy and commitment" to "manage, maintain and improve the condition of the public

rangelands so that they become as productive as feasible for all rangeland values in accordance

with management objectives and the land use planning process established" by FLPMA, while,

at the same time, continuing "the policy of protecting wild free-roaming horses and burros from

capture, branding, harassment, or death . . . ."  43 U.S.C. §1901(b)(2) and (4) (1986).  The

Secretary, through BLM, currently manages the public lands for multiple uses and manages wild

horses "in a manner that is designed to achieve and maintain a thriving natural ecological

balance on the public lands" and "multiple use relationship in that area." 16 U.S.C. §§ 1332(f),

1333(a).

Thus, BLM regulations and policy state that wild horses and burros shall be managed as

viable, self-sustaining populations of healthy animals in balance with other multiple uses and the

productive capacity of their habitat.  See 43 C.F.R. 4700.0-6.  A "self-sustaining population" is

an established population that is able to persist and successfully produce viable offspring through

multiple generations over the long term.  Managing the herds successfully requires consideration

of other uses of the land and identifying the ecological carrying capacity of each population.

3.    Management of Wild Horses on BLM Lands

Wild horses and burros are not managed as one great national herd.  See 43 U.S.C.

1332(c); 43 C.F.R. 4710.1; 16 U.S.C. §1334.  After the Wild Horses Act law was enacted, BLM

designated "Herd Areas" ("HAs") on BLM administered lands, which are defined as those areas

where wild horse and burros existed in 1971.  43 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1.  Under

the Wild Horses Act, BLM is directed to manage wild horses within these HAs and remove wild

horses that stray outside of these areas.  16 U.S.C. §§ 1332(c), 1333(a)-(b); 43 C.F.R. § 4710.4.

If BLM chooses to manage wild horses in a particular area for an extended period of time, it

typically establishes a Herd Management Area ("HMA") within an HA and develops an Appropriate Management Level ("AML") for the number or range of horses the HMA can sustain. <u>See</u> 43 C.F.R. § 4710.3; <u>see also</u> September 28, 2006 Declaration of Kent E. Walter, Field Manager, BLM White River Field Office ("Walter Decl.") ¶ 4. BLM sets AMLs for each HMA to provide for a level of use by wild horses and burros that results in a thriving natural ecological balance, avoids deterioration of the range, and takes into account other range uses. 43 U.S.C. §§ 1333(b)(1)-(2), 43 C.F.R. § 4700.0-6(a). BLM offices that manage wild horses in Colorado typically establish a range for an AML. <u>See</u> Walter Decl. ¶ 4. The range accommodates population growth over a period of time: The top of the range represents the maximum number of animals that the range can sustain and still maintain a thriving natural ecological balance, while the bottom of the range typically represents the baseline from which the population can grow. <u>Id.</u>

4.     <u>Gathers And Removals</u>

If the Secretary determines that an overpopulation exists in a particular HMA and that action is necessary to remove the excess animals, the Wild Horses Act requires that the agency act immediately to return the area to its AML. <u>See</u> 16 U.S.C. §1333(b)(2). <u>See</u> <u>Blake v. Babbitt</u>, 837 F. Supp. 458, 459 (D.D.C. 1993) (<u>citing</u> 43 U.S.C. § 1333(b)(2)) ("The Wild Horses Act was specifically amended, then, to require 'immediate' removal of excess horses....). <u>See also</u> <u>Am. Horse Prot. Ass'n v. Watt</u>, 694 F.2d 1310, 1317-19 (D.C. Cir. 1982). Once BLM determines that an overpopulation exists in a given area, it proposes a gather plan in an environmental assessment ("EA") which is open to public comment. <u>See</u> Walter Decl. ¶ 7. If BLM decides to proceed with the proposed gather plan, it develops and issues a gather plan

decision describing removal methods (including the techniques to ensure that the gathers are conducted humanely), impacts on the horses and other resources, and timing for the gather and removal of excess animals.  Id.  BLM provides the public with at least 30-days notice of the gather plan prior to the gather to allow any interested parties to file an appeal and a petition to stay the decision with the Department of Interior Board of Land Appeals (IBLA).  Id.  BLM develops and issues a gather plan decision describing the methods, impacts, including techniques to ensure that the gathers are conducted humanely, and timing for the gather and removal of excess animals.[1]  Id.; see also 16 U.S.C. §1332(b)(2); 43 C.F.R. §4720.1.  Because wild horse populations can expand rapidly, the goal of a gather is typically to return an overpopulation to the bottom of the AML range.  See Walter Decl. ¶ 6.  This also allows BLM to minimize the frequency of gather operations, which can be stressful for the horses.  Id.  Once gather operations have commenced, they can take from a few days to several weeks, depending on the number of animals to be gathered and a number of other factors, such as the size of the search area, the nature of the terrain and the ability of a gather contractor to locate wild horses and coax them into traps.  Id. ¶8

Some of the captured horses are adopted, while others that are considered unadoptable for reasons of age or health are returned to the range or placed in private long term pasturing arrangements.  Id. ¶ 9; see also 16 U.S.C. § 1633(c), (d).  Adoption is the primary tool for placing healthy animals that have been removed during a gather.  See 43 C.F.R. §4750.1.  Horses gathered from the range are held in quarantine for approximately 120 days before being placed in

---

[1]     BLM regulations ensure humane treatment of excess animals.  43 C.F.R. § 4700.0-6(e). "Humane treatment" means that the horses must be handled according to "animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering." 43 C.F.R. § 4700.0-5(e).

the adoption program.  Individuals who can provide proper care and humane treatment are

eligible to adopt a wild horse or burro through the program.  If, after a year of monitoring, the

prospective adopter has demonstrated the ability to provide such care and treatment, the adopter

will be granted title to the animal.  See 43 C.F.R. §4750.5(b).  Once titled, the animal is no

longer considered "wild" and the provisions of the Wild Horses Act no longer apply.  16 U.S.C.

§ 1333(d)(2).

### B.    The National Environmental Policy Act

NEPA serves the dual purpose of, first, informing agency decisionmakers of the

significant environmental effects of proposed major federal actions and, second, insuring that

relevant information is made available to the public so that they "may also play a role in both the

decisionmaking process and the implementation of that decision."  See Robertson v. Methow

Valley Citizens Council, 490 U.S. 332, 349 (1989).  To meet these dual purposes, NEPA

requires that an agency prepare a comprehensive Environmental Impact Statement ("EIS") for

"major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(2)(C); 40 C.F.R. §§ 1501.3.  However, not every federal action or proposal requires

preparation of an EIS.  Where the environmental impacts of an action are less than "significant,"

an agency may comply with NEPA through preparation of an EA and a FONSI.  See 40 C.F.R.

§§ 1501.3; 1501.4(c), (e); 1508.9.  The Council on Environmental Quality's ("CEQ") regulations

implementing NEPA provide guidance as to the nature and content of an EA.  See 40 C.F.R. §

1508.9.

NEPA, does not mandate particular results or impose substantive environmental

obligations upon federal agencies. See Robertson, 490 U.S. at 350-51; Marsh v. Or. Natural Res.

- 9 -

<u>Council</u>, 490 U.S. 360, 371 (1989).  "NEPA's goal is satisfied once ... information is properly disclosed; thus, NEPA exists to ensure a process, not to ensure any result."  <u>Inland Empire Pub. Lands Council v. U.S. Forest Service</u>, 88 F.3d 754, 758 (9th Cir. 1996); <u>see also</u> <u>Minn. Public Interest Research Group v. Butz</u>, 541 F.2d 1292, 1300 (8th Cir. 1976) ("The purpose of NEPA is not to require an objection free document, but rather to give Congress, the responsible agencies, and the public a useful decision-making tool.").

## FACTUAL BACKGROUND

### A.    The 1997 Resource Management Plan

To fulfill its obligations under FLPMA, (43 U.S.C. § 1712), BLM issued a Resource Management Plan for the White River Area which includes both the East Douglas HMA and the West Douglas HA.  <u>See</u> White River Record of Decision and Approved Resource Management Plan, dated July 1, 1997 (the "1997 RMP"), attached as Ex. C to Lall Decl.  The 1997 RMP provides, in part, that "[w]ild horses will be managed to provide a heathy, viable breeding population with a diverse age structure." 1997 RMP at 2-26.   Specifically, it calls for BLM to "manage for a wild horse herd of 95-140 animals on 190,130 acres within the East Douglas HMA so that a thriving ecological balance is maintained for all plant and animal species on that range."  <u>See</u> <u>id.</u>  The RMP also stated that BLM would manage the West Douglas HA "in the short term (0-10 years) to provide forage for a herd of 0-50 horses," and that "[t]he long term objective will be to remove all wild horses from [this] area."  <u>Id.</u>

The 1997 RMP was created by BLM to guide its management of public lands under

principles of multiple use and sustained yield.[2]  Development of the RMP included preparation of a draft EIS which was made available for public comment, and issued for a final EIS.  The EIS analyzed potential environmental impacts associated with implementation of the 1997 RMP along with alternatives.

.      **B.      The Piceance-East Douglas Herd Management Area**

The East Douglas HMA encompasses approximately 158,281 acres of public lands administered by BLM, White River Field Office ("WRFO") in Meeker, Colorado.  *See* East Douglas EA at 1.  There are approximately 31,741 acres of private lands not managed by BLM within the East Douglas HMA.  Id.

 BLM's responsibility for the management of all natural resources in the East Douglas HMA necessarily includes population management of the wild horse herds, not only for the benefit of the horses, but also for the benefit of other resources in the East Douglas HMA.[3] See East Douglas EA at 1.  As part of its management operations, and as discussed more fully supra, BLM establishes an AML for wild horses in any given HMA.  Presently, the AML for the East Douglas HMA is 135-235 horses, a marked increase from the minimum thresholds of 95-140 contained in the 1997 RMP.  See 1997 RMP, at p. 3-14.

1.  The East Douglas EA

In furtherance of its obligation to manage wild herd populations on public lands pursuant

_____

[2]      BLM is required pursuant to 43 C.F.R. 4700.0-6 to "manage [wild horses] as self sustaining animals in balance with other uses and the productive capacity of their habitat." *See* 43 C.F.R. § 4700.0-6. Further, Congress has identified and delegated authority to BLM to address the need to maintain appropriate numbers of wild horses within their HMA's.  See 16 U.S.C. §1333(b).

[3]      Occasional removal of wild horses in furtherance of maintaining herd population numbers is an integral part of BLM's management obligation to ensure a healthy, viable breeding population of wild horses.  *See* RMP at 2-26.

to 16 U.S.C. §§ 1332(f), 1333(a), and 43 C.F.R. § 4710.4,  on June 5, 2006, BLM proposed  to

gather 436 head of wild horses from within the East Douglas HMA, and 50-100 head determined

to have wandered off of the East Douglas HMA ("East Douglas Gather").  It prepared a draft EA

on the plan and invited public comments for 30 days.  After considering the comments, it issued

a final EA and FONSI on August 1, 2006 ("East Douglas EA")  The East Douglas EA throughly

considered the broad range of potential environmental impacts that could result from the East

Douglas Gather Plan.  In looking at the potential environmental impact(s), BLM consulted

Standards for Public Land Health approved by the Colorado Bureau of Land Management in

1997.  *See* East Douglas EA at 4.  These standards cover upland soils, riparian water systems,

plant and animal communities, threatened and endangered species and water quality.  Id.  BLM

analyzed the standard for each of these five categories in an environmental context, and made

specific findings as to each.  Id.  Additionally, BLM addressed several "non-critical elements"

pursuant to Colorado's Standards for Public Land Health.  These non-critical elements include:

soils; vegetation; wildlife (aquatic); wildlife (terrestrial); fire management; hydrology and water

rights; paleontology; rangeland management; recreation; noise; and wild horses.  See East

Douglas EA at pp. 4-40.

        The East Douglas EA also took a hard look the potential environmental impacts the

proposed East Douglas Gather Plan may have on wild horses.  *See* East Douglas EA at 40-48.

The EA considered potential effects to horse herd distribution; herd genetics and population

history; herd age, sex and color ratio; and color composition.  After careful consideration, which

included the use of several modeling scenarios, BLM determined that "lowering the herd to 135

animals, while taking into consideration environmental variables programmed into the

simulations, would not result in the population falling below its capacity to rebound." East Douglas EA at 46. Using conservative population modeling scenarios, BLM estimated that the herd will enjoy growth rates, post-gather of between 6-14%.[4] Id. Using BLM's population model, the East Douglas herd is projected to exceed the 235 AML presently established by BLM as an acceptable population for the herd by the time the next proposed gather will occur, in approximately four years time. Id. at 47.

Upon completion of the gather, BLM will have selectively returned 135 head of wild horses out of the 436 gathered from the East Douglas HMA so as to assure a diversified herd structure. East Douglas EA, at 2. Before return to the HMA, some of the horses (approximately 40-60 mares) will be treated with an immunocontraceptive drug known as Porcine Zona Pellucida or PZP, in an effort to curb the historically observed high rates of reproduction which make routine gather/removal projects necessary. See East Douglas EA at 2. PZP is a short-term fertility drug that has shown tremendous promise when used in the federal wild horse program. See Declaration of Fran Ackley, dated September 28, 2006 ("Ackley Decl.") ¶ 4. Management by BLM of 135 wild horses is near the high end of the range established by the 1997 RMP for management of 95-140.[5] East Douglas EA at 2. The East Douglas AML was derived from the analysis of range monitoring data accumulated by the WRFO between 1981 and 2002. Id. The WRFO studies determined that the East Douglas HMA will support an average of 165 horses over any extended period. Id. at 3.

---

[4]     A growth rate of 6-14% is conservative in light of the 20% growth rate historically observed with the East Douglas Herd. See East Douglas EA at 47.

[5]     The 1997 RMP expanded the boundary of the East Douglas HMA 31,200 acres through the addition of the Greasewood allotment. See East Douglas EA at 71. As the result of this increase, WRFO increased the AML for the East Douglas HMA to 135-235.

The majority of the animals removed from the East Douglas HMA will be transported to BLM Canon City wild horse holding facility and removed in accordance with the current age selective removal policy. *Id.* Under this policy, priorities for removal are: (1) horses younger than five years of age; (2) horses between 6 and 15 years of age; and (3) horses 16 years of age and older. *Id.* Horses unable to withstand the stress associated with capture, handling and transport will not be removed from the HMA. *Id.* These actions are necessary in order to restore a thriving, natural, ecological balance to the affected range resources, and to allow for long term maintenance of wild horse herd health and viability. *See* East Douglas EA at 3.

2. The East Douglas Finding of "No Significant Impact"

The FONSI accompanied the final East Douglas EA and Notice of Final Decision on August 1, 2006. See East Douglas EA at 51. The FONSI explained that the decision to remove wild horses from the East Douglas HMA and HA and to administer some with PZP also included several mitigation measures, including several to minimize the decision's impact on existing cultural resources, threatened and endangered plants/areas of environmental concern, use of hazardous and solid wastes, noxious weeds, wild horses, paleontology, terrestrial wildlife, and recreation.[6] East Douglas EA at 53-54. The FONSI stated "The approved measures result in a finding of no significant impact on the human environment. Therefore, an environmental impact statement is not necessary to further analyze the environmental effects of the proposed action." East Douglas EA at 51.

3. The East Douglas Final Decision

---

[6]    Mitigation measures as to horses included monitoring wild horses living within the HMA, more specifically, those mares receiving fertility control. See East Douglas EA at 53.

On August 1, 2006, BLM published a "Notice of Final Decision, Full Force and Effect," along with the final EA and FONSI (East Douglas Decision) The decision stated "[T]his full force and effect decision entails the capture of approximately 436 wild horses and the age selective removal of approximately 301 wild horses from the Piceance East-Douglas Herd Management Area and the capture and removal or relocation of approximately 62 wild horses from outside the Piceance-East Douglas [HMA]." <u>See</u> East Douglas Decision at 2.  It further explained, "[I]n response to crucial range conditions resulting from drought, and to allay the risk of range degradation likely to occur should the removal be delayed, this action will be completed under the auspice of a full force and effect decision.  The decision will be implemented as soon as funding becomes available, and following a 30-day appeal period granted to assure affected and interested parties time to review this management decision."  East Douglas Decision at 2. BLM explained its four reasons for placing the decision in full force and effect:

1.     Any delay in action would have a direct negative impact on plant communities relied upon by wild horses, wildlife and livestock, and, in turn, would consequently negatively affect the habitat of these animal species.
2.     Drought conditions have resulted in substantially low plant vigor and production with consequent limited forage for wild horses and other range users.
3.     Implementation of the [1997 RMP].
4.     Wild horses have relocated outside the East Douglas Herd Management Area into locations outside the boundaries.[7]

The East Douglas Decision further explained that the "Full Force and Effect" decision was in accordance with 43 C.F.R. § 4770.3:

The authorized officer may place in full force and effect decisions to remove wild horses or burros from public or private lands if removal is required by applicable

---

[7]        Wild Horses that stray out of herd areas must be captured pursuant to the Wild Horses Act, which limits wild horse management to area inhabited by wild horses at the time of the passage of the Act.  <u>See</u> 16 U.S.C. 1332(c); 43 C.F.R. 4710.4 ("management of [wild horses] shall be undertaken with the objective of limiting the animals' distribution to herd areas").

law or to preserve or maintain a thriving ecological balance and multiple use relationship.  <u>Full force and effect decisions shall take effect on the date specified, regardless of an appeal.</u>

August 1, 2006 Decision at 2 (Emphasis added).  The Decision explained that any interested and affected party could file an appeal with the Board of Land Appeals and a petition to stay the Decision pending appeal.

          4.  <u>Responses to Public Comments</u>

The public comment period for the East Douglas EA was from June 5, 2006-July 10, 2006.  East Douglas EA at 71.  Every comment letter was read, identified, and responded to.  Specifically, BLM received and responded to comments provided by Valerie Stanley, counsel for the Plaintiffs in the present action.

**C.      The West Douglas Herd Area**

The West Douglas HA encompasses approximately 127,387 acres of public lands administered by the WRFO.  <u>See</u> West Douglas EA at 1.  In April 2005, BLM published a 68 page environmental assessment that analyzed the environmental impacts of two proposed alternatives to amend the 1997 RMP concerning management of wild horses in the West Douglas HA.[9]  One alternative called for implementing the targets, that being, removal of all wild horses from the West Douglas HA as set forth in the 1997 RMP.  The other alternative called for amending the 1997 RMP to manage a small herd of 29-60 wild horses in the West Douglas HA.  Several months later, BLM published a proposed decision that recommended

---

[9]      This document is not attached the Defendants opposition hereto because it is pre-decisional in nature and thus not relevant for review by this Court at this time.

implementing the targets contained in the 1997 RMP: BLM would manage 0-50 horses through

2006 and remove wild horses from the West Douglas HA by July 2007.  Several environmental

organizations protested the proposed decision, including several of the Plaintiffs in this action.

BLM has not yet completed its response to the protests and has made no final decision as to

whether it will remove all wild horses from the West Douglas HA or whether it will maintain a

small herd of 29-60 horses.[9/]

       1.  <u>The West Douglas EA</u>

In 2006, BLM proposed a gather of wild horses from the West Douglas Area.  It

completed a draft EA on the proposal and circulated it for public comment.  After considering

and responding to the comments it issued a final EA and FONSI.

As explained in the EA, BLM proposed to reduce the population of wild horses in the

West Douglas HA from approximately 139 to 50 by capturing and removing 89 horses.  *See* West

Douglas EA at 1.  The action is to "restore a thriving natural ecological balance to the affected

resources and to bring wild horse numbers into compliance with the 1997 RMP range of 0-50

horses required by 2006."  West Douglas EA at 2.  Like the East Douglas EA, the West Douglas

EA examines the environmental effect of the proposal on range resources as well as the effects

of alternatives.  <u>See</u> <u>Id.</u> 1-46.

However, such action would also leave open the possibility of pursuing one of the

alternatives considered by the 2005 environmental assessment discussed above: manage a small

herd of horses in the West Douglas HA.  The West Douglas EA explained: "Due to the fact that

protests on the proposed West Douglas Herd Area Plan Amendment to the [1997 RMP] have not

- 17 -

yet been resolved, the purpose and need for this gather is remove wild horses from the West Douglas Herd Area down to the 0-50 range required by 2006 in the current [1997] RMP decision."  West Douglas EA at 1.

The West Douglas EA recommended against a "no action alternative" stating, "[a]s documented extensively by current monitoring data and every land use planning and wild horse removal decision over the last 30 years, wild horses in the West Douglas HA cannot be maintained within the parameters of a thriving, natural ecological balance as required by law, and the consequent degradation of range sites from the no-action alternative would be irreversible and irretrievable."  Id. at 2. The EA explained how the herd grows unless removals are undertaken.  It noted that the initial aerial census in 1974 recorded 9 wild horses in the area now recognized as the West Douglas HA.  Id. at 39. Since that time, the number has fluctuated between 30 and 137, with removals occurring in seven separate years.  Id. at 41.  BLM tried to totally remove wild horses from the West Douglas HA several times with a "concerted attempt in 1985," when BLM removed 45 horses from a population of 59.  Id. at 40  These attempts were not successful for a number of reasons including the size of the search area, horses inhabiting inaccessible locations and helicopter-wary horses.  Id.  In the past ten years, there have been three removals in the West Douglas HA: In 1996, 60 horses were removed from a population of 150; in 1998, 72 horses were removed from a population of 137; and in 2001, 53 horses were removed from a population of 113.  Id. at 41.  These figures show that the EA's proposed reduction of current wild horse population in the West Douglas HA is consistent with BLM's past practice of maintaining a small herd in this area.

2.  The West Douglas Final Decision

- 18 -

On July 27, 2006, BLM published a "Notice of Final Decision, Full Force and Effect," along with a final environmental assessment and a document entitled, "Finding of No Significant Impact/Decision Record." (the "West Douglas Decision").  The Decision stated: "This full force and effect decision entails the capture and removal of approximately 89 wild horses from within and capture and removal of all the wild horses that have located outside the West Douglas Herd Area." July 27, 2006 Decision at 1.  It further explained, "In response to crucial range conditions resulting from drought, and to allay the risk of range degradation likely to occur should the removal be delayed, this action will be completed under the auspice of a full force and effect decision.  The decision will be implemented as soon as funding becomes available, and following a thirty day appeal period granted to assure affected and interested parties time to review this management decision."  Id. Like the August 1, 2006 Decision, the July 27, 2006 Decision explained that: 1) any interested and affected party could file an appeal with the IBLA and/or a petition to stay the Decision pending appeal; 2) full force and effect decisions shall take effect on the date specified, regardless of an appeal; and 3) any party requesting a stay bears the burden of proof to demonstrate why a stay should be granted.  July 27, 2006 Decision at 2-3.

### 3.  The West Douglas Finding of No Significant Impact

The July 27, 2006 Decision included a document entitled, "Finding of No Significant Impact/Decision Record."  July 27, 2006 Decision at 48.  The West Douglas FONSI explained that the decision to remove wild horses from the West Douglas HA would include several mitigation measures, including measures to minimize the decision's impact on cultural resources, threatened and endangered plants, fossil sites and raptor nesting activity.  July 27, 2006 Decision at 49-50.  The West Douglas FONSI stated: "The approved measures result in a finding of no

significant impact on the human environment.  Therefore, an environmental impact statement is not necessary to further analyze the environmental effects of the proposed action."  <u>Id.</u> at 48.

## STANDARD OF REVIEW

To prevail on a motion for a preliminary injunction, the plaintiff "must demonstrate (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm absent the relief requested; (3) that other parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief."  <u>Ctr. for Law and Educ. et al. v. U.S. Dep't of Educ.</u>, 209 F. Supp. 2d 102, 114; <u>citing</u> <u>Taylor v. Resolution Trust Corp.</u>, 56 F.3d 1497, 1505-06 (D.C. Cir. 1995) <u>aff'd by</u> 396 F.3d 1152 (D.C. Cir. 2005); <u>Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841, 843 (D.C. Cir. 1977); <u>Mova Pharm. Corp. v. Shalala</u>, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  The Court must "balance the strengths of the requesting party's arguments in each of the four required areas."  <u>Ctr. for Law and Educ.</u>, 209 F. Supp 2d at 114 (quoting <u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 747 (D.C. Cir. 1995)). The Supreme Court has instructed that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (emphasis omitted); <u>Morgan Stanley DW Inc. v. Rothe</u>, 150 F. Supp. 2d 67, 73 (D.D.C. 2001) (same).  Plaintiff must meet a heavy burden of establishing that they are entitled to the extraordinary remedy of a preliminary injunction.  <u>See</u> <u>Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers</u>, 415 U.S. 423, 442-43 (1974).

## ARGUMENT

Plaintiffs' Motion contains numerous factual inaccuracies and unsupported assertions. Most importantly, Plaintiffs repeatedly claim that BLM intends to remove "all wild horses" from the West Douglas HA and "the vast majority" of horses from the East Douglas HMA. Pls.' Mot. at 1. This is simply incorrect. As discussed above, the decision documents for the two gathers clearly indicate that 50 horses will be left in the West Douglas HA and 135 horses in the East Douglas HMA. While there are reasons that BLM may decide to remove all wild horses from the West Douglas HA in the future, that decision is not being pursued in the West Douglas gather that Plaintiffs challenge here. As discussed below, Plaintiffs fail to satisfy any of the prerequisites for a temporary restraining order and their motion should be denied.

## I.     PLAINTIFFS HAVE NOT ESTABLISHED LIKELIHOOD OF SUCCESS ON THE MERITS

### A.     BLM's Actions are Entitled to Highly Deferential Review Under the APA

The Wild Horses Act, NEPA and FLPMA do not grant an independent right of action. Therefore, review of Plaintiffs' claims must fall under the Administrative Procedure Act (APA). The APA allows review of "agency action," dictating the type of agency action that is judicially reviewable, when agency action is judicially reviewable, the scope of review permitted, and the standard to be applied by a reviewing court.[10]  5 U.S.C. §§ 701-706; Darby v. Cisneros, 509 U.S.

---

[10]     Review of a final agency decision is limited to the administrative record of that decision. 5 U.S.C. § 706.  See also Florida Power and Light Co. v. Lorion, 470 U.S. 729, 743 (1985); Commercial Drapery Contractors v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998); Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 18 (D.D.C. 1996);  Environmental Defense Fund v. Costle, 657 F.2d 275, 284 (D.C. Cir. 1981).

137, 146 (1993).

In evaluating the legal sufficiency of informal agency actions under the APA, the Court must apply the "arbitrary and capricious" standard of review.  5 U.S.C. § 706(2)(A), (C).  Under this standard, an agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" or "in excess of statutory jurisdiction authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).  See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971); Louisiana Ass'n of Indep. Producers v. FERC, 958 F.2d 1101, 1117 (D.C. Cir. 1992); Nat'l Trust for Historic Preservation v. Dole, 828 F.2d 776, 781 (D.C. Cir. 1987).  The court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416.  "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for the agency."  Id.  The decision whether to prepare an EIS is reviewed under this standard.  Found. on Econ. Trends v. Heckler, 756 F.2d 143, 151 (D.C. Cir. 1985).

**B.    BLM's Decisions Fully Complied with NEPA**

Plaintiffs contend that BLM violated NEPA by failing to conduct an EIS in connection with the East Douglas and West Douglas gathers.  Pls.' Mot. at 11-12.  NEPA provides that federal agencies should prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(2)(C).  In order to determine whether an action is one requiring an EIS, the agency may prepare an Environmental Assessment.  40 C.F.R. §§ 1501.4(b), 1508.9.  See Anacostia Watershed Soc'y v. Babbitt, 871 F. Supp. 475, 482 (D. D.C. 1994).  An EA is a concise public document that should briefly describe

the proposal, examine alternatives, consider environmental impacts, and provide a listing of

individuals and agencies consulted.  40 C.F.R. § 1508.9.  "If a finding of no significant impact is

made after analyzing the EA, then preparation of an EIS is unnecessary."  Sierra Club v. U.S.

Dep't of Transp., 753 F.2d 120, 126 (D.C. Cir. 1985).  "NEPA's EIS requirement is governed by

the rule of reason ... an EIS must be prepared only when significant environmental impacts will

occur as a result of the proposed action."  Cabinet Mountains Wilderness v. Peterson, 685 F.2d

678, 682 (D.C. Cir. 1982) (internal citation omitted).

The D.C. Circuit has established four criteria for reviewing an agency's decision not to

prepare an EIS:  (1) whether the agency took a 'hard look' at the problem; (2) whether the

agency identified the relevant areas of environmental concern; (3) as to the problems studied and

identified, whether the agency made a convincing case that the impact was insignificant; and (4)

if there was an impact of true significance, whether the agency convincingly established that

changes in the project sufficiently reduced it to a minimum.  Sierra Club v. Peterson, 717 F.2d

1409, 1413 (D.C. Cir. 1983); see also Maryland-Nat'l Capital Park & Planning Comm'n v. U.S.

Postal Serv., 487 F.2d 1029, 1040 (D.C. Cir. 1973).

     1.     BLM took the requisite "hard look" at the proposed gather and removal
            projects

While Plaintiffs stated the "hard look" standard and suggested that BLM has not satisfied

it, they fail to explain the alleged shortcoming.  See Pls.' Mot. At 11-12, 17-18.  In fact, BLM

prepared thorough EA's for both the East Douglas and West Douglas Gather Plans.  Both EA's

described the proposed wild horse gathers with sufficient detail, taking the requisite "hard looks"

at potential environmental issues.  As discussed above, each EA emphasized the need to

establish a thriving natural ecological balance in the respective HMA and HA in compliance

with the 1997 RMP, which underwent its own EIS.

Both EA's considered the potential environmental impacts associated with the proposed gathers. The environmental analyses looked at impacts on air quality; cultural resources; invasive, non-native vegetative species; migratory birds; threatened, endangered and sensitive animal species and plants; hazardous or solid wastes; water quality; wetland and riparian zones; wilderness; soils; vegetation; aquatic and terrestrial wildlife; fire management; hydrology and water rights; paleontology; rangeland management; recreation; noise; and wild horses. See East Douglas EA at 4-48; West Douglas EA at 4-47. As to each of these resources, the agency made specific findings that the proposed gathers would not adversely affect the environment. See Id.

In recognition that wild horses are a part of BLM's over-all management responsibility as set forth in the 1997 RMP, the two EA's analyzed in detail horse herd distribution; herd genetics and population history; herd age, sex and color ratio; and color composition. See East Douglas EA at 40-47; West Douglas EA at 40-45. Ultimately, BLM concluded that not only were the environmental impacts of the proposed gather operations environmentally insignificant, but they were necessary to achieve a thriving natural ecological balance on the range as mandated by 16 U.S.C. §§ 1332(f), 1333(a) and the 1997 RMP. See East Douglas EA at 2; West Douglas EA at 2.

        2.    <u>BLM properly considered potential alternatives to the gather and removal projects</u>

Plaintiff alleges without explanation, that BLM failed to examine a no action alternative or a broader range of alternatives in the EA's. See Pls.' Mot. at 17-18. They are mistaken and they fail to address the legal standard.

NEPA requires examination of a no action alternative, 42 C.F.R. 1502.14(d), and both

EA's satisfied the requirement. In each of the EA's, BLM examined potential outcomes associated with a "no action alternative." BLM concluded that a no action alternative as to the East Douglas HMA and the West Douglas HA would result not only in BLM's non-compliance with the wild horse management objectives identified in the 1997 RMP, but such action would also run afoul of BLM's statutorily mandated duty to "prevent range deterioration resulting from wild horse overpopulation"...and prevent BLM from "preserv[ing] and maintain[ing] a thriving natural ecological balance and multiple use relationships in areas where horses are managed as a component of multiple uses." *See* East Douglas EA at 3; West Douglas EA at 2; *see also* 16 U.S.C. §§ 1332(f), 1333(a). A short examination of the "no action" alternative suffices. See Oregon Natural Res. Council v. Lyng, 882 F.2d 1417, 1423 n. 5 (9th Cir. 1989) amended by 899 F.2d 1565 (9th Cir. 1989); Farmland Pres. Assn'n v. Goldschmidt, 611 F.2d 233, 239 (8th Cir. 1979).

    Because BLM found no significant impacts, the EA's do not need to examine as broad a range of alternatives as an EIS since the necessary range of alternatives diminishes as the expected impacts diminish. See Friends of the Ompompanoosuc v. FERC, 968 F.2d 1549, 1558 (2d Cir. 1992) ("range of alternatives an agency must consider is narrower when, as here, the agency has found that a project will not have a significant environmental impact."); Sierra Club v. Espy, 38 F.3d 792, 796, 802 (5th Cir. 1994) (range of alternatives to be considered in EA "decreases as the environmental impact of the proposed action becomes less and less substantial) (internal quotations omitted). Courts will uphold an agency's "discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." Citizens Against Burlington,, Inc, v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991).

"The fact that the EA may not have considered a specific alternative preferred by plaintiffs is simply not grounds for finding that the agency failed to meet its obligations in preparing the EA, or that the agency's decision was 'arbitrary and capricious.'" City of Roseville v. Norton, 219 F. Supp. 2nd 130, 170 (D.D.C. 2002). Nor does the fact that an agency analyzed only the proposed action and the no action alternative mean that an agency has failed to consider a reasonable range of alternatives. See Busey, 938 F.2d at 198 (upholding FAA's consideration of two alternatives–no action and approval of airport expansion); Missouri Mining, Inc. v. Interstate Commerce Comm'n, 33 F.3d 980, 981 (8th Cir. 1994) (upholding decision analyzing only no action and proposed operation and construction of 17 mile railway.) Accordingly, the discussing of alternatives in the EA's were satisfied by NEPA.

> 3.      The public was fully-informed as to BLM's proposed gather and removal projects.

Plaintiffs suggest that they did not have an adequate opportunity to comment on the EA's. See Pls.' Mot. at 17. NEPA provides for public review of EA's "to the extent practicable." 40 C.F.R. 1501.4(b) The public was fully-consulted in connection with the proposed gathers. A draft of each EA was made available for comment and specifically, counsel for the Plaintiffs submitted comments on both of them for review. BLM considered and addressed each comment. See East Douglas EA at pp.71-73; see also West Douglas EA at pp. 61-65. "[NEPA] ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 87, 97, 100-101. (1983).

> 4.      BLM considered the "cumulative impacts" of the proposed gather and removal projects

With respect to the East Douglas HMA, BLM concluded that absent the proposed gather, "negative impacts to vegetation, soils, and riparian areas will continue and excess wild horses will continue to compete with native wildlife for the available water and vegetation.  See East Douglas EA at 48.  "Until wild horses can be gathered, impacts to vegetation, soils, and riparian areas will continue and excess wild horses will continue to compete with livestock and the native wildlife for the available water and vegetation."  West Douglas EA at 46.

        5.      <u>BLM's proposed fertility program was subjected to sufficient NEPA analysis</u>

Plaintiffs' motion (p. 1) and memorandum (p.2) indicate opposition to BLM's use of the drug PZP to control wild horse populations, but they assert no violation of law.  In any event, BLM's use of the drug is in compliance with the law, and the two EA's fully-examined the effects of using the drug.

Contrary to Plaintiffs' suggestion, use of the drug is consistent with the Wild Horses Act. <u>See</u> 16 U.S.C. § 1333(b)(1) (appropriate management levels may be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels.)).

Plaintiffs are similarly wrong to suggest that the drug is novel.  Since 2003, BLM has administered the two-year PZP vaccine to more than 1,400 wild horse mares in 35 different HMAs covering 8 western states.  <u>See</u> Ackley Decl. at ¶ 4.  Use of PZP as a means to control population growth was selected by the agency as a potential alternative to the routine gather and removal programs that have been the necessity to date.  <u>See</u> East Douglas EA at 47, and its decision was not hastily-made.   It consulted nearly twenty years of published scientific research conducted and/or reviewed by "experienced reproductive physiologists, equine scientists,

wildlife biologists, geneticists, and animal behaviorists, providing a portrayal of safety, high efficacy, and absence of long-term behavioral, physical, or psychological effects from the vaccine." See Kirkpatrick, Jay F., Ph.D., and Fazio, Patricia M., Ph.D., July 2006. "Immunocontraceptive Reproductive Control Utilizing Porcine Zona Pellucida (PZP) in Federal Wild Horse Populations" (First Edition), attached as Ex. F to Lall Decl., at 7-8.[11]

The vaccine has been used successfully to manage wild horse populations in the Assateague Island National Seashore in Maryland and Virginia; Cape Lookout National Seashore, North Carolina; Carrot Island, North Carolina; many areas in Nevada; California; Wyoming; Montana; and Georgia. See id. at 14. In addition to controlling the horse populations, the treatment has extended the lives and improved the health condition of older mares by removing the stresses of pregnancy and lactation. See Id. at 15. Horses treated with PZP have exhibited improved body condition and decreased mortality. See Id. Decreased foal mortality rates have also been observed. See id. at 19. Use of PZP on federal wild horse herds is coordinated between BLM and the United States Humane Society ("USHS"). See Id. at 13. At least some of the Plaintiffs have sought to enjoin BLM's use of PZP in connection with its management of federal wild horse herds in another District. That Court upheld the use of the drug. See Cloud Foundation, Inc.. v. Kempthorne, case number CV-06-109-M-DWM (August 2, 2006, D. Mont.), attached as Ex. G to Lall Decl.

The East Douglas EA, describes the use of the drug and its expected effects. All mares treated with the PZP will be freeze-marked on the hip to enable researchers to positively identify

---

[11]      The Kirkpatrick Study was specifically considered by BLM in connection with its decision to use PZP as a fertility-control measure on wild herds in the East Douglas HMA. See East Douglas EA at 49.

the animals during the research project as part of the data collection and continued monitoring phase. *See* East Douglas EA at 65. At a minimum, monitoring of reproductive rates using helicopter flyovers will be conducted in years 2 through 4 by checking for the presence/absence of foals. Id.; see also Ackley Decl. at ¶ 4. The flights scheduled for year 4 will be for the purpose of helping determine the percentage of mares that have returned to fertility. *Id.* The WRFO will assure that treated mares do not enter into the adoption market for three years following treatment. Id. Decisions as to the future use of the fertility control program will be made after the results of follow-up monitoring have been analyzed. East Douglas EA at 47.

The WRFO concluded that use of PZP will allow select wild horse mares an opportunity to achieve improved body condition until their next foaling and realize greater life span on their home range in the East Douglas HMA due to fewer routine gather operations. East Douglas EA at 47*; see also* Ackley Decl. at ¶ 4. Moreover WRFO concluded that this option promotes the strengthening of herd genetics, in that fewer horses are removed from routine gathers. See East Douglas EA at 73; Ackley Decl. at ¶ 4.

Given BLM's statutory duty to maintain thriving natural ecological balance on public lands (*see* 16 U.S.C. §§ 1332(f), 1333(a)), paired with the evidence that it consulted the available scientific evidence regarding use of immunocontraceptives in wild horse programs, BLM's decision to use PZP was not arbitrary, or capricious. Thus, Plaintiffs are unlikely to succeed on the merits as to this claim.

6.     Securing budgetary approval for the proposed projects does not constitute an "irretrievable commitment of resources" in violation of NEPA

In their motion for temporary restraining order, Plaintiffs assert that BLM violated NEPA because the "agency has already made an irretrievable commitment of resources to conduct these

roundups. . ."  Pls.' Mot. at 12.  Plaintiffs somehow suggest that BLM's request for budgetary

approval for the proposed actions means that the agency failed to conduct a "hard look" at the

contemplated projects.  Id.  Even a cursory read of the East and West Douglas EA's suggests that

this simply is not accurate.  In both EA's, BLM completed thorough analyses of potential

environmental impacts associated with the proposed projects, including a look at the possible

outcome associated with a "no action alternative."  The agency advertised the proposed projects

for public review and comment, and provided all interested parties with notice of a right to

appeal BLM's final decision.  The Plaintiffs did not appeal either of the Notices of Final

Decision associated with the East or West Douglas Gathers.  See Walters Decl. at ¶ 24.

Plaintiffs cannot show this claim is likely to be successful.  Arranging for budgetary pre-

approval of a proposed project before completion of a NEPA analysis is not an irretrievable

commitment of resources under NEPA.  See Friends of Southeast's Future v. Morrison, 153 F.3d

1059, 1063 (9th Cir. 1998) (whether an agency action constitutes an "irreversible and

irretrievable commitment of resources" turns on whether the government retains the absolute

authority to decide whether any such actions will take place or has ceded control of the resource,

as through a lease or contract for sale.)  see also Colorado River Water Consv. Dist. v. U.S., 593

F.2d 907, 909-10 (10th Cir. 1977) (Bureau of Reclamation contract to transport water through

Big Thompson facilities with condition that deliveries contingent on completion of NEPA

analysis on a project plan and approval of plan by Secretary was only "agreement to enter an

agreement", "Nor do we have a '[ir] reversible commitment'. . . because, in the instant case, if an

environmental statement is not approved the federal facilities are not committed."); Southern

Federal Power Customers, Inc., v. Caldera, 301 F. Supp. 2d 26, 32-34 (D.  D.C. 2004). (agency

can make pre-arrangements, such as a settlement proposal, prior to doing NEPA work, so long as the agency keeps its options open as to actually proceeding with the contemplated action.)  Here, there is no question that the government retained the authority and option to conduct or abandon the proposed gathers depending on the outcome of the NEPA analyses and there is no violation of NEPA if BLM seeks to ensure that funding is in place should it decide to proceed with a gather.  Furthermore, a proposed gather date is often required for the advanced scheduling needed to process wild horses through the national system of adoptions and care.  The East Douglas HMA was identified for gather in 2006 through the national budget process, contingent upon completion of NEPA." (Emphasis added).  See East Douglas EA at 71.  Thus, there has been no violation of NEPA through normal budgeting requests within the agency.

       7.       It was appropriate for BLM to prepare separate EA documents for each of the proposed gather plans

Plaintiffs argue that the East and West Douglas Gather/Removal projects should have been analyzed in a single environmental document.  See Pls.' Mot. at 13, citing 40 C.F.R. § 1508.25(a)(2).   Thus, they appear to argue that the projects are cumulative actions, "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same [environmental] impact statement." 40 C.F.R. § 1508.25(a)(2).  However, they also argue that BLM should have considered "actions having common timing or geography" as a basis for a single analysis. Implicating 40 C.F.R. 1508.25(a)(3).  Plaintiffs suggest the geographic proximity of the East Douglas HMA to the West Douglas HA in support for their argument that BLM should have conducted a singular comprehensive environmental analysis for the proposed projects.  See Pls' Mot. at 4.  Their claims, as best as they can be

identified, are unfounded.[12]

A single NEPA document is only required when "there is a single proposal governing the projects or when the projects are connected, cumulative, or similar actions under the regulations implementing NEPA." Native Ecosystems Council v. Dombeck, 304 F.3d 886, 893-94 (9th Cir. 2002) (internal citations and quotations omitted), appeal after remand, Bear Creek Council v Heath, 153 Fed. Appx. 435 (9th Cir. 2005). An agency's determination as to the scope of an environmental analysis "requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility." See Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976). Resolution of these issues "requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies." Id. Here, the East Douglas HMA is separated from the West Douglas HA area by State Highway 139. See Walters Decl. at ¶ 11. Fencing erected in 1983 physically separates the East Douglas HMA from the West Douglas HA. Id. The fencing prevents the migration of horses between the two areas, and such migration has never been observed. Id. Because the East and West Douglas herds are distinct and isolated populations,

––––––––––––––––––

[12]    Plaintiffs also repeatedly stray from the only ripe issue that is before this Court, that being, the proposed gather and removal projects associated with the East Douglas HMA and the West Douglas Herd Area. The repeated references made by Plaintiffs with regard to a proposed amendment by BLM to the 1997 RMP and a potential decision to "zero out" herds presently residing in the West Douglas HA is not ripe for judicial review at this time because no *final* agency decision has been made with regard to the proposed amendment to the 1997 RMP. BLM's proposal to amend its 1997 RMP is not yet a final agency action. See Bennett v. Spear, 520 U.S. 154, 178, (1997) (agency action is not final unless: (1) the action marks the consummation of the agency's decision making process; and (2) the action creates rights or obligations from which legal consequences will flow). Whether there has been "agency action" or "final agency action" within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable. Fund for Animals v. BLM, 460 F.3d 13 (D.C. Cir. 2006). Because the proposed amendment to the 1997 RMP is not a "final" action within the meaning of Bennett, Plaintiffs must wait until a final decision is made before seeking legal redress in the District Courts of the United States.

there is no common geography or suggestion of a significant cumulative effect and it was an entirely acceptable and appropriate exercise of discretion to conduct separate environmental analyses in connection with the proposed gather and removal of horses from each respective area notwithstanding geographic proximity.  Thus, Plaintiffs are not likely to succeed in claiming a single NEPA document should have been prepared.

### C. The Plaintiffs Cannot Demonstrate the Likelihood of Success on the Merits on their FLPMA and Wild Horses Act Claims

Plaintiffs challenge the setting of population limits in the East and West Douglas Areas in the 1997 RMP.  See Pls.' Mot. at 15-16.  This claim is time-barred and, in any event, it is unfounded.  FLPMA, 43 U.S.C. § 1701 et seq. establishes requirements for land use planning on land administered by the Secretary of Interior, including lands managed by BLM.  One of the stated congressional policies in FLPMA is that "goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple use and sustained yield unless otherwise specified by law."  43 U.S.C. § 1701(a)(7).  Managing for multiple use involves the complicated task of "striking a balance among the many competing uses to which land can be put, 'including but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'"  Blancett v. BLM, 2006 WL 696050, at *2 (D.D.C. Mar. 20, 2006) (quoting Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 58 (2004)) ("SUWA").  The principle of "sustained yield" refers to sustaining "a high level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use.  Blancett, 2006 WL 696050 at *2.

Resource Management Plans, otherwise known as "Land Use Plans" in the FLPMA

context, are, once adopted after notice and comment, "designed to guide and control future management actions." See SUWA, 542 U.S. at 59. "Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." Id. Under FLPMA, "[t]he Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with land use plans. . ." Id. at 59-60. Agencies are entitled to deference to their interpretation of their own regulations. See Forest Guardians v. U,S. Forest Serv., 329 F.3d 1089, 1097, 1099 (9th Cir. 2003); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1154 (9th Cir. 1998) (USFS entitled to deference in interpretation of forest plan prepared under the National Forest Management Act 16 U.S.C. §1604., which is akin to BLM's interpretation of a land use plan under FLPMA).

Here, pursuant to FLPMA, BLM must manage the resources in the East Douglas HMA and the West Douglas HA in conformity with the principles of multiple use and sustained yield contained in the 1997 RMP. This RMP was adopted more than 9 years ago after ample opportunity for public notice and comment. Plaintiffs' attempt to challenge decisions made in the 1997 RMP with respect to the establishment of HMA and HA's is time-barred. See Trafalgar Capital Assocs., Inc., v, Cuomo, 159 F.3d 21, 34 (1st Cir. 1998) (federal statute of limitations (28 U.S.C. § 2401) applies to actions brought under the APA). A cause of action accrues under the APA when the person challenging the administrative action "can institute and maintain a suit in court." Trafalgar, 159 F.3d at 35. That is, when there has been a "final agency action". Id. Challenges to the wisdom of a governmental policy must be brought within six years of the accrual of the action. See Wind River Mining Corp. v United States, 946 F.2d 710, 714-715 (9th Cir. 1991). "Grounds for such challenges will usually be apparent to any interested citizen

within a six-year period following promulgation of the decision." Id.  Aside from being time-barred, Plaintiffs have come forward with no evidence that BLM arbitrarily or capriciously defined relevant HMA and HA boundaries in connection with the 1997 RMP.

The Wild Horses Act directs the Secretary to manage the animals "as an integral part of the natural ecological balance on the public lands, " (16 U.S.C. § 1331), and to "preserve and maintain . . . [a] multiple-use relationship" with the land, Id. § 1332(f)(2); Fund for Animals v. BLM, 460 F.3d 13 (D.C. Cir. 2006).  BLM carries out its wild horse management duties as part its broader use land planning responsibilities.  Id.  This means that management of wild horses and burros shall be balanced with management of other resources with the objective of achieving and maintaining a thriving natural ecological balance on public lands.  See id; see also 16 U.S.C. §§1332(f), 1333(a).

1.    BLM's Decisions Comply with the Wild Free Roaming Horses and Burros Act

Pursuant to the Wild Horses Act, it is the goal of wild horse management to maintain a thriving natural ecological balance among wild horse populations, wildlife, livestock, and vegetation and to protect the range from the deterioration associated with overpopulation.  See 16 U.S.C. §1333(a); Dahl v. Clark, 600 F. Supp. 585, 594 (D. Nev.1984);  Blake v. Babbitt, 837 F. Supp. 458, 460 (D.D.C. 1993).

The 1978 amendments to the Wild Horse Act embody important clarification in the management of wild horses: first, that the agency administering the horse range must strike a balance between protecting the wild horses and the other competing interests in the resources on

the public ranges; second, that if the agency determines that excess horses exist they should be expeditiously removed.  Am. Horse Prot. Ass'n, Inc. v. Watt, 694 F.2d 1310, 1316 (D.C. Cir. 1982).  Thus, the Wild Horse Act creates its own tension between active management and passive protection of these feral horses. It recognizes that wild horses are "components of the public lands," that they shall be managed to maintain balance in the entire ecosystem, and that management activities shall be at the minimal feasible level to protect the balance of all wildlife species on the range.  16 U.S.C. § 1633(a). It also requires that when the agency determines, based on available scientific information, that "an overpopulation exists" and that "action is necessary to remove excess animals," the agency "shall immediately remove" the excess horses. 16 U.S.C. § 1333(b)(2).

        The Wild Horse Act does not require that the maximum number of horses be retained on the range without regard to the impact identified or projected for the ecosystem as a whole. See Dahl, 600 F. Supp. at 594 (finding that there is no requirement for BLM to maintain a particular number of wild horses under the Wild Horses Act, rather, such a determination lies within the Secretary's discretion.).  Instead the agency is given broad discretion to take action in a humane manner to remove horses to preserve and maintain the habitat for sustained use or to control population growth with the use of sterilization.  Am. Horse Protection Ass'n. Inc. v. Frizzell, 403 F. Supp. 1206, 1217 (D. Nev. 1975); 16 U.S.C. §1333(b)(1).  In American Horse v. Frizzell, the court upheld the use of an EA which determined that the removal of 400 horses was appropriate.  The court rejected Plaintiff's claim that an EIS should have been prepared.  Id. at 1218-1219.  The court found that BLM actions were not arbitrary and capricious because "BLM's decision to remove less than one-half of the wild horses in the Valley to reduce grazing

pressures is arguably in the best interests of the remaining wild horses." The court held, "This Court cannot say that the decision was arbitrary or capricious or in violation of BLM's duty to protect wild horses." American Horse, 403 F. Supp. at 1217-1218.  In regard to the Plaintiff's claim that they would be denied the knowledge that horses will remain on the public lands for their enjoyment, eyewitness observation, and television documentaries, the Court found that the remaining horses on the range would sufficiently satisfy that interest.  Id. at 1219.

In addition, the 1978 amendments to the Wild Horse Act discussed information that the agency is to review in making decisions regarding whether to remove horses and authorized removal even in the absence of the information:

> The most important 1978 amendment, for our purposes, is section 1333(b)(2). That section addresses in detail the information upon which BLM may rest its determination that a horse overpopulation exists in a particular area. The Agency is exhorted to consider (i) the inventory of federal public land, (ii) land use plans, (iii) information from environmental impact statements, (iv) the inventory of wild horses.  But the Agency is explicitly authorized to proceed with the removal of horses "in the absence of the information contained in (i-iv)." Id. Clauses (i-iv) are therefore precatory; in the final analysis, the law directs that horses "shall" be removed "immediately" once the Secretary determines, *on the basis of whatever information he has at the time of his decision*, that an overpopulation exists.  The statute thus clearly conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information.

American Horse Prot. Ass'n Inc. v. Watt, 694 F.2d at 1318. (Emphasis in original). See also Blake v. Babbitt, 837 F. Supp. 458, 459 (D.D.C. 1993).

2.      Overpopulations Exist in the East Douglas HMA and the West Douglas HA

In this case, BLM has reviewed and is implementing the 1997 RMP which is already in effect and have been through the NEPA process.  As discussed above, BLM has determined that the appropriate management level for the East Douglas HMA is 135-235 horses and the

appropriate population for the West Douglas HA is currently 0-50 horses.  The two decisions challenged by Plaintiffs in this case clearly explain that overpopulations exist: there are at least 436 wild horses in the East Douglas HMA and at least 139 wild horses in the West Douglas HA. See July 27, 2006 Decision at 1, August 1, 2006 Decision at 1.  Having determined that overpopulations exist BLM must "immediately remove excess animals from the range." 16 U.S.C. 1333(b)(2).  Far from being arbitrary and capricious, these decisions are clearly consistent with the Wild Horses Act.

## II.     PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE INJURY

Even if this Court were to find a violation of law, there is no presumption of harm where plaintiffs allege a violation of environmental statutes.  Amoco Produc. Co. v. Village of Gambell, 480 U.S. 531, 544-545 (1987) (reversing a preliminary injunction premised presumption of irreparable damage when an agency fails to evaluate thoroughly the environmental impact of a proposed action);  Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1400 (9th Cir. 1992) ("Merely establishing a procedural violation of NEPA does not compel the issuance of a preliminary injunction").  Rather, Plaintiffs bear the burden of demonstrating that gathers in the East Douglas HMA and the West Douglas HA, if allowed to proceed as planned, may result in a concrete injury to their interests that is "irreparable." See Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985) (the alleged injury "must be both certain and great; it must be actual and not theoretical.  Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time.'") (quoting Connecticut v. Massachusetts, 282 U.S. 660, 674 (1931)).

In their Motion, Plaintiffs make almost no showing that they will be irreparably harmed

by the two gathers. The only assertion they make is that they will be irreparably harmed "[b]ecause BLM intends that these roundups will remove all wild horses from one area and the vast majority from another area." Pls. Mot. at 1. The premise of this assertion is false. BLM is not removing all horses from the West Douglas HA and the vast majority of horses from the Piceance/East Douglas HMA in these gathers. Rather, BLM plans to reduce the population in the West Douglas HA to 50 horses and the population on the Piceance/East Douglas HMA to 135 horses, consistent with the Wild Horses Act's requirement that BLM manage wild horse populations at an appropriate management level and in a manner designed to maintain a thriving natural ecological balance on the public lands. See 16 U.S.C. § 1333(a)-(b).[13] After the gathers are complete, wild horses will still inhabit both areas. Cf. American Horse, 403 F. Supp. at 1219 (finding that the horse remaining on the range after gather was complete would sufficiently satisfy plaintiffs' interest in keeping wild horses on the public lands for their enjoyment). Thus, Plaintiffs' claim that they fear the extinction of horses in both areas is entirely speculative and insufficient to establish that they may suffer irreparable harm. See Wisconsin Gas, 758 F.2d at 674; Ctr. for Law and Educ. et al. v. U.S. Dep't of Educ., 209 F. Supp. 2d 102, 117.[14]

---

[13]    As discussed above, although BLM has proposed to remove all horses from the West Douglas HA, it has not made a final decision to do so. By leaving 50 horses in this area, BLM will still be able to pursue one of the alternatives in the environmental assessment on the amendment to the 1997 RMP, which is to manage a small herd of 29-60 horses in the area. See n.7, supra, and accompanying text.

[14]    Plaintiffs have also submitted a number of declarations with a patchwork of claims that they enjoy viewing wild horses in these areas, that they have had trouble viewing horses in these areas and that they fear that the current gathers will lead to the eventual "extinction" of wild horses in both areas. As discussed above, BLM is not removing all horses from either area, nor is it taking any action that will lead to their "extinction." Furthermore, it is understandable that Plaintiffs have had difficulty locating horses. The West Douglas HA and the Piceance/East Douglas HMA include hundreds of thousands of acres of rugged terrain with few roads. It is neither practical nor reliable to estimate horse populations from ground observations in an area this large. Aerial survey is the only reliable way to observe horses or conduct a census of the population. See Walter Decl. ¶ 15.

Further, Plaintiffs' claim that there is a need for emergency relief is undermined by their nearly two-month delay in bringing this motion.  Essentially, Plaintiffs, through their own inaction, have manufactured an "emergency."  This Court rejected a similar strategy in Fund for Animals v. Frizzell, 530 F.2d 982 (D.C. Cir. 1975).  There, the court held that its "conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one."  Id. at 987.  Fund for Animals sought to challenge regulations of the Fish and Wildlife Service permitting the hunting of the greater snow goose and the Atlantic brant. Id. at 983. The court held that the Fund for Animals forty-four-day delay in bringing any action was "inexcusable." Id.  Like the emergency motion in Fund for Animals, Plaintiffs' present motion fails to explain why Plaintiffs took nearly two months to seek emergency relief from this Court.  As such, their delay in seeking relief indicates that speedy action is not required.  Fund for Animals v. Frizzell, 530 F.2d at 987. See also Mylan Pharmaceuticals v. Shalala, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) ("Though [plaintiff's] delay [in seeking emergency relief] is not dispositive of the issue, it further militates against a finding of irreparable harm.");  Kansas Health Care Ass'n v. Kansas Dep't of Social and Rehab. Servs., 31 F.3d 1536, 1543-44 (10th Cir. 1994) ("As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury."); Lydo Enters. v. Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) (preliminary injunction should not issue where plaintiffs had delayed seeking injunctive relief).

There is no question that Plaintiffs' delay in filing their motion has created the exigency before this Court.  Plaintiffs have been raising concerns about these gathers for over six

months.[15]  BLM sent the environmental assessments for the proposed gathers to Plaintiffs'

counsel in June 2006 and indicated that it would consider comments submitted by July 10, 2006.

On July 10, 2006, BLM received a letter from Plaintiffs' counsel asserting that the gathers would

violate the NEPA, the FLPMA, the Wild Horses Act and should not proceed.  See Ex. H to Lall

Decl.  In two final decisions dated July 27, 2006 and August 1, 2006, BLM responded to these

comments and stated that it had decided to conduct the gathers proposed in the EAs.  See East

Douglas EA at 71; West Douglas EA at 61.  As discussed above, these two decisions clearly

explained that: 1)  any interested and affected party could file an appeal with the IBLA and a

petition to stay the decisions; 2) they were full force and effect, meaning they would take place

on the dates specified regardless of an appeal; and 3) if a party petitioned for a stay either

decision, he or she "bears the burden of proof to demonstrate why a stay should be granted."  See

July 27, 2006 Decision at 2-3; August 1, 2006 Decision at 2-3.  Plaintiffs neither appealed the

decisions nor petitioned for a stay.  Plaintiffs waited nearly seven weeks to file this action and

took another week to file their motion for a temporary restraining order, even though they knew

that the decisions were full force and effect and were informed on September 15, 2006 that the

gathers were behind schedule and going to proceed as quickly as possible.  See Walter Decl. ¶

25.  Although they were not required to do so, the fact that Plaintiffs did not seek relief from the

IBLA or federal court until after the gathers had begun undermines any assertion that emergency

relief should now be granted.

---

[15]      In a letter dated February 28, 2006, Plaintiffs wrote to the protest coordinator at BLM's head
office in Washington, D.C., raising concerns about wild horse gathers in the Piceance/East Douglas HMA
and the West Douglas HA that she claimed were planned for September 2006.  See February 28, 2006
Letter from Valerie Stanley to Brenda Williams, attached as Ex. H to Lall Decl.  Much like Plaintiffs'
TRO motion, Ms. Stanley's letter contained an erroneous assertion that the planned gathers would leave
only 20 horses in Piceance/East Douglas HMA and 5 horses in the West Douglas HA .  Id at 3.

In their motion, Plaintiffs claim: "Although BLM has placed this decision in 'full force and effect' to 'encourage expedited completion of this project' . . . plaintiffs submit that when that statement is viewed in light of all the other circumstances surrounding these actions, that determination must be viewed as suspect." Pls. Mot. at 18. Plaintiffs provide no further explanation for their delay, seriously undermining their assertion that they will be irreparably harmed if both gathers continue as planned. See Fund for Animals v. Frizzell, 530 F.2d at 987.

III.    **THE BALANCE OF THE HARDSHIPS FAVORS BLM AND AN INJUNCTION WOULD NOT SERVE THE PUBLIC INTEREST AS DEFINED IN THE WILD HORSES ACT**

If BLM were enjoined at this late stage, it would pose a serious hardship on the agency and the natural resources in the affected areas. See Walter Decl. ¶¶ 17-23. As discussed above, BLM has determined that the number of wild horses in the East Douglas HMA and the West Douglas HA exceeds the levels that can sustain a thriving natural ecological balance. Once BLM determines that an overpopulation exists, the Wild Horses Act directs BLM to remove excess animals, in part, to "protect the range from the deterioration associated with overpopulation." 16 U.S.C. § 1333(b)(2).

A.    **Any Delay Could Harm the Wild Horses**

If the wild horse populations continue to expand in these areas, it is possible that they will excessively consume vegetation, placing themselves at risk, and disrupting the balance of multiple uses that BLM seeks to achieve on the land. See Ackley Decl. ¶¶ 8, 10. In addition, the gathers challenged in this case were planned to take place during the fall because this would allow the current population of foals to be of an age and maturity to keep pace with the adult horses during the gather operation. Walter Decl. ¶ 19. Delaying the gathers would significantly

- 42 -

reduce the window of opportunity for a successful gather which allows for the least amount of impact to the horses.  Id.  Under BLM policy, gathers are not conducted from March 1 through June 30 in order to prevent duress to pregnant mares and to newborn foals.  Delaying a gather past February would likely result in another foal crop of 20%, exacerbating the deteriorating resource conditions even further and resulting in an increased deterioration of the vegetation and resources on the range and a substantial increase in BLM's gather cost.  Id.

More than 100 wild horses from the East Douglas HMA have been sent to BLM's holding facility in Canon City, almost 300 miles away.  Walter Decl. ¶ 21.  When these horses enter that facility they are exposed to other horses and must receive a series of  immunizations to prevent them from becoming sick.  See Ackley Decl. ¶ 7.  If BLM were ordered to return any of these horses to the range, it would pose a serious health risk to the remaining horses in that area. Id.  A number of other horses have been captured in the Piceance/East Douglas HMA and are being held in corrals in or near the area so that they can either be returned to the range or adopted locally.  See Walter Decl. ¶ 23.  If there is any delay in completing this gather, BLM will be forced to hold these wild horses in the corrals pending a decision, which is stressful for the horses.  Walter Decl. ¶ 23; Ackley ¶ 9.

**B.    Any Delay Would Impose a Serious Hardship on BLM**

BLM has maintained the wild horse population in the East Douglas HMA at an appropriate management level and has attempted to remove or maintain a small population of wild horses in the West Douglas HA for over 20 years.  Having carefully analyzed the two gathers in environmental assessments over the summer, BLM has devoted significant staff time and financial resources towards completing the two gathers this fall.  See Walter Decl. ¶¶ 18-23.

- 43 -

The contractor who is currently conducting the gather in the Piceance/East Douglas HMA has informed BLM that they commitments in another state beginning October 16, 2006. Id. ¶ 18. Therefore, if the contractor is unable to start the gather in the West Douglas HA in the next few days, they will have to delay the gather until November at the earliest and perhaps later. Delaying the gathers into the winter months increases the possibility for adverse weather conditions and increases safety risks to the contractors and BLM staff performing the work. Id. Furthermore, the likelihood of adverse driving conditions makes transportation of the animals more hazardous during this time of year. Id.

Finally, an adoption open to the public has been scheduled for September 30, 2006 for horses gathered from the East Douglas HMA. Id. ¶ 23. In addition, BLM is in final negotiations with a horse advocacy group to adopt or purchase all horses gathered from the HA and place them on an Indian reservation. Id. Delaying the gather in the East Douglas HMA would result in a waste of taxpayer dollars spent on advertising and planning the adoption and would increase the animal care costs for those horses already gathered from this area and held in corrals pending a decision. Id.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion seeking extraordinary injunctive relief should be denied.

Respectfully submitted this 28th day of September, 2006.

SUE ELLEN WOOLRIDGE, Assistant Attorney General
U.S. Department of Justice

Environment and Natural Resources Division
JEAN E. WILLIAMS, Chief
Wildlife and Marine Resources Section
CHARLES FINDLAY, Assistant Chief
KEVIN J. LARSEN, Trial Attorney
Natural Resources Section

/s/
PAUL D. LALL, Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7369
Washington, D.C.  20044-7369
Telephone: (202) 305-0201
Facsimile: (202) 305-0275

Attorneys for Defendants

- 45 -