IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF WASHINGTION, D.C.

| | |
|---|---|
| COLORADO WILD HORSE AND<br>BURRO COALITION, INC., ET AL.,<br><br>      Plaintiffs,<br><br>  v.<br><br>KEMPTHORNE, et al.,<br><br>      Defendants. | Civ. No. 06-1609 RMC |

DECLARATION OF KENT E. WALTER

I, Kent E. Walter, declare as follows:

1.      I am the Field Manager for the U.S. Department of Interior's Bureau of Land Management (BLM), Colorado State Office, White River Field Office, an agency of the U.S. Department of the Interior, located in Meeker, Colorado. In my capacity as Field Manager, I am responsible for the administration and management of 1,445,900 acres of BLM surface estate and 365,000 acres of split mineral estate within the White River Resource Area, located in Northwestern Colorado. I have been serving in my current capacity since October 2001.

2.      The purpose of this declaration is to explain the background and history of the two wild horse gather projects that Plaintiffs have challenged in this case and to explain the reasons why any delay could impose a serious hardship on BLM and the affected horses.

3.      Under the Federal Land Policy and Management Act (FLPMA), BLM is required to manage public lands in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmosphere, water resource, and archeological values, while recognizing the Nation's need for domestic sources of minerals, food, timber and fiber from the

public lands. Under FLPMA, Congress has directed BLM to manage public lands under principles of multiple use and sustained yield. To comply with these requirements, field offices of BLM develop and utilize Resource Management Plans (RMPs) to determine what resource uses are appropriate, where they are appropriate, how much use is anticipated and can be allowed with appropriate mitigation. An RMP establishes systems to monitor and evaluate the state of resources and the effectiveness of management practices over time. An RMP is developed using an interdisciplinary team of BLM employees, with public participation and is analyzed through the National Environmental Policy Act (NEPA) with an Environmental Impact Statement (EIS). An RMP for the White River Resource Area was approved in July of 1997. This RMP includes comprehensive land use decisions to effectively manage multiple uses throughout the White River Field Office including: mineral resources, grazing and livestock management, wildlife habitat, cultural and paleontological resources, soils, watersheds, forestry, wild horses and numerous other resources.

4.      In 1971, Congress enacted the Wild Free Roaming Horses and Burros Act (Wild Horses Act), which instructed BLM and the U.S. Forest Service to protect and manage wild free-roaming horses and burros as components of the public lands. In the same Act, Congress instructed BLM to manage these horses and burros within areas where they were found in 1971. After this law was enacted, BLM designated Herd Areas (HAs) on BLM administered lands, which BLM defines as those areas where wild horse and burros existed in 1971. It is important to recognize that HAs represent those areas where BLM has the authority to manage for wild horses. If BLM chooses to manage wild horses in a particular area for an extended period of time, it establishes a Herd Management Area (HMA) within an HA and develops an Appropriate

Management Level (AML) for the number or range of horses the HMA can support. Pursuant to BLM regulations, field offices that manage wild horse populations set AMLs for each HMA to provide for a level of use by wild horses and burros that results in a thriving natural ecological balance, avoids deterioration of the range, and takes into account other range uses. BLM field offices that manage wild horses in Colorado typically establish a range for an AML. The range accommodates population growth over a period of time: The top of the range represents the maximum number of animals that the range can sustain and still maintain a thriving natural ecological balance, while the bottom of the range typically represents the baseline from which the population can grow.

5.      HMAs are established based upon scientific studies and other available information about each herds' biological requirements, and AMLs are developed for the HMA based upon other site-specific considerations such as soil and watershed protection, domestic livestock, environmental quality, other resources uses and the needs of local wildlife.

6.      Pursuant to the Wild Horses Act, if BLM determines that an overpopulation exists on a given area of public land and that action is necessary to remove excess animals, it is required to immediately remove excess animals from the range so as to achieve the AML for the population. Because wild horse populations can expand rapidly, the goal of these operations typically is to return an overpopulation to the bottom of the AML range. This allows BLM to minimize the frequency of gather operations, which can be stressful for the horses.

7.      Once BLM determines that an overpopulation exists in a given area, it typically proposes a gather plan in an environmental assessment (EA) which is open to public comment. If BLM decides to proceed with the proposed gather plan, it develops and issues a gather plan

decision describing removal methods (including the techniques to ensure that the gathers are conducted humanely), impacts on the horses and other resources, and timing for the gather and removal of excess animals. BLM provides the public with at least 30-days notice of the gather plan prior to the gather to allow any interested parties to file an appeal and a petition to stay the decision with the Department of Interior Board of Land Appeals (IBLA).

8. Gather operations can take from a few days to several weeks, depending on the number of animals to be gathered and a number of other factors, such as the size of the search area, the nature of the terrain and the ability of a gather contractor to locate wild horses and coax them into traps. The primary method used to capture horses is called helicopter drive trapping. Using this method, a helicopter spots and herds bands of horses towards a large pre-constructed steel corral. At each end of the corral opening, there are funnel-shaped trap "wings" made of jute or snow fence that guide horses towards the corral opening. Once these traps are ready, the helicopter herds the horses into the trap wings and hovers to prevent them from running away. A ground crew on foot or horseback then herds the horses into the corral and closes a gate behind the horses. A pair of trained lead horses are often brought in with the ground crew to lead the wild horses into the corral and to encourage them to run smoothly inside the corral once the gate is shut. This process is often very difficult and dangerous for the helicopter and ground crew, especially if the weather changes unexpectedly.

9. Some of the captured horses are adopted, while others that are considered unadoptable for reasons of age or health are returned to the range or placed in private long term pasturing arrangements. Adoption is the primary tool for placing healthy animals that have been removed during a gather.

10.     Boundaries for HAs or HMAs are established, with public input, through an RMP or other environmental analysis. As discussed above, the Wild Horses Act requires BLM to manage wild horse populations within existing HA or HMA boundaries. When horses take up residence outside of established HMA or HA boundaries, the Act requires BLM to remove these excess horses as soon as practical.

11.     In 1974, three years after the Wild Horses Act was enacted, BLM conducted a census of the wild horse population in the White River Resource Area and found that there were 133 horses in the area that is now designated as the Piceance/East Douglas HMA and 9 horses in the area that is now designated as the West Douglas HA. In 1975, BLM drafted a White River Resource Area Management Framework Plan (MFP)[1] that provided a framework for managing multiple uses in the area, including the management of wild horses. In 1980, an updated MFP was published. The 1980 MFP established the Piceance/East Douglas HMA and also recommended that all horses west of Douglas Creek (later designated as the West Douglas HA) be removed because oil and gas activities in this area were causing horses to disperse into areas where they did not exist in 1971. In 1983, State Highway 139 was fenced on both sides. These fences create a physical barrier between the Piceance/East Douglas HMA and the West Douglas HA. In 1985, BLM attempted to completely remove wild horses from the West Douglas HA but was unsuccessful due a variety of reasons such as the size of the search area, the rough and inaccessible nature of portions of the terrain and the fact that horses were wary of the helicopters used to coral them into gather locations.

12.     On July 1, 1997, the Colorado State Director of BLM signed a Record of Decision for

the White River Resource Area Management Plan (1997 RMP). The 1997 RMP considered the multiple uses that BLM must manage in the White River Resource Area (i.e., wild horse populations, other wildlife populations, such as elk and deer, livestock grazing, extraction of oil and gas deposits, watershed control, recreation). One particular issue of concern is that there must be enough forage to sustain wild horses, other wildlife and livestock that graze in the White River Resource Area. Nearly all of the herd areas in the Resource Area are semi-arid and are between approximately 6,000 and 8,000 feet above sea level. Because vegetation is sparse and slow-growing, the ecosystem on the range can deteriorate quickly if there are too many animals (such as wild horses, elk and cattle) competing for forage. Considering these factors, the 1997 RMP established an AML for wild horses in the Piceance/East Douglas HMA of 95-140 animals on 190,130 acres, so that a thriving, natural ecological balance is maintained for all plant and animal species on that range. Since the development of the 1997 RMP, the AML for the Piceance/East Douglas HMA has been increase 65 percent to 135-235 wild horses to ensure the existence of a self-sustaining, genetically viable herd. The 1997 RMP management objective for the West Douglas HA, which encompasses 123,387 acres, allows for the management of 0-50 wild horses until 2007, when all horses are to be removed from the West Douglas Herd Area. Although the 1997 RMP calls for the total removal of wild horses from the West Douglas HA, BLM decided to reconsider this decision and conduct further analysis. On April 28, 2005, BLM published an environmental assessment that considered two alternatives: 1) removing all wild horses from the West Douglas HA by 2007; and 2) managing a small herd of 29-60 wild horses in this area. BLM has not issued a final decision on which alternative it will pursue.

---

[1] A Management Framework Plan (MFP) is the equivalent of what is now known as a Resource Management Plan

13.     The Bureau of Land Management, Colorado State Office, White River Field Office issued full force and effect decisions (August 1, 2006 and July 27, 2006) for both the 2006 Piceance/East Douglas Herd Management Area and West Douglas Herd Area Wild Horse Removals, as per Environmental Assessments (EA), CO-110-2006-030-EA and CO 1102006-166-EA.  The wild horse gathers are being performed in accordance with FLPMA, the Wild Horses Act, NEPA, and BLM regulations on the removal of excess wild horses from public lands (43 C.F.R. § 4720.1).  The objective of these gathers is to leave 135 horses in the Piceance/East Douglas HMA and 50 horses in the West Douglas HA, which is consistent with the 1997 RMP and allows BLM to continue managing horses in both areas until a decision is made on whether to remove all horses from the West Douglas HA.

14.     Currently, wild horse census data for these areas is: 436 horses in the Piceance/East Douglas HMA and 139 horses in the West Douglas HA.  If a gather is not conducted in the Piceance/East Douglas HMA the horse numbers would expand at the existing rate of 20% annually, with a resultant population of approximately 523 horses in the year 2007.  Even with current numbers, neither the Piceance/East Douglas HMA nor the West Douglas HA can be maintained within the parameters of a thriving, natural ecological balance. If these gathers do not proceed, it is likely that some range sites will deteriorate and take a long time to recover.

15.     Plaintiffs have questioned the accuracy of my office's census data for wild horses in the Piceance/East Douglas HMA and the West Douglas HA, and BLM's ability to ensure that a specific number of horses are left on the range.  Technical staff in the White River Field Office conduct aerial censuses at least every three years, making repeated flights over the areas.  When

---

(RMP).

they observe horses (typically in bands of one stud and several mares or bands of several bachelor studs), numbers and GIS coordinates are recorded, as well as identifying characteristics, such as size (i.e. foal, adult, or yearling) and coat color. This is to ensure that the same horses are not counted again on a subsequent flight. It is neither practical nor reliable to estimate horse populations from ground observations in an area this large. Aerial survey is the only reliable way to conduct a census of the population.

16.     Data from these censuses as well as from other sources are used to quantify the number of horses left in the HMA and HA during and after a roundup. In the gathers challenged in this case, a contractor will fly a small airplane on some mornings to locate the horses. BLM technical staff assist with this task by informing the contractor about patterns of band movements and known sightings of particular bands. Even with this information, it can be time-consuming to locate horses. Once they are located, these horses may or may not be gathered depending on the difficulty of herding them by helicopter to a trap (due to the topography and accessibility of the area). When horses are observed from the airplane numbers and GIS coordinates are recorded, as well as identifying characteristics, much like the information recorded during an aerial census. This is to ensure that the same horses are not counted again on a subsequent flight. Similarly, when horses are herded by helicopter towards a trap, some may be left behind and others may break away from the other horses before entering the trap. Typically, the contractor will only try to herd these horses a few times, before he or she determines that it is too difficult to capture the horses. These horses are also recorded according to GIS coordinates and identifying characteristics. Some horses are held at a temporary site after capture until gathering is complete within a certain geographic area. After the gathers in the entire area is finished, the age, sex, and

number of these horses is recorded and they are released. This also includes those mares that are held for the purpose of fertility control. All of this data, together with our census numbers, is compiled to ensure that the appropriate number of horses is either left in or returned to the HMA or HA.

17. Delaying the gathers in the Piceance/East Douglas HMA and the West Douglas HA would impose a serious hardship on BLM, the affected horses as well as resources on the ranges that are being impacted by excess numbers of wild horses. Current horse numbers are resulting in wild horses straying outside both the Piceance/East Douglas HMA and West Douglas HA. To delay the gathers would likely result in more wild horses moving into areas where BLM has no authority to manage wild horses.

18. Delaying the on-going wild horse gathers would also require rescheduling the contractors (gather contractor, local veterinarian, Animal Plant Health Inspection Service (APHIS) Veterinarians) who are already on-site, or scheduled to perform their contractual duties. Delaying the gathers into the winter months increases the possibility for adverse weather conditions and increases safety risks to the contractors and BLM staff performing the work. At this elevation, sub-zero temperatures can occur anytime after November, making gather activities much more difficult for employees, contractors, and other personnel. Furthermore, the likelihood of adverse driving conditions makes transportation of the animals more hazardous during this time of year. I have been advised by the contractor that they must begin work on another contract on October 16, 2006. Therefore, if they do not begin the West Douglas gather in the next few days, they will not be able to return until November at the earliest and perhaps later when there will be increased safety risks and likelihood of adverse weather conditions.

19.     Furthermore, the gathers were planned to take place during the fall because this will allow the current population of foals to be of an age and maturity to keep pace with the adult horses during the gather operation. Delaying the gathers would significantly reduce the window of opportunity for a successful gather which allows for the least amount of impact to the horses. Finally, per BLM policy, gathers are not conducted from March 1 through June 30 in order to prevent duress to pregnant mares that are in foal and to newborn foals.  Delaying a gather past February would result in another foal crop of 20%, exacerbating the deteriorating resource conditions even further and resulting in a substantial increase in BLM's gather cost.

20.     Due to these and other land use management activities, workload levels in the White River Field Office are unprecedented and personnel resources are stretched extremely thin. Planning for these gathers has been taking place for over a year.  Delaying the gather now would significantly reduce the window of opportunity for a successful gather and may adversely impact other workload objectives and targets.  Furthermore, BLM has expended financial resources and to postpone or delay the gather would increase the costs (demobilizing contractor, transportation, set-up) of performing the gather and would require additional expenditures within the White River Field Office's limited budget.

21.     The gather operations for the HMA have been underway since September 14, 2006. Over 200 horses have been gathered and approximately 100 horses have been transported to holding facilities in Canon City, Colorado. Transportation and holding operations would need to be rescheduled if a gather delay occurs.

22.     Fertility control will be applied to approximately 40 to 60 mares gathered and returned to the HMA.  Postponing the gather for the HMA would require rescheduling of personnel from

other states who are trained to administer the contraceptives.

23.     An adoption open to the public has been scheduled for September 30, 2006 for horses gathered from the HMA. In addition, we are in final negotiations with a horse advocacy group to adopt or purchase all horses gathered from the HA and place them on an Indian reservation. Funding has already been spent to advertise the adoption and conduct a mass mailing, and volunteers have been employed to distribute posters throughout northwestern Colorado. Delaying the gather in the Piceance/East Douglas HMA would result in a waste of taxpayer dollars spent on the adoption and would increase the animal care costs for those horses already gathered from this area and held in corrals pending a decision.

24.     The Colorado Wild Horse and Burro Coalition, Front Range Equine Rescue and American Mustang Burro Association (who are all plaintiffs in this case) commented on both gather EAs through counsel during the thirty day public comment period that ran from June 5 to July 10, 2006.  BLM provided responses to their comments in Appendix B and Appendix D of the gather EAs (CO-110-2006-030-EA and CO-1102006-166-EA).  BLM provided these organizations with the Notice of Final Decision for both gather EAs (August 1, 2006 and July 27, 2006).  Both decisions explained how to appeal and/or file a petition for a stay with the Interior Board of Land Appeals (IBLA).  Both decisions explained that they were "full force and effect," meaning an appeal would not stay BLM's implementation of the decision.  They also explained that a party petitioning for a stay of the decision bears the burden of demonstrating to the IBLA why a stay should be granted.  None of these organizations filed an appeal or a request for stay with the IBLA.

25.     Although plaintiffs specifically knew when the gathers would occur, they waited nearly

seven weeks to file this action on September 15, 2006. On the same day, September 15, 2006, Plaintiffs' counsel contacted me by telephone to request that I postpone the gathers because she was filing a lawsuit in District Court. I explained to her that our gather contractor was already working on the gather operation, and would have already been finished if we had not had any delays. I told her that I would not consider delaying the gather operation since it was already underway and to halt the gather operations would impose a serious hardship on my office and be fiscally irresponsible.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed in Meeker, Colorado on this 28th day of September, 2006.

_____
Kent E. Walter, Field Manager
U.S. Department of Interior
Bureau of Land Management
White River Field Office

13