IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| THE CLOUD FOUNDATION, INC., a Colorado non-profit organization, and FRONT RANGE EQUINE RESCUE, INC., a Colorado non-profit organization,<br><br>        Plaintiffs,<br><br>vs.<br><br>DIRK KEMPTHORNE, in his official capacity as Secretary, United States Department of Interior, et al.<br><br>        Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CV 06-109-M-DWM<br><br><br><br><br><br><br><br>ORDER |

## I. Introduction

On April 7, 2006 the Bureau of Land Management ("BLM") issued its Environmental Assessment ("EA") on population control for the Pryor Mountain Wild Horse Range ("Range"). The EA did not include an environmental impact statement ("EIS"). On June 29, 2006, the BLM followed with its Decision Record ("DR") and Finding of No Significant Impact ("FONSI"). The BLM's findings

-1-

call for the removal of 22 wild horses from the Range and the administration of an immunocontraceptive, Porcine Zona Pellucida ("PZP"), to 24 wild horses. The Cloud Foundation et al. filed suit on July 7, 2006 seeking to have the DR and FONSI set aside as a violation of the National Environmental Policy Act ("NEPA") and the Wild Free Roaming Horses and Burros Act through the Administrative Procedure Act ("APA"). On July 21, 2006, the Cloud Foundation filed for preliminary injunction. Defendants have filed for a change in venue and to dismiss the United States Forest Service as well. I find the preliminary injunction is not warranted and venue is properly located within the Billings Division of the District of Montana.

## II.  Factual Background

The Secretary of the Interior created the Pryor Mountain Wild Horse Range on September 9, 1968. The Range encompasses over 39,000 acres. In 1971, the Congress enacted the Wild Free Roaming Horses and Burros Act ("Wild Horses Act"), 16 U.S.C. § 1331 et seq. This Act charges the BLM to maintain a balance between wild horses, wildlife, and the ecosystem in general. This includes range management and allows for the BLM to manage herd levels through removal, destruction, sterilization, and natural controls. As part of its charge, the BLM is required to remove excess animals to "maintain a thriving natural ecological balance and multiple-use relationship in that area." § 1332(f).

In 1992, the BLM modified its herd management plan to set the appropriate level at 95 head of wild horses (within 10%). A

range survey conducted in 2004 that assessed the health of the rangeland conditions stated that the herd should be maintained between 45 to 142 horses. The April 2006 Environmental Assessment estimated the population level at 185 horses. The Cloud Foundation estimates the herd population is 172 head.

The Cloud Foundation asserts that research conducted by Dr. Gus Cothran, former director of the Equine Blood Typing Research Laboratory at the University of Kentucky, substantiates that at least 150 horses must be maintained. Dr. Cothran believes that of the 150, 50 is the absolute minimum to allow for adequate genetic diversity. The BLM, however, also cites Dr. Cothran and notes his endorsement of a plan to reduce the herd level to 100 horses to restore the range. Cothran's approval rests on maintaining "the core of the reproducing individuals" to maintain genetic variation.

The Cloud Foundation contests the BLM's characterization of the use of PZP. The Foundation calls it experimentation and asserts it will result in sterility in the subject mares. The DR and FONSI call for the administration of PZP in 2006 only and only to mares who are past their prime breeding years (11 years-old or greater).

### III. Analysis

#### A. Standards for Preliminary Injunctions.

If the court finds the Defendants have violated NEPA, an injunction is the appropriate remedy. *Forest Conserv. Council v.*

*U.S. Forest Service*, 66 F.3d 1489, 1496 (9th Cir. 1995). The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). In issuing an injunction the court must balance the equities between the parties and give due regard to the public interest. *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833 (9th Cir. 2002). An injunction is never to be issued automatically without explicit balancing of the equities. *Village of Gambell*, 480 U.S. at 542.

The Ninth Circuit applies two preliminary injunction tests. The traditional test requires plaintiffs to show (1) they will suffer irreparable injury if the preliminary injunction is not granted; (2) they will probably prevail on the merits; (3) in balancing the equities, the Government will not be harmed more than the plaintiffs are helped by the injunction; and (4) the injunction is in the public interest. *Earth Island Institute v. U.S. Forest Service*, 351 F.3d 1291, 1297-1298 (9th Cir. 2004).

The Ninth Circuit's alternative preliminary injunction test requires the plaintiff to demonstrate either a combination of probable success on the merits and the possibility of irreparable injury, or that serious questions are raised and the balance of hardship tips sharply in their favor. *Id.* Rather than two separate tests, these two possibilities represent two ends of a continuum. "Thus, the greater the relative hardship to [the

-4-

party seeking the preliminary injunction,] the less probability of success must be shown." *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir 2003).

Environmental claims can affect the preliminary injunction standard. *See, e.g., Am. Motorcyclist Assoc. v. Watt*, 714 F.2d 962, 965-66 (9th Cir. 1983). In *Village of Gambell*, the Supreme Court recognized that environmental harm is often irreparable: "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." 480 U.S. at 545.

Even if plaintiffs have a strong environmental claim, they are not automatically entitled to a preliminary injunction. *Village of Gambell*, 480 U.S. at 542. Irreparable harm is not presumed, even if a plaintiff is able to demonstrate that the agency violated an environmental statute. *Id.* at 544-45. Rather than focusing on the violation of statutory procedure, the court should focus on whether an injunction would undermine the "underlying substantive policy the [statutory] process was designed to effect." *Id.* The Ninth Circuit states Congress' purpose behind NEPA is to require a sufficiently detailed statement of environmental impacts as to allow informed decision making. *The Lands Council, et al. v. U.S. Forest Service*, 395

F.3d 1019, 1027 (9th Cir. 2004).

**B.   The Imposition of a Preliminary Injunction is not Warranted Because the Pryor Herd will not Suffer Irreparable Injury.**

The Cloud Foundation will not suffer irreparable injury if the BLM is allowed to proceed with its plan to cull the Pryor herd. Currently the population of the Pryor herd is beyond the highest estimate for carrying capacity-a maximum of 142 head[1]-of the Range and the BLM is required to act in accordance with the Wild Horses Act. The Cloud Foundation estimates that there are 172 head while the BLM estimates 185 head-in either case the number exceeds range capacity by at least 30 or more.[2] An expert both sides rely on, Dr. Cothran, has stated that a reduction to 100 horses could be achieved without hurting the long-term genetic viability of the Pryor herd if the reduction protects the core breeding pool. Thus, even if all of the Cloud Foundation's predictions about the application of PZP are true and 46 horses are permanently eliminated from the gene pool, the damage to the herd will not be irreparable.[3]

---

[1] Different herd management plans call for a maximum of even less-some as low as 105 adult horses (1992 Herd Management Plan). The April 2004 Pryor Mountain Wild Horse Range Survey and Assessment set the maximum level at 142 horses and also yielded considerable evidence of range decline.

[2] Regardless of whether the wild horses are ranging off of the designated Range to National Forest land, the harm to the horses will not be irreparable and evidence demonstrates the Range is in peril, which mandates BLM action.

[3] The application of PZP to 24 animals will not substantially affect the core breeding pool since the DR and FONSI mandate that it will only be applied to older mares who have already contributed to the genetic diversity of the herd.

The Cloud Foundation has not convincingly addressed the legal standards for a preliminary injunction in either its written briefs or during oral argument on August 1, 2006. Specifically, the Cloud Foundation has not demonstrated that irreparable harm will occur. At one point during the hearing Plaintiff's counsel had Ginger Kathrens testify. Kathrens, a naturalist who has produced movies and written books on the wild horses in the Pryor Mountains, stated she would suffer irreparable harm due to the BLM's DR and FONSI. She stated it was upsetting to see the horses suffer the results of the PZP and removal. She further stated the public in the United States and the rest of the world would suffer irreparable harm due to the BLM's plan. While Kathrens may be devoted to the wild horses and well versed in their behavior, the Court is concerned with preventing irreparable harm to the wild horses in the Pryor Mountains-not individual normative reactions to the BLM's adherence to legal mandates.

Under the Ninth Circuit's alternative test, courts balance irreparable harm with the probability of success on the merits. Those two considerations are the ends of the continuum. The greater the hardship would be to the Cloud Foundation then the less likely it has to be to succeed on the merits.

Here, the Cloud Foundation has not met its burden to show that the failure to implement the injunction will result in irreparable injury. As the United States Supreme Court held in *Village of Gambell*, the Court cannot presume irreparable harm,

-7-

even if the Cloud Foundation were to conclusively demonstrate a NEPA or APA violation.  Therefore the Court will not intercede and prevent a federal agency from acting in accordance with the law where the moving party cannot meet its burden.

**C.   The Billings Division is the Correct Venue.**

Pursuant to the BLM's motion, the Court agrees venue is properly located in the Billings Division.  The Cloud Foundation has apparently tied venue to the Missoula Division because the United States Forest Service is a defendant vis-a-vis the Custer National Forest.  However, the Pryor Mountains, the Custer National Forest, the wild horses, most of the witnesses, and the location of the offices for the major participants all reside within the Billings Division.  As found in Defendants' brief, Local Rule 1, the Montana Code Annotated, Montana case law, federal case law, and the United States Code all support Billings as the proper venue for this lawsuit.  Billings should have been the location of this lawsuit since its inception.  Now, pursuant to 28 U.S.C. 1404(a), venue is transferred to the Billings Division of the United States District Court for the District of Montana.

### V.   Conclusion

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' motion for a preliminary injunction (dkt #6) is DENIED; and

IT IS FURTHER ORDERED that Defendants' motion to transfer venue to the Billings Division of the United States District Court for the District of Montana (dkt #14) is GRANTED.

The Clerk of Court is directed to notify the Parties and transfer venue to the Billings Division.

DATED this 2nd day of August, 2006.

/s/ Donald W. Molloy
DONALD W. MOLLOY, Chief Judge
United States District Court