*Law Office of Valerie J. Stanley*
*329 Prince George Street*
*Laurel, MD 20707*

**Admitted in Maryland**
**and the District of Columbia**

**(301) 549-3126**
**(301) 549-3228 fax**

<u>*By Federal Express for Delivery July 10, 2006*</u>

July 8, 2006

Bureau of Land Management
White River Field Office
Attention: Melissa Kindall
73544 Highway 64
Meeker, Colorado 81641

Re: 2006 West Douglas Creek Herd Area Roundup

Dear Ms. Kindall:

I am submitting these comments on behalf of the Colorado Wild Horse and Burro Coalition (CWHBC), Front Range Equine Rescue (FRER) and the American Mustang and Burro Association. (AMBA). These organizations are comprised of Colorado residents and others who enjoy viewing wild horses living free in Colorado and who are concerned by BLM's intent to eradicate wild horses from the state, as expressed in both the EA issued for the roundup of the West Douglas Creek wild horses and the EA issued simultaneously for the roundup of the nearby Piceance-East Douglas wild horses.

### I. BLM Has Already Committed Resources to Engage in these Roundups in Violation of the National Environmental Policy Act and this EA Evidences BLM's Single-Minded Approach to Eradicating the West Douglas Herd

First, neither the EA issued for the West Douglas roundup nor the EA issued for the Piceance-East Douglas roundup disclose that the agency has already made an irretrievable commitment of resources to conduct these roundups, in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq.. NEPA requires that ***before committing resources to engage in activities, it must analyze the environmental effect of those activities.*** The language and

1

spirit of NEPA is aimed at ensuring that an agency's single-minded approach to a proposed action is tempered by consideration of a reasonable range of alternatives, including those with fewer adverse environmental impacts than the proposed action. A predecisional commitment of resources prohibits the "hard look" that agencies must engage in when they consider the environmental consequences of their proposed actions. This comprehensive "hard look" mandated by Congress and required by the statute must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.  As the Eighth Circuit observed in Environmental Defense Fund v. Corps of Eng'rs of the U.S. Army, 470 F.2d 289, 295 (8th Cir.1972)

> "[t]he unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives." Id. at 298.

BLM's irretrievable commitment of resources is evidenced by the 2006 Roundup Schedule, completed in October, 2005, which calls for both the West Douglas and the Piceance-East Douglas roundups to take place in September, 2006.  BLM's issuance of these EAs, which call for the actions BLM has already committed to, and its solicitation for the public to "comment" on its already planned actions, makes a mockery of NEPA.

Furthermore, BLM issued this WD Roundup EA, in spite of the fact that the West Douglas Herd Area Amendment to the White River Resource Management Plan is still under protest by some of the very same commenters to this EA, which raises factual and legal issues relevant to this roundup.  I enclose for your consideration, and incorporate by reference herein, the attached October 1 Protest, and its accompanying exhibits as **Attachment 1**, as well as the Protest Addendum I submitted on February 28, 2006, and its exhibit, as **Attachment 2,** which includes the FY 2006 planned BLM roundup schedule.

Not only is BLM's single-minded approach to eradicating the West Douglas herd evidenced by the 2006 Roundup "schedule," and the issuance of this EA even though there is a protest pending, but also from a history of the White River Field Office's treatment of this herd --- dating back to at least 1981.  As explained below, the agency had questions then whether its planned eradication of this herd was legal.

The first formal decision document regarding grazing management in the White River Resource Area was published in 1981 and its wild horse management provisions were then in violation of the Act.  Although this Rangeland Program

2

Summary acknowledges that the estimated population of wild horses in 1971 was 165, it proposed to diminish the herd to a maximum of only 140 horses.

Furthermore, the 1981 Summary ignored the Act's mandate that horses be maintained in their 1971 habitat by decreeing that the herd would be maintained only "within the best habitat of their *present* range, while simultaneously satisfying the needs for various other resource considerations " (emphasis added) (p. 7). Indeed, the Summary explicitly confesses its concern about "the possibility of the proposals violating the mandates of the Wild and Free-Roaming Horse and Burro Act" (p. 13). It indicates that the need for increased maintenance of the horse herds was precipitated by "the amount of habitat lost from increased oil and gas production and human disturbance, and the areas where horse movements are restricted by existing fences creating competition between horses and deer for winter range" (p. 12). Because BLM has the duty to protect and maintain wild horses in their herd use areas, these human interferences with the herds' statutorily-mandated habitat are the proper actions to regulate, rather than the alternative: illegal removal of the horses.

### II. BLM Has Drastically Reduced the Amount of Acreage Available to Wild Horses and Burros by Eliminating Herd Areas or Artificially Decreasing Herd Areas to Create Herd Management Areas

BLM's refusal to allow wild horses access to their historic ranges in 1971, as the Wild Free Roaming Horses and Burros Act, and BLM's own regulations, mandate, is evidenced by BLM's own maps and data. Those maps demonstrate that the agency has either completely eliminated many historic ranges of horses and burros -- their herd areas -- or has severely restricted these areas to artificially create herd management areas. See materials at **Attachment 3.** The FY05 Herd Area Statistics Chart shows the significant difference in acreage from Herd Areas to Herd Management Areas. A note under the "Summary of Management Status," states that "numbers of remaining HAs and HMAs cannot be totaled due to the combining and splitting of HAs to create HMAs." The maps of Colorado Herd Areas compared to Herd Management Areas vividly depict how the state has dramatically decreased wild horses' historic ranges throughout the state.

While BLM appears authorized to create Herd Management Areas under its own regulations, those same regulations provide that, "[M]anagement of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas, 43 C.F.R. § 4710.4."Herd area" is defined by regulation as "the geographic area identified as having been used by a herd as its habitat in 1971," 43 C.F.R. §4710.4. If BLM is limiting wild horses' and burros'

3

distribution to herd management areas instead, it is technically in violation of its own regulations.

### III. BLM Should Complete an EIS that Analyzes, on the State level, its Segmented Actions toward Wild Horses Within the State of Colorado

On June 8, 2006, the White River Field Office issued two EAs regarding the "management" of wild horses on the public lands of Colorado. One of those EAs proposes a significant reduction of wild horses and the other calls for the almost complete elimination of wild horses. Both EAs call for limited, genetically unviable populations of horses to remain in Piceance-East Douglas and the West Douglas Herd Area. Considering the geographic proximity of these two areas that wild horses use, and the fact that proposed actions regarding these two herds will undoubtedly have cumulative impacts, not identified, nor considered in the two separate EAs, the BLM should withdraw these two EAs and issue a comprehensive Environmental Impact Statement covering both areas.

Sincerely,

Valerie J. Stanley

4