Past actions regarding the management of wild horses has resulted in the current wild horse population within the Herd Area and some areas outside of the boundary. Wild horse management has contributed to the present resource condition and wild horse herd structure within the area. Removal of excess wild horses to the high point of the required RMP range would be expected to promote vegetation recovery and to maintain remaining animals in healthy condition. Until the wild horses can be gathered, impacts to vegetation, soils, and riparian areas will continue and excess wild horses will continue to compete with livestock and the native wildlife for the available water and vegetation.

While this analysis focuses on the removal of 89 excess wild horses from the HA the related action that is foreseeable within the HA is for implementing the current RMP for the complete removal of wild horses from the West Douglas HA by 2007. The proposed action should result in some stabilization efforts being realized with lower herd numbers.

## REFERENCES CITED:

Colorado Department of Public Health and Environment (CDPHE) Air Pollution Control Division (APCD), 2005. "Colorado Air Quality Data Report – 2004," September 2005.

Colorado Department of Public Health and Environment (CDPHE) Water Quality Control Commission (WQCC), 2004a. Regulation No. 37 Classifications and Numeric Standards for Lower Colorado River Basin. Adopted 1983 and Effective January 20, 2004.

CDPHE-WQCC, 2006b. "Status of Water Quality in Colorado – 2006, The Update to the 2002 and 2004 305(b) Report," April 2006.

CDPHE-WQCC, 2006c. "Regulation No. 93, 2006 Section 303(d) List Water-Quality-Limited Segments Requiring TMDLs," effective April 30.

CDPHE-WQCC, 2006d. "Regulation No. 94, 2006 Colorado's Monitoring and Evaluation List," effective April 30, 2006.

Cothran, E. Gus, Ph.D., Department of Veterinary Science, University of Kentucky, Lexington, KY, 2002. "Genetic Analysis of the West Douglas CO feral Horse Herd"

Tweto, Ogden Geologic Map of Colorado. United States Geologic Survey, Department of the Interior, Reston, Virginia.

## PERSONS / AGENCIES CONSULTED:

None

**INTERDISCIPLINARY REVIEW:**

| Name | Title | Area of Responsibility |
|---|---|---|
| Nate Dieterich | Hydrologist | Air Quality |
| Tamara Meagley | Natural Resource Specialist | Areas of Critical Environmental Concern |
| Tamara Meagley | Natural Resource Specialist | Threatened and Endangered Plant Species |
| Michael Selle | Archeologist | Cultural Resources Paleontological Resources |
| Robert (Bob) Fowler | Rangeland Management Specialist | Invasive, Non-Native Species |
| Ed Hollowed | Wildlife Biologist | Migratory Birds |
| Ed Hollowed | Wildlife Biologist | Threatened, Endangered and Sensitive Animal Species |
| Melissa J. Kindall | Hazmat Collateral | Wastes, Hazardous or Solid |
| Nate Dieterich | Hydrologist | Water Quality, Surface and Ground Hydrology and Water Rights |
| Robert (Bob) Fowler | Forester | Wetlands and Riparian Zones |
| Chris Ham | Outdoor Recreation Planner | Wilderness |
| Nate Dieterich | Hydrologist | Soils |
| Robert (Bob) Fowler | Rangeland Management Specialist | Vegetation |
| Ed Hollowed | Wildlife Biologist | Wildlife Terrestrial and Aquatic |
| Chris Ham | Outdoor Recreation Planner | Access and Transportation |
| Ken Holsinger | Natural Resource Specialist | Fire Management |
| Robert Fowler | Forester | Forest Management |
| Paul Daggett | Mining Engineer | Geology and Minerals |
| Robert (Bob) Fowler | Rangeland Management Specialist | Rangeland Management |
| Penny Brown | Realty Specialist | Realty Authorizations |
| Chris Ham | Outdoor Recreation Planner | Recreation |
| Chris | Ham | Visual Resources |
| Melissa J. Kindall | Range Technician | Wild Horses |

# Finding of No Significant Impact/Decision Record (FONSI/DR)

## CO-110-2006-166-EA

**FINDING OF NO SIGNIFICANT IMPACT (FONSI)/RATIONALE:** The environmental assessment and analyzing the environmental effects of the proposed action have been reviewed. The approved mitigation measures (listed below) result in a <u>Finding of No Significant Impact</u> on the human environment. Therefore, an environmental impact statement is not necessary to further analyze the environmental effects of the proposed action.

**DECISION/RATIONALE**: It is my decision to proceed with the Proposed Action analyzed in the 2006 West Douglas Wild Horse Environmental Assessment and Gather Plan to include the following:

- The reduction of the West Douglas wild horse herd to 50 wild horses, the high end of range for the herd.
- The total removal of wild horses from BLM administered allotments adjoining the West Douglas Herd Area with these animals placed into the BLM adoption program.

The herd will be reduced to 50 wild horses within the Herd Area. Approximately 89 wild horses will be removed from within the Herd Area and all horses that have drifted outside their Herd Area boundaries will be removed and placed into BLM's wild horse adoption program.

The planned action is in accord with the Code of Federal Regulations (CFR) 43, part 4700 which addresses the management of wild, free-roaming horses and burros. Specifically applicable to this removal action is subpart 4700.0-6, Policy; subpart 4710, Management Considerations; and subpart 4720, Removal.

The proposed action has been placed in full force and effect status in keeping with 43 CFR 4770.3(c) which authorizes the Bureau of Land Management to issue a full force and effect decision to remove wild horses from public and private lands. The planned removal will adhere to the policies and specifications included in the 2006 EA, as well as, to the specifications included in the National Program Office Wild Horse Removal Contract #NAR050089. This Decision Record is considered in effect until the actions included in the Proposed Action have been completed.

<u>Gather Method</u>: The gather and removal of wild horses from the proposed locations will be completed using helicopter drive trapping, helicopter drive roping, water, or hay trapping. The work will be completed by a nationally awarded gather contractor.

Rationale for Approval of the Proposed Action:  The decision to removal wild horses from the West Douglas Herd Area is based on vegetation monitoring studies which document that an ecological balance currently does not exist within the Herd Area.  The proposed action will encourage restoration of a balance of use between wild horses, wildlife, and livestock.

The decision to removal wild horses determined in excess of what their range can support is in conformance with 43 CFR 4700.0-6 and 43 CFR 4720.1.  The decision to removal wild horses from outside the Herd Area boundaries is in conformance with 43 CFR 4710.4.  The decision to release animals in specified age groups back into the Herd Area is in conformance with current Wild Horse and Burro Program directives.  The removal decision conforms with the 1971 Wild, Free-Roaming Horse and Burro Act, PL-92-195; with current regulations, policy, directives, and with the objectives contained in EA #CO-110-06-166-EA.

Rationale for Full Force and Effect:  The rationale for placing the action into full force and effect is based on the following:

- The planned gather supports the management of wild horses in the West Douglas Herd Area identified in the 1997 White River Resource Area RMP.
- Reducing wild horse numbers, as identified in the 2006 EA, will encourage protection of key forage species from the overuse attributed to wild horses.  The delay resulting from an appeal likely would result in direct, negative impacts on plant communities relied upon by the various range users.  This situation, in turn, would negatively affect local watersheds and the habitat of animals dependant upon this vegetation.
- Limitation of wild horse distribution to inside the West Douglas Herd Area is in keeping with CFR 43 4710.4 regulations.  A delay in the gather would increase the incidence of horses relocating outside the Herd Area boundaries as competition between wild horses, wildlife, and livestock increase.
- Completion of the planned removal in a timely, cost efficient manner is an action which benefits the taxpaying public.

## MITIGATION MEASURES:

1. Cultural Resources:  Horse trap locations and holding areas will need to be sited to avoid archaeological resources.  In areas with acceptable levels of inventory no additional field work shall be necessary except to ensure that sites in the near vicinity can be adequately avoided by drive lines, wing fences and traps.  In areas where inadequate inventory data exists an inventory will be necessary to ensure that any resources present are avoided.
2. Threatened and Endangered Plants/Areas of Critical Environmental Concern (ACEC): Facilities associated with removal actions will be allowed within the boundaries of a known ACEC following an inventory where any potential plant locations or potential habitat that is discovered to contain threatened and/or endangered plant species will become complete avoidance areas for any facilities proposed for use in this gather and removal action.

3.  Wastes; Hazardous and Solid: All needles will be disposed of by the contract veterinarian. The liquid nitrogen will be handled only by experienced BLM personnel. The hazardous materials coordinator will be notified in the case of nitrogen spillage.

4.  Noxious Weeds: Any hay fed at trap sites or holding facilities will be certified as weed free. Any noxious weeds that establish as a result of the Proposed Action will be controlled by the BLM and their Certified Pesticide Applicators.

5.  Wild Horses: Monitoring would continue for the wild horses living within the Herd Area. Refer to Appendix A, EA #CO-110-06-166, Standard Operating Procedures of the Proposed Action.

6.  Paleontology: Known and reported fossil localities shall be avoided when locating trap sites and associated wing fences and holding facilities. Sites without adequate inventory data will need to be examined for the presence of fossils during trap site selection activities. Trap facilities may need to be modified to avoid impacting identified fossil resources.

7.  Wildlife, Terrestrial: Surveys for raptor nesting activity will be conducted by WRFO staff on those trap sites proposed for use or development prior to September 1, 2006. In the event an active raptor nest is found in the vicinity of trapping operations, these sites will be afforded a buffer adequate to effectively isolate nesting activity from disruptions generated from horse trapping operations.

**NAME OF PREPARER**:  Melissa J. Kindall

**NAME OF ENVIRONMENTAL COORDINATOR**:  Caroline P. Hollowed

**SIGNATURE OF AUTHORIZED OFFICIAL**:  _____
                                        for  Kent E. Walter, Field Manager

**DATE SIGNED**:  7-27-06

**ATTACHMENTS**:  Appendix A: -Standard Operating Procedures
                  Appendix B: -Public comments on West Douglas Herd Area Gather Plan
                              of 2006 and BLM's Responses to the Comments
                  Appendix C: Location Map of the Proposed Action

## Appendix A

### Standard Operating Procedures

The following considerations and guidelines are considered the technical portion of the 2006 Piceance East Douglas Wild Horse Gather Plan. This appendix outlines the safety considerations involved with the technical aspects of capturing wild horses, transporting the horses to temporary holding facilities, handling the captured animals and shipping the horses to the BLM Canon City, Colorado, or to the Rock Springs, Wyoming holding facility. This appendix defines the roles and responsibilities of individuals directly involved with the planned gather project.

The gather will be completed through a nationally awarded gather contract. Agency personnel will be directly involved in the completion of the project. The same procedures for capture and handling of wild horses apply to contractors, to agency personnel, and to volunteers.

The following stipulations and procedures will be followed to ensure the welfare, safety and humane treatment of the wild horses in accordance with the provisions of 43 CFR 4700.

### A.    Capture Method Descriptions

1.  Helicopter drive trapping

The helicopter drive-trapping method of capture will be the primary method used to capture horses inside the HA. The following stipulations and procedures will be followed during the contract period to ensure the welfare, safety and humane treatment of the wild horses in accordance with the provisions of 43 CFR 4700 and with the KG Livestock, Incorporated gather contract. The capture will be conducted by BLM personnel and the contractor; both of whom are experienced in the humane capture and handling of wild horses. The same rules apply to both the contractor and to BLM personnel.

Helicopter drive-trapping involves using a helicopter to spot and then herd horses towards a pre-constructed trap. The trap is constructed of portable, round-pipe steel panels. Funnel-shaped trap wings are built out from the corners of the trap to funnel horses into the trap. Trap wings are built with jute or snow fence, which is draped over and tied around trees or steel posts. The wings form a visual barrier to the horses and they usually enter the trap without being aware they are being trapped.

The helicopter pilot completes a recon prior to trapping to see where the bands are located. Once the trap and wings are ready for use, the pilot starts moving one or more bands of horses toward the trap and into the wings. The number of horses/number of bands moved towards a trap at one time depends on a variety of facets including proximity of bands to the trap; the number of horses in each band; the distance bands travel to the trap; topography, weather conditions, temperature, time of year, animal condition and trap dimensions.

The pilot herds the horses into the wings of the trap and then hovers while a ground crew on foot

and/or horseback comes in behind the horses, hazes them into the trap corral and closes a gate behind the trapped horses. The helicopter remains in the trap wings close enough to keep the horses from running back out of the trap and far enough away to assure safety of the ground crew and the horses. Once the gate is closed, or when the pilot sees it is best for him to leave the area, the helicopter leaves the trap site.

A pair of Parada or Judas horses; are often supplied by the contractor to encourage bands of wild horses not to balk in the trap wings, and to run smoothly into the trap corrals. The Judas horses are best friends and do not like being separated from one another. One Judas horse is lightly tied in the trap corral. The second Judas horse is led into the mid-section of the trap wing and held along the edge of one side of the trap wing. As wild horses are moved by helicopter into the trap the Judas horse being held in the trap wing is released. The Judas horse picks up his tail and runs towards the trap corral to be with his buddy. The wild horses see a horse running free ahead of them. Their instinct tells them this horse is running to freedom; they follow the Judas horse into the trap corral. The Judas horses are familiar with being in close proximity to freshly-captured wild horses. The Parada horses, once trapped in the corral, hold their own but are not overly aggressive with the wild horses.

## 2. Helicopter Assisted Roping

Helicopter assisted roping is used when mares and foals become separated, when every horse must be captured from an area, and when specific animals are targeted for capture. In the upcoming gather helicopter assisted roping may be used if a mare and foal become separated, and to capture horses that have relocated outside HA boundaries. Helicopter roping will only be used when determined by the COR or PI as the most efficient manner to capture specific horses and when the roping can be done in a safe and humane manner.

In helicopter assisted rope capture individual horses are herded by helicopter towards ropers who rope the horse(s). Once roped, another rider rides alongside the roped horse and roper, helping to haze, or herd, the roped horse either towards the trap or towards a stock trailer. Once at the trap the rope is flipped away from the roped horse's neck and it joins the rest of the trapped horses. When hazed to a stock trailer the horse is hobbled, laid on its side and then either pulled or slid into the trailer. If the horse is slid into the trailer a fabric or wood surface is placed under the horse to protect the horses' hide as it is pulled into the trailer. Once in the trailer the horse is freed of ropes and allowed to quiet down before being transported to the trap site.

## 3. Water Trapping

Water trapping will be used when horses are not able to be helicopter drive trapped or roped, when every horse must be captured from an area, and when specific horses are targeted for capture. In the upcoming gather water trapping may be used for both horses within the HA and to capture horses that have relocated outside HA boundaries. Water trapping will be used when determined by the COR or PI as the most efficient manner to capture specific horses and when the helicopter drive trapping and assisted helicopter roping proves to be inadequate means of gathering or can not be done in a safe and humane manner.

In water trapping individual horses are allowed to use water sources before, during and after trap construction. The trap is constructed of portable, round-pipe steel panels. Funnel-shaped traps are built which allows horses to get deep into the trap so that when the gate release mechanism is activated time is allowed for the gate to close which traps the horses inside. Once trapped the captured horses will be loaded into an appropriate stock trailer and delivered to the holding facility. The horses are not herded towards the water they simply make use of the water that they frequent naturally or human enhanced water sources.

## 4. Hay Trapping

Hay trapping will be used when horses are not able to be helicopter drive trapped or roped, when every horse must be captured from an area, and when specific horses are targeted for capture. In the upcoming gather hay trapping may be used for both horses within the HA and to capture horses that have relocated outside HA boundaries. Hay trapping will only be used when determined by the COR or PI as the most efficient manner to capture specific horses and when the helicopter drive trapping, assisted helicopter roping, and water trapping prove to be inadequate means of gathering or can not be done in a safe and humane manner.

In hay trapping individual horses are allowed to use water sources during and after trap construction. The trap is constructed of portable, round-pipe steel panels. Funnel-shaped traps are built which allows horses to get deep into the trap so that the gate release mechanism allows time for the gate to close. Once trapped the captured horses will be loaded into an appropriate stock trailer and delivered to the holding facility. The horses are not herded towards the hay but simply make use of the hay as necessary supplemental feed source. All hay used will be certified weed free hay.

## B. **Trap Site Selection**

The Authorized Officer will make a careful determination of a boundary line to serve as an outer limit where the horses will be herded to each trap. The Authorized Officer will insure that the pilot is fully aware of all natural and man made barriers, which might restrict free movement of horses. Topography, distance, and current condition of the horses are factors that will be considered to set limits to minimize stress on horses.

Gather operations will be monitored to assure the body condition of the horses is compatible with the distances and the terrain over which they must travel. Pregnant mares, mares with small colts, and other horses will be allowed to drop out of bands that are being gathered if required to protect the safety and health of the animals.

All trap and holding facility locations will be approved by the Authorized Officer prior to construction. The situation may require moving of the trap. All traps and holding facilities not located on public land must have prior written approval of the landowner.

Trap sites will be located to cause as little injury and stress to the animals, and as little damage to the natural resources of the area, as possible. Sites will be located on or near existing roads. Additional trap sites may be required, as determined by the Authorized Officer, to relieve stress to the animals caused by specific conditions at the time of the gather (i.e. dust, rocky terrain, temperatures, etc.).

**C.    Stipulations for Portable Corral Traps/Exclosures**

1. Capture traps will be constructed in a fashion to minimize the potential for injury to wild horses and BLM personnel. Trapped horses held in traps longer than 10 hours will be fed and watered.

2. The Colorado Division of Wildlife will be notified as soon as possible if any wildlife are injured during capture operations. Wildlife caught inside traps will be released immediately.

3. All traps, wings, and holding facilities shall be constructed, maintained and operated to handle the animals in a safe and humane manner and in accordance with the following:

a. Traps and holding facilities shall be constructed of portable panels, the top of which shall not be less than 72 inches high for horses, and the bottom rail of which shall not be more than 12 inches from ground level. All traps and temporary holding facilities shall be without corners; oval or round in design.

b. All loading chute sides shall be fully covered with plywood (without holes) or like material. The loading chute shall also be a minimum of 6 feet high.

c. All runways shall be of sufficient length and height to ensure animal and wrangler safety and may be covered with plywood, burlap, plastic snow fence or like material a minimum of 1 foot to 6 feet for horses.

d. If a government furnished portable chute is used to restrain, age, or to provide additional care for animals, it shall be placed in the runway in a manner as instructed by or in concurrence with the Authorized Officer.

e. All crowding pens including the gates leading to the runways will, if necessary to prevent injuries from escape attempts, be covered with a material which prevents the animals from seeing out (plywood, burlap, snow fence etc.) and should be covered a minimum of 2 feet to 6 feet for horses.

f. Alternate pens will be constructed at the temporary holding facility to hold mares with newborn foals, animals that will be released, sick or injured animals, and domestic estrays from the other horses. Horses may also be separated according to age, number, size, temperament, and sex. They pens will be constructed to minimize injury resulting from fighting and trampling.

g. In some cases, the Government will require that animals be restrained for determining an animal's age or for other purposes. In these instances, a portable restraining chute will be provided by the Government. Segregation or temporary marking and later segregation will be at the discretion of the COR.

4. If animals are held in the traps and/or holding facilities, a continuous supply of fresh clean water at a minimum rate of 10 gallons per animal per day will be supplied. Animals held for 10 hours or more in the traps or holding facilities shall be provided good quality hay at the rate of not less than two pounds of hay per 100 pounds of estimated body weight per day.

5. Water troughs shall be provided at each pen where animals are being held. Water troughs shall be constructed of such material (e.g. rubber, rubber over metal) so as to avoid injury to animals.

6. When dust conditions occur within or adjacent to the trap or holding facility, the contractor/BLM shall be required to wet down the ground with water.

### D.    Capture Stipulations

1. The contractor/BLM shall attempt to keep bands intact except where animal or human health and safety become considerations that prevent such procedures

2. At least one saddle-horse will be immediately available at the trap site to perform roping if necessary. Roping shall be done as determined by the Contracting Officer's Representative or Project Inspector. Roping will be performed in such a manner that bands will remain together. Under no circumstances shall animals be tied down for more than one hour.

3. Domestic saddle horses may be used to assist the helicopter pilot on the ground during the gather operation, by having the domestic horse act as a pilot (or "Judas") horse leading the wild horses into the trap site. Individual ground hazers and individuals on horseback will be used to assist in the gather.

4. Foals will not be left behind. If a situation arises where a foal becomes separated from its mare ropers with the help of the pilot will make every attempt to capture either the mare, or the foal and reunite the mare/foal pair keeping the safety of the horses and gather crew in mind.

### E.    Contract Helicopter, Pilot and Communications

1. The contractor must operate in compliance with Federal Aviation Regulations, Part 91. Pilots provided by the contractor shall comply with the Contractor's Federal Aviation Certificates, and applicable regulations of the State in which the gather is located.

2. When refueling, the helicopter shall remain a distance of at least 1,000 feet or more from animals, vehicles (other than fuel truck), and personnel not involved in refueling.

3. The COR/PI shall have the means to communicate with the contractor's pilot at all times. If communications cannot be established, the Government will take steps as necessary to protect the welfare of the animals. The frequency (ies) used for this contract will be assigned by the COR/PI when the radio is used. The contractor shall obtain the necessary FCC licenses for the radio system.

4. The COR or PI will notify dispatch each morning prior to the helicopter leaving the ground to capture horses; and at the end of each day's project. Dispatch will be kept informed of the trap locations and location inside the HA where the pilot is herding/capturing horses. The gather pilot and COR will maintain open communications with dispatch to assure both parties are aware of aircraft other than the gather contractor who may be in the capture vicinity, or who request permission to travel through, or work in the capture vicinity.

5. The proper operation, service and maintenance of all contractor furnished helicopters is the responsibility of the contractor. The BLM reserves the right to remove from service pilots and helicopters which, in the opinion of the Contracting Officer or COR/PI, violate contract and FAA rules, are unsafe or otherwise unsatisfactory. In this event, the contractor will be notified in writing to furnish replacement pilots or helicopters within 48 hours of notification. All such replacements must be approved in advance of operation by the Contracting Officer or his/her representative.

6. All incidents/accidents occurring during the performance of any delivery order shall be immediately reported to the COR.

## F.    **Animal Handling and Care**

1. Prior to capturing horses, the COR/PI will conduct a pre-capture evaluation of existing conditions in the gather areas. The evaluation will determine whether the proposed activities will require the presence of a veterinarian during the project or if the veterinarian can remain on-call during the gather operation. Animal health, temperature extremes; topography, distance to the traps, and other factors will be considered when deciding between an on-call vet contract and an on-site contract.

2. The contractor will be apprised of the all conditions and will be given instructions regarding the capture and handling of animals to ensure their health and welfare is protected.

3. The Authorize Officer and pilot will identify and discuss natural hazards and man-made hazards on the ground by looking at a topographic map so the helicopter flight crew, ground personnel, and wild horse safety will be maximized. Aerial hazards will be recorded on the project map.

4. No fence modifications will be made without authorization from the Authorized Officer. The contractor/BLM shall be responsible for restoration of any fence modification.

5. If the route the contractor/BLM proposes to herd animals passes through a fence, opening

CO-110-2006-166-EA                                                                      56

should be large enough to allow free and safe passage. Fence material shall be rolled up and fence posts will be removed or sufficiently marked to ensure safety of the animals. The standing fence on each side of the gap will be well flagged and covered with jute or like material.

6. Wings shall not be constructed from materials injurious to animals and must be approved by the Authorized Officer.

7. It is the responsibility of the contractor/BLM to provide security to prevent loss, injury or death of captured animals until delivery to final destination.

8. Animals shall not be allowed to remain standing on trucks while not in transport for a combined period of greater than three (3) hours. Animals that are released back into the capture area may need to be transported back to the original trap site. This determination will be at the discretion of the COR.

9. Branded or privately owned animals captured during gather operations will be handled in accordance with state estray laws and existing BLM policy.

10. Capture methods will be identified prior to issuance of delivery orders. Regardless of which methods are selected, all capture activities shall incorporate the following:

### G.    Treatment of Injured or Sick; Disposition of Terminal Animals

1. The contractor/BLM shall restrain sick or injured animals if treatment is necessary. A veterinarian may be called to make a diagnosis and final determination. Destruction shall be done by the most humane method available. Authority for humane destruction of wild horses (or burros) is provided by the Wild Free-Roaming Horse and Burro Act of 1971, Section 3(b)(2)(A), 43 CFR 4730.1, BLM Manual 4730 - Destruction of Wild Horses and Burros and Disposal of Remains, and is in accordance with BLM policy.

2. Any captured horses that are found to have the following conditions may be humanely destroyed:

    a. The animal shows a hopeless prognosis for life.
    b. Suffers from a chronic disease.
    c. Requires continuous care for acute pain and suffering.
    d. Not capable of maintaining a body condition rating of one or two.
    e. The animal is a danger to itself or others.

3. The Authorized Officer will determine if injured animals must be destroyed and provide for destruction of such animals. The contractor/BLM may be required to dispose of the carcasses as directed by the Authorized Officer.

4. The carcasses of the animals that die or must be destroyed as a result of any infectious, contagious, or parasitic disease will be disposed of by burial to a depth of at least 3 feet.

5. The carcasses of animals that must be destroyed as a result of age, injury, lameness, or non-contagious disease or illness will be disposed of by removing them from the capture site or holding corral and placing them in an inconspicuous location to minimize visual impacts. Carcasses will not be placed in drainages regardless of drainage size or downstream destination.

### H.    Motorized Equipment

1. All motorized equipment employed in the transportation of captured animals shall be in compliance with appropriate State and Federal laws and regulations applicable to the humane transportation of animals. The contractor shall provide the Authorized Officer with a current safety inspection (less than one year old) of all tractor/stock trailers used to transport animals to final destination.

2. Vehicles shall be in good repair, of adequate rated capacity, and operated so as to ensure that captured animals are transported without undue risk or injury.

3. Only stock trailers with a covered top shall be allowed for transporting animals from trap site(s) to temporary holding facilities. Only stock trailers or single deck trucks shall be used to haul animals from temporary holding facilities to final destination(s). Sides or stock racks of transporting vehicles shall be a minimum height of 6 feet 6 inches from the vehicle floor. Single deck trucks with trailers 40 feet or longer shall have two (2) partition gates providing three (3) compartments within the trailer to separate animals. The compartments shall be of equal size plus or minus 10 percent. Trailers less than 40 feet shall have at least one partition gate providing two (2) compartments within the trailer to separate animals. The compartments shall be of equal size plus or minus 10 percent. Each partition shall be a minimum of 6 feet high and shall have at the minimum a 5 foot wide swinging gate. The use of double deck trailers is unacceptable and will not be allowed.

4. All vehicles used to transport animals to the final destination(s) shall be equipped with at least one (1) door at the rear end of the vehicle, which is capable of sliding either horizontally or vertically. The rear door must be capable of opening the full width of the trailer. All panels facing the inside of all trailers must be free of sharp edges or holes that could cause injury to the animals. The material facing the inside of the trailer must be strong enough, so that the animals cannot push their hooves through the sides. Final approval of vehicles to transport animals shall be held by the Authorized Officer.

5. Floors of vehicles, trailers, and the loading chute shall be covered and maintained with materials sufficient to prevent the animals from slipping.

6. Animals to be loaded and transported in any vehicle or trailer shall be as directed by the Authorized Officer and may include limitations on numbers according to age, size, sex, temperament, and animal condition. The minimum square footage per animal is as follows:

  11 square feet/adult horse (1.4 linear feet in an 8 foot wide trailer)

CO-110-2006-166-EA                                                         58

8 square feet/adult burro (1.0 linear foot in an 8 foot wide trailer)
6 square feet/horse foal   (0.75 linear feet in an 8 foot trailer)
4 square feet/burro foal   (0.50 linear feet in a 8 foot wide trailer)

7. The Authorized Officer shall consider the condition of the animals, weather conditions, type of vehicles, distance to be transported, or other factors when planning for the movement of captured animals. The Authorized Officer shall provide for any brand and/or inspection services required for the captured animals.

8. Communication lines will be established with personnel involved in off-loading the animals to receive feedback on how the animals arrive (condition/injury etc.). Should problems arise, gathering methods, shipping methods and/or separation of the animals will be changed in an attempt to alleviate the problems.

9. If the Authorized Officer determines that dust conditions are such that animals could be endangered during transportation, the contractor/BLM will be instructed to adjust speed and/or use alternate routes.

10. Periodic checks by the Authorized Officer may be made as animals are transported along dirt roads. If speed restrictions are in effect the Authorized Officer will at times follow and/or time trips to ensure compliance.

## I.     Special Stipulations.

1. Private landowners or the proper administering agency(s) would be contacted and authorization obtained prior to setting up traps on any lands that are not administered by BLM. Wherever possible, traps would be constructed in such a manner as to not block vehicular access on existing roads.

2. Gathering would be conducted when soils are dry or frozen and conditions are optimal for safety and protection of the wild horses and wranglers. Whenever possible, gathering activities will be scheduled to minimize impacts with big game hunting seasons.

3. Gathers would not be conducted 6 weeks on either side of peak foaling season recognized between March 1 and June 30 to reduce the risk of injury or stress to pregnant mares and mares with young foals.

4. The helicopter would avoid eagles and other raptors, and would not be flown repeatedly over any identified active raptor nests. Unnecessary flying would not occur over big game on their winter ranges or active fawning/calving grounds during the period of use.

## J.     Safety

Safety of BLM employees, contractors, members of the public, and the wild horses will receive primary consideration. The following safety measures will be used by the Authorized Officer

and all others involved in the operation as the basis for evaluating safety performance and for safety discussions during the daily briefings:

1. A briefing between all parties involved in the gather will be conducted each morning.

2. All BLM personnel, contractors and volunteers will wear protective clothing suitable for work of this nature. BLM will alert observers of the requirement to dress properly. BLM will assure that members of the public are in safe observation areas.

3. The handling of hazardous or potentially hazardous materials such as liquid nitrogen and vaccination needles will be accomplished in a safe and conscientious manner by BLM personnel or the contract veterinarian. (Refer to page 10, Wastes, Hazardous or Solid).

## K.    **Responsibility and Lines of Communication**

1. The Contracting Officer's Representative and Project Inspectors have the direct responsibility to ensure the contractor's compliance with the contract stipulations.

2. The Associate Field Manager and the Field Manager will take an active role to ensure the appropriate lines of communication are established between the Field Office, State Office, and Royal Gorge Field Office.

3. All employees involved in the gathering operations will keep the best interests of the animals and their own safety at the forefront at all times.

4. The COR will maintain open communications with dispatch to assure both parties are aware of project status; capture locations; and daily aviation activity.

**Appendix B**
**PUBLIC COMMENTS ON WEST DOUGLAS HERD AREA GATHER PLAN OF 2006
AND BLM'S RESPONSES TO THE COMMENTS**

**INTRODUCTION**

The public comment period for this Environmental Assessment was from June 5 through July 10th, 2006. Every comment letter was read and comments identified. Certain comments that suggested verbiage changes to the EA were incorporated into the final EA, and are not addressed further in this discussion. The appropriate Team Member was then assigned the comments relating to their specialty in order to develop a response. When the responses were complete, an effort was made to combine comments that contained the same or similar subject matter. Table A-1 contains a list of respondents and affiliation, the number of comments contained in each letter, and the number assigned to their specific comment(s). Individual respondents should be able to track their comments from the following table by finding their name and noting the comment numbers assigned to their comment.

**Table A-1:  List of Respondents**

| Name/Affiliation | Number of Comments | Comment Numbers |
|---|---|---|
| Darynne Anna Jessler | 2 | 1,2 |
| Jeffrey Hersch | 1 | 1 |
| Humane Society of the United States | 7 | 3,4,5,6,7 |
| Barbara Warner | 1 | 1 |
| Animal Welfare Institute | 5 | 3,4,5,8,10 |
| Valerie J, Stanley | 5 | 3,6,7,10,11 |
| C.E. Brooks and Associates | 0 | Comments addressed in document |

Comment/Responses to the West Douglas Gather Plan:

**1.)** Several respondents questioned the need for gathering horses from the West Douglas Herd Area.

**Response:** The need for this gather is to remove wild horses from the West Douglas Herd Area down to the 0-50 range required in the current White River Resource Management Plan (RMP) decision by 2006. This gather would remove horses to the upper range proposed in the RMP. Section 1333 of the *Wild Free-Roaming Horse and Burro Act of 1971, (WFRHBA),* and the implementing regulations *43 CFR Subpart 4710.1 Land use planning,* instruct the BLM that, "*Management activities affecting wild horses and burros, including the establishment of herd management areas, shall be in accordance with approved land use plans prepared pursuant to part 1600 of this title.*"

Currently, within the West Douglas herd area the public land health standards for vegetation and soils are not being met (see pages 21 and 25, *EA CO-WRFO-06-166*). The regulations *(43 CFR 4710.4)* also require that management of wild horses shall be undertaken with the objective of limiting the animals' distribution to herd areas. The decision to gather horses is consistent with the provisions of WFRHBA and the FLPMA.

**2.)** One respondent questioned why there was not an alternative for maintenance of a genetically viable herd of 200 horses.

**Response:** Several alternatives to manage for larger numbers of horses were analyzed in the 1997 RMP. The final RMP stated that the herd would be managed for 0-50 horses until 2006, when all horses would be removed. This EA implements that decision to manage between zero and 50 horses

**3.)** Several letters questioned the removal of wild horses from the West Douglas Herd Area when the 2005 Amendment has not been completed. These respondents also questioned where BLM is in the process of completing the Amendment.

**Response:** The need for this gather is to remove wild horses from the West Douglas Herd Area down to the 0-50 range required in the current White River Resource Management Plan (RMP) decision by 2006. This gather would remove horses to the upper range proposed in the RMP. Currently, within the West Douglas herd area the public land health standards for vegetation and soils are not being met (see pages 21 and 25, *EA CO-WRFO-06-166*). The regulations *(43 CFR 4710.4)* also require that management of wild horses shall be undertaken with the objective of limiting the animals' distribution to herd areas.

The gather date is determined through advanced scheduling that is required to process wild horses through the national system of adoptions and care. The West Douglas Herd Area was identified for gather in 2006 through the national budget process, contingent upon the completion of NEPA. This EA provides information to the public and the decision maker on the number of horses counted in the 2005 census, rangeland conditions, and the method(s) of capture.

Until the final decision on the pending Amendment is approved, decisions contained in the current RMP completed in 1997 remain valid. That decision is that the West Douglas Herd Area will be managed in the short-term (0-10 years) to provide forage for a herd of 0 to 50 wild horses, with a long term objective (+10 years) of removing all wild horses from this area.

The BLM is currently responding to the protest letters and projects the final Amendment decision to be issued this fall.

**4.)** The West Douglas Herd Area boundaries are essentially arbitrary lines that are not restrictive in actuality. Further there are no safeguards to insure that the roundup will not force the wild

horses from the Herd Area and be subject to the total gather factor proposed in the EA.

**Response:**  The proposed gather of 98 wild horses includes those wild horses found within and outside the Herd Area.  The removal would initially focus on wild horses outside the Herd Area and continue until 98 horses are captured, leaving 50 wild horses within the Herd Area.

**5.)** A respondent stated that the roundup and elimination of the wild horses from the West Douglas Herd Area will wipe out the Spanish line in that area and threaten the genetic viability of the remaining wild horses in the surrounding areas.  A second respondent included a reference to recently discovered unique genetic characteristics of the West Douglas Herd Area wild horses.

**Response:**   According to Dr. Cothran, the West Douglas herd does not possess unique or rare genetics that constitute isolation and protection.  Dr. Cothran states in his genetic analysis of this herd "The West Douglas herd is unique only in that their history is somewhat different from other herds that are in this area and that probably share the same ancestry.  The West Douglas horses show evidence of Spanish heritage but it is likely the type that came through North American breeds that also have Spanish ancestry." Dr. Gus Cothran concludes from his genetics tests that "One cannot state with certainty that the West Douglas horses originated from the Piceance /East Douglas Herd.  There are some similarities to the 84 Mesa group in the Piceance /East Douglas Herd Management Area, but the West Douglas herd does not appear to have originated solely, or even primarily, from the Piceance /East Douglas herd."  Of the 3 Colorado horse herds genetically compared with West Douglas, the Piceance /East Douglas herd ranks the lowest in genetic similarity to W. Douglas. While the 84 Mesa group within the Piceance herd does share some genetic similarity to West Douglas wild horses, this similarity still ranks below the similarity seen between the West Douglas and Little Bookcliffs and Sand Wash Herds.

The proposed action with respect to the West Douglas herd is to gather approximately 89 wild horses within the Herd Area and the approximately 9 wild horses located outside the Herd Area. Approximately 50 wild horses will remain in the Herd Area.

**6.)** The Environmental Assessment is biased and pre-decisional.  The EA reflects the ongoing process that is, and has been, inherently biased against the no action alternative and, therefore, any action taken by the agency that is based on the EA violates the fundamental goals and requirements of the National Environmental Policy Act.
The assessment is predecisional because BLM prepared this environmental assessment after committing to a 2005 schedule for roundups to take place in 2006.
The Environmental Assessment is insufficient and not in compliance with NEPA.  BLM should have an alternative for leaving the West Douglas Horses intact.

**Response:**  The EA on page 2 states the reasons the No-Action alternative is not considered is because it is in direct conflict with the 1997 RMP, as well as the *Wild Free-Roaming Horse and Burro Act of 1971, PL -92-195,* and the implementing regulations *43 CFR Subpart 4710.1 Land use planning,* instruct the BLM that, "*Management activities affecting wild horses and burros,*

*including the establishment of herd management areas, shall be in accordance with approved land use plans prepared pursuant to part 1600 of this title."* The West Douglas gather would implement a decision of the current RMP.

The gather date is determined through advanced scheduling that is required to process wild horses through the national system of adoptions and care. The West Douglas Herd Area was identified for gather in 2006 through the national budget process, contingent upon the completion of NEPA. This EA provides information to the public and the decision maker on the number of horses to be removed, based on the 2005 census, rangeland conditions, and the method(s) of capture.

**7.)** BLM's failure to prepare an Environmental Impact Statement violates the National Environmental Policy Act.

**Response:** We do not believe that the gather and removal of 98 wild horses from the West Douglas Herd Area meets the context and intensity criteria requiring an Environmental Impact Statement. This gather would implement decisions documented in the 1997 RMP Record of Decision and previously analyzed in the 1996 Final Environmental Impact Statement for the White River RMP.

**8.)** The Environmental Assessment lacks a sufficient range of alternatives.

**Response:** The range of alternatives was determined based on the current RMP decision which allows for 0-50 wild horses until 2006, and total removal thereafter. An RMP Amendment in which a full range of alternatives is considered is currently pending.

**9.)** The West Douglas Herd Area (HA) and Piceance/East Douglas Herd Management Area (HMA) should be analyzed together in a single Environmental Review.

**Response:** The West Douglas HA and Piceance/East Douglas HMA are being managed under separate RMP decisions because there is no interchange between these herds.

**10.)** The 1981 Rangeland Program Summary ignored the Act's mandate that horses maintained in their 1971 habitat by decreeing that the herd would be maintained only "within the best habitat of their present range while simultaneously satisfying the needs for various other resource considerations". The summary confesses its concern about the possibility of the proposals violating the mandates of the Wild Horse and Burro Act.

**Response:** The 1981 Rangeland Program Summary (RPS) was a public document provided to summarize the analysis and decisions of the 1981 Grazing Environmental Impact Statement. This document and the Program Summary have been superseded by the White River Resource

Area Resource Management Plan of 1997.

In the Public Involvement section, the RPS (pages 11 & 12) summarizes the public involvement and concerns of the public. The section you refer to states: "There were three areas of concern involving wild horses; the need for reducing the size of the wild horse range; the proposed population levels; and the possibility of the proposals violating the Wild and Free Roaming Horse and Burro Act". These were concerns voiced by the public not concerns of the BLM.

**11.)** BLM has drastically reduced the amount of acreage available to wild horses and burros by eliminating herd areas or artificially decreasing herd areas to create herd management areas.

**Response:** Herd Areas are not eliminated, they remain available for horse management through review and preparation of land use plans. The size of Herd Management Areas and appropriate management level (AML) are determined in land use plans and monitored through periodic activity-level environmental assessments, and that process is outside the scope of this particular EA. In 1997, the White River Field Office's Piceance/East Douglas HMA was increased in size by 31,200 acres with the addition of the Greasewood pasture.

