UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COLORADO WILD HORSE** ) <br> **AND BURRO COALITION, et al.,** ) <br>                                         ) <br> **Plaintiffs**             ) <br>                                         ) <br>                                         ) <br> **v.**                                ) <br>                                         )     **Civil No. 06-1609 (RMC)** <br>                                         ) <br>                                         ) <br>                                         ) <br> **DIRK KEMPTHORNE,**      ) <br> in his official capacity as Secretary, ) <br> United States Department of Interior, **et al**, ) <br>                                         ) <br> **Defendants**           ) <br> _____ ) | |

**PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF MOTION FOR
<u>TEMPORARY RESTRAINING ORDER</u>**

<u>**Introduction**</u>

Plaintiffs hereby submit their reply memorandum in support of their Motion for Temporary Restraining Order (TRO).

Plaintiffs have moved this Court to enter a TRO against the defendants' actions in the Piceance-East Douglas Herd Management Area (Piceance-East Douglas HMA) and the West Douglas Herd Area (West Douglas HA). At oral argument on this matter on September 29, 2006, defendants represented to the Court that they had administered PZP to 29 wild horse mares from the Piceance-East Douglas HMA the day before the hearing and were planning to round up an additional 35 wild horses from this area. Thus, with

1

regard to this HMA, the Court can grant no relief with respect to the administration of PZP, as this action has already taken place. Plaintiffs have been provided no information concerning whether additional horses have been rounded up from the Piceance-East Douglas HMA; therefore, if this action has not already taken place, and with respect to those wild horses removed from this HMA and not adopted, placed in holding or sold, these portions of defendants' actions are subject to this Court's jurisdiction.[1]

As plaintiffs demonstrate below, because defendants' planned actions violate clear mandates of the Wild Free Roaming Horses and Burros Act, (WFHBA), 16 U.S.C. §§ 1331 et seq., the Federal Land Policy Management Act (FLPMA), 43 U.S.C. §1701 et seq, and NEPA, 42 U.S.C. § 4321 et seq., this Court may temporarily enjoin defendants from completing these actions to maintain the status quo until this matter can be resolved on the merits.[2]

## I. Defendants' Plans to "Zero Out' the West Douglas Herd Area Violate The WFHBA, FLPMA and NEPA

Defendants' only current Land Use Plan not under challenge to the Secretary of

---

[1] Pursuant to the "Burns" Rider, an appropriations Rider from December, 2004, which amended the WFHBA, wild horses over age 10 that are removed from the public lands must be sold. The predominant market for wild horses this age is for slaughter, Wood Declaration at ¶ 4. The Burns Rider states that BLM is to sell wild horses over 10 years of age without reservation, meaning that BLM may sell horses in this age category directly to slaughter. Thus, since BLM's Instruction Memo provides that wild horses over 10 are to be removed from the range, some of the wild horses already removed from Piceance-East Douglas, or which may yet be removed, as well as any wild horses from the West Douglas Herd Area that are removed, may be sold directly for slaughter. BLM's practice in implementing this provision is to sell these horses for as low as $1.00 each.

[2] The issue of whether BLM is authorized under the WFHBA and FLPMA to completely eradicate wild horses from their herd area is a legal one.

Interior -- now some 9 years old -- provides that BLM will,

> <u>Manage for a wild horse herd of 95-140 animals on 190,130 acres within the Piceance-East Douglas Herd Management Area (HMA)</u> so that a thriving ecological balance is maintained for all plant and animal species <u>on that range</u>.
>
> The North Piceance and West Douglas Herd Areas will be managed in the short-term (0 to 10 years) to provide forage for a herd of 0 to 50 horses in each herd area. The long term objective (+10 years) will be to remove all wild horses from these areas. (See Map 2-10)[3]

Record of Decision and Approved White River Resource Area Management Plan (RMP) (July, 1997), Pl. Exh. 9 at 2-26 (emphasis added). As plaintiffs explain below, the provisions of this Management Plan regarding wild horses, cannot lawfully contradict the plain terms of the WFHBA.

Simply put, BLM is not authorized in the land use planning process to completely disregard --- much less, repeal --- provisions of the WFHBA. Yet this is what BLM has done through the 1997 WRRA RMP – and what defendants urge this Court to rule is within their "discretion." The discretion BLM hopes that this Court will ratify is not found in the statute, however. The WFHBA is quite clear when it states, ". . . wild horses are to be considered in the area where presently found, as an integral part of the natural system of the public lands," 16 U.S.C. §1331. By regulation, the Secretary has interpreted the phrase "where presently found," as a "herd area," and has defined this as the "geographic area identified as having been used by a herd as its habitat in 1971," 43 C.F.R. §4700.0.

Additional support for the concept that wild horses (and burros) are to be maintained where they were "presently found" in 1971 – and not zeroed out from ---

---

[3] Curiously, the RMP also provides, "[W]ild horses will be managed to provide a healthy, <u>viable breeding population</u> with a diverse age structure," Id. (emphasis supplied).

3

comes from another section of the Act which provides, in pertinent part, "Nothing in this chapter shall be construed to authorize the Secretary to relocate wild free-roaming horses or burros to areas of the public land where they do not presently exist," 16 U.S.C. §1339. At oral argument, counsel for defendants referred to BLM's plan to bring in wild horses from other areas if it was determined that the West Douglas herd area became "zeroed out." Congress specified that management of wild horses was not to become a zoo menagerie management exercise because to do so would ignore the wild, and free-roaming nature of these animals. In the Senate Committee report accompanying the bill that became law the Senate noted, "The committee wishes to emphasize that the management of the wild free-roaming horses and burros be kept to a minimum both from the aspect of reducing costs of such a program as well as to deter the possibility of "zoo like" developments," S. Rep. 92-242, 92nd Cong., 1st Sess. 1971 at 2152.

The importance of "herd areas" is further underscored by BLM's regulations which provide that, "[M]anagement of wild horses and burros shall be undertaken with <u>the objective of limiting the animals' distribution to herd areas.</u> Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans," 43 C.F.R. §4710.4 (emphasis supplied).

Under the terms of this Plan, but in violation of the WFHBA, both the North Piceance[4] and West Douglas Herd Areas can, <u>this year, with these roundups</u>, be "zeroed out" of wild horses. This is because BLM authorizes itself to "provide forage for a herd of 0 to 50 wild horses in each herd area," from 0 to 10 years and then removal of wild

---

[4] The North Piceance area is part of the Piceance-East Douglas Herd Area and constitutes a portion of the area originally identified as wild horse habitat. <u>See</u> Exhibit 1, attached hereto, Wild Horse Herd Management Areas and Herd Areas, Map 3-6, White River Draft RMP and EIS, October, 1994.

horses from these areas after 10 years.[5]  Furthermore, as set forth in Plaintiffs' Verified Complaint, ¶ 30 and Plaintiffs' Exhibit 1 to Memorandum in Support of Temporary Restraining Order, the Washington Office of the BLM signed off on the WRFO's plan to leave 20 wild horses in the Piceance-East Douglas HMA and a mere 5 wild horses in the WDHA after the roundups it authorized.  Thus, despite counsel's representations to the Court this past Friday, there is no documentation that this is, in fact, what BLM will actually do.  Furthermore, as set forth in Plaintiffs' Verified Complaint, ¶ 33, it is not normal practice for BLM to ensure that it is leaving a specific number of wild horses on the range after it has concluded its roundups.

The Second Declaration of Kent Walter does not alleviate any of plaintiffs' concerns that the zeroing out of the herd could be accomplished this year, nor does it provide any genuine assurances to this Court that 50, or any number of wild horses will be left, whatsoever.  This Declaration purports to address these concerns, Decl. at ¶3, however, it only confirms that BLM does not know how many wild horses will actually be left and that this number is at best only an estimate based on extrapolation. The Declaration does not state that BLM will count that it has left 50 horses; instead it says that BLM will do just as it planned on doing, requiring that the Court trust that BLM's census from last year will somehow prove that there are in total a wild horse population of 139 horses and that removal of the 89 wild horses BLM planned on taking will leave 50 to remain.

---

[5] Even a population of 50 wild horses will be insufficient to ensure that herd's genetic viability.  Verified Complaint at ¶25 and Declaration of Don Moore, ¶4, indicating the West Douglas herd has one of the lowest genetic variability of any wild horse herd in the U.S.

5

The Walter Declaration simply is insufficient to ensure this Court that at least 50 breeding age wild horses will remain.  After all, BLM first decided on the approach of leaving between 0 and 50 wild horses in the WD HA in 1981, then formalized this plan in 1997, wrote to Senator Wayne Allard in 2001 that it was revising this plan to shore up the bases for its decision, Pl. Exh. 8a, issued an EA in 1998, at which time Department of Justice counsel advised the Court that it would not zero out the area until 2006 at the earliest, and now issues this EA, relying on a land use plan which specifies that, the population will be managed at between 0 to 50. There are simply no assurances that these wild horses will not be gone, and the WD HA emptied of wild horses unless BLM is restrained from conducting any roundup and removal of wild horses here.  Unless restrained by this Court, BLM's actions threaten to accomplish factually what it may not do legally.  As Judge Griffith recognized in his dissenting opinion in Fund for Animals v. BLM, 460 F.3d 13 (D.C. Cir. 2006), which reviewed the very policy guiding BLM in the challenged roundups,

> The phenomenon we see in this case is familiar. Congress passes a broadly worded statute. The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like. Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations. One guidance document may yield another and then another and so on. Several words in a regulation may spawn hundreds of pages of text as the agency offers more and more detail regarding what its regulations demand of regulated entities. Law is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations. With the advent of the Internet, the agency does not need these official publications to ensure widespread circulation; it can inform those affected simply by posting its new guidance or memoranda or policy statement on its web site. An agency operating in this way gains a large advantage. It can issue or amend its real rules, i.e., its interpretative rules and policy statements, quickly and inexpensively without following any statutorily prescribed procedures. The agency may also think there is another advantage--immunizing its lawmaking from judicial review.

Appalachian Power, 208 F.3d at 1020 (quotation marks and internal citation omitted).  The same phenomenon occurs here today. At issue is a broad congressional mandate:

> "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Although agencies subject to similar mandates and promulgating similar memoranda nonetheless had to face judicial review in Appalachian Power, Bennett, and numerous other cases, today the BLM's interpretation of the Wild Free Roaming Horses and Burros Act escapes review.
>      Under the majority's decision, to obtain any relief, appellants will most likely have to challenge every specific removal of horses by individual field employees. <u>Horses can be removed from the public lands, however, faster than cases can proceed through the public's judicial dockets.</u>

Id. at 30 (Griffith, concurring in part; dissenting in part) (emphasis supplied).

As this Court is well aware, in situations where statutory language is clear, that "is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress, Chevron v. NRDC, 467 U.S. 837, 842-43 (1984). Thus, the WFHBA's command that wild horses shall be "considered in the area where presently found as an integral part of the natural system of public lands," 16 U.S.C. § 1331, prohibits BLM from its planned actions as set forth in the 1997 RMP.

In their brief, as well as in the Declaration of Don Glenn, defendants stress the "thriving natural ecological balance" provision at 16 U.S.C. § 1333(b) as their authority to remove wild horses from the range. BLM cannot rely on that statutory provision for the West Douglas roundup, however, as it has continually represented in its planning documents, as well as in its brief to this Court that the zeroing out of wild horses is dictated by the 1997 RMP. In any event, determinations of "thriving natural ecological balance," are to be made based on a <u>current</u> inventory of "wild free-roaming horses and burros on given areas of the public lands," 16 U.S.C. § 1333(b)(1), and "current inventory of lands within his jurisdiction," 16 U.S.C. § 1333(b)(2), and based on additional information set forth at 16 U.S.C. §1333(b)(2)(ii) – (iv).

These provisions call for determinations to be made by the individual BLM offices based on monitoring and inventorying of public lands, wild horses and other uses of the public lands such as wildlife and livestock.[6] In other words, as plaintiff Barbara Flores explains in her Second Declaration, these determinations are to be made from monitoring data collected and analyzed at the local level. There is nothing in either FLPMA or the WFHBA which allows determinations of the numbers of wild horses to be reached based on administrative convenience or based on the numbers of wild horses that any particular constituency agrees is acceptable.

American Horse Protection Ass'n v. Watt, 694 F.2d 1310 (D.C. Cir. 1982), does not afford BLM carte blanche authority to remove wild horses from the public lands. In fact, the Court made clear that it was only holding that BLM did not need to consider the wild horses' "winter range" alternative before ordering removals of the horses, id. at 1319. The Court explained that the 1978 Amendments to the WFHBA "do not license BLM to engage with impunity, in an 'arbitrary and capricious' reasoning process," id. at 1319 n. 42 in ordering removals of wild horses from the range.

Here, BLM's nationwide and years-long plan to remove wild horses from the range – of which the challenged roundups are a part -- is not only documented in the Fund for Animals v. BLM opinion from this Circuit, but it is affirmed in the Declaration

---

[6] In 1990, the GAO reviewed the Wild Horse and Burro Program and found that, inter alia: (1) due to insufficient information, [BLM local offices] could not determine how many horses ranges could support, the extent of degradation they caused, and the number of horses that should be removed from herd areas; (2) despite congressional direction, BLM did not base its removal of wild horses from federal rangeland on how many horses ranges could support; (3) BLM often did not accompany horse removals with a reduction in livestock grazing levels or effective range management, resulting in inhumane range conditions and exploitation. Rangeland Management: Improvements Needed in Federal Wild Horse Program, RCED 90-110.

of Don Glenn, which mirrors that Court's description of the program, Glenn Decl. at ¶¶ 9-10. Mr. Glenn has only been present in his current position since May, 2006; his lack of knowledge of the genesis of or negotiations leading to the Restoration Strategy or Instruction Memo is understandable. Both the D.C. Circuit opinion and the Glenn Declaration demonstrate that the Washington office of the BLM is dictating these removals, however. And, as explained in Plaintiffs' opening Memorandum, an Instruction Memorandum from Washington continues to provide "guidance" to the local offices in conducting roundups. Indeed, it is more than guidance as the Memorandum dictates that if field personnel wish to deviate from the Memorandum, they must seek prior authorization to do so; furthermore, the evidence before the Court in Fund for Animals indicated that employees closely followed the memorandum.[7] One must question what kind of proper, and independent, NEPA analysis will be done when the outcome is predetermined at the federal level, rather than based on monitoring and inventorying, as mandated by the WFHBA. The "Restoration Initiative," and the "Instruction Memorandum," which dictate numbers of wild horses to be removed like so many widgets, rather than the "living symbols of the West," who "enrich the lives of the American people," as Congress declared, turn the WFHBA and NEPA on their heads.

---

[7] For this reason, the budget cases cited by Defendants at pages 30-31 of their brief, are distinguishable. Here, the mandatory nature of the Instruction Memo demonstrates the irreversible commitment of resources that document requires.

Here, plaintiffs have submitted the second Declaration of Barbara Flores which describes her early questioning as to why only wild horses were being counted in the Restoration Strategy as it was being prepared by a BLM official, Flores Second Declaration at ¶ 1.  Ms. Flores also explains the statement she heard during a public meeting by a livestock management representative of the Wild Horse and Burro Advisory Board. Flores Second Declaration at ¶ 2. The reliability of her statement concerning the ability of the livestock industry to control BLM's administration of the program is corroborated by  Recommendation #3 of the NCBA, attached to Flores Second Declaration, Exhibit 2 .  As Ms. Flores explains, that recommendation turned up one year later in an Appropriations Bill for Interior and amended the Act to require the sale --- rather than placement in the adoption program --- of wild horses removed from the range. Compare 16 U.S.C. § 1333(e) with 16 U.S.C. § 1333(c).

## II.  PLAINTIFFS SATISFY THE ADDITIONAL FACTORS FOR INJUNCTIVE RELIEF

As explained in Plaintiffs' Memorandum, the Plaintiffs' Declarations and at the oral argument before the Court, plaintiffs will be irreparably injured if injunctive relief is not granted because BLM will be allowed to carry out its long held and illegal plan of zeroing out the West Douglas herd.  Defendants can point to no harm that they will suffer if the status quo is maintained until the very important issues plaintiffs have raised can be

resolved. Further, the public interest would benefit from a stay of defendants' planned action so that this irreplaceable herd can be saved.

                                                 Respectfully submitted,

                                                 /s/   Valerie J. Stanley
                                              _____
                                              Valerie J. Stanley
                                              D.C. Bar No. 384882
                                              329 Prince George Street,
                                              Laurel, MD 20707
                                              (301) 549-3126

Dated: October 4, 2006