**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | | |
|---|---|---|
| **COLORADO WILD HORSE** | ) | |
| **AND BURRO COALITION, INC.** | ) | |
| **2406 15ᵗʰ Avenue Court** | ) | |
| **Greeley, CO 81521** | ) | |
| | ) | |
| **AMERICAN MUSTANG** | ) | |
| **AND BURRO ASSOCIATION, INC.** | ) | |
| **2406 15ᵗʰ Avenue Court** | ) | |
| **Greeley, CO 81521** | ) | |
| | ) | |
| **THE CLOUD FOUNDATION, INC.** | ) | |
| **a Colorado, non-profit organization** | ) | |
| **107 South 7ᵗʰ Street** | ) | |
| **Colorado Springs, CO** | ) | |
| | ) | |
| **FRONT RANGE EQUINE RESCUE, INC.** | ) | **Civil No. 06-1609 (RMC)** |
| **2200 Twylby Road** | ) | |
| **Larkspur, CO 80118** | ) | |
| | ) | |
| **DR. DON MOORE** | ) | |
| **1787 K 6/10 Road** | ) | |
| **Fruita, CO 81521** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DIRK KEMPTHORNE,** | ) | |
| **in his official capacity as Secretary,** | ) | |
| **United States Department of Interior** | ) | |
| **1849 C Street, N.W.** | ) | |
| **Washington, D.C. 20240** | ) | |

**KATHLEEN CLARKE, in her**                        )
**official capacity as Director, Bureau of Land**   )
**Management,**                                      )
**1849 C Street, N.W.**                             )
**Washington, D.C. 20240**                          )
                                                    )
**and**                                             )
                                                    )
                                                    )
**KENT E. WALTER, in his**                          )
**official capacity as**                            )
**Field Manager, BLM,**                             )
**White River Field Office**                        )
**73544 Highway 64**                                )
**Meeker, CO 81641**                                )

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1. This is an action to declare illegal and set aside the Bureau of Land Management's (BLM) Instruction Memorandum 2002-95 and any subsequent and currently effective versions of that Memorandum (hereinafter "Instruction Memorandum"), which purports to require removals of "target" numbers of wild horses and burros in Colorado and from other public lands through 2010, because it violates the Wild Free Roaming Horses and Burros Act (WFHBA), 16 U.S.C. §1331 et seq., and was issued without complying with the notice and comment provisions of the Administrative Procedure Act.   This action also seeks to declare illegal and set aside BLM's actions to eradicate two herds of wild mustangs from their ranges -- the Piceance-East Douglas Herd and the West Douglas Herd.  These horses currently and lawfully occupy public lands within the White River Resource Area (WRRA) in northwest Colorado and are protected under the Wild Free-Roaming Horses and Burros Act (WFHBA), 16 U.S.C. §

1331 et seq.  These herds are managed by the White River Field Office of BLM (WRFO). The WRFO took and will be taking any subsequent actions with regard to these herds at the direction and with the consent of the Washington Field Office (WFO) of the BLM pursuant to the Instruction Memorandum. As a result of the WFO's mandate, the WRFO refuses to address issues underlying the conclusions it reached in its Herd Management Area Plan (HMAP) for the Piceance-East Douglas and West Douglas herds. This HMAP was originally drafted in 1981, revised by BLM personnel with handwritten notes in 1984, and last updated with addendums of roundup and removal information in 1996. As a result of the Instruction Memorandum, wild horses are being removed from the public lands as a directive from the WFO without requiring local BLM field offices to solicit, obtain, consider and respond to public comment on management actions affecting local populations of wild horses and update and amend the data underlying their "herd management area plans." Pursuant to the Instruction Memorandum, the WFO has and is directing the WRFO to "zero" out the West Douglas herd and remove substantial numbers of the Piceance-East Douglas herd as part of a national strategy to drastically reduce the nation's wild horse population to provide additional forage, and other resources, for livestock and other wildlife, especially wildlife subject to consumptive uses.  The WFO bases its direction to reduce the Piceance-East Douglas herd and other wild horse herds on the "appropriate management level" (AML) for wild horses set by local BLM field offices.  These AMLs have often been set decades earlier, do not reflect current monitoring and inventorying of wild horse herds and the pertinent lands, and are based on illegally decreased acreages of ranges for wild horses.  When the public comments on the environmental assessments for particular round-ups and removals of

wild horses and  raise concerns about the illegalities that have been involved in the setting of AMLs, BLM local offices advise – as the WRFO did with respect to the Piceance-East Douglas roundup -  that any challenges to the AMLs are beyond the scope of the EA for the roundup.  Thus, as a direct result of the Instruction Memorandum, wild horses are being removed from the public lands at an alarming rate without the ability of plaintiffs and other members of the public to raise issues regarding the illegalities in the setting of AMLs at the local level.

2.  On information and belief, defendants plan to continue actions set forth in the Decision Records issued in September, 2006 regarding the roundups of wild horses in Piceance-East Douglas and West Douglas areas as early as February, 2007.  In addition, because BLM's challenged actions are contrary to law and will result in irreparable injury to plaintiffs, plaintiffs are seeking declaratory and injunctive relief.

## JURISDICTION AND VENUE

3.  This case concerns a federal question and, therefore, jurisdiction is proper under 28 U.S.C. §1331.  Venue is also proper under 28 U.S.C. § 1391(e).  This Court may review defendants' actions and order appropriate relief under the Administrative Procedure Act, 5 U.S.C. §§701 et seq.

## PLAINTIFFS

4.  The Colorado Wild Horse and Burro Coalition (CWHBC) is a non-profit

Colorado corporation, organized to educate the public and wild horse and burro adopters about wild horse issues and to protect wild horses and burros, primarily in Colorado, but also in other states.  CWHBC brings this suit on behalf of its members, who are interested in and affected by the Bureau of Land Management ("BLM'") activities

regarding management of all the natural resources, and specifically the wild horses, in this area.  The Colorado Wild Horse and Burro Coalition (CWHBC) members and supporters recreate, photograph, and enjoy viewing wild horses on public lands within the Piceance-East Douglas and West Douglas areas in Colorado. They visit the area often, appreciate its natural beauty, enjoy its scenery and all of its wildlife, including wild horses, and because they are aware of the historical significance of its wild horse herds and the archeological significance of these areas.  CWHBC has participated in public land reviews and decisions regarding both Piceance-East Douglas and the West Douglas Herd Areas.   Toni Moore is a resident of the state of Colorado and is the Secretary/Treasurer of CWHBC and the Special Projects Coordinator of the Cloud Foundation.   On behalf of the CWHBC, and the Cloud Foundation, she participated in the only environmental review process afforded by BLM for its most recent actions of rounding up the West Douglas and Piceance East Douglas wild horses.   When Toni Moore commented on the proposed roundup of the Piceance-East Douglas horses, she raised concerns that this herd's historic range had been reduced from 443,979 acres to 148,153 acres, thereby subsequently drastically decreasing the AML for this population of wild horses.  The WRFO refused to consider this issue, stating that this issue was "beyond the scope of the EA," which only addressed removing wild horses from the

range. Issues concerning the setting of AML for this population thus threaten to escape review and correction, leading to further roundups and removals of these wild horses.

5. The American Mustang and Burro Association, Inc. (AMBA) is a national organization, dedicated to the protection and preservation of America's wild equines, service to adopters and to public and adopter education. Ms. Barbara Flores is on the Board of Directors and is the Founding Chair of CWHBC. AMBA sues on behalf of its members, some of whom are Colorado residents or visitors and who enjoy visiting Colorado's public lands to view wild horses and burros. AMBA has participated in public land reviews and decisions regarding both Piceance-East Douglas and the West Douglas Herd Areas.

6. Toni Moore and Barb Flores are residents of Colorado. Ms. Moore and Ms. Flores, and CWHBC and AMBA participated in the environmental review process for the actions challenged herein with respect to the Piceance-East Douglas herd and the West Douglas herd. These plaintiffs have the sincere desire to have BLM comply with NEPA, and not just "go through the motions," with its desired outcome already pre-determined, which violates the letter and spirit of NEPA. These individuals and organizations have been the primary advocates for and protectors of wild horses in this area. They have routinely and conscientiously commented on every proposed action by BLM affecting resources in the area, attended countless meetings where the public's input was sought and supposedly considered, kept in regular contact with local and federal agency officials and instituted administrative and federal litigation, all for the purpose of maintaining wild horses in the Piceance-East Douglas and West Douglas Herd Areas.

7. The Cloud Foundation is dedicated to preventing the extinction of the Pryor Mountain Wild Horse herd and other wild horse herds on public lands, especially isolated herds with unique characteristics and historical significance. TCF was organized by Ginger Kathrens, its Executive Director.  Ginger Kathrens first became involved with wild horse issues in 1994 when she filmed wild horses of the Pryor Mountains in Montana for Marty Stouffer's "Wild America" series.  As a result of filming a roundup of those horses, she learned that a young foal had become separated from its mother during the roundup.  When Ms. Kathrens questioned BLM, she was told that the foal "ran away from its mother" during the roundup.  Ms. Kathrens subsequently spent three days on foot in an attempt to locate the foal, in the hopes of reuniting it with its mother. Two months later she learned that the BLM had shot the foal in question when he fell or was driven over a cliff and broke his back during the early days of the round up. Since that time,  Ms. Kathrens has become a leading advocate for the preservation of wild horses on their native ranges. She is a nationally recognized authority on wild horse behavior and a frequent speaker about her study of and interactions with the wild stallion Cloud and the other wild horses of the Pryor Mountains, as well as the need to keep genetically viable herds of wild horses on our public lands. She has reached millions of people around the world through her documentaries and books about Cloud and his family.  TCF sues on behalf of its supporters.

8. Front Range Equine Rescue (FRER) is a Colorado non-profit corporation established in 1997, which is dedicated to stopping the abuse and neglect of both domestic and wild horses. It is FRER's belief that ignorance is often the main cause for equine abuse rather than outright cruelty. A primary goal of FRER is to educate new,

potential, and existing horse owners on basic horse care topics such as equine nutrition, first aid, farrier care, alternative therapies, and natural horsemanship training techniques. In addition, FRER has assisted hundreds of horses, including wild horses through direct rescue and its educational programs. While some horses are donated by their owners or are rescued when abandoned, many are rescued from livestock auctions to save them from slaughter. Once rescued, FRER then provides for the direct care and rehabilitation of these horses in need.

9.   FRER represents its supporters' interests in protecting wild horses on the range and those who have been adopted and need to be rescued from improper adoptive homes. FRER does this by commenting on BLM actions to remove wild horses from their range and urging BLM and other responsible federal agencies to ensure that removals and any other federal actions taken with regard to wild horses are based on a legitimate need to undertake those actions and that the horses' safety and welfare will be assured during those actions.  FRER has had extensive experience preparing wild horses for adoption to private homes.  FRER has found that when older wild horses are removed from the range, they have difficulty adjusting to being domesticated and therefore, there is a less of an adoption demand for these horses.

10.   Don Moore is an equine and small animal veterinarian and has lived in or near the WRFO almost his entire life.  Dr. Moore has a personal interest in viewing and enjoying wild horses in the WRRA.  Having lived and worked in the area for decades, he is intimately familiar with the WRRA, its history and the presence of wild horses there. He frequently visits the public lands to see and enjoy the wild horses that live there.

11.  Ms. Moore, Ms. Flores and Ms. Kathrens and other supporters of the organizations they direct have witnessed other roundups of wild horses taken off the range and the horses' reactions to the loss of their freedom.  They often have the memories of those events return to haunt them.  They fear for the wellbeing and safety of the horses BLM has captured and plans to capture from the Piceance-East Douglas Herd Management Area and the West Douglas Herd Area.

12.  In late September, 2006, Don Moore visited the wild horses rounded up from the West Douglas Herd Area in holding pens near the trap site. Dr. Moore learned that after four days of flying over the area in a helicopter, the contractor for BLM, who had conducted previous roundups of wild horses in this area, had only been able to round up 38 horses.  Dr. Moore counted these 38 horses that had been rounded up and later learned that an additional single wild horse had been captured, bringing the total wild horses captured from the West Douglas Herd Area to 39.  Only 35 of these wild horses were kept by the BLM and are currently in holding where they await being taken by a volunteer for placement in a sanctuary.  BLM did not release the other four wild horses – believed to be a mare and three foals -- back to the range; these four horses are unaccounted for and plaintiffs fear that they have been given to a private individual who will exploit them for commercial purposes.  BLM has refused to explain the whereabouts of these four wild horses despite requests from plaintiffs and other members of the public.

13.  Beginning on September 16, 2006, the day after plaintiffs advised BLM that they had filed their suit in this matter, but before they could seek an injunction, BLM conducted a roundup of wild horses from the Piceance-East Douglas Herd Management

Area and contiguous public lands.  Witnesses to this roundup saw BLM drive these wild horses from the range directly into horse trailers. In previous roundups in the WRFO that plaintiffs have observed, at no time did BLM allow the contractor (including the contractor for the September, 2006 roundup) to utilize small pens and run the wild horses directly from the range into trailers.  Such action is contrary to BLM's own regulations for the capture and transport of wild horses, which prohibit such activity because it is not humane.  Such action is contrary to BLM's standard practice of holding wild horses at the site of capture to attempt to give them time to acclimate to humans and the restrictions on their freedom from captivity and to separate the animals by bands and mares and foals from stallions. Due to these violations, some of the wild horses rounded up from the Piceance-East Douglas HMA sustained life threatening injuries, either died from their injuries or had to be euthanized, or are otherwise unaccounted for. In addition, four foals, which were still with their mothers before the roundup, were separated from them and remain so.  BLM has refused to explain the whereabouts of the dams of these foals or what happened to them despite repeated requests from plaintiffs and other members of the public.

14. Defendant BLM's actions and failures to act, as set forth in greater detail herein inflict current  harm to plaintiffs' procedural and substantive interests in the aesthetic enjoyment and protection of  individual wild horses and the wild horse populations of the Piceance East Douglas and West Douglas areas. By causing or threatening irreversible adverse effects to these horses.

**DEFENDANTS**

15.    Dirk Kempt Horne is the Secretary of the Department of the Interior. Pursuant to the WFHBA, he is responsible for the oversight of BLM's management of wild horses on the Nation's public lands, including the public lands of Colorado.

16.    Kathleen Clarke is the Director of the Bureau of Land Management and is responsible for implementing management decisions for wild horses in accordance with the WFHBA.  In addition, Kathleen Clarke instituted the "Restoration Strategy," calling for the removal of half the national wild horse population between the years 2000 to 2005 and is responsible for the Instruction Memorandum, which purports to govern wild horse removals through the year 2010. During the years 2000 to 2005, BLM has rounded up approximately 50,000 wild horses. On information and belief, Kathleen Clarke's initiation and continuation of these actions has been undertaken to support livestock interests throughout the western United States.

17.    Kent Walter is the Field Manager for the White River Field Office (WRRA) of BLM, and is responsible for managing the wild horses of the Piceance-East Douglas Herd Management Area and the West Douglas Herd Area in compliance with the Wild Free Roaming Horses and Burros Act and its implementing regulations.

**BLM's  MANAGEMENT OF WILD HORSES AND OTHER RESOURCES IN THE WRRA**

18.    Although the WFHBA requires BLM to protect and manage wild horses

where they were found at the passage of the Act in 1971 – and BLM has acknowledged that wild horses have lived in the West Douglas Herd Area (HA) since at least the 1880s -- BLM has slated wild horses in this area for total removal (zeroing out) in various land use planning documents issued pursuant to the Federal Land Policy Management Act (FLPMA), 43 U.S.C. §1701 et seq. since at least 1981.  Under law, and pursuant to BLM's regulations, a herd area is that area of wild horse historical use at the time of the passage of the Act in 1971.  In contrast, a "herd management area (HMA)" is that area where BLM chooses to manage wild horses.

19.  BLM states that the increase in oil and gas activities in the area warrants complete eradication of a population of wild horses in this area.  As early as 1975, at least one BLM employee, and more recently, as evidenced by documents obtained under FOIA, counsel for BLM, and have expressed concern that zeroing out a wild horse herd area was illegal.

20.  The 1981 "Herd Management Area Plan" for the White River Resource Area (WRRA), which addressed treatment of both the Piceance-East Douglas herd and the West Douglas herd,  provided that earlier Management Framework decisions established that the area ease of what is now Highway 139 would be the "preferred habitat" for the management of wild horses. This "preferred habitat" was established by BLM based upon where BLM counted these wild horses during the aerial census conducted of this area during the last week of February and the first week of March, 1974. BLM failed to account for areas wild horses occupied during other times of the year, seasonal migration patterns, and the need for wild horses to migrate to disseminate grazing impact and maintain a thriving, natural ecological balance, as provided in the WFHBA.   In the

HMAP, BLM decided to reduce the acreage where they would manage wild horses in the WRRA to 148,153 acres, even though wild horses had previously ranged over 443,979 acres in the Piceance Basin and Douglas Creek areas and BLM had recognized in its Management Framework Plan for the area from 1975 that, "all of the area included within the wild horse herd unit is being used by wild horses." The HMAP acknowledged that the 443,979 acres of wild horse historic use in this area would be decreased to 148,153 acres and those wild horses would be managed in this area. At the time, the Piceance-East Douglas HMA was not slated for intense oil and gas development, and the BLM determined that it was more convenient to manage for wild horses there. A 1981 Grazing Management Plan and EIS carried forward these earlier decisions regarding the "preferred habitat" into the HMAP and the subsequent White River Resource Management Plan, issued in July, 1997.

21. In July, 1997, BLM issued its Resource Management Plan (RMP) for the WRRA. In the 400 + page document, BLM devoted less than a full page to wild horses. BLM states that it plans to manage for a population of zero (0) to fifty (50) horses in the West Douglas Herd Area for 0 to 10 years and the long term objective would be to remove all wild horses from this area. Thus, under the RMP currently in effect, BLM has authorized itself to completely eradicate wild horses from the area at any time within 10 years from issuance of the July, 1997 RMP. The 1997 RMP called for BLM to manage a population of 95-140 horses on the Piceance-East Douglas HMA (its AML), 1997 RMP at 2-26. No AML has ever been set for the West Douglas area as BLM decided that it would not manage for wild horses in this area. No discussion was devoted to the minimum population of wild horses needed to maintain genetic diversity, nor whether

BLM would seek to use fertility control on any of the wild horses there. The 1997 RMP did not discuss the interrelationship between the Piceance-East Douglas Herd Area and the West Douglas Herd Area.

22.  In large part because the 1997 RMP did not adequately address or discuss management of wild horses in the West Douglas herd area --- and BLM knew that its actions were subject to being set aside for this reason --- BLM began a process in 2002 of amending the RMP.  The first revision to the 1997 RMP, which sought to address wild horse use of the area, was issued in 2004. This proposed amendment evaluated 8 alternatives regarding management of wild horses in the West Douglas Herd Area. The 2004 EA stated that without oil and gas stipulations --- agreements by oil and gas companies to preserve wild horse areas --- "critical wild horse habitat would be lost." The 2004 RMP Amendment was protested by numerous groups and the Secretary of BLM ordered that it be withdrawn.  BLM subsequently began work drafting another RMP Amendment.

23.  In 2005, BLM issued the "West Douglas Herd Area Amendment to the White River Resource Management Plan." This proposed Amendment to the RMP set forth two alternatives for West Douglas herd area—that of eliminating wild horses from the herd area in 2007 or maintaining a "small" population of 29-60 wild horses.  On August 29, 2005, BLM issued its Decision record for the RMP Amendment. This amendment reaffirmed the decision BLM made in its 1997 RMP to zero out wild horses from the WDHA.

24.  Plaintiffs, and other organizations, protested this RMP Amendment to the Secretary of the Interior.  That protest is still pending.  When the Secretary issues its

decision on the protest, it will either affirm the Amendment or, as it did in 2004, reject the Amendment and return the Amendment for further processing at the WRFO.

25.   Currently, the WRFO is analyzing "scoping" comments on an Environmental Impact Statement (EIS) for another proposed amendment to its 1997 Resource Management Plan (RMP). The plan amendment and associated EIS will address the potential impacts of significant increases in oil and gas development within the 1.5 million acre field office over the next 20 years. The scoping comment period was extended until September 30, 2006 to ensure the public had sufficient opportunity to provide comments.

26.   BLM's notice about the scoping comments period for this Oil and Gas EIS provides, "The lifestyles and concerns of area residents, including the activities of grazing and hunting, will be recognized in the RMPA/EIS." The RMPA/EIS does not purport to recognize the concerns of area residents in maintaining wild horse populations, including the interests of area residents in maintaining wild horse populations within the Piceance-East Douglas Herd Management Area, the very area to be impacted by significant increases in oil and gas development. BLM's current and future actions challenged herein with regard to wild horses threaten to eliminate wild horses from consideration as BLM analyzes oil and gas use in these areas.  This is despite BLM's recognition in its 2004 proposed RMP Amendment that without oil and gas stipulations (i.e. the stipulations that oil and gas companies give to preserve area for wild horse use), "critical wild horse habitat would be lost."

27.   BLM states that a second public comment period will follow the release of the Draft Plan/EIS, currently anticipated to be in 2007 and that it anticipates a final

decision record in 2008.  Unless BLM is ordered to include the effects of oil and gas development on wild horses, there may be no wild horses within the WDHA as early as this fall, 2006 and there could be no wild horses in the Piceance-East Douglas HMA by the end of  2007.

28. In contrast to this RMP Amendment which will analyze Oil and Gas Development in the area and project the area's needs for the next 20 years, the WRFO has not updated its 1981 Herd Management Area Plan to include new information and the current status of wild horses and issues affecting wild horses, such as oil and gas development, in the Piceance/East Douglas Herd Management Area or the West Douglas Herd Area.

29.  Since 1997, national research has been conducted on the genetics of wild horse populations, including the number of wild horses necessary in a given area to ensure the genetic viability of the herd, as well information concerning impediments to wild horse free-roaming migratory patterns, such as interior fences.  This information, as well as age/sex demographics of wild horse populations is necessary to ensure a valid AML for the area. BLM, itself, as well as wild horse population experts, have determined that to remain viable, a wild horse population must have a minimum of 150 individuals, which generally guarantees a Ne of 50, i.e. (those individuals who are actively passing their genes on to the next generation). Neither the 1981 HMAP nor the 1997 RMP contain or consider this updated and pertinent information, including continued fragmentation of the area and impacts of energy development in these areas, which affects the validity of the numbers set forth in this area's AML. These documents thus fail to properly and adequately inform BLM and the public so as to ensure the accuracy

and timeliness of its information and decisions regarding management of wild horses in these areas.

30. The 1981 HMAP for the Piceance-East Douglas Herd Area indicates that herds' historical range was decreased by 295,826 acres as a compromise, and a portion of this new decreased range was established as the Piceance/East Douglas Herd Management Area. The actions of BLM in conducting the roundups in Piceance/East Douglas and West Douglas, and in directing future removals of wild horses from these and other areas is in furtherance of the approach set forth in BLM's Instruction [M]emorandum, which BLM has admitted, "continues to serve as guidance to the field for the conduct of specific gather and removal decisions," Fund for Animals v. BLM, 2006 WL 2381022 (D.C. Cir. 2006).  The WFO's Instruction Memorandum, which directs the removal of "target" numbers of wild horses from both Piceance-East Douglas and West Douglas, does not take into account this local and area-specific information, whether it is valid, or the fact that it is over 22 years old.  The Instruction Memorandum merely dictates that removal of a specific number of wild horses shall be accomplished. Furthermore, through its Instruction Memorandum, the WFO of BLM provides that herd areas and herd management areas may be "zeroed out," if provided by land use plan.

31.  As with all other herd areas and herd management areas affected by the Instruction Memorandum and the yearly list of wild horse populations and herds to be rounded up, the local office of BLM directed to accomplish the removal of the specified number of wild horses must do so without benefit of public comment and evaluation as to whether the numbers of wild horses set forth in its AML or herd management area plans are accurate, current or valid.

32.  As a result of BLM's round up activities, wild horses in the Piceance-East Douglas Herd Management Area and the West Douglas Herd Area currently exist in such few numbers that the genetic viability of these populations is  threatened.  In addition, BLM has either already zeroed out the West Douglas Herd Area or has left such few numbers of wild horses in the area, that the population is subject to die off due to a severe environmental event.. Plaintiffs have learned that BLM  may continue rounding up additional wild horses from these areas as early as February, 2007 under the challenged EAs. Because of BLM's actions, the wild horse populations in these areas are threatened with irreparable genetic harm which will jeopardize their ability to survive.  Plaintiffs' interests in the survival of wild horses in these areas and in their continued ability to continue to enjoy viewing wild horses in these areas are therefore threatened as well.

33.   In 2005, the WFO listed the number of wild horses it wanted to be gathered in Piceance-East Douglas as 175 and the number of wild horses it wanted removed as 155, purportedly authorizing the leaving of 20 wild horses in the area. The WRRA received its requested budget from BLM headquarters in Washington, D.C. to complete this roundup. On June 5, 2006, the WRFO issued for a 30 day comment period, its Environmental Assessment (EA), purporting to elicit comment on whether it should conduct a roundup of these wild horses and whether it should administer PZP to the wild horse mares it planned to round up, despite the fact that it had been instructed by the WFO to complete the roundup.

34.  In 2005, the WRFO listed the number of wild horses it wanted to be gathered in the West Douglas Herd Area as 116 and the number of wild horses it wanted to remove as 110, purportedly authorizing the leaving of 6 wild horses in the area.  The

WRFO received its requested budget from BLM headquarters in Washington, D.C. to complete this roundup.  On June 5, 2006, BLM issued for a 30 day comment period, its Environmental Assessment, purporting to elicit comment on whether it should conduct a roundup of these wild horses.

35.  At the time it was authorized by WFO to conduct these roundups, the WRFO had not conducted a current census of either wild horse population and therefore the WFO's listing of the number of wild horses it wanted removed from the public lands was based neither on an assessment of whether the roundup needed to be conducted, where wild horses were existing and whether they were having an impact that necessitated their removal.

36.  After the WFO directed the WRFO that it could leave 20 wild horses in the Piceance-East Douglas Area and 6 wild horses in the West Douglas area after its roundups were completed, and after public opposition to these actions became known, the WRFO conducted an aerial survey of the wild horse populations in these areas and purportedly counted more wild horses than it had originally thought were occupying these areas.  Despite repeated requests from plaintiff representatives of CWHBC and AMBA to accompany BLM on census missions to count wild horses, and to corroborate BLM's wild horse numbers, BLM has refused to allow plaintiffs' representatives to do so.

37.  Pursuant to the Instruction Memo, the WFO directed that 155 wild horses be removed from the Piceance-East Douglas Herd Management Area and 110 wild horses be removed from the West Douglas Herd Area.  When BLM and its contractor went to the field to conduct the roundups, they only reportedly were able to locate under 200 wild

horses from the entire Piceance-East Douglas HMA and 39 wild horses from the West Douglas Herd Area.

38. When BLM conducts removals of wild horses from public lands, it continues its removal operations until at least the targeted number of animals are removed. BLM does not count the number of wild horses it has left in the area, after its removal actions are completed, nor does BLM in any way seek to ensure that it has left a certain number of wild horses of appropriate age/sex ratios so as to ensure the genetic viability of the herd that remains.

39. The West Douglas Herd Area is denominated as such because it is the area that wild horses used as their historical range in 1971, at the passage of the Act.

40. The Piceance-East Douglas HMA is a much smaller subset of the original herd area wild horses used as their historical range in 1971. Typically, and in this case, the herd management areas BLM establishes do not extend to wild horse original habitat. The decision to manage horses in areas smaller than their geographic range leads to the setting of smaller "AMLs" for wild horses in these areas. The Piceance-East Douglas Herd Management Area does not represent the HA identified as being used by the horses when the Act was passed but has been reduced to a much smaller geographic area. Therefore, any wild horses "outside the HMA" are <u>inside</u> the HA, and under the law and according to the implementing regulations, are not supposed to be subject to removal for that reason.

41. Since wild horses' herd areas are those areas that horses were historically

occupying at the passage of the Act, wild horses do not respect the artificial boundaries created by BLM when it establishes "herd management areas' and seeks to curtail wild horse presence in or travel within these artificially created "herd management areas."

42.  BLM often seeks to justify a roundup and removal of wild horses due to the fact that the horses have roamed outside of the herd management area, in essence, because the wild horses are using their historic, migratory habitat.  The roundup and removal of wild horses from West Douglas and Piceance East Douglas were such removals, and threaten to be the basis for removals of wild horses from these areas in the future.  Neither the WFHBA nor BLM's regulations implementing the Act authorize BLM to remove wild horses simply because they are outside a herd management area.

43.  When BLM conducts its helicopter gathering of wild horses, the noise associated with this action often forces wild horses out of their normal grazing areas, into areas outside of agency declared management boundaries.  When plaintiffs CWHBC and AMBA challenged a removal of wild horses from West Douglas in 2002, the Field Manager of the WRRA, James Cagney, stated in an internal memo, that BLM would conduct the roundup in any event and just classify it as an "outside the HMA" roundup.

44.  Pursuant to the Instruction Memo, the WRFO is required to remove wild horses in the category of age 10 and older.  Pursuant to the "Burns" Rider, an appropriations Rider from December, 2004, wild horses age 10 and older removed from the public lands must be sold.  The predominant market for wild horses this age is for slaughter. The Burns Rider states that BLM is to sell wild horses 10 years of age and older without reservation, meaning that BLM may sell horses in this age category directly to slaughter.

45. Upon realizing that they have been caught, wild horses have been known to jump or attempt to jump the six foot panels of corrals in which they are held and/or throw themselves against the panels out of fear or in a desperate attempt to escape the restrictions on their movement imposed by the corrals. Some of these horses run head long into the barriers that restrict their escape, break their necks and die. Others severely injure themselves in the process or are shot due to their injuries. Still other trapped wild horses suffer from what is called "capture myopathy," in which they become depressed and despondent over being captured and/or being separated from their bands.

## IV. **Porcine Zona Pellucida (PZP)**

46. Porcine Zona Pellucida (PZP) is an immunocontraceptive agent obtained from pigs. It is administered using Freund's Complete Adjuvant (FCA), which has been noted to cause granulomas at the site of injection in a percentage of treated mares.

47 BLM has admitted that significant questions remain concerning the effects of PZP application at the population level as well as the effects on behavior, social structure, and harem dynamics of free-ranging animals. BLM has thus concluded that these questions are "best answered with field trials on wild horse herds under a research protocol," FTP at 2.

48. BLM has stated that ovarian function needs to be assessed for a large sample of mares treated for four years and that the effects of PZP and the adjuvant, FCA, on any clinical health problems (e.g. possible abscesses, ovarian damage) "need to be observed under tightly controlled conditions." BLM has also stated that PZP application may influence the seasonality of birth of foals.

49.   Under BLM's FTP, the prime time of year in which to administer PZP is noted to be October through February. Pursuant to BLM's DR for Piceance-East Douglas, PZP will be administered to mares in this herd, for the first time ever. On information and belief, BLM has failed to secure prior approval to use this drug on this herd.

50.   The last time BLM removed wild horses from Piceance-East Douglas was in 2002; at that time, BLM only found, rounded up and removed  101 horses including foals and yearlings. BLM then returned 12 mares and 6 stallions to that area.  BLM has waited four years to express its need to remove wild horses from the area. Its determination in 2006 that it had to place its decision to remove wild horses in "full force and effect," meaning that it had an urgent need to remove these wild horses, is pretextual.

51. The WRFO established an AML for the Piceance-East Douglas Herd Area in its 1981 Herd Management Area Plan (HMAP).  The WRFO has failed to update this AML and other information in the HMAP with current monitoring and inventorying to address the current and potential impacts to management and protection of a healthy, viable wild horse herd such as energy development, access to water, loss of free-roaming status due to fencing to enhance livestock grazing, loss of habitat due to road construction and development, loss of water due to filings of water rights on streams and creeks.  In addition, the WRFO has failed to respond to public concerns that the office illegally reduced the horses' historic range.

## STATUTORY AND REGULATORY  BACKGROUND GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

### I.  The Wild Free-Roaming Horses and Burros Act

52.  Through the 1971 Wild Free-Roaming Horses and Burros Act (WFHBA),
16 U.S.C. §§ 1331 et seq., Congress found and declared that, "wild free-roaming horses
and burros are living symbols of the historic and pioneer spirit of the West; that they
contribute to the diversity of life forms within the Nation and enrich the lives of the
American people; and that these horses and burros are fast disappearing from the
American scene."  Upon finding this, Congress stated that its policy was that
 "wild free-roaming horses and burros shall be protected from capture, branding,
harassment, or death, and to accomplish this they are to be considered in the area where
presently found as an integral part of the natural system of public lands," 16 U.S.C. §
1331.

53.  BLM and the US Forest Service (USFS) have exclusive authority under the
WFHBA for the protection of wild horses and burros on the public lands administered by
those agencies, 16 U.S.C. § 1331(a).  The WFHBA requires that BLM's and USFS's
management activities be at "the minimal feasible level," Id. According to BLM's own
regulations, BLM must protect wild horses and burros from unauthorized capture,
branding, harassment or death and provide these animals with humane care and
treatment," 43 C.F.R. § 4700.

54.  Under the WFHBA, wild horses are "to be considered in the area" where they

were found in 1971 "as an integral part of the natural system of the public lands," 16 U.S.C. § 1331.  These legally protected areas are known as "herd areas,"  (HAs) and are defined as "the geographic area identified as having been used by a herd as its habitat in 1971," 43 C.F.R. § 4710.3-1.

55.  Under the WFHBA, "range," means "the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands," 16 U.S.C. §1332 (c).

56.  The Act requires the Secretary to "protect and manage wild free-roaming horses and burros as components of the public lands. . .The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands,"  16 U.S.C. §1333(a). The Act provides that, "The Secretary shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands." Under the Act, "appropriate management levels" of wild horses are to be based on a current inventory of wild horses and on the basis of ecological balance, which cannot arbitrarily be fixed at a moment in time.  This inventory is to be the basis for determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals, determine appropriate management levels and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels), 16 U.S.C. § 1333 (b)(1). The Act also provides that, "Where the Secretary determines. . . that an

overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels," 16 U.S.C. §1333(b)(2).

57.  In the Senate Committee report accompanying the bill that became law the Senate noted, "The committee wishes to emphasize that the management of the wild free-roaming horses and burros be kept to a minimum both from the aspect of reducing costs of such a program as well as to deter the possibility of "zoo like" developments," S. Rep. 92-242, 92nd Cong., 1st Sess. 1971 at 2152.  An intensive management program of breeding, branding, and physical care would destroy the very concept that this legislation seeks to preserve….leaving the animals alone to fend for themselves and placing primary emphasis on protecting the animals from continued slaughter and harassment by man," Id.

## II. National Environmental Policy Act

58.  Under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., any major federal actions that significantly affects the quality of the human environment requires the preparation of an environmental impact statement. (EIS), NEPA §102(2) (C).  The language and spirit of NEPA is aimed at ensuring that an agency's single-minded approach to a proposed action is tempered by consideration of a reasonable range of alternatives, including those with fewer adverse environmental impacts than the proposed action.

59.  Agencies may decide instead of preparing an EIS, to prepare an environmental analysis (EA) first.  An EA serves three purposes: it assists in agency decision-making on whether to prepare an EIS or Finding of No Significant Impact

(FONSI); it independently ensures compliance with NEPA even when no EIS is required; and it facilitates the preparation of an EIS if one is required.  40 C.F.R. § 1508.9(a).

60.   NEPA requires BLM to analyze in an EA  alternatives which involve unresolved conflicts concerning alternative uses of available resources even when an EIS is not required.  NEPA §102(2) (C)(iii).

61.  Although an EA is a "concise, public document," it must include a discussion of the need for the proposal, alternatives, environmental impacts of the proposed action and the alternatives and a listing of the persons and agencies consulted.  40 C.F.R. §§ 1508.9(a), 1508.9(b).

62.  An EA's FONSI is only considered adequate if the agency took a "hard look" at the problem, the agency identified the relevant areas of environmental concern, the agency made a convincing case that the environmental impacts were insignificant as to the problems studied and identified; and if there were significant impacts, the agency convincingly established changes that reduced the impacts to a minimum.

63.  The Council on Environmental Quality ("CEQ"), the agency responsible for implementing NEPA, and BLM's regulations under NEPA, requires that BLM analyze the direct, indirect and cumulative impacts on the environment under the proposed action and each alternative to determine if the impacts are significant.  BLM's regulations require that this analysis be based on the best available information and should be objective, i.e. should not reflect subjective value judgments.

64.  An EA may contain mitigation measures to avoid significant impacts that would otherwise require the preparation of an EIS.  BLM regulations require that an EA

must identify and analyze mitigation measures which may be taken to avoid or reduce environmental harm.

65.  An EA serves an important statutory purpose beyond being an initial step toward the preparation of an EIS or a FONSI.  Independent of this requirement, an EA must discuss, in adequate detail, a reasonable range of alternatives.

66.  An agency must take a "hard look" at the alternatives and the environmental impacts of each.  An agency must consider a full range of alternatives that cover a full spectrum of possibilities and demonstrate reasoned decision-making.  It must also give a reasoned explanation for rejecting each alternative.

67. BLM regulations also require that a No-Action alternative be analyzed at the same level of detail as the proposed action.

### III. <u>FEDERAL LAND POLICY MANAGEMENT ACT</u>

68.  BLM must manage public lands under concepts of multiple use and sustained yield pursuant to the Federal Land Policy Management Act (FLPMA), 43 U.S.C. §1701 <u>et</u> <u>seq,</u> FLPMA thus requires the BLM to manage the public lands for many purposes and for many members of the public.

69. FLPMA requires that the public lands planning process be accomplished through land use plans, FLPMA § 202(a).  FLPMA recognizes, however, that a land use plan does not trump the statutory command of other laws, such as the WFHBA, which requires BLM to consider wild horses as an integral part of the public lands,  FLPMA § 102(b), and mandates that BLM provide wild horses and burros specific protection.

70. BLM's regulations implementing the WFHBA provide that "wild horses and burros shall be considered comparably with other resource values in the formulation of land use plans," 43 C.F.R. §4700.0-6.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Violations of NEPA, NEPA Regulations and the APA)

71.  Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

72.  BLM failed to prepare an EIS for its actions in both Piceance-East Douglas and West Douglas even though they each, separately, and cumulatively, constituted a major federal action that will significantly affect the quality of the human environment.

73.  BLM's EA failed to provide sufficient information to decision-makers and the public, in violation of NEPA.

74.  BLM's EA and DR failed to take a hard look at the environmental consequences of its actions.

75. BLM'S EA and DR did not properly analyze nor address alternatives to administering PZP on the Piceance-East Douglas herd, including but not limited to allowing the herd to regulate its population itself or via natural controls on population.

76. BLM's EA and DR did not properly analyze nor address alternatives to the removal of the wild horses.

77.  BLM's EA and DR did not properly analyze nor address significant gaps and uncertainty in the scientific data relating to the effects of PZP on  the individual horses and the population as a whole, including, but not limited to, causes of site injection lumps

and/or abscesses, whether the drug would cause out of season births which could lead to deaths of foals born out of season, whether infertility from the drug could last for years longer than anticipated, whether administration of the drug would cause the population to drop to levels which threaten the herd's genetic diversity and ability to survive catastrophic events, whether administration of the drug disrupted social and behavior activity of the bands and herd and/or whether additional funding would be needed for monitoring those horses to whom PZP had been administered.

78. BLM's EA and DR did not properly analyze nor address the cumulative impacts of the past and future planned administration of PZP with the past and future planned removals of wild horses from the range.

79. BLM's EAs and DRs are improperly tiered to the 1997 RMP.

80. In sum, Defendant BLM's EAs and DRs are major federal actions approved contrary to NEPA, 42 U.S.C. §4332(2)(C), and its implementing regulations. BLM failed to take the requisite hard look at the foreseeable consequences of their actions. BLM failures to comply fully with NEPA and its regulations were arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, thereby subject to reversal under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (APA).

## COUNT TWO

### (Violations of the WFHBA, WFHBA Regulations and APA)

81.  Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

82.   BLM is not authorized to "zero out" a herd area, either directly by removing all wild horses present, or indirectly by leaving wild horses in such few numbers that they are genetically unviable.

83.   BLM's plans to zero out the West Douglas herd and to remove a significant percentage of the wild horse population of the Piceance-East Douglas Herd Management Area, leaving wild horses in numbers so few that their genetic viability is threatened, and its reliance on its 1997 RMP to take these actions violates the WFHBA.

84.  These actions are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law,  and must be set aside under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (APA).

## COUNT THREE

### (Violations of FLPMA, the WFHBA and the APA)

85.  Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

86.  BLM has refused to acknowledge and provide for the historical use and seasonal migratory patterns of the wild horses living in the Piceance-East Douglas HMA and the West Douglas HA.

87.  This refusal has limited the horses' range to those areas where BLM has determined it is convenient to manage them.

88. BLM is not authorized to "zero out" a herd area, either directly by removing all wild horses present, or indirectly by leaving wild horses in such few numbers that they are genetically unviable.

89.  BLM's reliance on the 1997 RMP to eradicate wild horses from the West Douglas HA and to remove wild horses from the Piceance-East Douglas HMA violates FLPMA and the WFHBA.

90. These actions are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law,  and must be set aside under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (APA).

## COUNT FOUR

### (Violations of FLPMA, the WFHBA and the APA)

91. Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

92. BLM has advised the public that it cannot revisit issues affecting wild horses which were addressed in its 1981 HMAP, including the setting of AMLs,  in the context of EAs for a roundup. BLM has not otherwise addressed these issues in a manner that allows meaningful public comment and public participation.  BLM has failed to revise and update the information in its 1981 Herd Management Area Plan governing management of wild horses in the West Douglas and Piceance-East Douglas areas to

consider how more recent activities in the WRRA affect wild horses and how wild horses affect other uses of these areas.

93.  BLM's failure to update and revise information in its 1981 HMAP constitutes agency action unreasonably delayed and unlawfully withheld, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (APA) and in violation of the WFHBA, which requires decisions concerning the populations of wild horses to be based on a current inventory of wild horses in the area and monitoring of the public lands, including their historic ranges.  This Court may enter an order to remedy this unreasonably delayed and unlawfully withheld action.

## COUNT FIVE

### (Violations of the WFHBA and the APA)

94. Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

95.  The BLM's "Instruction Memorandum,." which BLM acknowledges guides the WRFO, and other local BLM offices, mandates removal of wild horses from a particular area, by solely referencing a particular wild horse population's measurement against its "appropriate management level," whereas AMLs are to be set at the local field office, based on current and accurate information after adequate monitoring of public lands and inventorying of wild horse herds.

96.  BLM's "Instruction Memorandum" currently threatens to affect wild horses in West Douglas and Piceance East Douglas because it is in effect through 2010 and any actions the WRFO will take with regard to wild horses in this area must comply with the directives of that Memorandum.

97.  The WFO's "Instruction Memorandum" constitutes a change in policy for implementation of the WFHBA, that has been implemented without notice and comment and otherwise violates the framework of the WFHBA, which requires decisions regarding the maintenance of wild horses as integral parts of the natural system of public lands and the setting of AMLs to be based on current monitoring and inventorying of wild horses and the public lands on which they live.

## PRAYERS FOR RELIEF

WHEREFORE,  plaintiffs respectfully request that this Court enter judgment in favor of plaintiffs and grant the following relief:

A.  Issue a declaratory judgment that:

1. Defendant BLM's EAs and DRs for the West Douglas HA and Piceance-East Douglas Herd Area violate the National Environmental Policy Act, its implementing regulations, and the APA;

2.  Defendant BLM's EA and associated DRs and the actions planned therein, and which may be continued as early as February, 2007 by BLM pursuant to those EAs and DRs, violate the Wild Free Roaming Horses and Burros Act, and its implementing regulations, and are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, contrary to the APA, 5 U.S.C. §706(2)(A)-(F).

3. Defendant BLM's actions in refusing to acknowledge the legal right of the West Douglas and Piceance-East Douglas wild horse herds to lands they historically used

at the passage of the Wild Free-Roaming Horses and Burros Act, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, contrary to the APA, 5 U.S.C. §706(2)(A)-(F).

4. Defendant BLM's failure to update inventory information concerning wild horse populations in the West Douglas Herd Area and the Piceance-East Douglas Herd Management Area contained in its 1981 Herd Management Area Plan, including failing to set and revise as necessary based on current monitoring information AMLs that would reflect populations of wild horses occupying their areas of historic use area constitutes agency action unreasonably delayed and unlawfully withheld in violation of the Administrative Procedure Act, 5 U.S.C. §706.

5. Defendant BLM's "Instruction Memorandum" constitutes a change in policy for implementation of the WFHBA, that has been implemented without notice and comment and otherwise violates the framework of the WFHBA, which requires decisions regarding the maintenance of wild horses as integral parts of the natural system of public lands and the setting of AMLs to be based on current monitoring and inventorying of wild horses and the public lands on which they live.

B. Pursuant to the APA:

1. Issue an order directing BLM to update appropriate information concerning wild horses in the White River Resource Area to its 1981 Herd Management Area Plan, with full public notice and comment, to provide for two naturally genetically viable populations of wild horses in the Piceance-East Douglas Herd Management Area and the West Douglas Herd Area;

2. Issue an order setting aside BLM's "Instruction Memorandum;" a) as in violation of the WFHBA insofar as it directs the removal of target numbers of wild horses from the Piceance-East Douglas Herd Management Area and the West Douglas Herd Area, and other areas, without regard to whether current monitoring and inventorying information has been used to set AMLs and b) which was developed without providing for notice and comment on this policy in violation of the APA;

3. Issue an order prohibiting BLM from a) zeroing out wild horses from the West Douglas Herd Area; b) managing wild horses in the West Douglas Herd Area in genetically unviable numbers; c) zeroing out wild horses from the Piceance-East Douglas herd; d) managing wild horses in the Piceance-East Douglas Herd Management Area in genetically unviable numbers.

4. Issue an order directing BLM to recognize the historic herd use area for wild horses within the White River Resource Area and to provide for use of these areas by naturally genetically viable populations of wild horses.

C.  Award plaintiffs their costs and expenses (including reasonable attorney, expert

witness and consultant fees); and

D.  Award plaintiffs such other relief as the Court deems appropriate.

Respectfully submitted,


/s/ Valerie J. Stanley
Valerie J. Stanley
D.C. Bar No. 384882
329 Prince George Street
Laurel, MD 20707
(301) 549-3126

Counsel for Plaintiffs


December 6, 2006