UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

COLORADO WILD HORSE            )
AND BURRO COALITION, INC.,     )
et al.,                        )
                               )
        Plaintiffs             )
                               )
                               )
v.                             )        Civil No. 06-1609 (RMC)
                               )
DIRK KEMPTHORNE,               )
in his official capacity as Secretary,  )
United States Department of Interior    )
1849 C Street, N.W.            )
Washington, D.C. 20240,        )
et al.,                        )
_____)

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

Plaintiffs' claims for judicial review of BLM's actions with regard to the wild

horses of the Piceance (pronounced "Pēance")-East Douglas Herd Management Area and

West Douglas Herd Area, have been timely brought, are not moot, concern final agency

action and state claims upon which relief may be granted. Defendants' motion to dismiss

for lack of jurisdiction and failure to state a claim are without merit and should be denied.

## I. INTRODUCTION

This case concerns the wild horses currently living in Piceance-East Douglas (P-

ED) and West Douglas (WD), two herds in the White River Resource Area, threats to

their statutorily protected existence in these areas and the rights of Plaintiffs to enjoy now

and in the future the horses' current presence and continued existence in these areas in accordance with the letter and spirit of the Wild Free-Roaming Horses and Burros Act (WFHBA).  16 U.S.C. §1332 et seq.

In order to understand Plaintiffs' claims and the legal issues involved in the current controversy surrounding these two herd areas, it is necessary to review the history of these areas.[1]

## II. WILD HORSES IN THE WHITE RIVER RESOURCE AREA

The White River Resource Area (WRRA) is located in northwestern Colorado and "encompasses 2,675,300 acres of federal, state and private lands; of this acreage, BLM administers 1,820,000 acres . . ." White River Resource Area, Draft Resource Management Plan and Environmental Impact Statement, October, 1994 (hereinafter "1994 Draft RMP"), Exhibit 1, at Summary.  According to BLM, "historical records show that wild horses were present in the resource area when the first settlers arrived in 1882." 1994 Draft RMP, Exhibit 1 at 3-22.

From 1882 until passage of the Wild Free-Roaming Horses and Burros Act in 1971, wild horses of these areas, as well as wild horses throughout the nation, were routinely rounded up by the thousands by private and government individuals to be made

---

[1] Consideration of these issues requires reference to certain historical documents, some of which are referenced in Plaintiffs' First Amended Complaint and some of which have been submitted by Defendants in support of their Motion to Dismiss.  As Plaintiffs explain herein, while they do not dispute that the records submitted are authentic, Plaintiffs do not concede that they represent the entire universe of documents that are relevant to this Court's consideration of the issues raised with respect to these two herds. In addition, the administrative record has not been submitted for either the Plaintiffs' or the Court's review and neither Party has yet moved for summary judgment on these issues.

into commercial products or to be used.  See Johnston, "The Fight to Save a Memory,"

50 Texas L. Rev. 1055, 1056 n.2 (1972), noting that, "throughout the West, [wild horse]

numbers, which had been assessed in the millions, were reduced to an estimated 14, 810

to 29,260 in the 1950s."  W. Wyman, The Wild Horse of the West (1945).

Approximately twenty years later, at the passage of the WFHBA in 1971, BLM advised

Congress that "the number of . . . free-roaming horses, found mainly in Nevada, Oregon

and Wyoming, has remained relatively stable at 17,000.  Of this total, it is estimated that

7,500 are branded or probably will be claimed by private owners, leaving about 9,500

unclaimed, free-roaming horses."  See Protection of Wild Horses and Burros on Public

Lands, Hearing on S. 862, S. 1116, S. 1090 and S. 1119 Before the Senate Subcomm. on

Public Lands of the Comm. on Interior and Insular Affairs, 92nd Cong. 20 (1971)

(hereinafter "Senate Hearing") (Statement of Harrison Loesch, Assistant Secretary of the

Interior).

    The 1994 Draft RMP and EIS stated that, "wild horses presently occur in and are

presently managed on a total of 512,528 acres of BLM land in the WRRA."  1994 Draft

RMP at 3-22.[2]  The 1994 Draft RMP went on to explain,

---

[2] While Plaintiffs cite to the 1994 Draft RMP here, they discuss earlier planning
documents at Section III, infra.  They note the following proviso, however:  There are
numerous BLM planning documents which, to varying degrees, affected BLM's
treatment of wild horses within the WRRA.  Over the course of their involvement in
protecting these wild horses, Plaintiffs have obtained and reviewed numerous of these
documents.  Plaintiffs are not certain, however, that they have obtained or been provided
with all pertinent documents or complete copies of these pertinent documents.  In
deciding a Rule 12(b)(1) motion to dismiss, the Court "may consider materials outside
the pleadings in determining jurisdiction, but it  must still accept all of the factual
allegations set forth in the Plaintiffs' complaint as true.  Research Air. Inc. v. Norton,
2006 U.S. Dist. LEXIS 10784, at *14 (D.D.C. March 1, 2006) (citation omitted).  In
Wilderness Society v. Griles, this Circuit held that the district court must give a plaintiff
the opportunity to discover evidence relevant to his jurisdictional claim.  824 F.2d 4, 16

The estimated current population of wild horses is 516. The wild horses
are presently distributed among three wild horse units that occur in ten
livestock grazing allotments.  Of the three wild horse units, only one is a
Herd Management Area (HMA).  It is called the Piceance-East Douglas
Creek HMA.  The other two units are called herd areas (HAs).  They are
the West Douglas HA and the North Piceance HA.  A wild horse
management plan for the Piceance-East Douglas HMA was approved in
June 1981 at which time implementation of the plan began . . .

The resource area wild horse herd was initially counted in August 1975
and numbered 143 head.  The current population estimate of 516 is an
extrapolation from the last aerial census done in March, 1993 with a 20
percent adjustment for annual population recruitment.  Over the last ten
years, 897 horses have been removed in the course of six gathering
operations.

Id. at 3-22.

## III.  PASSAGE OF THE WILD FREE ROAMING HORSES AND BURROS ACT IN 1971, AMENDMENTS THERETO AND THE WRRA'S RESPONSE TO THESE STATUTES

In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act

(WFHBA), 16 U.S.C. §1332 et seq, to protect wild horses and burros which, prior to that

time, had been rounded up by the thousands and removed from the public lands by

persons who profited from the animals by selling them for slaughter.  One of the issues

Congress debated as it considered how best to protect these animals was whether the

---

(D.C. Cir. 1987) ("Insofar as the defendant's motion to dismiss raises factual issues, the
plaintiff should have an opportunity to develop and argue the facts in a manner that is
adequate in the context of the disputed issues and evidence." (citation omitted)).
Nevertheless, Plaintiffs have attached hereto as Exhibits some of BLM's historical
documents concerning wild horses of the WRRA that Plaintiffs reference in the First
Amended Complaint, for purposes of the Court's consideration of the Fed. R. Civ. P.
12(b)(1) motion.  Furthermore, Plaintiffs submit that the documents demonstrate that the
West Douglas herd is now threatened with extirpation and the Piceance-East Douglas
herd faces the same eventual destiny unless Defendants' actions and inactions are
remedied.  Accordingly, Plaintiffs are now harmed, and will, in the future, be further
harmed, if review is not granted.  In addition, as noted in n.1, supra, the administrative
record has not been submitted for either the Plaintiffs' or the Court's review, and neither
Party has yet moved for summary judgment on these issues.

4

horses should be confined to specific ranges, which may have differed from areas that they currently occupied, or whether they should be left to roam in the areas of the public lands that they then occupied.  The issue of whether specific ranges should be created arose, in part, because three years earlier, the Secretary of the Interior created the Pryor Mountain Wild Horse Range (PMWHR) from public lands in Wyoming and Montana. See 33 Fed. Reg. 12920 (1968).  BLM also favored the creation of specific ranges – a total of five within the United States – and urged Congress to adopt a bill providing for these ranges, where it would place such free-roaming horses and burros as the Secretary "deems worthy and capable of protection as a national heritage," and providing that "[t]he Secretary shall select areas [for those ranges] which he finds will provide a habitat on which such horses and burros can thrive in harmony with the environment. . . ." See Senate Hearing at 21.

Thus, while Congress had the model of limiting wild horse occupancy of the public lands to specific, delineated areas by providing for the dedication of specific ranges for wild horses – and BLM even submitted a draft bill that would have continued this course – Congress explicitly rejected this particular model of providing for the protection of wild horses and burros in general on the public lands.  Instead, Congress provided that wild horses would be protected in all areas where they were found at the passage of the Act, and wild horses would be considered comparably among other uses in the administration of the public lands.  Congress declared that:

> It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of public lands.

16 U.S.C. § 1332 (emphasis supplied).[3]

In addition, Congress heeded witnesses' concerns that wild horses not be managed in park or zoo type settings with intense manipulations such as introducing new bloodlines etc. because to do so would interfere with the nature of wild horses.  See Protection of Wild Horses and Burros on Public Lands.  Hearing on S. 862, S. 1116, S. 1090 and S. 1119 before the Senate Subcomm. on Public Lands of the Comm. on Interior and Insular Affairs, 92nd Cong. 71 (1971) (Statement of Hope Ryden); id. at 75-121 (Statement of Velma Johnson).

Congress also heard testimony that neither the public in general, nor the Bureau of Land Management, knew specifically how many wild horses there were on public lands. Nor did they have knowledge of the horses' behavioral habits. See H.R. CONF. REP. 92-681 (1971) at 1.  In reconciling the draft Senate and House bills, the Conference Committee explicitly stated the intent that the final act not only protect wild horses from activities immediately causing them substantial harm, but also from those activities that "would have a cumulatively detrimental effect on the health and welfare of the animals." Id.  Congress placed responsibility for the protection of wild horses with the BLM and the U.S. Forest Service.  Unfortunately, Congress did not initially fund the agencies to accomplish these goals.  See Johnston at 1063-64.

The WRRA of the BLM conducted its first census of wild horses in the area in 1974, three years after passage of the Act.  See Wild Horse Inventory, attached hereto as

---

[3]  BLM's regulations implementing the WFHBA recognize the significance of the wild horses' area of historical use in 1971 by denominating such areas as "herd areas."  In contrast, "herd management areas" (HMAs) are those areas in which BLM has decided it will manage wild horses; these areas (like the Piceance-East Douglas HMA) are smaller areas – routinely subsets of herd areas.

Exhibit 2 and 1975 Management Framework Plan (MFP), attached hereto as Exhibit 3.
The MFP provided, "[t]he decision has been made to manage wild horses with wildlife
and livestock.  The wild horses will be managed on their present range with the exception
of that portion of the horse range lying west of Douglas Creek.  Thirty to forty horses will
be removed and disposed of from this area."  MFP, Exhibit 2 at Management Decision
Summary.  BLM provided that fences would be built to "contain the horses within the
selected range."  Id.  BLM noted that the "only forage surveys that would cover the wild
horse range were completed in 1939 [and] . . . [t]he forage data from this survey is
inadequate for present use . . . .  [M]ost of this range was severely overgrazed in the early
1900's and has not fully responded to present management practices."  MFP at WH-9**.**

        In the sole helicopter count it conducted**,** BLM found 45 wild horses and noted
that "twelve more were located after the census in an area that was not included in the
wild horse range . . . ."  MFP at WH-4.  BLM also noted that no seasonal use studies had
been conducted to determine wild horse migration patterns.  Id.  By forgoing a
comprehensive study in favor of a single "snapshot," BLM could not accurately assess
the size or use of the horses' existing herd areas.  BLM admitted its ignorance regarding
what wild horses ate in the West Douglas herd area.  The MFP noted, "[t]here is no
available data on the food or food habitat of horses in this horse unit.  Presumably, these
horses would prefer the same type of plants as those in Piceance Basin."  MFP at WH-6.
Later in the document, BLM conceded that "[i]t is not practical to determine whether or
not the range is being utilized properly without knowing the present available forage use
by domestic livestock, wild horses and wildlife.  However, there are no records that show

<u>that allowances have been made for wild horse use</u>." MFP at WH-10 (emphasis supplied).

After noting that, "most of the Douglas Creek wild horse range consists of the pinyon-juniper vegetative type," BLM remarked that "[i]t is believed that in this area, the home ranges of some bands are predominantly located in pinyon-juniper areas. It is believed that during hot weather, most horses seek areas of shade [and] it can only be assumed that these heavily timbered areas are also used during winter storms." MFP at WH-5. BLM also noted the importance of the pinyon-juniper as a means of cover, which it discovered when it attempted to capture branded horses. MFP at WH-7 ("[the horses] made good use of the trails in the pinyon-juniper areas. It may be that many of the trails in the pinyon-juniper are escape routes").

The MFP concluded that more scientific data was needed in the following areas: "1) determination of home ranges and exact range boundaries; 2) population data [marking system]; 3) importance and function of cover; 4) status of old fences and inventory of private fences; 5) range survey on horse range; 6) extensive fecal analysis studies over entire range." MFP at WH-15.

In 1976, Congress passed the Federal Lands Policy Management Act (FLPMA), 43 U.S.C. §1701 <u>et seq</u>. FLPMA requires BLM to manage the public lands under concepts of multiple use. FLPMA §303(a). FLPMA specifically provides, however, that a land use plan cannot override the statutory commands of other laws, such as the WFHBA, which requires that BLM consider wild horses as an integral part of the public lands. <u>See</u> FLPMA § 102(b) (stating that FLPMA shall "be construed as supplemental to

and not in derogation of the purpose for which public lands are administered under other provisions of law").

In 1978, Congress passed the Public Rangelands Improvement Act, 43 U.S.C. §1901, which added the definition of "excess" animals to the WFHBA. These amendments authorized BLM to remove wild horses if, and only if, an overpopulation existed and removal of these animals was necessary to "preserve and maintain a thriving natural ecological balance and multiple use relationship" in an area of the public lands. 16 U.S.C. §1332(f). The Act directs that any removals of wild horses be based on current inventorying and monitoring of wild horses in the area. 16 U.S.C. §1333(b).

In 1980, in partial response to the passage of FLPMA, BLM began work on creating a Grazing Management Program and Environmental Impact Statement (EIS). BLM recognized that most livestock grazing capacity inventories "did not make direct allocations or allowances for wildlife grazing use and . . . did not make direct allocations for wild horse grazing use." 1980 Grazing EIS (selected portions of which are attached hereto as Exhibit 3) at 1. BLM explained that with respect to wild horses, they "would be managed on 107,000 acres of the existing 443,979 acre horse area, the same area proposed in Alternative A (Map 2-1)[4] . . . A maximum of 450 wild horses with a minimum of 250 horses would be maintained in this area on 3 allotments." 1980 Grazing EIS at 20. In contrast, BLM proposed to intensively manage 437,226 acres of public land . . . to improve critical deer winter ranges . . . and to improve deer summer and winter ranges on [other allotments]. Id.

---

[4] Map 2-1 is set forth at Exhibit 4.

BLM acknowledged the following deleterious effects on wild horses and provided

that this was its preferred alternative.  As BLM explained,

> The initial allocation of vegetation in the action proposal would . . .
> decrease the wild horse population from 366 to 90 (75 percent) in the . . .
> allotments and decrease the remainder of the existing wild horse range
> (Map 2-1) by 100 percent (259) horses.  Total wild horse reductions would
> be 86 percent (535 horses) of the present wild horse herd of 625.

> The action proposal recommends total removal of wild horses outside the
> proposed 107,000 acre wild horse area.  Total removal would cause short
> term periods of stress by removing horses from the natural environment.
> During a recent total removal operation on Douglas Mountain in northwest
> Colorado, most of the remaining 10 percent of the herd had to be removed
> with a capture resulting in a 3 percent death loss.  Death losses in the EIS
> area could be expected to exceed this figure because the wild horses are
> scattered over a larger area which includes more fences and rougher
> terrain.

Id. at 140.

BLM acknowledged, as well, that its preferred alternative would further threaten

the remaining horses.  BLM stated,

> The reduction of 276 wild horses from the proposed wild horse
> management area would only leave an average of 30 wild horses in each
> of the three allotments.  Herds of 30 wild horses could be susceptible to
> total elimination during severe winters . . . .

Id.

The area where BLM determined it would manage wild horses came to be known

as the Piceance-East Douglas Herd Management Area (HMA).

Some sixteen years later, in 1997, BLM issued the White River Resource Area

Management Plan (RMP) and EIS, a 400 plus page document, which reaffirmed and, by

its own admission, carried forward earlier conclusory decisions to zero-out the West

Douglas Herd Area and manage wild horses in the Piceance-East Douglas Herd

Management Area on a fraction of these wild horses' historic range.  In the single page

pertinent to wild horses within the area, BLM provided,

> Manage for a wild horse herd of 95-140 animals on 190,130 [5] acres within
> the Piceance-East Douglas Herd Management Area (HMA). . . .  The
> North Piceance and West Douglas Herd Areas will be managed in the
> short-term (0-10 years) to provide forage for a herd of 0 to 50 horses in
> each herd area.  The long term objective will be to remove all wild horses
> from these areas (See Map 2-10).
>
> Update and revise the Piceance-East Douglas Herd Management Area
> Plan.  Monitoring studies will be conducted and the long term appropriate
> management level (AML) for the Herd Management Area will be adjusted
> based on the results of this monitoring.

1997 Record of Decision and Approved Resource Management Plan at 2-26, attached

hereto as Exhibit 5.

Since 1997, BLM has conducted several interim roundups of wild horses from

these areas in furtherance of the goal of zeroing out the WDHA.  Several wild horse

groups appealed a 1996 roundup to the Interior Board of Land Appeals (IBLA).  See

Animal Protection Institute, 151 IBLA 396 (2000).  In that case, IBLA noted that the

1997 RMP was not before it for review, because it was signed three days after petitioners

submitted their challenged to the roundup to IBLA.  In addition, some of the plaintiffs in

this action brought suit in this Court to challenge another roundup from the WDHA in

1998.  See American Mustang and Burro Ass'n v. Babbitt, Civ. Action No. 98-2144 (JR).

Although both roundups were upheld, neither the IBLA nor the District Court in the

American Mustang and Burro case addressed the legality of zeroing out a herd area.  In

---

[5] The disparity between the 190,130 acres noted to be in this area in the 1997 RMP,
compared to the 107,000 acres noted in the 1980 Grazing Management Plan, resulted
from the addition of the Greasewood Allotment.  However, as Barbara Flores explains in
her Affidavit submitted herewith, this allotment was not truly "added" to the horse range
but was rather restored, having been initially removed by BLM.

fact, in the 1998 case, the government specifically represented to the District Court that

its roundup would not result in the zeroing out of the herd and that such action would not

occur until at least 2006.[6] Additionally, even though these challenges were brought to

BLM's implementation of its 1997 RMP, the issue of whether BLM may provide for

such zeroing out in a land use plan, has not been decided.  It is of particular significance

that BLM has previously defended roundup and removal operations by arguing that the

impact of those removals "would not significantly affect the herds' long term viability," a

tacit admission that BLM roundups may not be used to reduce a wild horse herd to a

point that is deemed genetically unviable.  Animal Protection Institute, et al., 151 IBLA

396, (2000).

      In 2002, the WRRA began the process of reconsidering whether it would manage

wild horses in the West Douglas Herd Area, by accepting scoping comments.  In 2004,

BLM issued an Amendment to the WRRA RMP and Environmental Assessment (EA),

but this EA was subsequently withdrawn.  In 2005, BLM issued its second Amendment

to the WRRA RMP; this Amendment was protested by some of the plaintiffs herein and

other groups and is still pending before BLM.[7]

---

[6] In 2000, BLM threatened to fully implement its plans to zero out the West Douglas wild
horse herd.  When challenged by Plaintiffs herein, BLM called off this roundup, citing
"budgetary" reasons.  In 2001, BLM again decided to conduct a roundup of wild horses
in the area; when challenged by Plaintiffs, BLM decided to characterize its roundup as an
"outside the herd area" roundup.  See Exhibit 6, Email of James Cagney, Field Manager,
White River Resource Area.
[7] Plaintiffs discuss the agency review of this Amendment at Sections IV, B and IV, C,
infra.

## IV.  THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS AND THEY STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED

Defendants assert both that this Court is without jurisdiction to hear Plaintiffs' claims and that they fail to state a claim upon which relief can be granted pursuant to Federal Rules 12(b)(1) and 12(b)(6), respectively.  Defendants do not challenge Plaintiffs' standing to bring their claims.  Nevertheless, as demonstrated by Plaintiffs' allegations in the complaint, as well as the attached of Toni Moore, Don Moore and Barbara Flores, Plaintiffs have standing to challenge BLM's actions and inactions herein. See Exhibit A, Declarations of Barb Flores, submitted on behalf of the American Mustang and Burro Association at ¶¶1, 15, 17-20, Don Moore at ¶¶ 1, 2, 12, 14  and Toni Moore, individually and on behalf of the Colorado Wild Horse and Burro Coalition at ¶¶ 1, 2, 3, 9.  Defendants assert that the issues of timeliness, mootness, and lack of final agency action relate to jurisdiction. Furthermore, Don Moore explains through his Declaration the many wild horses he has seen in various areas within the West Douglas Herd Area and what is now the Piceance-East Douglas HMA, as well as other areas within the WRRA at the passage of the WFHBA and thereafter.  See Declaration of Don Moore at ¶¶ 3, 5-11.  Although Defendants do not state a basis for their claims under Federal Rule 12(b)(6), it appears that they argue this in the alternative, as a basis for dismissal should the Court deem that it has jurisdiction.

A motion to dismiss for lack of subject matter jurisdiction should "not prevail unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief and plaintiffs, at this juncture, enjoys all favorable inferences that can be drawn from the alleged facts."  Beverly Enters., Inc. v. Herman, 50 F.Supp.2d 7, 11

(D.D.C.1999).  At this juncture, the plaintiff enjoys all favorable inferences that can be drawn from the alleged facts, EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C.Cir.1997), but the plaintiff bears the burden of pleading a claim within the Court's subject-matter jurisdiction.  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F.Supp.2d 9, 13 (D.D.C.2001).

### A. Plaintiffs' Claims Have Been Timely Brought

Defendants' brief on this issue is limited to an entire one-third of a page.  In that portion, Defendants cite a few cases from the Ninth Circuit; even those cases, however, recognize that plaintiffs' claims can be brought beyond six years from the date the agency takes action and still be timely brought under 28 U.S.C. § 2401.  For example, the Ninth Circuit in Wind River Mining Corp. v. Lujan, 946 F.2d 710, 715 (9th Cir. 1991) held that while policy-based facial challenges to an agency's action must be brought within six years, substantive claims that an agency is violating a statute may be brought beyond six years from the date the agency acted.  It is clear that Plaintiffs challenge substantive, illegal actions and inactions of BLM with regard to the management of wild horses within the P-ED and WD areas, and not mere "policy" decisions.  Because the challenges Plaintiffs bring to BLM's actions herein are not policy decisions, however, Defendants' arguments fail, even under this non-binding precedent.

Furthermore, in Wind River Mining, the Ninth Circuit recognized that, "[o]ther circuits have concluded that an agency regulation or other action of continuing application may be challenged after a limitations period has expired if the ground for challenge is that the issuing agency acted in excess of its statutory authority."  946 F.2d at 714 (citations omitted) (emphasis supplied).  One of the cases the Ninth Circuit found

persuasive was <u>Functional Music, Inc. v. FCC</u>, 274 F.2d 543 (D.C. Cir. 1958), <u>cert. denied</u>, 361 U.S. 813 (1959).  In that case,  the D.C. Circuit found that administrative orders issued decades earlier, but which had continuing application, should be subject to judicial review because "limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity."  <u>Id</u>. at 546-47.

Similarly, in <u>Oppenheim v. Coleman</u>, 571 F.2d 660 (D.C. Cir. 1978),  a long term Civil Service employee who retired in 1974 sought additional retirement benefits, claiming that a 1946 Civil Service Commission ruling had adversely affected the amount of retirement benefits when he sought those benefits in 1974.  The Court held that the employee could challenge the agency's 1974 reliance on the 1946 ruling as "recent arbitrary agency action" based upon a substantively wrong earlier decision.  <u>Id</u>. at 663.

More recently, in <u>Wilderness Society v. Norton,</u> this Circuit held that challenges to agency <u>inaction</u> may be brought beyond the six year limitations period of 28 U.S.C. §2401(a).  434 F.3d 584 at 588-89 (D.C. Cir. 2006).  Here, Plaintiffs challenge Defendants' failure to recognize the historic use area of the wild horses from the P-ED HMA and the WD HA as reflected in BLM's earlier planning documents, decisions that were carried forward to the 1997 RMP, and which still effectively govern BLM's administration of wild horses and other resources within the WRRA.  Further, Plaintiffs seek declaratory relief concerning BLM's reduction of acreage for the P-ED and its intention to zero out the WD herd.  <u>See</u> Plfs' First Am. Compl. at pp. 34-36.

**B. Plaintiffs' Challenges to BLM's Actions and Failures to Act with Regard to the Piceance-East Douglas Herd and West Douglas Herd and to the Legality of the BLM "Instruction Memorandum" Are Not Moot**

Plaintiffs have challenged the unlawful removal of wild horses from public lands and BLM's plans to eradicate herds from their historical ranges in accordance with the Instruction Memorandum and the 1997 RMP, as beyond the authority of BLM and contrary to statute and regulation.  Contrary to Defendants' argument, Plaintiffs' challenge presents a live controversy and is not moot.

Defendants erroneously characterize Plaintiffs' Amended Complaint as challenging only roundups that have already been completed, whereas Plaintiffs have challenged BLM's overall scheme to zero-out wild horses from the West Douglas and Piceance-East Douglas Herd Areas by removing all horses from their herd areas or, alternatively, reducing the herds to genetically unviable numbers, of which the completed roundups are component actions.  See Def. Memo at p. 9; Plfs' First Am. Compl. at p. 2, ¶ 1 and pp. 31-32, ¶¶ 81-90.  Defendants' reliance upon Fund for Animals to support their assertion of mootness is misplaced.  See Def. Memo at p. 10, citing Fund for Animals v. BLM, 460 F.3d 13, 22 (D.C. Cir. 2006).  In that case, the Court of Appeals did not consider the issued presented here, i.e., whether BLM has the statutory authority to zero-out a wild horse herd area through repeated gather and removal operations.[8]  Hence, Plaintiffs Prayer for Relief requests an order directing BLM to recognize the wild horses' historic herd use area within the White River Resource Area, and prohibiting BLM from

---

[8] In Fund for Animals, the D.C. Circuit held that BLM had the authority to remove "excess" animals to deal with an "overpopulation" of wild horses, and that appellants' challenges to specific completed roundups conducted to remove excess wild horses from recognized herd areas were moot.  460 F.3d at 16, 22-23.

eradicating the herds, which are recognized by Congress "as an integral part of the natural system of public lands."  See Plfs' First Am. Compl. at pp. 34-36.

The Supreme Court has instructed that in cases where a plaintiff has sought both declaratory and injunctive relief, the denial of the injunctive relief will not operate to moot the case because the Court may still afford plaintiffs declaratory relief.  See Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115, 121-22 (1974) (if court can issue declaratory relief, case is not moot even if injunctive relief would be moot).

Although the September 2006 Piceance-East Douglas and October 2006 West Douglas roundups have been completed, the issues raised by Plaintiffs' Complaint are not moot.  Not only do Plaintiffs seek declaratory relief, their claims fall within the "capable of repetition, yet evading review" doctrine.  Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515 (1911).  BLM's roundups and removals of wild horses are "in [their] duration too short to be fully litigated prior to [their] cessation or expiration," and "there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again."  Beethoven.com LLC. v. Librarian of Congress, 394 F.3d 939, 950 (D.C. Cir. 2005) (citing Weinstein v. Bradford, 423 U.S. 147, 149 (1975)).  See also Dow Chem. Co. v. EPA , 605 F.2d 673, 678-79 n.12 (3rd Cir. 1979) ("Most cases utilizing this [capable of repetition but evading review exception to mootness] approach have involved official action that by its very nature could not, or probably would not be able to be adjudicated while fully 'live.'").

BLM's claim of mootness fails because the agency cannot demonstrate that "there is no reasonable expectation" that it will conduct further roundups in the Piceance-East Douglas or West Douglas herd areas.  United States v. W. T. Grant Co., 345 U.S. 629,

633 (1953).  See also Maryland People's Counsel v. FERC, 761 F.2d 768, 773 (D.C. Cir.

1985) (controversy not moot where there was a "demonstrated probability" of recurrence

of a challenged agency action (citations omitted)).  BLM's repeated and unceasing

assertion of authority to eliminate wild horses from existing herd areas, most recently

embodied in its 2005 amendment to its 1997 RMP,[9] "by its continuing and brooding

presence, casts what may well be a substantial adverse effect on the interests of [the

Plaintiffs]."  Humane Soc'y of the United States v. EPA, 790 F.2d 106, 114 (D.C. Cir.

1986) (citations omitted) (where the challenged permit had expired, but there was a very

reasonable expectation that the agency would issue additional permits in the series, the

case was not moot).

        BLM concedes that the 1981 MFP reiterated its earlier decision to remove,

eventually, all wild horses from the West Douglas herd area.  See Def. Memo at pp. 3-4.

In the 1997 RMP, which BLM describes as the "definitive land use planning document

for all resources within the WRRA," BLM announced that it intended to achieve its stated

objective of zeroing out the herd during calendar year 2007.[10]  See Def. Exh. A, p. 6.

Furthermore, Plaintiffs have obtained BLM's annual roundup schedule for 2007 issued

from the Secretary's office within the BLM.  West Douglas is listed as being scheduled

for a roundup in February, 2007.  It is, therefore, a near certainty that BLM will conduct

further roundups and removals in the near term.

        BLM roundups in the Piceance-East Douglas and West Douglas herd areas evade

review because their extremely short duration makes it virtually impossible to litigate

---

[9] Defendants' assertion that review of this action is prohibited as BLM has not yet ruled
on the protests of Plaintiffs and others, is discussed at Section IV, D, infra.
[10] See Plaintiffs' Exhibit 7, attached hereto and incorporated by reference.

fully any one gather and removal operation before its completion. <u>Weinstein v. Bradford</u>, 423 U.S. 147, 148 (1975). <u>See also</u> <u>PUC v. FERC</u>, 236 F.3d 708, 714 (D.C. Cir. 2001) ("orders of less than two years' duration ordinarily evade review") (quoting <u>Burlington N. R.R. Co. v. Surface Transp. Bd.</u>, 75 F.3d 685, 690 (D.C. Cir. 1996)); <u>cf.</u> <u>First Nat'l Bank of Boston v. Bellotti</u>, 435 U.S. 765, 774 (1978) (full judicial review cannot be obtained within eighteen-month duration). BLM completed its 2006 Piceance-East Douglas and West Douglas roundups and removals approximately four months after issuing the EAs for these roundups for public comment. <u>See</u> Def. Memo at pp. 5-6. In <u>Maryland People's Counsel</u>, the District of Columbia Circuit held that orders with a duration of less than a year do not allow sufficient time for challenges to their validity to be fully litigated. 761 F.2d at 773. <u>See also</u> <u>Beethoven.com LLC.</u>, 394 F.3d at 951 (it is "a virtual certainty" that a challenge to an agency action with a duration of only a few months cannot be fully litigated and resolved before its expiration).

BLM acknowledges that it has yet to respond to protests against its planned eradication of wild horses from the West Douglas herd area. <u>See</u> Def. Memo at pp. 15-16. BLM's delay in substantively responding to Plaintiffs' October 3, 2005 protest to the Decision Record and FONSI for the West Douglas Herd Area Amendment to the White River RMP and to Plaintiffs' February 28, 2006 addendum[11] to that protest regarding then proposed roundups (which were ultimately conducted in September and October 2006) further demonstrates that BLM's actions to gather and remove wild horses from their ranges evade review. <u>See</u> <u>PUC v. FERC</u>, 236 F.3d 708, 714 (D.C. Cir. 2001) (issues could not have been litigated and resolved before expiration and agency action evaded

---

[11] This letter is attached hereto as Exhibit 8.

review, where agency responded to petitioners request for rehearing more than thirteen months after issuing order and only five months before expiration of contested contract).

"[A] public interest in having the legality of the practices settled" militates against mooting a dispute, despite voluntary cessation of a party's challenged conduct.  United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953).  BLM avers that it has not reached a final decision regarding the eradication of wild horses from their West Douglas Herd Area, and that any additional gather and removal operations in the Piceance-East Douglas and West Douglas herd areas would be subject to a new Notice of Final Decision.  See Def. Memo at pp. 6-7.  However, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)).  See also Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000) ("Voluntary cessation of challenged conduct moots a case, however, only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'  And the '"heavy burden of persuading" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.'" (citations omitted) (emphasis in original)).  As this Circuit has held, an agency's promise to desist from following a challenged practice is insufficient to moot an action, where it "has not come close to satisfying the heavy burden of demonstrating 'that "there is no reasonable expectation" . . . that the alleged violation will recur.'"  Payne Enter., Inc. v. United States, 837 F.2d 486, 491-92 (D.C. Cir. 1988) (citations omitted) (emphasis and omission in original).

Therefore, BLM's stated plans to zero-out wild horses in the West Douglas Herd Area and limit the population of wild horses in the Piceance-East Douglas area based on an illegal diminution of those horses' historic use area, coupled with its refusal to rule out additional near-term roundups and removals in the Piceance-East Douglas and West Douglas herd areas, keep this action very much alive and overcome any assertion of mootness.

As explained infra, BLM drastically reduced the acreage of the herd area when it created the Piceance East Douglas herd "management" area.  BLM relies on this decreased acreage to support its contention that this area is capable of supporting fewer wild horses.  Originally, the P-ED area was the "preferred habitat" for wild horses, as BLM thought this area was not preferred for oil and gas development.  See 1997 RMP, Exhibit 5 at 2-26.  This has changed recently.  See Protest Addendum at Exhibit 8.  The decreased acreage and the issue of whether it was legal for BLM to do this will continue. This issue is not capable of being decided during a roundup challenge.  In fact, BLM stated in response to comments submitted on the EA for the P-ED roundup that the issue of decreased herd acreage was "beyond the scope" of the EA.  See Defendants' Responses to Comments on the EA for P-ED, attached hereto as Exhibit 9.

BLM's recent actions with regard to both P-ED and WD demonstrate how BLM has subverted the will of Congress in enacting the WFHBA and why this Court must issue the declaratory relief that Plaintiffs seek.  In 1997, BLM decided that the P-ED was going to be the "preferred habitat" for wild horses, since a decision – and an illegal one at that – had been made to zero-out the herd in WD.  Now, BLM has decided that it does

not want to "manage" horses in P-ED, either, due to changed circumstances. See Plaintiffs' Exh. 10.

Defendants point to the Instruction Memorandum's given expiration date of September 30, 2003 in arguing that Plaintiffs' challenge to the Memorandum is moot. See Def. Memo at 9. However, Defendants have previously conceded that "the general national planning approach set forth in the [Instruction Memorandum] continues to serve as guidance to the field for the conduct of specific gather and removal decisions." Fund for Animals, 460 F.3d at 18-19 (emphasis supplied). Furthermore, BLM mischaracterizes the appellate court's finding of mootness in Fund for Animals. Def. Memo at 11 (citing 460 F.3d at 18). In that case, the Court stated only that the appellants' claim that BLM issued the Instruction Memorandum in violation of NEPA was moot. 460 F.3d at 18. Here, Plaintiffs allege not only that the Instruction Memorandum was improperly issued, but that its implementation violates the framework of the WFHBA for the maintenance and preservation of wild horses "as integral parts of the natural system of public lands." See Plfs' First Am. Compl. at p. 35, ¶ 5. As the dissent in Fund for Animals observed, "the parties [were not] allow[ed] to develop a record on mootness," that would address the question of whether "this Memorandum is still in effect or the agency has issued another memorandum setting forth the same, continuing legal interpretation of the WHBA." Id. at 23 (Griffith, J., dissenting). Plaintiffs' challenge to BLM's use and application of the Instruction Memorandum therefore remains a live controversy appropriate for review by this Court.

**C.  BLM's Early Planning Documents, the 1997 RMP and the Instruction
Memo Are Final Agency Actions which this Court May Review**

As Plaintiffs have explained at Section III, <u>supra</u>, BLM's 1997 RMP, which is
currently the RMP in effect guiding BLM's decisions with regard to BLM's actions for
wild horses and other resources in the WRRA, contains decisions which were carried
forward – often without much change or further analysis – from BLM's earlier planning
documents.  Defendants' argument that these earlier decisions, as well as the 1997 RMP,
cannot be reviewed by this Court because they do not constitute final agency action, are
without merit.  As explained below, the 1997 RMP is final agency action which Plaintiffs
may challenge when the RMP is implemented.  The RMP was implemented when BLM
conducted its roundups in the P-ED HMA and the WD HA.  And, by Defendants' own
admission, since the 2005 Amendment to the RMP is still under protest, the 1997 RMP
still functions as a directive to BLM with regard to its management of resources within
the WRRA.  That document still threatens the P-ED and WD wild horses with further
roundups and removals.  Likewise, that portion of the Instruction Memo, which by its
explicit terms, contains BLM's interpretation that if a land use plan provides that wild
horses may be zeroed out from an area, that is authority enough, may be reviewed by this
Court.  <u>See</u> Instruction Memo, Exhibit 11 at 5

The 1997 RMP and the Instruction Memorandum clearly meet the two-pronged
test for final agency action.  Agency action is final if it "(1) 'marks the consummation of
the agency's decision making process – it must not be of a merely tentative or
interlocutory nature'; and (2) the action 'must be one by which rights or obligations have
been determined or from which legal consequences will flow.'"  <u>Domestic Secs. v. Secs.</u>

& Exch. Comm'n, 333 F.3d 239, 246 (D.C. Cir.2003) (quoting Bennett v. Spear, 520 U.S. 154, 177-78, (1997)).  A court therefore must consider "whether the agency's position is definitive and whether it has a direct and immediate effect on the day-to-day business of the parties."  Indep. Petroleum Ass'n of Am. v. Babbitt, 235 F.3d 588, 595-96 (D.C.Cir. 2001).

Here, there cannot be any serious question that the 1997 RMP is the consummation of the agency's decision-making process.  The RMP has driven every implementation action BLM has taken in furtherance of its mandate that wild horses will be managed at "0-50" wild horses in the interim and zeroed out in the WD Herd Area within 10 years and managed at reduced numbers in the Piceance-East Douglas HMA that correspond to BLM's illegal diminution of their historic range.  1997 RMP at 2-26. The Instruction Memo, which purports to govern actions with regard to wild horse herds throughout the United States, including the herds in Colorado, through 2010 is anything but tentative.  Furthermore, the Instruction Memorandum makes clear that should any local office wish to deviate from its proscriptions, it must justify doing so to the Secretary-level offices within BLM.  The Instruction Memorandum itself recognizes the final nature of the 1997 RMP because the Memorandum provides that if a "determination is made in a land use plan that a herd may be [eradicated], that is sufficient authority.  See Instruction Memo, Exhibit 11, at 5.  Furthermore, both the RMP and the Instruction Memorandum certainly have a "direct and immediate" effect on the day-to-day business of the parties.  The RMP is the "definitive" guiding document, 1997 RMP at 1, and the Instruction Memorandum seeks to bind local office action until 2010.

In <u>Ohio Forestry Ass'n v. Sierra Club</u>, the Supreme Court reviewed whether a plaintiff might challenge a Forest Plan which provided for activities that would harm plaintiffs at the time the Plan was issued or whether the plaintiffs had to await further implementation of the Plan. 523 U.S. 726 (1998). The Court held that review was not appropriate until the agency action had been formalized and its effects felt in a concrete way. <u>Id</u>. at 727. However, the Court instructed that Sierra Club will have ample opportunity to bring its claim when "harm is more imminent and more certain." <u>Id</u>. at 733. The Court held that, "any such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, <u>i.e.</u> if the Plan plays a causal role with respect to the future, then imminent, harm from logging." <u>Id</u>. at 734. Here, Plaintiffs are faced with the eradication of the West Douglas wild horse herd in the very near interim; similarly the 1997 Plan dictates BLM's approach to the management of the P-ED herd on acreage that is far more restricted than its historical range with a correspondingly reduced population.

In <u>Bennett v. Spear</u>, plaintiffs challenged a Biological Opinion issued by the Fish and Wildlife Service which concluded that the Department of Interior's operation of various water bodies within the Klamath Project was likely to jeopardize the continued existence of two endangered fish. 520 U.S. 154 (1997). Plaintiffs alleged that they would be injured by the restriction on the water delivery recommended by the Biological Opinion since it would substantially reduce the quantity of available irrigation water. <u>Id</u>. at 160. The Court held that review of the Opinion was appropriate final agency action because of its coercive effect. <u>Id</u>. at 168. Here, the 1997 RMP (and the decisions carried forward to it from earlier BLM land use documents) and the Instruction Memorandum

exert a powerful coercive effect on the WRRA.  Just as a federal agency that chooses to

deviate from the recommendations contained in the Biological Opinion bears the burden

of "articulating in its administrative record its reasons for disagreeing with the

conclusions of a biological opinion." 520 U.S. at 169 (citations omitted), here the

Instruction Memorandum issued from the main office of BLM similarly urges local

offices, including the WRRA that "it is important that each State schedule gathers based

on these removal targets as closely as possible so that the overall program will stay

within budget projections. . . Any changes from this schedule will have to be coordinated

with WO-260 and approved by the Assistant Director for Renewable Resources and

Planning (AD-200.)"

     With respect to the Instruction Memorandum, it bears emphasis that the

Department of  Justice admitted in its brief to the DC Circuit that the Instruction

Memorandum "continues to serve as guidance to the local offices.  While the "expiration

date" on the memo may have been placed there at a time which the agency expected for

the memo to expire, the Memorandum is, for all intents and purposes, the directive that it

was initially intended to be.

    **D.  This Court May Reach the Legal Issues Presented by Plaintiffs' First
       Amended Complaint Despite the Pendency of the Protest to the 2005
       Amendment to the Resource Management Plan**

     Plaintiffs submitted their protest to the 2005 Amendment to the White River

Resource Management Plan in October, 2005.  While Plaintiffs' protest on the 2005 RMP

Amendment, which BLM undertook solely to attempt to cure the deficiencies in its 1997

RMP, was pending, Defendants conducted two roundups.  Furthermore, Defendants

represented to this Court that the Secretary of Interior was under no time deadline in

which to respond to Plaintiffs' protest. Defense counsel's representation, while technically correct, was wholly lacking in candor with the Court. Pursuant to BLM's regulations, the Director of BLM is required to "<u>promptly</u> render a decision on the protest." 43 C.F.R. §1610.5-2(a)(3) (emphasis supplied).

Defendants repeatedly assert that BLM's decision to zero out the West Douglas herd is only <u>proposed</u> while, at the same time, conceding that a succession of BLM documents dating back to 1975 call for the eventual removal of <u>all</u> horses from their existing herd area. <u>See</u> Def. Memo at pp. 1-5. Furthermore, Defendants admit that BLM has failed to respond to Plaintiffs' protests and has, likewise, failed to issue a final decision on the pending amendment to the RMP. <u>See</u> Def. Memo at pp. 7, 12.

Defendants have sole control over the pace of the administrative process. They should not be permitted to transform their own administrative stonewalling into an argument that the legal issues raised here are not subject to review, so as to manipulate the judical process to their own advantage – and to the disadvantage of Plaintiffs.

### V. PLAINTIFFS HAVE STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED

Under the standards set forth in <u>Conley v. Gibson</u>, "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45-46 (1957). In addition, "general allegations [are viewed as embracing] those specific facts that are necessary to support the claim." <u>Bennett v. Spear</u>, 520 U.S. 154 (1997). Here, Plaintiffs' claims are supported by the clear language of the WFHBA and FLPMA.

As this Circuit has repeatedly stated, in considering a motion to dismiss under Rule 12(b)(6), a court "must treat the complaint's factual allegations as true, and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted) (holding that plaintiff's ability to make out a *prima facie* case was not relevant at the pleading stage). See also, Rochon v. Gonzales, 438 F.3d 1211, 1216 ("the issue presented by a motion to dismiss is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims") (quoting Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1086 (D.C. Cir. 1998)). Plaintiffs have more than met this standard in alleging specific facts to support their claims that several actions by Defendants violate federal statutes and regulations.

Plaintiffs seek judicial review of BLM's actions and failures to act under the Administrative Procedure Act, 5 U.S.C. § 706. This Court reviews BLM's actions employing a traditional Chevron analysis. Here, Plaintiffs contend that the plain language of 16 U.S.C. §1331, as well as the legislative history of the WFHBA, requires BLM to consider wild horses in their historic areas of use as "an integral part of the system of public lands." Id. Plaintiffs contend, pursuant to the plain language of FLPMA, that BLM may not provide by a land use plan for activities which would be illegal under the WFHBA. Plaintiffs also contend that Defendants' implementation of the Instruction Memorandum was undertaken without notice and comment, in violation of the APA.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Respectfully submitted,


_____/s/_____
Valerie J. Stanley
D. C. Bar No. 384882
329 Prince George Street
Laurel, MD 20707
(301) 549-3126
(301) 549-3228

Counsel for Plaintiffs


Dated: February 2, 2007