UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

|   |   |
|---|---|
| **COLORADO WILD HORSE** <br> **AND BURRO COALITION, INC.,** <br> <u>et</u> <u>al.</u>, <br><br>       **Plaintiffs** <br><br> v. <br><br> **DIRK KEMPTHORNE,** <br> in his official capacity as Secretary, <br> United States Department of Interior <br> 1849 C Street, N.W. <br> Washington, D.C. 20240, <br> <u>et</u> <u>al.</u>, <br> _____ | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     **Civil No. 06-1609 (RMC)** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
LEAVE TO CONDUCT DISCOVERY ON JURISDICTIONAL ISSUES RAISED
BY DEFENDANTS' MOTION TO DISMISS AND RELATING TO
DEFENDANTS' POSITION REGARDING THE LEGALITY
OF ZEROING OUT A WILD HORSE HERD AREA**

      Defendants have filed a Motion to Dismiss Plaintiffs' First Amended Complaint on the grounds, <u>inter alia</u>, that plaintiffs' challenge to a Bureau of Land Management (BLM) Instruction Memorandum (IM) regarding the removal of wild horses from areas of the public lands throughout the United States does not constitute "final agency action," and thus, that this Court is without jurisdiction to hear plaintiffs' challenge to that IM. That motion is pending before this Court.

      Plaintiffs submit this Memorandum in support of their Motion for Leave to Conduct Discovery and to apprise this Court of a recent ruling on issues pertinent to

BLM's Instruction Memorandum. This ruling corroborates allegations Plaintiffs make in support of their claims for relief with respect to that Instruction Memorandum.[1]

As Plaintiffs explained in their Memorandum in Opposition to Defendants' Motion to Dismiss, BLM developed this Instruction Memorandum from its Restoration Strategy, which singled out wild horses as being responsible for watershed damage throughout the West. That strategy selectively ignored the effects of livestock grazing on these same watersheds and did not call for reduction of any livestock.

In support of Plaintiffs' Motion for Preliminary Injunction, plaintiff Barbara Flores submitted an affidavit explaining that, when she questioned a BLM official in early 2000 about why he was not considering the effects of livestock grazing on public lands and riparian areas, he told her that "he was only ordered to look at wild horse [effects]." Ms. Flores also explains at Paragraph 2 of her Declaration that the BLM national policy, carried out through the IM, is to dictate target numbers of wild horses and burros to be permanently removed from federal public lands based on numbers developed from BLM's Washington, D.C. office, as a result of an agreement with the National Cattlemen's Beef Association (NCBA).[2] Ms. Flores explains that this is contrary to the way allowable numbers of wild horses and burros would be established if those numbers were based on monitoring of forage and wild horse and burro populations at the local, field office level, as required by the Wild Free Roaming Horses and Burros Act, 16 U.S.C. § 1331, et seq. It was precisely this lack of monitoring that Chief Judge Winmill of the U.S. District Court for the District of Idaho reviewed and found so

---

[1] See, e.g., Memorandum Decision and Order, attached hereto as Exhibit 1.
[2] Ms. Flores' Affidavit is attached hereto as Exhibit 2.

pervasive in <u>Western Watersheds Project v. Kraayenbrink</u>, CV-05-297-E-BLW and which caused him to enjoin BLM's grazing regulations.

Based on his determinations that BLM had issued the regulations after selectively adopting approaches favored by the livestock industry and the NCBA without determining whether these approaches would ameliorate watershed degradation, Judge Winmill enjoined these regulations. Specifically, he found that,

> monitoring data is required to reliably determine if grazing is a substantial factor in grazing violations. Yet for most of the 7, 437 allotments the BLM assessed, it had no current monitoring data and yet nevertheless concluded that [livestock] grazing was not a significant factor in violations.
>
> While the absence of monitoring data makes the BLM reluctant to convict cattle of grazing damage, the BLM is not hesitant to acquit. The BLM never explains that distinction.

Memorandum Decision and Order at 34.

As Plaintiffs also explained in their Memorandum in Opposition to Defendants' Motion to Dismiss, counsel for Defendants' assertions in this case that the Instruction Memorandum is no longer in operation are directly at odds not only with the plain terms of the Instruction Memorandum itself, which purports to govern the removal of wild horses and burros from the public lands through 2010, but with representations counsel for BLM made to the D.C. Circuit in <u>Fund for Animals v. BLM</u>, 460 F.3d 13 (D.C. Cir. 2006). In that case, BLM counsel represented that the Restoration Strategy determines how an act of Congress will govern wild horses and burros throughout the American West for the foreseeable future--what the BLM calls in its brief "some unspecified period of time." 460 F.3d at 24 (Griffith, J., dissenting), citing Appellees' Br. at 28. Plaintiffs need discovery to develop the current status of the IM, to further and more fully oppose

3

Defendants' motion to dismiss and to enable them, if necessary, to seek to file an amended complaint.[3] Cf. Singh v. S. Asian Soc'y of George Wash. Univ., No. 06-574, 2007 WL 1521050 (D.D.C. May 21, 2007) (jurisdictional discovery allowed in a case brought under the Federal Tort Claims Act to determine whether the federal government defendant could properly rely on an exemption from suit).

In their Opposition to Defendants' Motion to Dismiss, plaintiffs submitted as an Exhibit, an email from an agency official within the White River Field Office (WRFO), the local BLM office having responsibility for the West Douglas Herd Area and the Piceance-East Douglas Herd Management Area. That email references a communication from agency counsel for BLM, which indicates that this counsel did not support the WRFO's plans to zero out this West Douglas Herd Area.

Plaintiffs also seek BLM documents and communications related to any legal opinion or advice requested from or provided by BLM and/or DOI legal counsel and/or the Office of the U.S. Solicitor General, in regard to the "White River position" referenced in Plaintiff's Exhibit 6, including but not limited to interpretation of the term "Herd Area" and the legality of removals of wild horses from the West Douglas and other Herd Areas. Under established Circuit precedent, disclosure of this email precludes Defendants from invoking privilege in the current action. Permian Corp. v. United States, 665 F.2d 1214, 1221 (D.C. Cir. 1981) ("The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim

---

[3] Because the Motion to Dismiss is pending before the Court, plaintiffs are submitting this motion to the Court. In addition, Plaintiffs have this date served a request for production of documents to defendants. Plaintiffs anticipate that, in addition, they may request that defendants designate one or more individuals pursuant to Federal Rule of Civil Procedure 30(b)(6) to testify on issues related to the IM. Plaintiffs reserve the right to respond to any Motion for Protective relief which defendants may file.

of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit."). See also SEC v. Lavin, 111 F.3d 933 (D.C. Cir. 1997) ("The prohibition against selective disclosure of confidential materials derives from the appropriate concern that parties do not employ privileges both as a sword and as a shield."); In re Sealed Case, 676 F.2d 793, 818 (D.C. Cir. 1982) ("[S]ince the purpose of the attorney-client privilege is to protect the confidentiality of attorney-client communications in order to foster candor within the attorney-client relationship, voluntary breach of confidence or selective disclosure for tactical purposes waives the privilege. Disclosure is inconsistent with confidentiality, and courts need not permit hide-and-seek manipulation of confidences in order to foster candor.").

By disclosing Exhibit 6, a June 5, 2001 email from Jim Cagney, then Field Manager of the White River Resource Area discussing legal advice on these issues, the Government has waived any attorney-client privilege that may have existed in regard to these communications. Permian Corp., 665 F.2d at 1219 ("The attorney-client privilege exists to protect confidential communications, to assure the client that any statements he makes in seeking legal advice will be kept strictly confidential between him and his attorney; in effect, to protect the attorney-client relationship. Any voluntary disclosure by the holder of such a privilege is inconsistent with the confidential relationship and thus waives the privilege."). See also Lavin, 111 F.3d at 929 ("In the attorney-client context, this court adheres to a strict rule on waiver of privileges. 'The confidentiality of communications covered by [a] privilege must be jealously guarded by the holder of the privilege lest it be waived.' If the holder wishes to preserve its privilege, 'it must treat

5

the confidentiality . . . like jewels—if not crown jewels.' In other words, the holder must zealously protect the privileged materials, taking all reasonable steps to prevent their disclosure.") (quoting In re Sealed Case, 877 F.2d 976, 980 (D.C. Cir. 1989)). The waiver of privilege applies regardless of whether the disclosure is intentional or inadvertent. See In re Sealed Case, 877 F.2d at 980 ("Although the attorney-client privilege is of ancient lineage and continuing importance, the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant. We therefore agree with those courts which have held that the privilege is lost 'even if the disclosure is advertent.'") (internal citation omitted).

In addition, Defendants' waiver of attorney-client privilege extends to all other communications concerning the subject of the Cagney email, *i.e.*, legal advice and opinions regarding the legality of removals of wild horses under the purview of the White River Office. In re Sealed Case, 877 F.2d at 980-81 ("[A]s we have previously said, a waiver of the privilege in an attorney-client communication extends 'to all other communications relating to the same subject matter'") (internal citation omitted). As the District of Columbia Circuit stated in Permian Corp., "Because the attorney-client privilege inhibits the truth-finding process, it has been narrowly construed, and courts have been vigilant to prevent litigants from converting the privilege into a tool for selective disclosure." 665 F.2d at 1221. See also In re Sealed Case, 676 F.2d at 818 ("When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege as to all other communications relating to the same

6

subject matter because 'the privilege of secret consultation is intended only as an incidental means of defense and not as an independent means of attack, and to use it in the latter character is to abandon it in the former.'") (internal citation omitted).

WHEREFORE, Plaintiffs move this Court to grant Plaintiffs' Motion.

Dated: June 25, 2007

Respectfully submitted,

_____/s/_____
Valerie J. Stanley
 D.C. Bar No. 384882
 329 Prince George Street
 Laurel, MD 20707
 (301) 549-3126
 (301) 549-3228 fax

_____/s/_____
Mara C. Hurwitt
D.C Bar 482409
LeBoeuf, Lamb, Greene & MacRae LLP
1101 New York Avenue, N.W., Suite 1100
Washington, D.C. 20005-4213
(202) 986-8094
(202) 986-8102 fax