**Exhibit 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) ) ) | Case No. CV-05-297-E-BLW (Lead Case) |
| Plaintiff, | ) ) | **MEMORANDUM DECISION** |
| v. | ) ) | **AND ORDER** |
| JOE KRAAYENBRINK, et al., | ) ) ) | |
| Defendants. | ) | |
| _____ | ) ) | |
| RALPH MAUGHAN, et al., | ) ) | Case No. CV-06-275-E-BLW |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| DAVE ROSENKRANCE, et al., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## SUMMARY OF ANALYSIS

The parties seek a ruling on the legality of the BLM's revisions to nation-wide grazing regulations. Past BLM regulations imposed restrictions on grazing and increased the opportunities for public input to reverse decades of grazing damage to public lands. Without any showing of improvement, the new BLM

**Memorandum Decision and Order – Page 1**

regulations loosen restrictions on grazing.

They limit public input from the non-ranching public, offer ranchers more rights on BLM land, restrict the BLM's monitoring of grazing damage, extend the deadlines for corrective action, and dilute the BLM's authority to sanction ranchers for grazing violations.

While the BLM justifies the changes as making it more efficient, the BLM was not their originator – it was the grazing industry and its supporters that first proposed them.  Certainly the industry has a vital interest in being regulated efficiently, but the new regulations reach far beyond that prosaic purpose. According to the federal agency charged with protecting endangered species – the Fish and Wildlife Service – the new regulations "fundamentally change the way BLM lands are managed," and "could have profound impacts on wildlife resources." *AR* at 68069.

After throughly reviewing the extensive Administrative Record in this case, the Court finds that this assessment of the Fish and Wildlife Service is accurate. Accordingly, the Court finds that the BLM should have consulted with the Fish and Wildlife Service – as required by the Endangered Species Act (ESA) – before issuing the new regulations.  The Court also finds that BLM violated the National Environmental Policy Act (NEPA) by failing to take the required "hard look" at

**Memorandum Decision and Order – Page 2**

the environmental effects of the regulations.  For many of same reasons, the Court

also finds that the regulations violate the Federal Land Policy and Management Act

(FLPMA).

Based on these violations, the Court will issue an injunction enjoining the

revised regulations from taking effect until the BLM proceeds with consultation

under the ESA and takes the requisite "hard look" at the environmental impacts

under NEPA.

## FACTUAL BACKGROUND

In 1978, Congress declared that "vast segments of the public rangelands . . .

are in unsatisfactory condition."  *See* 43 U.S.C. § 1901(a)(1).  These poor

conditions, Congress found, contributed "significantly to unacceptable levels of

siltation and salinity in major western watersheds; negatively impact[ed] the

quality and availability of scarce western water supplies; [and] threaten[ed]

important and frequently critical fish . . . habitat."  *Id*. at § 1901(a)(3).

Almost 20 years later, the stewards of this rangeland – the BLM and Forest

Service – jointly concluded that while "[t]he ecological condition on most uplands

has improved[,] . . . many riparian areas continue to be degraded and are not

functioning properly."  *AR* at 68952.  This situation caused "several conservation

groups [to] request that the Secretary of the Interior require BLM to improve its

**Memorandum Decision and Order – Page 3**

grazing administration by encouraging stewardship and designing ways to quickly improve the environment."  *AR* at 68952.

### 1.   <u>1995 Regulations</u>

Prompted by these concerns, the BLM and Forest Service began in 1993 to propose new grazing rules that would become known as the 1995 regulations.  A keystone of these reforms was a set of criteria for healthy rangelands that would be applied nation-wide, called the Fundamentals of Rangeland Health (FRH).  *AR* at 68959; 69253; 43 C.F.R. § 4180 *et seq.*  The BLM described the FRH as "critical" to improving rangeland conditions, "especially riparian areas."  *AR* at 69253.

The 1995 regulations were also designed to increase public participation.  In announcing the new rules, the BLM declared that "[a]llowing more Americans to have a say in the management of their public lands is an important element of improving the management of the public rangelands."  *AR* at 69249.  The BLM concluded that "increased public participation is essential to achieving lasting improvements in the management of our public lands."  *Id.*  To that end, the new rules "gave extensive consideration to public participation in rangeland management."  *Id.*

The BLM concluded that the proposed 1995 regulations required consultation with the Fish and Wildlife Service (FWS) under Section 7 of the ESA.

**Memorandum Decision and Order – Page 4**

The FWS issued a Biological Opinion (BO) that assessed the impact of the

regulations on listed species "assum[ing] full implementation" of" the FRH

regulations.  On the basis of that assumption, the FWS concluded in the BO that

the 1995 regulations were "not likely to jeopardize the continued existence of

listed or proposed species, and [are] not likely to result in the destruction or

adverse modification of designated or proposed critical habitat."  *AR* at 69143.

**2.**    **2006 Regulatory Changes**

The Administrative Record contains the BLM's observation that "almost

immediately after implementation of the grazing rules changes of 1995, there have

been suggestions from BLM field managers for improving them."  *AR* at 67799.

These changes were either "minor technical corrections," *AR* at 67797, or

responses to a recent Tenth Circuit case.  These minor corrections were largely

adopted and are not at issue here.

Other proposals for change, more sweeping in scope, were developed by

outside groups and conveyed to the BLM by "letters from various livestock

industry groups and western politicians that contain specific requests for grazing

rules revisions."  *AR* at 67797.  For example, the National Cattlemen's Beef

Association (NCBA) proposed revisions to allow permittees to share title to range

improvements "in order to protect their financial investment."  *AR* at 67800-01.

**Memorandum Decision and Order – Page 5**

Likewise, proposed restrictions on public participation in day-to-day grazing matters was also, according to the BLM, "requested by Constituency," referring to the cattle industry and its supporters. *AR* at 67877.

The BLM asserts that the changes were necessary to "improv[e] the working relationship with permittees and licensees and increas[e] administrative efficiency and effectiveness, including resolution of legal issues." *See Visser Declaration* at ¶ 6. By July of 2002, the BLM had developed a list of proposed changes, and assembled an interdisciplinary team of experts to review and report on the planned changes. *AR* at 67845. The team's report, dated November 29, 2002, predicted that the limitations on public input would "lead to poorer land management decisions" and to "greater environmental harm, without necessarily sustaining or improving economic conditions." *AR* at 67849. Based on these findings, the team recommended that "the definition of *interested public* be changed to specifically allow for broader public participation . . . ." *AR* at 67848 (emphasis in original).

The BLM decided not to alter the proposed changes, and published a Federal Register notice on March 3, 2003, setting forth the proposed rules and inviting comments. *AR* at 4-9. It is difficult to tell precisely how many comments were received, but WWP has estimated that 5,000 comments opposed the proposed rules, and the BLM has not rebutted that estimate. *See also, AR* at 67903 (BLM's

**Memorandum Decision and Order – Page 6**

estimate that "[m]ost of the 8300 comments were form letters expressing

opposition to BLM making any changes to the existing regulations that were

passed in 1995").

The BLM assembled a second interdisciplinary team in the spring of 2003 to

review the proposed rules.  The team members were selected for, among other

qualities, being "[k]nowledgeable in their field of expertise, preferably with field

experience."  *AR* at 75929.  The team was led by Molly Brady from the BLM's

Washington D.C. office, and included (1) Jay Thompson, a fisheries biologist from

BLM's Montana office, (2) Erick Campbell, a BLM wildlife biologist for 30 years,

(3) William Brookes, a BLM hydrologist for 34 years, (4) a soils scientist, and (5)

other specialists in economics, fuels/fire, recreation, wild horses, and archeology.

This team issued a report referred to as the Administrative Review Copy Draft EIS

(ARC-DEIS).

The ARC-DEIS was issued on November 17, 2003, just three weeks before

the publication of the proposed changes on December 8, 2003.  Given the wide-

ranging expertise of the authors, it is no surprise that the discussion in the ARC-

DEIS is scientific in nature with heavy citation to numerous authorities and studies.

The ARC-DEIS is quite critical of the new regulations.  For example, it

concludes that the new regulations will cause (1) "a slow long-term adverse effect

on wildlife and biological diversity in general," *see ARC-DEIS* at p. 9; (2)

"[u]pland and riparian habitats [to] continue to decline," *id*.; and (3) [t]he numbers

of special status species [to] continue to increase," *id.*  Addressing the changes to

ownership of range improvements, the ARC-DEIS concludes that they will have a

"very long-lasting adverse effect to the wildlife of the public lands of the West."

*Id*. at p. 10.  With regard to the FRH changes, the report concludes that (1) the

BLM "lacks sufficient funding and staffing to perform adequate monitoring," *id*. at

p. 11; and (2) that the changes "could have significant and long-term adverse

effects on wildlife resources and biological biodiversity in general . . . ."  *Id*.

        The BLM circulated the ARC-DEIS internally.  In the circulation cover

letter, the BLM's Assistant Director sets a quick deadline for comments because

"[t]he proposed regulations have been completed and will be announced in early

December 2003."  *AR* at 67977.

        The BLM set November 28th – just 11 days after the ARC-DEIS was issued

– as the deadline for internal comments.  To review these comments and the ARC-

DEIS "as rapidly as possible," the BLM "assembled a small team to review and

revise the draft documents [ARC-DEIS]."  *See Borchard Affidavit* at p. 3.

        Before this small team was even done reviewing the ARC-DEIS, the BLM

published the proposed regulations on December 8, 2003.  *AR* at 418-41.  That

**Memorandum Decision and Order – Page 8**

publication was not accompanied by a Draft EIS (DEIS), which would not be completed for another month.  It was issued on January 6, 2004.  *AR* at 442.

The revision team responsible for the DEIS substantially re-wrote the ARC-DEIS.  For example, the DEIS deleted, without comment, the ARC-DEIS's conclusions that the proposed changes would have adverse impacts on wildlife, biological diversity, and riparian habitats.  As another example, the ARC-DEIS's conclusion that ownership of water rights or range improvements will greatly diminish the BLM's ability to regulate grazing and have long-term impacts on wildlife was re-written to state that the changes in ownership would have little or no impact.  Likewise, the ARC-DEIS's conclusion that the BLM had inadequate funding and staffing to carry out adequate monitoring was eliminated from the DEIS.

Neither the DEIS nor the FEIS contained any explanation of these changes. In an affidavit filed in this action, Team Leader Borchard explains that "this team reached a consensus that revisions to the draft materials were necessary based on their analysis of the draft in light of the proposed regulations and rangeland experience." *Id*.

It was not until March 31, 2006 – eight months after the FEIS was issued – that the BLM issued an Addendum to the FEIS.  While the Addendum contains a

**Memorandum Decision and Order – Page 9**

discussion of the ARC-DEIS, the Addendum was not issued specifically for this purpose. The BLM states in the "Introduction" to the Addendum that it was issued to respond to comments received after the close of the public comment period, "most notably those comments from the U.S. Fish and Wildlife Service [that] had not been addressed in the FEIS." *See Addendum* at p. v. That explains why the discussion relating to the ARC-DEIS is not found until page 50 of the Addendum, in response to a comment critical of the BLM's editing of the ARC-DEIS.

That response explains that the ARC-DEIS was revised "in an effort to produce a factually accurate, scientifically sound and reasoned DEIS." *Id*. at p. 50. The changes were made, according to the BLM, "to correct erroneous interpretations of the proposed rule, correct misstatements of law, and improve its logic." *Id*. at p. 53.

The Addendum did quibble with some minor inaccuracies in the ARC-DEIS. *Id*. at 50-54. Nevertheless, the Addendum does not refute the major criticisms contained in the ARC-DEIS. For example, in response to the ARC-DEIS conclusion that the BLM lacked funding and staffing to carry out adequate monitoring, the Addendum simply notes that "BLM funding and staffing levels are issues that arise in annual budget development, and the BLM plans to work regularly to ensure that data collection remains a priority." *Id*. at p. 52. This

**Memorandum Decision and Order – Page 10**

sounds like a concession that levels are inadequate, and does not explain why the ARC-DEIS criticism was deleted.

The Addendum says nothing about deleting the ARC-DEIS's criticism that the changes will have "a long-term adverse impact upon wildlife resources and biological diversity, including special status species" and that "the numbers of special status species will continue to increase in the future under this alternative." *See ARC-DEIS* at p. 18.

About four months after the Addendum was issued, the BLM issued its Final Rule and Record of Decision (ROD), adopting the proposed changes on July 12, 2006.

### 3.   <u>Changes to Public Participation</u>

The Final Rule makes two major changes to the public participation process. First, the BLM modified the definition of "interested publics."  Under the old definition, an individual or group that submitted a written request to the BLM to be involved in the decision-making process as to a specific allotment would be put on a list of "interested publics" and receive notice of issues arising concerning that allotment – including notice of day-to-day management issues.  Under the new rule, the group would be dropped from that list if it received notice but did not

comment.[1]

The second major change in public input comes from a narrowing of the

BLM's duty to consult, cooperate, and coordinate (CCC) with the interested public.

Under the old rules, the BLM's CCC duties ran to the interested public, the

affected ranchers, and the state whenever the BLM issued, renewed, or modified a

grazing permit for a certain allotment.  The new rules no longer require the BLM to

CCC with the interested public on the following decisions: (1) adjustments to

allotment boundaries, *see* 43 C.F.R. § 4110.2-4; (2) changes in active use, *see* 43

C.F.R. § 4110.3-3(a); (3) emergency allotment closures, *see* 43 C.F.R. § 4110.3-

3(b); (4) issuance or renewal of individual permits or leases, *see* 43 C.F.R.

§ 4130.2(b); and (5) issuance of temporary nonrenewable grazing permits and

leases, *see* 43 C.F.R. § 4130.6-2.  For these matters, the interested public would be

cut out of the discussions between the BLM and the ranchers at the formulation

stage of decisions.

The BLM's CCC duties will continue to apply to longer-range decisions

such as developing allotment management plans, range development planning and

apportioning additional forage.  *See FEIS* at p. 4-28 (explaining that "[t]he

---

[1]  The Final Rule contains no provision for notifying dropped parties that they have been
dropped.  The BLM explains that this is an "operational issue[] left to implementation of the
Final Rule."  *See BLM Brief in Support of Summary Judgment* at p. 7, n. 4.  The Final Rule does
provide that the dropped parties can regain their status as interested parties.

**Memorandum Decision and Order – Page 12**

proposed regulation would foster increased administrative efficiency by focusing the role of the interested public on planning decisions and reports that influence daily management, rather than on daily management decisions themselves").

Importantly, the new regulations eliminate public oversight of temporary nonrenewable (TNR) permits.  Under the existing regulations, the BLM was required to consult with the interested public, *see* 43 C.F.R.§ 4130.6-2(a), and issue a proposed decision (that could be protested) before issuing the TNR.  *See* 43 C.F.R. §§ 4160.1, 4160.2.  Under the new regulations, the TNR permits will go into effect immediately without notice or consultation with members of the public.

Ken Visser, the BLM's "national expert on public lands grazing administration," *see Visser Declaration* at p. 2, ¶ 3, concludes that "[a]fter August 11, 2006, WWP will receive no notices with respect to day-to-day management such as designating and adjusting allotment boundaries or modifying a grazing permit or lease . . . ."  *Id.* at p. 9, ¶ 12.  During oral argument on the injunction motion, the BLM's counsel explained that Visser's statement is inaccurate because WWP would receive proposed decisions from the BLM so long as WWP remained on the list of "interested publics."  Counsel cited 43 C.F.R. § 4160.1 in correcting Visser.

However, this regulation would not apply to TNR permits because no

**Memorandum Decision and Order – Page 13**

proposed decision will be provided to the interested public, as discussed above.
Otherwise, counsel is correct, but her correction only addresses part of Visser's
interpretation.  While WWP will receive proposed decisions, it will not receive
notice – or be consulted – prior to the issuance of a proposed decision on those
day-to-day management issues listed above.  To the extent Visser was commenting
on public input *prior to the issuance of a proposed decision*, his interpretation is
correct, and that portion of his testimony was not addressed by the BLM's counsel.
Moreover, even after issuing a proposed decision to WWP, the BLM has no CCC
duty running to WWP (with regard to the day-to-day items listed above) as it had
under the old regulations.

The new public input provisions will have a substantial impact on WWP.
WWP has "interested publics" status on hundreds of BLM allotments
encompassing at least 50 million acres of public lands in Idaho, Nevada, Utah and
other states.  *See, e.g., Declaration of Marvel* at ¶¶ 6-7.  Given its wide
involvement, WWP cannot respond to every BLM notice, and its failure to respond
would get it dropped from the notice list for each corresponding allotment.
Moreover, the BLM's CCC duties would no longer apply to WWP for those day-
to-day decisions listed above.

**4.    <u>Changes to Fundamentals of Rangeland Health</u>**

**Memorandum Decision and Order – Page 14**

The Final Rule changes the BLM's reliance on the Fundamentals of

Rangeland Health (FRH) criteria in four ways.  First, the BLM need not rely on the

FRH at all if state-specific Standards and Guidelines are in place.[2]  The previous

regulation required the BLM to take corrective action upon finding either an FRH

violation or a Standards & Guidelines violation.  *See* 43 C.F.R. §§ 4180.1,

4180.2(c) (2004).  Under the revisions, only the Standards & Guidelines will be

enforced, although they must be consistent with the FRH.

The BLM explained this change by saying that the broad description of

range conditions set forth in the FRH made it "very difficult to link those broad

characteristics to a determination that livestock grazing is the cause of [those]

conditions."  *See Federal Register* at p. 39492.  Consequently, the FRH were

"difficult to administer."  *Id*.  In contrast, the Standards were more specific, leading

the BLM to rely upon them "to evaluate rangeland health," rendering the FRH

redundant.  *Id.*  This change, the BLM concluded, would lead to "long-term

improvements in rangeland conditions."  *Id.*

Second, the BLM may no longer rely on "all available data" in determining

whether Standards and Guidelines are being violated but is required to use only

monitoring data.  Under this revision, if the rangeland is failing to meet Standards,

---

[2]  FRH standards apply nation-wide while Standards & Guidelines are developed by
BLM offices in each of the states where grazing occurs on BLM land.

**Memorandum Decision and Order – Page 15**

or management practices do not conform to guidelines, monitoring data must then be collected and evaluated to determine if livestock grazing is a significant factor in those failings. *See Federal Register of July 12, 2006* at p. 39411.

The BLM explained that this revision would protect rangeland health and "improve working relations with permittees and lessees because determinations on the causes of failure to meet a Standard will be based on monitoring and assessment data, thus helping to ensure comprehensive and sustainable decisions." *Id*. at p. 39411-12. The BLM further explained that only about 16% of the 7,437 allotments evaluated were not meeting Standards and would need monitoring. *Id*. at p. 39412.

Third, the BLM is no longer required to take immediate action upon finding violations but may instead, upon finding a Standards violation, take 24 months to adopt a new grazing decision and then take an additional year to implement that decision. The previous regulation required the BLM to take corrective action "as soon as practicable but not later than the start of the next grazing year"upon finding either an FRH violation or a Standards & Guidelines violation. *See* 43 C.F.R. § 4180.1 (2004).

Finally, if the BLM decides that a reduction in grazing of more than 10% is needed to correct the Standards' violations, the reduction cannot be implemented

immediately but must be phased-in over 5 years, unless the affected grazer agrees

to a shorter period or the changes must be made before the end of 5 years to

comply with relevant law.

**5.     Changes to Range Improvement Ownership & Control**

The Final Rule amends 43 C.F.R. § 4120.3-2 to allow shared title of

permanent range improvements constructed under cooperative range improvements

agreements.  Title would be shared in proportion to the permittee's and

Government's contributions to the on-the-ground project development and

construction costs.

The Final Rule also (1) removes the prior requirement that livestock water

rights on BLM land be acquired and perfected in the name of the United States

only, and not in the permittee's name, *see* 43 C.F.R. §§ 4120.3-2, 3-9; (2) redefines

the definitions of "grazing preference" and "active use" to be an historic forage

allocation (expressed in AUMs) attached to the base property; (3) allows

permittees to extend both livestock numbers and periods of use so long as overall

AUMs remain within the amount of "active use" authorized by permit, *see* 43

C.F.R. § 4130.4(b); (4) limits the BLM's ability to withhold, suspend or cancel

grazing permits for violations of laws by permittees committed on lands other than

the allotment covered by the permittee's permit; and (5) added Tribal, state, local,

**Memorandum Decision and Order – Page 17**

and county-established grazing boards to those groups the BLM routinely cooperates with in administering laws related to grazing, *see* 43 C.F.R. § 4120.5-2.

## 6. **Litigation History**

The new regulations were to take effect on August 11, 2006.  In two decisions, issued August 11, 2006, and September 25, 2006, the Court concluded that WWP's challenge was ripe for judicial review and enjoined the Final Rule on the ground that WWP was likely to prevail on its NEPA claims.  More specifically, the Court found it likely that the BLM violated NEPA by improperly minimizing the detrimental effects of limiting public input, and by excluding without explanation a report of BLM experts critical of the modifications to the regulations. The Court did not reach WWP's ESA claims.

In a later-filed decision, the Court denied the BLM's motion to dismiss WWP's ESA claims, holding that WWP had given proper pre-filing notice to the BLM of its intent to sue under § 7 of the ESA.  Both sides have now filed motions for summary judgment, seeking a final resolution of WWP's challenge to the Final Rule.

## ANALYSIS

## 1. **Standard of Review – NEPA & FLPMA Claims**

The Court's review of WWP's NEPA and FLPMA claims is governed by the

Administrative Procedures Act (APA).  *See Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549 (9th Cir. 2006).  Under the APA, the Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Although this standard is a "narrow one," the Court is required to "engage in a substantial inquiry[,] . . .  a thorough, probing, in-depth review."  *Native Ecosystems Council v. United States*, 418 F.3d 953, 961 (9th Cir. 2005).  To avoid acting in an arbitrary and capricious manner, the agency must present a "rational connection between the facts found and the conclusions made."  *Id.*  More specifically to this case, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."  *Motor Vehicle Manufacturers Assoc. v. State Farm*, 463 U.S. 29, 42 (1983).

In reviewing the adequacy of an Environmental Impact Statement (EIS) under NEPA, the Court applies the "rule of reason" standard, which "requires a pragmatic judgment whether the EIS's form, content, and preparation foster both informed decision-making and informed public participation."  *Id.* at 961.  The Court must ensure that the agency has taken a "hard look" at the potential environmental consequences of the proposed action.  *Id.*

**Memorandum Decision and Order – Page 19**

The BLM argues that WWP faces an additional "heavy burden" because it is not challenging "any actual application of the grazing amendments, but rather [is] challenging the facial validity of the amendments by arguing they violate provisions of relevant law."  *See BLM Brief in Support of Motion for Summary Judgment* at p. 14.  The BLM cites in support *Rust v. Sullivan*, 500 U.S. 173 (1991) that in turn relied upon *United States v. Salerno*, 481 U.S. 739 (1987).

Under *Salerno* and *Rust*, a facial challenge to an administrative regulation can succeed only if "no set of circumstances exists under which the regulation would be valid."  *Salerno*, 481 U.S. at 745.  The application of this test to procedural claims such as those here under NEPA and the ESA adds nothing to the analysis – if the BLM failed to follows the procedures required by NEPA and/or the ESA before approving the Final Rule, the Final Rule is invalid because no set of circumstances exists under which a regulation that failed to comply with the procedural rules of NEPA or the ESA could be valid.  *See Wildlaw v. U.S Forest Service*, 471 F.Supp.2d 1221 (M.D.Ala. 2007) (applying *Salerno* to NEPA challenge but holding that it made no difference in analysis).

In contrast, the FLPMA claims are substantive in nature.  For those claims, WWP does bear the "heavy burden" of showing that there are no set of circumstances under which the regulations could be valid under FLPMA.

**Memorandum Decision and Order – Page 20**

2.    **Public Participation Changes**

Applying these standards to this case, NEPA requires that the BLM take a

hard look in the FEIS as to why public participation and CCC duties should be

more limited than those in the 1995 regulations.  One reason advanced by the BLM

for this change involves the cost of maintaining a list of "interested publics" that

must get "periodic mailings at taxpayer expense" but have not "participated . . . in

years."  *See FEIS* at p. 5-95.  The BLM does not list the specific costs it incurs,

beyond noting that it has incurred "substantial expenses" in supporting public

participation generally and that '[s]ome of these resources have been devoted to

tasks such as maintaining lists" of persons that have not participated in years.  *Id.*

It is impossible to evaluate this claim without knowing the specific costs

involved.  The cost of "maintaining" a list is not apparent.  Certainly there is a cost

for mailing notices to the "interested publics" but the FEIS does not discuss the

number, bulk, or frequency of mailings.  Indeed, at another section of the FEIS, the

BLM contradicts itself by asserting that the "modification of the definition [of

interested publics] would result in some *minor* administrative cost savings

associated with maintaining the interested public mail list and in mailing costs."

*See FEIS* at p. 4-27 (emphasis added).

This contradictory and vague discussion of costs in the FEIS prevents the

**Memorandum Decision and Order – Page 21**

public and Court from evaluating the BLM's claim that the new regulations will

save costs.  Simply put, the FEIS fails to explain how the limits on public input

will save costs.

The BLM has advanced other reasons for the changes, including the

following:

> BLM believes that in-depth involvement of the public in day-to-day
> management decisions is neither warranted nor administratively efficient
> and can in fact delay BLM remedial response actions necessitated by
> resource conditions.  Day-to-day management decisions implement land
> use planning decisions in which the public has already had full
> opportunity to participate.  Also, such in-depth public involvement can
> delay routine management responses, such as minor adjustments in
> livestock numbers or use periods to respond to dynamic on-the-ground
> conditions.  Cooperation with permittees and lessees, on the other hand,
> usually results in more expeditious steps to address resource conditions
> and can help avoid lengthy administrative appeals.

*See FEIS* at pp. 5-24 to 5-25.[3]

Public participation is, by nature, messy.  To manage it, agencies must be

"given ample latitude to adapt their rules and policies to changed circumstances."

*Motor Vehicle Mfgs.*, 463 U.S. at 42.

At the same time, the agency's management of public input cannot defeat

NEPA's purpose of "ensuring that the agency will have . . . detailed information

---

[3] The FEIS also states that "[t]he proposed regulation would foster increased administrative efficiency by focusing the role of the interested public on planning decisions and reports that influence daily management, rather than on daily management decisions themselves."  *See FEIS* at p. 4-28.

**Memorandum Decision and Order – Page 22**

concerning significant environmental impacts, and . . . that the public can . . .

contribute to that body of information . . . ."  *San Luis Obispo Mothers for Peace v.*

*Nuclear Regulatory Commission*, 449 F.3d 1016, 1034 (9th Cir. 2006).  The BLM

itself recognized this when proposing the 1995 regulations:  "Experience has

shown that the greater and more meaningful the participation during the

formulation of decisions and strategies for management, the higher the level of

acceptance and thus the lower the likelihood of a protest, an appeal, or some other

form of contest."  *See* 60 Fed.Reg. 9894, 9924 (1995).

 The FEIS makes no attempt to explain how things have changed since 1995

to justify curtailing public input.  *See Motor Vehicle Manufacturers Assoc. v. State*

*Farm*, 463 U.S. 29, 42 (1983).  The required "reasoned analysis" for changing

course on public input is entirely missing.  There is no detailed discussion of either

the volume or quality of comments the BLM receives on day-to-day issues.  Has

the volume become overwhelming?  Are the comments mostly specious?  What are

the costs and employee resources involved?  These questions are not addressed in

the FEIS.

 When "the information in the . . . EIS [is] so incomplete . . . that the . . .

public could not make an informed comparison of the alternatives, revision of the

EIS may be necessary . . . ."  *Ecology Center, Inc. v. Austin*, 430 F.3d 1057, 1067

**Memorandum Decision and Order – Page 23**

(9th Cir. 2005).  In this case, the FEIS does not contain enough information to

allow decision-makers and the public to make an informed evaluation of the

BLM's claim that efficiency compels these changes.

The BLM correctly notes that "a formal and mathematically expressed cost-

benefit analysis is not always a required part of an EIS . . . ."  *Columbia Basin*

*Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 594 (9th Cir. 1981).  The Court

is not requiring a mathematical cost-benefit analysis here – it is simply requiring

some analysis; a "hard look" under NEPA's terminology.  Even *Columbia Basin*

notes that the absence of a cost-benefit analysis "may be fatal" if the "EIS

evaluation is insufficiently detailed to aid the decision-makers in deciding whether

to proceed, or to provide the information the public needs to evaluate the project

effectively . . . ."  *Id*.  That is the case here.

The FEIS concludes that the changed rules on public input will have only a

minimal effect on public input.  However, a group like WWP that monitors

hundreds of allotments will now have to comment on every management issue or

risk losing its status as an "interested public."  Such groups will either have to

monitor fewer allotments, thereby reducing the information transmitted to the

BLM, or comment indiscriminately at every opportunity, diluting the value of their

input.

**Memorandum Decision and Order – Page 24**

Either way, the changes substantially affect both the amount and quality of public input.  The FEIS reasons that groups like WWP will still receive notice of proposed decisions and can file protests and appeals.  *See Addendum* at p. 53.  However, a proposed decision carries with it an inevitable momentum favoring that result, an effect NEPA seeks to avoid by "ensur[ing] that federal agencies are informed of environmental consequences *before making decisions* . . . ."  *Citizens for Better Forestry v. United States*, 341 F.3d 961, 970 (9th Cir. 2003) (emphasis added)(quotations omitted).  Thus, getting notice of a proposed decision does not mitigate the harm of being precluded from the formulation process.

Moreover, the interested public will not receive proposed TNR permit decisions under the new regulations – the TNRs could be issued immediately.  In the past, the BLM has used often used TNRs to increase grazing levels.  *See WWP v. Bennett*, 392 F.Supp.2d 1217 (D. Id. 2005) (finding that "the BLM has authorized past grazing increases by issuing temporary nonrenewable permits").  The new regulations would freeze the public out of the TNR permit process until the decision had been made and the TNR permit issued.

The FEIS also reasons that groups like WWP will still be able to participate in the preparation of Allotment Management Plans (AMPs).  *See FEIS* at p. 4-28.  The record here – and the Court's experience in other cases – shows that many

**Memorandum Decision and Order – Page 25**

allotments lack AMPs, and that the AMP preparation process is very slow. *See Visser Declaration* at § 10 (AMPs cover only about half of the allotment acreage, with coverage increasing only slightly in the last 15 years).

NEPA values public input without distinguishing whether it involves day-to-day issues or longer-range issues. Because both are valued, neither can be jettisoned simply to reduce the agency's work load. The BLM offers no legal authority that public input on day-to-day issues is inherently less valuable and thus subject to less protection than public input on long-range issues.

NEPA's "hard look" requires "a discussion of adverse impacts that does not improperly minimize negative side effects." *Earth Island*, 442 F.3d at 1159. The FEIS violates NEPA because it improperly minimizes the negative side effects of limiting public input.

With regard to their FLPMA challenge, WWP must carry a "heavy" burden, as discussed above. WWP, in its facial challenge, "must establish that no set of circumstances exists under which the [regulations] would be valid." *Rust*, 500 U.S. at 183.

That standard requires the Court to examine first whether the BLM's regulatory revisions are authorized by Congress under FLPMA. *Id.* The revised regulations delete the requirements to consult, cooperate and coordinate with the

**Memorandum Decision and Order – Page 26**

"interested public" on crucial decisions involving the issuance of grazing permits.[4] The BLM's intent was to "[k]eep[] day-to-day stuff between the agency and permittee." *AR* at 67,968.  Explaining this revision in similar terms, the FEIS stated that it "focuses the role of the interested public on planning decisions and reports that influence daily management, rather than on daily management decisions themselves." *AR* at 664.

Yet this revision is in direct conflict with the language of FLPMA and cannot be reconciled by some later interpretation.  In FLPMA, Congress stated that the BLM , "by regulation *shall* establish procedures . . . to give . . . the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in the preparation and execution of plans and programs for, and the management of, the public lands."  *See* 43 U.S.C. § 1739(e) (emphasis added).

The term "shall" makes a provision mandatory, and the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary.  *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000).  Thus, the BLM is required to provide for public input.

The BLM asserts that the revisions do not prevent it from seeking public

---

[4]  This includes both the issuance or renewal of individual permits as well as adjustments to allotment boundaries, emergency allotment closures, and issuance of TNRs.

**Memorandum Decision and Order – Page 27**

input at its discretion.  Assuming that is true, the revisions would violate FLPMA.

The mandatory use of the term "shall" removes the BLM's discretion to pick and

choose the circumstances for public input.  Under the specific circumstances listed

in the statute – the "formulation of standards and criteria for, and . . . the

preparation and execution of plans and programs for, and the management of, the

public lands" – the BLM must provide for public input.

      The clear meaning of the statutory language quoted above is that public

input is required on long-range issues ("preparation . . . of plans and programs") as

well as on day-to-day issues ("the management of" and "execution of" those long-

range plans).  *See National Wildlife Federation v. Burford*, 835 F.2d 305, 322 (9th

Cir. 1987) (rejecting BLM's argument that FLPMA's public input provisions only

apply to land use planning process as opposed to individual revocation decisions).

      Grazing permit issues are the crucial "management" and "execution" tools of

the BLM to carry out its long-range plans.  In the management of BLM lands, this

is where the rubber meets the road.  It is the grazing permit (or TNR permit) that

determines the amount and season of use, the grazing boundaries, and the myriad

of details that directly affect the land.

      Congress, in FLPMA, did not give the BLM any discretion to cut the public

out of these management and execution issues.  Yet the BLM seeks to grant itself

**Memorandum Decision and Order – Page 28**

that forbidden discretion in its regulatory revisions.  Accordingly, under *Rush* and *Salerno*, WWP has met its "heavy" burden of proving that those revisions limiting public input constitute a facial violation of FLPMA.

**3.      Changes to FRH & Range Improvement Ownership**

WWP argues that the BLM's own experts concluded in the ARC-DEIS that the proposed regulatory changes concerning the FRH and ownership of range improvements and water rights would have adverse effects on wildlife and riparian conditions.  WWP asserts that these expert opinions were suppressed by the BLM and never presented to the public.

Under NEPA "[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements.  They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement."  *Earth Island*, 442 F.3d at 1159-60.  The BLM failed to comply with this standard.

First, the BLM apparently drafted the proposed regulations without waiting for the ARC-DEIS, given the statement in the circulation cover memo quoted in the Court's discussion of the factual background above.  Second, the BLM moved with extraordinary speed to reject the substantial ARC-DEIS criticisms, raising

**Memorandum Decision and Order – Page 29**

serious questions about whether the agency took a "hard look" at those criticisms.

On closer review, the "hard look" is missing.  The BLM's own experts found in the ARC-DEIS that the proposed regulatory changes would have "a slow long-term adverse effect on wildlife and biological diversity, including threatened and endangered and special status species," *see ARC-DEIS* at p. 29, and would lead to a continual decline in upland and riparian habitats, and would cause "the numbers of special status species [to] continue to increase." *Id.* at p. 9.  These findings are supported by lengthy and detailed citations to scientific authorities.  Yet there is no evidence that the BLM considered these substantial criticisms before publishing the proposed rules just 3 weeks after the ARC-DEIS was issued.

Granted, there was a 6-week delay between the ARC-DEIS and the DEIS.  By that point, however, the BLM had already announced that it would be ignoring the ARC-DEIS by publishing the regulatory changes just 3 weeks after the ARC-DEIS issued.  Nothing in this record that explains why the BLM rejected the ARC-DEIS analysis so quickly in publishing the proposed rules.

It is true that the Addendum does address *some* of the ARC-DEIS analysis.  But the FEIS had already been issued, raising a serious question whether the Addendum contains analysis or justification for a decision already made.  Supporting the latter conclusion is the fact that the Addendum's discussion of the

**Memorandum Decision and Order – Page 30**

ARC-DEIS only identifies minor inaccuracies and is buried deep in the Addendum, almost as an aside.  The public never got a chance to comment on what discussion there was in the Addendum.

Most importantly, however, the Addendum never refuted the more substantive criticisms of the ARC-DEIS.  The BLM's failure to explain itself in the DEIS and FEIS deprived the public of its ability to comment on the BLM's reasoning process.[5]  *See Earth Island*, 442 F.3d at 1159 (holding that an FEIS meets the hard look requirement only if it "foster[s] both informed decision-making and informed public participation").

Certainly the BLM has broad discretion to resolve conflicts among its own experts.  *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992). However, a recitation of that conflict and its resolution must take place in the EIS. *State of California v. Block*, 690 F.3d 753, 770-71 (9th Cir. 1982).  Here, the conflict among experts was not revealed until the Addendum was filed after the public comment period was closed.

For all of these reasons, the Court finds that the FRH changes and the changes to ownership of range improvements and allowing entities other than the BLM to hold water rights violate NEPA.

---

[5]  The BLM has not directed the Court to anything in the record showing a public comment period on the Addendum.

**Memorandum Decision and Order – Page 31**

4.      **Delay**

The new regulations contain three provisions that will raise the potential for delay in correcting grazing abuses: (1) The deadline for correcting FRH violations is extended; (2) Grazing reductions generally cannot be based entirely on a standards assessment but must await review of monitoring data; and (3) The phase-in time for grazing reductions is extended to 5 years.

Each of these revisions promotes delay.  With regard to the new requirement that monitoring data is required, the Administrative Record is replete with statements that the BLM's monitoring ability is hampered by lack of funds and manpower.  For example, the Fish and Wildlife Service commented that "[o]ur experience shows that monitoring of rangeland standards is not being completed in a timely, effective manner under current requirements due to BLM funding and staffing limitations." *AR* at 68067.  The ARC-DEIS – compiled by the BLM's own experts – said the same thing: "Present BLM funding and staffing levels do not provide adequate resources for even minimal monitoring . . . ." *AR* at 68008. The Administrative Record also contains a letter sent during the comment period to the BLM by seven experts in the field.[6]  They state that "[i]n our observation and

_____

[6]  They include (1) Robert Ohmat, a Professor of Applied Biological Sciences with an emphasis on management of riparian areas in the Western United States; (2) Juliet Stromberg, an Associate Professor of Plant Biology with an emphasis in riparian ecology; (3) Robert Beschta, an Emeritus Professor of Forest Hydrology with an emphasis on riparian management; (4) Dr.

**Memorandum Decision and Order – Page 32**

experience, the BLM does not monitor the condition of most riparian areas . . . ."
*AR* at 61610.  The letter goes on to conclude that the new monitoring requirement
"would make most of the standards and guidelines unenforceable for the
foreseeable future on many, and perhaps most, grazing allotments."  *Id.*

Delays will be compounded by the extension of the deadline for correcting
FRH violations and the 5 year phase-in for grazing reductions.  These two
revisions, the ARC-DEIS concluded, "could have a significant and long-term
adverse effect[] upon wildlife resources and biological diversity in general, but
could be especially problematic for many of the special status species on public
lands, especially plants."  *AR* 68007-08.

The FEIS downplays the adverse effects by noting that "[t]he total number
of allotments affected by this provision [the monitoring requirement] would be
small because only 16 percent of the allotments evaluated during the last 5 years
failed to achieve standards and conform to guidelines because of existing grazing
management practices or levels of grazing use."  *See FEIS* at p. 4-26.  Because the
7,437 allotments evaluated by the BLM in reaching the 16% figure were identified

---

William Platts, who holds a doctorate in Fisheries Science and has consulted with the BLM and
other agencies on fisheries issues; (5) Thomas Fleischner, a Professor of Environmental Studies
with an emphasis on ecology and natural history, (6) Allison Jones, who holds a masters in
Conservation Biology and was a principal investigator in a study that tested and improved upon
the BLM's methods for assessing riparian areas; and (7) Elizabeth Painter who holds a doctorate
in range science.

**Memorandum Decision and Order – Page 33**

as being high risk (that is, likely to have problems), the BLM does not expect more

than 16% of the allotments overall to be failing to meet standards.  *See Federal*

*Register* at p. 39412.  Indeed, the BLM went even further and asserted that

"assessments of the remaining 84% [of the 7,437 high priority allotments]

indicated that standards were met, or that there was a reason other than existing

livestock grazing for not meeting standards."  *See Federal Register of July 12,*

*2006 at p. 39426.*

This argument refutes the very premise of the monitoring requirement.  That

premise is that monitoring data is required to reliably determine if grazing is a

substantial factor in grazing violations.  Yet for most of the 7,437 allotments the

BLM assessed, it had no current monitoring data[7] and yet nevertheless concluded

that grazing was not a significant factor in violations.

While the absence of monitoring data makes the BLM reluctant to convict

cattle of grazing damage, the BLM is not hesitant to acquit.  The BLM never

explains that distinction.

But more importantly, the FEIS never takes a "hard look" at the combined

---

[7]    There are 7,437 high priority allotments.  *See Federal Register* at p. 39495.  The BLM
collects monitoring data on about 3,500 allotments.  *Id*.  Assuming that all the 3,500 monitored
sites are high priority sites, that leaves 3,937 high priority sites – or 53% of the high priority sites
– as unmonitored.  Thus, the BLM did not have current monitoring data for most of the
allotments it evaluated, and yet concluded that standards were being met even on the
unmonitored allotments.

**Memorandum Decision and Order – Page 34**

effect of these three revisions – that is, their combined potential to create delays in correcting grazing abuses. While the FEIS asserts that delays can be avoided by "reprioritizing work" to focus more resources on monitoring, *see FEIS* at p. 4-26, this fails to address the combined effect of the three revisions.

For example, if standards violations are found, the new rules give the BLM two years to issue a decision, *see* 43 C.F.R. § 4180.2(c), which could stretch into a seven-year delay if that decision reduces grazing by over 10% (requiring a phase-in period of five years). Even if these delays only affect 16% of all allotments, that means, according to the BLM's own statistics for 2002 (prior to the issuance of the DEIS), that on over 23 million acres of public land, livestock grazing was a significant factor in standards violations. *See Table 7B for 2002, BLM's National Rangeland Inventory Monitoring and Evaluation Report.*[8] This was a big jump over the 2000 figures showing that on about 13 million acres livestock grazing was a significant factor causing standards violations. *Id. for 2000.* And even by 2004 (prior to the issuance of the FEIS), over 11,000 allotments – containing over 83 million acres – had not even been assessed. *Id. for 2004.*

The FEIS contains no evaluation of these BLM figures. Instead, the FEIS

---

[8] By 2005, prior to the issuance of the Addendum and Prior Rule, this figure had jumped to over 29 million acres. *Id. at Table 7B for 2005.* Thus, the BLM's monitoring responsibility is growing.

**Memorandum Decision and Order – Page 35**

focuses on the 16% figure.  If the light is right, even a looming figure will cast but a small shadow.  The 16% figure is the small shadow of a much larger figure – the acreage represented by 16% of the allotments.  Looking beyond the shadow to its substance reveals that on tens of millions of acres, grazing is a significant factor in standards violations, and that tens of millions of acres remain unassessed.  This sheer mass of acreage makes alarming the delays in correcting grazing damage that are written into the revised regulations.

Perhaps all these figures overestimate actual grazing damage on the ground.  Perhaps riparian conditions are improving so that delay in correcting grazing abuses is inconsequential.  Perhaps the BLM needs delay to obtain more reliable data and thereby avoid past mistakes where it unfairly imposed grazing reductions.

Any one of these rationales – or something akin to them – could support the BLM's decision to write delays into the revised regulations.  However, nothing like them has been advanced by the BLM, with support in the Administrative Record, as a justification for the new rules.  There is no supporting documentation or analysis in the FEIS identifying past mistaken assessments based on unreliable data,[9] or describing improvements in riparian conditions.

---

[9]  The FEIS does justify the delaying provisions by asserting they will "result[] in improved cooperative relations and management between BLM and the permittee or lessee." *AR* at 661.  However, the FEIS never explains why relations were strained between the BLM and permittees.  Does the BLM have a history of unfairly restricting grazing on the basis of

**Memorandum Decision and Order – Page 36**

Where the EIS is "so incomplete or misleading that the decision-maker and the public could not make an informed comparison of the alternatives, revision of an EIS may be necessary . . . ."  *NRDC v. U.S. Forest Service*, 421 F.3d 797, 813 (9th Cir. 2005) (quoting  *Animal Def. Council v. Hodel,* 840 F.2d 1432, 1439 (9th Cir.1988), amended by 867 F.2d 1244 (9th Cir.1989)).  When the agency is changing course, it must explain itself.  *Motor Vehicle Manufacturers Assoc. v. State Farm*, 463 U.S. 29, 42 (1983).

The BLM is changing course here.  While the 1995 regulations erected protections against grazing damage and guarded against delay, the revisions at issue here promote delay.  NEPA requires the BLM to explain itself so the public and decision-makers can determine if this change in course is acceptable.  The FEIS does not contain that explanation and so violates NEPA.  For the same reasons, these delaying revisions violate FLPMA.

## 5.    Endangered Species Act

The ESA contains both substantive and procedural provisions designed to protect species listed as threatened or endangered under the Act.  *See Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir.2006).  Section 7(a)(2), the substantive provision of the Act, requires federal agencies to "insure that any

---

unreliable data?  The FEIS does not identify any such instances.

**Memorandum Decision and Order – Page 37**

action, authorized, funded, or carried out by [the] agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." *See* 16 U.S.C. § 1536(a)(2).

The ESA defines an "action" requiring consultation to include "the promulgation of regulations." *See* 50 C.F.R. § 402.02(b). Section 7(b) then sets forth the process of consultation. It requires that federal agencies consult with the appropriate wildlife agency on every action that "may affect" a threatened or endangered species. *See* 50 C.F.R. § 402.14(a). The phrase "may affect" has been interpreted broadly to mean that "any possible effect, whether beneficial, benign, adverse, or of an undetermined character," triggers the consultation requirement. *See* 51 Fed.Reg. 19926, 19949 (June 3, 1986).

If the agency finds that its action "may affect" a listed species, it must request information from the appropriate federal consulting agency, the Fish & Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS"), regarding "whether any species which is listed or proposed to be listed may be present in the area of such proposed action." *See* 16 U.S.C. § 1536(c)(1)). If the consulting agency determines that listed species may be present in the affected area, the agency preparing to act must produce a "biological assessment"

**Memorandum Decision and Order – Page 38**

(BA) in accordance with NEPA "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." *Id.*

If the BA concludes that listed species are in fact likely to be adversely affected, the agency ordinarily must enter "formal consultation" with the wildlife service. *Id.* at § 1536(a)(2).  Formal consultation requires the wildlife service to produce a "biological opinion" (BO) that evaluates the nature and extent of the proposed action's effect on the listed species and that, if necessary, posits reasonable and prudent alternatives to the proposed action.  *Id.* at § 1536(b)(3)(A).

To avoid the lengthy and costly process of formal consultation, the agency may voluntarily initiate a less rigorous regulatory procedure called "informal consultation."  *See* 50 C.F.R. § 402.13.  If during informal consultation it is determined by the agency, with the written concurrence of the consulting agency, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.  *Id.* at § 402.13(a).

As discussed above, the BLM did engage in formal consultation before approving the 1995 regulations.  As those regulations contained tighter restrictions on grazing than the revisions, one would expect the revisions to be vetted through the consultation process as well.

**Memorandum Decision and Order – Page 39**

That was not the case, however.  In the FEIS, the BLM announced that it was not pursuing consultation because "[t]he changes under the proposed regulations are expected to have no effect on special status species, as the changes largely provide clarification of the existing regulations or bring the regulations into compliance with court rulings."  *See FEIS* at p. 4-38.

The BLM expanded on that conclusion in the Addendum.  *AR 1131-38.*  The BLM explained that the recent changes were "administrative, add[] no fundamentally new regulatory topics, and remove[] no substantial sections of the regulations that were the basis for the "no effect" determination and concurrence [by the FWS] in 1994."  *AR 1131.*

The agency the BLM would have consulted with – the FWS – came to a completely different conclusion: "We believe the proposed revisions would fundamentally change the way BLM lands are managed temporally, spatially, and philosophically.  These changes could have profound impacts on wildlife resources."  *AR* 68069.

The FWS reached this overall conclusion after finding serious flaws in many of the individual revisions.  For example, the FWS was "most concerned" that "public coordination is not required for renewal or issuance of grazing permits/leases."  *AR 68060.*  The FWS pointed out that (1) "[b]y removing public

**Memorandum Decision and Order – Page 40**

comment opportunities from daily or seasonal grazing operations, the public is

essentially removed from any substantive decision-making processes," *id*. at

68062; (2) "[p]ublic input is an important component of ensuring [a] complete and

accurate analysis," *id*. at 68060; and (3) "[i]mproperly managed permits or leases

could have negative effects for listed and sensitive species." *Id.*

     Other revisions had equally pernicious effects in the opinion of the FWS.

The extension of the prior "next-grazing-season" deadline for correcting Standards

violations "could be extremely detrimental to long-term range health and fish and

wildlife services." *Id*. at 68067.  Placing more reliance on monitoring before

taking corrective action was troublesome because "[o]ur experience shows that

monitoring of rangeland standards is not being completed in a timely, effective

manner under current requirements due to BLM funding and staffing limitations."

*Id*.

     It is important to recall here that when the FWS signed-off on the 1995

regulations in its BO (as discussed above), the FWS assumed that the FRH

standards would be fully implemented.  Now, not only is the FWS not consulted,

but the revisions dispense with the FRH standards, using only Standards &

Guidelines.

     The FWS was also concerned with the 5-year phase-in period now required

**Memorandum Decision and Order – Page 41**

whenever grazing is reduced by 10% or more.  While the Final Rule states that the

BLM retains discretion to move quicker to comply with the ESA (among other

laws), the FWS expressed concern for species deserving of protection but not listed

under the ESA.  *Id*. at 68063.  With regard to these species, the FWS pointed out

that the "5-year implementation period may be too long to begin necessary

effective range management changes . . .and thus result in irreversible long-term

impacts to . . . associated wildlife species."  *Id*.

    The FWS also took issue with the change that took away the BLM's

authority to revoke a permit for prohibited acts occurring outside the grazing

permit boundary.  *Id*. at 68066.  The FWS pointed out that livestock frequently

trespass onto National Wildlife Refuge (NWR) lands adjacent to the allotments.

*Id*.  Such trespasses could, under the prior system, lead to revocation of the

permittee's permit, but no longer.  The removal of this deterrent to errant grazing

would cause, in the FWS's opinion, "significant adverse effects to fish and wildlife

resources the [FWS] is mandated to protect."  *Id*. at 68066.  By relaxing its own

authority to sanction, the BLM "communicates to permittees that attention to a

healthy rangeland ethic ends at their permit boundary."  *Id*. at 68066.

    With regard to water rights ownership, the FWS observed that "[n]umerous

sensitive wildlife and plants species depend upon water." The FWS expressed

**Memorandum Decision and Order – Page 42**

concern that the sensitive species' access to water could be adversely affected if the water rights were owned by an entity whose primary interest was in grazing cattle. *Id*. at 68070.

The BLM argues that the FWS comments are unsigned and labeled "Draft." If this argument is meant to imply that the comments were either half-baked or not intended to be disseminated, neither implication is accurate. The comments are detailed and extensive, contained in 17 pages of thoughtful and well-written analysis. The fax is clearly a finished (and polished) document.

Moreover, it bears no sign that it was mistakenly sent: It was sent from the "FWS Director's Office" to Molly Brady, the lead contact on the BLM team. *AR 68058*. The FWS never sought the return of the fax or disavowed its contents. Nothing in the fax signals that it is other than the official position of the FWS on the proposed regulations.

Indeed, the subsequent conduct of the parties shows that the fax was official and got the BLM's attention. On October 12, 2005, the BLM met with the FWS to address the very concerns raised in the fax. That sounds like the views expressed in the fax were official, meant to be taken seriously, and considered as such by the BLM.

The BLM responds that after this meeting the FWS "did not finalize its

**Memorandum Decision and Order – Page 43**

comments.  Rather, BLM addressed FWS' concerns in the Addendum."  *See BLM Response Brief* at p. 47.  The Court is not clear what this means.  If the BLM is implying that the parties somehow resolved the FWS's objections, the record contains no support for such an implication and, in fact, supports the opposite conclusion.  The minutes of the meeting show only that the FWS asked questions and the BLM explained the revisions.  *AR* at 68250-51.  The minutes contain no indication that the FWS dropped any of its objections or represented that its objections were "addressed" in the sense of being resolved.  *Id.*  Following the meeting, the FWS's Deputy Director issued a letter to the BLM expressing appreciation for the BLM's consideration of the FWS's objections but giving no hint that those objections had either been resolved or withdrawn.  *AR* at 68292.[10]

This is understandable because the FWS's objections were not based on confused interpretations that could be resolved simply by a clear explanation.  Instead, the FWS's objections were fundamental in nature, expressing a profound disagreement with the very basis of the changes.

The FWS was not alone in its objections – BLM's own experts shared their

---

[10]    The BLM does not argue that this meeting fulfills the criteria for an informal consultation.  *See* 50 C.F.R. § 402.13.  Indeed, about two weeks after the meeting between the FWS and the BLM, a BLM memo from upper management to the BLM's Director assumed that no informal consultation had taken place and that a "no effect" determination would obviate the need for any such consultation in the future.  *AR* at 68261.

**Memorandum Decision and Order – Page 44**

concerns.  For example, the ARC-DEIS concluded that the revisions "would result

in a long-term, adverse impact upon wildlife resources, and biological diversity,

including threatened and endangered . . . species." *See ARC-DEIS* at p. 29.  Erick

Campbell, an ARC-DEIS team member and BLM wildlife biologist for 30 years,

concluded that "we are definitely in a 'may affect' situation and should therefore

consult." *AR* at 68227.  Todd Thompson, the BLM's Fish and Wildlife Program

Lead, agreed with Campbell, finding that consultation was a "no brainer." *AR* at

68193.  Jay Thompson, a BLM fisheries biologist, concluded that "[s]everal of the

regulation changes within the proposed action are likely to adversely affect listed

species . . . , which triggers the need to consult with the FWS." *AR* at 68193.

        To determine if the BLM violated its ESA duty to consult, the Court must

first consider whether the revisions constituted agency action.  The term "action" is

defined to include "the promulgation of regulations," and hence an action exists

here. *See* 50 C.F.R. § 402.02(b).

        The BLM is therefore required to consult with the FWS if the action "may

affect" a threatened or endangered species. *See* 50 C.F.R. § 402.14(a).  As

explained above, the phrase "may affect" has been interpreted broadly to mean that

"any possible effect, whether beneficial, benign, adverse, or of an undetermined

character." *See* 51 Fed.Reg. 19926, 19949 (June 3, 1986).

**Memorandum Decision and Order – Page 45**

While WWP has cited extra-record material supporting a "may affect" finding, the material cited above by the Court is all within the Administrative Record and was before the BLM when it made its decision not to consult. Examining only this Administrative Record material under the broad definition of "may affect," the Court finds that the BLM's failure to consult was arbitrary and capricious.

The Court is not bound, however, to the Administrative Record. *See Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024, 1030 (9th Cir. 2005) (affirming district court ruling – based on review "outside an administrative record" – ordering consultation in ESA citizen suit, and holding that APA standards did not govern). The BLM takes issue with this conclusion, citing *Arizona Cattle v. FWS*, 273 F.3d 1229 (9th Cir. 2001). The BLM argues that *Arizona Cattle* held that APA standards govern ESA citizen suits and preclude reference to materials outside the Administrative Record except in limited circumstances. The Court disagrees.

Neither *Arizona Cattle,* nor the case it relied upon, *Bennett v. Spear*, 520 U.S. 154 (1997), so held. *Bennett* held that a challenge to a Biological Opinion, not cognizable under the ESA, could be brought under the APA. *See Bennett v. Spear*, 520 U.S. 154 (1997). *Arizona Cattle* simply followed *Bennett* in holding

**Memorandum Decision and Order – Page 46**

that a challenge to a Biological Opinion was reviewable under the APA.  *Arizona*

*Cattle,* 273 F.3d at 1229 (9th Cir. 2001).

Bennett applied APA standards only to claims that were outside the ESA

citizen suit provisions. *See Bennett*, 520 U.S. at 1167.  Neither *Bennett* nor *Arizona*

*Cattle* considered whether judicial review of an ESA citizen suit to compel

consultation is limited to the Administrative Record.  That issue was addressed by

*Washington Toxics,* a decision that did examine material outside the

Administrative Record.  While the BLM takes *Washington Toxics* to task for

silently overruling *Arizona Cattle* and ignoring *Bennett,* the former was

unnecessary and the latter proper.[11]

Looking beyond the Administrative Record, the Court examines the

Declarations filed by WWP from recognized experts establishing that the revisions

"may affect" listed species.  *See Declarations of House, Fite, and Carter.*  For

example, Robert House was a fisheries biologist who worked for 6 years for the

FWS and 19 years for the BLM, where he was the agency's first National

Anadromous Fish Program Manager.  He testifies that many of the revisions will

have an adverse effect on listed species.  For example, "[r]equiring additional

monitoring prior to making changes to correct adverse impacts from livestock

---

[11]  Accordingly, the Court will deny the BLM's motion to strike the extra-Record material.

**Memorandum Decision and Order – Page 47**

grazing is likely to adversely affect listed and special status fish species because, in

reality, BLM is unlikely to have sufficient monitoring data as it is newly defined to

justify a change in grazing." *See House Declaration* at ¶ 44, p. 27.

Another Declaration was filed by Kathleen Fite, who has a Master's Degree

in Biology and worked for 9 years as a Senior Wildlife Technician with the Idaho

Department of Fish and Game, with a particular emphasis on upland bird habitat

and vegetation in the sagebrush-steppe ecosystem of southern Idaho, northern

Nevada, and eastern Oregon. One example of her testimony concerns those

revisions that limit public input. She concludes, based on long experience in

reviewing BLM projects, that the revisions will cause "additional harm to . . .

endangered and threatened species . . . ." *See Fite Declaration* at ¶ 84, p. 25.

These Declarations provide persuasive proof – in addition to that already in

the Administrative Record – that the revisions "may affect" listed species. The

BLM argues, however, that WWP has failed to show how the revisions will cause

any effect on listed species. The BLM argues that WWP must await site-specific

actions that apply the revisions before any effect can be discerned.

The Court disagrees. First, the ESA's consultation requirements apply with

equal strength to site-specific and programmatic actions. *See Citizens for Better

Forestry v. U.S. Dept. Of Agriculture*, 2007 WL 966985 at *34 (N.D. Cal. March

**Memorandum Decision and Order – Page 48**

30, 2007).  Moreover, the limitations on public input are not statements of general

policy waiting for a specific project to be put into practice – they go into effect

immediately.  And the FWS concluded, as discussed above, that these limitations

may effect listed species.  *AR* at 68060.  In addition, the FRH changes will take

place immediately.  Once again, the FWS concluded that this change "could result

in detrimental consequences" for listed species.  *AR* at 68068.

The BLM also argues that WWP must show causation; that is, it must show

that the revisions will cause harm to listed species.  However, all WWP must show

to trigger the consultation requirement is that the revisions "may affect" listed

species.  *Citizens for Better Forestry*, supra at *34 (rejecting a similar causation

argument as "putting the cart before the horse").  WWP has made that showing as a

matter of law.

For all of these reasons, the Court finds that the BLM's failure to consult

under Section 7 of the ESA before approving the Final Rule is a violation of the

ESA.

## 6.    <u>Remedy</u>

The Court has found that the BLM's regulatory revisions violate NEPA,

FLPMA and the ESA.  The Circuit has held that the "traditional preliminary

injunction analysis does not apply to injunctions issued pursuant to the ESA."

*National Wildlife Federation v. NMFS*, 422 F.3d 782, 793 (9th Cir. 2005).  With

regard to ESA violations, the Court "must not use equity's scales" and must

recognize that the "balance of hardships always tips sharply in favor of endangered

or threatened species."  *Id*. at 794.

This standard warrants an injunction in this case pursuant to the ESA

violations.  The Court shall therefore enjoin the operation of the new regulations

under the ESA until the BLM has completed the required consultation and

evaluation under the ESA.

At the same time, the BLM must give a "hard look" at these revisions under

NEPA, and the Court will accordingly enjoin the operation of these revisions until

that "hard look" is completed.  Finally, the injunction would also be supported by

the FLPMA violations set forth above.

If the revisions are enjoined, an issue arises as to whether the prior

regulations are revived.  In *Citizens for Better Forestry v. United States*, 2007 WL

966985 (N.D.Ca. March 30, 2007), the court enjoined Forest Service regulations

known as the "2005 Rule" and then stated "it would seem that the rule immediately

preceding the 2005 Rule would control future agency action.  Nevertheless this is a

determination for the USDA to make in the first instance."  *Id*. at *59.

The Court agrees with this analysis. While it would seem that the 1995

**Memorandum Decision and Order – Page 50**

regulations would govern until new compliant regulations are passed, that

determination is for the BLM to make in the first instance.

In *Citizens*, the court issued a final judgment, remanding the case to the

agency to conduct the procedures necessary to comply with NEPA, FLPMA and

the ESA. *Id*. This Court feels that is the best course but is restrained by the fact

that WWP filed a motion for *partial* summary judgment, indicating that issues

remain to be tried here. The Court will therefore not issue a final judgment at this

time. Counsel are free to file a motion seeking a final judgment if the Court is

incorrect in assuming that issues remain to be resolved in this case.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for partial

summary judgment (Docket No. 112), and the motion for summary judgment

(Docket No. 114) are GRANTED.

IT IS FURTHER ORDERED, that the motions for summary judgment

(Docket Nos. 109, 113 & 110) are DENIED.

IT IS FURTHER ORDERED, that the BLM regulations set forth in the

Federal Register of July 12, 2006, 43 CFR Part 4100 *et. seq.*, are ENJOINED in all

respects.

**Memorandum Decision and Order – Page 51**

IT IS FURTHER ORDERED, that the motion to strike (Docket No.121) is DENIED.

DATED:  **June 8, 2007**



B. LYNN WINMILL
Chief Judge
United States District Court