# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**COLORADO WILD HORSE**      )
**AND BURRO COALITION, INC.**  )
**2406 15th Avenue Court**       )
**Greeley, CO 81521**            )
                           )
**AMERICAN MUSTANG**       )
**AND BURRO ASSOCIATION, INC.** )
**2406 15th Avenue Court**       )
**Greeley, CO 81521**            )
                           )
**THE CLOUD FOUNDATION, INC.**  )     **Civil No. 06-1609 (RMC)**
**a Colorado, non-profit organization** )
**107 South 7th Street**        )
**Colorado Springs, CO**        )
                           )
**FRONT RANGE EQUINE RESCUE, INC.** )
**2200 Twylby Road**          )
**Larkspur, CO 80118**       )
                           )
**DR. DON MOORE**          )
**1787 K 6/10 Road**          )
**Fruita, CO 81521**           )
                           )
**v.**                          )
                           )
**DIRK KEMPTHORNE,**       )
**in his official capacity as Secretary,** )
**United States Department of Interior** )
**1849 C Street, N.W. Washington, D.C. 20240** )
                           )
**JAMES L. CASWELL, in his**    )
**official capacity as Director, Bureau of Land** )
**Management,**            )
**1849 C Street, N.W.**       )
**Washington, D.C. 20240**    )
                           )
                           )

```
                                              )
                                              )
KENT E. WALTER, in his official capacity as   )
Field Manager, BLM,                           )
White River Field Office                      )
73544 Highway 64                              )
Meeker, CO 81641                              )
                                              )
and                                           )
                                              )
SALLY E. WISELY, in her official capacity     )
as BLM Colorado State Director                )
2850 Youngfield Street                        )
Lakewood, CO 80215                            )
```

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.      This action concerns two wild horse herds -- the Piceance-East Douglas Herd and the West Douglas Herd.  These horses currently and lawfully occupy public lands within the Bureau of Land Management's ("BLM") White River Resource Area ("WRRA") in northwest Colorado and are protected under the Wild Free-Roaming Horses and Burros Act ("WFHBA" or "Act"), 16 U.S.C. § 1331, et seq.  These herds are managed by the White River Field Office ("WRFO") of BLM.

2.      On October 10, 2007, the Secretary of the Department of Interior ("DOI") issued a final decision resolving protests filed against an Amendment to the White River Resource Management Plan ("RMP").  That Amendment called for the eradication of the wild horses within the West Douglas herd and is known as the West Douglas Herd Area Amendment to the White River RMP ("2005 West Douglas Herd Area Amendment"), CO-WRFO-05-083-EA.  The October 10, 2007 Decision Record ("DR") on the White River RMP Amendment explicitly

states that it is BLM's intention to eradicate all wild horses from the West Douglas Herd Area "at the earliest practicable date."  One of the rationales set forth for BLM's decision to eradicate the West Douglas herd is that BLM has determined it is more feasible to manage wild horses in the Piceance-East Douglas Herd Management Area ("HMA").  Both the West Douglas Herd Area and the Piceance-East Douglas Area HMA are areas that wild horses occupied historically at the passage of the WFHBA.  Unless this Court enters a declaratory judgment that the BLM must manage wild horses in areas they occupied at the passage of the Act, as provided for by the Act's explicit language and legislative history, it is likely that BLM will shortly decide it is not feasible to manage wild horses in the Piceance-East Douglas Area HMA.  BLM's illegal interpretation of its authority under the Act will result in the extermination of all wild horses from the West Douglas Herd Area and the potential for eradication of the Piceance-East Douglas herd based on determinations BLM threatens to make that wild horses cannot be managed in that area.  Because BLM's challenged actions are contrary to law and will result in irreparable injury to plaintiffs, plaintiffs are seeking declaratory and injunctive relief.

## JURISDICTION AND VENUE

3.      This case concerns a federal question and, therefore, jurisdiction is proper under 28 U.S.C. § 1331.  Venue is also proper under 28 U.S.C. § 1391(e).  This Court may review defendants' actions and order appropriate relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, et seq.

# PLAINTIFFS

4.      The Colorado Wild Horse and Burro Coalition ("CWHBC") is a non-profit
Colorado corporation, organized to educate the public and wild horse and burro adopters about
wild horse issues and to protect wild horses and burros, primarily in Colorado, but also in other
states.  CWHBC brings this suit on behalf of its members, who are interested in and affected by
the BLM activities regarding management of all the natural resources, and specifically the wild
horses, in this area.  The CWHBC members and supporters recreate, photograph, and enjoy
viewing wild horses on public lands within the Piceance-East Douglas and West Douglas areas
in Colorado.  They visit the area often, appreciate its natural beauty, enjoy its scenery and all of
its wildlife, including wild horses, and because they are aware of the historical significance of its
wild horse herds and the archeological significance of these areas.  CWHBC has participated in
public land reviews and decisions regarding both Piceance-East Douglas and the West Douglas
Herd Areas.  Ms. Toni Moore is a resident of the state of Colorado and is the Secretary/Treasurer
of CWHBC and the Special Projects Coordinator of The Cloud Foundation, Inc. ("TCF").  On
behalf of the CWHBC and the TCF, she participated in the only environmental review process
afforded by BLM for its most recent actions of rounding up the West Douglas and Piceance-East
Douglas wild horses in 2006.  When Ms. Moore commented on the proposed roundup of the
Piceance-East Douglas horses, she raised concerns that this herd's historic range had been
reduced from 443,979 acres to 148,153 acres, thereby subsequently drastically decreasing the
Appropriate Management Level ("AML") for this population of wild horses.  The WRFO
refused to consider this issue, stating that this issue was "beyond the scope of the EA," which
only addressed removing wild horses from the range.  Legal issues concerning the administration
of this herd and the public lands they have occupied historically threaten to escape review and

correction, leading to further roundups and removals of these wild horses, all of which harm and threaten to harm plaintiffs.  The CWHBC submitted a protest of BLM's 2005 West Douglas Herd Area Amendment.

5.      The American Mustang and Burro Association, Inc. ("AMBA") is a national organization, dedicated to the protection and preservation of America's wild equines, service to adopters and to public and adopter education.  Ms. Barbara Flores is on the Board of Directors and is the Founding Chair of CWHBC.  AMBA sues on behalf of its members, some of whom are Colorado residents or visitors and who enjoy visiting Colorado's public lands to view wild horses and burros.  AMBA has participated in public land reviews and decisions regarding both Piceance-East Douglas and the West Douglas Herd Areas.  The AMBA submitted a protest of BLM's 2005 West Douglas Herd Area Amendment.

6.      Ms. Toni Moore and Ms. Barbara Flores are residents of Colorado.  Ms. Moore and Ms. Flores, and CWHBC and AMBA last participated in the environmental review process for the 2006 roundups of wild horses from the Piceance-East Douglas herd and the West Douglas herd.  These individuals and organizations have been the primary advocates for and protectors of wild horses in this area.  They have routinely and conscientiously commented on every proposed action by BLM affecting resources in the area, attended countless meetings where the public's input was sought and supposedly considered, kept in regular contact with local and federal agency officials, and instituted administrative and federal litigation, all for the purpose of maintaining wild horses in the Piceance-East Douglas and West Douglas Herd Areas.

7.      TCF is dedicated to preventing the extinction of the Pryor Mountain Wild Horse herd and other wild horse herds on public lands, especially isolated herds with unique characteristics and historical significance.  TCF submits comments on behalf of its supporters on

various actions of BLM Field Offices which affect wild horses. TCF supporters have found in commenting on various Environmental Assessments ("EA") for wild horse roundups issued by BLM that BLM often begins roundups of wild horses immediately upon issuing its DRs for those roundups. TCF was organized by Ms. Ginger Kathrens, its Volunteer Executive Director. Ms. Kathrens first became involved with wild horse issues in 1994 when she filmed wild horses of the Pryor Mountains in Montana for Marty Stouffer's "Wild America" series. As a result of filming a roundup of those horses, she learned that a young foal had become separated from its mother during the roundup. When Ms. Kathrens questioned BLM, she was told that the foal "ran away from its mother" during the roundup. Ms. Kathrens subsequently spent three days on foot in an attempt to locate the foal, in the hopes of reuniting it with its mother. Two months later she learned that the BLM had shot the foal in question when he fell or was driven over a cliff and broke his back during the early days of the round up. Since that time, Ms. Kathrens has become a leading advocate for the preservation of wild horses on their native ranges. She is a nationally recognized authority on wild horse behavior and a frequent speaker about her study of and interactions with the wild stallion Cloud and the other wild horses of the Pryor Mountains, as well as the need to keep genetically viable herds of wild horses on our public lands. She has reached millions of people around the world through her documentaries and books about Cloud and his family. TCF sues on behalf of its supporters. TCF submitted a protest of BLM's 2005 West Douglas Herd Area Amendment.

8.     Front Range Equine Rescue ("FRER") is a Colorado non-profit corporation established in 1997, which is dedicated to stopping the abuse and neglect of both domestic and wild horses. It is FRER's belief that ignorance is often the main cause for equine abuse rather than outright cruelty. A primary goal of FRER is to educate new, potential, and existing horse

owners on basic horse care topics such as equine nutrition, first aid, ferrier care, alternative

therapies, and natural horsemanship training techniques.  In addition, FRER has assisted

hundreds of horses, including wild horses through direct rescue and its educational programs.

While some horses are donated by their owners or are rescued when abandoned, many are

rescued from livestock auctions to save them from slaughter.  Once rescued, FRER then provides

for the direct care and rehabilitation of these horses in need.

        9.      FRER represents its supporters' interests in protecting wild horses on the range

and those who have been adopted and need to be rescued from improper adoptive homes.  FRER

does this by commenting on BLM actions to remove wild horses from their range and urging

BLM and other responsible federal agencies to ensure that removals and any other federal

actions taken with regard to wild horses are based on a legitimate need to undertake those actions

and that the horses' safety and welfare will be assured during those actions.  FRER has had

extensive experience preparing wild horses for adoption to private homes.  FRER has found that

when older wild horses are removed from the range, they have difficulty adjusting to being

domesticated and therefore, there is a less of an adoption demand for these horses.

        10.     Dr. Don Moore is an equine and small animal veterinarian and has lived in or near

the WRFO almost his entire life.  Dr. Moore was a contract veterinarian for the BLM in the

1970s and 1980s, as well as the contract veterinarian on a census, roundup and removal of wild

horses from Douglas Mountain in 1974, after passage of the WFHBA.  Douglas Mountain is a

wild horse herd area due north of the West Douglas Herd Area and near the Piceance-East

Douglas HMA.  After passage of the WFHBA, BLM removed all of an approximate population

of over 600 wild horses and has never returned any wild horses to this area.  In planning

documents issued at the time, BLM stated that wild horses would be removed, adopted or shot

and that those wild horses that presented difficulties in being captured would be shot. BLM subsequently failed to recognize Douglas Mountain as a wild horse area of historic use and thus, determined it would not manage that area for wild horses. Dr. Moore has a personal interest in viewing and enjoying wild horses in the WRRA. Having lived and worked in the area for decades, he is intimately familiar with the WRRA, its history, and the presence of wild horses there. He frequently visits the public lands to see and enjoy the wild horses that live there.

11.     Ms. Moore, Ms. Flores, Ms. Kathrens, and other supporters of the organizations they direct have witnessed other roundups of wild horses taken off the range and the horses' reactions to the loss of their freedom. They often have the memories of those events return to haunt them. They fear for the well being and safety of any wild horses BLM has captured and all wild horses currently living in the Piceance-East Douglas HMA and the West Douglas Herd Area.

12.     In late September 2006, Dr. Moore visited the wild horses rounded up from the West Douglas Herd Area in holding pens near the trap site. Dr. Moore learned that after four days of flying over the area in a helicopter, the contractor for BLM, who had conducted previous roundups of wild horses in this area, had only been able to round up 38 horses. Dr. Moore counted these 38 horses that had been rounded up and later learned that an additional single wild horse had been captured, bringing the total wild horses captured from the West Douglas Herd Area to 39. Only 35 of these wild horses were kept by the BLM. BLM did not release the other four wild horses believed to be a mare and three foals -- back to the range; these four horses are unaccounted for and plaintiffs fear that they have been given to a private individual who will exploit them for commercial purposes. BLM has refused to explain the whereabouts of these four wild horses despite requests from plaintiffs and other members of the public.

13.     Beginning on September 16, 2006, the day after plaintiffs advised BLM that they had filed their suit in this matter, BLM acted quickly to conduct a hurried roundup of wild horses from the Piceance-East Douglas HMA and contiguous public lands.  Witnesses to this roundup saw BLM drive these wild horses from the range directly into horse trailers in contravention of BLM's own regulations for the capture and transport of wild horses, which prohibit such activity because it is not humane.  In addition, after filing suit in this matter, but before the Plaintiffs' Motion for Temporary Restraining Order could be heard, BLM administered Porcine Zona Pellucida ("PZP") to the captured wild horse mares from the Piceance-East Douglas HMA, thus mooting plaintiffs' challenge to the administration of that drug to this herd.  Although plaintiffs are not now challenging BLM's actions in those 2006 roundups, BLM's conduct in those roundups is relevant to demonstrate that plaintiffs do not have an adequate opportunity to obtain judicial review of the legal issues affecting wild horses in the context of a challenge to an Environmental Assessment that BLM issues whenever it conducts a roundup.  In previous roundups in the WRFO that plaintiffs have observed, at no time did BLM demand that the contractor (including the contractor for the September 2006 roundup) utilize small pens and run the wild horses directly from the range into trailers.  Such action is contrary to BLM's standard practice of holding wild horses at the site of capture to attempt to give them time to acclimate to humans and the restrictions on their freedom from captivity and to separate the animals by bands and mares and foals from stallions.  Due to these violations, some of the wild horses rounded up from the Piceance-East Douglas HMA sustained life threatening injuries, either died from their injuries or had to be euthanized, or are otherwise unaccounted for.  In addition, four foals, which were still with their mothers before the roundup, were separated from them and remain so.  BLM has refused to explain the whereabouts of the dams of these foals or what happened to them.

14.     Defendant BLM's actions and failures to act, as set forth in greater detail herein, inflict current harm to plaintiffs' procedural and substantive interests in the aesthetic enjoyment and protection of individual wild horses and the wild horse populations of the Piceance-East Douglas and West Douglas Areas by causing or threatening irreversible adverse effects to these horses.

## DEFENDANTS

15.     Dirk Kempthorne is the Secretary of the DOI. Pursuant to the WFHBA, he is responsible for the oversight of BLM's management of wild horses on the Nation's public lands, including the public lands of Colorado.

16.     James L. Caswell is the Director of the BLM and is responsible for implementing management decisions for wild horses in accordance with the WFHBA.

17.     Mr. Kent E. Walter is the Field Manager for the WRFO, and is responsible for managing the wild horses of the Piceance-East Douglas HMA and the West Douglas Herd Area in compliance with the WFHBA and its implementing regulations.

18.     Ms. Sally Wisely is the Colorado State Director of the BLM.  On October 10, 2007, Ms. Wisely approved the proposed decision of Field Manager Mr. Walter, calling for the total removal of the wild horses in the West Douglas Herd Area "at the earliest practicable date."

## BLM's MANAGEMENT OF WILD HORSES AND OTHER RESOURCES
## IN THE WRRA

19.     The WRRA consists of two, distinct wild horse herds, the Piceance-East Douglas herd and the West Douglas herd.  Although the WFHBA requires BLM to protect and manage wild horses where they were found at the passage of the Act in 1971 -- and BLM has acknowledged that wild horses have lived in the West Douglas Herd Area since at least the 1880s -- BLM has slated wild horses in this area for total removal (zeroing out) in various land use planning documents issued pursuant to the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701, et seq. since at least 1981.  On October 10, 2007, the DOI issued a Final Decision directing "the total removal of the wild horses in the West Douglas Herd Area at the earliest practicable date."  See White River Resource Management Plan DR.

20.     Under law, and pursuant to BLM's regulations, a herd area is that area of wild horse historical use at the time of the passage of the Act in 1971.  In contrast, under BLM regulations, a "herd management area" is that area where BLM chooses to manage wild horses.  Herd management areas consist of areas geographically smaller than herd areas, with more limited acreage and habitat.  Prior to issuance of BLM's regulations implementing the Act, areas of historic wild horse use at the passage of the Act were referred to as "herd use areas."  As early as 1975, at least one BLM employee, and more recently, as evidenced by documents obtained under the Freedom of Information Act ("FOIA"), counsel for BLM, and have expressed concern that zeroing out a wild horse herd area was illegal.  Since passage of the Act in 1971, BLM's creation of HMAs has caused the loss of 19,003,349 acres of habitat for wild horses and burros, down from the 53,444,499 acres that made up original wild horse herd areas.  The Piceance-East Douglas HMA consists of such decreased acreage and habitat for wild horses.

21.     Recent genetic evidence taken from wild horses of the West Douglas Herd Area demonstrates that they are not genetically related to wild horses from the Piceance-East Douglas HMA.  Thus, horses in the West Douglas Herd Area were never "outliers" from the Piceance-East Douglas HMA.  Ms. Flores has presented this data to Mr. Walter, the current manager of the WRFO.

22.     The 1981 Herd Management Area Plan ("HMAP"), which addressed treatment of both the Piceance-East Douglas herd and the West Douglas herd, provided that earlier Management Framework decisions established that the area east of what is now Highway 139 would be the "preferred habitat" for the management of wild horses.  This "preferred habitat" was established by BLM based upon where BLM counted these wild horses in an aerial census conducted during the last week of February and the first week of March 1974.  BLM failed to account for areas wild horses occupied during other times of the year, seasonal migration patterns, and the need for wild horses to migrate to disseminate grazing impact and maintain a thriving, natural ecological balance, as provided in the WFHBA.  In the HMAP, BLM decided to reduce the acreage where they would manage wild horses in the WRRA to 148,153 acres, even though wild horses had previously ranged over 443,979 acres in the Piceance Basin and Douglas Creek areas and BLM had recognized in its Management Framework Plan for the area from 1975 that, "all of the area included within the wild horse herd unit is being used by wild horses."  The HMAP acknowledged that the 443,979 acres of wild horse historic use in this area would be decreased to 148,153 acres and those wild horses would be managed in this area.  At the time, the HMA was not slated for intense oil and gas development, and the BLM determined that it was more convenient to manage for wild horses there.  A 1981 Grazing Management Plan and Environmental Impact Statement ("EIS") carried forward these earlier decisions regarding the

12

"preferred habitat" into the HMAP.  This HMAP was given a cursory update in 1996, however, there was no public input, challenge or legal review of this document.  Subsequently, the White River RMP was issued in July 1997.

23.  In July 1997, BLM issued its RMP for the WRRA.  In the 400+ page document, BLM devoted less than a full page to wild horses.  BLM states that it plans to manage for a population of zero (0) to fifty (50) horses in the West Douglas Herd Area for 0 to 10 years and the long term objective would be to remove all wild horses from this area.  Thus, under that RMP, BLM stated its plan to completely eradicate wild horses from the area at any time within 10 years from issuance of the July 1997 RMP.  The 1997 RMP called for BLM to manage a population of 95-140 horses on the Piceance-East Douglas HMA (its AML).  See 1997 RMP at 2-26.  No discussion was devoted to the minimum population of wild horses needed to maintain genetic diversity, nor whether BLM would seek to use fertility control on any of the wild horses there.  In addition, the RMP did not discuss the biotic needs of wild horses.  The 1997 RMP did not discuss the interrelationship between the Piceance-East Douglas HMA and the West Douglas Herd Area.

24.  In large part because the 1997 RMP did not adequately address or discuss management of wild horses in the West Douglas Herd Area -- and BLM knew that its actions were subject to being set aside for this reason -- BLM began a process in 2002 of amending the RMP.  The first revision to the 1997 RMP, which sought to address wild horse use of the area, was issued in 2004.  This proposed amendment evaluated eight alternatives regarding management of wild horses in the West Douglas Herd Area.  The 2004 EA stated that without oil and gas stipulations -- agreements by oil and gas companies to preserve wild horse areas -- "critical wild horse habitat would be lost."  The 2004 RMP Amendment was protested by

13

numerous groups and the Secretary of Interior ordered that it be withdrawn. BLM subsequently

began work drafting another RMP Amendment.

25.     In 2005, BLM issued the "West Douglas Herd Area Amendment to the White

River Resource Management Plan." This proposed Amendment to the RMP set forth only two

alternatives for West Douglas Herd Area -- that of eliminating wild horses from the herd area in

2007 or maintaining a "small" population of 29-60 wild horses. On August 29, 2005, BLM

issued its DR for the RMP Amendment. This amendment reaffirmed the decision BLM made in

its 1997 RMP to zero out all wild horses from the West Douglas Herd Area.

26.     Plaintiffs and other organizations protested this RMP Amendment to the Secretary

of the Interior. On October 10, 2007, the Secretary responded to that protest, and the protests of

four other parties, and affirmed the White River RMP Amendment. This response to the protest,

which constitutes the final decision of the Secretary, directs that "the total removal of the wild

horses in the West Douglas Herd Area [shall be accomplished] at the earliest practicable date."

See White River Resource Management Plan DR; Second Decl. of Kent E. Walter, ¶¶ 6-7.

These responses constituted the Department's final agency action on all issues and concerns

raised in the protest. BLM expects to complete its site-specific gather plan and associated EA,

which will set forth *how* the horses of the West Douglas herd will be removed by Spring 2008.

Id., ¶ 9. BLM has asserted that it does not anticipate conducting round ups in the West Douglas

Herd Area before August 2008. Id., ¶ 11. However, the WRFO's estimated completion date

provides no assurance that the "total removal" of wild horses from the West Douglas Herd Area

directed by the Secretary to occur "at the earliest practicable date" will not occur before August,

or before the beginning of the foaling season, noted by BLM to begin in March. The direction of

the Colorado State Director that the roundup occurs at the earliest practicable date would trump any decision of the local field office as to the timing of the roundup.

27.     Currently, the WRFO is preparing another proposed amendment to its 1997 RMP. The plan amendment and associated EIS will address the potential impacts of significant increases in oil and gas development within the 1.5 million acre field office over the next 20 years.  The scoping comment period was extended until September 30, 2006 to ensure the public had sufficient opportunity to provide comments.

28.     BLM's notice about the scoping comments period for this Oil and Gas EIS provides, "The lifestyles and concerns of area residents, including the activities of grazing and hunting, will be recognized in the RMPA/EIS."  The RMP Amendment/EIS does not purport to recognize the concerns of area residents in maintaining wild horse populations, including the interests of area residents in maintaining wild horse populations within the Piceance-East Douglas HMA, the very area to be impacted by significant increases in oil and gas development. BLM's current and future actions challenged herein with regard to wild horses threaten to eliminate wild horses from consideration as BLM analyzes oil and gas use in these areas.  This is despite BLM's recognition in its 2004 proposed RMP Amendment that without oil and gas stipulations (i.e. the stipulations that oil and gas companies give to preserve area for wild horse use), "critical wild horse habitat would be lost."

29.     BLM states that it anticipates a final DR in 2008.  Unless BLM is ordered to include the effects of oil and gas development on wild horses, there may be no wild horses within the West Douglas Herd Area or the Piceance-East Douglas HMA as early as this summer, 2008.

30.     In contrast to this RMP Amendment which will analyze Oil and Gas Development in the area and project the area's needs for the next 20 years, the WRFO has failed to update its 1981 HMAP to include new information and the current status of wild horses and issues affecting wild horses, such as oil and gas development, in the Piceance-East Douglas HMA or the West Douglas Herd Area.

31.     Since 1997, national research has been conducted on the genetics of wild horse populations, including the number of wild horses necessary in a given area to ensure the genetic viability of the herd, as well information concerning impediments to wild horse free-roaming migratory patterns, such as interior fences.  This information, as well as age/sex demographics of wild horse populations is necessary to ensure a valid AML for the area. BLM, itself, as well as wild horse population experts, have determined that to remain viable, a wild horse population must have a minimum of 150 individuals, which generally guarantees a Ne of 50, i.e. (those individuals who are actively passing their genes on to the next generation).  Neither the 1981 HMAP, the 1997 RMP nor the 2005 West Douglas Herd Area Amendment contain or consider this updated and pertinent information, including continued fragmentation of the area and impacts of energy development in these areas, which affects the populations of wild horses. These documents thus fail to properly and adequately inform BLM and the public so as to ensure the accuracy and timeliness of its information and decisions regarding management of wild horses in these areas.

32.     The 1981 HMAP for the Piceance-East Douglas HMA indicates that herds' historical range was decreased by 295,826 acres as a compromise, and a portion of this new decreased range was established as the Piceance-East Douglas HMA.  The Washington Field Office ("WFO") of BLM directs its local offices that herd areas and herd management areas may

be "zeroed out," if provided by land use plan.  Such direction is in conflict with and violates the WFHBA.

33.     As a result of BLM's round up activities, wild horses in the Piceance-East Douglas HMA and the West Douglas Herd Area currently exist in such few numbers that the genetic viability of these populations is threatened.  Because of BLM's actions, the wild horse populations in these areas are threatened with irreparable genetic harm which will jeopardize their ability to survive.  Plaintiffs' interests in the survival of wild horses in these areas and in their continued ability to continue to enjoy viewing wild horses in these areas are therefore threatened as well.

34.     In 2005, the WFO listed the number of wild horses to be gathered in Piceance-East Douglas as 175 and the number of wild horses it wanted removed as 155, purportedly authorizing the leaving of 20 wild horses in the area.  The WRRA received its requested budget from BLM headquarters in Washington, D.C. to complete this roundup.  On June 5, 2006, the WRFO issued for a 30 day comment period, its EA, purporting to elicit comment on whether it should conduct a roundup of these wild horses and whether it should administer PZP to the wild horse mares it planned to round up, despite the fact that it had been instructed by the WFO to complete the roundup.

35.     In 2005, the WRFO listed the number of wild horses to be gathered in the West Douglas Herd Area as 116 and the number of wild horses it wanted to remove as 110, purportedly authorizing the leaving of six wild horses in the area.  The WRFO received its requested budget from BLM headquarters in Washington, D.C. to complete this roundup.  On June 5, 2006, BLM issued for a 30 day comment period, its EA, purporting to elicit comment on whether it should conduct a roundup of these wild horses.

17

36.     At the time it was authorized by WFO to conduct these roundups, the WRFO had not conducted a current census of either wild horse population and therefore the WFO's listing of the number of wild horses it wanted removed from the public lands was based neither on an assessment of whether the roundup needed to be conducted, where wild horses were existing and whether they were having an impact that necessitated their removal.

37.     After the WFO directed the WRFO that it could leave 20 wild horses in the Piceance-East Douglas Area and six wild horses in the West Douglas Herd Area after its roundups were completed, and after public opposition to these actions became known, the WRFO conducted an aerial survey of the wild horse populations in these areas and claimed that it counted more wild horses than it had originally thought were occupying these areas.  Despite repeated requests from plaintiff representatives of CWHBC and AMBA to accompany BLM on census missions to count wild horses, and to corroborate BLM's wild horse numbers, BLM has refused to allow plaintiffs' representatives to do so.

38.     The Piceance-East Douglas HMA is a much smaller subset of the original herd area wild horses used as their historical range in 1971.  Typically, and in this case, the herd management areas BLM establishes do not extend to wild horse original habitat.  The decision to manage horses in areas smaller than their geographic range results in the setting of smaller "AMLs" for wild horses in these areas.  The Piceance-East Douglas HMA does not represent the herd area identified as being used by the horses when the Act was passed but has been reduced to a much smaller geographic area.  Therefore, any wild horses "outside the HMA" are within the boundaries of the herd area, and under the law and according to the implementing regulations, are not supposed to be subject to removal for that reason.

39.     Since wild horses' herd areas are those areas that horses were historically occupying at the passage of the Act, wild horses do not respect the artificial boundaries created by BLM when it establishes "herd management areas" and seeks to curtail wild horse presence in or travel within these artificially created "herd management areas."

40.     BLM often seeks to justify a roundup and removal of wild horses due to the fact that the horses have roamed outside of the herd management area, in essence, because the wild horses are using their historic, migratory habitat.  The roundup and removal of wild horses from West Douglas and Piceance-East Douglas were such removals, and threaten to be the basis for removals of wild horses from these areas in the future.  Neither the WFHBA nor BLM's regulations implementing the Act authorize BLM to remove wild horses simply because they are outside a herd management area.

41.     When BLM conducts its helicopter gathering of wild horses, the noise associated with this action often forces wild horses out of their normal grazing areas, into areas outside of agency declared management boundaries.  When plaintiffs CWHBC and AMBA challenged a removal of wild horses from West Douglas in 2002, the Field Manager of the WRRA, James Cagney, stated in an internal memo, that BLM would conduct the roundup in any event and just classify it as an "outside the HMA" roundup.

42.     Upon realizing that they have been caught, wild horses have been known to jump or attempt to jump the six foot panels of corrals in which they are held and/or throw themselves against the panels out of fear or in a desperate attempt to escape the restrictions on their movement imposed by the corrals.  Some of these horses run head long into the barriers that restrict their escape, break their necks and die.  Others severely injure themselves in the process or are shot due to their injuries.  Still other trapped wild horses suffer from what is called

"capture myopathy," a condition affecting wild animals upon capture in which they react

negatively to their confinement and lack of movement.  In 1996, a truckload of BLM wild horses

rounded up from the Piceance-East Douglas HMA died from capture myopathy.

### IV. <u>Porcine Zona Pellucida</u>

43.     PZP is an immunocontraceptive agent obtained from pigs.  It is administered

using Freund's Complete Adjuvant ("FCA"), which has been noted to cause granulomas at the

site of injection in a percentage of treated mares.

44.     BLM has admitted that significant questions remain concerning the effects of PZP

application at the population level as well as the effects on behavior, social structure, and harem

dynamics of free-ranging animals.  BLM has thus concluded that these questions are "best

answered with field trials on wild horse herds under a research protocol," Field Trial Plan

("FTP") at 2.

45.     BLM has stated that ovarian function needs to be assessed for a large sample of

mares treated for four years and that the effects of PZP and the adjuvant, FCA, on any clinical

health problems (e.g. possible abscesses, ovarian damage) "need to be observed under tightly

controlled conditions."  BLM has also stated that PZP application may influence the seasonality

of birth of foals.

46.     Under BLM's FTP, the prime time of year in which to administer PZP is noted to

be October through February.  Pursuant to BLM's DR for Piceance-East Douglas, PZP was

administered to mares in this herd, for the first time ever.  On information and belief, BLM failed

to secure prior approval to use this drug on this herd.

47.     The last time BLM removed wild horses from Piceance-East Douglas was in

2002; at that time, BLM only found, rounded up and removed 101 horses including foals and

yearlings.  BLM then returned 12 mares and six stallions to that area.  BLM has waited four years to express its need to remove wild horses from the area.  Its determination in 2006 that it had to place its decision to remove wild horses in "full force and effect" meaning that it had an urgent need to remove these wild horses and an urgent need to administer PZP, was pretextual.

48.     The WRFO established an AML for the Piceance-East Douglas HMA in its 1981 HMAP.  The WRFO has failed to update this AML and other information in the HMAP with current monitoring and inventorying to address the current and potential impacts to management and protection of a healthy, viable wild horse herd such as energy development, access to water, loss of free-roaming status due to fencing to enhance livestock grazing, loss of habitat due to road construction and development, loss of water due to filings of water rights on streams and creeks.  In addition, the WRFO has failed to respond to public concerns that the office illegally reduced the horses' historic range.

## STATUTORY AND REGULATORY BACKGROUND GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

### I. The Wild Free-Roaming Horses and Burros Act

49.     Through the WFHBA, Congress found and declared that, "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene."  Upon finding this, Congress stated that its policy was that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of public lands."  16 U.S.C. § 1331.

50.     BLM and the US Forest Service ("USFS") have exclusive authority under the WFHBA for the protection of wild horses and burros on the public lands administered by those agencies. 16 U.S.C. § 1331(a).  The WFHBA requires that BLM's and USFS's management activities be at "the minimal feasible level."  Id.  According to BLM's own regulations, BLM must protect wild horses and burros from unauthorized capture, branding, harassment or death and provide these animals with humane care and treatment.  43 C.F.R. § 4700.

51.     Under the WFHBA, wild horses are "to be considered in the area" where they were found in 1971 "as an integral part of the natural system of the public lands."  16 U.S.C. § 1331.  These legally protected areas are known as "herd areas," and are defined as "the geographic area identified as having been used by a herd as its habitat in 1971."  43 C.F.R. § 4700.0-5(d).

52.     Under the WFHBA, "range" means the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands," 16 U.S.C. § 1332 (c).

53.     The Act requires the Secretary to "protect and manage wild free-roaming horses and burros as components of the public lands . . . . The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands."  16 U.S.C. § 1333(a).  The Act provides that, "The Secretary shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands."  Under the Act, "appropriate management levels" of wild horses are to be based on a current inventory of wild horses and on the basis of ecological balance, which

cannot arbitrarily be fixed at a moment in time.  This inventory is to be the basis for "determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels . . . determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)". 16 U.S.C. § 1333 (b)(1).  The Act also provides that, "Where the Secretary determines. . . that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels."  16 U.S.C. §1333(b)(2).

54.     In the Senate Committee report accompanying the bill that became law the Senate noted, "The committee wishes to emphasize that the management of the wild free-roaming horses and burros be kept to a minimum both from the aspect of reducing costs of such a program as well as to deter the possibility of 'zoo like' developments."  S. Rep. 92-242, 92nd Cong., 1st Sess. 1971 at 2152.  "An intensive management program of breeding, branding, and physical care would destroy the very concept that this legislation seeks to preserve . . . leaving the animals alone to fend for themselves and placing primary emphasis on protecting the animals from continued slaughter and harassment by man."  Id.


## II. National Environmental Policy Act

55.     Under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., any major federal actions that significantly affects the quality of the human environment requires the preparation of an EIS.   NEPA §102(2) (C).  The language and spirit of NEPA is aimed at ensuring that an agency's single-minded approach to a proposed action is tempered by

consideration of a reasonable range of alternatives, including those with fewer adverse environmental impacts than the proposed action.

56.     Agencies may decide instead of preparing an EIS, to prepare an EA first.  An EA serves three purposes: it assists in agency decision-making on whether to prepare an EIS or Finding of No Significant Impact ("FONSI"); it independently ensures compliance with NEPA even when no EIS is required; and it facilitates the preparation of an EIS if one is required.  40 C.F.R. § 1508.9(a) (2007).

57.     NEPA requires BLM to analyze in an EA alternatives which involve unresolved conflicts concerning alternative uses of available resources even when an EIS is not required. NEPA § 102(2) (C)(iii).

58.     Although an EA is a "concise public document," it must include a discussion of the need for the proposal, alternatives, environmental impacts of the proposed action and the alternatives and a listing of the persons and agencies consulted.  40 C.F.R. §§ 1508.9(a), 1508.9(b).

59.     An EA's FONSI is only considered adequate if the agency took a "hard look" at the problem, the agency identified the relevant areas of environmental concern, the agency made a convincing case that the environmental impacts were insignificant as to the problems studied and identified; and if there were significant impacts, the agency convincingly established changes that reduced the impacts to a minimum.

60.     The Council on Environmental Quality ("CEQ"), the agency responsible for implementing NEPA, and BLM's regulations under NEPA, requires that BLM analyze the direct, indirect and cumulative impacts on the environment under the proposed action and each alternative to determine if the impacts are significant.  BLM's regulations require that this

analysis be based on the best available information and should be objective, i.e. should not reflect subjective value judgments.

61.     An EA may contain mitigation measures to avoid significant impacts that would otherwise require the preparation of an EIS.  BLM regulations require that an EA must identify and analyze mitigation measures which may be taken to avoid or reduce environmental harm.

62.     An EA serves an important statutory purpose beyond being an initial step toward the preparation of an EIS or a FONSI. Independent of this requirement, an EA must discuss, in adequate detail, a reasonable range of alternatives.

63.     An agency must take a "hard look" at the alternatives and the environmental impacts of each. An agency must consider a full range of alternatives that cover a full spectrum of possibilities and demonstrate reasoned decision-making. It must also give a reasoned explanation for rejecting each alternative.

64.     BLM regulations also require that a No-Action alternative be analyzed at the same level of detail as the proposed action.

### III. Federal Land Policy Management Act

65.     BLM must manage public lands under concepts of multiple use and sustained yield pursuant to the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701, et seq., FLPMA thus requires the BLM to manage the public lands for many purposes and for many members of the public.

66.     FLPMA requires that the public lands planning process be accomplished through land use plans, FLPMA § 202(a).  FLPMA recognizes, however, that a land use plan does not

trump the statutory command of other laws, such as the WFHBA, which requires BLM to

consider wild horses as an integral part of the public lands, FLPMA § 102(b), and mandates that

BLM provide wild horses and burros specific protection.

67.     BLM's regulations implementing the WFHBA provide that "[w]ild horses and

burros shall be considered comparably with other resource values in the formulation of land use

plans." 43 C.F.R. §4700.0-6(b).

## CLAIMS FOR RELIEF

## COUNT ONE

### (Violations of NEPA, NEPA Regulations and the APA)

68.     Plaintiffs incorporate by reference here the allegations of the preceding

paragraphs of this Complaint.

69.     BLM's presentation to the public of only two alternatives for analysis under

NEPA, one providing for a herd of wild horses in such few numbers as to threaten their genetic

viability, or the other for the elimination of that herd of wild horses violates NEPA's requirement

for consideration of a range of alternatives to be considered by the agency.

70.     BLM's failure to consider an alternative which provided for management of a

wild horse herd with genetically viable numbers in acreage of the original herd habitat violates

the WFHBA and NEPA.

71.     BLM's decision to limit the White River EA to an assessment of the impact of

alternatives for methods for eradicating wild horses from West Douglas is insufficient under

NEPA in the absence of an EIS analyzing the proposed decision to remove all horses from the

herd area.

72.     BLM's s finding of no significant impact is in error and necessitates the preparation of an EIS.  BLM's DR is a major federal action approved contrary to NEPA, 42 U.S.C. §4332(2)(C), and its implementing regulations.  BLM failed to take the requisite hard look at the foreseeable consequences of their actions.  BLM failures to comply fully with NEPA and its regulations were arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, thereby subject to reversal under the APA.

## COUNT TWO

### (Violations of the WFHBA, WFHBA Regulations and APA)

73.     Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

74.     BLM is not authorized to "zero out" a herd area, either directly by removing all wild horses present, or indirectly by leaving wild horses in such few numbers that they are genetically unviable.

75.     These actions are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, and must be set aside under the APA.

## COUNT THREE

### (Violations of FLPMA, the WFHBA and the APA)

76.     Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

77.     BLM has refused to acknowledge and provide for the historical use and seasonal migratory patterns of the wild horses living in the Piceance-East Douglas HMA and the West Douglas Herd Area.

78.     This refusal has limited the horses' range to those areas where BLM has determined it is convenient to manage them.

79.     BLM is not authorized to "zero out" a herd area, either directly by removing all wild horses present, or indirectly by leaving wild horses in such few numbers that they are genetically unviable.

80.     These actions are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, and must be set aside under the APA.


**COUNT FOUR**

**(Violations of FLPMA, the WFHBA and the APA)**

81.     Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

82.     BLM has advised the public that it cannot revisit issues affecting wild horses which were addressed in its 1981 HMAP, including the setting of AMLs, in the context of EAs for a roundup. BLM has not otherwise addressed these issues in a manner that allows meaningful public comment and public participation.  BLM has failed to revise and update the information in its 1981 HMAP governing management of wild horses in the West Douglas and Piceance-East Douglas areas to consider how more recent activities in the WRRA affect wild horses and how wild horses affect other uses of these areas.

83.    BLM's failure to update and revise information in its 1981 HMAP constitutes agency action unreasonably delayed and unlawfully withheld, in violation of the APA and in violation of the WFHBA, which requires decisions concerning the populations of wild horses to be based on a current inventory of wild horses in the area and monitoring of the public lands, including their historic ranges.  This Court may enter an order to remedy this unreasonably delayed and unlawfully withheld action.

## COUNT FIVE

### (Violations of the WFHBA and the APA)

84.    Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

85.    BLM's mandate that wild horses are to be removed from a particular area solely by referencing a particular wild horse population's measurement against its "appropriate management level," violates the Act's requirement that AMLs are to be set at the local field office, based on current and accurate information after adequate monitoring of public lands and inventorying of wild horse herds.

86.    These actions are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, and must be set aside under the APA.

## COUNT SIX

### (Violations of the WFHBA, FLPMA, NEPA and the APA)

87.     Plaintiffs incorporate by reference here the allegations of the preceding paragraphs of this Complaint.

88.     The DOI's affirmation of BLM's decision to "zero out" the West Douglas herd violates the WFHBA.

89.     The DOI's interpretation that its field offices, including the WRFO, may zero out wild horses from areas they used at the passage of the WFHBA if such action is authorized by a land use plan, violates FLPMA and the WFHBA.

90.     These actions are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, and must be set aside under the APA.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter judgment in favor of plaintiffs and grant the following relief:

A.      Issue a declaratory judgment that:

1.      Defendant BLM's EA and associated DR violate the WFHBA, and its implementing regulations, and are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, contrary to the APA.

2.      Defendant BLM's actions in refusing to acknowledge the legal right of the West Douglas and Piceance-East Douglas wild horse herds to lands they historically used at the passage of the WFHBA, are arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law, and without observance of procedure required by law, contrary to the APA. 5 U.S.C. § 706(2)(A)-(F).

3.      Defendant BLM's failure to update inventory information concerning wild horse populations in the West Douglas Herd Area and the Piceance-East Douglas HMA contained in its 1981 HMAP, including failing to set and revise as necessary based on current monitoring information AMLs that would reflect populations of wild horses occupying their areas of historic use area constitutes agency action unreasonably delayed and unlawfully withheld in violation of the APA § 706.

4.      BLM may not provide in a land use plan, or otherwise take action to zero out an area that wild horses occupied at the passage of the WFHBA.

5.      BLM may not provide in a land use plan that an area wild horses occupied at the passage of the WFHBA will contain a population of wild horses in such few numbers that the population is neither genetically viable nor self-sustainable.

6.      BLM may not zero out a Herd Area or a Herd Management Area.

B.      Pursuant to the APA:

7.      Issue an order directing BLM to update appropriate information concerning wild horses in the WRRA with full public notice and comment, to provide for two naturally genetically self-sustaining viable populations of wild horses in the Piceance-East Douglas HMA and the West Douglas Herd Area;

8.      Issue an order setting aside BLM's West Douglas Herd Area Amendment to the White River Resource Management Plan, as in violation of the WFHBA, insofar as it directs the eradication of wild horses from their historic range, the West Douglas Herd Area.

9.      Issue an order prohibiting BLM from a) zeroing out wild horses from the West Douglas Herd Area; b) managing wild horses in the West Douglas Herd Area in genetically unviable numbers; c) zeroing out wild horses from the Piceance-East Douglas herd; d) managing wild horses in the Piceance-East Douglas HMA in genetically unviable numbers.

10.     Issue an order directing BLM to recognize the historic herd use area for wild horses within the WRRA and to provide for use of these areas by naturally genetically self-sustaining viable populations of wild horses.

11.     Issue an order prohibiting BLM from conducting any roundups in the WRRA until resolution of this action.

C.      Award plaintiffs their costs and expenses (including reasonable attorney, expert witness and consultant fees); and

D.      Award plaintiffs such other relief as the Court deems appropriate.

Respectfully submitted,

/s/ Valerie J. Stanley
Valerie J. Stanley
D.C. Bar No. 384882
329 Prince George Street
Laurel, MD 20707
(301) 549-3126

/s/ Mara C. Hurwitt
Mara C. Hurwitt
D.C. Bar No. 482409
Dewey & LeBoeuf LLP
1101 New York Ave. N.W.
Suite 1100
Washington, D.C. 20005-4213
(202) 986-8094

Counsel for Plaintiffs

January 4, 2008