*Law Office of Valerie J. Stanley*
*329 Prince George Street*
*Laurel, MD 20707*

**Admitted in Maryland**
**and the District of Columbia**

**(301) 549-3126**
**(301) 549-3228 fax**

*By Hand Delivery*

October 1, 2005

Director (210)
Bureau of Land Management
Attn: Brenda Williams, Protest Coordinator
1620 L Street, N.W., Suite 1075
Washington, D.C. 20036

Re: Decision Record/Finding of No Significant Impact
West Douglas Herd Area Amendment to the
White River Resource Management Plan
CO-WRFO-05-083-DR/FONSI

Dear Director:

### Interest of Protesters

This protest is submitted on behalf of Toni Moore, on her own behalf, and on behalf of the Colorado Wild Horse and Burro Coalition (CWHBC), the American Mustang and Burro Association (AMBA), and The Cloud Foundation (TCF) ("protesters"). Ms. Moore and these organizations participated in the planning process for this amendment. These organizations bring this protest on their behalf, as well as on behalf of their members, because they are adversely affected by this proposed amendment to the White River Resource Management Plan. The members and supporters of these organizations are residents of Colorado or neighboring states, or persons who visit the West Douglas Herd Area to observe and enjoy wild horses roaming free and in the manner intended and protected by the Wild Free-Roaming Horses and Burros Act (WFHBA), 16 U.S.C. §§ 1331-1340, and the lawful regulations implementing that statute. These organizations and their members participated in this environmental review process in the sincere desire that BLM would comply with NEPA, and not just "go through the motions," with its desired outcome already pre-determined, which violates the letter and spirit of NEPA.

Ms. Flores, and AMBA, Ms. Moore and the CWHBC are interested in and affected by the Bureau of Land Management ("BLM'") activities regarding management of all the natural resources, and specifically the wild horses, in this area. This is because they visit the area often, appreciate its natural beauty, enjoy its scenery and all of its wildlife, including wild horses, and because they are aware of its historical and archeological significance. Their interests in this area and explanation of their long involvement in land use planning efforts for this area are more specifically described in their affidavits which are attached hereto and incorporated by reference as **Exhibit 1**. Protesters Toni Moore, on behalf of CWHBC, and AMBA submitted comments and also filed a protest on August 12, 2004 regarding the EA CO-WRFO-03-050 and FONSI (hereinafter referred to as predecessor or withdrawn EA). That EA, for the first time ever, blamed oil and gas development as the reason the BLM needed to zero out this area. That EA was withdrawn in December, 2004, and the instant EA is the subsequent EA issued on this matter.

The Cloud Foundation is a non-profit organization whose purpose is to protect the Pryor Mountain Wild Horse herd and other wild horse herds as wild animals living on the range, especially isolated herds with unique characteristics and historical significance. The Cloud Foundation was started by Ginger Kathrens, an Emmy award-winning film maker who has produced two PBS Specials on Cloud, a wild horse stallion in the Pryors, and his band. Through these films, millions of people in the United States and internationally have learned about that herd and other wild horse herds throughout the United States. Ms. Kathrens is the Executive Director of The Cloud Foundation

These individuals and organizations have been the primary advocates for and protectors of wild horses in this area. Copies of the comment letters submitted by these protesters on the instant EA are attached hereto and incorporated by reference as **Exhibit 2**. They have consistently fought long and hard against BLM's single-minded and unwavering agenda to rid this area of wild horses. They have routinely and conscientiously commented on every proposed action by BLM affecting resources in the area, attended countless meetings where the public's input was sought and supposedly considered, kept in regular contact with local and federal agency officials and instituted administrative and federal litigation, all for the purpose of maintaining wild horses in the West Douglas Herd Area and preventing BLM from "zeroing out" the Herd Area.

In 1999, Toni and Don Moore and AMBA filed an appeal with the Office of Hearings and Appeals of the Interior Board of Land Appeals of the Field Manager's Final Decision dated July 30, 1999 concerning renewal of Grazing Permit #1456 on the Twin Buttes Allotment. The Twin Buttes Ranch Company is the primary livestock permittee in the West Douglas Herd Area. That appeal had been pending before IBLA until briefing on the issues concluded last year. Because many of the legal issues involved in that appeal are relevant to the issues in this EA, Appellants' Memorandum in Support of their Motion for Summary Judgment and in Opposition to Intervenor Twin Buttes' Motion for Summary Judgment is attached hereto and incorporated by reference as **Exhibit 3.**

Throughout their involvement with this area, protesters have offered to work with agency officials, and other interested and affected parties, toward concrete and creative solutions that would allow wild horses to continue living free in this area, as one of the multiple uses on the public lands, as Congress intended, not only for their own personal enjoyment, and that of their family members and future generations, but for the wild horses themselves.

At numerous junctures in their efforts, and often simultaneously, they have been assured by BLM that the agency would consider their interests, all the while the agency advised them that their concerns were 1) not yet ripe for consideration; 2) should have been raised in an earlier proceeding; 3) were already conclusively decided against them in an earlier proceeding to which the agency was bound; 4) had to await the agency's action on other issues. Furthermore, the agency has consistently denied requests by Ms. Flores and Toni Moore that BLM schedule and conduct an aerial census to determine seasonal migration patterns without being in conjunction with a roundup, with third party individuals present who were acceptable to Ms. Flores, the Moore's and the BLM. See August 6, 2001 Letter to James Cagney proposing a census of the West Douglas Herd Area, attached hereto and incorporated by reference as **Exhibit 4**.

Further, the agency has never attempted to implement any of the activities protesters' expert, Dr. Jeff Powell, suggested could be made to modify wild horse use of those limited areas where BLM contended they were causing damage. See e.g., Letter from the undersigned to James Cagney, Field Manager and July 12, 2001 Report of Dr. Powell, attached hereto and incorporated by reference as **Exhibit 5**. Protesters' efforts to ensure the existence of wild horses in the area and their efforts offered to work with the permittee and the BLM to attempt to resolve this conflict fell on deaf ears. On July 18, 2001, James Cagney, then Field Manager of the White River Field Office wrote to Senator Wayne Allard, commenting, "Frankly, it is easy to see the issue from Davie's (permittee's) perspective. . .In an effort to address this issue, I have decided to initiate a land use plan amendment. The White River Field Office still believes that our long term land use planning is both legal and wise. However if I simply issue a decision to catch all the horses in the West Douglas Area, a legal challenge is almost certain. Testing the legality of our long term planning within the narrow framework of a wild horse gather plan seems unwise," Letter from James Cagney to U.S. Senator Wayne Allard, July 18, 2001, attached hereto as **Exhibit 6**. Exhibit 6 raises the issue of whether the outcome of this EA – to provide a firmer foundation to a decision of the BLM made three decades ago --- was pre-determined. The fact that none of the recommendations made by Dr. Powell, or any efforts to accommodate both the interests of the permittee and those favoring retention of a viable wild horse herd in the West Douglas Area, are even referenced in this EA demonstrates that BLM used this amendment process merely to support its pre-determined outcome.

3

## Preliminary Statement regarding the Due Date of this Protest

The cover letter for this Decision Record (DR) is dated August 27, 2005. The DR /FONSI is dated August 29, 2005. The regulation addressing the due dates for the filing of protests, provides that for a DR on an EA which has not been published in the Federal Register, the protest shall be filed "within 30 days of the publication of the notice of its effective date," 43 C.F.R. §1610.5-2 (a)(1). The effective date of this Decision is October 1, 2005, a Saturday, a day on which federal offices are closed, and thus not available to receive documents for filing.

According to Horace Traylor, an employee of the Protest Office, the Protest office policy would be to consider a protest for this DR timely filed if received on the next business day after October 1st, which in this case is Monday, October 3rd, 2005.

## Statement of Issues Presented

1.      **Whether BLM's failure, since 1984, to consider wild horses as an integral part of the system of public lands in the West Douglas Herd Area, and comparably with other resource values, violates the WFHBA, the Federal Land Policy Management Act (FLPMA) and the Administrative Procedure Act (APA)?**

2.      **Whether BLM is authorized to plan to eradicate wild horses from the West Douglas Herd Area, an area in which they have historically roamed because the Twin Buttes Ranch Company, a livestock permittee, whose allotment comprises a portion of the West Douglas Herd Area, claims a superior interest in those lands for its livestock operation?**

3.      **Whether the BLM's failure to provide the public with the data by which it has increased and/or changed the grazing utilization of this permittee's livestock operation, thereby decreasing available forage for wild horses, and failure to offer the public the opportunity to comment on this data, violates NEPA?**

4.      **Whether BLM may chose to manage wild horses on specific areas of public land based upon administrative convenience?**

5.      **Whether BLM may continue to receive comment on an EA three weeks after the close of the public period for submission of comments without reopening the comment period and affording the public the opportunity to comment on the information provided after the close of the public comment period?**

6.      **Whether BLM may reduce a herd area by over a hundred thousand acres, without legal authority to do so, and without providing the public with the basis on which the agency did this?**

7.      **Whether BLM's failure to consider the impact of increased numbers of**

elk and deer, and/or management of the predators of elk and deer, have on available forage for wild horses violates the WFHBA and requires withdrawal of this EA and publication of a new EA with this information so that the public may comment?

8.      Whether BLM's failure to conduct a census of wild horse use of the West Douglas Herd area during each season of the year skews BLM's analysis of how much forage is available to all species, how much forage is used by all species and use of available forage by wild horses?

9.      Whether BLM's presentation to the public of only two alternatives for analysis under NEPA, one providing for a herd of wild horses in such small numbers as to threaten their genetic viability, or the elimination of that herd of wild horses, and its failure to analyze a "no action" alternative violates NEPA's requirement for consideration of a range of alternatives to be considered by the agency?

10.     Whether BLM should have evaluated other alternatives which could accommodate both the interests of the livestock permittee and members of the public, including protesters, who desire to have the West Douglas herd of horses remain in its original herd area, as required by the WFHBA?

11.     Whether BLM's failure to consider an alternative which provided for management of a wild horse herd with genetically viable numbers in acreage of the original herd habitat violates the WFHBA and NEPA?

12.     Whether the agency's finding of no significant impact (FONSI) is in error and necessitates the preparation of an Environmental Impact Statement (EIS)?

## Statement of Parts of the Amendment Being Protested

In general, the parts of the Amendment being protested are listed below. Specific references or citations to parts of the amendment are listed under each topic and/or it is discussed infra.

a.   Decision to remove all wild horses from the Herd Area (throughout document);

b.   Finding of No Significant Impact, causing the agency to decide that it need not or will not complete an EIS (iii-vii)

c.   Decision now --- in 2005 --- to remove all wild horses from the area by 2007 without assessing before that date and on a regular basis whether the modifications made in grazing use, added range improvements, implementing

5

minimal feasible management practices, will result in achieving a thriving, natural, ecological balance.

d.  Section 1.3 Geographic Scope of the Planning Area—lists the area as encompassing 123,387 acres of federal land. As set forth in the comments of protesters, this area is much smaller than that represented to Congress in BLM's Seventh Annual Report to Congress, p. 24, 1988; Eighth Report to Congress, 1990, p. 28.

e.  Table 1-1 regarding Census Information. Census was not taken until 3 years after passage of the Act; prior to census, wild horses were killed off in the area by opponents of the new Act. Nor was census taken with regard to wild horse season of use, migration patterns, etc. Use of this chart to indicate that wild horses in West Douglas were "outliers," not residents.

f.  Chart on page 67, indicating that even if a non-viable herd of wild horses is maintained in the West Douglas herd area, this will result in the loss of 750 AUMs, which is the "equivalent of losing 63 cattle from the operation." This analysis stems from the fact that through this EA, BLM is simply trying to justify the illegal decision it made in 1983 to not manage for wild horses in the West Douglas Herd Area because those lands comprised the Twin Buttes Allotment.

g.  Amendment resulting from consideration of only two alternatives --- the elimination of the herd or maintaining the herd in numbers insufficient to maintain genetic diversity.

h.  The only alternative considered which would have provided for the continued existence of wild horses in the area, provided that the population of wild horses would be maintained in numbers so low that their genetic diversity, and therefore, their viability as a population would be threatened. This would require introduction of mares from other herd management areas.

i.  Failure to publish for the public's consideration the change in management protocols since 2003 for the Twin Buttes grazing permit, which would have afforded the public the ability to comment.

j.  There has never been a wild horse herd area where all the horses were removed that has had wild horses reintroduced; therefore, BLM's suggestion that, "the West Douglas herd area will remain eligible for consideration for wild horse management in the future," is disingenuous.

**The State Director's Proposed Decision is Incorrect for the Following Reasons:**

### BLM's Decision to Eliminate Wild Horses From the Herd Area Violates the WFHBA, FLPMA and the APA (Issues 1-8)

It is uncontroverted that BLM has long since decided that it would not manage for wild horses in the West Douglas Herd Area. Initially, BLM determined that conflicts with livestock grazing necessitated this action. This conclusion was counter to the evidence before the agency then --- and now. The 1983 Allotment Management Plan (AMP), attached hereto as **Exhibit 7** recognized that the area has numerous inherent problems which make livestock grazing difficult --- i.e. poor soil, rocky outcrop, erosion, and noxious weeds, finding that "major problems and conditions . . . are either a part of the current grazing system or directly affect the utilization of range forage by livestock," Id. at 12-14.

Since then, BLM has spent countless thousands of hours trying to justify this decision on various grounds. See generally, Affidavit of Toni Moore, ¶¶ 10-16, Affidavit of Barb Flores, ¶¶ 10-15.

The Wild Free Roaming Horses and Burros Act mandates by its plain language that wild horses are to be "protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the system of public lands," 16 U.S.C. §1331. The phrase "where presently found" has been interpreted to mean where the horses lived in 1971. See 43 C.F.R. § 4710.3-1 (defining herd area as the "geographic area identified as having been used by a herd as its habitat in 1971)[1] From the title of the Act, as well as from knowledge of wild horse behavior, it is evident that wild horses are free-roaming in nature. This fact is also acknowledged by the term "range," which is defined in the Act as

> . . .the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands;

16 U.S.C. §1332 (c)

---

[1] BLM has previously argued that they did not begin to refer to the West Douglas area as a "herd area" until some time after 1979. The controlling fact, however, is where the horses were at the time of the passage of the WFHBA, not when and how BLM referred to the area.

In this case, there is no question that wild horses inhabited the White River Resource Area long before 1971 and there is no question that their range extended to and included the West Douglas Herd Area, which includes the area west of Colorado 139, south of the town of Rangely and north of Douglas Pass.

It is elementary that BLM must comply with federal laws when it creates a land use plan and that the plans it creates cannot supersede federal law. A land use plan cannot override the statutory command of the Wild Free Roaming Horses and Burros Act which declares that wild horses are to be considered as an integral part of the natural system of the public lands, 16 U.S.C. §1331. This is clear. Neither can a land use plan contravene the statute under which it operates: the Federal Lands Policy Management Act (FLPMA) Section 102(b) of that Act specifically provides that the Act shall "be construed as <u>supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law</u>," (emphasis added) The West Douglas Herd Area must be managed in accordance with the WFHBA. A provision of a land use plan, which contradicts that law, is not valid irrespective of how long that provision has been in existence or how many times it, has been cited. To hold so otherwise would mean that agencies could rewrite law, and provided their interpretation was long-standing, it could take on a validity of its own.

If wild horses cannot be eliminated from an area they occupied in 1971 under law, it follows that they cannot be eliminated from that area for reasons such as administrative convenience, because managing them there interferes with the permittee's livestock operation or any such other reasons and the IBLA has so recognized. In ruling on the setting of an appropriate management level for horses in an area, the IBLA has long held, ". . . an AML established purely for administrative reasons or because it was the level of wild horse use at a particular point in time cannot be justified under the statute, <u>Animal Protection Institute v. BLM</u>, 109 IBLA 112 (1989).

BLM's steadfast adherence to the land use plan is also plainly contrary to FLPMA, as recently articulated by the Supreme Court in <u>Southern Utah Wilderness Alliance v. BLM</u> ("SUWA"), 124 S. Ct. 2373 (June 14, 2004). In that case, the Supreme Court explained that, "[A] land use plan, however, is a tool to project present and future use. Unlike a specific statutory command requiring an agency to promulgate regulations by a certain date, a land use plan is generally a statement of priorities; it guides and restrains actions, but does not prescribe them. . . . The land use plan statements at issue here are not a legally binding commitment enforceable under Section 706(1)," <u>Id</u>. at 2381-2384.

In addition, the Twin Buttes' Ranch Company grazing permit confers no right to own the lands, <u>Public Lands Council v. Babbitt</u>, 529 U.S. 728, 733 (2000) (" the issuance of a permit ... shall not create any right, title, interest, or estate in or to the lands."), nor does it afford it the right to displace other uses of the land, which it claims make its operations less flexible, see DR at 16 ("Because of the limited forage, there is competition between horses and livestock during the spring period, which results in

8

decreased livestock management flexibility and shifts grazing use to other areas."). It follows that BLM's sole focus on affording the permittee flexibility to the detriment and elimination of other range values is illegal.

It appears that a major cause for BLM's determination that there is limited forage is due to the fact that it has --- without explanation --- decreased the available acreage for forage in this area. See Comments at Exhibit 2 noting decrease in acreage, contrary to acreage amount reported to Congress. See **Exhibit 8.**

Furthermore, BLM's decision now, in 2005, that it will remove all horses by 2007 is contrary to the WFHBA's and FLPMA's mandates that allocation of forage be based on monitoring and inventorying. BLM proposes to decrease AUMs for the Twin Buttes Ranch. BLM is silent as to whether it may be increasing AUMs for this permittee in another area. If BLM contends that reducing AUMs will improve range values, does it not make sense to "wait and see" if this does improve conditions? Perhaps wild horses will not need to be removed at all. Livestock utilization should be measured to ensure that this would be accomplished. BLM's failure to provide the public with any data as to how it has modified the permittee's grazing use since 2003 makes it impossible for the public to monitor and evaluate this.

Finally, determining that wild horses will not be managed in an area where they were found at the passage of the Act also makes no sense in light of the provisions of the WFHBA and the Public Rangelands Improvement Act, 43 U.S.C. §1902 et seq. If the purpose of the WFHBA is *to protect horses from capture, and this is to be done by considering them where they are presently found as an integral part of the natural system of public lands* and PRIA specifies that wild horses can only be removed, i.e. when a certain number of them are determined to be "excess" and their removal is necessary to restore a thriving natural ecological balance on the public lands, 16 U.S.C. 1333(b)(2), then it makes no sense to decide *in advance of monitoring and inventorying* that wild horses will be removed or that they will be completely eradicated from an area. Once wild horses are removed as a part of the natural system of public lands, the WFHBA's purpose -- to protect them from capture and have them be integral to the system of public lands --- is violated, there is no "thriving natural ecological balance" under the WFHBA, nor is "multiple use" under FLPMA. Furthermore, eradication of a wild horse population certainly does not constitute management of those animals at the minimal feasible level, as required by the WFHBA.

Regarding the Secretary's duties toward wild horses, the Act provides, in pertinent part,

> . . .The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving ecological balance on the public lands. . . All management activities shall be at the minimal feasible level and shall be carried out in consultation with the wildlife

> agency of the State wherein such lands are
> located in order to protect the natural
> ecological balance of all wildlife species
> which inhabit such lands,

16 U.S.C. § 1333(a) (emphasis supplied)

The DR and EA evidences no consultation with the wildlife agencies monitoring the elk and deer populations, and how they may be impacting forage utilization, in violation of this provision.

Finally, it appears that the BLM accepted comments on this issue from the Northwest Resource Advisory Committee after the comment period closed on this EA. See **Exhibit 9**. While two of the protesters did attend this telephone meeting, the vast majority of other interested public members, who are vitally interested in this issue, but who may not have been able to attend by telephone, were precluded from participating due to the fact that there were under 25 telephone lines available for this conference, at least ten of which were taken by the RAC members. They were also prohibited from learning what extra, last-minute direction regarding elimination of wild horses from the area, the BLM was receiving. They certainly had no opportunity to comment as the comment period had closed some three weeks earlier. Field Manager Kent Walter, who signed the DR, commented at the conclusion of the teleconference that the recommendation from the Colorado Northwest RAC would be definitely included in BLM's decision-making for this EA.

### BLM's Finding of No Significant Impact, Failure to Consider a Range of Alternatives, and Failure to Consider Ways to Resolve Conflicts between Various Users of this Area Violates the National Environmental Policy Act (Issues 9-12)

The final Environmental Assessment (EA) reflects the ongoing process that is, and has been, inherently biased against the no-action alternative and, therefore, any action taken by the agency that is based on the EA violates the fundamental goals and requirements of the National Environmental Policy Act.

The goal behind the National Environmental Policy Act (NEPA) is the implementation of a broad plan to protect the natural environment and the human experience. 42 U.S.C. § 4321. Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b)-(c). The collection of data and information that only supports the agency's preferred action does not ensure that all the relevant information is before the agency prior to the decision-making.

Unfortunately, the environmental documentation prepared in this case is anything but unbiased and with no perceived agenda. It is clear from the language of the

10

document that the officials at BLM had already determined that the horses in this area would be removed from the moment it issued its Draft Resource Management Plan in 1994. Nothing issued since then has changed that perception; the bias in the decision-making process is apparent. The public can only be left with the impression that the agency has already chosen its course of action and is willing to overlook the legal requirement to consider input from scientists, other agencies, and members of the public as to other alternatives.

It is evident from the response to comments given on the draft EA and other land management plans that the agency is unwilling to place the welfare of its trust responsibilities, i.e., the wild horses in this Herd Area, above consumptive uses of the land. The supporting information used to justify the preferred alternative has little or no value or significance to the alternatives. Once again, the language in the EA makes it clear that the agency is not interested in examining the validity and efficacy of options that do not include the total elimination of the horses in the HA.

The bias that has been demonstrated throughout the process defeats the purpose and intent of NEPA. "The ultimate harm NEPA seeks to prevent is the real environmental harm which may occur as a result of inadequate foresight and deliberation by agency decision makers." Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir.1989)

> All of these rules notwithstanding, NEPA does not require that agency officials be "subjectively impartial." Environmental Defense Fund v. Corps of Eng'rs of the U.S. Army, 470 F.2d 289, 295 (8th Cir.1972). The statute does require, however, that projects be objectively evaluated.
>
> NEPA assumes as inevitable an institutional bias within an agency proposing a project and erects the procedural requirements of § 102 to insure that "there is no way [the decision-maker] can fail to note the facts and understand the very serious arguments advanced by the [commenters] . . . if he carefully reviews the entire environmental impact statement."
>
> Id. (quoting Environmental Defense Fund v. Corps of Eng'rs of the U.S. Army, 342 F.Supp. 1211, 1218 (E.D.Ark.1972)
>
> In summary, the comprehensive "hard look" mandated by Congress and required by the statute must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made. As the Eighth Circuit observed in Environmental Defense Fund, "[t]he unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives." Id. at 298.

The bias that has been shown throughout the process demonstrates the predisposition of the agency to approve the elimination of the horses from the herd area regardless of the analysis of comments received during the NEPA process. The

predetermined bent of the agency not only violates NEPA, but is arbitrary and capricious and, thus, violates the Administrative Procedure Act (5 U.S.C. § 551 et seq. (2004)).

Moreover, neither the analysis in the EA nor the rationale in the Finding of No Significant Impact (FONSI) justifies the decision of the agency as delineated in the FONSI. The purpose behind the FONSI is to allow the agency to present its reasons why the proposed action will not have a significant effect on the human environment, thereby elimination the need for an EIS. (40 CFR § 1508.13.) It is clear that the removal of these horses is a significant effect and worthy of a separate EIS. The proposed action can only be viewed and interpreted as an elimination of a Herd Area. That, in itself, is highly significant. The effect of this action, therefore, is the elimination of a herd area in violation of the Wild, Free Roaming Horses and Burros Act of 1971. Furthermore, BLM's newly hatched plan to maintain the herd area devoid of the wild horses is certainly precedent-setting and for this reason, requires that an EIS be completed.

The term "significant" requires a consideration of both the context of the proposed action as well as of its intensity. Section 1508.27 of the regulations that implement NEPA requires the proposing agency to consider the degree to which the action is highly controversial and to whether the action might establish a precedent for future actions with significant actions. (40 CFR §§ 1508.27 (b)(4) and (6).) The impacts created by the action can be both adverse and beneficial. (Id. at § 1508.27(b)(1).) The analysis of the effects of the action must include a study of the impacts on the "components, structures, and functioning of ecosystems,[and the impact on] aesthetic, historic, cultural, economic, social, or health [factors], whether direct, indirect, or cumulative." (Id. at § 1508.8.) An examination of these factors, as listed above, must lead to the conclusion that there will be a significant impact requiring the more detailed analysis under a new and separate EIS.

### Conclusion

For the foregoing reasons, we request that the State Director revisit the decision to approve this amendment.

Respectfully submitted,

Valerie J. Stanley
Counsel for Protesters

Toni Moore and Colorado Wild
Horse and Burro Coalition
c/o 505 Poplar Drive
Fruita, CO 81521
(970) 858-0844.

12

Barb Flores and the American
Mustang and Burro Association
2406 15th Avenue Court
Greeley, CO 80631.
(970) 302-0766

Ginger Kathrens
The Cloud Foundation
107 7th Street
Colorado Springs, CO 80905
(719) 633-3842



## DECLARATION OF TONI HUTCHESON MOORE

1. I make this declaration with knowledge it will be presented with the Appellants' Memorandum in Support of a Motion for Summary Judgment and in Opposition to Intervenor's Motion for Summary Judgment and Respondent's Concurrence with Intervenor's Motion.

2. I am over the age of 18 years and competent in all respects to make this declaration.

3. I am the office manager and co-owner at Adobe Creek Animal Clinic in Fruita, Colorado. I have held this position since 1994.

4. I moved to Grand Junction, Colorado in November, 1976 and have lived in the area for 26 years. I began observing wild horses in the West Douglas Herd and the Piceance/East Douglas Herd since June, 1989.

5. Since that time, I have hiked, ridden horseback, and driven by 4 wheel drive in those areas observing wild horses in and around the Twin Buttes allotment including Oil Springs Mountain, Texas Mountain areas.

6. The sole purpose of my trips was to observe wild horses in their natural habitat. I enjoyed watching several bands, during the first several years, migrate throughout the area, and observe the changes in the social hierarchy including the birth of foals, and changing of band stallions. After observing these animals I have come to understand and appreciate the Congressional and presidential actions to declare wild horses our national heritage species. Their beauty, strength and adaptability represent a very historic time in the evolution of our nation as well as such cultural importance for so many Americans, including myself. I have enjoyed taking my five children to the West Douglas Creek area to enjoy the wild horses, share with them the culturally rich heritage along with that of the Native people of the region.

7. From June, 1989 to December, 1996 I traveled through some part of West Douglas Creek Herd Area located in the Twin Buttes allotment at least three times a month enroute to work at my husband's veterinary clinic in Rangely. Many times, wild horses could be observed without binoculars to the west of Colorado 139 in the draws and gullies. I also observed during this time period many vehicles with out-of-state license plates photographing and observing the wild horses.

8. Following the 1998 roundup, I have chosen to reduce my excursions in the West Douglas Creek Herd Area due to the fact that I have not observed wild horses since that time. There are very few wild horses that frequent the area west of Colorado 139 (I have heard reports there is still one band that some Rangely residents have seen on occasion, but I have not). During my trips through the interior of the West Douglas Creek Herd Area and other locations, such as Missouri Creek and Evacuation Creek since 1999, I have not seen any wild horses. I frequent the area only two or three times a year due to fact that I have not observed wild horses during any of my previous visits since 1998 and the area seems quite lacking without them present.

9. Staring on October 31, 1991, I attended the first BLM sponsored meeting concerning the West Douglas Creek Herd, in response to an ad I read in the Rangely Times, concerning a helicopter hearing prior to the total removal of the horses scheduled for November, 1991. It was my understanding that early snow and high winds canceled the planned removal. Following that meeting I requested to be placed on BLM's mailing list in order to be kept informed of actions and management decisions concerning this area and the herds who live there.

10. From that time forward, I researched the Wild Horse and Burro Act, other applicable federal laws and regulations. I regularly attended public meetings, responded to verbally and in writing to issues pertinent to the management of this area and it's wild horse herd. In 1993, I joined the newly formed Colorado Wild Horse and Burro Coalition, whose original mission was to disseminate information between BLM. In 1995, I was appointed to the Northwest Resource Advisory Council to represent wild horse interests. In 1998 I became the Administrator for Wild Horse and Burro Freedom Alliance, a coalition of humane and wild horse advocacy groups with approximately 9 millions members.

10. Upon review of planning documents generated by the White River Resource Area Field Office since 1991 I have found there have been several statements which have found inconsistencies between congressional mandate and land use planning documents. The following is a synopsis of that information.

11. 1971 – The Wild Horse and Burro Act Passed December 16, 1971.

1974 – WRRA conducted a wild horse inventory for the entire Craig District between February 26 and March 6, 1974. The actual flight time while counting horses was 17.3 hours (Wild Horse Inventory dated April 11, 1974, Page 2, Paragraph 2). August, 1974 Helicopter Flyover Count Noted in URA's.

1975 – February Unit Resource Analysis Step III – Page WH-4, Paragraph 2 states approximately one half of the identified wild horses from the August, 1974 helicopter count were located west of the Douglas Creek Road (County Road 139) with about 10 – 15 using Texas Mountain. Paragraph 5 states "Studies have not been initiated to determine seasonal use areas. Observations have been limited to aerial surveillance. Six to ten horses can usually be found on top of Texas Mountain during the winter." Page WH-12, Paragraph 2, "Most ranchers that attended the Step II public workshops in Meeker and Rangely indicated that the presence of the wild horses would be acceptable...Their primary concern was for loss of livestock forage...." Paragraph 5, "During the public meeting, it was learned that there were horses in an area that we did not census". Page WH-14 – Step II Public Workshops: "Of the three public workshops that were held on wild horses, only one consisted primarily of people from wild horse organizations. This was the meeting held in Denver...About 90% of the people who attended this meeting indicated that wildlife/wild horse habitat was the most important use of public lands." Page WH-15, "The Rangely workshop consisted of several interest groups with stockmen being in the majority. Very few questionnaires were filled out for the Rangely workshop, about 50% thought livestock forage was the most important resource and 50% thought wildlife habitat was the most important."

1979 – Management Framework Plan Recommendation – Analysis – Decision February, 1979 "1. All horses west of Douglas Creek be removed. Rationale is the increase in oil and gas activities in this area warrants removal of the horses."

1980 – Management Framework Plan Step III, Summary, December, 1980. Paragraph 1, "The MFP Step III Decision presents a workable solution to the various conflicts identified under Step I Recommendation 2.1. The resolution is aimed at maintaining a viable wild horse population on 148,153 acres of public land, a reduction of 295,826..."This 148,153 acre area was chosen because it has the most concentrated wild horse population (their preferred habitat)." 'Key decisions to accomplish these objectives include: 1. Reserve 2,101 AUMs of forage for between 95 to 140 head of wild horses. This number is in excess of the number of wild horses in the Resource Area in 1971 at the time the Wild Horse and Burro Act was passed"

1981 – Herd Management Area Plan, Page 1, Paragraph 3, "Wild horses presently range over 443,979 acres in the Piceance Basin and Douglas Creek areas. Movement of wild horses within their range is

influenced by existing fences and seasonal factors." Page 3, Paragraph 1, "The proposal to limit the herd management area to 148,153 acres of public land was established through the land use planning process...."'"

1981 – Grazing EIS calls for a reduction of acreage to the WRRA wild horse herds, admits this decision may not be legal.

1983 – Allotment Management Plan, Twin Buttes Allotment – August, 1983, Page 8, Paragraph 2, "Currently there are approximately 200 wild horses on the Twin Buttes Allotment." Page 16, Paragraph 1, "By removal of wild horses in which case AUMs allocated to wild horses would be reallocated to livestock and wildlife."

1993 – Piceance/E. Douglas Wild Horse Removal Plan, EA-CO-017-93-045 states decisions concerning wild horse management were based on: "Manage horse herd on 140,000 acres public land...Remove all wild horses from 295,000 acres of public land and manage those areas more *intensively for livestock use.*

1995 – Colorado Northwest Resource Advisory Council. In the August of 1995 I was appointed by the Secretary of the Interior to the Colorado Northwest Resource Advisory Council (NW RAC). Our first action was to assist Colorado BLM in writing Standards and Guidelines for Livestock Grazing for our state. The Standards and Guidelines for Livestock Grazing in Colorado address Special Status Species, which include wild horses. Once S&G's for Livestock Grazing were completed the CO NW RAC then began the task of assisting the State BLM Office in writing Standards and Guidelines for Recreation. My second term ended prior to the completion of that task. Only once during my two term appointment did WRRA field personnel come before the RAC to present information on the West Douglas Creek Wild Horse Herd. WRRA personnel only addressed their current management of the herd and did not ask for advice. The Advisory Council's duties and responsibilities are advisory only, and WRRA did not request the RAC's advice. The current Colorado NW RAC was asked by the WRRA to sanction a subcommittee concerning the West Douglas Creek Herd, which was initiated in early 2003. The subcommittee has not formally met and is comprised of RAC members from oil and gas, livestock grazing, county government, off road vehicle users and an environmental group. There are no current RAC members who are wild horse advocates or who are versed in wild horse law.

1998 – White River Resource Area Gather Plan, Page 1, Paragraph 2 states, "through the planning process's the determination of habitat suitability has consistently for the removal of all horses from the West Douglas Herd Area."

12. The WRRA has based management of wild horses based on numbers, which is illegal as stated in Dahl vs. Clark. The 1981 Grazing EIS stated the reduction of acreage was probably not legal. The WRRA has a pattern of linking wild horse habitat suitability to livestock grazing. Based on the current and past management patterns of the WRRA, wild horse management is explicitly linked with livestock grazing practices and subsequently advocates, such as myself must comment on AMPs as they relate to the management and protection of wild horses.

13. In 1994, I was party to an appeal of a proposed removal of wild horses from West Douglas Creek. The removal was subsequently canceled.

14. In 1996, CWHBC appealed a round up decision and asked for a motion to stay in federal court. Points raised in the action included monitoring data, livestock use, RMP validity as well as herd area size. The judge ruled CWHBC must first exhaust the administrative process prior to presently to federal court.

15. On October 19, 1999, CO-01-97-01, I attended a hearing for CWHBC where we requested to be granted Intervenor status in an Appeal of the WRRA Manager's 1997 decision denying an Application

for Additional Active Use and Temporarily Suspending Grazing Use for the Burke Brothers, a livestock permit holder.

16. Since that time I have continued to comment on actions affecting the West Douglas Creek Wild Horse Herd and Piceance/East Douglas Herd located in the White River Resource Area.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 19, 2003.

Toni Hutcheson Moore

1. I, as a member of the Colorado Wild Horse and Burro Coalition (CWHBC) since its inception in 1989, and as a member of the Board of Directors of the American Mustang and Burro Assoc., Inc. have been concerned and involved in the management of the wild horses in the West Douglas Herd Area (WDHA). The West Douglas HA is one of the most beautiful of all the wild horse ranges I have visited in the six western states where I have been on wild horse or burro ranges. With it's varied and thick pinion juniper forests and streams, it is both rugged and peaceful. For the observant, the hidden pictographs on rock walls are gems to be cherished, reminders of the rich and ancient indigenous history of the area. The history of the horses themselves goes back to Ute travelers who brought horses to these hills before any white man arrived. When Spanish explorers Escalante and Dominguez first visited the area in 1776 they encountered mounted Utes. The dawn of the 20th century saw local cowboys capturing, breaking and selling wild horses. An area so rich in wild horse and native American history in such a beautiful setting makes my spirit soar to visit it and catch the now isolated glimpse of the last remaining wild horses in West Douglas.

2. AMBA's involvement with the West Douglas Herd Area began when we first learned, in about 1989, that West Douglas and North Piceance Herd Areas were slated for total removal. Naturita had already been "zeroed out" at that time and the Douglas Mountain herd of over 600 horses had been wiped out, with the last few holdouts being shot.

3. The CWHBC met regularly with representatives of the Bureau of Land Management during the period between 1989 and 1992 and frequently discussed concern over the future of the WDHA and BLM's plans to eliminate the wild horses from that area.

4. On July 24, 1992, I attended a meeting with BLM, permitees Robertson and Theos and oil and gas industry representatives, on the future of the WD wild horses. I , and others, presented comments for retaining the WD herd. Permitees were amenable and oil and gas testified they had seen little impact so far on wild horses by their operations. The following day we toured the WDHA with BLM.

5. On July 29th I filed a Motion to Stay the 1992 West Douglas wild horse gather (IBLA 93-134), which was later withdrawn after the BLM Area Manager, Curt Smith, agreed not to gather horses from West Douglas until a new Resource Management Plan was developed (the previous one having been done in 1981).

6. I was told by BLM that our wishes would be taken into serious consideration.

7. During the coming years, I visited the range (WDHA) several times, noting that most damage attributed to wild horses seemed to be caused by cattle, which greatly outnumbered the wild horses and have distinctly different grazing habits.

8. AMBA responded to the draft RMP in 1995 and to the proposed RMP in 1996. West Douglas and North Piceance Herd Areas were still slated for total removal.

9. In 1996, I filed a Motion to Stay and an Appeal of the West Douglas gather to prevent irreparable damage to the genetic viability of that herd by a gather aimed toward the eventual elimination of it.

10. Our organization has tried to discuss the fate of these areas with the Colorado State Director, the Area Manager and Wild Horse Specialist, and to present our concerns to the National BLM office and to the National Wild Horse and Burro Advisory Board.

11. In late summer of 1997, Don Moore, Lane Wardell and I rode the northern section of the WDHA and Twin Buttes Allotment, entering from south of Rangely. We found only one small band of approximately 8 wild horses in the area of Texas Creek and county road 109.

12. On September 3, 1998, the Bureau of Land Management (BLM) finished rounding up about 77 of what they claim are approximately 137 wild horses remaining in Colorado's West Douglas Herd Area. This roundup was in furtherance of BLM's plan to completely eliminate, or "zero out" the wild horse population of the West Douglas Herd Area. BLM scheduled the horses for immediate adoption on September 5, 1998.

13. On September 4, 1998, the American Mustang and Burro Association (AMBA) filed a lawsuit in federal district court in Washington, DC, challenging BLM's action. AMBA asked the federal court to stop BLM from turning the 77 horses over to adopters until the court had reviewed the merits of the case. AMBA argued that (1) BLM's determination that a mere 137 wild horses had caused poor soil and grass conditions on the entire 150,000 acres of the West Douglas Herd Area was arbitrary, and (2) BLM's claim that the 77 horses it removed were "excess" was arbitrary and capricious because it was based on incomplete and erroneous data. That Court upheld the round-up.

14. I last visited the West Douglas Herd Area in the early summer of 2000, where I was troubled to find only a couple of wild horses on a far ridge. After spending the night at the foot of Oil Spring Mountain, I traveled along the slopes to the lower levels in close proximity to Missouri Creek, where I encountered a group of riders on horseback who said they rode the area often. I continued along the track until Missouri Creek crossed the road, preventing me from going further with my car. Quite a number of cattle were grazing there, standing in the creek and some were defecating in it. This is common for cattle, but almost unheard of for wild horses, which will drink and then leave, behavior I have witnessed many times while observing wild horses on the range.

15. The decision to manage wild horses on only 190,130 (pg. 3-14, White River RMP-Proposed, June 1996) of the original 462,812 acres originally identified as their 1971 habitat violates the Law. The BLM premise that concentrating wild horse in the areas considered by BLM to be their "preferred habitat" has no basis in law and violates even the CFRs governing wild horse protection and management. Exclusion of West Douglas, North Piceance and large chunks of traditional wild horse territory from the current East Douglas/Piceance HMA violates both the letter and the spirit of the Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 18, 2003.

Barbara M. Flores



COLORADO WILD HORSE AND BURRO COALITION
July 7, 2005
RE:  CO-WRFO-05-083-EA


Mr. Kent E. Walter
Field Manager
White River Field Office
Bureau of Land Management
73544 Highway 64
Meeker, CO 81641


Dear Mr. Walter:

Again, we appreciate the ability to comment on yet another document concerning the West Douglas Creek Wild Horse Herd.  As you are aware, Colorado Wild Horse and Burro Coalition members are intimately affected by BLM decisions concerning the West Douglas Creek Wild Horse Herd, as members who recreate, live, work and enjoy a variety of uses as well as the intrinsic values located in western Colorado.  The West Douglas Creek Wild Horse Herd is a significant part of those values.  We are confused why BLM withdrew EA CO-WRFO-03-050 published in March of 2004.  That document is very similar in nature to the above referenced EA CO-WRFO-05-083, only the current document is more limited in actual analysis of the issues.  The current EA does not address the withdrawal of the previous document yet only offers two alternatives which mirror Alternatives A and C in the earlier EA.  The above referenced EA is woefully inadequate and does not comply with National Environmental Policy Act (NEPA).


ACREAGE

Upon review, we find there have been no interim planning documents other than wild horse removal documents concerning management of the West Douglas Creek wild horses since the ROD/EIS of June 1996.  We find that wild horse herd area habitat has been shrinking since the draft of that document.

Page 2

The White River Field Office reported to the Colorado State Office on numerous occasions the West Douglas Creek Herd Area consisted of 271,936 BLM acres along with 30,352 other acres. This information has also been submitted to the National Program Office (NPO) and published extensively for public use and in Reports to Congress, (see Seventh Report to Congress, 1988 page 24, Eighth Report to Congress, 1990 page 28). Yet the current EA states the herd area encompasses 123,387 acres of BLM administered lands and 4,754 acres of private land. We are not presenting a new question, merely an unanswered one. The 1994 Draft WRRMP presented a loss of 111,418 acres from previously published acreage, with no legal reason presented. The Third Report to Congress, June 1980 published an error indicating the area around West Douglas Creek was the only major wild horse area in Colorado (page 8). While that was corrected, we find it impossible to believe BLM would continue to allow a "mistake" to be published in state and national documents for some 23 years after the Act passed. Again, we are requesting how was the acreage removed, when did BLM decided to remove the 174,147 acres, by what authority and/or planning document was this accomplished?

Since BLM does not have data in place to confirm wild horse range in 1971 as required by the Wild Free Roaming Horses and Burros Act, nor are copies of the initial flyover census from February 26 - 28 in BLM's possession, we are unwilling to accept BLM's arbitrary and capricious action to continually reduce wild horse habitat to accommodate narrow focused management actions.

We can not overly state our concern for BLM's withdrawal from consideration the EA authored in 2004, (which was funded by a one time additional expenditure from Congress in the amount of $14,000) which stated oil and gas was the primary reason for zeroing out the herd. Why was that document created and why the sudden withdrawal, what was the legal precedent? The current document, only offers two alternatives, which were also considered in the previous document. EA WRFO-05-083 does not acknowledge any range of alternatives (only two, total elimination of the horse herd and management in smaller genetically unviable numbers) and does not fully evaluate the impacts of genetic diversity, biotic needs for wild horses or the impacts of other resource values or those of vested interests (livestock and energy development) as required by NEPA. A range of alternatives, especially one which considers management of a genetically viable herd between 160 and 180 animals in the original herd use area was not analyzed in the current EA even after numerous public comments in the preceding EA noted this deficiency.

Page 3

## GENETIC VIABILITY

A disingenuous effort to comply with the WHBA is seen throughout this document, but noticeably so with BLM's assertion this action provides a "self-sustaining" population of healthy animals as required in the Code of Federal Regulations (CFR). Studies by Dr. Gus Cothran and Dr. Francis Singer refute the White River Field Office's claim this alternative is compatible with long term genetic viability. In fact, when Dr. Cothran analyzed blood samples from this herd in 2001, two previous roundups had already occurred (1996 and 1998) which resulted in removal of a significant number of animals. Even with CWHBC providing the supplies and urging to the wild horse specialist, Valerie Dobrich and John Meilhoff, Field Office Manager, samples were not submitted for genetic testing. When Dr. Cothran received the samples from the 2001 roundup, he was not provided with a topographic map of the region, historic information of the area (including eastern Utah), a time line of incoming settlers and the types of horses they brought. Also information readily available in historical archives. Dr. Cothran was not provided with information that wild horses captured from the West Douglas Creek area were nominated to the Spanish Mustang Registry, during Mr. Brislawn's initial evaluations. We believe the data Dr. Cothran received was not complete, nor presented in good faith. If BLM was concerned about genetic viability, samples would have been submitted prior to BLM's intense efforts to remove horses. We suggest that BLM submitted samples from the 2001 roundup in hopes that Dr. Cothran's analysis would indicate a total loss of genetic viability, thereby enabling efforts to remove the animals as they were not a "self-sustaining" herd. Nevertheless, we are concerned the herd's low genetic variability is compounded by BLM's continued mismanagement since the 1971 Act. It would appear BLM did not have intentions to manage wild horses in West Douglas Creek from the inception of the Act, as public comments during initial scoping meetings did not call for removal only management. As evidenced by the wild horses still present in West Douglas Creek, this area has been appropriate habitat and with proper resource management will continue to support wild horses along with other natural values of the land.

The document at page 14, Population Color Balance states three grey horses were captured and removed in 1996. Personal observations, notes, adoption logs and film were unable to identify three gray horses.


## WILDLIFE

EA CO-WRFO-050-83 acknowledges the Colorado Division of Wildlife (CDOW) has exceeded long term elk populations objectives by 2 to 3 times. Again, we can only ask why? This information was not analyzed in the EA along with

Page 4

alternatives concerning predator management, thereby eliminating the public's
ability to supply meaningful dialogue on this subject. BLM fails to note that at
the time of passage of the Act elk numbers were listed at an insignificant 7
animals. Either that translates into poor census data, or BLM has supported, or
at the very least ignored the impact of CDOW managing the elk herd as a
commodity and the impacts to "drought stricken" BLM administered public
lands. BLM fails to elaborate on CDOW's attempt "to install innovative and
aggressive methods to reduce elk populations in GMU 21 with the 2004
season", page 34 of EA. We can only surmise the results of CDOW's methods
were unavailable for
public review six months following the end of hunting season. BLM neglects to
research the impacts on the vegetation of a growing elk population as well as
CDOW endeavors to increase the deer population by 50% . WRFO BLM did not
address these actions as to their impacts to wild horses, livestock grazing, as
well as the energy industry.

LIVESTOCK

The 2004 EA stated the range was impacted by several years of drought, and
reduction of livestock would need to be implemented, yet this document
conspicuously omits that information. The Twin Buttes Allotment, the major
livestock operation in the herd area, has implemented different management
protocols since the 2004 EA, along with altering the grazing AMP with approval
of range conservationist, Bob Fowler. Mr. Fowler did not provide notification to
the interested public of these changes, again thereby jeopardizing the
interested and affected public's input. We are unsure why this information
would not be presented in the current EA along with scientific analysis of the
reasoning and subsequent findings of the alterations of livestock management
actions.

In this document, BLM states the forage allocation for wild horses will be
derived from livestock permitted use. We understand that permits to graze
livestock on public lands is a privilege, not a right, as defined by the Supreme
Court. In the 2004 EA, BLM states there is currently 9,080 AUM's of forage
allocation available to livestock, page 13. This same document states, "The
carrying capacity of the Herd Area would be 9,080 AUMs." The current EA at
page 50 states the exact same language. It would be a likely conclusion based
on these two documents that BLM has over allocated grazing privileges based
on available vegetation, especially in a stated time of drought. BLM in the
narratives for these documents did not consider elk, deer, or wild horse
vegetative requirements. Vegetative analysis states there were "approximately
1,700 acres of rangeland within the herd area that do not meet the Standard
for Public Land Health for vegetation, which is directly attributable to wild horse
utilization" page 62, without benefit of defining the areas. Yet, BLM fails to

Page 5

note in the Cottonwood Pasture Analysis, that wild horses have not utilized that area in the northern portion of the Herd Area since almost all of the horses were removed in the 1989 roundup. BLM also fails to note the same area was not in a decline at the time the wild horses were removed. A roundup in 1996 removed wild horses from the entire herd area (with several from the Cottonwood Pasture), yet the removal plan noted wild horses were causing an impact only in small portion of the southern part of the herd area.

A majority of the impacts associated with each of these "pastures" fails to note that wild horses do not "hang out" around the watering holes, and will travel up to 10 miles daily for water. Yet livestock rarely move more than 2 miles from water sources and must be actively forced to do so. It is absurd and insulting to the general public to present data which states less than 100 wild horses impact the land more than a year round 1200 head cow/calf operation. While we use that figure, the EA was noticeably absent of the number of cows which utilize the wild horse herd area along with how many animals utilized each "pasture" for what length of time.

Intrinsic values or vested interests, yet there is no meaningful analysis to determine their impacts on wild horses. While the White River BLM Field Office moves to confine wild horses to less than 1% of original habitat of 1971, we can only deduct that the "multiple use" concept excludes wild horses. With the Act stating wild horses are to be managed "principally, but not necessary exclusively" on their range and are to be considered "comparably" with other resource values in the land use planning process, we can only conclude, the White River Resource Office of Bureau of Land Management has in the past and continues to act arbitrary and capricious concerning the management of wild free roaming horses.


OIL AND GAS DEVELOPMENT

While we agree that energy development can exist with wildlife, especially with intent to fulfill a congressional mandate to protect wild horses. When any activity on public land exceeds impacts and levels outlined in planning documents, a comprehensive analysis via an Environmental Impact Statement is warranted.

Upon review of APD's (Applications for Permit to Drill), issued after the passage of the Act and before the first land use planning decision in the January, 1980 MFP, we find there were no stipulations placed to protect wild horse sensitive

Page 6

habitat (ie, foaling areas or critical winter habitat).   Why?  BLM was still in the
information gathering phase for wild horse data, and certainly had not publicly
reached a decision concerning management.  BLM actively chose to ignore any
potential impacts to the herd prior to coming to the conclusion it was not
feasible to manage wild horses in this area.  Again, we can only surmise BLM
chose to arbitrarily and capriciously avoided their legal obligation to protect the
West Douglas Creek Wild Horse Herd.

Only one oil and gas company to date has stated concerns that wild horses in
the West Douglas Creek area may impact their operations.  Encana Oil and Gas
employees indicated they were informed by WRFO Acting Field Office Manager
Jim Cagney, that the company should protest long term management of the
West Douglas Creek Herd due to potential impacts to their operations.

During our long involvement with this herd area, BLM has not worked toward
consultation, coordination or communication on a direct basis with wild horse
advocates and energy companies to ascertain if there are truly impacts or if
there are mitigation actions which would be agreeable to both values.
Employees of energy companies have been very vocal in reporting harassment
and death of wild horses to BLM, as well as sharing this information with wild
horse advocates. This is an unexplored partnership which has yet to be
analyzed by BLM.  If BLM determined energy development would have such a
significant impact to wild horses, we assert they would not have withdrawn the
earlier EA.  If media reports are accurate and BLM is truly concerned that oil
and gas will displace wild horses an analysis via an Environmental Impact
Statement (EIS) would be certainly be warranted under NEPA regulations.

SOCIO ECONOMICS

The current EA states big game hunting is an important income generating
activity in Rio Blanco County.  In the preceding paragraph the EA states
agricultural expenses are greater than its income.  BLM did not
comprehensively analyze these impacts nor any other use of public lands.  With
the population of western Colorado increasing, hiking, mountain biking, wildlife
photography and others all contribute to the local economy.  Income which
could be generated by  public viewing of wild horses was also not analyzed.
The potential for solitude and prime recreational opportunities would be
enhanced with the continued existence of wild horses in this area.  If data
submitted for the EA is correct, it appears that BLM efforts in continuing to
promote of livestock grazing, as it is currently administered for this area, is a
tremendous financial drain on the economy of the county as well as valuable
BLM resources.  BLM also fails to analyze the impacts of oil shale development
on the Piceance-East Douglas

Page 7

Wild Horse Herd, which could significantly impact habitat, biotic needs and long term genetic viability, which could potentially place the White River Field Office in the position of not having a wild horse herd.

WILDERNESS

While BLM asserts "Removal of wild horses would allow for improvement of within northeastern portions of the Oil Springs Mountain WSA", they have not provided monitoring data from that portion of the WSA in any planning documents evaluated by CWHBC within the past 14 years. Livestock grazing while allowed, is quite limited due to the lack of consistent water sources and fencing to hold cattle there. CWHBC asserts that wild horse habitat and the wilderness study area are quite compatible due to the very nature of the WHBA which directs BLM to maintain a current monitoring and inventorying. Under the previous document, EA CO-WRFO-03-050, it was apparent to us that BLM wanted to eliminate the wilderness qualities from the Oil Springs Mountain WSA by constructing a fence through a portion of the area and thereby reducing wild horse habitat acreage in the process. Since wild horses evolved to a finished form on this continent, they are a native, albeit, reintroduced species, which only enhances the wilderness experience in the WSA. Disturbance from helicopters during roundup operations would only nominally impact the area and for a very short time frame. CWHBC is completely opposed to any fence building, trap building, and oil and gas development within the Oil Spring Mountain WSA. Any development will severely impact the naturalness, solitude and opportunities for primitive recreation as well as impact all wildlife habitat, this includes wild horses. Since an overwhelming majority of the White River Field Office is leased, we feel wild horse habitat management and wilderness offer a premier opportunity to promote "a thriving, ecological balance" as defined in the WHBA.

CONCLUSION

The West Douglas Creek Wild Horse Herd is significant not only to residents of Rio Blanco County and western Colorado, but to the entire state of Colorado and the American public. Historically this region is one of the first to have wild horses reintroduced during the colonization of this country. The Ute Indian tribe was one of the first tribes to acquire horses from settlements located in Utes, Papers #17)in the early 1600s. Settlement of western Colorado occurred later than many other areas of the state due to remoteness and the determination of the Ute Indians to maintain their lands. Many residents of Rio Blanco County only have to look back 2 or 3 generations to family members who came to this area

remembering fondly the abundant wildlife, vegetation, native people and yes, wild horses. Historically and culturally the eradication of the West Douglas Creek Wild Horse Herd will be a significant loss not only the American public, but a gross and negligent violation of the Wild Free Roaming Horses and Burros Act. We urge the White River Field Office to withdraw EA WRFO-05-083, implement an EIS which will comprehensively analyze the current situation in the West Douglas Creek Wild Horse Herd. We are requesting a decision that reflects long term management of this herd in genetically viable numbers in acreage reflecting the original habitat which reflects the spirit and wishes of the American public.

Sincerely,

Toni H. Moore
Colorado Wild Horse and Burro Coalition

<u>By Telefax and U.S. Mail</u>

2406 15th Avenue Court
Greeley, Colorado 80631
970-302-0766
bflores@colostate.edu
7 July 2005



Kent E. Walter, Field Manager
USDI BLM
White River Field Office
73544 Highway 64
Meeker, Colorado 81641
Attn: WDHA EA

Dear Sir:

Thank you for allowing the American Mustang and Burro Assoc., Inc. to submit comments as part of the public review of the West Douglas Herd Area Amendment to the White River Resource Management Plan, (CO-WRFO-05-083-EA). AMBA would not be serving its members or the public well if we did not strive for implementation of the Law in preserving and managing our wild horses.

While your letter states that Alternative B is BLM's preferred alternative, AMBA does not find either alternative A or B acceptable, but instead suggests that the Bureau take an honest look at alternative D, with one small variation. Instead of an AML range between 100 and 207, which would produce an average AML of 149 horses for 1786 AUMS, since Alternative D allows 2232 AUMs for wild horses, the correct range would be 125 to 259, for an average of 186 wild horses. This alternative is not developed in the EA, as it ought to be, but instead simply states it was "Eliminated From Detailed Analysis". AMBA would be very interested in knowing why this alternative was eliminated and in seeing such a detailed analysis. This Alternative should not require introduction of outside mares to maintain genetic viability. (What happened to the "Three grey horses ..captured and removed" during the 1996 gather, as there seems to be no record of them and no recollection of seeing them?) We STRONGLY object to management at an AML so low that mares would have to be introduced from other herd management areas. This is not managing for a viable population. Additionally, comments on page 16, related to Dr. Cothran's study seem to indicate that this herd is genetically unique, with no "'undesirable' genetic traits".

AMBA does not accept the theory that wild horses use 1.25 AUMs per animal, when cows use 1.0, as prevailing science conducted IN THIS AREA does not support this premise. Domestic horses grazing on BLM

allotments are charged for 1.0 AUMs of use per horse, and they are often larger horses than those found in wild horse herds. This allocation is supported in **Diets of wild horses, cattle, and mule deer in the Piceance Basin, Colorado** by Richard Hubbard in 1975. His thesis study determined that cows and horses used almost the same amount of forage, with cows using slightly more.

It is stated on page 11 of the EA that "The initial aerial census recorded 9 wild horses in the area now recognized as the West Douglas Herd Area". However, BLM is well aware that at public meetings conducted soon after this census that members of the public drew staff's attention to numerous areas where horses were missed during this flyover. The BLM has used the excuse of rough terrain and dense woodlands hindering the gather of wild horses and making it dangerous, as just one of many excuses for eradicating the West Douglas herd. This same terrain, however, was never considered a barrier to conducting an accurate census of wild horses from a Bell-47 helicopter, in 1974. Part of this inadequacy was address by Bill Lawhorn in the WILD HORSE INVENTORY February 26 to March 6, 1974 as he wrote, "The Bell-47 was inadequate because it would not reach the higher altitudes where a large percentage of the horses were found." More accurate counts are much more likely in areas not so heavily forested as the Douglas Creek herd unit. Neither the word nor the spirit of the Act allows the Bureau of Land Management (BLM) to manage wild horses only in the exact spot where they were standing when the less than reliable census was taken in 1974, three years after passage of the Act.

There seems to be some question and confusion within BLM regarding the acreage of the West Douglas HA. On page 9 of this EA table 2-1 indicates there are 123,387 acres in the "Entire Area" that would be "allocated to wild horse management" under Alternative B. The URA-Step 3, pg. WH-4, from Feb-75 had the Douglas Creek wild horse herd unit with a total of 187,970 acres (182,157 BLM and 5,810 Private). The more recent "BUREAU OF LAND MANAGEMENT HERD AREA STATISTICS 1996" indicates there are 274,019 BLM acres, with an addition 28,272 "other" acres in the West Douglas Herd Area, while the Draft WHITE RIVER RESOURCE MANAGEMENT PLAN from June 1996, on page 2-55 has the WDHA acreage at 190,870. AMBA is very interested in learning why there is such a large discrepancy in the number of acres, especially since the West Douglas horses have historically ranged as far as the Utah border to the west, and may be closely related to wild horses since eradicated from Utah and the now non-existent Douglas Mountain herd to the northwest.

As the February 2005 wild horse census indicates, the Texas Creek "pastures" are critical wild horse winter range. We suggest that a reduction in livestock be immediately implemented in these pastures to ensure wild horses will have access to adequate winter range. There is

currently admitted 3550 AUMs of livestock use spanning nearly a 7 month period from Nov 1 through May 20, with little growing season rest, an average of 463 cows per month.

The EA assumes, as noted on page 12, that the Texas Mountain area is the wild horse's "preferred habitat". This is based on census data gathered only in a one month period from early February to early March. In order to get a more realistic picture of the wild horse use and migration patterns in this area, seasonal censuses should be conducted at least once in the spring, summer, fall and winter for at least one year. The only available data so far would tend to indicate a preference for the Texas Mountain area in February, or as a winter range. To assume from this limited information that wild horses spend twelve months a year and consume 1164 AUMs of plant use (for 97 horses) in this one area is unwarranted. If the BLM were to spend some time studying and understanding wild horse behavior they might understand that wild horses are more like wildlife than like domestic livestock.

The extensive damage done by cattle along the low-lying areas and streambeds in the Texas Creek area, as observed in Nov 2004, would indicate a reduction in livestock is certainly warranted, for the health of the range and other resources and users.

Page 11 states: "The White River Field Office currently manages a population of between 135 and 235 wild horses on the 190,000 acres in the Piceance-East Douglas Herd Management Area". Yet, it appears that the mismanagement of this area has resulted in a current population estimate of fewer than 100 horses after the February "reconnaissance". Given these low numbers in Piceance/East Douglas and the eradication of the Douglas Mountain HA in the late 70s and early 80s, the public is owed a viable herd in West Douglas.

It is obvious to the American public that the Bureau of Land Management, in coordination with the private livestock industry, has embarked on an agenda that will totally eradicate the Nation's wild horses. As we see one after another of the HMAs experience total removal or management at an AML far below viable population requirements, we are very much aware of the plan.

We were very disappointed to learn, from letters between Senator Wayne Allard's office and the White River Field Office, with confirmation in a telephone conversation with Forrest Nelson, head of the Northwest RAC Wild Horse Committee, that the West Douglas wild horse herd is being pushed for total removal solely to eliminate competition with Twin Buttes Ranch livestock and to appease Davey Robertson. Mr. Nelson also stated that he did not think there were ANY wild horse representatives on the Northwest RAC. Why is this, when wild horses are such an important resource on northwest Colorado BLM lands?

The West Douglas wild horse herd is a genetically unique and historically rich herd that has far more value to the American public and to local residence than a single private livestock operation. To manage West Douglas primarily for wild horses and the archeological treasures that abound in this area, as a magnificent history lesson would not only be the wisest use of this resource, but would to some degree rectify the terrible wrong done when the Douglas Mountain herd of over six hundred horses was exterminated.

We need to ask ourselves: Are wild horses a resource, or a use? It is the way we answer this question that determines how they will be managed.

Sincerely,

Barbara M. Flores
Board of Directors


Cc: Kathleen Clarke by Telefax

The Cloud Foundation
July 8, 2005
RE: CO-WRFO-05-083-EA

Mr. Kent E. Walter
Field Manager
White River Field Office
Bureau of Land Management
73544 Highway 64
Meeker, CO 81641

Dear Mr. Walter;

Thanks for the opportunity to comment on the current EA for the West Douglas Wild Horses. It is unusual to have EA's so close together in my experience. I assume the one last year was withdrawn because of the indefensible assertion that wild horse cannot exist with oil and gas activities. They certainly do in the Jicarilla Herd in Northern New Mexico. And before the Bonanza herd in Utah was zeroed out by BLM, I took pictures of wild horses standing in the shade of the pump jacks. Wild horses are clearly not incompatible with these activities.

But, moving right along, this year a new EA would zero out the West Douglas herd or manage them at genetically non-viable numbers. What kind of a choice is this? I would think the agency would feel embarrassed to put these target herd numbers out there. 29 horses? 0-50?

As you know, Drs. Cothran and Singer have determined that a <u>minimum</u> of 150 wild horses must be maintained to avoid the loss of genetic variability. Therefore, managing at this ridiculously low number is a violation of the Wild Horse and Burro Act which requires that BLM manage for <u>sustainable herds</u>. This EA clearly violates that clause and should be withdrawn.

<u>Why is the herd area shrinking—from 300,000 acres as reported in BLM's last report to Congress in 1995 to under 130,000 acres in this EA</u>? I find no explanation for this in the EA and believe an answer must be forthcoming before any decision can be rendered.

What seems clear is that BLM does not want to manage wild horses in this area at all. A few years back, BLM's reason for wanting to zero out the herd was they were too difficult to manage and the terrain was too rugged.

THE *Cloud*
FOUNDATION

107 S. 7th Street   Colorado Springs, CO 80905   719.633.3842   www.thecloudfoundation.org

-2- The Cloud Foundation comments on EA CO-WRFO-05-083-EA

Fortunately for the wild horses and the American public, this is not a legal reason for BLM to rid themselves of wild horses in West Douglas Creek--then or now.

BLM must realize that not just people in Colorado but around the country love this herd and do not want to see them destroyed. BLM must also realize that this herd has special historical significance. It is perhaps the oldest wild horse herd on the Western slope of the Rockies. The Ute Indians were some of the first tribes to acquire horses from settlements to the south in the early 1600's and wild horses have found refuge in this rugged landscape ever since.

In spite of public sympathy and interest in preserving wild horses in West Douglas Creek and their historical significance to the area, BLM has offered two alternatives for management, both of which would lead to the destruction of this valued resource.

We request that any BLM decision regarding the West Douglas Creek Wild Horse Herd include management for genetically viable numbers in acreage reflecting the original habitat.

We urge the White River Field Office to withdraw EA WRFO-05-083. And we believe an Environmental Impact Statement (EIS) would certainly be warranted under NEPA regulations, which will comprehensively analyze the current situation in the West Douglas Creek Wild Horse Herd.

Sincerely,

Ginger Kathrens
Executive Director,
The Cloud Foundation



THE *Cloud*
FOUNDATION

107 S. 7th Street   Colorado Springs, CO 80905   719.633.3842   www.thecloudfoundation.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November, 2003 I sent a true copy of Appellants' Memorandum in Support of Motion for Summary Judgment and In Opposition to Intervenor's Motion for Summary Judgment and Respondent's Concurrence with Intervenor's Motion to the following by facsimile and sent by Federal Express (Monday delivery) to the following at the addresses listed below:

Andrea Gelfuso Goetz, Esquire
Office of the Regional Solicitor, Rocky Mountain
U.S. Department of Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215

Michael Marinovich, Esquire
Brooks & Associates, P.C.
999 18th Street, Suite 1605
Denver, CO 80202

Valerie J. Stanley

-19-

encompassing the Twin Buttes Allotment.

Respectfully submitted,

*Valerie J. Stanley*

Valerie J. Stanley
329 Prince George Street
Laurel, MD 20707
(301) 549-3126
Counsel for Appellants



Valerie J. Stanley
329 Prince George Street
Laurel, MD 20707
(301) 549-3126

Attorney for Appellants

## UNITED STATES DEPARTMENT OF INTERIOR

## OFFICE OF HEARINGS AND APPEALS

| | |
|---|---|
| **AMERICAN MUSTANG AND BURRO ASSOCIATION, TONI AND DON MOORE AND BARB FLORES,** | : <br> : <br> : <br> : |
| **Appellants** | : **CO-01-99-01** <br> : <br> : |
| **v.** | : **Appeals of the Field Manager's** <br> : **Final Decision dated July 30, 1999** <br> : **concerning Grazing Permit** <br> : **#1456 on the Twin Buttes** |
| **BUREAU OF LAND MANAGEMENT,** | : **Allotment, White River Field** <br> : **Office, Colorado** |
| **Respondent** | : |
| – – – – – – – – – – – – – – – – – – – – – | : <br> : |
| **TWIN BUTTES RANCH CO.,** | : <br> : |
| **Intervenor** | : |

## APPELLANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO INTERVENOR'S MOTION FOR SUMMARY JUDGMENT AND RESPONDENT'S CONCURRENCE WITH INTERVENOR'S MOTION

Appellants, Toni and Don Moore, Barb Flores and the American Mustang and Burro

Association, will demonstrate herein that there are no material facts in dispute and that, as a

matter of law, 1) they are proper persons to challenge BLM's issuance of a grazing permit to the

Twin Buttes Ranch Company; 2) the issue of whether the grazing permit was properly granted is ripe for adjudication even though BLM has instituted a process to amend the White River Resource Management Plan to "identify the most appropriate strategy for managing wild horses in the West Douglas Herd Area;" 3) appellants' complaints with regard to their exclusion from the Section 8 review process are justiciable [1] and 4) BLM's decision to renew the Twin Buttes' grazing permit, which was based on BLM's opinion that forage could be allocated to livestock instead of wild horses, since the 1997 White River Resource Management Plan had provided that wild horses were not to be allowed to live in the West Douglas Herd Area, violates the Wild Free-

---

1 On June 8, 1999, the Animal Legal Defense Fund (ALDF), submitted a protest to BLM on its proposed grant of a grazing permit to the Twin Buttes Ranching Company ("Twin Buttes") and enclosed a copy of comments submitted on May 9, 1999. Exhibit 1. That document made clear that the protest was being submitted on behalf of Barb Flores, Toni and Don Moore and the American Mustang and Burro Association (AMBA). Barb Flores and Toni and Don Moore are persons who enjoy using the public lands which are part of the Twin Buttes' allotment and AMBA is a membership organization which includes persons who enjoy these same areas. Similarly, on September 2, 1999, when ALDF filed an appeal of the Area Manager's decision to grant the Twin Buttes' permit, it noted that it was doing so on behalf of Barb Flores, Toni and Don Moore and AMBA. Exhibit 2. AMBA also filed an appeal. Exhibit 3. Thus, although this case has been entitled Animal Legal Defense Fund v. BLM, the caption of the case is incorrect as ALDF filed the protest and appeal in its capacity as counsel for these parties.

Roaming Horses and Burros Act (WHBFA), 16 U.S.C. §1331 et seq. and the Federal Land Policy Management Act (FLPMA), 43 U.S.C. § 1701 et seq.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### 1. The Twin Buttes Allotment and the West Douglas Herd Area

The Twin Buttes Ranch Company is the primary livestock permittee in the West Douglas Herd Area (WDHA). A large portion of the Twin Buttes Allotment lies within the WDHA in northwestern Colorado.

In 1983, seven allotments were combined in an Allotment Management Plan (AMP) for the Twin Buttes Ranch Company. The allotments combined under the plan were: Cottonwood, Moonlight, Lower Horse Draw, Water Canyon, Texas Creek, West Creek, and West Douglas Creek. Exhibit 4, 1983 Twin Buttes Allotment Management Plan (1983 AMP). The Texas Creek allotment was noted to support another ranch operation of the Steele Brothers in common with the Twin Buttes Ranch Company.

The 1983 AMP described, "major problems and conditions which are either a part of the current grazing system or directly affect the utilization of range forage by livestock," Id. at 12. Namely, these problems were 17,000 acres of unsuitable range (19,000 acres if all minor steep topography were included), lack of access trails which inhibits the spring/fall migration of cattle through the area, lack of watering facilities, lack of exterior fences along portions of the eastern boundary, continuous use in the creek bottom areas of Douglas Creek. See 1983 AMP at 12-14. The AMP also noted that, "present trend on the allotment is 1513 acres improving condition, 114,043 acres are in static condition and 19,046 are in declining condition," Id. at 8. The AMP

listed various improvements that had been made to the allotment as well as 28 separate ones, which were to be completed in the future. 1983 AMP at 30. Many of the improvements that were deemed necessary and were to be made were associated with the East and West Texas Creek and Douglas Creek allotments. Id. The AMP also cautioned,

> Upon completion of the interior and boundary fencing and sufficient waters and vegetation manipulations to provide sufficient forage and water, the proposed grazing system will go into effect. It should be emphasized that without adequate waters and vegetation manipulations, the proposed grazing system would not function.

1983 AMP at 33. Not all of the proposed improvements were made, however. BLM stated --- thirteen years later --- that the reason they were not implemented was due to a "lack of range improvement projects and the money to construct them," Comments and Responses to the 1996 Twin Buttes AMP/EA, attached hereto as Exhibit 20, at second page of comments.

## 2.    BLM's Planning for Public Lands in the West Douglas Herd Area and Appellants' Involvement with Those Land Use Issues

Dr. Donald Moore has lived in northwestern Colorado almost his entire life. Donald Moore Aff, Exhibit 5. He has ridden on horseback in the area designated as the West Douglas Herd Area (WDHA); on these trips he has always searched out and has often seen wild horses. Id. at ¶¶ 5-8 As a young man, he worked for a livestock operation, which grazed cattle in the area of the WDHA. Having lived and worked in the area, he is very familiar with the area, its history and the presence of wild horses and livestock allowed by BLM to graze there. He saw horses living in the area of the WDHA when the Wild Free Roaming Horses and Burros Act was passed in 1971. Id. at ¶ 13.

Toni Moore has gone to visit the WDHA for the purpose of enjoying the beauty and solitude of the area and viewing wild horses there. Affidavit of Toni Moore, Exhibit 6 at ¶¶ 4-8. Similarly,

-4-

Barb Flores, an officer of the American Mustang and Burro Association (AMBA), has visited the WDHA for the purpose of appreciating the beauty of the area, including the opportunities the area provides her for viewing wild horses there on numerous occasions. Affidavit of Barb Flores, Exhibit 7  The American Mustang and Burro Association (AMBA) is a national non-profit member organization dedicated to the protection and preservation of America's wild equines, service to adopters, and public and adopter education. Exhibit 10  AMBA has members who have gone to view the wild horses in the WDHA and will continue going to this area in the hopes of seeing wild horses and enjoying their beauty. Id.

Since at least 1975 and continuing through the 1970s and 1980s, BLM has concluded that wild horses should be eliminated from the West Douglas Herd Area. See generally Exhibit 8a, Summary of Land Use Planning Decisions for the White River Resource Area, 1975 to present, and 8b (BLM Hand-drawn Maps). The 1981 Draft Environmental Impact Statement on grazing management, Exhibit 8c (excerpts), declared that wild horse herds would be maintained "within the best habitat of their present range, while simultaneously satisfying the needs for various other resource considerations," 1981 EIS at 7  One of these considerations was that "increase in oil and gas activities in the area warrants removal of the horses," Exhibit 8a at 2. In addition, the decision to completely remove all the horses in the WDHA represented a "compromise" whereby horses would be allowed to occupy only 148,153 of the original 295,826 acres that they occupied at the passage of the WFHBA. See Exhibit 8d, Excerpts from Herd Area Management Plan.

Since at least 1989, because of their interest in the area for its own sake and because it is the habitat of wild horses, both Toni Moore and Barb Flores have been actively engaged in many aspects of the land use planning efforts, including the allocation of forage between livestock, wild

-5-

horses and wildlife for areas within the WDHA and surrounding areas. <u>See</u> Affidavit of Toni Moore, Exhibit 6, ¶¶ 9-16 and Affidavit of Barb Flores, Exhibit 7, ¶¶ 2-15.On March 24, 1995, AMBA commented on the White River Resource Area Draft Resource Management Plan expressing concern over the allocation of forage among livestock, wild horses and other wildlife. <u>See</u> Affidavit of Barb Flores ¶ 8.

Specifically, AMBA commented,

> The 1981 White River Resource Area Grazing Management FEIS states short term forage allocation for all species in the area to be at 183,460 AUMs and long term allocation to be at 230,330 AUMs, with long term allocations for livestock to reach 156, 630 AUMs by the year 2000.

> Page 2-52 of the draft RMP states the allocation for livestock to be 126,490 AUMs in the long term. (This still gives livestock interests no less than 55% of the total forage allocation available, and as high at 63.4%) . . . 2,100 AUMs is currently allocated to wild horses and in Alternative C a maximum of 4,800 AUMs would be allocated to wild horses. This gives wild horses between .9% and 2% of the long range forage allocation. It appears that wild horses are definitely getting the short end of the forage allotment stick and that <u>private</u> livestock interests continue to get the lion's share. . .

> Alternative C might result in a decrease in livestock AUMs of 2,700, a 2.1% reduction of the short term allotment and a 1.8% reduction of the long term amount. <u>This need for reallocation of AUMs is based on the premise stated on pages 4-5 and 4-12 of the draft RMP, that it would be necessary to decrease livestock forage allocation in order to increase wild horse and wildlife forage. This is a very small % of decrease in the number of livestock to support retention of a national treasure.</u> . . .

> Due to the past and future increase in energy development, we feel that the Texas Creek HMA should be expanded to include all of the West Douglas Herd Area, so that the horses may use whatever area is necessary within their current range to obtain forage as an additional 4,000 acres is disturbed by oil and gas development in the area.

AMBA Comments, Exhibit 9.

BLM made no changes to the RMP in response to these concerns, and therefore, on August 2,

1996, AMBA appealed the adoption of the White River Resource Area Proposed Resource

Management Plan and Final Environmental Impact Statement. See Exhibit 10. In response to

AMBA's August 2, 1996 appeal, BLM responded,

> There is no need to make changes to the Proposed RMP as a result
> of your protest. This decision completes the administrative review
> of your protest. The Interior Board of Land Appeals (IBLA) does
> not hear appeals from a decision by the Director of the BLM on
> protests regarding RMPs. Any person adversely affected by a
> decision of the BLM official to implement some portion of a RMP
> may appeal such action to IBLA at the time the action is
> proposed for implementation.

June 13, 1997 Letter from the Assistant Director for Renewable Resources and Planning,

Exhibit 11 (emphasis supplied) BLM urged Ms. Flores to work with BLM as it implements the

RMP. Id.

Both Barb Flores, on behalf of AMBA (IBLA 96-490), and Toni Moore, as an individual,

(IBLA 96-492) challenged the 1996 White River Resource Area Wild Horse Removal

Plan/Environmental Assessment by appealing that decision to the IBLA (hereinafter referred to as

the 1996 Removal EA appeal) and filed motions to stay the removal. Specifically, that appeal

challenged the decision of the Area Manager authorizing a gather and age selective removal of

horses determined to be excess from the Piceance Basin portion of the Piceance-East Douglas Herd

Management Area and the Texas Creek portion of the West Douglas Herd Are, as well as the

complete removal of all horses permanently residing outside any designated Herd Area. See Animal

Protection Institute v. BLM, 151 IBLA 396 (2000).[2]

---

[2] While the 1996 Removal/EA appeal was pending, in 1996, Toni Moore and Barb Flores

In that appeal, Toni Moore and AMBA also attempted to challenge the Area Manager's reduction of horse habitat by approximately 295,826 acres. BLM argued that the reduction of horse habitat was not involved in the Area Manager's July 2 decision but had been included in the Final EIS prepared for the White River RMP published July 5, 1996, three days after the decision which was the subject of the appeal in API. Indeed, BLM contended that the issue of acreage reduction was "not subject to any review in the absence of further action by BLM to adopt or implement the EIS/RMP." API, 151 IBLA 399 (emphasis supplied) The Board agreed with BLM and held,

> . . .to the extent appellants seek to raise the issue of the diminution in horse habitat area contemplated in the July 5 EIS, that matter is not properly before the Board at the present time. While the EIS has been finalized, no record of decision adopting it has been issued. It is, thus, neither ripe for direct review nor is it properly subject o collateral review in the instant proceeding.

Id., citing, Order of August 22, 1996, at 3.

On February 15, 2000, when it issued is opinion on appellants' appeal of the July 2, 1996 decision, the Board commented, " [w]e reaffirm that ruling herein. The issues relating to the reduction of horse habitat acreage are neither directly involved in the instant matter nor subject to collateral attack herein," 151 IBLA at 399-400.

Just over one month after this ruling, when the IBLA ruled on the motions for a stay filed by AMBA and ALDF in conjunction with the instant appeals, it commented on BLM's characterization

instituted suit against BLM in U.S. District Court in Colorado and sought a temporary restraining order against the roundup. The District Court denied the TRO and the parties dismissed the case in order to allow the administrative challenge to be resolved.

of the Twin Buttes Allotment Management Plan. The IBLA noted that, "[i]n responding to challenges to his proposed decision, the Field Office Manager noted that <u>the AMP was an Activity Plan under the White River Record of Decision and Approved Resource Management Plan (RMP)</u>adopted in July, 1966 (sic)," <u>See</u> <u>American Mustang and Burro Association</u>, IBLA 99-386 at 2 (emphasis supplied), attached hereto as Exhibit 12. Although the IBLA denied the motions for a stay, IBLA commented,

> Admittedly, appellants allege that the reauthorization of grazing use, particularly at increased consumptive levels, exacerbates the deterioration of the range and will provide further justification for BLM's announced policy of totally removing horses from the West Douglas HA. Certainly, these are arguments which appellants may present to the Administrative Law Judge in the first instance and ultimately to the Board should a subsequent appeal occur. . . .

> Before such adverse consequences are properly effectuated, we believe it only fair to require appellants to establish, rather than merely allege, that BLM's decision violates both the provisions of FLPMA and the Wild and Free-Roaming Horses and Burros Act, <u>as amended</u>, 16 U.S.C. 1331-40 (1994). <u>They will have such an opportunity at the hearing before an Administrative Law Judge.</u>

<u>Id</u>. at 2-3 (emphasis supplied).

BLM sent both Toni Moore and Barb Flores a copy of the Twin Buttes Allotment Management Plan (AMP), which supported the issuance of Grazing Permit #1456, which is at issue in this appeal, and requested their comments. <u>See</u> Exhibit 13 3. AMBA commented on January 22, 1999 and February 25, 1999, Exhibit 14. On April 6, 1999, BLM enclosed the draft AMP and EA in a letter to Barb Flores, requested her comments but then stated, "immediately following this date I will sign the decision record and issue the Grazing Permit" On May 9, 1999, AMBA submitted

---

3 The document warns, "The failure to control noxious weeds on the allotment is the greatest threat to the forage base on the allotment. The permittee and his employees are the greatest asset in controlling weeds on the allotment. The permittee and his employees must be able to identify the noxious weeds and be committed to weed control," Twin Buttes Allotment Management Plan (Revision) at 4.

comments on the Twin Buttes Allotment Management Plan. See Exhibit 15 On May 9, 1999, Toni

Moore submitted comments on the Twin Buttes AMP. See Exhibit 16 On that date, ALDF

submitted comments on the Twin Buttes AMP on behalf of Barb Flores and Toni and Don Moore.

See Exhibit 17. On June 8, 1999, Toni Moore appealed the grazing allotment management plan.

See Exhibit 18. On September 2, 1999, ALDF filed an appeal of the Area Manager's decision to

grant the Twin Buttes' permit on behalf of Barb Flores, Toni and Don Moore and AMBA. See

Exhibit 2.

## THIS BOARD HAS JURISDICTION OVER THE GRAZING APPEAL

1. **Appellants are proper persons to challenge BLM's Issuance of a Grazing Permit to the Twin Buttes Ranch Company and Appellants May Challenge this because BLM is Thereby Taking Action to Implement a Portion of the 1996 Land Use Plan**

The impetus for BLM's position that wild horses need to be removed from the West Douglas

Herd Area has been the permittee's insistence that BLM must take this action. The reason that the

permittee asserts that it may make such demands is that it has a permit to graze livestock in this area.

By renewing Grazing Permit #1456 to the Twin Buttes Ranch and by virtue of selecting Alternative

4, as recommended by the Section 8 Review Team, BLM has taken action which harms the interests

of appellants in ensuring the continued presence of wild horses in this area. Thus, by the position

BLM had taken before the IBLA previously in this litigation, see page 8, supra, this appeal is the

appropriate vehicle in which appellants may challenge defendant's decision to remove wild horses

from the West Douglas Herd Area.

Under BLM's regulations, Toni Moore and Barb Flores are interested persons who are

entitled to bring and maintain a challenge to BLM's issuance of a grazing permit to the Twin Buttes

Ranch Company.  BLM's regulations not only provide for the interested public to be involved in

grazing plans but also for persons adversely affected by BLM decisions to appeal.  The

regulations provide, in pertinent part,

> . . . .Allotment Management Plans . . . may be revised by the
> authorized officer after consultation, cooperation and
> coordination with the affected permittees or lessees,
> and the interested public.

43 C.F.R. §4120.2 (e)

Furthermore, BLM's regulations also provide that a person adversely affected by a BLM

decision has standing to appeal.  See 43 C.F.R. 4770.3(a) ("Any person who is adversely affected by

a decision of the authorized officer in the administration of these regulations may file an appeal.")

Elaine Mikels, 41 IBLA 305, 307 n. 1 (1979).

## 2.    A Review of this Appeal is Warranted Even Though BLM Has Stated its Intention to Amend the Management Plan to Address Wild Horses in the WDHA

Neither should the fact that BLM has undertaken to amend the White River Resource

Management Plan to "identify the most appropriate strategy for managing wild horses in the West

Douglas Herd Area;" persuade this Court to postpone either conducting a hearing on this appeal

regarding appellants' concerns with issuance of the Grazing Permit or, if the Court determines that

there are no issues in dispute, issuing a ruling on the legal challenge appellants have raised.  Unless

modified, the grazing permit will be in effect through 2009, yet, according to the  WRRA RMP,

removing of all wild horses is to be accomplished by 2006.  Furthermore, on information and belief,

defendants have already sought funding for a roundup of wild horses in this area to be accomplished

in August of 2004 — a fact that further calls into question whether BLM is likely to change its

position. It is also very possible that BLM may decide that other priorities should receive their attention as has already occurred once. See Exhibit 19. Under these circumstances, the issue of whether wild horses will be allowed in the West Douglas Herd Area is one that could benefit from this Court's review and if review is withheld, could easily evade review.

Furthermore, it bears stating that the entity urging BLM to remove wild horses from the Herd Area is the permittee. This appeal presents the controversy of a permittee whose stated goal is the removal of wild horses from a herd area which coincides with its allotment and persons whose interests in ensuring the existence of that herd in the area are harmed by BLM's renewal of the permittee's grazing permit.

In conjunction with this appeal, the Board has already recognized that the precedential nature of such a controversy. It held that the issue of

> [w]hether BLM may totally remove horses from an HA is a matter which the Board has not yet addressed. Indeed, in its consideration of a previous appeal involving the same general area (see Animal Protection Institute of America, 151 IBLA 396 (2000), the Board originally stayed a horse removal decision to the extent that it authorized total removal of horses from within HA's.

See Order of August 22, 1996.

As is undisputed by any party to this appeal, the agency's decision to eliminate wild horses from the WDHA has been longstanding. This approach formed the cornerstone of the decision to exclude Toni Moore from the Section 8 review team, a team whose recommendation was the basis .of Alternative 4, the alternative selected by BLM in the Twin Buttes EA. BLM explained that, "participation on the Section 8 (team) was determined by the (Colorado Commissioner of Agriculture). The Commissioner did not include wild horse advocates because the management of

-12-

wild horses was determined by the Bureau's planning system, and <u>rehashing of those issues was</u>

<u>counterproductive</u>," Comments and Responses to Twin Buttes AMP/EA, attached hereto as Exhibit

20, at 3rd page of comments (emphasis supplied). All of the information presented to or by the

Section 8 team as possibilities for management of resources within the Twin Buttes Allotment thus

excluded wild horses from the equation --- thus harming appellants' interests. Appellants' claims of

being excluded further injures appellants' interests and supports another reason for pursuing this

appeal. This Court can certainly consider this claim in conjunction with the other issues raised

herein. As this decision adversely affects appellants, they may appeal and they have raised this issue

in conjunction with the appeal of the grazing permit.


## THE WFHBA, AND NOT A LAND USE PLAN, DIRECTS HOW BLM IS TO MAINTAIN WILD HORSES ON THE WDHA

The Wild Free Roaming Horses and Burros Act mandates by its plain language that wild

horses are to be "protected from capture, branding, harassment, or death; and to accomplish this they

are to be considered in the area where presently found, as an integral part of the system of public

lands," 16 U.S.C. §1331. The phrase "where presently found" has been interpreted to mean where

the horses lived in 1971. <u>See</u> 43 C.F.R. § 4710.3-1 (defining herd area as the "geographic area

identified as having been used by a herd as its habitat in 1971)[4] From the title of the Act, as well as

---

[4] BLM has previously argued that they did not begin to refer to the West Douglas area as a "herd area" until some time after 1979. The controlling fact, however, is where the horses were at the time of the passage of the WFHBA, not when and how BLM referred to the area.

from knowledge of wild horse behavior, it is evident that wild horses are free-roaming in nature. This fact is also acknowledged by the term "range," which is defined in the Act as

> . . .the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands;

16 U.S.C. §1332 (c)

In this case, there is no question that wild horses inhabited the White River Resource Area long before 1971 and there is no question that their range extended to and included the West Douglas Herd Area, lands that coincide with several of the permittee's livestock's grazing allotments.

It is elementary that BLM must comply with federal laws when it creates a land use plan and that the plans it creates cannot supercede federal law. A land use plan cannot override the statutory command of the Wild Free Roaming Horses and Burros Act which declares that wild horses are to be considered as an integral part of the natural system of the public lands, 16 U.S.C. §1331. This is clear  Neither can a land use plan contravene the statute under which it operates: the Federal Lands Policy Management Act (FLPMA) Section 102(b) of that Act specifically provides that the Act shall "be construed as <u>supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law</u>," (emphasis added)  The West Douglas Herd Area must be managed in accordance with the WFHBA. A provision of a land use plan which contradicts that law is not valid irrespective of how long that provision has been in existence or how many times it has been cited.  To hold so otherwise would mean that agencies could rewrite law, and provided their interpretation was long-standing, it could take on a validity of its own.

-14-

If wild horses cannot be eliminated from an area they occupied in 1971 under law, it follows
that they cannot be eliminated from that area for reasons such as administrative convenience,
because managing them there interferes with the permittee's livestock operation or any such other
reasons and the IBLA has so recognized. In ruling on the setting of an appropriate management level
for horses in an area, the IBLA has long held, ". . . an AML established purely for administrative
reasons or because it was the level of wild horse use at a particular point in time cannot be justified
under the statute, Animal Protection Institute v. BLM, 109 IBLA 112 (1989).

In United States v. Fuller, 409 U.S. 488, 494 (1973), the Supreme Court held that the Taylor
Grazing Act expressly states that "no compensable expectancy is created in the permit lands
themselves as a result of permit issuance." The U.S. Court of Federal Claims has applied this
holding further and ruled,

> . . . given the longstanding multiple use mandate incorporated in all of the governing
> legislation, and in the terms of their permits, plaintiffs
> did not have a compensable expectancy in exclusion of wild horses and
> other wild animals from the allotment or exclusive use of the forage
> and water . . . Given the undisputed presence of wild free-roaming
> horses on the allotment at the time these permits were issued, plaintiffs
> could not reasonably have expected to have exclusive use of the water
> or forage.

Fallini v. United States, 31 Fed. Cl. 53 (1994), vacated on other grounds, 56 F.3d 1378 (Fed. Cir.
1995)

The Tenth Circuit's ruling in Public Lands Council v. Babbitt, 167 F.3d. 1287, 1299-1300
(10th Cir. 1999), aff'd, 529 U.S. 728 (2000) recognized that FLPMA requires BLM to manage the
public lands "for many purposes in addition to [livestock] grazing and for many members of the
public in addition to the livestock industry."

-15-

The interpretation of intervenor, as well as that of BLM, that a land use plan may provide that wild horses will not be managed in an area where they were found at the passage of the Act also makes no sense in light of the provisions of the WFHBA and the Public Rangelands Improvement Act, 43 U.S.C. §1902 et seq. If the purpose of the WFHBA is *to protect horses from capture, and this is to be done by considering them where they are presently found as an integral part of the natural system of public lands* and PRIA specifies that wild horses can only be removed, i.e. when a certain number of them are determined to be "excess" and their removal is necessary to restore a thriving natural ecological balance on the public lands, 16 U.S.C. 1333(b)(2), then it makes no sense to hold that wild horses can be completely eradicated from an area. Once wild horses are removed as a part of the natural system of public lands, the WFHBA's purpose -- to protect them from capture and have them be integral to the system of public lands --- is violated, there is no "thriving natural ecological balance" under the WFHBA, nor is "multiple use" under FLPMA.

Furthermore, eradication of a wild horse population certainly does not constitute management of those animals at the minimal feasible level, as required by the WFHBA. Regarding the Secretary's duties toward wild horses, the Act provides, in pertinent part,

> . . .The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving ecological balance on the public lands. . . All management activities shall be at the minimal feasible level and shall be carried out in consultation with the wildlife agency of the State wherein such lands are located in order to protect the natural ecological balance of all wildlife species which inhabit such lands,

16 U.S.C. § 1333(a) (emphasis supplied)

-16-

Use of drift fences, for example,  to control wild horse movements and modify their use of a particular area would be less intrusive - - and would certainly qualify as action at the minimal feasible level - - more so than eradication of the population.[5] This alternative solution, and no doubt other ones which could be devised after careful consideration,  was never seriously considered or pursued, all because of a determination made, and an illegal one, over 20 years ago, that wild horses would not be managed in the WDHA.[6]

## CONCLUSION

For the foregoing reasons, intervenor is not entitled to summary judgment on the jurisdictional bases it has set forth.  Appellants are entitled to summary judgment as a matter of law. As a remedy for defendant's violations, and in lieu of setting aside the permit in its entirety, appellants respectfully request that this Court should direct the agency to consider in consultation with the appellants and the permittee specific ways that Grazing Permit #1456 could be amended to provide for the continued existence and proper maintenance of wild horses on the public lands

---

[5]  A rangeland expert advising ALDF made this suggestion in comments ALDF submitted in opposition to a proposed roundup in the WDHA in 2001.  See Letter of 12 July 2001 at 2 from Jeff Powell,  PhD, CRMC, RLS International submitted as an attachment to August 6, 2001 Request to BLM to Conduct an Actual Census of the West Douglas Herd Area, attached hereto as Exhibit 21.

[6]  Intervenor relies on an unpublished decision in Uintah County v. Norton, Civil No. 2:00-CV-0482J, for the proposition that the agency must comply with a land use plan.  As the Court notes in footnote 9 of that opinion, however, the Court was not ruling on the validity of whether BLM could provide in a  land use plan that wild horses were not to be managed in a particular area in Utah because that issue "is not now before the court."  Thus, this case is of marginal significance here.

encompassing the Twin Buttes Allotment.

Respectfully submitted,

*Valerie J Stanley*
Valerie J. Stanley
329 Prince George Street
Laurel, MD 20707
(301) 549-3126
Counsel for Appellants

-18-

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of November, 2003 I sent a true copy of Appellants' Memorandum in Support of Motion for Summary Judgment and In Opposition to Intervenor's Motion for Summary Judgment and Respondent's Concurrence with Intervenor's Motion to the following by facsimile and sent by Federal Express (Monday delivery) to the following at the addresses listed below:

Andrea Gelfuso Goetz, Esquire
Office of the Regional Solicitor, Rocky Mountain
U.S. Department of Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215

Michael Marinovich, Esquire
Brooks & Associates, P.C.
999 18th Street, Suite 1605
Denver, CO 80202

Valerie J. Stanley



# ANIMAL LEGAL DEFENSE FUND

FILE COP

401 EAST JEFFERSON STREET, SUITE 206, ROCKVILLE, MD 20850-2617
Phone: (301) 294-1617   Fax: (301) 294-8519   E-mail: animal-law@aldf.org

August 6, 2001

**Via Facsimile: (970) 878-5717**

James A. Cagney
Field Manager
Bureau of Land Management
White River Resource Area
73544 Highway 64
Meeker, Colorado 81641

Chair
Stephanie Nichols-Young

President
Steve Ann Chambers

Vice President
Robert L. Trimble

Secretary
Sarah H. Luick

Treasurer
David S. Favre

Directors
Katie M. Brophy
Nancy L. Ober
Katharina Otto-Bernstein
Jay L. Pomerantz
Kenneth D. Ross

Executive Director
Joyce Tischler

National Office
127 Fourth Street
Petaluma, CA 94952
Phone: (707) 769-7771
Fax: (707) 769-0785
http://www.aldf.org

**Re:    Request to BLM to Conduct an Actual Census of the West Douglas Herd Area**

Dear Mr. Cagney:

The Animal Legal Defense Fund ("ALDF"), on behalf of the Colorado Wild Horse and Burro Coalition ("CWHBC"), the American Mustang and Burro Coalition ("AMBA"), and their members, submitted comments on BLM's 2001 White River Resource Area ("WRRA") Wild Horse Removal Plan/Environmental Assessment, West Douglas Region (CO-WRFO-01-100-EA) ("EA") on June 13, 2001, and submitted further comments by letter on July 16, 2001. That EA called for the complete removal of all wild horses living in the West Douglas Herd Area ("WDHA").

This letter serves as further correspondence with BLM concerning the agency's upcoming round-up in the WDHA, and, thus, ALDF requests that this letter be placed in the administrative record. Based on BLM's population estimates for the WDHA, BLM's data on the WDHA, and Jeff Powell, Ph.D.'s report, ALDF, on behalf of CWHBC and AMBA, hereby requests that BLM conduct an actual census of the WDHA before wild horses are removed from the area.

## Background

The July 16, 2001, comments from ALDF to BLM also served as a follow-up to a telephone conversation we had on July 10, 2001, in which you stated that BLM planned to issue a Record of Decision ("ROD") that will call for the removal of 53 wild horses from areas outside the WDHA. That letter and Dr. Powell's report are attached for your reference. Although the round-up will focus on horses living outside of herd area boundaries, BLM will venture inside the WDHA until it removes 53 wild horses. BLM plans to leave 60 wild horses inside the

1

RECYCLED PAPER

WDHA. BLM believes there are approximately 115 wild horses living in the area. EA at 10. All numbers are based on population estimates. Id. at 40.

Based on Dr. Powell's report analyzing BLM's records of the WDHA, ALDF stated in its July 16, 2001, letter that its clients could not support BLM's upcoming ROD to remove 53 wild horses, which would effectively zero out the WDHA by leaving a herd too small to sustain itself. See ALDF letter to BLM at 2 ( July 16, 2001). Dr. Powell concluded that BLM should conduct further current inventorying and monitoring of the WDHA before wild horses are removed from the WDHA. Id.; see also Powell Report at 2 (submitted with ALDF's July 16, 2001, letter). In addition, Dr. Powell suggested a less drastic, as well as less expensive, management method than complete removal to control the little damage wild horses are actually causing in the area. Powell Report at 2. ALDF reminded BLM that it is under the mandatory duty to conduct wild horse management activities at the minimal feasible level pursuant to the Wild Free-Roaming Horses and Burros Act ("WHBA"), 16 U.S.C. § 1331 et seq. ALDF Letter at 3 (citing 16 U.S.C. § 1333(a)).

ALDF also pointed out that BLM does not have an accurate census of the WDHA, in violation of the WHBA's requirement that BLM maintain a current inventory of wild horse populations. 16 U.S.C. § 1333(b)(1). In other words, BLM has no idea how many horses actually live in the WDHA, and thus, lacks any factual basis for removing any wild horse, let alone for concluding that precisely 53 horses must be removed.

On July 26, 2001, BLM issued its Record of Decision ("ROD") on this EA, which reflected our telephone conversation. The ROD will take effect on August 31, 2001. ALDF has yet to receive a written response to its July 16, 2001, letter.

## Proposal

ALDF, on behalf of CWHBC and AMBA, would like to present BLM with a proposal that would effectively determine whether the WDHA is indeed in need of a round-up and also serve as an alternative to litigation. ALDF requests that BLM conduct an aerial census of the WDHA in order to determine how many wild horses actually live inside and outside of WDHA boundaries and whether a round-up is actually warranted. BLM is under the statutory duty to maintain a current inventory of wild horses living in the WDHA. 16 U.S.C. § 1333(b)(1). All of BLM's population numbers are estimates, and BLM has not conducted an aerial count since 1997. See EA at 40. Therefore, BLM is required by statute to conduct a census of wild horses in and around the WDHA before a round-up can occur.

Pursuant to this proposal, ALDF offers BLM two people who are familiar with wild horse census-taking, Dave Hillberry and Dan Rathbun, and requests that one of these people accompany BLM on the aerial census as an independent observer. Both have agreed to accompany BLM on this census if BLM consents to this proposal.

2

Dave Hillberry lives in Craig, Colorado and, before retiring, worked for BLM for over thirty years. He has served in a variety of positions including range conservationist and wild horse specialist for the Sand Wash Herd. Mr. Hillberry has flown in fixed wing aircraft and helicopters to count wild horses in the Sand Wash Herd and thus is familiar with aerial census-taking. He may be reached at (970) 824-5601.

Dan Rathbun retired from BLM two years ago after serving BLM for several decades in New Mexico and Nevada in a variety of positions. Mr. Rathbun is very familiar with wild horse issues and has participated in wild horse management activities in Nevada and with the Bonanza herd in Utah, which is near the WDHA. Mr. Rathbun may be reached at (775) 852-0374.

If the census shows that the WDHA is in need of a round-up to maintain or achieve a thriving natural ecological balance, as the WHBA requires, 16 U.S.C. § 1333(b)(2), then AMBA and CWHBC will not object to such a round-up.

ALDF looks forward to a prompt written response to this letter in addition to its July 16, 2001, letter. This proposal represents a reasonable alternative to BLM's ROD to remove 53 wild horses. Feel free to contact us at (301) 294-1617 or the address on the letterhead if you have any questions.

Sincerely,

Nancy Brown-Kobil
Staff Attorney

Valerie Stanley
Senior Staff Attorney

cc:    Henri Bisson, Assistant Director, Renewable Resources & Planning, BLM
       Ann Morgan, BLM Colorado State Director
       Amy Sosin, Office of the Solicitor, Department of the Interior

Attached:    Letter to BLM from ALDF dated July 16, 2001
             Jeff Powell, Ph.D., CRMC, Report to ALDF dated July 12, 2001

3