

# ANIMAL LEGAL DEFENSE FUND

401 EAST JEFFERSON STREET, SUITE 206, ROCKVILLE, MD 20850-2617
Phone: (301) 294-1617  Fax: (301) 294-8519  E-mail: animal-law@aldf.org

July 16, 2001

Chair
Stephanie Nichols-Young

President
Steve Ann Chambers

Vice President
Robert L. Trimble

Secretary
Sarah H. Luick

Treasurer
David S. Favre

Directors
Katie M. Brophy
Nancy L. Oker
Katharina Otto-Bernstein
Jay L. Pomerantz
Kenneth D. Ross

Executive Director
Joyce Tischler

National Office
127 Fourth Street
Petaluma, CA 94952
Phone: (707) 769-7771
Fax: (707) 769-0785
http://www.aldf.org

Via Facsimile: (970) 878-5717

James A. Cagney
Field Manager
Bureau of Land Management
White River Resource Area
73544 Highway 64
Meeker, Colorado 81641

Re:   **BLM's Upcoming Record of Decision for the 2001 WRRA Wild
      Horse Removal Plan/Environmental Assessment, West Douglas
      Region (CO-WRFO-01-100-EA).**

Dear Mr. Cagney:

As you know, the above-referenced Environmental Assessment (EA) called
for the complete removal of all wild horses living in the West Douglas Herd
Area("WDHA"). The Animal Legal Defense Fund (ALDF) submitted comments on
this EA on June 13, 2001, on behalf of the Colorado Wild Horse and Burro
Coalition, the American Mustang and Burro Coalition, and these organizations. In
those comments, ALDF specifically reserved the right to submit further comments
on the EA after your office provided, and ALDF reviewed, records responsive to our
outstanding June 1, 2001 FOIA request and certain information and clarification we
had previously requested by letter dated May 25, 2001.

Accordingly, this letter serves as the further comments ALDF reserved the
right to submit on the EA, and it serves as a follow-up to the telephone conversation
we had on July 10, 2001, which will be explained below. ALDF requests that, 1) this
letter; 2) the enclosed report from Jeff Powell, Ph.D., CRMC, which contains his
analysis of the above-referenced EA and the records provided in response to our June
1, 2001 request and, 3) ALDF's June 1, 2001 FOIA request be placed in the
administrative record.

On July 10, 2001, you informed me that BLM's Record of Decision ("ROD") would be
the following: BLM would permanently remove 53 wild horses from the West Douglas "region,"
with a primary emphasis on areas outside of herd area boundaries. Sixty wild horses would

RECYCLED PAPER

*Working For Justice For Animals*

remain in the area (BLM believes that 113 wild horses live in the West Douglas region). Although you assured me that the emphasis would be on areas outside of the WDHA, BLM would venture inside the WDHA if it was unable to remove 53 wild horses outside of the WDHA. In addition, the ROD would contain a proposal to amend the 1997 White River Resource Area Resource Management Plan ("RMP") this upcoming winter. Although the alternatives were in their early stages, you stated that they would resemble the following:

1. Keep the existing decision.
2. Manage the West Douglas Herd Ara by fencing off the southern boundary.
3. Manage all wild horses where they exist now.
4. Fence off the Wilderness Study Area ("WSA"), which is the southern boundary of the WDHA.
5. Fence off the northern boundary of the WSA, which would effectively cut in half the wild horses' summer range and thus would not be given detailed consideration.

ALDF is pleased that BLM has determined that it will undergo the process to amend the RMP as ALDF has urged BLM to do for many years.

However, after discussions with our clients and receiving Dr. Jeff Powell's report on BLM's analysis of the EA, ALDF cannot support BLM's upcoming ROD to remove 53 wild horses, which would, through a *fait accompli*, zero out the WDHA.

Jeff Powell, Ph.D., CRMC, is President of RLS International and is a professor of rangeland science at the University of Wyoming. Last year, after reviewing records released by your office in support of BLM's decision to zero out the WDHA, Dr. Powell prepared a report for ALDF calling into question the reasoning of that decision. ALDF sent that report to BLM urging BLM to cancel the round-up. ALDF re-submitted that report with its June 13, 2001, comments on the 2001 EA.

This year ALDF also requested Dr. Powell to analyze BLM's 2001 EA (in comparison with the 2000 EA) and BLM's supposed "expanded documentation" to justify this year's round-up. A copy of his report is attached for your reference. Again, Dr. Powell expressed serious reservations about whether the data supports BLM's conclusions.

Dr. Powell points out many inconsistences and points of confusion in BLM's 2001 EA. He concludes that BLM should undergo further current inventorying and monitoring of wild horses and the rangeland before any wild horses are removed from the WDHA. First, Dr. Powell casts serious doubt on the BLM's data on the causes of population increases in certain pastures in the WDHA. Powell Report at 2. ALDF would also like to point out that BLM does not contain an accurate census of the WDHA, in violation of the Wild Free-Roaming Horses and Burros Act's requirements that the agency maintain a current inventory of wild horse populations. Instead this EA only contains population estimates. In other words, BLM has no idea how many

horses actually live in the WDHA and outside the herd area. Thus, BLM lacks factual basis for removing <u>any</u> wild horse.

Second, Dr. Powell states that, "based on only reported environmental damage in any pastures, the 18 head of horses in the Texas Creek West Pasture appear to be the only horses justifying removal or behavior modification," Powell Report at 2. Removal of even these 18 horses could be avoided if drift fences were placed across the horses' trails; this would force the animals to traverse along less fragile areas. Placement of such drift fences, a common rangeland management practice, rather than removal of the horses would certainly fulfill BLM's statutory duty to comply with mandate of the Wild Free Roaming Horses and Burro Act that, ". . . All management activities shall be at the minimal feasible level . . . ," 16 U.S.C. § 1333 (a).

In summary, Dr. Powell concludes, <u>inter alia</u>:

1. There appears to be only a few pastures-- such as Texas Creek-- which have any evidence of significant impact by wild horses;
2. "[T]he actual degree of horse impacts seems to be based more on logic and conjecture. . . than on scientific data. . ." Powell Report at 4;
3. Less expensive and more long-term effective solutions may be available to manage wild horses in the West Douglas region that complete removal;
4. "[T]he are numerous points of confusion, inadequate explanation, and inconsistences in the 2000 EA and 2001 EA" <u>Id.</u>;
5. "[T]he 2001 EA does not contain any new quantitative data to support the 2001 emphasis (e.g., oil and gas development causing increased horse migration) or conclusions." <u>Id.</u>

Based on Dr. Powell's conclusions, ALDF requests that BLM rescind its upcoming ROD and reconsider its decision to remove 53 wild horses based on the mistaken belief that a thriving natural ecological balance is not being maintained. As ALDF has argued many times in the past – based on BLM's <u>own</u> data– wild horses are not the agent causing rangeland degradation in the WDHA, and thus cannot be removed. Wild horses cannot be used as scapegoats or in some other form of mitigation to compensate for other causes of rangeland deterioration (i.e., oil and gas development and livestock grazing). ALDF insists that no wild horse be removed from the WDHA until the 2001 EA is revised, clarified, and expanded and the above-mentioned use of management activities at the minimal feasible level is considered and implemented.

ALDF looks forward to a written response to this letter. If you have any questions, please contact Nancy Brown-Kobil at the phone number and address on the letterhead.

Sincerely,

Nancy Brown-Kobil / lp

Nancy Brown-Kobil
Staff Attorney

Valerie J. Stanley / lp

Valerie J. Stanley
Senior Staff Attorney

cc:    Amy Sosin, Office of the Solicitor, U.S. Department of the Interior

Attached:    June 1, 2001 ALDF FOIA Request
Jeff Powell, Ph.D., CRMC, Report to ALDF, dated July 12, 2001

4



# RLS International

**Jeff Powell, PhD, CRMC**
President

P.O. Box 2002
Laramie, WY 82070
(307) 742-2552

DATE:    12 July 2001

TO:    Valerie J. Stanley, Senior Staff Attorney
Nancy Brown-Kobil, Staff Attorney
Animal Legal Defense Fund
401 East Jefferson St., Suite 206
Rockville, MD 20850-2617
Phone: 301.294.1617
FAX: 301.294.8519
E-mail:aldf@wt.infi.net

FROM:    Jeff Powell, PhD, CRMC, CRMP
514 W. 24th St.
Cheyenne, WY 82001
Phone: 307.635.5746
FAX: 307.778.0877
E-mail: rls.int.wy@worldnet.att.net

RE:    Review of BLM documents concerning Colorado WRRA wild horse removal plan

As per your letter request of 22 June 2001, I reviewed the BLM 2001 WRRA Wild Horse Removal Plan/EA: West Douglas Region, No. CO-WRFO-01-100EA ('20001 EA') and compared the information in the 2001 EA to the information in the 2000 WRRA Wild Horse Removal Plan/EA: West Douglas Herd Area and Adjacent Land, No.: CO-WRFO-00-133-EA ('2000 EA'). In addition, I compared statements made in the 2001 EA to data in the BLM documents you received from your 31 March 2000 FOIA request of John J. Mehlhoff, Field Manager, BLM, White River Resource Area (WRRA).

In general, there are no statements made in the 2001 EA that changes any opinions or conclusions I stated in my earlier reports of 4 May 2000 and 23 June 2000. Therefore, the comments made in this report are based primarily on the information in the 2001 EA.

The 2001 EA appears to place more emphasis than in the 2000 EA on wild horse migration into previously unoccupied areas because of increased oil and gas development and subsequent increased human presence. How much more human activity because of oil and gas development has occurred since the 2000 EA was written was not documented in the 2001 EA. I do not know how much discretion the BLM has on limiting the degree of oil and gas development in any area.

I agree that increased human activity in the area of oil and gas development probably is a major factor driving horses out of that area. The 2000 EA states the Removal Plan Project Area includes the pastures (and number of wild horses) Cottonwood (4), Lower Horse Draw (0), Water Canyon (10), Texas Creek West (15), Texas Creek East (11), West Creek (10), Park (0), Water Hole (0), Bull Draw Allotment (same 10 as in Water Canyon), pastures outside (but adjacent to) the West Douglas Herd Area, Evacuation Creek (36) and East Douglas Creek (4). The 2001 EA reports changes in horse numbers by pasture as Cottonwood (4), Lower Horse Draw (0), Water Canyon

(ALDF, Report No. 3, 12 July 2001)

(12), Texas Creek West (18), Texas Creek East (13), West Creek (12), Park (0), Water Hole (0), Bull Draw Allotment (same 12 as in Water Canyon), pastures outside (but adjacent to) the West Douglas Herd Area, Evacuation Creek (45) and East Douglas Creek (5) for a total increase of 19 head in the Project Area. However, the increase from 90 head (2000 EA) to 107 head (2001 EA) in the Project Area is about the same percentage (i.e., 18.9%) as the BLM projects for an annual percentage increase (i.e., 20%) in wild horse population numbers. Therefore, it difficult to conclude whether the increase between the 2000 EA and the 2001 EA is due to migration or a natural increase in population numbers. The increase can not be because of both migration and natural increase in population size unless the projected increase in population size is less than 20%. As the reported increase from 36 head to 45 head (25% increase) in the Evacuation Creek pasture was much greater than in any other pasture, and the natural percentage increase in population size should be about the same in all Project Area pastures because of similar environmental factors during the year, it does appear logical there was more migration into the Evacuation Creek Pasture than into any other pasture.

The major environmental degradation problem stated in the 2001 EA and in the 2000 EA is in the southern part of the Texas Creek West pasture and in the Water Hole pasture (i.e., adjacent to the Texas Creek West pasture. There are no horses stated as being in the Water Hole pasture, but any actual wild horse damage in the Water Hole pasture could logically be caused by the horses traveling into the Water Hole pasture from the Texas Creek West and/or Evacuation Creek pastures. If so, when and why do horses from outside the Water Hole pasture go into the Water Hole pasture?

The 'horse trails' across the bottoms of the Texas Creek West pasture appear to be the most probable evidence of horse damage in any Project Area pastures, although livestock do make trails to water or other attractions and could be contributing to the degree of erosion along the horse trails. Regardless, based on only reported environmental damage in any pastures, the 18 head of horses in the Texas Creek West pasture appear to be the only horses justifying removal or behavior modification.

By 'behavior modification', I mean obstructions (e.g., drift fences) could be placed across the horse trails causing horses (and livestock) to trail elsewhere along less fragile soils. This is a common rangeland improvement practice to encourage better grazing distribution. If the BLM is expected to manage wild horse distribution as the BLM is expected to manage livestock distribution, then fencing for improved wild horse distribution is a reasonable alternative to removal of wild horses from the area.

The remainder of this report are items, in my opinion, of either less significance than the 2 main points discussed above or items that have been addressed in my earlier reports.

On p. 5 of the 2001 EA, the Multiple Use Recommendation No. 4, "That the horses west of Douglas Creek be removed from the entire resource area." is paired with Reason No. 4, "The increase in oil and gas activities in this area warrants removal of the horses. **Without forage surveys completed east of Douglas Creek to determine the carrying capacity, the area should not be burdened. ..."** Which area should not be burdened? How does the carrying capacity east of Douglas Creek affect the horses west of Douglas Creek or vice versa?

P. 5, para. 3 under 1981 MFP Decisions mentions objectives advanced by 'the wild horse specialist'. However, on p. 48, no wild horse specialist was listed as one of the 2001 EA preparers. Why not?

(ALDF, Report No. 3, 12 July 2001)

Throughout the 2001 EA and 2000 EA, there is an inconsistent use of maps, 'pastures', and allotments, and herd area. The herd area usually refers to wild horses, but the pastures and allotments refer to livestock grazing. Are the wild horses being managed in the same areas as the livestock for convenience of the BLM personnel?; are the livestock grazing monitors the same people as the wild horse grazing monitors?; what are the duties of the wild horse specialist (e.g., only counting horses) and how do those duties differ from those of the range conservationists (e.g., forage surveys)? An outside reviewer of BLM wild horse removal plans could more accurately interpret BLM conclusions if actual topographic maps showing topography contours (i.e., degree of slope and aspect), streams, range sites, fences, locations of transects, oil and gas development, etc. were presented in the BLM documents instead of the planimetric maps currently being used. Accurate interpretation of wild horse and livestock behavior and distribution depends on how well an interpreter can visualize the existing topography.

2001 EA, p. 9: an excerpt from the Case # IBLA 96-490, 96-492 states that "the data clearly establishes that the decline in forage conditions is directly attributable to the increases in wild horse population." However, p. 38 in the 2001 EA states that "Forage-related impacts (by wild horses) with big game are **additive to and similar in nature** to livestock and interspecific big game competition." If the forage-related impacts of wild horses are similar to the impacts of livestock and big game, how can the degree of impact by wild horses be differentiated from those of livestock and big game when the only quantitative data are forage utilization data on plants which could have been grazed by any herbivore? Logically, as horse numbers increase, the degree of forage utilization by horses will increase, but the degree of forage utilization by wild horses can not be determined solely on forage utilization studies. Where are the data for horse numbers at the site of the forage utilization transects?

P. 20: why is 'Horses Identified As A Causative Factor' (as a wild horse impact on soils and vegetation) 'Not Applicable' for Evacuation Creek and E. Douglas Creek pastures when the wild horses in those pastures are planned for removal? Perhaps the presentation of information should conform to the objective of the EA instead of the protocols of the BLM.

P. 18: the section on trapping methods states that "To use water trapping would require fencing numerous springs, seeps, creeks and ponds." P. 19 states "There are few natural waters (springs, seeps, creeks) with the majority of water provided by stock ponds which are scattered throughout the area." However, p. 6 states that the final grazing EIS emphasized the principal considerations used in modifying the size of the wild horse range as including ... 'the lack of dependable watering areas, ...' So, which is correct - numerous watering areas or a lack of watering areas? Restricting access to stock ponds (for the purpose of trapping wild horses) will mean restricting access for livestock also.

Similarly, p. 6 states 'the number of existing fences restricting horse movement...' as another consideration in modifying the size of the wild horse range, whereas the discussion of oil and gas development causing increased horse migration implies that existing fences are not restricting horse movement within the Project Area.

P. 21: "These pastures (Cottonwood, Lower Horse Draw, Water Canyon, Park, Water Hole, & Bull Draw) were combined into one analysis, as individual analysis of each pasture showed similar affected environments and environmental consequences." However, p. 20 reports that, of these 6 pastures, only Water Hole listed horses as a causative factor of soil and plant standards (even though

(ALDF, Report No. 3, 12 July 2001)

no horses were listed as being present in this pasture), and only Park had no soil or plant problems. These inconsistencies imply **dissimilar** affected environments and environmental consequences for Water Hole, Park, and the other 4 pastures.

   P. 23 (Analysis of Standard 3...) and p. 25 (last sentence) mentions 'season-long wild horse grazing' whereas p. 24 (Alternative A) mentions 'continuous, year-long grazing by horses...' There is a big difference in potential environmental impact between season-long and year-long grazing. The EA should clarify the discrepancy and explain which horse herds, if any, migrate to different areas in the summer and winter, which compete with big game for spring range, and which stay in the same area 12 months of the year. P. 37 states "In general, the seasonal ranges of horses are not as spatially distinct as big game and yearlong occupation tends to largely coincide with big game winter and transitional ranges." Does this mean horses do not have seasonal ranges or that the BLM does not know the actual seasonal ranges of wild horses? I suspect the BLM does not have the personnel to monitor wild horse numbers or locations very often.

   P. 37 (last sentence) also discusses heavy utilization levels on preferred (big game) browse. How much of this utilization, if any, is because of horse utilization on browse? P. 38, para. 2 discusses deer use of green herbaceous forage in early spring. This discussion of spring herbage for deer may be somewhat misleading because there are studies from California which indicate deer diets changing rapidly from winter browse to green, 'washy' herbaceous forage in spring may cause a further deterioration in deer health because of a lack of energy in green forage. Of equal importance to deer nutrition is the condition of the deer going into the winter. This is dependent on the supply of nutritious browse in late fall. Horses will browse during the winter when deep snow covers the grass, but they rarely browse during the fall. There is an additional inconsistency in this section because the 2001 EA reports elk numbers being high and deer numbers being low. Horses should be much more competitive with elk, especially on south-facing slopes in the spring, than they are with deer. So why are elk numbers increasing if horses are significant competition?

   In summary, 1) horse numbers west of Douglas Creek appear to be much higher in 2000 than in 1971, 2) increased oil and gas activity logically will cause horse migration, 3) there appears to be only a few pastures (e.g., Texas Creek West) with significant horse impacts, 4) the actual degree of horse impacts seems to be based more on logic and conjecture (more horses = greater utilization) than on scientific data (e.g., forage utilization transects), 5) there may be less expensive and more long-term effective range improvement alternatives (e.g., horse distribution practices) to complete removal, 6) there are numerous points of confusion, inadequate explanation, and inconsistencies in the 2000 EA and 2001 EA, and 7) the 2001 EA does not contain any new quantitative data to support the 2001 emphasis (e.g., oil and gas development causing increased horse migration) or conclusions.

   If you have additional questions, I will be glad to try to answer them. I will be in Cheyenne or Laramie except for the week of 22 - 27 July.



4700

July 18, 2001

U. S. Senator Wayne Allard
C/O Shane K. Henry
215 federal Building, 400 Road Ave.
Grand Junction, CO 81501

Dear Shane:

Thank you for your note relating to wild horses and Davie Robertson's concerns. Frankly, it is easy to see the issue from Davie's perspective. The BLM has completed a series of approved land use plans dating back to 1975. Each plan specifies that wild horses will be managed in the Piceance East Douglas Herd Management Area, but not on range allotments associated with Davie's grazing permit. Despite this, horses continue to use the area. The region in question is called the West Douglas Herd Area. Until recently, the reason for continuing horse use was the logistical difficulty in catching them. The area features exceptionally rough terrain, with dense forest canopies.

Today there is a very dedicated group of people who strongly support permanent wild horse management in the West Douglas Region. The Wild-Free Roaming Wild horse and Burro Act of 1971 specifies that wild horses "are to be considered in the area where presently found, as an integral part of the natural system of the public lands." Many people believe that horses were present in the West Douglas Herd Area in 1971, and that the BLM has no legal authority to exclude horses from the area. When the BLM completed its first wild horse inventory in 1974, there were nine horses west of Douglas Creek. A year later there were probably 30 using the area.

Davie's often stated perspective is that the facts were current in 1975, and that was the only fair time to address the issue. He noted that it is now impossible to argue the negative - that horses were not present in 1971. Again, his point of view has merit.

In an effort to address this issue, I have decided to initiate a land use plan amendment. The White River Field Office still believes that our long term land use planning is both legal and wise. However if I simply issue a decision to catch all the horses in the West Douglas Area, a legal challenge is almost certain. Testing the legality of our long term planning within the narrow framework of a wild horse gather plan seems unwise. There are a lot of key points that would be difficult to inject into that process. Hopefully the land use plan amendment will provide the BLM the opportunity to collect all the facts, and make the best decision we can. Please don't hesitate to contact me if I can provide any additional information.

Sincerely,

James A. Cagney
Field Manager



AMP TITLE PAGE

Allotment Management Plan
Twin Buttes Allotment (6346)
Twin Buttes Ranch Company - Davie Robertson
Craig District
White River Resource Area
Rangely S½

AGREEMENT

    I, the undersigned, user of the public lands in the Twin Buttes Allotment
hereby accept this allotment management plan as my authorized grazing
operation.  I understand that the privileges allowed hereon are subject
to all rules, regulations and directives set forth by the Grazing Regul-
ations (43 CFR; Part 4100), the Taylor Grazing Act of 1934, as amended, and
the Secretary of the Interior.

    This allotment management plan is intended to be dynamic and will be
periodically reviewed in consultation with the operator.  Modifications
of this agreement may be made when reduced to writing and approved by the
Area Manager.

    This agreement may be cancelled by either party by written notification
to the other party as provided in the grazing regulations (43 CFR 4120.2-3(c))
after careful and considered consultation, cooperation and coordination with
the parties involved.


Accepted by:


Davie Robertson, Twin Buttes Ranch Company        August 19, 1983
                                                            Date

Prepared by:


Robert J. Fowler, Range Conservationist        8-19-83
                                                            Date

Approved by:


B. Curtis Smith, Area Manager                8/19/83
                                                              Date

INDEX

|  | Page |
|---|---|
| General Information | 1 |
| Land Use Plan Objectives | 5 |
| Coordination | 7 |
| Grazing Management Problems | 12 |
| Objectives | 15 |
| Key Species and Phenology | 20 |
| Grazing Management System | 24 |
| Existing Range Improvements - Proposed Range Improvements | 27 |
| Trailing | 31 |
| Flexibility | 32 |
| Interim Grazing System | 33 |
| Grazing Use | 34 |
| Changes in Grazing Use | 35 |
| Billing Procedures | 36 |
| Studies and Evaluation | 37 |
| Appendix | 40 |

Allotment Map
Grazing Formula
Grazing Sequence

1.   GENERAL INFORMATION:

    a.   Description, Location and Area

        1.   Description

A total of seven allotments will be combined in this
Allotment Management Plan (AMP), all of which are currently
administered by the Bureau of Land Management and used by
the Twin Buttes Ranch Company in support of a year round
cow/calf operation.  One allotment, known as Texas Creek,
also supports another ranch operation (Steele Bros.) in
common with Twin Buttes Ranch Company.

The allotments to be combined under this plan are the
following:

| | |
|---|---|
| Cottonwood #6346 | Texas Creek #6352 |
| Moonlight #6347 | West Creek #6360 |
| Lower Horse Draw #6348 | West Douglas Creek #6363 |
| Water Canyon #6351 | |

These allotments may be referred to independently through-
out the course of the following discussions.  However,
when referred to collectively, these allotments shall be
known as the Twin Buttes Allotment, (6346).

        2.   Location

The Twin Buttes Allotment envelops an extensive area of
rangeland south of the town of Rangely, Colorado.  The

allotment boundary begins approximately 6 miles south of the town and continues southward over a distance of nearly 30 miles to the top of Douglas Pass, the southern border of the Craig BLM District. Approximately 85 percent of the allotment is situated in Rio Blanco County with the remaining 15 percent in Garfield County to the south. In total, the allotment extends into six Townships (T1N & T1-5S) and three ranges (R101-103W).

3.    Area and Land Status (in tabular form) as of 3-11-81

| Ownership | Acres | AUMs | % Acres of Total | % AUMs of Total |
|---|---|---|---|---|
| Federal | 134,602 | 10,794 | 90 % | 66 % |
| State (DOW) | 789 | * | 0.7 % | -- |
| Private (controlled) | 14,039 | 5,650 | 9 % | 34 % |
| (uncontrolled) | 400 | -- | 0.3 % | -- |
| Total | 149,830 | 16,444 | 100 % | 100 % |

b.    Qualifications and Livestock Management Items

1.    Qualifications:

| Operator | AUMs | Suspended Non-Use | Total |
|---|---|---|---|
| Twin Buttes Ranch Co. | 10,794 | 1,130 | 11,924 |
| James D & CF Steele* | 700 | 0 | 700 |
| | | TOTAL | 12,624 |

2.   Estimated Average Use:  Estimated average relative
     to drought and market conditions.

| Operator | A U Cattle | AUMs Fed Range |
|----------|------------|----------------|
| Twin Buttes Ranch Co. | 1000 | 9100 |
| James D & CF Steele * | 50 | 700 |

* James D & CF Steele – Qualifications for Winter Use of
50 cattle of Texas Creek Sub-allotment.  AUM Use for the
period 1974 to the present is located in the appendix.

3.   Acreage of Soil Association by Condition Class and
     AUMs Produced (Description of Range Sites in Appendix)

| Soil Association | Acres | | | AUMs | | |
|------------------|-------|------|------|------|------|------|
| | Poor | Fair | Good | Poor | Fair | Good |
| 1 | | 1,478 | | | 102.99 | |
| 2 | 7,207 | 4,804 | | 426.4 | 363.9 | |
| 5 | 4,717 | 2,541 | | 262.0 | 195.5 | |
| 6 | 3,502 | 74,095 | 700 | 194.5 | 4,358.5 | 58.3 |
| 7 | 220 | 1,105 | 884 | 12.9 | 73.6 | 80.36 |
| 8 | 3,652 | 1,955 | | 214.8 | 150.3 | |
| 10 | 14,149 | 13,593 | | 1,274.6 | 1,510.3 | |
| Total | 33,447 | 99,571 | 1,584 | 2,385.2 | 6,755.09 | 138 |

c.   Elevation, Topography

1.   Elevation – Elevations on the allotment range from
approximately 5,475 feet along the bottoms of Douglas
Creek in the north to 9,030 feet atop the highest south-
eastern ridge of Douglas Pass.

3

2.    Topography – The Twin Buttes Allotment is a region
of variable topography.  Much of the northern region may
be characterized as a conglomerate of rocky foothills and
alluvial plains, which are highly dissected by numerous
intermittant drainages and washes.  Many of these drainages
are sharply terraced by rock outcrops composed of sandstone,
limestone or shale bedrock.

The central region of the allotment reflects much of the
same type of rough topography as the north, yet is distin-
guished by being more heavily vegetated.  The elevations
are generally higher in this region and the sloping
terrain is almost exclusively dominated by the pinyon-
juniper vegetative type.  The most prominent geologic
feature of this is a central ridge which runs north-
south, essentially dividing the allotment in half.  At
the pinnacle of the ridge is the central formation, Texas
Mountain.

The southern region of the allotment contains the Douglas
Pass ridge which is the highest and most extensive ridge
on the allotment.  This structure comprises the entire
southern border of the allotment and contains peak elevations
ranging from 8,500 feet to 9,300 feet.

4

AMP Preparatin/Revision Review Checklist Example *

Twin Buttes allotment
(Allotment Name)
Written by — name/title

Robert Fowler  —  Range Conservationist

| | Preparation Stage (Signature) | (Date) | Final Draft Stage (Signature) | (Date) |
|---|---|---|---|---|
| Range Specialist | Roberts | 12/18/80 | John Dula | 3/9/81 |
| Wildlife Biologist | | | Allen Duvall | 11 March 1981 |
| Watershed Specialist | | | Phil Wind | 3-12-81 |
| Realty Specialist | | | | |
| Minerals Specialist | | | | |
| Recreation Specialist | | | | |
| Environmental Coordn. | | | | |
| Archeologist | | | | |
| Forestry Specialist | | | C. Armstrong | 3-10-81 |

* Review specialists should be determined by Area Manager.

COMMENTS CONCERNING TWIN BUTTES ALLOTMENT MANAGEMENT PLAN

During review of the final AMP, questions were raised concerning wording and the origin of the Land Use Plan Objectives. This section is to clarify these questions in writing so that problems do not develop in the future.

Land Use Plan Objectives:  These objectives were developed within the range section of the Unit Resource Analysis (URA), Step 4 opportunities for development.  This section identifies by planning unit all technologically feasible opportunities to increase production and improve range condition for domestic livestock grazing.  From the URA, objectives are determined and rational for each prepared.  This is step 1 of the Management Framework Plan.  These objectives are then analyzed for impacts by an interdisciplinary team (step 2).  These impacts are then weighed and a decision is then made concerning the objective by the Area Manager (step 3).

The objectives contained within the Allotment Management Plan are verbatum from the Management Framework Plan and summarized within the White River Grazing EIS.  They are basic to the range program but may not specifically apply to the Allotment Management Plan.

Objective 3:  Relates to reductions and studies to verify forage production.  This objective does not relate to the situation on Twin Buttes Allotment as no reduction in livestock numbers is anticipated.  Studies are being conducted to verify carrying capacity and determine condition and trend.

Objective 5:  Sets minimum rest requirements.  As written in the AMP this objective is confusing and should be written as:

Initiate min... ...m rest requirement of 3-15 to 6-10 1 in 2 years on the range identified as spring range.  Initiate minimum rest requirement of 4-1 to 6-15 1 in 2 years on the range identified as transition range, the area between winter-spring and summer-fall. initiate minimum rest requirement of 4-15 to 7-15 1 in 2 years on the summer-fall range.

The above rest requirements were based on rest requirements for the key species within the identified seasonal range.  As the above dates often conflict with the actual year by year variation of plant phenology the above dates should not be considered as concrete and greater emphasis should be placed on actual plant phenology.

2.    LAND USE PLAN OBJECTIVES:

The range program is oriented towards three major objectives: to improve range conditions within acceptable standards; to provide an optimum amount of forage for livestock, wildlife, and wild horses on a sustained yield basis; to improve effeciency of grazing management.

These objectives and the following associated actions and constraints were developed through the Bureau planning system. They are specific decisions contained in the Management Framework Plan.

1.    Develop grazing systems that will satisfy key forage species minimum rest requirements. Grazing systems would incorporate adjustments in the actual livestock grazing use to bring grazing use to the level of available forage production.

2.    Decisions issued for implementation of grazing systems and enforcement of minimum rest requirements would be based on whether management facilities are needed to fully implement the grazing system.

3.    Reductions in livestock numbers would be spread over the implementation period. All reductions to be fully implemented by the end of the period. During this period, conduct necessary studies to verify allotment forage production.

5

4.  Develop livestock facilities including waters, fences, stock trails and vegetation manipulations. (Constraints to these facilities are contained in MFP Step II.).

5.  Initiate minimum rest requirement of 3-15 to 6-10 1 in 2 years and 4-1 to 6-25 1 in 2 years and 4-15 to 7-15 1 in 2 years.

Objectives of the watershed program include:

Protection of those watershed areas that are presently in a stable condition or in the highly susceptible erosion classification; prevent degradation of the water quality below that which presently exists. Public lands should be examined for plant species that are sensitive or have possibilities to be designated as threatened or endangered prior to surface disturbing activities.

6

3.  COORDINATION:

   a.  <u>Vegetation</u>

   1.  Forage allocation from adjusted range surveys indicates that areas of the allotment sustain grazing use above the current carrying capacity by wildlife, wild horses and livestock.

Vegetation Allocation

| Present Authorized Use Incl Susp-Non Use | Livestock | Deer | Elk | W. Horses |
|---|---|---|---|---|
| 11,371 | 11,371 | 1,587 | 142 | 0 |

TOTAL 13,100

   2.  On this allotment there are 21,808 acres of potentially suitable range.  These areas are presently not suitable due to lack of waters and access.  There are 17,543 acres of unsuitable range due to steep topography.  (Refer to Suitability Overlay).

   3.  Present condition by veg. type on Twin Buttes Allotment:

EXISTING LIVESTOCK RANGE CONDITION BY VEGETATION TYPE AND SUITABILITY CLASS

Range Condition

| Vegetation Type | Total | Poor Suitable | Poor Unsuitable | Fair Suitable | Fair Unsuitable | Good Suitable | Good Unsuitable |
|---|---|---|---|---|---|---|---|
| Grassland | 826 | 0 | 0 | 126 | 0 | 700 | 0 |
| Sagebrush | 37,124 | 0 | 0 | 36,240 | 0 | 884 | 0 |
| Mountain Shrub | 3,544 | 0 | 0 | 3,544 | 0 | 0 | 0 |
| Conifer | 7,151 | 0 | 0 | 3,550 | 3,601 | 0 | 0 |
| Waste | 6,200 | 0 | 6,200 | 0 | 0 | 0 | 0 |
| Pinyon-Juniper | 72,385 | 1,660 | 3,940 | 48,043 | 3,800 | 0 | 0 |
| Greasewood | 7,372 | 6,707 | 0 | 665 | 0 | 0 | 0 |
| TOTALS | 134,602 | 23,307 | 10,140 | 92,168 | 7,403 | 1,584 | 0 |

4.   Present trend on the allotment is 1513 acres improving condition, 114,043 acres are in static condition and 19,046 acres in declining condition.   (Refer to trend overlay).

b.   <u>Wild Horses</u>

1.   Currently there are approximately 200 wild horses on the Twin Buttes Allotment.

2.   Two thousand four hundred AUMs of forage will be required by wild horses until their removal.

3.   Wild horses are extending their range which is increasing competition between domestic livestock and wildlife.

4.   The range adjacent to Texas Mountain is in poor to fair condition with declining trend due to over use by wild horses.

c.   <u>Wildlife</u>

1.   Cottonwood Draw, Moonlight Draw and Lower Horse Draw lie within deer winter range but deer use is light.

2.    Water Canyon Allotment lies within deer winter range and receives a considerable amount of deer use.

3.    Texas Creek Allotment lies within deer winter range. The area around Rabbit Mountain receives heavy deer use. The southeastern section is considered critical deer winter range, as is a small area northwest of Texas Mountain.

4.    A deer migration corridor runs from the southeast corner of Texas Creek Allotment to the northwest central region.

5.    West Creek and West Douglas Creek are deer and elk summer range.  Habitat condition is rated good to excellent.  A small area in the center of the former West Creek Allotment is also considered critical elk winter range.  This 3.4 square mile area supports a herd of approximately 30 elk.

6.    Forage requirements for big game ungulates are 1587 AUMs for deer and 142 AUMs for elk.

d.  Watershed

1.  Erosion condition class.

| Stable | Slight | Moderate | Severe |
|--------|--------|----------|--------|
| 10,768 | 44,419 | 76,723 | 2,692 |

2.  Many of the major drainages in the northern and central regions contain severely incised gullies.

e.  Cultural/Historical

1.  Canyon Pintado Historic District lies along Colorado Hwy. 139 and affects a small portion of the allotment.

2.  The carrotmen pictographs are on the National Register of Historic Places located in Section 19, T1S, R102W.

3.  The Fremont Lookout Fortification is also a NRHP location in Section 4, T3S, R102W.

4.  An open Indian Camp is located at the confluence of West Creek and West Douglas Creek.

f.  Riparian

1.  Riparian zones are located along West Creek, Missouri Creek and Wild Rose Spring.

g.   <u>Energy Development</u>

   1.   Oil and Gas exploration continues to impact key grazing areas throughout the allotment.

h.   <u>Visual</u>

   1.   Colorado Highway 139 has been designated as a scenic corridor in the White River MFP.

i.   <u>Wilderness</u>

   1.   Oil Spring Mountain Wilderness Study Area is located south of Texas Mountain.

4.    GRAZING MANAGEMENT PROBLEMS

The following is a description of the major problems and conditions which are either a part of the current grazing system or directly affect the utilization of range forage by livestock.

There are several major areas, primarily in the southern region of the allotment, which are inaccessible to livestock due to steep topography. Collectively, these areas constitute approximately 17,000 acres of unsuitable range (refer to the grazing use patterns overlay d. for location of these areas). If all minor steep topographic aspects were included in this figure, nearly 19,000 acres or one seventh of the allotment would be considered to be inaccessible to livestock.

There is a lack of access trails in the west central region, north and south of Oil Spring Mountain, which inhibits the spring/fall migration of cattle through this area.

There is a lack of watering facilities, primarily in the northern and central winter-spring-fall ranges and in the high country above Missouri and West Creek.

The allotment lacks exterior fencing along portions of the eastern boundary. This has caused problems in the handling and control of livestock between the allottee and adjacent operators.

The allotment also lacks sufficient interior fencing to improve livestock distribution and utilization.

The allotment receives continous use in the creek bottom areas of Little Horse Draw and Douglas Creek during the spring of each year. Consequently, these areas have been overutilized.

Sheep herds trail through the northern region of the allotment each spring and fall, in the vicinity of Cottonwood Creek and along Dragon Road. This has caused overuse around watering holes and along the trailing route.

There is a need for detached winter campsite and corral facility in the northern region of the allotment. The present lack of these facilities has limited the extent of range riding during the winter months, when livestock may become stranded or entrapped by winter storms.

Many of the major intermittent drainages in the northern and central regions contain deeply "incised" gullies, which run the length of the drainages. From the standpoint of range management this condition prevents livestock from moving freely to either side of a drainage.

Salting practices in the southern region of the allotment have enhanced livestock distribution by establishing salt grounds up on the ridges, away from water. However, these salt grounds have not been moved from year to year, consequently cattle have congregated in these areas causing a localized deterioration in the watershed. This condition is particularly evident in several of the high elevation sagebrush parks.

Poisonous plants are a potential problem in several small areas throughout the allotment. Halegeton (Halogeton glameratus) occurs on distrubed sites in the northern winter range. Water hemlock (Cicuta douglasii) may be found in the drainages of Douglas Creek and West Creek, generally in private wet meadows and pastures. Other species, such as Houndstongue (Cynoglossum ssp.), locoweed (Astrogalus spp.), larkspur (Delphinium spp.) and chokecherry (Prunus Virginiana), occurs in isolated areas throughout the central and southern spring-summer-fall ranges.

There is a continuing problem of gates being left open along several of the fenced sections of the allotment. This problem generally occurs most frequently during the hunting season.

5.    OBJECTIVES

    a.    <u>Vegetation</u>

        1.    Objective:  Increase the present grazing capacity
for livestock of 11,371 AUMs to 12,181 AUMs within 20
years.

        2.    Maintain the upward trend on Lower Horse Draw Allot-
ment.  Improve static trend of Cottonwood Draw and Water
Canyon Allotments.  Improve declining trend of Little
Horse Draw area.  Improve static trend on Texas Creek
Allotment.  Improve static trend on West Creek and West
Douglas Creek Allotments.  Trend is to be improving
within 10 years.

Rationale:  Management problems related to vegetation can
be resolved by improving condition and trend.  Forage
availability for both livestock and big game will increase,
soil erosion rates will decrease.  Improving condition
and trend will result in improved plant species diversity,
increased forage production and will more adequately
provide for the nutritional requirements of livestock and
big game.  Vegetation objectives are to be accomplished
through implementation of the grazing system, which would
allow for the rest of plant species, and allow density,
cover, and production to increase; development of water

15

facilities which would allow 17,543 acres of potentially suitable range due to lack of waters to be utilized. Building of livestock trails to allow access to areas not currently accessable; through vegetation manipulation to increase production of herbacious species in areas of dense pinyon-juniper and decident Mountain Shrub vegetation. Through fences to control areas of use by livestock. By removal of wild horses in which case AUMs allocated to wild horses would be reallocated to livestock and wildlife.

b.    Management

1.    Objective: Improve the plant composition of the livestock trail and adjacent areas of Cottonwood Draw Allotment from 50% Bromus tectorum to 20% Agropyron smithii within 15 years.

Rationale: Improving plant composition along the livestock trail would increase cover and decrease erosion rates. This objective is to be obtained by clearly marking the livestock trail and issuing trespasses to livestock operators straying outside of trail boundaries. An alternate trailing site would also be establihsed to allow for rest of the trail.

16

2.    Objective:  Improve livestock operators ability to care for cattle during the winter and spring.

Rationale:  Improved handling of cattle during the winter and critical spring calving season would decrease the death loss of livestock.   Construction of a detached campsite and corral in the area of West Fourmile Reservoir would provide a base for range riders.

3.    Objective:  Prevent inter and intra- allotment trespass cuased by lack of fencing and open gates.

Rationale:  Controlling livestock movements would improve the permittees ability to manage location and distribution of stock.  Objective could be accomplished by building allotment boundary fences and posting gates that are to be left closed.  In areas where open gates are a continuing problem cattleguards would be installed.

4.    Objective:  Mitigate loss of forage from energy related development.

Rationale:  Requiring surface disturbing activities to mitigate loss of forage through off site land treatments would improve plant composition and decrease erosion on

previously less productive areas. Mitigation would stabilize the ranch operation. Mitigation would be accomplished through off site pinyon-juniper and brush manipulations.

c.   <u>Wild Horses</u>

1.   Objective:  Provide forage and habitat for approximately 200 wild horses until removal.

Rationale:  Allocate forage for wild horses until their removal.  Allocation would prevent degradation of vegetation and soil resources.

d.   <u>Wildlife</u>

1.   Objective:  Provide 1,587 AUMs to deer, 142 AUMs to elk and in the long term provide 1,952 AUMs for deer, and 160 AUMs for elk.

Rationale:  Land use plan objectives are to improve habitat quality and carrying capacities so deer and elk populations can increase by 23 and 8 percent respectively on the allotment.  Refer to vegetation rationale for specifics on how this objective is to be obtained.

2.    Objective:  Maintain or improve the condition of browse within the critical deer and elk winter range.

Rationale:  Areas within the allotment designated as critical deer and elk winter range should be maintained or improved from the current condition so as to provide a adequate food supply for wildlife and livestock.  Combined utilization of key species by livestock and wildlife limited to 45 percent leader growth.

6.   KEY SPECIES AND PHENOLOGY

a.   Phenology

Low Elevation Winter Ranges

|  | Start Growth | Boot | Flower | Seed Ripe |
|---|---|---|---|---|
| Western wheatgrass | 4-1 | 6-20 | 7-15 | 8-15 |
| Colorado wildrye | 3-20 | 5-25 | 6-15 | 7-1 |
| Mountain mahogany | 4-15 | 5-20 | 7-20 | 8-20 |

Central Mid-Elevation Spring and Fall Ranges

|  | Start Growth | Boot | Flower | Seed Ripe |
|---|---|---|---|---|
| Indian ricegrass | 3-20 | 6-10 | 7-1 | 7-20 |
| Needle & Thread Grass | 4-10 | 5-23 | 6-10 | 6-20 |
| Mountain Mahogany | 4-15 | 5-20 | 7-20 | 8-20 |

South High Elevation Summer Ranges

|  | Start Growth | Boot | Flower | Seed Pipe |
|---|---|---|---|---|
| Mountain Brome | 5-1 | 7-1 | 7-10 | 7-30 |
| Columbia and Letterman needlegrass | 5-1 | 7-10 | 7-20 | 8-10 |
| Mountain Mahogany | 4-15 | 5-20 | 7-20 | 8-20 |

b.   Key Species - Rationale

1.   Key Species

Key Species selected for evaluation on the Twin Buttes Allotment are as follows:

20

For the north low elevation winter ranges – western wheatgrass (<u>Agropyron</u> <u>smithii</u>) Agsm, Colorado wildrye (<u>Elymus</u> <u>ambiguus</u>), and mountain mahogany (<u>Cercocarpus</u> <u>montanus</u>) Cemo.

For the central mid-elevation spring and fall ranges – indian ricegrass (<u>Oryzopsis</u> <u>hymenoides</u>) Orhy, needle and thread grass (<u>Stipa</u> <u>comata</u>) Stco, and mountain mahogany (<u>Cercocarpus</u> <u>montanus</u>) Cemo.

For the south high elevation summer ranges – mountain brome (<u>Bromus</u> <u>marginatus</u>) Brma, nodding brome (<u>Bromus</u> <u>anomalus</u>) Bran, needle grasses (<u>Stipa</u> <u>columbiana</u>, <u>Stipa</u> <u>lettermanii</u>), and true mountain mahogany (<u>Cercocarpus</u> <u>montanus</u>) Cemo.

For specific information regarding the percent composition and phenological profile of these key species, refer to the transect data sheets (Form 4112-2) in the Appendix and Overlay b.

2.   Rationale

The above perennial vegetative species were chosen for the protection and maintenance of the watersheds as they are usually the best type of vegetation to improve soil structure and reduce erosion rates.

The rhyzomatous cool season grass Agsm was specifically chosen as an indicator for the drier bottomland drainages which comprise much of the northern winter ranges. This species has a relatively high preference rating for livestock and is an excellent indicator of disturbed and/or poor drainage sites.

The perennial bunchgrasses of Elam, Stco and Orhy were chosen as key watershed plants because these grasses appear to be well adapted to the steep shale slopes and warm south exposures characteristic of much of the central region of the alloment. On these types of sites, these species often provide critical spring and fall forage. Forage value and preference for these species varies greatly with the range site, however, as a general overall ranking, Elam is good; Stco is fair; and Orhy is fair.

The cool season grasses of Brma, Stcol, and Stle were selected as primary indicators for the interpretation of range condition in the high elevation aspen and sagebrush park ranges location in the southern region. These bunchgrasses are prolific in both their production and distribution on these upland ranges. Both grasses also have a high forage value and prefence rating, and may be recognized and easily evaluated in the field due to their large conspicuous seed heads.

The major browse plant selected for evaluation is Cemo, a plant which is widely distributed over the allotment and has a

22

high forage preference rating for both livestock and wildlife.
Because of these attributes, it is an excellent indicator
species for monitoring hedging pressure in an area.  Attempts
will be made to discern the types of use made on this plant,
whether it be from livestock, big game or both.

7. GRAZING MANAGEMENT SYSTEM

Twin Buttes Ranch Company

The management system to be employed on Twin Buttes Allotment is a combination of continuous use, deferred use and year long rest. Lower Horse Draw, Cottonwood Draw, Water Canyon and Texas Creek will be grazed continously throughout the winter season yearly, and deferred from grazing March 15 through October 1 during alternate years. The summer range, West Creek and West Douglas Creek would be grazed continously June 15 to October 1. The holding pasture would be rested from grazing on alternate years.

The allotment will be composed of six grazing use areas (pastures) which correspond with the old allotment boundaries. Use within these areas will be controlled by herding, fencing of waters and boundary fences (Overlay 4). During the course of the year-round grazing season, the cycle of livestock use within the pasture shall proceed as follows: The first year all Twin Buttes livestock, approximately 1,000 cattle, will be spread out between Lower Horse Draw, Cottonwood Draw, Water Canyon and Texas Creek allotments for the winter period of October 15 - March 15. The number of cattle to be placed in each of these pastures will be determined by the permittee, to attain the most even utilization of the forage resource for that year. After the start of plant growth approximately March 15, all livestock will be moved into Cottonwood Draw and west half of Texas Creek allotments and eventually driven to the south end of the west half of Texas Creek Allotment by June 5, or as key species are grazed to 60 percent use. Starting June 5, all livestock will be moved into the small

24

holding pasture east of Texas Mountain where they would be held for approximately ten days as they are processed (branding, vaccinations) and split into two herds of approximately equal numbers. After June 15, or as Letterman needlegrass reaches five inches growth, one herd will be trailed to the West Douglas Creek Allotment and the other to West Creek Allotment. The livestock will remain dispersed in these pastures for the duration of the summer, June 15 to October 15 or until key species are grazed to 50 percent. After October 15, the cattle will be allowed to drift back through all pastures until they are again secured in Cottonwood Draw, Water Canyon, Lower Horse Draw and Texas Creek Allotments by January 15.

The second year, cattle will remain in the four pastures throughout the winter grazing period, until March 15. After the start of plant growth approximately March 15, the livestock will be moved into Lower Horse Draw, Water Canyon and the East half of the Texas Creek Allotments. The livestock will then be moved to the south end of the east half of Texas Creek Allotment by June 5, or as key species are grazed to 60 percent use. During this period the livestock will again be separated into two herds of equal numbers. After June 5, the herds will be driven to West Douglas Creek and West Creek Allotments going east around the holding pasture (east of Texas Mountain). Again, the cattle will be dispersed throughout the summer range until October 15, or until key species are grazed to 50 percent. After the 15th, the cattle will be allowed to drift through all pastures, trampling and shattering seed until they are

25

secured in the winter range.

Steele Brothers

The Steele Brothers will run in conjunction with the Twin Buttes
cattle in the east and west halves of Texas Creek allotments during
the winter and early spring.  During the first year, the Steele
livestock will be dispersed throughout the west half of the Texas
Creek Allotment from November 1 to May 30.  The second year, they
will use the east half of Texas Creek Allotment from November 1 to
May 30.

Rationale

The proposed grazing system is designed to be compatible with other
resource values.  It was primarily selected because it will allow
rest of all winter, spring, and fall pastures until after seed
ripe, one in two years.  This system negates the harmful effects of
selective grazing by resting the range at intervals so that all
plant species can improve vigor and reproduce normally.  This
system also allows for maximum storage of carbohydrates in the
roots by plants in the rested pasture.  The summer, fall pastures
of West Creek and West Douglas Creek would be rested yearly during
the critical early spring period of plant growth and establishment.

8.    EXISTING RANGE IMPROVEMENTS - PROPOSED RANGE IMPROVEMENTS

Existing Range Improvements

Currently an inventory of all range improvements is being conducted to determine location, condition and maintenance responsibility. Upon completion of this inventory a complete list will be placed in this document. On the following page is a current list of exising range improvements.


Proposed Range Improvements

A list of proposed projects is located after the list of existing range improvements.

27

EXISTING RANGE IMPROVEMENTS

| Type | Units | Date Completed | Maint. Respons. | Condition | Location Other |
|------|-------|----------------|-----------------|-----------|----------------|
| | | | | | T3-4S R102W |
| Reservoir | 9.0 | 73 | 3 | Fair | Sec. 27 T3S R102W |
| Ret. Dam | 1.0 | 61 | 3 | | Sec. 35 T3S R102W |
| Reservoir | 1.0 | 50 | 1 | Poor | Sec. 4 T3S R102W |
| Reservoir | 1.0 | 72 | 3 | Poor | T3-4S R102W |
| Springs | 12.0 | 73 | 3 | Fair | Sec. 17 T4S R102W |
| Spring | 1.0 | 42 | 3 | Poor | Sec. 12 T4S R103W |
| Spring | 1.0 | 44 | 1 | Inaccessable | Sec. 10 T5S R102W |
| Spring | 1.0 | 56 | 3 | | Sec. 23 T1S R103W |
| Well | 1.0 | 46 | 3 | Needs pump & engine | Sec. 22 T1S R102W |
| Well | 1.0 | | | Needs new pipe, pump & engine | Sec. 11 T3S R103W |
| Seep | 1.0 | 44 | 1 | Needs development | |

EXISTING RANGE IMPROVEMENTS

| Project No. | Name | Type | Units | Date Completed | Maint. Respons. | Condition |
|---|---|---|---|---|---|---|
| 4012 | Robinson-Theos Fence | Fence | 7.8 | 70 | 3 | Good |
| 4116 | Brady-Kirby Fence | Fence | 3.9 | 71 | 3 | Fair |
| 0899 | Cottonwood Fence | Fence | 3.7 | 67 | 1 | Fair |
| 1180 | Upper Hr. Dr. En. Fence | Fence | .4 | 68 | 3 | Fair |
| 0639 | Douglas Creek Fence | Fence | 3.9 | 68 | 3 | Fair |
| 0895 | Red Rock Fence | Fence | 5.2 | 68 | 1 | Fair |
| 0583 | Texas Creek Fence | Fence | 4.5 | 66 | 3 | Fair |
| 3529 | E-W-3 Fence 2 | Fence | 1.1 | 69 | 3 | Fair |
| 3550 | Twin Buttes Fence | Fence | 3.8 | 69 | 3 | Fair |
| 1395 | Rector Sec. 4 Fence | Fence | 4.0 | 53 | 3 | Fair |
| 1396 | Kirby Sec. 4 Fence | Fence | 1.5 | 53 | 3 | Fair |
| 0511 | West End Canyon Fence | Fence | 2.4 | 65 | 3 | Fair |
| 4418 | Kirby-Young Fence | Fence | 2.7 | 73 | 3 | Good |
| 0421 | No Name Tr. Tr. | Truck Trail | 6.0 | 44 | 1 | |
| 0509 | Water Canyon Ridge Tr. Tr. | Truck Trail | 4.0 | 45 | 1 | |
| 0601 | Jensen Tr. Tr. | Truck Trail | 3.2 | 46 | 1 | |
| 0594 | Moon Canyon Tr. Tr. | Truck Trail | 2.5 | 46 | 1 | |
| 0565 | West Cottonwood Tr. Tr. | Truck Trail | 3.5 | 46 | 1 | |
| 0397 | Texas Mtn. Tr. Tr. | Truck Trail | 12.5 | 44 | 3 | |
| 0562 | Water Canyon Tr. Tr. | Truck Trail | 1.5 | 46 | 1 | |
| 4476 | Kirby Sec. 4 Roads | Roads | 29.0 | 73 | 3 | Good |
| 0645 | Doug. Cr. Brush Control | Brush Control | 889.0 | 66 | 1 | Good |
| 0027 | Cowboy Corral Res. | Reservoir | 1.0 | 41 | 3 | Fair |
| 0517 | Lower Jensen Res. | Reservoir | 1.0 | 45 | 3 | Poor |
| 0072 | Middle Cottonwood Res. | Reservoir | 1.0 | 43 | 3 | Poor |
| 0032 | Cottonwood Res. #2 | Reservoir | 1.0 | 41 | 3 | Poor |
| 0029 | Lower Hr. Dr. Res. | Reservoir | 1.0 | 41 | 3 | Good |
| 4349 | Kirby Sec. 4 Res. | Reservoir | 7.0 | 72 | 3 | Fair |
| 0042 | Water Canyon Res. | Reservoir | 1.0 | 41 | 1 | Fair |
| 0401 | Upper Red Wash Res. | Reservoir | 1.0 | 44 | 1 | Fair |
| 4352 | Kirby Sec. 4 Dams | Reservoir | 2.0 | 72 | 3 | Fair |
| 1122 | N. Tex. Cr. Check Dams | Check Dams | 4,086 Cu. Ft. | 67 | 1 | 1 Fair  2 Good |
| 0405 | Lower Red Wash Res. | Reservoir | 1.0 | 44 | 1 | Fair |
| 0680 | Rope Canyon Res. | Reservoir | 1.0 | 50 | 1 | |

## EXISTING RANGE IMPROVEMENTS

| Type | Units | Date Completed | Maint. Respons. | Condition | Location Other |
|------|-------|----------------|-----------------|-----------|----------------|
| Fence | 7.8 | 70 | 3 | Good | T1S & 1N R102W |
| Fence | 3.9 | 71 | 3 | Fair | T3S R101W |
| Fence | 3.7 | 67 | 1 | Fair | T1S R102W |
| Fence | .4 | 68 | 3 | Fair | Sec. 36 T2S R102W |
| Fence | 3.9 | 68 | 3 | Fair | T3S R101W |
| Fence | 5.2 | 68 | 1 | Fair | Sec. 33 T3S R101W |
| Fence | 4.5 | 66 | 3 | Fair | T3S R103W |
| Fence | 1.1 | 69 | 3 | Fair | T4S R101-102W |
| Fence | 3.8 | 69 | 3 | Fair | T4S R102W |
| Fence | 4.0 | 53 | 3 | Fair | T4S R102W |
| Fence | 1.5 | 53 | 3 | Fair | Sec. 34 T4S R102W |
| Fence | 2.4 | 65 | 3 | Fair | Sec. 23, 26, 35 T4S R103W |
| Fence | 2.7 | 73 | 3 | Good | T5S R102W |
| Truck Trail | 6.0 | 44 | 1 | | T1S R102W |
| Truck Trail | 4.0 | 45 | 1 | | T1-2S R102W |
| Truck Trail | 3.2 | 46 | 1 | | T1S R103W |
| Truck Trail | 2.5 | 46 | 1 | | T1S R103W |
| Truck Trail | 3.5 | 46 | 1 | | T1S R103W |
| Truck Trail | 12.5 | 44 | 3 | | Sec. 19 & 20 T2S R102W |
| Truck Trail | 1.5 | 46 | 1 | | Sec. 34 T2S R102W |
| Truck Trail | 29.0 | 73 | 3 | Good | T2S R103W |
| Roads | 889.0 | 66 | 1 | Good | T3S R102W |
| Brush Control | 1.0 | 41 | 3 | Fair | Sec. 18 T1S R102W |
| Reservoir | 1.0 | 45 | 3 | Poor | Sec. 16 T1S R103W |
| Reservoir | 1.0 | 43 | 3 | Poor | Sec. 21 T1S R103W |
| Reservoir | 1.0 | 41 | 3 | Good | Sec. 23 T1S R103W |
| Reservoir | 7.0 | 72 | 3 | Fair | Sec. 28 T1S R102W |
| Reservoir | 1.0 | 41 | 1 | Fair | Sec. 7, 16, 17, 19 & 21 T2S R102W |
| Reservoir | 1.0 | 44 | 1 | Fair | Sec. 21 T2S R102W |
| Reservoir | 2.0 | 72 | 3 | Fair | Sec. 30 T2S R102W |
| Check Dams | 4.086 Cu. Ft. | 67 | 1 | 1 Fair 2 Good | Sec. 30 T2S R102W |
| Reservoir | 1.0 | 44 | 1 | | Sec. 36 T2S R103W  Sec. 2 & 10 T3S |
| Reservoir | 1.0 | 50 | 1 | Fair | Sec. 25 T2S R103W |
| | | | | | Sec. 30 T3S R101W |

PROPOSED PROJECTS

| Name | No. | Size | Maintenance Responsibility |
|---|---|---|---|
| Cottonwood Well | 1 | 8 Ft. Fan | 3 |
| Cottonwood Reservoirs | 6 | 1200 Yds$^3$ | 3 |
| Horse Draw Well #1 | 1 | 8 Ft. Fan | 3 |
| Horse Draw Well #2 | 1 | 8 Ft. Fan | 3 |
| Horse Draw Reservoirs | 7 | 1200 Yds$^3$ | 3 |
| Water Canyon Catchments | 3 | | 3 |
| Water Canyon Reservoirs | 8 | 1200 Yds$^3$ | 3 |
| Land Treatments P-J | 5 | 1500 Acres Total | 1 |
| Camp Site | 1 | 1 Acre | 3 |
| East Texas Creek Reservoirs | 20 | 1500 Yds$^3$ | 3 |
| West Texas Creek Veg. Manips. P-J | 1 | 420 Acres | 1 |
| West Texas Creek Stock Trail | 1 | .7 Miles | 3 |
| West Texas Creek Reservoirs | 9 | 1500 Yds$^3$ | 3 |
| East Texas Creek Veg. Manips. P-J | 5 | 1800 Acres | 1 |
| East Texas Creeek Stock Trails | 4 | 1.5 Miles | 3 |
| West Texas Creek Seep | 1 | 1 Trough | 3 |
| West Creek Stock Trail | 1 | .5 Miles | 3 |
| West Creek Reservoirs | 10 | 1200 Yds$^3$ | 3 |
| W.C. Land Treatments P-J | 3 | 1300 Acres Total | 1 |
| W.C. Land Treatments Mtn. Shrub | 1 | 500 Acres | 1 |
| West Douglas Creek Springs | 2 | 6 Troughs | 3 |
| West Douglas Creek Reservoirs | 4 | 1400 Yds$^3$ | 3 |
| Missouri Creek Reservoirs | 3 | 1000 Yds$^3$ | 3 |
| Division Fence | 1 | 24 Miles | 3 |
| Rock Canyon Fence | 1 | 5.5 Miles | 3 |
| Douglas-Brush Creek Fence | 1 | 5.3 Miles | 3 |
| Foundation Creek Fence | 1 | .8 Miles | 3 |
| Timber Canyon Fence | 1 | 2.6 Miles | 3 |

9. TRAILING

The trailing or movement of livestock between pastures in the
allotment will be accomplished in a timely order to meet the yearly
grazing schedule as outlined. Livestock may be moved to and from
areas by opening up fenced waters in advance of livestock and
closing them behind, salting in advance along upland trail routes
and range ridings.

All trailing will be done within the confines of the allotment with
the exception of an area outside of the allotment along Douglas
Creek. This area runs along Highway 139 for approximately five miles
between Little Vandamore Draw and Little Horse Draw. Trailing
through this area will not require a trailing permit since the
permittee's use has been authorized.

10.  FLEXIBILITY

Flexibility options will be exercised in this plan as follows:

There will be allowed 15 days of flexibility on either side of the pasture change dates (which are specified in the Yearly Grazing Schedule).

During periods of drought, fire damage to a grazing area, flood or snow damage to facilities, or poisonous plant occurrence, pastures being rested may be grazed provided prior approval from the Area Manager is obtained.  If these conditions persist, livestock numbers or season of use will be adjusted correspondingly to the reduction in forage.

11.  INTERIM GRAZING SYSTEM

The interim grazing system would be the same as the existing system;
that being, cattle would spend the winter and spring (November 1 to
May 20) in Cottonwood Draw, Water Canyon, Lower Horse Draw, and
Texas Creek Allotments.  During the period May 20 to June 10, the
animals drift to the summer country of West Creek and West Douglas
Creek.  Livestock are pulled off the summer country prior to big
game hunting season and held on private pastures in West Creek and
West Douglas Creek until the end of hunting season.  After hunting
season, the cattle are moved to the winter country.

Upon completion of the interior and boundary fencing and sufficient
waters and vegetation manipulations to provide sufficient forage
and water, the proposed grazing system will go into effect.  It
should be emphasized that without adequate waters and vegetation
manipulations, the proposed grazing system would not function.

33

12. GRAZING USE

TWIN BUTTES RANCH COMPANY

Grazing use for the 1982 grazing season would be at the existing level.

Changes in use after the 1982 grazing season would be determined through utilization and trend studies. This process has been outlined in the decisions of January 1982.

STEELE, JAMES D.

Grazing use for the period 3/1/82 to 2/28/84 would be 339 AUMs on the Texas Creek Allotment. For the period 3/1/84 to 2/28/89, use would be 319 AUMs on the Texas Creek Allotment. Changes in use during the above period would be determined through utilization and trend studies.

STEELE, C. F.

Grazing use for the period 3/1/82 to 2/28/84 would be 209 AUMs on the Texas Creek Allotment. For the period 3/1/84 to 2/28/89, use would be 199 AUMs on the Texas Creek Allotment. Changes in use during the above period would be determined through utilization and trend studies.

13.  CHANGES IN GRAZING USE

    a.  <u>Numbers</u>

       Numbers in excess of the normal operation must be authorized
       by the Area Manager.

    b.  <u>Natural Disaster</u>

       If any natural disaster affects the allotment (i.e., fire,
       drought) variances from the normal grazing system must be
       authorized by the Area Manager.

    c.  <u>Flexibility in Numbers and Turnout and Closing Dates</u>

       Flexibility may be authorized as studies show additional
       forage is available.

14.  BILLING PROCEDURES

Billings will be made on the basis of actual use records maintained by the livestock operator(s).  Grazing use must be made within the normal operation and operator flexibility as specified above unless additional flexibility is approved, in advance, by the Area Manager. Billings for grazing fees will be made after the fact in accordance with 43 CFR 4120.203(e) and 4130.5-1(e).

The livestock operator shall submit at each pasture change actual livestock grazing use.  Upon failure to submit an actual use report, a bill immediately due and payable shall be issued for grazing use at the upper limit of flexibility set forth in the Allotment Management Plan.

No annual application, except for nonuse, is required for grazing use authorized by this plan.  Use authorized in excess of established qualifications is considered nonrenewable.  Supplementary use does not establish additional priority qualifications (43 CFR 4130.4). Actual use will be defined and certified on a form provided by the BLM.  This certification will become a part of the Allotment Management Plan.

The failure for two consecutive fee years to make substantial use of all or part of the grazing privileges authorized in the normal operation, may result in the cancellation of the grazing preference only to the extent of failure to use (43 CFR 4170.1-2 and 4140.1(a)(2) Prohibited Acts).

36

15.  STUDIES AND EVALUATION

a.   <u>Studies</u>

Actual use records will be maintained by the permittee throughout
the course of each grazing season.  These records will provide
the basis for actual use billing at the end of each grazing
fee year.  The grazing fee year has been established from
March 1 – February 28.  Studies to be conducted on the allot-
ment will include those necessary to make an evaluation of the
effectiveness of the plan.  These are shown below:

| Range Study | Study Completion Date | Frequency | Method | Responsibility BLM/Permittee | |
|---|---|---|---|---|---|
| Actual Use | End of each graz-ing fee year. | With each pasture change. | Actual use record. | | X |
| Utilization | Annually | After each pasture change. | Paired Plot Key Forage Plant | X | |
| Condition & Trend | September | Every 3 years | Photo Plots Daubenmire | X | |
| Climate | Annually | Annually | Weather Bureau BLM rain gauge | X | X |
| Riparian | September | Every 2 years | Photo points | X | |

As outlined above, permanent photo and transect sites will
be established in each pasture to insure consistency in the
vegetative data that will be obtained.  Paired plots will be

established in conjunction with the permanent photo plots. These plots will be read after each pasture change.

Rain gauges will be set up in three locations on the allotment to monitor local moisture regimes (consult overlay g. for the approximate location of the proposed rain gauge).

In addition to specific resource studies, such as those mentioned above, allotment supervision visits will be conducted to check licensed compliance of the AMP. There will be a minimum of three visits per year, all to occur at the time when pasture changes are designated. A compliance checklist (form CSO 4000-1) will be completed at this time and filed with the AMP. Other visits may be scheduled as necessary to properly surpervise the plan.

b.   AMP Evaluation

Evaluation of the AMP would be made after each cycle of the grazing system (two years). At that time, on-the-ground inspection would be made by the range conservationist responible for supervision of the AMP, the grazing permittee, and those resource specialists whose resource is being affected by the grazing management of the allotment.

The inspection would include a stop at all study plots in all pastures. Trend photos and evaluation summary sheets would be

reviewed at each site. Any problems indicated by the permittee or others should be investigated and discussed.

An overall inspection of each pasture would be completed to determine if the objectives of the AMP are being met.

Each resource specialist would prepare a paper on his findings and recommendations.

The range conservationist responsible for the AMP should consolidate all information and prepare final conclusions and recommendations.

The final report should be discussed with the permittee and necessary changes worked out mutually.

APPENDIX

**GRAZING FORMULA**

| Treatment | March | April | May | June | July | August | September | October | November | December | January | February |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | Rest For Plant Vigor, Seed Production | | | | | | | | | | | |
| B | Graze for Lvsk Production | | | | | R e s t | | | | | | |
| C | Rest During Early Spring For Plant Growth | | | Graze for Livestock Production | | | | | | R e s t | | |
| D | | R e s t | | Graze | | | | R e s t | | G r a z e | | |
| E | | | | | | R e s t | | | | | | |

**GRAZING SCHEDULE**

| Year | Horse Draw | Water Canyon | East ½ Texas Creek | Cottonwood Creek | West ½ Texas Creek | West Creek | Douglas Creek | Holding Pasture |
|---|---|---|---|---|---|---|---|---|
| 1 | A | A | A | B | B | C | C | D |
| 2 | B | B | B | A | A | C | C | E |

GRAZING SEQUENCE

YEAR 1

| Cottonwood | L. Horse Draw & Water Canyon |
|---|---|
| 10-15      6-5<br>Graze | 10-15      3-15<br>Graze |
| W½ Texas Creek | E½ Texas Creek |
| 10-15      6-5<br>Graze | 10-15      3-15<br>Graze |
| Holding Corral | |
| 6-5-6-15<br>Graze | |
| West Creek | W. Douglas Crk. |
| 6-15     10-15<br>Graze | 6-15     10-15<br>Graze |

YEAR 2

| Cottonwood | L. Horse Draw & Water Canyon |
|---|---|
| 10-15      3-15<br>Graze | 10-15      6-5<br>Graze |
| W½ Texas Creek | E½ Texas Creek |
| 10-15      3-15<br>Graze | 10-15      6-5<br>Graze |
| Holding Corral | |
| Rest | |
| West Creek | W. Douglas Crk. |
| 6-15     10-15<br>Graze | 6-15     10-15<br>Graze |



# EIGHTH REPORT TO CONGRESS 1990

# ADMINISTRATION OF THE WILD FREE-ROAMING HORSE AND BURRO ACT


United States
Department of the
Interior


Bureau of
Land Management


United States
Department of
Agriculture


Forest
Service



| STATE / HERD AREA NAME | ACREAGE BLM | ACREAGE OTHER* | HERD AREA MANAGEMENT STATUS | HORSE AML | HORSE POP | BURRO AML | BURRO POP | FY HMAP | FY LAST CENSUS |
|---|---|---|---|---|---|---|---|---|---|
| **COLORADO** | | | | | | | | | |
| LITTLE BOOKCLIFFS | 30,261 | 816 | HERD MGT AREA | 125 | 95 | 0 | 0 | 84 | 89 |
| NATURITA | 19,700 | 5,640 | REMOVE ANIMALS | 0 | 0 | 0 | 0 | -- | -- |
| NORTH PICEANCE | 120,214 | 10,705 | REMOVE ANIMALS | 0 | 30 | 0 | 0 | -- | 84 |
| PICEANCE-EAST DOUGLAS CREEK | 148,153 | 16,579 | HERD MGT AREA | 95 | 200 | 0 | 0 | 84 | 87 |
| SANDWASH | 154,960 | 2,800 | HERD MGT AREA | 160 | 130 | 0 | 0 | 84 | 89 |
| SPRING CREEK | 14,835 | 1,620 | HERD MGT AREA | 50 | 80 | 0 | 0 | 86 | 89 |
| WEST DOUGLAS CREEK | 271,936 | 30,352 | REMOVE ANIMALS | 0 | 70 | 0 | 0 | -- | 84 |
| **TOTALS:** | 760,059 | 68,512 | | 430 | 605 | 0 | 0 | | |
| **STATE HERD AREA TOTAL:** | 828,571 | | STATE WH&B AML: 430 | | | STATE WH&B POP: 605 | | | |
| **IDAHO** | | | | | | | | | |
| BLACK MOUNTAIN | 35,000 | 0 | HERD MGT AREA | 30 | 30 | 0 | 0 | 78 | -- |
| CHALLIS | 154,150 | 10,570 | HERD MGT AREA | 185 | 223 | 0 | 1 | 79 | 89 |
| HARD TRIGGER | 70,000 | 0 | HERD MGT AREA | 66 | 49 | 0 | 0 | 78 | 89 |
| MORGAN CREEK | 17,952 | 0 | REMOVE ANIMALS | 0 | 0 | 0 | 0 | -- | -- |
| SANDS BASIN | 15,000 | 0 | HERD MGT AREA | 22 | 22 | 0 | 0 | 78 | -- |
| SAYLOR CREEK | 50,000 | 0 | HERD MGT AREA | 50 | 30 | 0 | 0 | -- | -- |
| SHEEP MOUNTAIN | 4,000 | 10,000 | REMOVE ANIMALS | 0 | 0 | 0 | 0 | -- | -- |
| WEST CRANE CREEK | 10,000 | 0 | REMOVE ANIMALS | 0 | 0 | 0 | 0 | -- | -- |
| WILLOW RIDGE | 90,000 | 0 | NO DECISION | -- | 0 | 0 | 0 | -- | -- |
| **TOTALS:** | 466,102 | 20,570 | | 353 | 354 | 0 | 1 | 355 | -- |
| **STATE HERD AREA TOTAL:** | 466,672 | | STATE WH&B AML: 353 | | | STATE WH&B POP: 355 | | | |



Westlaw.

70 FR 41235-01                    FOR EDUCATIONAL USE ONLY                         Page 1

70 FR 41235-01, 2005 WL 1660902 (F.R.)

(Cite as: 70 FR 41235)

NOTICES

DEPARTMENT OF THE INTERIOR

Bureau of Land Management

[CO-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-EJ]

Notice of Public Meetings, Northwest Colorado Resource Advisory Council
Meetings

Monday, July 18, 2005

AGENCY: Bureau of Land Management.

*41235 ACTION: Notice of public meetings.

SUMMARY: In accordance with the Federal Land Policy and Management Act (FLPMA) and
the Federal Advisory Committee Act of 1972 (FACA), the U.S. Department of the
Interior, Bureau of Land Management (BLM) Northwest Colorado Resource Advisory
Council (RAC) will meet as indicated below.

DATES: The Northwest Colorado RAC is holding a special meeting on Friday, July 29,
2005. This meeting is being held via conference call, and will begin at 12 p.m.
m.t. and adjourn by 1:30 p.m. m.t. A public comment period is scheduled for 12:30
p.m. m.t.

ADDRESSES: This Northwest Colorado RAC meeting will be held via conference call.
Any public interested in participating in the call must contact Melodie Lloyd at
970-244-3097 by Thursday, July 28, 12 p.m. m.t. to reserve a line.

FOR FURTHER INFORMATION CONTACT: Jamie Connell, BLM Glenwood Springs Field
Manager, 50629 Hwy. 6&24, Glenwood Springs, CO; telephone 970-947-2800; or Melodie
Lloyd, Public Affairs Specialist, 2815 H Rd., Grand Junction, CO, telephone
970-244-3097.

SUPPLEMENTARY INFORMATION: The Northwest Colorado RAC advises the Secretary of the
Interior, through the Bureau of Land Management, on a variety of public land
issues in Colorado.

 The purpose of the July 29, 2005 conference call meeting is to discuss the BLM
White River Field Office West Douglas Herd Area Amendment to the White River
Resource Management Plan, for the purpose of offering guidance and advice to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 41235-01            FOR EDUCATIONAL USE ONLY           Page 2

70 FR 41235-01, 2005 WL 1660902 (F.R.)

**(Cite as: 70 FR 41235)**

BLM. This conference call meeting is open to the public. The public may present written comments to the RAC. This conference call meeting will also have time, as identified above, allocated for hearing public comments. Depending on the number of persons wishing to comment and time available, the time for individual oral comments may be limited.

 Dated: July 13, 2005.

John Ruhs,

Kremmling Field Manager and Designated Federal Officer for the Northwest, Colorado RAC.

[FR Doc. 05-14151 Filed 7-14-05; 11:59 am]

BILLING CODE 4310-JB-P

 70 FR 41235-01, 2005 WL 1660902 (F.R.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.