# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **COLORADO WILD HORSE** | ) |
| **AND BURRO COALITION, INC.** | ) |
| <u>et al.</u>, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )  **Civil Action No. 06-1609 (RMC)** |
| | ) |
| **DIRK KEMPTHORNE,** | ) |
| <u>et al.</u>, | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS''
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 1

I.      Statutory and Regulatory Framework ................................................... 1

        A.      Wild and Free-Roaming Horses and Burros Act .......................... 1

        B.      Federal Land Policy Management Act ......................................... 2

        C.      National Environmental Policy Act ............................................. 3

II.     Factual Background ................................................................................ 4

        A.      Plaintiffs Have Standing to Maintain this Action ....................... 4

        B.      The West Douglas Herd Area, BLM's Early Land Use Planning
                and the First Decisions to Eliminate Wild Horses from the West
                Douglas Herd Area ...................................................................... 7

        C.      The 1984 Allotment Management Plan for the Twin Buttes
                Ranching Company and Roundups of West Douglas Wild Horses
                in the 1980s ............................................................................... 10

        D.      The 1997 White River Resource Management Plan .................... 11

        E.      BLM's Roundups in Furtherance of the 1997 RMP Decision to
                Provide Forage for Zero to Fifty Horses Annually for Zero to Ten
                Years .......................................................................................... 12

        F.      BLM's Reevaluation of Its Long Term Objective to Zero out the
                West Douglas Herd ..................................................................... 12

        G.      The 2004 EA, its Withdrawal, and the 2005 EA ......................... 13

        H.      Recent Management Practices and BLM's Current Plan to
                Eliminate the Herd ..................................................................... 17

LEGAL STANDARD ............................................................................................... 18

ARGUMENT ........................................................................................................... 19

DEFENDANTS' DECISION TO ERADICATE ALL WILD HORSES FROM
THE WEST DOUGLAS HERD AREA VIOLATES THE WILD AND FREE-
ROAMING HORSES AND BURROS ACT ............................................................... 19

A.     BLM's Decision to Zero Out of the West Douglas Herd is
       Contrary to the Plain Language of the WFHBA........................................19

B.     The WFHBA Authorizes Removal of Horses from a Herd Area
       Only When They Are Deemed to Be Excess..............................................21

C.     Defendants' Decision Fails to Maintain a Thriving Natural
       Ecological Balance in the West Douglas and Piceance-East
       Douglas Herd Areas, in Violation of the WFHBA ....................................23

DEFENDANTS' ACTIONS ARE IN VIOLATION OF THE NATIONAL
ENVIRONMENTAL POLICY ACT ................................................................................24

A.     Defendants' Failure to Prepare an Environmental Impact Statement
       on the Elimination of the West Douglas Herd Violates NEPA .................24

B.     Defendants' Presentation of Only Two Alternatives For the
       Management of Wild Horses in the WDHA Violates NEPA''s
       Requirement For Consideration of a Wide Range of Alternatives ............26

THE FEDERAL LAND POLICY MANAGEMENT ACT DOES NOT
PROVIDE AUTHORITY FOR BLM TO ZERO OUT THE WEST DOUGLAS
HERD...............................................................................................................................30

A.     FLPMA Does Not Override the Statutory Mandates of the
       WFHBA ......................................................................................................30

B.     Defendants' Failure to Notify Congress of the Decision to Zero
       Out the West Douglas Herd Violates FLPMA ..........................................32

DEFENDANTS' ACTION TO ERADICATE THE WEST DOUGLAS HERD IS
ARBITRARY AND CAPRICIOUS AND NOT IN ACCORDANCE WITH LAW
BECAUSE IT IS CONTRARY TO THE LANGUAGE, LEGISLATIVE
HISTORY AND INTENT OF THE WFHBA..................................................................32

CONCLUSION................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Alexander v. Sandoval,
    532 U.S. 275 (2001)............................................................................................34

American Horse Protection Ass'n v. Andrus,
    608 F.2d 811 (9th Cir. 1979) ..........................................................................244

American Horse Protection Ass'n v. Watt,
    694 F.2d 1310 (D.C. Cir. 1982)................................................................22, 343

Barnhart v. Thomas,
    540 U.S. 20 (2003)............................................................................................34

Board of Governors, Federal Reserve System v. Dimension Financial Corp.,
    474 U.S. 361 (1986)..........................................................................................35

California ex rel. Brown v. Watt,
    668 F.2d 1290 (D.C. Cir. 1981)........................................................................33

Chevron U.S.A. v. NRDC,
    467 U.S. 837 (1984)....................................................................................33, 34

Citizen Advocates for Responsible Expansion, Inc. v. Dole,
    770 F.2d 423 (5th Cir. 1985) ..............................................................................3

Citizens Against Burlington, Inc. v. Busey,
    938 F.2d 190 (D.C. Cir. 1991)........................................................................29,

City of New York v. DOT,
    715 F.2d 732 (2d Cir. 1983)............................................................................29

Fund for Animals v. Babbitt,
    903 F. Supp. 96 (D.D.C. 1995)........................................................................18

Government of Manitoba v. Norton,
    398 F. Supp. 2d 41 (D.D.C. 2005)...................................................................30

Grand Canyon Trust v. FAA,
    290 F.3d 339 (D.C. Cir. 2002)...............................................................5, 25, 26

Great Old Broads for Wilderness v. Kempthorne,
    52 F. Supp. 2d 71 (D.D.C. 2006)....................................................................26

Greater Boston Television Corp. v. FCC,
    444 F.2d 841 (D.C. Cir. 1970).........................................................................30

Humane Society of the United States v. Hodel,
    840 F.2d 45 (D.C. Cir. 1988) ........................................................................24

James Madison Ltd. v. Ludwig,
    82 F.3d 1085 (D.C. Cir. 1996) .....................................................................18

Kern v. BLM,
    284 F.3d 1062 (9th Cir. 2006) .....................................................................26

Kleppe v. New Mexico,
    426 U.S. 529 (1976) ....................................................................................32

NRDC v. Daley,
    209 F.3d 747 (D.C. Cir. 2000) .....................................................................34

Nevada v. DOE,
    457 F.3d 78 (D.C. Cir. 2006) .......................................................................26

Nuclear Energy Institute, Inc. v. EPA,
    373 F.3d 1251 (D.C. Cir. 2004) ...................................................................33

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1989) ......................................................................................4

Southern Utah Wilderness Alliance v. Norton,
    237 F. Supp. 2d 48 (D.D.C. 2002) ..........................................................26, 28

**Statutes**

5 U.S.C. § 701 ........................................................................................................18

5 U.S.C. § 706(2)(A) ..............................................................................................18

16 U.S.C. § 1331 ............................................................................................. passim

16 U.S.C. § 1332(f) ..................................................................................................2

16 U.S.C. § 1333(a) .............................................................................................2, 23

16 U.S.C. § 1333(b)(1) .............................................................................................2

16 U.S.C. § 1333(b)(2) ...............................................................................21, 22, 33

16 U.S.C. § 1334 ....................................................................................................20

16 U.S.C. § 1339 ....................................................................................................20

42 U.S.C. § 4332(2)(E) ......................................................................................26, 28

42 U.S.C. § 4332(C) ...................................................................................................................3

43 U.S.C. § 1701 .......................................................................................................................2

43 U.S.C. § 1701(b) ........................................................................................................2, 30, 31

43 U.S.C. § 1702(l) ..................................................................................................................32

43 U.S.C. § 1712(e)(2) .........................................................................................................3, 32

**Regulations**

40 C.F.R. § 1500 ........................................................................................................................3

40 C.F.R. § 1500.2(a) ................................................................................................................3

40 C.F.R. § 1500.2(f) .................................................................................................................3

40 C.F.R. § 1500.3 .....................................................................................................................3

40 C.F.R. § 1502.14 ................................................................................................................26

40 C.F.R. § 1502.14(a) .......................................................................................................4, 26

40 C.F.R. § 1508.7 ..................................................................................................................25

40 C.F.R. § 1508.9 ..................................................................................................................26

40 C.F.R. § 1508.9(a) ................................................................................................................4

40 C.F.R. § 1508.27 ................................................................................................................26

40 C.F.R. § 1508.27(b)(1) .........................................................................................................3

40 C.F.R. § 1508.27(b)(6) .......................................................................................................24

40 C.F.R. § 1508.27(b)(7) .......................................................................................................25

43 C.F.R. § 4700.0-2 ...............................................................................................................23

43 C.F.R. § 4700.0-5(d) ............................................................................................................1

43 C.F.R. § 4700.0-6(b) .....................................................................................................4, 31

43 C.F.R. § 4710.4 ..................................................................................................................21

43 C.F.R. § 4750.3 ..................................................................................................................20

Revision of Existing Regulations on Protection, Management, and Control
of Wild Free-Roaming Horses and Burros,
    51 Fed. Reg. 7410 (1986) ..........................................................................................21, 22

## Rules

Fed. R. Civ. P. 56(c) .........................................................................................................18

## Legislative Materials

124 Cong. Rec. 19,501 (1978) .....................................................................................22, 34

H.R. Rep. No. 92-681 (1971),
    *as reprinted in* 1971 U.S.C.C.A.N. 2159 ..............................................................1, 20, 34

H.R. Rep. No. 765 (1969),
    *reprinted in* 1969 U.S.C.C.A.N. 2751, 2756, 2757 & 2771 ..................................................3

H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978)..............................................22

Protection of Wild Horses and Burros on Public Lands, Hearing on S. 862,
    S. 1116, S. 1090, and S. 1119 Before the Senate Subcomm. On
    Public Lands of the Comm. On Interior and Insular Affairs, 92nd
    Cong. 20 (1971) (Statement of Harrison Loesch, Assistant
    Secretary of the Interior).....................................................................................7

Protection of Wild Horses and Burros on Public Lands, Hearing on S. 862,
    S. 1116, S. 1090, and S. 1119 Before the Senate Subcomm. On
    Public Lands of the Comm. On Interior and Insular Affairs, 92nd
    Cong. 20 (1971) (Statement of Hope Ryden) ..................................................20

Protection of Wild Horses and Burros on Public Lands, Hearing on S. 862,
    S. 1116, S. 1090, and S. 1119 Before the Senate Subcomm. On
    Public Lands of the Comm. On Interior and Insular Affairs, 92nd
    Cong. 20 (1971) (Statement of Velma Johnson) ............................................20

## Miscellaneous

Johnston, *The Fight to Save a Memory,*
    50 Texas L. Rev. 1055 (1972) ...........................................................................7

## INTRODUCTION

This action concerns long-held and recently reaffirmed plans of the Defendant Bureau of Land Management ("BLM") to eradicate a small herd of wild horses protected under the Wild Free-Roaming Horses and Burros Act ("WFHBA" or "Act"), 16 U.S.C. § 1331, et seq., and occupying an area of over 100,000 acres of the public lands in northwest Colorado.  BLM states that it plans to begin this roundup on October 1, 2008.

## BACKGROUND

### I.    Statutory and Regulatory Framework

#### A.    Wild and Free-Roaming Horses and Burros Act

The purpose of the WFHBA is "to insure the preservation and protection of the few remaining wild free-roaming horses and burros in order to enhance and enrich the dreams and enjoyment of future generations of Americans."  H.R. Rep. No. 92-681 (1971), *as reprinted in* U.S.C.C.A.N. 2159, 2161.  Through the WFHBA, Congress found and declared that, "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene."  16 U.S.C. § 1331.

By its plain language, the WFHBA mandates that wild horses are to be "protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of public lands."  16 U.S.C. § 1331.  The phrase "where presently found" has been interpreted to mean where wild horses lived at the time of the law's enactment.  See 43 C.F.R. § 4700.0-5(d) (defining herd area as "the geographic area identified as having been used by a herd as its habitat in 1971").  The WFHBA requires the Secretary of the

Interior (the "Secretary") to "protect and manage wild free-roaming horses and burros as components of the public lands . . . .  The Secretary shall manage horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands."  16 U.S.C. § 1333(a).  The Bureau of Land Management ("BLM") and the United States Forest Service ("USFS") have exclusive authority under the WFHBA for the protection of wild horses and burros on the public lands administered by those agencies.  16 U.S.C. §§ 1331, et seq.  The WFHBA requires that BLM's and USFS''s management activities be at "the minimal feasible level."  16 U.S.C. § 1333(a).

The WFHBA provides that, "The Secretary shall maintain a current inventory of wild free-roaming horses and burros on given areas of public lands."  16 U.S.C. § 1333(b)(1).  This inventory shall be used to "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals."  Id.  As defined by the WFHBA, "excess animals" means wild free-roaming horses and burros "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  16 U.S.C. § 1332(f).

### B.     Federal Land Policy Management Act

The Federal Land Policy Management Act ("FLPMA") establishes requirements for land use planning of public lands.  43 U.S.C. §§ 1701, et seq.  FLPMA recognizes, however, that a land use plan does not trump the statutory command of other federal law, such as WFHBA, which requires BLM to consider wild horses as an integral part of the public lands.  43 U.S.C. § 1701(b); 16 U.S.C. § 1331.

FLMPA requires the Secretary to notify and seek approval from Congress for any management decision, or action pursuant to a management decision, for the

implementation of developed or revised land use plans that totally eliminate a principal or major use for an area of public land of one hundred thousand (100,000) acres or more, for a period of two or more years.  43 U.S.C. § 1712(e)(2).

      **C.**    **National Environmental Policy Act**

      The National Environmental Policy Act ("NEPA") requires all federal agencies to prepare an Environmental Impact Statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Even if the agency believes that, on balance, the effect of the proposed action will be beneficial, for the purposes of NEPA its impact may still be significant.  40 C.F.R. 1508.27(b)(1).

      The language and spirit of NEPA are aimed at ensuring that an agency's single-minded approach to a proposed action is tempered by consideration of a reasonable range of alternatives.  40 C.F.R. §§ 1500, et seq.  "NEPA operates to prevent a federal agency from taking any major action *before* that agency has considered the environmental effects of that action."  Citizen Advocates for Responsible Expansion, Inc. v. Dole, 770 F.2d 423, 431 (5th Cir. 1985) (emphasis in original) (citing H.R. Rep. No. 765, *as reprinted in* 1969 U.S.C.C.A.N. 2751, 2756, 2757 & 2771)).

      Implementing regulations issued by the Council on Environmental Quality (the "CEQ") mandate that federal agencies use the process set forth in NEPA to "identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."  40 C.F.R. §§ 1500.2(a), 1500.2 (e), 1500.3.  "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been

committed or the die otherwise cast." Robertson v. Methow Valley Citizens Council, 490

U.S. 332, 349 (1989). This is particularly relevant in this instance, where BLM plans to

eliminate a historical use of the public lands that Congress has mandated to be an

"integral" part of the system of public lands, and where BLM's own regulations require

that "wild horses . . . shall be considered comparably with other resource values in the

formulation of land use plans." See 43 C.F.R. § 4700.0-6(b).

Rather than preparing an Environmental Impact Statement ("EIS"), agencies may

choose to first prepare an Environmental Assessment ("EA"). An EA (1) assists the

agency in determining whether to prepare an EIS or Finding of No Significant Impact

("FONSI"); (2) independently ensures compliance with NEPA even where an EIS is not

required; and, (3) facilitates the preparation of an EIS when one is required. 40 C.F.R. §

1508.9(a). An EA is considered adequate only if the agency has taken a "hard look" at

the problem; identified the relevant areas of environmental concern; made a convincing

case that the environmental impacts were insignificant to the problems studied and

identified; and, if there were significant impacts, convincingly established changes that

reduced the impacts to a minimum. Grand Canyon Trust v. FAA, 290 F.3d 339, 341

(D.C. Cir. 2002). An EA must discuss, in adequate detail, a reasonable range of

alternatives and must also give a reasoned explanation for rejecting each alternative that

it does not accept. 40 C.F.R. § 1502.14(a).

## II.    Factual Background

### A.    Plaintiffs Have Standing to Maintain this Action

Dr. Don Moore, DVM, an individual plaintiff, is a life long resident of northwest

Colorado. He has ridden all of the West Douglas Herd Area on horseback since he was a

young boy and has worked to preserve the herd's right to continue to inhabit the area since he first heard BLM refer to this herd of wild horses as "range predators" in a BLM land planning meeting after passage of the WFHBA.  Declaration of Don Moore ("Don Moore Declaration," ¶¶ 1-4, 6 attached hereto and incorporated by reference as Exhibit 1. Dr. Moore has first hand knowledge of BLM's land planning activities for the West Douglas Herd Area and expresses concern that from the beginning BLM has made in-house decisions not to manage for wild horses in that area.  Id. ¶ 7.  Based on his past involvement with BLM roundups as a veterinarian and a spectator, he states that he has "real concerns for the overall treatment and health of any wild horses removed from this area" based upon BLM's intent to completely remove all wild horses from the area in an expeditious manner.  "I believe this is is to prevent any further public involvement concerning wild horses in this area."  Id. ¶ 8.

So intent is BLM in beginning this roundup, that it is anticipating conducting it in the dead of winter and is considering running the wild horses in deep snow to the trap site.  Plaintiff Front Range Equine Rescue urged BLM to leave the horses in their wild state and not to inhumanely run them in deep snow as this is not even something human athletes would be asked to do.  May 25, 2008 Comments of Front Range Equine Rescue, attached hereto and incorporated by reference as Exhibit 2.

In addition, Plaintiffs are several wild horse advocacy groups whose members have visited the West Douglas Herd Area and who want to ensure that they will continue to be able to appreciate the wild horses that live there.  These groups sue on behalf of their members.  Specifically, individuals Toni Moore and Barbara Flores are officials of the Colorado Wild Horse and Burro Coalition ("CWHBC") and the American Mustang and

Burro Association ("AMBA"), respectively. These organizations, as well as Ms. Moore and Ms. Flores, have participated in every public process concerning the West Douglas herd since 1992. See Declaration of Toni Moore ("Toni Moore Declaration,") ¶¶ 5-8, attached hereto and incorporated by reference as Exhibit 3, and Declaration of Barbara Flores ("Flores Declaration,") ¶¶ 2-14, attached hereto and incorporated by reference as Exhibit 4. Ms. Moore has visited the West Douglas Herd Area since 1989 with her husband and her children to see the wild horses there. Toni Moore Declaration ¶¶ 2-4; she hopes that she will be able to take her one month old granddaughter to see these horses in the future. Id. ¶ 12. When witnessing the 1996 roundup of wild horses from West Douglas, she witnessed a wild horse mare being run over a ridge by a helicopter and then "headed and heeled" by two BLM wranglers, who, in the process fractured her rear leg, then dragged her onto a trailer where she was taken to a holding pen, held for 24 hours and then euthanized. Id. ¶ 9. During the same roundup, Ms. Moore adopted a 4 month old filly who had sustained roundup injuries to her front legs; these injuries were later confirmed by a racetrack veterinarian to be consistent with injuries sustained by young racehorses who are asked to run "too far, too fast, at too young of an age." Id. ¶ 10. Ms. Moore has been prevented from viewing additional roundups by BLM. Id. ¶ 11. Ms. Flores visited the herd in the summer of 2000 and was "troubled to find only a couple of wild horses on a far ridge." Id. ¶ 15. Again in 2004, Ms. Flores visited the WDHA and saw only one band of wild horses, compared to 75 cattle in the area. Id. ¶ 17. During Ms. Flores' last trip in April, 2005, she did not see any wild horses. Id. ¶ 18. Ms. Flores plans to visit the West Douglas herd area again in June or July, 2008. Id. ¶ 19.

**B.    The West Douglas Herd Area, BLM's Early Land Use Planning and the First Decisions to Eliminate Wild Horses from the West Douglas Herd Area**

The West Douglas Herd Area (WDHA) encompasses 123,387 acres of federal land managed by the BLM and 4,754 acres of private land.  AR Vol. 1, Tab 73, page 490.

From 1882 until passage of the Wild Free-Roaming Horses and Burros Act in 1971, wild horses of these areas, as well as wild horses throughout the nation, were routinely rounded up by the thousands by private and government individuals to be made into commercial products or to be used.  See Johnston, "The Fight to Save a Memory," 50 Texas L. Rev. 1055, 1056 n.2 (1972), noting that, "throughout the West, [wild horse] numbers, which had been assessed in the millions, were reduced to an estimated 14, 810 to 29,260 in the 1950s."  W. Wyman, The Wild Horse of the West (1945).

Approximately twenty years later, at the passage of the WFHBA in 1971, BLM advised Congress that "the number of . . . free-roaming horses, found mainly in Nevada, Oregon and Wyoming, has remained relatively stable at 17,000.  Of this total, it is estimated that 7,500 are branded or probably will be claimed by private owners, leaving about 9,500 unclaimed, free-roaming horses."  See Protection of Wild Horses and Burros on Public Lands, Hearing on S. 862, S. 1116, S. 1090 and S. 1119 Before the Senate Subcomm. on Public Lands of the Comm. on Interior and Insular Affairs, 92nd Cong. 20 (1971) (hereinafter "Senate Hearing") (Statement of Harrison Loesch, Assistant Secretary of the Interior).

After passage of the Act, the WRFO undertook to conduct an inventory of wild horses in the area but its inventory was limited to single, recorded "snapshots" of the land and horses as seen from helicopters.  In the 1975 Unit Resource Analysis, "Wild Horse and Burro Present Situation," Bill Lawhorn of the BLM, noted that, "[P]resently there are

approximately 71 horses in the Douglas Creek wild horse herd unit.  The actual count by helicopter was 45 in August of 1974.  Twelve more were located after the census in an area that was not included in the wild horse range, bringing the total to 57.  Twenty-five percent was added to the total amount of 57 to allow for those horses not observed in the census area.  The horses occupy a range of 187,970 acres.  About one-half of these horses are located just below the Cathedral Bluffs on the east side of Douglas Creek road.  The remainder are located throughout the horse range, with about 10 to 15 using Texas Mountain."  AR Vol. 4, Tab 14, page 373.[1]

After passage of the Act, BLM did not engage in seasonal use studies, but noted that "observations have been limited to aerial surveillance.  Six to ten horses can usually be found on top of Texas Mountain during the winter.  The top of this mountain is flat and winds keep the grass exposed.  These horses move down on all four sides of the mountain during the spring and summer, using the chained areas and side canyons.  Observations on the east side of Douglas Creek indicate that more horses are coming from the Piceance Basin herd unit; but until a number of horses are marked and sufficient data collected, these conclusion can only be presumed."  AR Vol. 4, Tab 14, page 373.  While relying on its single snapshot views of wild horses in the WDHA, BLM also noted that "most of the Douglas Creek wild horse range consists of the pinyon-juniper vegetative type. . . "[i]t is believed that in this area, the home ranges of some bands are predominantly located in pinyon-juniper areas.  It is believed that during hot weather, most horses seek areas of shade [and] it can only be assumed that these heavily timbered areas are also used during winter storms."  AR Vol. 4, Tab 12, page 346.  BLM also

---

[1] A map showing some of these areas is set forth at AR Vol. 1, Tab 73, page 498.

noted the importance of the pinyon-juniper as a means of cover, which it discovered when it attempted to capture branded horses.  AR Vol. 4, Tab 12, page 346 ("[the horses] made good use of the trails in the pinyon-juniper areas.  It may be that many of the trails in the pinyon-juniper are escape routes").

The Unit Resource Analysis concluded that more scientific data was needed in the following areas: "1) determination of home ranges and exact range boundaries; 2) population data [marking system]; 3) importance and function of cover; 4) status of old fences and inventory of private fences; 5) range survey on horse range; 6) extensive fecal analysis studies over entire range."  AR Vol. 4, Tab 14, page 370.

Historically, the area occupied by the West Douglas herd has been also been used heavily by permittees who use the public lands to graze their livestock; BLM allocates usage of the public lands by apportioning forage among livestock, wild horses and other wildlife. In its 1975 analysis, BLM noted that "Authorized use is what the permittee is qualified to use and does not indicate the amount of available forage.  In 1974, permittees used 11,019 AUMs[2] of forage.  Horse use for the area was calculated for 71 horses and they used 1,070 HUMs (horse unit months).  Total AUMs used by both horses and domestic livestock was 12,089 AUMs.  It is not practical to determine whether or not the range is being utilized properly without knowing the present available forage for use by domestic livestock, wild horses and wildlife.  However, there are not records that show that allowances have been made for wild horse use."  Vol. 4, Tab 14, Page 379 (emphasis supplied); see also, AR Vol. 4, Tab 12, page 313 (The MFP recognized that there had been "no forage authorized for wild horse use.").

Just five years later, BLM noted in its 1980 Management Framework Plan Revision Summary that, "this . . . revision was undertaken primarily to provide an up to date basis for developing grazing management alternatives. . . . Allotment Management Plans will be initiated on allotments identified for intensive management. . . . Present information indicates there are 109,575 AUMs of forage available for livestock grazing. . . . A total of 2,101 AUMs of forage will be reserved to support between 95 to 140 head of wild horses. All horses west of Douglas Creek will be removed." AR Vol. 4, Tab 9, pages 143-44.

    C.    **The 1984 Allotment Management Plan for the Twin Buttes Ranching Company and Roundups of West Douglas Wild Horses in the 1980s**

According to BLM, total removals of wild horses were attempted starting in the early 1980s. In 1984, BLM entered an Allotment Management Plan ("AMP") with the Twin Buttes Ranching Company. As the 1984 AMP recognized, the allotment has numerous, inherent problems which make livestock grazing difficult, i.e., "poor soil, rocky outcrop, erosion, and noxious weeds . . . major problems and conditions are either a part of the current grazing system or directly affect the utilization of range forage by livestock," 1984 AMP at 12-14. AR Court Doc. 67-3 at 12-14[3] The Twin Buttes Allotment "consists of 158,520 acres of public land . . . and the Twin Buttes Ranching Company runs 1157 cattle and is reliant on the public lands throughout the year." AR Vol. 1, Tab 73, page 504. The "northern part of the Allotment (which is the West Douglas Herd Area) . . .[is] used during the winter and the spring. The middle elevations

---

[2] An AUM refers to an Animal Unit Month, or the amount of forage consumed by an animal in one month. AR Vol. 1, Tab 73, page 567.
[3] This document is attached as an Exhibit to Plaintiffs' Protest. At the time Defendants filed the Administrative Record, they did not have a complete copy of the Protest. The

centered around Texas Mountain . . .[are] used during the fall, winter and spring.  The

southern part of the allotment . . . is used during the summer and fall.  AR Vol. 1, Tab 73,

page 504.

One year after entering the AMP with Twin Buttes, BLM made a concerted

attempt to completely remove wild horses from the Herd Area.  The "1985 attempt was

unsuccessful for a variety of reasons including helicopter wary horses, horses inhabiting

inaccessible locations and the size of the search area (approximately 20,000 acres)." AR

Vol. 1, Tab 70, page 499.  Wild horse capture through the 1980s concentrated on

removing wild horses from the northern part of the herd area "principally because

capturing horses was easier in the northern Herd Area than in the southern Herd Area."

AR Vol. 1, Tab 77, page 573.

**D.     The 1997 White River Resource Management Plan**

The next major planning event for the WRRA was the 1997 White River

Resource Management Plan ("RMP").  A single paragraph in the 400+ page document

was devoted to management of wild horses in the West Douglas Herd Area.  That

paragraph provided, "The North Piceance and West Douglas Herd Areas would be

managed in the short term (0-10 years) to provide forage for a herd of 0 to 50 horses in

each herd area.  The long term objective would be to remove all wild horses from these

areas."  AR Vol. 4, Tab 5, page 54.

---

complete copy was subsequently located and was submitted by Defendants as a
supplement to the Administrative Record.

**E.** **BLM's Roundups in Furtherance of the 1997 RMP Decision to Provide Forage for Zero to Fifty Horses Annually for Zero to Ten Years**

BLM conducted a roundup of the West Douglas horses in 1998. AR Vol.1, Tab 73, page 501. A decision to remove all wild horses from the WDHA in 2000 was withdrawn and, therefore, no wild horses were removed during that year. AR Vol. 1, Tab 44, Page 269.

In 2001, BLM conducted a roundup of horses that it claimed had moved outside the unfenced boundary of the West Douglas Herd Area. The Field Manager noted that,

> The distribution of the horses and the terrain involved preclude[] removal of all horses outside the herd area boundaries. It is expected that horses will move back and forth across the unfenced boundary during gather operations. Conditions in the region make gather operations exceptionally difficult and dangerous. Given the unfenced southern boundary, there is no reason to unnecessarily stress the animals and endanger the pilot in order to remove every animal outside of the herd area. It is anticipated that the remaining horses will reoccupy the rangeland south of the herd area.

DR/FONSI

**F.** **BLM's Reevaluation of Its Long Term Objective to Zero out the West Douglas Herd**

On July 18, 2001, James Cagney, Field Manager for the WRFO wrote to Senator Allard explaining that, "it is easy to see the issue from Davey's [the permittee's] perspective . . . The White River Field Office still believes that our long term land use planning is both legal and wise. However, if I simply issue a decision to catch all the horses in the West Douglas Area, a legal challenge is almost certain. Testing the legality of our long term planning within the narrow framework of a wild horse gather plan seems

unwise.  There are a lot of key points that would be difficult to inject into that process . . ."  AR Court Doc. 67-3, Ex. 6 at page 11 of 66.

### G.    The 2004 EA, its Withdrawal, and the 2005 EA

When BLM issued its 2004 EA for the West Douglas Herd Area Amendment to the White River Resource Area Plan, it analyzed <u>six</u> alternatives:  manage a population of 0 – 50 wild horses in the WDHA; remove all wild horses from the herd area; manage a small herd in an unfenced Preferred Habitat of Texas Mountain; have a mid-sized herd excluded from a Wilderness Study Area ("WSA") (with BLM building a corridor to facilitate movement of the horses into areas of the north where there would be fewer conflicts with other resources); manage a mid sized herd in the Preferred Habitat of Texas Mountain with fences; or manage a maximum sized herd in a fenced Herd Area.  AR Vol. 2, Tab 28, pages 318-21.[4]  The 2004 EA stated that two additional alternatives were initially considered but eliminated without any detailed analysis.  AR, Vol. 2, Tab 28, page 321.

After receiving comments on the Draft EA, WRFO Field Manager Kent Walter issued a Decision Record recommending that the RMP be amended as described in Alternative B, which was to remove all wild horses from the WDHA within three years of final approval of the Amendment.  AR Vol. 1, Tab 31, page 142.

BLM Colorado State Director Ron Wenker did not sign the Decision Record for the 2004 RMP Amendment.  AR Vol. 1, Tab 31, page 142.  The 2004 Amendment was protested by the livestock permittee, and the BLM Director remanded the decision back

---

[4] The Proposed/Draft 2004 EA was not included in the Administrative Record.  Only the Final EA and Record were included.

to Colorado for reconsideration, with direction to try to achieve a "win-win" resolution.
Id.

The 2004 EA was withdrawn as announced by BLM on January 6, 2005.  AR
Vol. 2, Tab 1 at page 2.  BLM subsequently issued the 2005 EA. AR Vol. 1, Tab 73, Page
485, et seq.

The 2005 EA evaluated only two alternatives – rather than six – for the
management of wild horses in the WDHA.  AR Vol. 1, Tab 73, pages 497-98.  In the
2005 EA, BLM discarded five of the six alternatives that had been proposed in the draft
2004 EA.  AR Vol. 1, Tab 73, pages 497-98.  In Appendix A of the 2005 EA, BLM
briefly described those five alternatives.  AR Vol. 1, Tab 74, pages 556-58.  BLM stated
that those alternatives were "not found to be implementable," but did not provide any
reasons for their rejection.  Id.

Alternative A in the 2005 EA called for the removal of the entire West Douglas
herd, including both those horses within the WDHA and any that had migrated to areas
outside the boundaries of the herd area.  AR Vol. 1, Tab 73, page 497.  This alternative
allocated 9,080 AUMs to livestock forage and was the only alternative carried over from
the 2004 to the 2005 EA.  Id.  Alternative B provided for the management of a herd of
between 29 and 60 wild horses in the 123,387 acre WDHA, with a livestock forage
allocation of 8330 AUMs.  Id.  The latter alternative was nearly identical to the 2004
EA's Alternative C, except that, in the 2004, version livestock forage was reduced to
6947 AUMs.  AR Vol. 2, Tab 28, pages 319-322.

One Alternative presented in the 2004 EA but not in the 2005 EA ("2004
Alternative B") called for the removal of all wild horses from the herd area as soon as

possible and the modification of livestock forage allocation by pasture, with a reduction

of livestock forage allocation from 9627 to 6947 AUMs.  AR Vol. 1, Tab 74, page 556;

AR Vol 2, Tab 28, pages 317-323.  This would be a 25% reduction in livestock AUMs.

In the 2004 EA, there would be no new stipulations for oil and gas development

for Alternatives A and B.  AR Vol 2, Tab 28, pages 317-20.  Surface use stipulations

would be imposed on new oil and gas leases for Alternatives C, E, G and F.  Id. BLM has

stated that "[w]ild horses and natural gas development can co-exist, as evidenced by the

current herd, which continues to grow."  AR Vol 2, Tab 1, page 3.

The Environmental Assessment ("EA") for the West Douglas Herd Area

Amendment to the White River Resource Management Plan, states that the "boundaries

[of the West Douglas Herd Area] are described and depicted in the White River Record

of Decision and Approved Resource Management Plan ("ROD/RMP"), approved July,

1997 . . . as it appears on Map 1-2, the southwestern boundary of the herd area bisects the

Oil Springs Mountain Wilderness Study Area ("WSA").  AR Vol. 1, Tab 73, page 490.

BLM notes that, "Oil Spring Mountain Wilderness Study Area (WSA) which straddles

the southern boundary of the West Douglas Herd Area, is an undeveloped island

surrounded by scattered oil and gas wells, roads and well pads.  There are no other areas

remaining in a natural state with similar landforms and ecosystems within the oil and gas

development belt in this region of Western Colorado.  AR Vol. 1, Tab 73, page 518.

Wild horses were identified as a special feature in the intensive wilderness

inventory conducted in 1979 and within the Intensive Wilderness Inventory Analysis of

Public Comment and Final Wilderness Study Areas (BLM 1980).  AR Vol. 1, Tab 73,

pages 518-19.

Initially, the 2005 EA''s "preferred alternative" was to manage the West Douglas Herd Area with a small population of wild horses, i.e., a herd of between 29-60 wild horses and allocates to wild horses 750 AUMs of Twin Buttes'' permitted use to sustain the AML.

In its comments on the 2005 EA, Twin Buttes Ranch noted that, "the previous draft Environmental Assessment ("2004 EA") for the plan amendment was withdrawn by BLM. In the 2004 EA, BLM proposed the removal of all wild horses from the herd area "as soon as possible" and separately recommended the permanent reduction of Twin Buttes'' livestock forage allocation by over 25 percent. In the new EA, Twin Buttes concurs with BLM's exclusion of the livestock carrying capacity decision from the planning process but objects to the 750 AUM reduction in permitted use . . . " AR Vol. 1, Tab 56, page 394.

In its comments section entitled, "Presence of Wild Horses Prevents Twin Buttes Ranch from Implementing Its Grazing Allotment Management Plan," Twin Buttes argued that if the preferred alternative were implemented, "This would require changes in the livestock operation, including modifying numbers of livestock and periods of use and there may be a need for additional range improvements." AR Vol. 1, Tab 56, page 399.

In an internal email between Jay Thompson, BLM Resources Branch Chief, to Bob Fowler of the WRFO before issuance of the 2005 Proposed EA, Thompson commented that removal of wild horses would not solve the problem of cattle not having access to forage. He states, "If BLM requires the permittee to hire a range rider to move the livestock out of the bottoms on a regular basis, then I agree that grazing intensity in the bottoms will decrease (regardless of whether horses are removed). . . I do not believe

the livestock will use the upland water and forage unless they are coaxed out of the stream bottom.  It has nothing to do with the presence of horses – it''s a matter of livestock behavior and management."  AR Vol 1, Tab 76, page 569.

After reviewing comments on the Draft EA, WRFO Field Manager Kent Walter issued a Decision Record recommending that the RMP be amended as described in Alternative A, to remove all wild horses from the West Douglas HA by 2007.  AR Vol.. 1, Tab 31, page 143.

BLM has stated that the "2005 amendment was a continuation of the 2004 Amendment process.  The 2005 EA was, in effect, a supplemental EA to remedy an unrelated deficiency."  AR Vol. 1, Tab 27, page 133.  A BLM Planning and Environmental Analyst stated that he could not "find one statement in the 2005 EA explaining any relationship this document has to the previous 2004 EA."  AR Vol 1, Tab 27, page 134.  BLM Colorado State Director Ron Wenker did not sign the Decision Record for the 2005 RMP Amendment.  AR Vol. 1, Tab 31, page 143.

Plaintiffs and others protested the 2005 Amendment.  AR, Vol. 1, Tabs 46-50. On October 10, 2007, BLM denied Plaintiffs'' protests.  AR, Vol. 1, Tabs 13-17.

## H.    Recent Management Practices and BLM's Current Plan to Eliminate the Herd

In 2006, BLM captured 33 wild horses; two of these horses were killed when they ran into a side panel of a pen and broke their necks.  AR Vol. 1, Tab 30, page 140-141.

BLM has determined that the 20% annual population growth rate does not apply to the West Douglas wild horse herd.  See Comment noting that if herd growth rate is estimated conservatively at 20% and "we counted 77 horses in the 2002 census, why don''t we show a 20% growth rate in 2003 and 2004."  AR Vol. 1, Tab 77, page 574.

The most recent census (as of 2005) documented 97 horses: 72 adults and 25 yearlings. AR, Vol 1, Tab 73, page 501.

On April 25, 2008, BLM issued a Proposed EA for the roundup of all the West Douglas Herd Area wild horses.  The Comment period on that EA closed on May 27, 2008.

## **LEGAL STANDARD**

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). Under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, et seq., courts set aside agency decisions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This Circuit has held that judicial review of an agency action under the APA must be "thorough, probing, [and] in-depth."  James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1098 (D.C. Cir. 1996) (internal citation omitted).  In reviewing an agency's actions, "the Court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors."  Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995) (internal citation omitted).

<u>**ARGUMENT**</u>

**DEFENDANTS' DECISION TO ERADICATE ALL WILD HORSES FROM THE WEST DOUGLAS HERD AREA VIOLATES THE WILD AND FREE-ROAMING HORSES AND BURROS ACT**

       **A.**       **BLM's Decision to Zero Out of the West Douglas Herd is Contrary to the Plain Language of the WFHBA**

The WFHBA explicitly states that wild horses "are to be considered in the area where presently found [in 1971] as <u>an integral part</u> of the <u>natural system</u> of the public lands." 16 U.S.C. § 1331 (emphasis added).

BLM asserts that it must zero out the West Douglas herd, because wild horses from that herd can now be found in areas beyond the WDHA. AR Vol. 4, Tab 12, page 248. Such a conclusion has no basis in law or fact.

BLM attributes the presence of wild horses outside the WDHA to human activity that has driven the horses from public land they occupied in 1971, causing them to expand their migratory range. AR Vol. 1, page 500. However, BLM has acknowledged that its first inventory of the West Douglas herd area, undertaken in 1974, was inadequate, in that it failed to locate at least fifty-seven percent (57%) of the horses then inhabiting their historical range. AR Vol. 1, page 500. The nine horses originally recorded in the February 1974 census were located by aerial observation in the Big Bull Draw area in the central eastern portion of the WDHA. AR Vol. 1, pages 499-500. However, the twelve horses subsequently added to the initial WDHA inventory, based on sightings by the public during that period, were found in the Cottonwood Creek and Texas Mountain areas of the WDHA. AR Vol. 1, page 499.

In reporting out the final version of the WFHBA, the Joint Committee of Congress took note of "the apparent lack of adequate knowledge regarding many of the

habits of [wild horses and burros]."  H.R.Rep. No. 92-681, 1971 U.S.C.C.A.N. at 2160.

This lack of adequate knowledge concerning wild horse behavior and migratory habits

was amply demonstrated by BLM's inability to locate over half the wild horses in the

WDHA and the resulting deficiencies in the 1974 West Douglas census.  Having failed to

observe and inventory more than half of the wild horses present in West Douglas - horses

that were occupying other areas of their range - BLM cannot conclude with any degree of

certainty that the adjacent public lands in which the West Douglas horses are now found

was not part of their migratory range in 1971.

Furthermore, contrary to Defendants' assertions, there is no statutory mandate for

BLM to remove the West Douglas horses from those areas of the public lands where it

cannot be conclusively demonstrated that they were present in 1971.  The Secretary must

take action to remove wild horses outside of their herd areas only if they stray onto

private land and the landowners demand they be removed.  16 U.S.C. § 1334; 43 C.F.R.

§ 4750.3.  However, nothing requires the Secretary to remove wild horses from areas of

the public lands to which they have migrated.  BLM misconstrues the language of 16

U.S.C. §1339, which states that the Secretary is not authorized to "relocate wild free-

roaming horses or burros to areas of the public lands where they [did not exist in 1971]."

16 U.S.C. §1339.  This is not a mandate for the removal of wild horses, but rather a

prohibition against actions to relocate the horses from their natural ranges to create "zoo-

like" habitats in which to manage them.  See Protection of Wild Horses and Burros on

Public Lands.  Hearing on S. 862, S. 1116, S. 1090 and S. 1119 before the Senate

Subcomm. on Public Lands of the Comm. on Interior and Insular Affairs, 92nd Cong. 71

(1971) (Statement of Hope Ryden); id. at 75-121 (Statement of Velma Johnson).

Nor do federal regulations require that BLM remove horses on public lands outside their herd areas.  BLM regulations governing the management of wild free-roaming horses and burros state that, "Management of wild horses and burros shall be undertaken with the objective of limiting the animals'' distribution to herd areas. Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans."  43 C.F.R. § 4710.4. However, BLM clearly explained the intent and meaning of the language of Section 4710.4, "Constraints on management," in its final rulemaking procedure:

> Another change has been incorporated to make it clear that management will not be restricted to herd areas, but will rather be undertaken with the objective of limiting animal distribution to herd areas by controlling herd size to prevent habitat from being overpopulated.

Revision of Existing Regulations on Protection, Management, and Control of Wild Free-Roaming Horses and Burros, 51 Fed. Reg. 7410, 7412 (1986), (emphasis added). Therefore, BLM is not required by statute or by regulation to remove these horses.

Finally, BLM may not use the migration of members of herd as a basis to eliminate, in their entirety, those horses that lawfully occupy their herd area, because Congress has spoken directly to the issue by mandating that wild horses be maintained in the areas in which they were found on the public lands in 1971.  16 U.S.C. § 1331.

**B.     The WFHBA Authorizes Removal of Horses from a Herd Area Only When They Are Deemed to Be Excess**

Under the WFHBA, excess horses are those that must be removed when "an overpopulation" of wild horses exists in an area.  16 U.S.C. § 1333(b)(2).  BLM is authorized to remove wild horses from a herd area only after determining that "an overpopulation exists," and then may remove only that number of horses necessary "to

restore a thriving natural ecological balance to the range," and, secondarily, to "protect the range from the deterioration associated with overpopulation."  Id.

Representative Roncalio, the sponsor of the 1978 House bill amending the WFHBA, explained that Congress intended the provisions added to the WFHBA to address the issue of excess horses as "positive action to curb identified overpopulations" that had developed between 1971 and 1978, a period in which no healthy horses were removed from their herd areas.  American Horse Protection Ass'n v. Watt, 694 F.2d 1310, 1317 (D.C. Cir. 1982), quoting 124 Cong. Rec. 19,501, 19503-04 (1978) (emphasis added).  As this Circuit has noted, in amending the WFHBA, "Congress determined that ''action is needed to prevent a successful program from exceeding its goals,''" in light of concerns ""'that wild horse overpopulations were threatening the ranges and even the survival of the wild horses themselves.''"  Id. (emphasis in original), quoting H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978).  Hence, Congress authorized BLM to reduce the number of wild horses only in those areas where there was an identifiable overpopulation.  16 U.S.C. § 1333(b)(2).

Federal regulations governing BLM's management of wild horses adopt the statutory definition of "excess" without further restriction or clarification.  See 51 Fed. Reg. at 7410 ("The language of the statute [defining the terms ''appropriate management level'' and ''excess animals''] will govern management.").  Nothing in the BLM regulations permits the designation of an entire herd as "excess" and, thus, subject to total elimination.

BLM cannot rely on anything in the language of WFHBA, any other statute, or any federal regulation as authority to declare an entire herd or the entire population of a

herd area to be "excess."  Rather, such an action is in direct contravention of the plain

language of the WFHBA, which requires that wild horses be considered "as an integral

part of the system of public lands."  16 U.S.C. § 1331.

>    **C.    Defendants' Decision Fails to Maintain a Thriving Natural Ecological Balance in the West Douglas and Piceance-East Douglas Herd Areas, in Violation of the WFHBA**

WFHBA recognizes wild horses as an "integral part of the natural system of the

public lands."  16 U.S.C. § 1331.  As such, the statute requires that wild horses be

considered a part of the "thriving natural ecological balance" of the areas in which they

are found.  16 U.S.C. § 1333(a).  In furtherance of this statutory mandate, the stated

objective of BLM regulations governing wild free-roaming horses and burros is their

management "as an integral part of the natural system of the public lands under the

principle of multiple use; protection of wild horses and burros from unauthorized capture,

branding, harassment or death; and humane care and treatment of wild horses and

burros."  43 C.F.R. § 4700.0-2.

Therefore, while BLM may, in certain circumstances, remove some horses from

their herd area to <u>restore</u> a natural balance on the public lands, it may not willfully

<u>destroy</u> that statutorily mandated natural balance by zeroing out an entire herd.  BLM's

decision to eliminate the entire West Douglas herd is, therefore, in violation of the

WFHBA and the agency's own regulations.

**DEFENDANTS' ACTIONS ARE IN VIOLATION OF THE NATIONAL
ENVIRONMENTAL POLICY ACT**

>   A.    **Defendants' Failure to Prepare an Environmental Impact Statement
>   on the Elimination of the West Douglas Herd Violates NEPA**

The decision to eradicate an entire herd of wild horses from their historic herd
area is precisely the kind of agency action that demands a full-fledged EIS under NEPA.
See, e.g., American Horse Protection Ass'n v. Andrus, 608 F.2d 811, 814 (9th Cir. 1979)
("It cannot be denied that removal of a substantial number of wild horses will affect the
quality of the human environment as that quality is viewed by Congress.").

The CEQ regulations provide that the assessment of whether an agency action has
"significant" environmental impacts, and thus should be evaluated in an EIS, "requires
consideration of both context and intensity." 40 C.F.R. § 1508.27. The "intensity" of an
action''s impact involves a number of factors, among them, "[t]he degree to which the
action may establish a precedent for future actions with significant effects or represents a
decision in principle about a future consideration." 40 C.F.R. § 1508.27(b)(6). Surely
the elimination of an entire herd of wild horses, subject to the protections of the WFHBA,
is an action that "may establish precedent for future actions with significant effects," and,
as such, requires an EIS under NEPA. Id.

This Circuit evaluates an agency's "finding of no significant impact" ("FONSI")
under a four-part test. Humane Soc'y of the United States v. Hodel, 840 F.2d 45, 62
(D.C. Cir. 1988). A court must determine

>   1) whether the agency took a "hard look" at the problem;
>
>   2) whether the agency identified the relevant areas of environmental concern;
>
>   3) as to the problems studied and identified, whether the agency made a
>      convincing case that the impact was insignificant; and

24

4)  if there was an impact of true significance, whether the agency convincingly
established that changes in the project sufficiently reduced it to a minimum.

Id.  BLM improperly issued a FONSI for the WDHA Amendment to the WRRMP, in

part, because the 2005 EA failed to make a convincing case that the impact of zeroing-out

the West Douglas herd is insignificant.

NEPA and the implementing CEQ regulations require that an agency look beyond

an isolated action to determine whether it has "significant" impacts:  An action may be

"related to other actions with individually insignificant but cumulatively significant

impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant

impact on the environment."  40 C.F.R. § 1508.27(b)(7).  "'Cumulative impact'' is the

impact on the environment which results from the incremental impact of the action when

added to other past, present, and reasonably foreseeable future actions regardless of what

agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative

impacts can result from individually minor but collectively significant actions taking

place over a period of time."  40 C.F.R. § 1508.7.

This Circuit has held that,

> a meaningful cumulative impact analysis must identify (1)
> the area in which the effects of the proposed project will be
> felt; (2) the impacts that are expected in that area from the
> proposed project; (3) other actions--past, present,   and
> proposed, and reasonably foreseeable--that have had or are
> expected to have impacts in the same area; (4) the impacts
> or expected impacts from these other actions; and (5) the
> overall impact that can be expected if the individual
> impacts are allowed to accumulate.

Grand Canyon Trust v. FAA, 290 F.3d 339, 345-46 (D.C. Cir. 2002) (internal citation

omitted).  BLM's 2005 EA failed to meet this standard because it did not analyze the

cumulative impacts of its selected alternative (Alternative A), elimination of the West

Douglas herd, on the preservation of wild horses generally, and on Colorado''s wild horses, in particular.  AR Vol. 1, Tab 73, pages 535-37.  See Great Old Broads for Wilderness v. Kempthorne, 452 F. Supp. 2d 71, 84 (D.D.C. 2006) ("A discussion of cumulative impacts is a necessary part of any assessment.  While EAs are 'not intended to be a lengthy document[,]' they 'must at a minimum address the considerations relevant to determining whether an EIS is required . . . .," quoting Grand Canyon Trust v. FAA, 290 F.3d at 345.)  See also Kern v. BLM, 284 F. 3d 1062, 1075-76 (9th Cir. 2006) (analysis of cumulative impacts is particularly important in EAs, given that so many more EAs are prepared than EISs).  Therefore, this Court should find that BLM's 2005 EA fails to comply with NEPA and the CEQ regulations.

      **B.**      **Defendants' Presentation of Only Two Alternatives For the Management of Wild Horses in the WDHA Violates NEPA''s Requirement For Consideration of a Wide Range of Alternatives**

      "At the 'heart of the environmental impact statement' is the requirement that an agency 'rigorously explore and objectively evaluate' the projected environmental impacts of all 'reasonable alternatives' to the proposed action."  Nevada v. DOE, 457 F.3d 78, 87 (D.C. Cir. 2006), quoting 40 C.F.R. § 1502.14.  See also Southern Utah Wilderness Alliance v. Norton, 237 F. Supp. 2d 48, 52 (D.D.C. 2002) ("As part of its preparation of an EA, an agency is required to ''study, develop, and describe appropriate alternatives to recommended courses of action,'' 42 U.S.C. § 4332(2)(E), and to discuss alternatives that is has considered, 40 C.F.R. § 1508.9.")  The agency must also explain its reasons for rejecting any alternatives that it considered but eliminated from detailed study.  40 C.F.R. § 1502.14(a).  BLM has neither considered reasonable appropriate alternatives to the course of action it has selected, nor has it adequately explained its reasons for eliminating certain alternatives from detailed study.

In its draft 2004 EA for the WDHA Amendment to the White River Resource Area Plan, BLM analyzed six alternatives:  manage a population of 0 – 50 wild horses in the WDHA; remove all wild horses from the herd area; manage a small herd in an unfenced Preferred Habitat of Texas Mountain; have a mid-sized herd excluded from a WSA (with BLM building a corridor to facilitate movement of the horses into areas of the north where there would be fewer conflicts with other resources); manage a mid sized herd in the Preferred Habitat of Texas Mountain with fences; or manage a maximum sized herd in a fenced Herd Area.  AR, Vol. 2, Tab 28, pages 318-321.

BLM withdrew the Amendment and 2004 EA in January, 2005, AR Vol. 2, Tab 1, page 2, and issued the 2005 EA on April 28, 2005.  AR Vol. 1, Tab 73, page 486-55.  The 2005 EA evaluated only two alternatives – rather than six – for the management of wild horses in the WDHA.  AR Vol. 1, Tab 73, pages 497-98.  In the 2005 EA, BLM discarded five of the six alternatives that had been proposed in the draft 2004 EA.  AR Vol. 1, Tab 73, pages 497-98.  In Appendix A of the 2005 EA, BLM briefly described those five alternatives.  AR Vol. 1, Tab 74, pages 556-58.  BLM stated that those alternatives were "not found to be implementable," but did not provide any reasons for their rejection.  Id.

Alternative A in the 2005 EA called for the removal of the entire West Douglas herd, including both those horses within the WDHA and any that had migrated to areas outside the boundaries of the herd area.  AR Vol. 1, Tab 73, page 497.  This alternative allocated 9,080 AUMs to livestock forage and was the only alternative carried over from the 2004 to the 2005 EA.  Id.  Alternative B provided for the management of a herd of between 29 and 60 wild horses in the 123,387 acre WDHA, with a livestock forage

allocation of 8330 AUMs.  Id.  The latter alternative was nearly identical to the 2004

EA''s Alternative C, except that, in the 2004, version livestock forage was reduced to

6947 AUMs.  AR Vol. 2, Tab 28, pages 319-322.

Of note, one of the five alternatives presented in the 2004 EA, but not considered

in the 2005 EA, called for the removal of all wild horses from the herd area as soon as

possible and the modification of livestock forage allocation by pasture, with a reduction

of livestock forage allocation from 9627 to 6947 AUMs.  AR Vol. 1, Tab 74, page 556;

AR Vol 2, Tab 28, pages 317-23.  BLM has not explained why it rejected this alternative

course of action, which would have imposed a twenty-five percent (25%) reduction in

livestock forage allocation.  However, the 2004 EA was protested by the livestock

permittee, and the BLM Director remanded the decision back to Colorado for

reconsideration, with direction to try to achieve a "win-win" resolution.  AR Vol. 1, Tab

31, page 142.

BLM's 2005 EA does not meet NEPA''s minimum procedural requirements of

for the study and analysis of reasonable alternatives to the proposed action.  See Southern

Utah Wilderness Alliance v. Norton, 237 F. Supp. 2d 48, 53-54 (D.D.C. 2002)

("Congress has directed federal agencies ''to the fullest extent possible'' to ''study,

develop, and describe appropriate alternatives to recommended courses of action in any

proposal which involves unresolved conflicts concerning alternative uses of available

resources.''  There is no de minimis exception to that procedural requirement," quoting

42 U.S.C. § 4332(2)(E)).

BLM consistently asserts that it has planned to zero out the West Douglas herd

since 1997, if not 1981.  AR Vol.1 Tab 73, pages 492-95.  In the Decision Record for the

2004 EA for the White River RMP (which was subsequently withdrawn), BLM selected

the alternative that provided for the removal of all wild horses from West Douglas and

the allocation of forage in the WDHA to livestock.  AR Vol.2 Tab 25, page 301.  Yet, in

the 2005 draft EA, BLM reversed its longstanding position and identified Alternative B

for the retention of 29-60 horses in the WDHA as the Preferred Alternative, AR Vol. 1,

Tab 73, page 485 – only to reject this supposed Preferred Alternative in its final decision

in favor of the zeroing out the West Douglas herd, despite the fact that the vast majority

of comments and protests submitted on both the 2004 and 2005 EAs opposed eliminating

the West Douglas herd.  AR Vol. 1, Tab 12, pages 70-71; AR Vol. 1, Tabs 46-50, pages

273-38; AR Vol. 1, Tabs 57-72, pages 418-84; AR Vol. 2, Tabs 9-27, pages 18-298; AR

Vol. 2, Tabs 31-58, pages 536-697.

     This alternatives shell game cannot conceal the serious deficiencies in BLM's

decision-making or the "parochial impulses that drive them."  See Citizens Against

Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991) ("Deference, however,

does not mean dormancy, and the rule of reason does not give agencies license to fulfill

their own prophecies, whatever the parochial impulses that drive them . . . .  [A]n agency

may not define the objectives of its action in terms so unreasonably narrow that only one

alternative from among the environmentally benign ones in the agency's power would

accomplish the goals of the agency's action," citing City of New York v. DOT, 715 F.2d

732, 743 (2d Cir. 1983)).  Nor may BLM ignore the mandates of the WRHBA in

establishing its objectives for the WDHA.  See Citizens Against Burlington, Inc., 938

F.2d at 196 (when framing the objectives of an action, "an agency should always consider

the views of Congress, expressed, to the extent that the agency can determine them, in the

agency's statutory authorization to act, as well as in other congressional directives"
(internal citation omitted)).

BLM's 2005 EA is inadequate under NEPA, because the agency did not take the
requisite "hard look" at the issues involved in the maintenance of a "thriving natural
ecological balance" multiple uses in the WDHA, because BLM did not consider a
reasonable range of alternatives, limiting itself to only those that placed virtually all of
the burden for range management on the wild horses, and because BLM's established
objectives in issuing the EA were too narrow to allow for reasoned decision-making.  See
Governmentt of Manitoba v. Norton, 398 F. Supp. 2d 41, 64-65 (D.D.C. 2005) ("A court
should intervene if it ''becomes aware, especially from a combination of danger signals,
that the agency has not really taken a "hard look" at the salient problems, and has not
genuinely engaged in reasoned decision-making.''" (quoting Greater Boston Television
Corp. v. FCC, 444 F.2d 841, 851 (D.C. Cir. 1970))).  This Court should therefore find
that BLM has failed to satisfy the requirement of NEPA in reaching its final decision to
zero-out the West Douglas herd.

## THE FEDERAL LAND POLICY MANAGEMENT ACT DOES NOT PROVIDE AUTHORITY FOR BLM TO ZERO OUT THE WEST DOUGLAS HERD

### A.    FLPMA Does Not Override the Statutory Mandates of the WFHBA

By its express language, FLPMA prohibits BLM from using the land planning
process to nullify duties that agency has under other statutes.  FLPMA provides that, "the
policies of this Act shall . . . be construed as supplemental to and not in derogation of the
purposes for which public lands are administered under other provisions of law."  43
U.S.C. §1701(b).  FLPMA thus cannot override BLM's duties under the  WFHBA, which
requires BLM to consider wild horses as an integral part of the public lands.  43 U.S.C.

§ 1701(b); 16 U.S.C. § 1331.  Further, as explained above, there is absolutely no authority under the WFHBA for eliminating whole herds of horses.  And BLM cannot import that authority, no matter how much it would like to do so, into the land use planning process under FLPMA.

Simply put, BLM is not authorized in the land use planning process to completely disregard – much less, repeal – provisions of the WFHBA, an Act whose whole purpose was to *prevent wild horses  from "fast disappearing from the American scene*,"  16 U.S.C § 1331.  Yet this is precisely what BLM has tried to engineer throughout its land planning process with regard to the West Douglas herd.  BLM's discretion does not extend so far as to allow it to disregard whole provisions of a statute.  The WFHBA is quite clear when it states, ". . . [wild horses] are to be considered in the area where presently found, as an integral part of the natural system of the public lands."  16 U.S.C. §1331.  Congress then specified the activities from which wild horses were to be protected, e.g. "capture, branding, harassment or death," so as to ensure that they remain as an integral part of the public lands.  Id.

Furthermore, BLM's own regulations recognize that wild horses have a place in the public lands and are to be accommodated there.  Those regulations provide that, "Wild horses and burros shall be considered comparably with other resource values in the formulation of land use plans."  43 C.F.R. § 4700.0-6(b).

For all these reasons, and as explained above, the land use planning process neither authorizes BLM to zero out a herd or determine that it is not "feasible" to allow wild horses to exist in an area they have were using at the passage of the WFHBA.  It appears that BLM has not only done this with regard to the West Douglas herd but it

31

views its establishment of Herd Management Areas (HMAs) as affording that

"flexibility."  See Ackley Memo.

     **B.**     **Defendants' Failure to Notify Congress of the Decision to Zero Out the West Douglas Herd Violates FLPMA**

BLM failed to notify Congress of its decision to eliminate wild horses in the

WDHA, in violation of FLPMA.  43 U.S.C. § 1712(e)(2).

The West Douglas Herd Area encompasses 123,387 acres of federal land

managed by the BLM, and 4,754 acres of private land.  AR Vol. 1, Tab 73, page 490.

FLPMA mandates that the Secretary report to the House of Representatives and the

Senate any management decision or action that totally eliminates a principal or major use

with respect to an area of public land 100,000 acres in size or larger, for a period of two

or more years, giving Congress the opportunity to adopt a concurrent resolution of

disapproval of the decision.  43 U.S.C. §1712(e)(2).  The Secretary must promptly

terminate any such action for which Congress adopts a concurrent resolution of

disapproval.  Id.

FLPMA defines "principal or major uses" to include, inter alia, "wildlife

development and utilization."  43 U.S.C. § 1702(l).  The Supreme Court has expressly

held that wild horses and burros are "wildlife."  See Kleppe v. New Mexico, 426 U.S.

529 (1976) (upholding the regulation of wild horses and burros under the WFHBA,

pursuant to Congress''s power to regulate wildlife on the public lands under the Property

Clause).  Therefore, BLM is statutorily prohibited from zeroing out the West Douglas

herd until it complies with FLPMA''s requirements for congressional notification.

**DEFENDANTS' ACTION TO ERADICATE THE WEST DOUGLAS HERD IS ARBITRARY AND CAPRICIOUS AND NOT IN ACCORDANCE WITH LAW**

**BECAUSE IT IS CONTRARY TO THE LANGUAGE, LEGISLATIVE HISTORY AND INTENT OF THE WFHBA**

In determining whether BLM's decision to eradicate the West Douglas herd violates the WFHBA, a court must apply the two-step "Chevron test." Chevron U.S.A., Inc., v. NRDC, Inc., 467 U.S. 837 (1984). Chevron requires the Court to first inquire "whether Congress has directly spoken to the precise question at issue," and, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. Only "[if] the statute is ''silent or ambiguous with respect to the specific issue,'' we proceed to *Chevron*''s second step, asking whether the agency's interpretation ''is based on a permissible construction of the statute.''" Nuclear Energy Inst. v. EPA, 373 F.3d 1251, 1269 (D.C. Cir. 2004) (quoting Chevron, 467 at 843).

Plaintiffs contend that Congress has spoken directly to the question at issue in this case in the text of the WFHBA. See California ex rel. Brown v. Watt, 668 F.2d 1290, 1304 (D.C. Cir. 1981) ("the most important manifestation of Congressional intent" is the language of the statute) (internal citations omitted). WFHBA expressly states that wild horses are to be "protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of public lands." 16 U.S.C. § 1331. The language of WFHBA also makes clear that excess animals are those that must be "removed so as to restore a thriving ecological balance to the range and protect the range from the deterioration associated with overpopulation," when it has been determined "that an overpopulation [of wild horses] exists on a given area of the public lands." 16 U.S.C. § 1333(b)(2).

Under <u>Chevron</u> step one, traditional tools of statutory construction are employed to determine whether "Congress had an intention on the precise question at issue." <u>Chevron</u>, 467 U.S. at 843.  These tools include the text and structure of the statute, and the relevant legislative history.  <u>Alexander v. Sandoval</u>, 532 U.S. 275, 312 (2001).  The legislative history of the WFHBA and its 1978 amendment reinforces the plain language of the statute.  According to the Joint Statement of the Committee of Conference, Congress''s intent in passing the WFHBA was "to insure the preservation and protection of the few remaining wild free-roaming horses and burros in order to enhance and enrich the dreams and enjoyment of future generations of Americans."  H.R. Rep. No. 92-681, 1971 U.S.C.C.A.N. at 2161.  As discussed above, Congress amended the statute in 1978 to permit the removal of excess horses <u>specifically</u> "to curb identified overpopulations" of wild horses – not to remove entire populations of horses.  <u>American Horse Protection Ass'n v. Watt</u>, 694 F.2d 1310, 1317 (D.C. Cir. 1982), quoting124 Cong. Rec. 19,501, 19503-04 (1978).

Plaintiffs believe that the issue before the Court is resolvable under step one of the <u>Chevron</u> analysis.  If, however, the Court were to conclude that Congress''s intent is not sufficiently unambiguous, further analysis under <u>Chevron</u> step two would be necessary to determine whether Defendants' action is based on a "reasonable construction" of the statute.  <u>Barnhart v. Thomas</u>, 540 U.S. 20, 26 (2003).  A reviewing court will defer to an agency's interpretation only if it is "reasonable and consistent with the statutory purpose and legislative history," but will refuse to uphold an interpretation "that diverges from any realistic meaning of the statute."  <u>NRDC v. Daley</u>, 209 F.3d 747, 752-53 (D.C. Cir. 2000) (internal citations omitted).  BLM's reading of the congressional intent with regard

34

to the removal of wild horses from their historic herd areas is at direct odds with the language of the WFHBA and its legislative history and is, therefore, patently unreasonable under step two.

BLM's interpretation of the WFHBA would permit it to decline to manage wild horses in any herd area, and to eradicate entire herds of wild horses from their historical habitats on the public lands.  Nothing in their reading of the statute prevents them from, after eliminating the West Douglas herd, to subsequently eliminate the Piceance East Douglas horses – or any other herd of wild horses occupying its historical habitat.  This construction attempts to twist Congress's intent into something contrary to the declared purpose of the WFHBA, and is not entitled to any deference by this Court.  See Board of Governors, Fed. Reserve System v. Dimension Financial Corp., 474 U.S. 361, 368 (1986) ("The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress.").

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court enter summary judgment for plaintiffs, set aside the 2005 Amendment to the RMP, and issue a declaratory judgment that defendants may not zero out the West Douglas herd or any other herd of wild horses.

Dated this 18th day of June, 2008.

Respectfully submitted,

/s/ Valerie J. Stanley
Valerie J. Stanley
D.C. Bar No. 384882
329 Prince George Street
Laurel, MD 20707
(301) 549-3126
(301) 549-3228 fax

/s/ Mara C. Hurwitt
Mara C. Hurwitt
D.C. Bar No. 482409
Dewey & LeBoeuf LLP
1101 New York Ave. N.W.
Suite 1100
Washington, D.C. 20005-4213
(202) 346-8094
(202) 956-3280 fax

Counsel for Plaintiffs