UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| COLORADO WILD HORSE ) | |
| AND BURRO COALITION, INC. ) | |
| et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 06-1609 (RMC) |
| ) | |
| DIRK KEMPTHORNE, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

_____ )

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rules 7(h) and 56.1, Plaintiffs herewith submit their Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

**BLM's Management of Wild Horse Herds Throughout the Western States**

**1.  Wild Horses Removed from the Public Lands and Being Held for Adoption Outnumber Wild Horses Remaining on Public Lands**

1.   As a result of roundups of wild horses conducted by the Bureau of Land Management ("BLM"), the number of wild horses removed from the public lands and awaiting adoption now totals approximately 30,000, which outnumbers wild horses and burros remaining on the public lands.  See American Wild Horse Preservation Campaign, **http://www.wildhorsepreservation.com/numbers.html**.

**2.      The Distinction between Herd Areas and Herd Management Areas**

2.      BLM has drawn a distinction between how it has managed Herd Areas ("HAs") and Herd Management Areas ("HMAs").  AR Vol. 2, Tab 3, page 6.[1]

3.      BLM has zeroed out HAs previously within the State of Colorado, AR Vol. 4, Tab 5, page 58, and within other Western States.

4.      BLM has numerous HAs with wild horse populations of under 60 animals where it is doing no augmentation of the herds by introducing other animals.  BLM is aware of information that populations of this level are at risk for survival.  AR Vol. 1, Tab 22, page 120 (Email from Fran Ackley, BLM, to Glenn Wallace, BLM noting that, "it is generally accepted that in order to have a genetically viable herd, the population should number at least 150 animals.").

5.      Herd Area ("HA") "means the geographic area identified as having been used by a herd as its habitat in 1971."  43 C.F.R. § 4700.0-5(d).  BLM's regulations require the authorized officer to "maintain a record of the herd areas that existed in 1971, and a current inventory of the numbers of animals and their areas of use."  43 C.F.R. § 4710.2.  BLM's regulations provide that, "[M]anagement of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas," 43 C.F.R. § 4710.4.

6.      Herd Management Areas ("HMA"), on the other hand, "shall be established for the maintenance of wild horse and burro herds."  43 C.F.R. § 4710.3-1.  BLM regulations further provide that "[I]n delineating each herd management area, the authorized officer shall consider the appropriate management level (AML) for the herd, the habitat

---

[1] AR refers to the Administrative Record.

requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4 (Constraints on Management). 43 C.F.R. § 4710.3-1. "Herd Management Areas" are "basically subsets of HAs." Email from Fran Ackley to the White River Field Office ("WRFO") describing HA vs. HMA terminology. AR Vol. 2, Tab 3, page 6. According to Ackley, "[H]owever, if the decision is made to manage for zero horses, then the unit stays a HA. . . . Can a HA be managed in perpetuity without becoming an HMA? While there is no restriction against managing a HA indefinitely, there are funding realities that make it unwise. Funding is not distributed for management of HAs, only HMAs. . . . We can usually get gather money when we need it but no money for on the ground management, i.e. census and monitoring. . . . Therefore, even if the area is designated an HMA, if future resource conditions don't support the AML, it can be changed. This could be changed to zero as has happened in other states, raised or lowered. Since we have this flexibility within the context of managing an HMA, I can't see any value to keeping an area where we actually manage horses as an HA." Id.

**Historical Facts Concerning the West Douglas Herd of Wild Horses**

7.     The White River Management Framework Plan ("MFP") was completed through several phases of development and finalized in June, 1975. AR Vol. 4, Tab 12, pages 238-39. First, an inventory of all information was prepared; then, a Unit Resource Analyses ("URA") was prepared for each of the three Planning Units: Meeker, Rangely, and Piceance Basin. Id. The MFP was prepared encompassing all three Planning Units. Id. The MFP noted that, "[b]ecause of the complexities of the resource area, the MFP decisions cannot and will not remain static. New resource data is constantly being added

3

to the data base. Significant public comment, ideas and thoughts will affect the future land decisions. New laws passed by Congress and BLM policy changes will influence the future management of the White River Resource Area." Id.

8.      In the 1975 Unit Resource Analysis, "Wild Horse and Burro Present Situation," Bill Lawhorn of the BLM, noted that, "[P]resently there are approximately 71 horses in the Douglas Creek wild horse herd unit. The actual count by helicopter was 45 in August of 1974. Twelve more were located after the census in an area that was not included in the wild horse range, bringing the total to 57. Twenty-five percent was added to the total amount of 57 to allow for those horses not observed in the census area. The horses occupy a range of 187,970 acres. About one-half of these horses are located just below the Cathedral Bluffs on the east side of Douglas Creek road. The remainder are located throughout the horse range, with about 10 to 15 using Texas Mountain." AR Vol. 4, Tab 14, page 373.

9.      After passage of the Wild Free-Roaming Horses and Burros Act ("WFHBA" or "Act"), 16 U.S.C. § 1331, et seq., BLM did not engage in seasonal use studies, but noted that "observations have been limited to aerial surveillance. Six to ten horses can usually be found on top of Texas Mountain during the winter. The top of this mountain is flat and winds keep the grass exposed. These horses move down on all four sides of the mountain during the spring and summer, using the chained areas and side canyons. Observations on the east side of Douglas Creek indicate that more horses are coming from the Piceance Basin herd unit; but until a number of horses are marked and sufficient data collected, these conclusion can only be presumed." AR Vol. 4, Tab 14, page 373.

10.    In its 1975 analysis, BLM noted that "Authorized use is what the permittee is qualified to use and does not indicate the amount of available forage. In 1974, permittees used 11,019 AUM's$^2$ of forage. Horse use for the area was calculated for 71 horses and they used 1,070 HUM's (horse unit months). Total AUMs used by both horses and domestic livestock was 12,089 AUM's. It is not practical to determine whether or not the range is being utilized properly without knowing the present available forage for use by domestic livestock, wild horses, and wildlife. However, there are not records that show that allowances have been made for wild horse use." AR Vol. 4, Tab 14, page 379.

11.    BLM estimated that the annual population increase for wild horses in the West Douglas Herd Area "is thought to be less than 15% which may be an indicator to range conditions. The 15% colt crop in Douglas Creek is 9% lower than the 24% colt crop in the Piceance Basin Planning Unit." AR Vol. 1, Tab 14, page 383.

12.    BLM noted that "determination of home ranges and exact range boundaries" was one of the areas in which more scientific data is needed. AR Vol. 4, Tab 14, Page 385.

13.    BLM's initial aerial census recorded nine wild horses in the area now recognized as the West Douglas Herd Area. AR, Vol. 1, Tab 73, page 499. Members of the public notified BLM of additional areas that wild horses occupied that BLM had missed in its census. Id. Members of the public advised BLM that they had seen wild horses in the vicinities of Cottonwood Creek and Texas Mountain. Id.

14.    In the MFP, "Management Decision Summary," it was noted, "The decision has been made to manage wild horses with wildlife and livestock. The wild horses will be managed on their present range with the exception of that portion of the horse range lying

---

$^2$ An AUM refers to an Animal Unit Month, or the amount of forage consumed by an animal in one month. AR Vol. 1, Tab 73, page 567.

5

west of Douglas Creek. Thirty to forty horses will be removed and disposed of from this area. Decisions have been made to update 244,000 acres of forage survey to determine carrying capacity for numbers of wild horses, livestock and wildlife that can be supported in this area." Vol. 4, Tab 12, page 241.[3]

15.    The MFP stated that wild horses west of Douglas Creek would be removed because "gas development activity is causing horses to disperse into areas where they did not exist prior to 1971. The WHBA states that horse range or habitat will not expand beyond the area occupied when the law was passed." AR Vol. 4, Tab 12, page 248.

16.    The MFP recognized that there had been "no forage authorized for wild horse use." AR Vol. 4, Tab 12, page 313.

**The West Douglas Wild Horses as a Herd and as Individuals**

17.    BLM notes that "claims have been made that the West Douglas herd includes some of our remaining truly wild horses. The horses have a reputation of possessing high levels of self-preservation. They flee the moment they sense human presence. The herd's tendency towards aggression and acute awareness of human presence is likely an adaptation to their environment." 2004 EA, Vol. 2, Tab 28, page 328.

18.    With the "increased pressures of commercial development and human presence, the West Douglas herd has increasingly begun to concentrate in remote, rugged country synonymous with heavy overstory and deep arroyos." 2004 EA, Vol. 2, Tab 28, page 328.

---

[3] The MFP refers to various overlay maps demonstrating where various activities and uses, such as recreation, range management, wildlife, forest, watershed, minerals and wild horses existed. BLM has not provided those overlay maps for the Administrative Record, however. Plaintiffs cannot ascertain whether these overlay maps are the ones that Defendants have represented were available for viewing at the WRFO.

**Geography and Use of the West Douglas Herd Area**

    **1.    Land**

19.    The West Douglas HA encompasses 123,387 acres of federal land managed by the BLM and 4,754 acres of private land.  AR Vol. 1, Tab 73, page 490.

20.    BLM recognized that, "one of the points of the horse advocacy groups has been the wide variety of acreages portrayed by BLM for the Piceance/East Douglas and West Douglas HA.  The figures presented to the public over the years have been completely inconsistent and not reconcilable.  Some of the numbers are so far off nobody has a clue as to where they came from.  In the West Douglas response to commenters, we addressed the issue honestly and said that mistakes had been made in reporting the acreages."  Email from Fowler to Wallace,  AR Vol. 1, Tab 28, page 136.

    **2.    Use**

21.    In its 1980 Management Framework Plan Revision Summary, BLM noted that, "this . . . revision was undertaken primarily to provide an up to date basis for developing grazing management alternatives . . . . Allotment Management Plans will be initiated on allotments identified for intensive management. . . . Present information indicates there are 109,575 AUMs of forage available for livestock grazing. . . . A total of 2,101 AUMs of forage will be reserved to support between 95 to 140 head of wild horses.  All horses west of Douglas Creek will be removed."  AR Vol. 4, Tab 9, pages 143-44.

22.    In 1984, BLM finalized its Allotment Management Plan for the Twin Buttes Ranching Company.  AR Vol. 1, Tab 73, page 504.

**BLM's Management of the West Douglas Herd Area and the West Douglas Herd**

      **1.     Early Census Data and Planning Decisions of the WRFO regarding wild horses**

23.     The White River Resource Area ("WRRA") of the BLM conducted its first census of wild horses in the area in 1974, three years after passage of the Act. See 1975 Management Framework Plan, AR Vol. 4, Tab 12, page 238.

24.     The MFP provided, "[t]he decision has been made to manage wild horses with wildlife and livestock. The wild horses will be managed on their present range with the exception of that portion of the horse range lying west of Douglas Creek. Thirty to forty horses will be removed and disposed of from this area." AR Vol. 4, Tab 12, page 241. BLM provided that fences would be built to "contain the horses within the selected range." Id. BLM noted that the "only forage surveys that would cover the wild horse range were completed in 1939 [and] . . . [t]he forage data from this survey is inadequate for present use . . . . [M]ost of this range was severely overgrazed in the early 1900's and has not fully responded to present management practices." AR Vol. 4, Tab 14, page 378.

25.     In the first helicopter count it conducted, BLM found 45 wild horses and noted that "twelve more were located after the census in an area that was not included in the wild horse range . . . ." AR Vol. 4, Tab 13, page 373. BLM also noted that no seasonal use studies had been conducted to determine wild horse migration patterns. Id. By forgoing a comprehensive study in favor of a single "snapshot," BLM could not accurately assess the size or use of the horses' existing HAs. BLM admitted its ignorance regarding what wild horses ate in the West Douglas HA. The MFP noted, "[t]here is no available data on the food or food habitat of horses in this horse unit. Presumably, these horses would prefer the same type of plants as those in Piceance Basin." AR Vol. 4, Tab

8

14, page 375.  Later in the document, BLM conceded that "[i]t is not practical to determine whether or not the range is being utilized properly without knowing the present available forage use by domestic livestock, wild horses and wildlife.  However, <u>there are no records that show that allowances have been made for wild horse use</u>."  AR, Vol. 4, Tab 14, page 379 (emphasis supplied).

26.     After noting that, "most of the Douglas Creek wild horse range consists of the pinyon-juniper vegetative type," BLM remarked that "[i]t is believed that in this area, the home ranges of some bands are predominantly located in pinyon-juniper areas.  It is believed that during hot weather, most horses seek areas of shade [and] it can only be assumed that these heavily timbered areas are also used during winter storms."  AR Vol. 4, Tab 12, page 346.  BLM also noted the importance of the pinyon-juniper as a means of cover, which it discovered when it attempted to capture branded horses.  AR Vol. 4, Tab 12, page 346 ("[the horses] made good use of the trails in the pinyon-juniper areas.  It may be that many of the trails in the pinyon-juniper are escape routes").

27.     The Unit Resource Analysis concluded that more scientific data was needed in the following areas: "1) determination of home ranges and exact range boundaries; 2) population data [marking system]; 3) importance and function of cover; 4) status of old fences and inventory of private fences; 5) range survey on horse range; 6) extensive fecal analysis studies over entire range."  AR Vol 4, Tab 14, page 370.

28.     In 1984, BLM entered an Allotment Management Plan ("AMP") with the Twin Buttes Ranching Company.  See AR Court Doc. 67-3 at 12-14.[4]  The Twin Buttes

---

[4] This document is attached as an Exhibit to Plaintiffs' October 2005 Protest.  At the time Defendants filed the Administrative Record, they did not have a complete copy of

9

Allotment "consists of 158, 520 acres of public land . . . and the Twin Buttes Ranching Company runs 1157 cattle and is reliant on the public lands throughout the year." AR Vol. 1, Tab 73, page 504. The "northern part of the Allotment (which is the West Douglas HA) . . .[is] used during the winter and the spring. The middle elevations centered around Texas Mountain . . . [are] used during the fall, winter and spring. The southern part of the allotment . . . is used during the summer and fall. AR Vol. 1, Tab 73, page 504.

### 3.     The 1997 White River Resource Management Plan

29.    The 1997 White River Resource Management Plan ("RMP") consisted of over 400 pages. A single paragraph in the 400+ page document was devoted to management of wild horses in the West Douglas HA. That paragraph provided, "The North Piceance and West Douglas HAs would be managed in the short term (0-10 years) to provide forage for a herd of 0 to 50 horses in each HA. The long term objective would be to remove all wild horses from these areas." AR Vol. 4, Tab 5, page 54.

### 4.     Reconsideration of the 1997 RMP Decision to Remove All Wild Horses from the West Douglas HA

30.    On July 18, 2001, James Cagney, Field Manager for the WRFO wrote to Senator Allard explaining that, "it is easy to see the issue from Davey's [the permittee's] perspective. . . . The White River Field Office still believes that our long term land use planning is both legal and wise. However, if I simply issue a decision to catch all the horses in the West Douglas Area, a legal challenge is almost certain. Testing the legality of our long term planning within the narrow framework of a wild horse gather plan seems

---

the Protest. The complete copy was subsequently located and was submitted by Defendants as a supplement to the Administrative Record.

unwise. There are a lot of key points that would be difficult to inject into that process." AR Vol. AR Court Doc. 67-3, Ex. 6 at page 11 of 66.

### 5. The 2004 EA, its Withdrawal, and the 2005 EA

31. When BLM issued its 2004 Environmental Assessment ("EA") for the West Douglas Herd Area Amendment to the White River Resource Area Plan, it analyzed six alternatives, ranging from maintaining a population of 0 – 50 wild horses, remove all wild horses, maintain a small herd in an unfenced Preferred Habitat of Texas Mountain, have a mid-sized herd excluded from a Wilderness Study Area ("WSA") (with BLM building a corridor to facilitate movement of the horses into areas of the north where there would be fewer conflicts with other resources), maintain a mid-sized herd in the Preferred Habitat of Texas Mountain with fences, or a maximum sized herd in a fenced HA. AR, Vol. 2, Tab 28, pages 318-21.[5]

32. After receiving comments on the Draft EA, WRFO Field Manager Kent Walter issued a Decision Record recommending that the RMP be amended as described in Alternative B, which was to remove all wild horses from the West Douglas HA within three years of final approval of the Amendment. AR Vol. 1, Tab 31, page 142.

33. BLM Colorado State Director Ron Wenker did not sign the Decision Record for the 2004 RMP Amendment. AR Vol. 1, Tab 31, page 142.

34. The 2004 Amendment was protested by the livestock permittee, and the BLM Director remanded the decision back to Colorado for reconsideration, with direction to try to achieve a "win-win" resolution. Id.

---

[5] The Proposed/Draft 2004 EA was not included in the Administrative Record. Only the Final EA and Record were included.

11

35.     The 2004 EA was withdrawn as announced by BLM on January 6, 2005.  AR Vol. 2, Tab 1, page 2.  BLM subsequently issued the 2005 EA.  AR Vol. 1, Tab 73, paged 485, et seq.  The 2005 EA considered only two alternatives for the management of wild horses in the West Douglas HA.  AR Vol. 1, Tab 73, pages 497-98.  In the 2005 EA Alternative A (2005 Alternative A) called for zeroing out the entire West Douglas herd, including both those horses within the West Douglas HA and any that had migrated to areas outside the boundaries of the herd area.  AR Vol. 1, Tab 73, page 497.  Alternative B (2005 Alternative B) provided for the management of a herd of between 29 and 60 wild horses within the West Douglas HA, encompassing 123,387 acres, with a livestock forage allocation of 8330 AUMs.  Id.  This Alternative was nearly identical to Alternative C presented in the 2004 EA, except that the previous Alternative limited livestock forage to 6947 AUMs.  AR Vol 2, Tab 28, pages 319-22.

36.     In the 2005 EA, BLM discarded five of the six alternatives that had been presented in the 2004 EA.  AR Vol. 1, Tab 73, pages 497-98.  In Appendix A of the 2005 EA, BLM described those five alternatives.  AR Vol. 1, Tab 74, pages 556-58.  BLM stated that those alternatives were "not found to be implementable," but did not provide any reasons for their rejection.  Id.

37.     The only Alternative carried over from the 2004 to the 2005 EA was Alternative A with 9080 AUMs.  AR Vol. 1, Tab 73, page 497.

38.     One Alternative presented in the 2004 EA but not in the 2005 EA ("2004 Alternative B") called for the removal of all wild horses from the herd area as soon as possible and the modification of livestock forage allocation by pasture, with a reduction

12

of livestock forage allocation from 9627 to 6947 AUMs. AR Vol. 1, Tab 74, page 556; AR Vol 2, Tab 28, pages 317-23.

39. However, the 2005 EA adopted another alternative from the 2004 EA ("2004 Alternative A") that provided for the removal of all wild horses from the West Douglas HA and all those that had migrated outside the herd area, with a livestock forage allocation of 9080 AUMs.

40. BLM has stated that the "2005 amendment was a continuation of the 2004 Amendment process. The 2005 EA was, in effect, a supplemental EA to remedy an unrelated deficiency." AR Vol. 1, Tab 27, page 133. A BLM Planning and Environmental Analyst stated that he could not "find one statement in the 2005 EA explaining any relationship this document has to the previous 2004 EA." AR Vol. 1, Tab 27, page 134.

41. In the 2004 EA, there would be no new stipulations for oil and gas development for Alternatives A and B. AR Vol. 2, Tab 28, pages 317-20. Surface use stipulations would be imposed on new oil and gas leases for Alternatives C, E, G and F. Id.

42. BLM has stated that "[w]ild horses and natural gas development can co-exist, as evidenced by the current herd, which continues to grow." AR Vol 2, Tab 1, page 3.

43. The EA for the West Douglas Herd Area Amendment to the White River Resource Management Plan, states that the "boundaries [of the West Douglas Herd Area] are described and depicted in the White River Record of Decision and Approved Resource Management Plan (ROD/RMP), approved July, 1997 . . . as it appears on Map 1-2, the southwestern boundary of the herd area bisects the Oil Springs Mountain Wilderness Study Area (WSA). AR Vol. 1, Tab 73, page 490. BLM notes that, "Oil

13

Spring Mountain Wilderness Study Area (WSA) which straddles the southern boundary of the West Douglas Herd Area, is an undeveloped island surrounded by scattered oil and gas wells, roads and well pads. There are no other areas remaining in a natural state with similar landforms and ecosystems within the oil and gas development belt in this region of Western Colorado. AR Vol. 1, Tab 73, page 518.

44.     Wild horses were identified as a special feature in the intensive wilderness inventory conducted in 1979 and within the Intensive Wilderness Inventory Analysis of Public Comment and Final Wilderness Study Areas (BLM 1980). AR Vol. 1, Tab 73, pages 518-19.

45.     Initially, the 2005 EA's "preferred alternative" was to manage the West Douglas HA with a small population of wild horses, i.e. a herd of between 29-60 wild horses and allocates to wild horses 750 AUMs of Twin Buttes' permitted use to sustain the AML.

46.     In its comments on the 2005 EA, Twin Buttes Ranch noted that, "the previous draft Environmental Assessment ("2004 EA") for the plan amendment was withdrawn by BLM. In the 2004 EA, BLM proposed the removal of all wild horses from the herd area "as soon as possible" and separately recommended the permanent reduction of Twin Buttes' livestock forage allocation by over 25 percent. In the new EA, Twin Buttes concurs with BLM's exclusion of the livestock carrying capacity decision from the planning process but objects to the 750 AUM reduction in permitted use . . . " AR Vol. 1, Tab 56, page 394.

47.     In its comments section entitled, "Presence of Wild Horses Prevents Twin Buttes Ranch from Implementing Its Grazing Allotment Management Plan," Twin Buttes argued that if the preferred alternative were implemented, "This would require changes in the

14

livestock operation, including modifying numbers of livestock and periods of use and there may be a need for additional range improvements." AR Vol. 1, Tab 56, page 399.

48.     After reviewing comments on the Draft EA, WRFO Field Manager Kent Walter issued a Decision Record recommending that the RMP be amended as described in Alternative A, to remove all wild horses from the West Douglas HA by 2007. AR Vol. 1, Tab 31, page 143.

49.     BLM has stated that the "2005 amendment was a continuation of the 2004 Amendment process. The 2005 EA was, in effect, a supplemental EA to remedy an unrelated deficiency." AR Vol. 1, Tab 27, page 133. A BLM Planning and Environmental Analyst stated that he could not "find one statement in the 2005 EA explaining any relationship this document has to the previous 2004 EA." AR Vol. 1, Tab 27, page 134.

50.     BLM Colorado State Director Ron Wenker did not sign the Decision Record for the 2005 RMP Amendment. AR Vol. 1, Tab 31, page 143.

**2.    BLM's Roundups of Wild Horses from the West Douglas HA**

   **A.    Pre-2006**

51.     According to BLM, total removals of wild horses have been attempted starting in the early 1980s, with a concerted attempt in 1985. The "1985 attempt was unsuccessful for a variety of reasons including helicopter wary horses, horses inhabiting inaccessible locations and the size of the search area (approximately 20,000 acres)." AR Vol. 1, Tab 70, page 499.

52. BLM contends that, "[R]oundups of horses from the West Douglas HA have caused the horses to shift their occupancy of the West Douglas HA to the south, to the area of Texas Mountain. AR Vol. 1, Tab 77, page 572.

53. Wild horse capture through the 1980s concentrated on removing wild horses from the northern part of the herd area "principally because capturing horses was easier in the northern Herd Area than in the southern Herd Area." AR Vol. 1, Tab 77, page 573.

54. A decision to remove all wild horses from the West Douglas HA in 2000 was withdrawn and therefore, no wild horses were removed during that year. AR Vol. 1, Tab 44, page 269.

55. West Douglas horses "flee the moment they sense human presence, and their tendency toward aggression and acute awareness of human presence is likely an adaptation to their environment."

56. In 2001, BLM conducted a roundup of horses that it claimed had moved outside the unfenced boundary of the West Douglas HA. The Field Manager noted that,

> The distribution of the horses and the terrain involved preclude[] removal of all horses outside the herd area boundaries. It is expected that horses will move back and forth across the unfenced boundary during gather operations. Conditions in the region make gather operations exceptionally difficult and dangerous. Given the unfenced southern boundary, there is no reason to unnecessarily stress the animals and endanger the pilot in order to remove every animal outside of the herd area. It is anticipated that the remaining horses will reoccupy the rangeland south of the herd area.

DR/FONSi at 2, AR Supp.

### B. 2006 Roundup

57. In 2006, BLM captured 33 wild horses; two of these horses were killed when they

ran into a side panel of a pen and broke their necks. AR Vol. 1, Tab 30, pages 140-41.

### C. Recent Management Practices and BLM's Current Plan to Eliminate the Herd

58. BLM has determined that the 20 percent annual population growth rate does not apply to the West Douglas wild horse herd. See Comment noting that if herd growth rate is estimated conservatively at 20 percent and "we counted 77 horses in the 2002 census, why don't we show a 20% growth rate in 2003 and 2004." AR Vol. 1, Tab 77, page 574.

59. The most recent census (as of 2005) documented 97 horses: 72 adults and 25 yearlings.

60. On April 25, 2008, BLM issued a Proposed EA for the roundup of all the West Douglas HA wild horses. The Comment period on that EA closed on May 27, 2008.

61. BLM plans to begin the roundup of the West Douglas wild horses on October 1, 2008.

Dated this 18th day of June, 2008.

Respectfully submitted,

/s/ Valerie J. Stanley
Valerie J. Stanley
D.C. Bar No. 384882
329 Prince George Street
Laurel, MD 20707
(301) 549-3126
(301) 549-3228 fax

/s/ Mara C. Hurwitt
Mara C. Hurwitt
D.C. Bar No. 482409
Dewey & LeBoeuf LLP
1101 New York Ave. N.W.
Suite 1100
Washington, D.C. 20005-4213
(202) 346-8094
(202) 956-3280 fax

Counsel for Plaintiffs