RONALD J. TENPAS,
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

CHARLES FINDLAY, Assistant Chief
JACOB HASEMAN, Trial Attorney
Natural Resources Section
601 D Street, N.W.
Washington, D.C.  20004
Telephone: (202) 305-0240
Jacob.Haseman@usdoj.gov

JEAN E. WILLIAMS, Chief
Wildlife and Marine Resources Section
KRISTEN BYRNES FLOOM
Trial Attorney (DC Bar No. 469615)
Wildlife and Marine Resources Section
601 D Street, N.W.
Washington, D.C.  20004
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COLORADO WILD HORSE AND BURRO COALITION, INC., et al.,   )<br><br>Plaintiffs,   )<br><br>v.   )<br><br>DIRK KEMPTHORNE, et al.,   )<br><br>Defendants.   ) | Civ. No. 06-1609 RMC<br><br>**DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

TABLE OF CONTENTS

PAGE

INTRODUCTION ......................................................................................... 1

FACTUAL BACKGROUND ......................................................................... 2

STATUTORY AND REGULATORY BACKGROUND ................................ 2

I.     Wild Free-Roaming Horses And Burros Act .......................................... 2

II.    Federal Land Policy And Management Act .......................................... 3

III.   National Environmental Policy Act ...................................................... 5

PROCEDURAL BACKGROUND .................................................................. 6

STANDARD OF REVIEW ............................................................................. 7

ARGUMENT ................................................................................................... 9

I.     PLAINTIFFS' WFRHBA AND FLPMA CLAIMS ARE NOT AUTHORIZED
       UNDER THE APA ............................................................................... 9

       A.     The Specific Resource Management Planning Goals Challenged By
              Plaintiffs Do Not Qualify As Reviewable "Final Agency Actions" ........ 10

II.    BLM'S DECISION TO REMOVE ALL WILD HORSES FROM THE WEST
       DOUGLAS HA IS A REASONABLE EXERCISE OF THE AGENCY'S DISCRETION
       UNDER THE WFRHBA AND SHOULD BE UPHELD BY THE COURT. ............... 12

       A.     Plaintiffs' Argument Must Fail As A Factual Matter Because BLM Is Not
              Eliminating Horses From An Area Where They Were Found At The
              Passage Of The WFRHBA ................................................................... 13

       B.     BLM's Decision To Remove All Wild Horses From The West Douglas
              HA Is Based On A Permissible Construction Of The Statute ................. 16

              1.     The plain language and legislative history of the WFRHBA do not
                     evidence a Congressional intent to preclude total removal of horses
                     from a herd area ......................................................................... 16

              2.     BLM's decision to remove all horses from the West Douglas HA
                     is based on a permissible construction of the statute ................... 19

C.    BLM Has Stated A Rational Basis For Removing All Horses From The
      West Douglas HA, And Its Decision Is Entitled To Deference ............... 21

III.   THE BLM COMPLIED WITH NEPA BY TAKING THE REQUISITE "HARD
       LOOK" AT POTENTIAL ENVIRONMENTAL IMPACTS AND
       DETERMINING THAT NO SIGNIFICANT IMPACTS WERE LIKELY TO
       OCCUR ........................................................................................................ 24

       A.    The Environmental Assessment Adequately Addressed the Potential
             Impacts of Removing Wild Horses From the West
             Douglas Herd Area ................................................................................ 25

             1.    Direct and Secondary Impacts Were Identified, Discussed in
                   Detail, and the Conclusions Reached Were Supported by the
                   Record .......................................................................................... 25

             2.    Cumulative Impacts Were Identified, Discussed in Detail, and the
                   Conclusions Reached Were Supported by the Record ................ 26

       B.    The Environmental Assessment Appropriately Addressed Reasonable
             Alternatives ........................................................................................... 29

       C.    No EIS Was Required Because the Agency Reasonably Determined There
             Were Not Likely to Be Significant Environmental Impacts ................... 35

IV.    THE BLM CONDUCTED LAND USE PLANNING UNDER FLPMA ........... 40

       A.    BLM's Land Use Planning Process Under FLPMA Properly
             Considered the WFRHBA ...................................................................... 40

       B.    43 U.S.C. § 1712(e)(2) Creates No Obligation for the BLM to Notify
             Congress of It's Decision to Eliminate Wild Horse From
             the West Douglas Herd Area ................................................................. 41

CONCLUSION ........................................................................................................ 44

TABLE OF AUTHORITIES

CASES                                                                                          PAGE

Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998) .................................. 11, 12

Am. Soc'y of Dermatology v. Shalala, 962 F. Supp. 141 (D.D.C. 1996) ...................... 13

American Horse Protection Ass'n v. Andrus, 608 F.2d 811 (9th Cir. 1979) ........... 39, 40

Ariz. Pub. Serv. Co. v. EPA, 211 F.3d 1280 (D.C. Cir. 2000) ....................................... 19

Balt. Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87 (1983) .................. 8, 25

Biodiversity Conservation Alliance v. BLM ("BCA"), 404 F. Supp. 2d 212 (D.D.C. 2005) ...................................................................................................................... 25

Blake v. Babbit, 837 F. Supp. 458 (D.D.C. 1993) .......................................................... 43

Bluewater Network v. EPA, 372 F.3d 404 (D.C. Cir. 2004) ............................................ 9

Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678 (D.C. Cir. 1982) ........... 36, 39

Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984) .............................................. 16, 19

Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. 1991) ........... 30, 31

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) ......................... 8

City of Alexandria, Va. v. Slater, 198 F.3d 862 (D.C. Cir. 1999) .................................. 30

City of Olmstead Falls v. FAA, 292 F.3d 261 (D.C. Cir. 2002) ...................................... 9

City of Roseville v. Norton, 219 F. Supp. 2d 130 (D.D.C. 2002) .................................. 33

Coal. On Sensible Transp. v. Dole, 642 F. Supp. 573 (D.D.C. 1986) ........................ 6, 30

Env'l Def. Fund, Inc. v. Costle, 657 F.2d 275 (D.C. Cir. 1981) ...................................... 9

Farmland Pres. Ass'n v. Goldschmidt, 611 F.2d 233 (9th Cir. 1979) ........................... 32

Fla. Power & Light Co. v. Lorion, 470 U.S. 729 (1985) .................................................. 8

Friends of Ompompanoosuc v. FERC, 968 F.2d 1549 (2d Cir. 1992) .......................... 30

Fund for Animals, Inc. v. BLM, 460 F.3d 13 (D.C. Cir. 2006) ............ 2, 3, 10, 12, 41, 43

Gov't of Manitoba v. Norton, 398 F. Supp. 2d 41 (D.D.C. 2005) .................................. 39

Grand Canyon Trust v. FAA, 290 F.3d 339 (D.C. Cir. 2002) .................................... 9, 25

Headwaters, Inc. v. BLM, 914 F.2d 1174 (9th Cir. 1990) ........................................ 27, 28

Ideal Basic Indus., Inc. v. Morton, 542 F.2d 1364 (9th Cir. 1976) .................................. 3

Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754 (9th Cir. 1996) ... 27

Izaak Walton League of America v. Marsh, 655 F.2d 346 (D.C. Cir. 1981) .......... 27, 28

Karst Envtl. Educ. & Prot., Inc. v. EPA, 475 F.3d 1291 (D.C. Cir. 2007) ...................... 9

Kleppe v. New Mexico, 426 U.S. 529 (1976) .............................................................. 42

Kleppe v. Sierra Club, 427 U.S. 390 (1976) .............................................................. 27, 28

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990) ............................................. 9, 11, 12

Marsh v. Or. Natural Res. Council, 490 U.S. 360 (1989) .................................. 5, 9, 26, 28

Missouri Mining, Inc. v.  Interstate Commerce Comm'n, 33 F.3d 980 (8th Cir. 1994)  30

Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221 (D.C. Cir. 2007) .................. 8

Norton v. S. Utah Wilderness Alliance ("SUWA"),542 U.S. 55 (2004)........... 3, 5, 22, 41

Occidental Eng'g Co. v. INS, 753 F.2d 766 (9th Cir. 1985) ............................................. 8

Or. Nat'l Res. Council v. Lyng, 882 F.2d 1417 (9th Cir. 1989) ..................................... 32

Public Citizen v. Nat'l Highway Traffic Safety Admin., 848 F.2d 256 (D.C. Cir. 1988) . 5

Richards v. INS, 554 F.2d 1173 (D.C. Cir. 1977) ............................................................ 8

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) ............................. 6

Sierra Club v. Espy, 38 F.3d 792 (5th Cir. 1994) ........................................................... 30

Sierra Club v. U.S. Dep't of Transp., 753 F.2d 120 (D.C. Cir. 1985) ............................ 36

Slope Borough v. Andrus, 642 F.2d 589 (D.C. Cir. 1980) ............................................. 30

Stuttering Found. of America v. Springer, 498 F. Supp. 2d 203 (D.D.C. 2007) .............. 8

Tongass Conservation Soc'y v. Cheney, 924 F.2d 1137 (D.C. Cir. 1991) ................. 9, 30

STATUTES

5 U.S.C. § 70 ................................................................................ 10

5 U.S.C. § 551(13 ........................................................................... 11

5 U.S.C. § 706(2)(A) ........................................................................ 8

16 U.S.C. § 1331 ................................................... 1, 2, 16, 18, 42, 44

16 U.S.C. § 1332(c) .......................................................................... 2

16 U.S.C. § 1332(f) ..................................................................... 20, 21

16 U.S.C. § 1333(a) ..................................................................... 19, 21

16 U.S.C. § 1333(b)(1) ................................................................... 3

16 U.S.C. § 1333(b)(2) ............................................................... 3, 20

16 U.S.C. § 1333(b)(3) ................................................................... 43

16 U.S.C. § 1338(a) ....................................................................... 43

16 U.S.C. §1333(a) ......................................................................... 2

1978 U.S.C.C.A.N. 4069 ............................................................... 43

1978 U.S.C.C.A.N. 4127 ............................................................... 19

42 U.S.C. § 4321 ............................................................................. 5

42 U.S.C. § 4332(2)(C) ............................................................... 5, 40

43 U.S.C. § 1701(a)(7) ................................................................... 41

43 U.S.C. § 1701(a)(8), (12) (1976) ............................................. 3, 43

43 U.S.C. § 1702(l) ......................................................................... 42

43 U.S.C. § 1712(a) ................................................................................ 5, 41

43 U.S.C. § 1712(e) .................................................................................... 5

43 U.S.C. § 1732(a) .................................................................................... 3

43 U.S.C. §1732(a) ..................................................................................... 2

43 U.S.C. § 1701 ......................................................................................... 1

43 U.S.C. § 1701-1782 ............................................................................... 40

43 U.S.C. § 1712(e)(2) .......................................................................... 42, 44

RULES

Fed. R. Civ. Pro. 56(c) ................................................................................ 7

REGULATIONS

40 C.F.R. § 1502.13; ............................................................................ 30, 31

40 C.F.R. § 1502.14(a), ............................................................................. 30

40 C.F.R. § 1501 ......................................................................................... 5

40 C.F.R. § 1501.4 .................................................................................... 6 -

40 C.F.R. § 1502.21 ................................................................................... 32

40 C.F.R. § 1502.3 ................................................................................ 5, 40

40 C.F.R. § 1508.27 ............................................................................. 37, 38

40 C.F.R. § 1508.27(b) .............................................................................. 38

40 C.F.R. § 1508.7 ............................................................................... 25, 26

40 C.F.R. § 1508.8(a) ................................................................................ 25

40 C.F.R. § 1508.8(b) ................................................................................ 25

40 C.F.R. § 1508.9(b) ........................................................................... 6, 30

40 C.F.R. § 1500-1508 ........................................................................................... 5

40 C.F.R. § 1502.13 ............................................................................................. 30

40 C.F.R. §§ 1508.9(a) ........................................................................................... 6

43 C.F.R. 1601.0-5 ................................................................................................. 5

43 C.F.R. 4700.0-6(b) ......................................................................................... 44

43 C.F.R. Part 4110 ............................................................................................. 34

43 C.F.R. § 1601.0-5(n) ......................................................................................... 5

43 C.F.R. § 1610.5-3 ............................................................................................. 5

43 C.F.R. § 1610.6 ............................................................................................... 44

43 C.F.R. § 4700.0-5(d) ...................................................................................... 14

43 C.F.R. § 4710.1 ........................................................................................... 2, 21

43 C.F.R. § 4710.2 ............................................................................................. 14

43 C.F.R. § 4710.3-1 ...................................................................................... 2, 14

43 C.F.R. § 4710.4 ..................................................................................... 3, 15, 23

43 C.F.R. § 4720.1 ............................................................................................. 20

## INTRODUCTION

Plaintiffs challenge a decision by the Bureau of Land Management ("BLM") to remove all wild horses from a herd area in Colorado. After considering the issue in a series of planning documents for over a decade, the BLM reasonably concluded that the wild horses should be removed from the West Douglas Herd Area ("HA"). The BLM will continue to manage wild horses in a neighboring area that is better suited to sustain a healthy population of wild horses in balance with other land uses.

Plaintiffs' claims must fail because: (a) this Court lacks jurisdiction to review their claims challenging a planning document that does not constitute final agency action for purposes of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq.; and (b) they fail to establish that BLM's decision violates the Wild Free-Roaming Horses and Burros Act ("WFRHBA"), 16 U.S.C. § 1331 et seq., the National Environmental Policy Act ("NEPA"), 16 U.S.C. § 1331 et seq., or the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 et seq.

BLM's decision to remove all wild horses from the West Douglas HA is consistent with the language and purpose of the WFRHBA, and is fully supported by the administrative record. In performing its land management duties and fulfilling its multiple use mandate, the BLM properly considered the WFRHBA pursuant to FLPMA. Further, the BLM appropriately identified environmental concerns and too the requisite hard look at reasonable alternatives and potential environmental impacts in determining the removal of wild horses from the West Douglas HA was not likely to have significant environmental effects pursuant to NEPA. Thus, the Court should uphold BLM's decision, grant Defendants' cross-motion for summary judgment, and dismiss Plaintiffs' Second Amended Complaint in its entirety.

**FACTUAL BACKGROUND**

The factual background is set forth in Defendants' Statement of Undisputed Facts pursuant to Local Civil Rules 7(h) and 56.1.

**STATUTORY AND REGULATORY BACKGROUND**

**I.    Wild Free-Roaming Horses And Burros Act**

The BLM "manage[s] the public lands under principles of multiple use and sustained yield." 43 U.S.C. §1732(a).  Since 1971, this responsibility has included oversight and management of wild horses and burros on public lands.  See generally WFRHBA, 16 U.S.C. § 1331 et seq.  When it enacted the WFRHBA, Congress was concerned that wild horses were vanishing from the West.  Congress wished to preserve the horses as "living symbols of the historic and pioneer spirit of the West," and directed the Secretary to provide for their protection and management.  See 16 U.S.C. §§ 1331.  The WFRHBA grants the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros on federal lands and directs the Secretary to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. §1333(a); see also Fund for Animals, Inc. v. BLM, 460 F.3d 13, 15 (D.C. Cir. 2006).  "The Bureau (as the Secretary's delegate) carries out this function in localized 'herd management areas ("HMAs"),'" Id.; see also 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1, established in accordance with broader land use plans.  Fund for Animals, 460 F.3d at 15; see also 43 C.F.R. § 4710.1.  "Responsibility for a particular herd management area rests with the [BLM's] local field and state offices."  Fund for Animals, 460 F.3d at 15.

In each herd management area, BLM officials at the field and state office levels are

afforded significant discretion to determine their own methods for computing "appropriate management levels" ("AML") for the wild horse and burro populations they manage.  <u>Id.</u>; <u>see</u> <u>also</u> 16 U.S.C. § 1333(b)(1).  When wild horse populations exceed the carrying capacity of the range, or when they stray outside of a designated herd area, BLM is obliged under the Wild Horses and Burros Act to remove them.  <u>See</u> 16 U.S.C. § 1333(b)(2); 43 C.F.R. § 4710.4.

## II.    Federal Land Policy And Management Act

The BLM manages in excess of 260 million acres of the public lands of the United States.  U.S. Dept. of the Interior, BLM, <u>Public Lands Statistics 1993</u>, 6 (1993).  The Secretary of the Interior "has broad plenary powers over the disposition of public lands." <u>Ideal Basic Indus., Inc. v. Morton</u>, 542 F.2d 1364, 1367 (9th Cir. 1976).  Congress, in enacting the FLPMA, declared it to be the policy of the United States that, among other things, "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values . . . [and] that will provide food and habitat for fish and wildlife and domestic animals" while recognizing "the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands."  43 U.S.C. § 1701(a)(8), (12) (1976).  In addition, FLPMA mandates that BLM manage the public lands under principles of multiple use and sustained yield.  <u>See</u>, <u>e.g.</u>, 43 U.S.C. § 1732(a).  The Supreme Court has identified multiple use management as a "deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put  . . . ."  <u>Norton v. S. Utah Wilderness Alliance ("SUWA")</u>, 542 U.S. 55, 71 (2004).

Specifically, BLM manages the public lands under the FLPMA using a multi-step

planning and decision process. BLM first develops a Resource Management Plan ("RMP") for an area that sets forth long-term goals and objectives for management of resources on BLM-administered lands. 43 U.S.C. § 1712(a). The RMP generally establishes, among other things, objectives relating to the management of wild horses, and the conditions under which management of each resource should occur within a particular resource planning area. 43 C.F.R. § 1601.0-5(n); see also SUWA, 542 U.S. at 71. Generally, an RMP does not constitute a decision to undertake any particular site-specific action. 43 C.F.R. 1601.0-5. At the second tier of decisionmaking, BLM implements the RMP through project-specific decisions, which must conform to the RMP. See 43 U.S.C. § 1712(e); 43 C.F.R. § 1610.5-3.

## III.    National Environmental Policy Act

The purpose of the NEPA, 42 U.S.C. §§ 4321, et seq., is to focus the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before the action is implemented and potential negative environmental impacts can be avoided. 42 U.S.C. § 4321; 40 C.F.R. § 1501; Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989). NEPA mandates the procedures for agencies to consider the environmental impacts of their actions, but does not dictate substantive results. Robertson, 490 U.S. at 351 ("NEPA merely prohibits uninformed–rather than unwise– agency action."). NEPA requires federal agencies to consider the environmental impact of any major federal actions they undertake, and to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3; Public Citizen v. Nat'l Highway Traffic Safety Admin., 848 F.2d 256, 265 (D.C. Cir. 1988). The purpose of the statute is to force an agency to consider "information concerning significant environmental impacts"

when it makes decisions, and to make that information available to the general public. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).

An agency may prepare an "environmental assessment" ("EA") to determine whether a proposal constitutes major federal action significantly affecting the quality of the human environment for which an EIS is required. See 40 C.F.R. § 1501.4. If, after a "hard look" at the proposed action, the agency concludes that there will not be any significant environmental impact, the agency may issue a Finding of No Significant Impact ("FONSI"), and is not required to prepare an EIS. See Coal. On Sensible Transp. v. Dole, 642 F. Supp. 573, 584 (D.D.C. 1986). In contrast to an EIS, an EA need only include brief discussions of the need for a proposal, alternatives, and of the environmental impacts of the proposed actions and alternatives. 40 C.F.R. § 1508.9(b); See also 40 C.F.R. §§ 1508.9(a), (a)(1) (An [EA] is a "concise public document" that "[b]riefly provides sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact.").

## PROCEDURAL BACKGROUND

On September 17, 2006, Plaintiffs filed their complaint seeking declaratory and injunctive relief. See Doc. No. 1. On September 22, 2006, Plaintiffs filed a motion seeking emergency injunctive relief (Doc. No. 5), which was denied on October 5, 2006. See October 5, 2006 Minute Entry Order. On December 6, 2006, Plaintiffs filed an amended complaint, see Doc. No. 24, and Federal Defendants moved to dismiss the amended complaint on December 29, 2006.

On June 25, 2007, Plaintiffs moved for leave to conduct discovery. See Doc. No. 36. On July 9, 2007, the Court denied Defendants' Motion to Dismiss without prejudice pending resolution of discovery issues. See July 9, 2007 Minute Order. By Order dated November

30, 2007, the Court denied Plaintiffs' motion for discovery. <u>See</u> Doc. No. 49. The Court held, inter alia, that Plaintiffs were not entitled to discovery regarding the status of a 2002 Instruction Memorandum because the memorandum had expired by its own terms. <u>See</u> Doc. No. 48 at 5-6. The Court further held that Plaintiffs were not entitled to discovery regarding the Bureau of Land Management's ("BLM") Restoration Strategy because it is not final agency action subject to review under the Administrative Procedure Act ("APA"). <u>Id.</u> at 6.

On October 22, 2007, Defendants filed a Status Report on the West Douglas Herd, Doc. No. 47, informing the Court and parties that on October 10, 2007, the Colorado State Director of BLM approved Mr. Walter's proposed decision to remove all wild horses from the West Douglas HA. <u>See</u> Second Walter Decl. at ¶ 8. On January 4, 2008, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint, Doc. No. 53 ("Pl. Mot. Am."). The Court granted Plaintiffs' motion and entered the Second Amended Complaint, which adds a challenge to the October 10, 2007 Decision Record, Doc. No. 47-3, and joins the signatory of the Decision Record, the Colorado State Director of BLM, as a defendant in this action. <u>See</u> Plaintiffs' Second Amended Complaint, Doc. No. 57 ("Sec. Am. Cmpl.").

### STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment may be granted when the moving party shows that there are no material facts in dispute, and the party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c). In a case involving judicial review of a final agency action under the APA, the court's role is limited to review of the administrative record. <u>See</u> 5 U.S.C. § 706 (a reviewing court "shall review the whole record or those parts of it cited by a party . . . ."). The reviewing court's task is to "decide, on the basis of the record the agency provides, whether the action passes muster under the

appropriate APA standard of review." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). In the APA context, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985). See also Stuttering Found. of America v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review"), citing Richards v. INS, 554 F.2d 1173, 1177 n.28 (D.C. Cir. 1977).

BLM's decision to remove the West Douglas herd is reviewed under the APA, which provides that a court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard of the APA, the court is not empowered to substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); see also Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1229 (D.C. Cir. 2007). The arbitrary and capricious standard is highly deferential and presumes that agency action is valid. Id.; see also Nat'l Coalition for Marine Conservation, 231 F. Supp. 2d at 127 ("The APA standard accords great deference to agency decisionmaking, and the Secretary's action enjoys an initial presumption of validity."). Where, as here, the agency's scientific and technical expertise is involved in the decision, a reviewing court must be particularly deferential to the judgment of the agency. Balt. Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1983). See also Marsh, 490 U.S. at 375-77 (where analysis "requires a high level of technical expertise," court must defer to informed discretion of agency); Bluewater Network v. EPA, 372 F.3d 404, 410 (D.C. Cir. 2004)

(courts must give "particular deference" to agency acting under "'unwieldy and science-driven'" statutory scheme).

Plaintiffs' NEPA claims are also reviewed under the APA's arbitrary and capricious standard.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 872 (1990); Karst Envtl. Educ. & Prot., Inc. v. EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007).  In reviewing the sufficiency of an agency's NEPA analysis, courts are deferential to the agency.  See Grand Canyon Trust v. FAA, 290 F.3d 339, 341 (D.C. Cir. 2002); Env'l Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981) (review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid."); see also Tongass Conservation Soc'y v. Cheney, 924 F.2d 1137, 1140 (D.C. Cir. 1991) (quoting NRDC v. Hodel, 865 F.2d 288, 294 (D.C. Cir. 1988)).  The Court's role is "'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'"  City of Olmstead Falls v. FAA, 292 F.3d 261, 269 (D.C. Cir. 2002) (quoting Balt. Gas & Elec., 462 U.S. at 97-98).

## ARGUMENT

## I.    PLAINTIFFS' WFRHBA AND FLPMA CLAIMS ARE NOT AUTHORIZED UNDER THE APA.

Plaintiffs' second amended complaint challenges various agency planning documents, chief among them, the amendment to the RMP.  Plaintiffs principally take issue with BLM's planning decisions pertaining to wild horses reflected in the West Douglas EA and, by implication, its effect on the 1997 RMP.  Plaintiffs ask this Court to issue an order prohibiting BLM from removing wild horse herds presently occupying the West Douglas HA.  Plaintiffs' challenge to BLM's plan to remove the horses from the West Douglas HA

is not reviewable as a "final agency action" within the meaning of the APA.  Rather, the focus of Plaintiffs' challenge should be the BLM's decision to undertake a gather pursuant to its July 14, 2008 Gather Plan EA, CO-110-2008-052-EA, which documents and reviews the actual method to be used to remove horses from the West Douglas HA, hereto attached. See Attachment I.

### A. The Specific Resource Management Planning Goals Challenged By Plaintiffs Do Not Qualify As Reviewable "Final Agency Actions"

Plaintiffs challenges to the legality of specific management planning goals in the West Douglas EA/RMP Amendment are not reviewable "final agency actions" pursuant to § 704 of the APA.  Federal Courts are not authorized to review agency policy choices in the abstract.  Fund for Animals, 460 F.3d at 18-22.  In the absence of a specific statutory review provision, the APA provides a cause of action to "[a] person suffering legal wrong because of an *agency action*, or adversely affected or aggrieved by *agency action*."  See id. at 18 (internal quotation marks omitted) (alteration in original); see also 5 U.S.C. § 702.  "Review under the APA is further limited to a '*final agency action* for which there is no other adequate remedy in a court.'"  Fund for Animals, 460 F.3d at 18 (quoting 5 U.S.C. § 704) (emphasis added).  "Whether there has been 'agency action' or 'final agency action' within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable."  Fund for Animals, 460 F.3d at 18.

The APA defines an "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof."  5 U.S.C. § 551(13).  While this list is expansive, the D.C. Circuit has "long recognized that the term [agency action] is not so all encompassing as to authorize us to exercise judicial review over everything done by

an administrative agency." <u>Fund for Animals</u>, 460 F.3d at 19 (<u>quoting</u> <u>Indep. Equip. Dealers</u> <u>Ass'n v. EPA</u>, 372 F.3d 420, 427 (D.C. Cir. 2004)). "Much of what an agency does is in anticipation of agency action." Fund for Animals, 460 F.3d at 19-20. "Agencies prepare proposals, conduct studies, meet with members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs." <u>Id.</u> at 20. "Courts may 'intervene in the administration of laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect.'" <u>Id.</u> (quoting Lujan, 497 U.S. at 894). Nor may courts "entang[le] themselves in abstract disagreements over administrative policies . . . until an administrative decision has been formalized and its effects felt in a concrete way." <u>Ohio Forestry Ass'n,</u> <u>Inc. v. Sierra Club</u>, 523 U.S. 726, 732-33 (1998).

The Plaintiffs' challenges to BLM's planning goals related to the management of wild horses contained in the West Douglas EA/RMP Amendment are not reviewable as final agency actions because they do not qualify as circumscribed, discrete agency actions. <u>See</u> <u>Fund for Animals</u>, 460 F.3d at 20. The West Douglas EA/RMP Amendment does not establish a legal right to gather horses or abolish any legal authority to object to horses being gathered. <u>See</u> <u>Ohio Forestry</u>, 523 U.S. at 728-730 (1998). It is not the kind of final agency action that has an "actual or immediately threatened effect." <u>See</u> <u>Lujan</u>, 497 U.S. at 894. It does not "command anyone to do anything or to refrain from doing anything; [it does] not grant, withhold, or modify any formal legal license, power, or authority; [it does] not subject anyone to any civil or criminal liability; [it] create[s] no legal rights or obligations." <u>See</u> <u>Fund for Animals</u>, 460 F.3d at 22.

The D.C. Circuit has consistently refused to review agency orders "that do[] not

- 11 -

[themselves] adversely affect complainant[s] but only affect [their] rights adversely on the contingency of *future* administrative action." Id. (emphasis added). The West Douglas EA/RMP Amendment is merely a land use plan that provides guidance and authorization for *future* action. The *eventual* removal of all horses from the West Douglas HA is not a final agency decision sufficient to grant Plaintiffs an immediate cause of action under the APA. See Lujan, 497 U.S. at 891. By its own terms, the West Douglas EA/RMP Amendment states that "the purpose of the RMP Amendment is to identify whether it is feasible at this time to manage wild horses in the West Douglas Herd Area" and specifically does not authorize the actual removal, or method of removal, of wild horses from the Herd Area. AR Vol. 1, Tab 73, p. 489. The long-standing practice in this Circuit is "to require the complaining party to challenge the specific implementation of the broader agency policy." Fund for Animals, 460 F.3d at 22; see also Ohio Forestry, 523 U.S. at 737 (like forest plans, Congress has not provided for pre-implementation judicial review of land use plans). As such, Plaintiffs' claims challenging wild horse management planning goals as contained in the West Douglas EA/RMP Amendment are not claims for which this Court can grant relief and Counts Two, Three and Six in their complaint should be dismissed.

## II.   BLM'S DECISION TO REMOVE ALL WILD HORSES FROM THE WEST DOUGLAS HA IS A REASONABLE EXERCISE OF THE AGENCY'S DISCRETION UNDER THE WFRHBA AND SHOULD BE UPHELD BY THE COURT.

Plaintiffs' claims under the WFRHBA must fail because BLM is not eliminating wild horses from an area where they were found in 1971, at the time of passage of the Act. Further, Plaintiffs' claims must fail as a legal matter, because nothing in the statute or legislative history supports their view that BLM is prohibited from removing horses from

a portion of the land they occupied in 1971. BLM's decision to remove all wild horses from the West Douglas HA is permitted under the WFRHBA, is a reasonable exercise of the agency's discretion, and is supported by the administrative record. Because Plaintiffs have failed to show that BLM abused its discretion, Defendants are entitled to summary judgment on Counts Two, Three, and Six of Plaintiffs' Second Amended Complaint.[1]

### A. Plaintiffs' Argument Must Fail As A Factual Matter Because BLM Is Not Eliminating Horses From An Area Where They Were Found At The Passage Of The WFRHBA.

Even if there were a legal basis for Plaintiffs' argument that BLM is precluded from removing all horses from the West Douglas HA, which Defendants dispute, their claim must fail as a factual matter. BLM's decision to remove horses from the West Douglas HA will not eliminate all wild horses from an area where they were found in 1971, when the WFRHBA was passed. Although Plaintiffs focus on the West Douglas HA, the relevant area is the larger Douglas Creek herd unit which BLM identified for wild horse management shortly after the passage of the WFRHBA. A significant portion of this area, the Piceance-East Douglas HMA, will continue to provide habitat for wild horses. Thus, BLM is not eliminating horses from the area where they were found in 1971 – it is merely choosing to manage them in the portion of the historic range that provides the best habitat.

West Douglas was not a herd area at the time the WFRHBA was enacted. The term "herd area" was not defined at the WFRHBA's passage in 1971, but was subsequently adopted by BLM regulations to describe "the geographic area identified as having been used by a herd as its habitat in 1971." See 43 C.F.R. § 4700.0-5(d). BLM is required to

---

[1] Plaintiffs have failed to offer any argument in their motion for summary judgment related to Counts Four and Five, and therefore have abandoned those claims. See, e.g., Am. Soc'y of Dermatology v. Shalala, 962 F. Supp. 141, 142 n.1 (D.D.C. 1996).

"maintain a record of the herd areas that existed in 1971, and a current inventory of the numbers of animals and their areas of use." 43 C.F.R. § 4710.2. A herd area is not set in stone; rather, BLM's Land Use Planning Handbook allows for the possibility that the boundaries of a herd area may be changed where "the HA boundary does not correctly portray where wild horses and burros were found in 1971." A.R. Vol. 1, Tab 3, p. 19. The regulations implementing the WFRHBA anticipate that wild horses will be maintained not throughout the entire herd area, but within specified "herd management areas" that are subsets of the broader herd areas. See 43 C.F.R. § 4710.3-1. See also A.R. Vol. 1, Tab 3, p. 19 ("Herd management areas (HMAs) are established only in HAs, within which wild horses and/or burros can be managed for the long term.").[2] In designating herd management areas, BLM must consider, inter alia, "the appropriate management level for the herd," "the habitat requirements of the animals," and "the relationships with other uses of the public and adjacent private lands." 43 C.F.R. § 4710.3-1. Management of wild horses is to be carried out with the goal of limiting distribution of the animals to herd areas. See 43 C.F.R. § 4710.4.

The area of wild horse use at the passage of the Act was an area of 187,970 acres

---

[2] In a December 8, 2004 email, Fran Ackley, Wild Horse Program Leader, BLM Colorado State Office, explained the difference between herd areas and herd management areas:

> HMAs are basically subsets of HAs. A herd area is established per the initial inventories done after the Act was passed. Those HAs are then assessed as to their capability for long term horse management. After this is determined, the boundaries are either the same as the HA or refined into a smaller HA, and this geographical unit usually becomes an HMA. As such, we have to establish an AML for the HMA. However, if the decision is to manage for zero horses, then the unit stays a HA. . . . Can a HA be managed in perpetuity without becoming an HMA? While there is no restriction against managing a HA indefinitely, there are funding realities that make it unwise. Funding is not distributed for management of HAs, only HMAs.

A.R. Vol. 2, Tab 3, p. 6.

known as the "Douglas Creek wild horse herd unit," encompassing the present-day West Douglas HA and Piceance-East Douglas HMA.  See A.R. Vol. 4, Tab 14, p. 373.  See also A.R. Vol. 4, Tab 9, p. 147 (referring to Piceance Basin and Douglas Creek herd units); A.R. Vol. 4, Tab 11, p. 236 (listing number of wild horses observed in Douglas Creek and other herd units).  The West Douglas HA does not reflect where wild horses were found in 1971.  Rather, it is the portion of the Douglas Creek Basin that was not selected for inclusion in the HMA (Piceance-East Douglas) because it was not identified as key habitat for wild horses.  See A.R. Vol. 1, Tab 5, p. 26.

Thus, it is the Douglas Creek herd unit, not the West Douglas HA, that is the historical habitat for purposes of the WFRHBA.  BLM will continue to manage horses in the Douglas Creek herd unit because wild horses will be maintained in the Piceance-East Douglas HMA, the portion of the Douglas Creek area best suited for managing wild horses.  See A.R. Vol. 1, Tab 13, p. 73 ("The BLM has determined through several land use planning processes (in 1975, 1980, 1997, and 2005) that the Piceance/East Douglas portion of the original Douglas Creek and Piceance Basin herd units is the best location in which to manage a large, genetically viable wild horse herd in balance with the habitat and other uses to maintain a TNEB, with the minimum level of management necessary to attain land use plan objectives. . . .").  Therefore, even if Plaintiffs are correct that the WFRHBA prohibits BLM from removing all horses from an area where they were found at the passage of the Act – which Defendants dispute – their claims must fail because BLM is not removing all horses from the area that they occupied in 1971.

- 15 -

**B.      BLM's Decision To Remove All Wild Horses From The West Douglas HA Is Based On A Permissible Construction Of The Statute.**

Even if Plaintiffs were accurate in their view that BLM is eliminating all horses from a portion of their historic range, their WFRHBA claims would fail as a legal matter because BLM's action is based on a permissible construction of the statute.  As Plaintiffs note, the Court must apply the test set forth in <u>Chevron U.S.A., Inc. v. NRDC</u>, 467 U.S. 837 (1984), in considering whether BLM's decision to remove all horses from the West Douglas HA violates the WFRHBA.  <u>See</u> Pls.' Mem. at 33.  Under <u>Chevron</u>, the court first determines "whether Congress has directly spoken to the precise question at issue" ("step one").  <u>See</u> Chevron, 467 U.S. at 842 ("If the intent of Congress is clear, that is the end of the matter . . . .").  If, however, the statute is "silent or ambiguous with respect to the specific issue," the court must consider whether the agency's interpretation "is based on a permissible construction of the statute" ("step two").  <u>Id.</u> at 843.  Here, neither the plain language of the WFRHBA nor the legislative history reflect a Congressional intent to preclude BLM from removing all horses from a herd area.  In the absence of a clear statutory prohibition, BLM's decision is a proper exercise of its discretion to manage wild horses in the West Douglas HA.

> 1.      The plain language and legislative history of the WFRHBA do not evidence a Congressional intent to preclude total removal of horses <u>from a herd area.</u>

The WFRHBA states Congress' declaration of policy that wild horses "are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.  In furtherance of this purpose, the Secretary of the Interior – and, by delegation, BLM – must "protect and manage" wild horses "as components of the

public lands," and "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands."  <u>Id.</u> at § 1333(a).  In carrying out these responsibilities, BLM must undertake management activities "at the minimal feasible level." <u>Id.</u>

Plaintiffs' argument is based on a flawed reading of the statute that converts the phrase "where presently found" in the Congressional declaration of policy into a mandate requiring BLM to maintain horses throughout every acre of the habitat they occupied in 1971.  Nothing in the WFRHBA supports this interpretation or requires BLM to manage horses in a particular area.  BLM need only "consider" where the horses were found in 1971, and "<u>may</u> designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation . . . ."  <u>See id.</u> (emphasis added).  A "range" is defined as "the amount of land necessary to sustain an existing herd or herds of" wild horses, "which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands."  <u>Id.</u> at § 1332(c).  Designation and maintenance of a "range" is at BLM's discretion, <u>see id.</u> at § 1333(a), and nothing in the statutory language limits BLM's discretion to choose not to maintain a particular range.

Nor does the legislative history of the WFRHBA support Plaintiffs' reading of the statute.  There is no indication that Congress intended to preclude BLM from removing wild horses from an area where they were found in 1971.  What is clear from the legislative history is that Congress intended for the Secretary to exercise broad discretion in carrying out his management responsibilities.

Congress' overriding concern was ending the harassment and slaughter of wild

- 17 -

horses.  S. Rep. No. 92-242, at 2150 (1971).  <u>See</u> <u>also</u> H.R. Rep. No. 95-1122, at 21 (1978)

("In 1971, Congress passed legislation to protect wild and free-roaming horses and burros

from indiscriminate capture, branding, harassment and death.  This legislation was necessary

to correct intolerable abuses of these animals by those seeking to exploit them for private use

and profit.  Particularly objectionable were several cruel practices of rounding up, and then

slaughtering animals for sale to processing plants for horse meat.").  Congress gave the

Secretary a great deal of discretion in carrying out his responsibility to protect wild horses

from harm and exploitation at the hands of humans:

> It should be pointed out that the Secretaries of Interior and Agriculture are
> given a high degree of discretionary authority for the purposes of protection,
> management, and control of wild free-roaming horses and burros on the
> public lands.  The Act provides the administrative tools for protection of the
> animals from depredation by man.  This is the paramount responsibility with
> which the Secretaries are charged under the terms of the statute.

H.R. Rep. No. 92-681, at 2160 (1971) (Conf. Rep.).

The directive to manage horses "where presently found," 16 U.S.C. § 1331, is

clarified by the legislative history.  The Department of the Interior had proposed a scheme

whereby wild horses would be managed on five ranges established by the Secretary

specifically for their protection.  S. Rep. 92-242 at 2156.  However, Congress rejected the

range concept in favor of protection and management "as a component of the public lands

and an integral part of the multiple use management system."  <u>Id.</u> at 2150.  Thus, the

reference to managing horses where they are "presently found" distinguishes the approach

adopted in the WFRHBA – managing horses in their natural habitat – from the refuge

approach advocated by the Department of the Interior.  There is no indication that, by

inserting this phrase, Congress intended to require BLM to maintain wild horses in

perpetuity in every area where they could be found in 1971.

        2.      BLM's decision to remove all horses from the West Douglas HA is
                based on a permissible construction of the statute.

Since the statute is silent – or, at least ambiguous – with respect to whether BLM may remove all horses from a herd area, the Court must consider whether BLM's action is "based on a permissible construction of the statute." Chevron, 467 U.S. at 843. The Court should uphold BLM's decision if it is reasonable. See Ariz. Pub. Serv. Co. v. EPA, 211 F.3d 1280, 1287 (D.C. Cir. 2000) ("The reasonableness prong includes an inquiry into whether the agency reasonably filled a gap in the statute left by Congress."). BLM reasonably concluded that it has the discretion under the WFRHBA to remove all horses from the West Douglas HA while continuing to manage horses in the Piceance-East Douglas HMA.

Contrary to Plaintiffs' allegations, BLM is managing wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance ["TNEB"] on the public lands." See 16 U.S.C. § 1333(a); contra Pls.' Mem. at 23. See also H.R. Rep. No. 95-1737, 15 (1978) (Conf. Rep.), reprinted in 1978 U.S.C.C.A.N. 4127, 4131 ("The goal of wild horse and burro management, as with all range management programs, should be to maintain a thriving ecological balance between wild horse and burro populations, wildlife, livestock, and vegetation . . . ."). BLM will continue to manage wild horses on a portion of the historic range that encompassed the West Douglas HA (the Douglas Creek herd unit), as explained supra. BLM reasonably determined that "it is more appropriate to manage horses in [the Piceance-East Douglas HMA] rather than in the West Douglas HA" because that area is "highly suited to the needs of wild horses." A.R. Vol. 1, Tab 16, p. 101. In the Piceance-East Douglas HMA, BLM can manage horses in a manner that will maintain "a

self-sustaining population of healthy horses in balance with other uses and their habitat. . . ." A.R. Vol. 1, Tab 13, p. 74.  Thus, BLM is managing the range in a manner that maintains a balance of uses, including wild horses.

Equally flawed is Plaintiffs' argument that BLM may only remove wild horses from a herd area where the agency has made a determination that there is an "overpopulation" and that such horses are "excess."  See Pls.' Mem. at 21-22.  If BLM determines that an overpopulation exists, the WFRHBA imposes a duty on the agency to "immediately remove excess animals from the range so as to achieve appropriate management levels."  16 U.S.C. § 1333(b)(2).  See also 43 C.F.R. § 4720.1.[3/]  Seven years after the passage of the WFRHBA, Congress recognized that the WFRHBA was so successful at protecting wild horses and burros that, in some places, their numbers exceeded the carrying capacity of the range.  H.R. Rep. 95-1122 at 21 ("Excess numbers of horses and burros pose a threat to wildlife, livestock, the improvement of range conditions, and ultimately, to their own survival.").  Congress directed the Secretary to maintain a current inventory of wild horses and burros and, where overpopulation is determined to exist, decide how to control excess animals.  Id. at 22.   However, nothing in the WFRHBA precludes BLM from removing wild horses from a herd area absent a finding that an overpopulation exists.  Rather, BLM has broad discretion to manage wild horses, provided that it undertakes such management "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands."  16 U.S.C. § 1333(a).  In keeping with this broad discretion, BLM guidance instructs that

---

[3/] The term "excess animals" is defined as "wild free-roaming horses or burros (1) which have been removed from an area by the Secretary pursuant to applicable law or, (2) which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  16 U.S.C. § 1332(f).

"[w]here appropriate, the land use plan may include decisions removing horses from all or part of a [herd area]" if, for example "essential habitat components are not available for wild horse or burro use within an HA."  A.R. Vol. 1, Tab. 3, p. 19.

Moreover, even if Plaintiffs' reading of the WFRHBA were correct, their argument would fail because BLM did conclude that the West Douglas horses were "excess."  BLM found that the horses must be removed from West Douglas in order to maintain a thriving natural ecological balance, and therefore the horses are excess.  See A.R. Vol. 1, Tab 16, p. 101 ("Because a TNEB is not being achieved in the West Douglas HA, and because the BLM has decided under its authority at 43 C.F.R. § 4710.1 and 4710.3 that the West Douglas portion will not be included within the boundaries of an HMA, the horses are excess.").  See also 16 U.S.C. § 1332(f) ("excess animals" means, inter alia, wild horses "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area").  Plaintiffs cite nothing in the WFRHBA or implementing regulations that prohibits BLM from determining that all of the horses in the West Douglas HA are excess.  BLM's decision to remove all horses from the West Douglas HA is based on a permissible construction of the WFRHBA, and it should be upheld by the Court.

### C.     BLM Has Stated A Rational Basis For Removing All Horses From The West Douglas HA, And Its Decision Is Entitled To Deference.

BLM's decision to remove all horses from the West Douglas HA is a reasonable exercise of agency discretion and is supported by the administrative record.  BLM has a great deal of discretion under the WFRHBA, and the Supreme Court has cautioned against judicial interference with respect to the agency's compliance with mandates such as that in

- 21 -

the WFRHBA to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance . . . ." SUWA, 542 U.S. at 67 ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA."). Here, the record supports BLM's conclusion that wild horses should be eliminated from the West Douglas HA because they could be better managed elsewhere.

In 1997 it was estimated that the West Douglas herd numbered approximately 114 horses. See A.R. Vol. 4, Tab 2, p. 13. BLM decided that the West Douglas HA was "not suitable for long term wild horse management, and horse use in th[is] area[] will be phased out." A.R. Vol. 4, Tab 2, p. 12. BLM decided to focus management efforts in a limited area in order to create "one high quality wild horse herd," and created the Piceance-East Douglas HMA for this purpose. A.R. Vol. 4, Tab 2, p. 14. "This expanded Herd Management Area contains the majority of the resource area's high quality habitat occupied in 1971 when the [WFRHBA] was passed." Id. BLM reasonably decided to manage horses in Piceance-East Douglas rather than West Douglas, which has significant limitations:

> The principal problem in maintaining wild horses in the West Douglas Herd Area is a major shift in wild horse grazing use patterns that has occurred since the early 1980's. It is probable that intense energy exploration and development occurring in the northern part of the herd area has concentrated use in the south. This change of use has resulted in overgrazing the Texas Creek drainage, and horse use in Missouri and Evacuation Creeks that are not a part of the 1971 herd area.

> The rugged terrain and Pinyon-Juniper cover in the southern portion of the herd area makes gather operations unreasonably expensive and dangerous.

Id. See also A.R. Vol. 4, Tab 5, p. 58 ("The 'balance' prescribed by the 1971 Act and FLPMA is the basis for emphasis on management of wild horses in the Piceance-E. Douglas

- 22 -

[HMA] as described in Alternative D of this plan.").

Consistent with its duty to manage wild horses "with the objective of limiting the animals' distribution to herd areas," see 43 C.F.R. § 4710.4, BLM reasonably determined that it was necessary to take action to address the dispersal of wild horses outside of the West Douglas HA. Due to the geography of the West Douglas HA and expansion of oil and gas development, BLM has been unable to manage horses in a manner that restricts their distribution to the herd area:

> In the case of the West Douglas Herd Area, the basis for past planning decisions and the Preferred Alternative of this RMP that calls for removal of horses from this area is again, based on the issue of manageability. Lacking physical barriers on the south and west boundaries of the Herd Area which would prevent their movement, wild horses have dispersed to areas which they did not inhabit at the passage of the 1971 Act. The location of horses outside the Herd Area contradicts Section 10 of the Act and BLM Manual Planning guidance which states, "Herd management must be implemented with the objective of limiting animal distribution to areas inhabited in 1971". [sic] The primary cause of this movement in the past and at the present is the intense oil and gas exploration and development that is occurring throughout the Herd Area.

A.R. Vol. 4, Tab 5, p. 58. See also A.R. Vol. 4, Tab 9, p. 153 ("The increase in oil and gas activities in this area warrants removal of the horses. Gas development activity is causing horses to disperse into areas where they did not exist prior to 1971. The Wild Horse and Burro Act states that horse range or habitat will not expand beyond the area occupied when the law was passed."). Wild horses have consistently been found outside of the herd area. See A.R. Vol. 1, Tab 73, p. 499. Thus, BLM concluded that:

> [a] large herd could not be sustained in this area with the existing habitat condition and other competing uses. Since the early 1980's, each wild horse census has found horses from the West Douglas HA outside of the HA. To maintain a smaller herd on the west side of Douglas Creek and State Highway 139 would not be a responsible allocation of public resources. Horses in that area would require intensive management to maintain genetic variability, keep them within the boundaries of the management area, carry

out gathers in the localized rough terrain and maintain adequate horse habitat in light of disturbances from other uses in this area.

A.R. Vol. 1, Tab 13, p. 74.

BLM reasonably concluded that it should focus its management efforts on the Piceance-East Douglas HMA because that area is better suited for wild horses than the neighboring West Douglas HA. Because Plaintiffs have failed to demonstrate that BLM lacked a rational basis for its decision to remove all horses from the West Douglas HA, Defendants are entitled to summary judgment on Plaintiffs' claims under the WFRHBA.

## III.   THE BLM COMPLIED WITH NEPA BY TAKING THE REQUISITE "HARD LOOK" AT POTENTIAL ENVIRONMENTAL IMPACTS AND DETERMINING THAT NO SIGNIFICANT IMPACTS WERE LIKELY TO OCCUR.

Plaintiffs' NEPA claims focus primarily on challenging the BLM's FONSI decision following preparation of the West Douglas EA. Here, the BLM took the requisite "hard look" at removal of the West Douglas Herd's potential impacts and alternatives, and reasonably determined the project would not have a significant effect on the environment.[4] Because no factors were present that required an EIS, the BLM's analysis satisfied NEPA's procedural mandate. Thus, Defendants are entitled to summary judgment on Count One of Plaintiffs' Second Amended Complaint.

### A.   The Environmental Assessment Adequately Addressed the Potential Impacts of Removing Wild Horses From the West Douglas Herd Area

The BLM's analysis of potential impacts took a "hard look" in accordance with NEPA. Courts review an agency's impact analysis only "to ensure that the agency has

---

[4]On July 14, 2008, the BLM released the 2008 West Douglas Removal Plan EA, CO-110-2008-052-EA. See Attachment I. The 2008 West Douglas Removal Plan EA implements the decision in the West Douglas EA/RMP Amendment and provides further in depth environmental review on the gather and removal of wild horses from the West Douglas HA. At this time, Plaintiff has not challenged the 2008 West Douglas Removal Plan EA.

adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Balt. Gas & Elec. Co., 462 U.S. at 97-98.  As part of its analysis, an agency must examine direct, secondary, and cumulative impacts.[5]  An EA must give a "realistic evaluation" of the total impacts, not just an isolated look at the proposed project.  Grand Canyon Trust, 290 F.3d at 342; see also Biodiversity Conservation Alliance v. BLM ("BCA"), 404 F. Supp. 2d 212, 218 (D.D.C. 2005).  Here, the EA considered and adequately informed the public of potential impacts, and all conclusions were supported by the record.

> 1.    Direct and secondary impacts were identified, discussed in detail, and the conclusions reached were supported by the record.

The West Douglas EA identified and disclosed several potential direct and secondary environmental impacts for the proposed project.  These include impacts to wild horses (AR Vol. 1, Tab 73, p. 535), rangeland management (AR Vol. 1, Tab 73 p. 537), vegetation (AR Vol. 1, Tab 73, p. 538), water quality (AR Vol. 1, Tab 73, p. 540), hydrology and water rights (AR Vol. 1, Tab 73, p. 541), riparian zones (AR Vol. 1, Tab 73, p. 541), soils (AR Vol. 1, Tab 73, p. 542), wilderness (AR Vol. 1, Tab 73, p. 543), geology and minerals (AR Vol. 1, Tab 73, p. 544), land status and realty authorizations (AR Vol. 1, Tab 73, p. 545), wildlife (AR Vol. 1, Tab 73, pp. 535, 545, 551-552 ), migratory birds (AR Vol. 1, Tab 73, p. 550), threatened and endangered animals (AR Vol. 1, Tab 73, p. 550), threatened and endangered plants (AR Vol. 1, Tab 73, p. 550),  recreation (AR Vol. 1, Tab 73, p. 551),

---

[5]Direct impacts are those "caused by the action and occur in same time and place."  40 C.F.R. § 1508.8(a).  Secondary impacts include effects "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).  Cumulative impacts result from "incremental impact of the action when added to past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7.  These can result from individually minor, but collectively significant actions taking place over time.  Id.

visual resources (AR Vol. 1, Tab 73, p. 551), cultural resources (AR Vol. 1, Tab 73, p. 552),

paleontology (AR Vol. 1, Tab 73, p. 553), access and transportation (AR Vol. 1, Tab 73, p.

554), forest management (AR Vol. 1, Tab 73, p. 554), and socio-economics (AR Vol. 1, Tab

73, p. 554).  As to each of these resources, the agency made specific findings that the

proposed decision would not adversely affect the environment and, additionally, proposed

procedures and strategies to continue monitoring the impacts.  Additionally, none of the

conclusions reached regarding these impacts was arbitrary and capricious.  Given the West

Douglas EA's disclosure and evaluation of potential environmental impacts, and the support

in the record for the BLM's conclusions on those potential impacts, the document satisfied

NEPA's impact requirements.

> 2.     Cumulative impacts were identified, discussed in detail, and the
> conclusions reached were supported by the record.

The BLM also met NEPA's requirements for examining cumulative impacts.  The

Supreme Court has recognized that agencies retain substantial discretion as to the extent of

their cumulative impacts inquiry and explanation.  Marsh, 490 U.S. at 376-77.  The CEQ

regulations define "cumulative impact" as the impact:

> on the environment which results from the incremental impact of the action
> when added to other past, present, and reasonably foreseeable future actions
> regardless of what agency (Federal or non-Federal) or person undertakes
> such other actions.  Cumulative impacts can result from individually minor
> but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  The "determination of the extent and effect" of the impacts of projects,

"and particularly identification of the geographic area within which they may occur, is a task

assigned to the special competency of the appropriate agencies."  Kleppe v. Sierra Club, 427

U.S. 390, 414 (1976).  The BLM's determination of the scope of the environmental review

process is entitled to deference.  Marsh, 490 U.S. at 373-374.  There is no need to consider

"purely hypothetical cumulative impacts." Headwaters, Inc. v. BLM, 914 F.2d 1174, 1182 (9th Cir. 1990), and, NEPA does not require the government to do the impractical, Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 764 (9th Cir. 1996). Further, "[d]etailed analysis is required only where impacts are likely." Izaak Walton League of America v. Marsh, 655 F.2d 346, 377 (D.C. Cir. 1981), cert. denied, 454 U.S. 1092 (1981).

The BLM performed an extensive analysis on cumulative impacts within the West Douglas HA, including the effect of grazing (by wildlife, wild horse, and livestock) on vegetation (AR Vol. 1, Tab 73, p. 540), riparian areas (AR Vol. 1, Tab 73, p. 542), water (AR Vol. 1, Tab 73, p. 541), soils at the affected riparian site (AR Vol. 1, Tab 73, p. 543), pasture (AR Vol. 1, Tab 73, p. 537), cultural resources (AR Vol. 1, Tab 73, pp. 552-53), and paleontology (AR Vol. 1, Tab 73, pp. 553-554). As a result of this analysis, the BLM has recognized the expected and overall impacts of grazing on these resources and, through the use of established procedures such as Best Management Practices ("BMPs"), vegetation monitoring studies, grazing management monitoring data, and range improvement projects has identified strategies for efficient and continued management of the resources. See AR Vol. 1, Tab 73, pp. 537, 540-543.

Likewise, cumulative impacts to wild horses, livestock and wildlife from human development (i.e. oil and gas development) and grazing are addressed at the habitat, herd area, and regional geographic scales. AR Vol. 1, Tab 73, pp. 536-38, 549-50. As a result of this analysis, BLM concluded that range monitoring (including forage manipulation and water development), forage allocation, and animal health and habitat will be evaluated for future changes. See id. Additionally, the effects of continued development of oil and gas, and associated infrastructure (roads, pipelines, etc...) on other resource values, including

- 27 -

range (AR Vol. 1, Tab 73, p. 538), vegetation (AR Vol. 1, Tab 73, p. 540), water quality (AR Vol. 1, Tab 73, p. 542), soils at affected riparian sites (AR Vol. 1, Tab 73, p. 541, 543), wilderness (AR Vol. 1, Tab 73, p. 544), recreation (AR Vol. 1, Tab 73, p. 551), visual resources (AR Vol. 1, Tab 73, p. 552), cultural resources (AR Vol. 1, Tab 73, p. 552), paleontology (AR Vol. 1, tab 73, pp. 553-554), and forest management (AR Vol. 1, Tab 73 p. 554) were considered and will be monitored to balance competing uses in the future.

Plaintiff argues that the West Douglas EA fails to meet the cumulative impact standard because "it did not analyze the cumulative impacts of the selected alternative (Alternative A), elimination of the West Douglas herd, on the preservation of wild horses generally, and on Colorado's wild horses, in particular." Pls.' Br. at 25-26. Plaintiffs argument has no merit. A cumulative impact analysis does not require that the agency examine impacts on the human environment from possible future horse removal throughout Colorado or the West. See Kleppe, 427 U.S. at 414; Marsh, 490 U.S. at 373-374; Headwaters, Inc., 914 F.2d at 1182.

Here, the BLM properly limited the West Douglas EA to environmental impacts of the proposed alternatives in the West Douglas HA. AR Vol. 1, Tab 73, pp. 489-90. West Douglas is geographically separated in scope and purpose from other wild horses in the West and, specifically, in Colorado. While the East Douglas HMA is located near the West Douglas HA, it is geographically separated from the West Douglas HA by State Highway 139. AR Vol. 1, Tab 36, p. 161; AR Vol. 1, Tab 73, p. 493. Fencing erected in 1983 physically separates the East Douglas HMA from the West Douglas HA, creating two geographically isolated wild horse herds with little to no relation. AR Vol. 1, Tab 36, p. 161; AR Vol. 1, Tab 73, p. 503. This fencing prevents the migration of wild horses between the

two areas, and such migration has never been observed.  <u>See</u> AR Vol. 1, Tab 73, p. 503.

Because the West Douglas herd is geographically separated from other herds in Colorado

and elsewhere, it was appropriate there were no cumulative impacts in conjunction with

other wild horses in the West.

The BLM's West Douglas EA discusses the overall impacts that removal of wild

horses will have in conjunction with other resource usage in the West Douglas HA, as

required by NEPA.  It took the requisite "hard look" at potential direct, secondary and

cumulative impacts, made them available for public comment, and disclosed its conclusion

in the EA.  The West Douglas EA therefore satisfied NEPA.

**B.     The Environmental Assessment Appropriately Addressed Reasonable Alternatives**

Plaintiffs' assert that the BLM considered only two alternatives for the management

of wild horses in the West Douglas HA in violation of NEPA.  Pls.' Br. at 26.   Further,

Plaintiffs suggest the BLM "established objectives in issuing the EA [that] were too narrow

to allow for reasoned decision-making."  <u>Id.</u> at 30.   Finally, Plaintiffs' argue the BLM has

not adequately explained its reasons for eliminating certain alternatives from detailed study.

<u>Id.</u> at 26.  Plaintiffs' assertions are groundless, as the BLM identified a range of reasonable

alternatives consistent with the statement of purposes and needs in the EA and it took the

requisite "hard look" at the alternatives in satisfaction of NEPA.

The NEPA regulations require that an EA only briefly discuss potential alternatives.

40 C.F.R. § 1508.9(b).  It is for the agency to determine the range of alternatives, <u>N. Slope</u>

<u>Borough v. Andrus</u>, 642 F.2d 589, 601 (D.C. Cir. 1980), and the alternatives needs only be

reasonable.  <u>See</u> <u>Citizens Against Burlington, Inc. v. Busey</u>, 938 F.2d 190, 195 (D.C. Cir.

1991); <u>Coal. On Sensible Transp.</u>, 642 F. Supp. at 593 (citing <u>NRDC v. Morton</u>, 458 F.2d

827, 833-38 (D.C. Cir. 1972)).  Reasonable alternatives are those that will bring about the ends of the intended project.  See 40 C.F.R. §§ 1502.13, 1508.9(b); City of Alexandria, Va. v. Slater, 198 F.3d 862, 867-69 (D.C. Cir. 1999).  While the regulations only require a brief discussion of the reasons for eliminating alternatives from detailed study, 40 C.F.R. § 1502.14(a), the agency must take the requisite "hard look" and explain the reasons for rejecting alternatives.  Coal. On Sensible Transp., 642 F. Supp. at 593 (citing Balt. Gas & Elec. Co., 462 U.S. at 97-98).

An EA does not need to examine as broad a range of alternatives as an EIS since the necessary range of alternatives diminishes as the expected impacts diminish.  See Friends of Ompompanoosuc v. FERC, 968 F.2d 1549, 1558 (2d Cir. 1992) ("range of alternatives an agency must consider is narrower when, as here, the agency has found that a project will not have a significant environmental impact."); Sierra Club v. Espy, 38 F.3d 792, 803 (5th Cir. 1994) (range of alternatives to be considered in EA "decreases as the environmental impact of the proposed action becomes less and less substantial.") (internal quotation marks omitted).  An appropriate range of alternatives is defined by the statement of purpose and need in the EA.  40 C.F.R. § 1502.13; City of Alexandria, 198 F.3d at 867.  Courts will uphold an agency's "discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail."  Busey, 938 F.2d at 196.  Also, NEPA does not require analysis of a minimum number of alternatives and analysis of only the proposed action and the no action alternative does not denote an inadequate range of alternatives.  Id. at 198 (upholding FAA's consideration of two alternatives–no action and approval of airport expansion); Tongass, 924 F.2d at 1140-42; Missouri Mining, Inc. v. Interstate Commerce Comm'n, 33 F.3d 980, 981 (8th Cir. 1994) (upholding decision analyzing only no action and

proposed operation and construction of 17 mile railway.)  Here, the BLM took that requisite "hard look" at the alternatives and articulated its reasons for rejecting alternatives from detailed analysis.  Accordingly, the alternative discussion in the West Douglas EA satisfied NEPA.

Plaintiffs assert that BLM "established objectives in issuing the EA [that] were too narrow to allow for reasoned decision-making."  Pls.' Br. at 30.  Further, Plaintiffs argue the BLM did not consider an appropriate number of alternatives in their analysis.  <u>Id.</u> at 26.  Plaintiffs' real objection is that they disagree with the alternative that the BLM selected.  The stated purpose and need of the West Douglas EA is to identify whether it is feasible at this time to manage wild horses in the West Douglas HA, while protecting resource values, providing for multiple uses, and improving the health of public lands.  AR Vol. 1, Tab 73, pp. 489-90; AR Vol. 1, Tab 54, p. 360; AR Vol. 2, Tab 28, p. 311.  Thus, any alternative falling within those parameters would have been a reasonable alternative for the project.  To this effect, the BLM examined nine alternatives during the NEPA process.  <u>See</u> AR Vol. 1, Tab 73, p. 497; AR Vol. 1 Tab 74, pp. 556-58; AR Vol. 2, Tab 28, pp. 319-22.

Specifically, the West Douglas EA examines the effects of "Alternative A" (the "no action alternative"), as well as "Alternative B."  AR Vol. 1, Tab 73, p. 497.  Alternative A "maintained the status quo" and would continue management in accordance with the 1997 RMP, or to remove all horses from the West Douglas HA by 2007.  <u>Id.</u>; <u>see</u> <u>also</u> AR Vol. 4, Tab 5, pp. 52-59.  When updating land management plans, the existing management direction is the appropriate no action alternative.  "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981).  A short examination of the "no action" alternative suffices.  <u>See</u> <u>Or. Nat'l Res.</u>

Council v. Lyng, 882 F.2d 1417, 1423 n.5 (9th Cir. 1989) amended by 899 F.2d 1565 (9th Cir. 1989); Farmland Pres. Ass'n v. Goldschmidt, 611 F.2d 233, 239 (9th Cir. 1979). BLM also extensively analyzed Alternative B, which provided for the management of a herd of between 29 and 60 wild horses in the entire West Douglas HA, with a livestock forage allocation of 8330 animal unit months ("AUMs"), 750 of which would be allocated to wild horses for forage. AR Vol. 1, Tab 74, p. 497, 537.

The BLM considered numerous other reasonable alternatives for the management of wild horses in the West Douglas HA during earlier stages of the planning process and associated NEPA analysis, which included opportunity for public comment.[6] AR Vol. 2, Tab 28, pp. 319-22; AR Vol. 2, Tab 29 (public comments); AR Vol. 2, Tabs 9 - 27 (protests); AR Vol. 1, Tab 54, p. 360; see also AR Vol. 1, Tab 73, p. 498; AR Vol 1 Tab 74, pp. 556-58. Various herd sizes, including zero horses, 29 to 50 horses, 100 to 207 horses, 310 to 643 horses, and their manageability with other ongoing land uses and resources were analyzed. AR Vol. 2, Tab 28, pp. 319-22 ; AR Vol. 1, Tab 54, p. 360. This was a reasonable range of alternatives within the stated purpose and need in the West Douglas EA and plaintiffs fail to show otherwise.

Specifically, Plaintiffs assert that "BLM's failure to consider an alternative which provided for management of a wild horse herd with genetically viable numbers in acreage of the original herd habitat violates the [NEPA]." Pls.' 2d Am. Compl. at 26, ¶ 70. However, "[t]he fact that the EA may not have considered a specific alternative preferred by plaintiffs is simply not grounds for finding that the agency failed to meet its obligations

---

[6]The 2005 West Douglas EA incorporated a draft 2004 EA in accordance with NEPA regulations. See 40 C.F.R. § 1502.21. The references to the draft 2004 EA are well identified. See AR Vol. 1, Tab 73, p. 489, 498; AR Vol. 1, Tab 74, pp. 556-58.

in preparing the EA, or that the agency's decision was "arbitrary and capricious." City of Roseville v. Norton, 219 F. Supp. 2d 130, 170 (D.D.C. 2002). In this instance, the draft 2004 EA process revealed that alternatives consisting of management of greater than 60 horses presented a high likelihood that horses would stray from the West Douglas HA, and would use private lands within and outside of the HA. AR Vol. 1, Tab 54, p. 366, 381; AR Vol. 2, Tab 28, pp. 325, 366-67, 369; AR Vol. 2, Tab 30, p. 499, 503. Range monitoring analysis also indicated that the proposed herd management area can sustain a population of wild horses managed in a range of between 29 and 60 horses. AR Vol. 1, Tab 54, pp. 370-71; AR Vol. 1, Tab 73, p. 535. Based on this information, analysis of Alternative B in the West Douglas EA revealed that only a small herd of 29 to 60 horses could be managed within the West Douglas HA and still be in balance with other multiple resource land uses. AR Vol. 1, Tab 54, p. 360, 370, 378; AR Vol. 1, Tab 73, p. 489.

Further, Plaintiffs note that "one of the five alternatives presented in the draft 2004 EA, but not considered in the West Douglas EA, called for the removal of all wild horses from the herd area as soon as possible and the modification of livestock forage allocation by pasture, with a reduction of livestock forage allocation from 9627 to 6947 AUMs." AR Vol. 1, Tab 74, p. 556; AR Vol. 2, Tab 28, pp. 317-23. Plaintiffs identify a parallel between Alternative B and the 2004 alternative, noting that the 2004 alternative "would have imposed a twenty-five percent (25%) reduction in livestock forage allocation," while Alternative B does not. Pls.' Br. at 28. However, the BLM specifically recognized that the carrying capacity determination, as used in the draft 2004 EA, was not used in the West Douglas EA because determination of forage allocation and livestock carrying is an activity level decision and does not require a decision within a LUP amendment. AR Vol. 1, Tab 54, pp.

- 33 -

370; See generally 43 C.F.R. Part 4110. As such, Alternative B was reasonably considered and provided a forage allocation for wild horses derived from the permitted use. AR Vol. 1, Tab 73, pp. 497, 537-38.

Plaintiffs also suggest the BLM failed to adequately explain its reasons for eliminating certain alternatives from detailed study; specifically, the alternatives proposes in the draft 2004 EA. Pls.' Br. at 26-27. Plaintiffs' argument has no merit, as the BLM provided ample reasons for the rejection of the alternatives in the draft 2004 EA. Based on the public comments and BLM internal review, the BLM decided to withdraw the draft 2004 EA and examine management in the West Douglas HA further. AR Vol. 2, Tab 1, pp. 2-3; AR Vol. 2, Tab 2, p. 5; see also AR Vol. 2, Tab 29 (public comments and responses); AR Vol. 2, Tabs 9-27 (protests of 2004 EA). Central to the alternatives, as presented in the draft 2004 EA, were lease stipulations on human development in an effort to protect key and preferred wild horse habitat.[7] AR Vol. 2, Tab 28, pp. 319-322; AR Vol. 1, Tab 73, p. 489. While the draft 2004 EA discussed a full range of options for managing wild horses in the West Douglas HA, it also found that application of oil and gas stipulations to unleased parcels – which totaled a mere 7% of the West Douglas HA – would not provide adequate protection to wild horse habitat. AR Vol. 1, Tab 54, pp. 379-80, 382, 387-89; AR Vol. 2, Tab 1, p. 3; AR Vol. 2, Tab 28, p. 345. As such, the BLM reasonably concluded the West Douglas EA would not incorporate stipulations on human (oil and gas) development, as their functionality in protection of wild horse habitat was determined negligible. AR Vol. 1, Tab 73, p. 489, 519; AR Vol. 1, Tab 54, p. 379.

---

[7]In the EA, human development is defined as "any impacts to the public lands related to human use. These uses can include *oil and gas development*, livestock management, and recreational use." AR Vol. 1, Tab 73, p. 489 (emphasis added).

As discussed above, the draft 2004 EA process also revealed that alternatives consisting of management of greater than 60 horses presented a high likelihood that horses would stray from the West Douglas HA, and would use private lands within and outside of the HA.  AR Vol. 1, Tab 54, p. 366, 381; AR Vol. 2, Tab 28, pp. 325, 366-67, 369; AR Vol. 2, Tab 30, p. 499, 503.  Further, range monitoring analysis indicated that the proposed herd management area can sustain a population of wild horses managed in a range of between 29 and 60 horses.  AR Vol. 1, Tab 54, pp. 370-71; AR Vol. 1, Tab 73, p. 535.  As such, the BLM provided a reasonable explanation for its elimination of alternatives from detailed study; specifically, the alternatives proposed in the draft 2004 EA.

Accordingly, BLM's alternatives analysis satisfies NEPA, because the BLM identified a range of reasonable alternatives consistent with the statement of purposes and needs in the EA and it took the requisite "hard look" at the alternatives.  The alternatives and reasons for rejection were discussed in the BLM's decision document in conformance with NEPA, and the practicable alternatives analysis was therefore valid.

### C.    No EIS Was Required Because the Agency Reasonably Determined There Were Not Likely to Be Significant Environmental Impacts

In a 5 year process, the BLM completed a comprehensive EA evaluating the environmental impacts of both the removal and continued management of wild horses in the West Douglas HA.  See generally AR Vol. 3, Tab 7, p. 568; AR Vol. 2, Tab 28, pp. 299-405; AR Vol. 1, Tab 73, pp. 485-555; AR Vol. 1, Tab 54, pp. 360-63; AR Vol. 1, Tab 12, pp. 70-71.  Following completion of the West Douglas EA, which included extensive public comment, BLM issued a FONSI; thus, there was no need for it to prepare an EIS.  See AR Vol. 1, Tab 12, p. 70; AR Vol. 1, Tab 54, pp. 360-63; AR Vol. 1, Tabs 56-72, pp. 394-498; Sierra Club v. U.S. Dep't of Transp., 753 F.2d 120, 126 (D.C. Cir. 1985) ("If a finding of

no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary."); Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 682 (D.C. Cir. 1982) ("NEPA's EIS requirement is governed by the rule of reason . . . an EIS must be prepared only when significant environmental impacts will occur . . . .").

The D.C. Circuit has established four factors to determine if an agency decision not to prepare an EIS was arbitrary and capricious. Cabinet Mountain Wilderness, at 681-82. The factors include (1) whether the agency identified the relevant areas of environmental concern; (2) whether the agency took a "hard look" at potential environmental impacts; (3) whether the agency made a convincing case that the impact was insignificant; and (4) if the impact was significant, whether the agency convincingly established project changes to reduce that risk. Id. Under this standard, BLM appropriately determines that an EIS was not required for the West Douglas HA.

First, as noted above, the BLM identified, and discussed in-depth, potential areas of environmental concern associated with the West Douglas HA, focusing on environmental issues including wild horse management, human development, forage allocation, and rangeland health. AR Vol. 1, Tab 73, pp. 493-94, 499-55. Second, in addition to discussions within the West Douglas EA itself, the agency's pre-decision review also took the requisite "hard-look." See AR Vol. 1, Tab 54; AR Vol. 1, Tabs 73-74; AR Vol. 1, Tabs 46-50; AR Vol. 2, Tab 28; AR Vol. 2, Tab 30; AR Vol. 2, Tabs 9-27. The West Douglas EA is over 60 pages. AR Vol. 1, Tab 73. It considered two alternatives – management of a herd of 39-60 wild horses and a "no action alternative" that continued the direction in the 1997 RMP. AR Vol. 1, Tab 73, p. 489, 497. The West Douglas EA focused on approximately twenty-one categories of potential impacts, including impacts on wild horses (AR Vol. 1, Tab 73, p.

535), rangeland management (AR Vol. 1, Tab 73, p. 537), vegetation (AR Vol. 1, Tab 73, p. 538), and wildlife (AR Vol. 1, Tab 73, p. 545). Further, the West Douglas EA included consideration of public comments on a draft of the EA, as well as the withdrawn draft 2004 EA and public comments on it. See AR Vol. 1, Tab 54, pp. 364-89; AR Vol. 2, Tab 28, pp. 299-406; AR Vol. 2, Tab 30, pp. 490-535. On the basis of this analysis, BLM concluded that the removal of wild horses would not cause any significant environmental impacts.

Third, the discussions in the West Douglas EA makes a convincing case that any impacts from the project would not be significant. See AR Vol. 1, Tab 73, pp. 535-55. A determination on significance must consider both the context and intensity of any potential environmental impacts. 40 C.F.R. § 1508.27. "Context" means the setting of the proposed action to help determine whether local, regional or nationwide impacts are relevant. Id. Here, consistent with FLPMA and the WFRHBA, the BLM appropriately considered impacts of wild horse management on a multitude of resources, including wild horses, wildlife, livestock, human development, and vegetation, within the West Douglas HA. Specifically, wild horse and livestock grazing (AR Vol. 1, Tab 73, p. 51), as well as other resource uses have historically degraded portions of the West Douglas HA. Wild horses also have a dietary overlap with other ungulates occupying the same habitat and often compete with each other for available forage. AR Vol. 1, Tab 73, pp. 501-502. This competition for forage has historically had a negative affect on the condition of the land within West Douglas HA. Id. Further, BLM considered impacts associated with human development within the West Douglas HA. AR Vol. 1, Tab 73, pp. 500, 519-520.

The NEPA regulations define "intensity" of potential impacts as including several factors. See 40 C.F.R. § 1508.27(b). These include, *inter alia*, beneficial and adverse

impacts, cumulative impacts, and any impacts on endangered or threatened species. <u>See</u> 40 C.F.R. § 1508.27(b). As explained above, the BLM examined each of these. <u>See</u> <u>generally</u> AR Vol. 1, Tab 73, pp. 535-55. Further, the record shows that the removal of horses will have beneficial environmental impacts. Sub-optimal forage resources would improve (AR Vol. 1, Tab 73, pp. 537-38) and conflict and competition between horses and other wildlife and ungulate resources would be eliminated (AR Vol. 1, Tab 73, pp. 537, 545-547). Further, there will be improvement in acres meeting standards for vegetation health (AR Vol. 1, Tab 73, p. 538), water shed stability and water quality (AR Vol. 1, Tab 73, p. 540), and in the conditions of cultural resources (AR Vol. 1, Tab 73, p . 552) and paleontology sites (AR Vol. 1, Tab 73, p. 553). The BLM therefore fulfilled its obligation under NEPA to identify, analyze, and discuss any potential adverse environmental impacts, <u>see</u> <u>generally</u> AR Vol. 1, Tab 73, pp. 535-55, and it appropriately concluded that significant adverse impacts were unlikely and that an EIS was not required. AR Vol. 1, Tab 12, pp. 70-71; Vol. 1, Tab 54, pp. 360-63.

In addition, even if removal of horses could be considered in the abstract as having potentially significant environmental impacts, the West Douglas EA highlighted project specific mitigation measures that would reduce such risks. <u>See</u> AR Vol. 1, Tab 73, p. 538 (Rangeland Management), AR Vol. 1, Tab 73, p. 540 (Vegetation), AR Vol. 1, Tab 73, p. 541 (Water Quality; Hydrology and Water Rights), AR Vol. 1, Tab 73, p. 542 (Riparian Zones), AR Vol. 1, Tab 73, p. 543 (Soils), AR Vol. 1, Tab 73, p. 544 (Wilderness), AR Vol. 1, Tab 73, p. 549 (Wildlife), AR Vol. 1, Tab 73, p. 550 (Migratory Birds; Threatened and Endangered Species), AR Vol. 1, Tab 73, p. 551 (Recreation), AR Vol. 1, Tab 73, p. 552 (Cultural Resources), AR Vol. 1, Tab 73, pp. 553-54 (Paleontology). Further, one of the

fundamental premises of the entire West Douglas EA/RMP Amendment is to improve the health of public lands. AR Vol. 1, Tab 73, pp. 489-90; AR Vol. 1, Tab 54, p. 360; AR Vol. 2, Tab 28, p. 311. Agencies may take project-related mitigation into account when determining whether an action will have significant impacts. See Cabinet Mountain Wilderness, 685 F.2d at 682. An EIS is not required if the project is modified to add mitigating measures that compensate for any adverse environmental impacts. Id.; Gov't of Manitoba v. Norton, 398 F. Supp. 2d 41, 65 n.24 (D.D.C. 2005) (citing Md. Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv., 487 F.2d 1029, 1040 (D.C. Cir. 1973)). Here, the planned mitigation will result in further net-benefit to the West Douglas HA, as the BLM has recognized the expected and overall impacts of grazing and wild horse removal on these resources and, through the use of established procedures such as BMPs, vegetation monitoring studies, grazing management monitoring data, and range improvement projects have identified strategies for efficient and continued management of the resources and to meet standards for rangeland health. See AR Vol. 1, Tab 73, pp. 537, 540-543.

Finally, Plaintiffs rely on a passage in American Horse Protection Ass'n v. Andrus, 608 F.2d 811, 814 (9th Cir. 1979), which states that "[i]t cannot be denied that removal of a substantial number of wild horses will affect the quality of the human environment as that quality is viewed by Congress" to support their conclusion that an EIS should be prepared on the West Douglas HA. Pls.' Br. at 24. However, Plaintiffs conveniently ignore the full context of the court's statement. The court qualified its statement by explaining that "the question is whether it [removal of horses] will *significantly* do so." American Horse Protection Ass'n, 608 F.2d at 814. Further, the situation in that case dealt with the removal of 3,500 to 7,000 horses, as opposed to significantly fewer in the West Douglas HA.

Ultimately, the court remanded the case for determination of the "significance" of the action and whether the preparation of an EIS was required – a central and primary component of any NEPA analysis. See id. at 815; 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3. Thus, Plaintiffs reliance on American Horse Protection Ass'n v. Andrus does no more than reiterate the procedures required by NEPA. See id.

The West Douglas EA appropriately identified environmental concerns and took the requisite "hard look" at potential environmental impacts in determining the removal of wild horses from the West Douglas HA was not likely to have significant environmental effects. An EIS therefore was not required. As such, Defendants are entitled to summary judgment on Count One of Plaintiffs' Second Amended Complaint.

## IV.    THE BLM CONDUCTED LAND USE PLANNING UNDER FLPMA.

Plaintiffs appear to argue that the BLM's implementation of land use planning under FLPMA somehow overrode requirements in the WFRHBA. Pls.' Br. at 31. They are wrong. The BLM's implementation of planning under FLPMA was in concert with the WFRHBA. Plaintiffs also argue that FLPMA required the Secretary to report to Congress on the BLM's planning decision to remove horses from the West Douglas HA. Pls.' Br. at 32. This argument is also incorrect.

### A.    BLM's Land Use Planning Process Under FLPMA Properly Considered the WFRHBA

Contrary to Plaintiff's assertions, the BLM's West Douglas EA/RMP Amendment under FLPMA properly considered the mandates of the WFRHBA. FLPMA requires the BLM to balance competing demands and utilizes RMP's to guide and control future management actions. See 43 U.S.C. § 1712(a); SUWA, 542 U.S. at 59, 71. It does not require the BLM to manage all lands for all purposes. See SUWA, 542 U.S. at 59. Rather,

- 40 -

under FLPMA, the BLM may favor some purposes on particular lands while limiting or prohibiting other purposes on those same lands.  Id.; See also Blancett v. BLM, No. Civ. A. 04-2152 (JDB) 2006 WL 696050, at *2 (D.D.C. Mar. 20, 2006).

The WFRHBA directs the Secretary to manage the animals "as an integral part of the natural system of the public lands " and to "preserve and maintain a . . . multiple-use relationship" with the land.  16 U.S.C. §§ 1331, 1332(f)(2); Fund for Animals, 460 F.3d at 15.  As explained above, BLM developed its West Douglas EA/RMP Amendment to achieve and maintain a thriving natural ecological balance on public lands, and carried out its wild horse management duties in consonance with its land use planning responsibilities.  Id.; see also 16 U.S.C. §§ 1332(f), 1333(a).  It's decision to remove all wild horses from the West Douglas HA is within its authority under the WFRHBA and is well supported in the record. Thus, Plaintiff's claim that the BLM has used FLPMA to override the mandates of the WFRHBA is without merit.

**B.      43 U.S.C. § 1712(e)(2) Creates No Obligation for the BLM to Notify Congress of It's Decision to Eliminate Wild Horse From the West Douglas Herd Area**

Finally, Plaintiff asserts that FLPMA requires the Secretary to report to the House of Representatives and the Senate the BLM's decision to eliminate wild horses from the West Douglas HA.  Pls.' Br. at 32.  Its argument is based on a provision of FLPMA that requires such reporting to Congress when a management decision is made that totally eliminates a principal or major use with respect to a tract of public land 100,000 acres in size or larger, for a period of two or more years.  43 U.S.C. § 1712(e)(2).  Plaintiff misconstrues this FLPMA provision.  In order for § 1712(e)(2) to apply, wild horses must first constitute a "principal or major use" under FLPMA.  "The term 'principal or major use' includes, and

is limited to, domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production." 43 U.S.C. § 1702(l). Contrary to plaintiffs' assertion, the Supreme Court has not "expressly held" that wild horses are wildlife. See Pls.' Br. at 32. In Kleppe v. New Mexico, 426 U.S. 529 (1976), although the Supreme Court implied in dicta that wild horses are "wildlife," the question was not before the Court and it did not squarely address the issue.

Further, neither the WFRHBA nor FLPMA identify wild horses to be "wildlife." As to the WFRHBA, there is no suggestion that wild horses are "wildlife" in the statutory language, 16 U.S.C. § 1331 et seq., implementing regulations, or legislative history. Indeed, the text of the WFRHBA suggests the opposite:  it directs the Secretary of the Interior to conduct ecological research for the purpose of "furthering knowledge of wild horse and burro population dynamics and their interrelationship with wildlife."  16 U.S.C. § 1333(b)(3).  Further, the conference committee report on the 1978 Amendments to the WFRHBA state: "[t]he goal of wild horses and burros management . . . should be to maintain a thriving ecological balance between wild horse and burro populations, wildlife, livestock, and vegetation . . . ."  H.R. Rep. No. 95-1737 at 15 (1978), reprinted in 1978 U.S.C.C.A.N. 4069, 4131 (quoting Blake v. Babbit, 837 F. Supp. 458, 460 (D.D.C. 1993); Animal Prot. Inst., 124 IBLA 231, 235 (IBLA 1992).  None of these sources identifies wild horses as "wildlife."  Rather, they show an intended difference between wild horses and wildlife by identifying them separately.

Similarly, FLPMA does not identify wild horses as "wildlife" in its statutory language.  In fact, Congress, in enacting FLPMA, did not mention wild horses at all, with the exception of Title IV, where FLPMA amended the WFRHBA to allow for the use of

helicopters. 16 U.S.C. § 1338(a). FLPMA does, however, recognize the unique niche created by Congress for wild horses and burros and BLM manages them as a unique resource as part of its larger land use planning responsibility. See generally Fund for Animals, 460 F.3d at 15. Instead of explicitly referring to wild horses as wildlife (or, for that matter, domestic livestock), FLPMA declared it the policy of the United States that, among other things, "the public lands be managed in a manner that will protect the quality of scientific, scenic, *historical*, ecological, environmental, air and atmospheric, water resource, and archeological values . . . [and] that will provide food and habitat for fish and wildlife and domestic animals." 43 U.S.C. § 1701(a)(8) (emphasis added). When it enacted the WFRHBA, Congress' intent was to preserve the horses as "living symbols of the *historic and pioneer spirit of the West*," and directed the Secretary to provide for their protection and management. See 16 U.S.C. § 1331 (emphasis added). In the performance of its management responsibilities under FLPMA and the WFRHBA, BLM considers wild horses "comparably with other resource values in the formulation of land use plans." 43 C.F.R. 4700.0-6(b).

Thus, as neither FLPMA nor the WFRHBA identify wild horses as wildlife, but provide for management of public lands in a manner to protect *historical* values, as Congress has described wild horses and burros, these animals are more appropriately managed as a resource value under 43 C.F.R. 4700.0-6(b). BLM was therefore not required to notify Congress of its decision to eliminate wild horses in the West Douglas HA under 43 U.S.C. § 1712(e)(2), as wild horses do not constitute "wildlife" and, thus, are not a "principal or major use" subject to the notification requirements of § 1712(e)(2). Thus, plaintiffs argument has no merit.

- 43 -

Even if wild horses were considered to be wildlife, the West Douglas EA/RMP Amendment is not the type of management decision subject to 43 U.S.C. § 1712(e)(2). That provision applies, by its own terms, to "management decisions to implement land use plans developed or revised under this section." 43 U.S.C. § 1712(e); see also MaxWilson, 131 IBLA 306, 309-310 (IBLA 1994) (Interior Board of Land Appeals distinguishes between adoption of LUP, which does not have to be reported to Congress under § 1712(e)(2), and decisions to implement an LUP, which does trigger notice). The West Douglas EA/RMP Amendment is, itself, a land use plan, not a management decision implementing such a plan. Thus, the Secretary was not required to report adoption of the plan to Congress. See also 43 C.F.R. § 1610.6.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that Plaintiffs' motion for summary judgment be denied and that summary judgment be entered in Federal Defendants' favor dismissing all of Plaintiffs' claims.

Respectfully submitted this 16th day of July, 2008.

RONALD J. TENPAS,
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

CHARLES FINDLAY, Assistant Chief
JACOB T. HASEMAN, Trial Attorney
Natural Resources Section
601 D Street, N.W.
Washington, D.C.  20004
Telephone: (202) 305-0240
Jacob.Haseman@usdoj.gov

JEAN E. WILLIAMS, Chief
Wildlife and Marine Resources Section
/s/ *Kristen Byrnes Floom*
KRISTEN BYRNES FLOOM
Trial Attorney (DC Bar No. 469615)
Wildlife and Marine Resources Section
601 D Street, N.W.
Washington, D.C.  20004
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov

*Attorneys for Defendants*

OF COUNSEL:

Andrea Gelfuso
Office of the Solicitor
Rocky Mountain Region
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215