UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COLORADO WILD HORSE AND BURRO COALITION, INC., et al., ) ) ) ) Plaintiffs, ) ) v. ) ) DIRK KEMPTHORE, et al., ) ) Defendants. ) ) | Civ. No. 06-1609 RMC **DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS** |

Pursuant to Local Civil Rules 7(h) and 56.1, Defendants hereby submit their Statement of Undisputed Material Facts in support of their Cross-Motion for Summary Judgment. Local Civil Rule 7(h) provides that each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue.

This lawsuit involves a challenge to an agency action and arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq. The APA limits judicial review to the administrative record that was considered by the agency at the time the decision in question was made. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729 (1985); Camp v. Pitts, 411 U.S. 138 (1973); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971). Where the initial level of judicial review lies in the district court, the district court is a reviewing court; it does not act as a fact-finder. Florida Power & Light Co., 470 U.S. at 744; Cronin v. U.S. Dept. of Agriculture, 919 F.2d 439, 443 (7th Cir. 1990). Instead, "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." Florida Power & Light Co., 470 U.S.

at 743-44. Therefore, judicial review in this matter is appropriately limited to the administrative record that was filed with the Court on April 15, 2008 and supplemented on June 6 and 11, 2008.

However, in order to facilitate the Court's review of Defendants' cross-motion for summary judgment, Defendants submit the following statement of relevant, undisputed facts contained in the administrative record filed in this case.

**I.      The Evolution of Wild Horse Management in the White River Resource Area**

1. The White River Resource Area ("WRRA") encompasses 1,445,900 acres of BLM surface estate and 365,000 acres of split mineral estate in Meeker, Colorado. Declaration of Kent E. Walter (Doc. No. 27-4) (Dec. 29, 2006) ("Walter Decl."), ¶ 1. The portion of the WRRA south of the White River is divided into two watershed basins by a ridge called the Cathedral Bluffs. The two basins are called the Douglas Creek Basin and the Piceance Basin. See A.R. Vol. 1, Tab 5. After the Wild Free-Roaming Horses and Burros Act ("WFRHBA") was passed in 1971, BLM decided to manage the two basins as "herd units," which were called the Douglas Creek Herd Unit and the Piceance Basin Herd Unit. See A.R. Vol 1, Tab 73, p. 491.

2. In 1974, BLM conducted an inventory of wild horse distribution in the WRRA, including the Douglas Creek and Piceance Basin Herd Units. A.R. Vol 4, Tabs 13, 14, 15. The 1974 wild horse inventory also identified key horse habitat for the wild horses in the Douglas Creek and Piceance basins. A.R. Vol 4, Tab 15. Typically, watershed basins provide discrete land use planning boundaries, but the 1974 wild horse inventory determined that the Douglas Creek and Piceance Basin wild horses used adjacent habitat in both basins and used the cooler elevation of Cathedral Bluffs for summer habitat. Id.;

   see also A.R. Vol. 1 Tab 5.  Based on the inventory, and later field observations, BLM determined that there was a single herd using the Douglas Creek and Piceance Basins. Id.  In 1974, BLM identified a total of 146 horses in the two basins, nine in the area west of Douglas Creek (the Douglas Creek Herd Unit), and 133 in the area east of Douglas Creek.  A.R. Vol 1 Tab 73 p. 491.

3. In 1975, as a result of rangeland analysis reflecting that the primary resource use of the Douglas Creek area was for oil and gas development, BLM first determined that lands in the Douglas Creek Herd Unit, specifically those lands west of Douglas Creek, would not be managed for wild horses.  A.R. Vol. 4 Tab 12, p. 241.  In 1981, BLM combined lands within the Piceance Basin Herd Unit and the eastern portion of the Douglas Herd Unit into an area totaling 148,153 acres which contained the best wild horse habitat from both the Piceance and the Douglas Creek basins.  A.R. Vol. 4, Tab 9, p.145.

4. Although BLM currently uses the terms "herd area" ("HA") and "herd management area" ("HMA") to describe areas where wild horses are located, those terms are not defined in the WFRHBA.  The WFRBHA referred to areas where wild horses were present at the passage of the Act as "ranges," defined as "the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands." 16 U.S.C. 1333(b).  The terms HA and HMA were not applied until 1986 when they were defined in BLM regulations implementing the WFRHBA.  See 43 C.F.R. § 4700.0-5(d) ("Herd area means the geographic area identified as having been used by a

herd as its habitat in 1971."); id. at § 4710.3-1 ("Herd management areas shall be established for the maintenance of wild horse and burro herds…); 51 Fed. Reg. 7,414 (March 3, 1986).

5.   Although BLM essentially created the Piceance-East Douglas HMA in 1981, it was not until 1997 that BLM first referred to the area by that name. See A.R. Vol. 4, Tab 5, p.52. Also in 1997, BLM first referred to the area in the Douglas Creek Herd Unit west of Douglas Creek as the West Douglas Herd Area. See id.  A map of the Piceance-East Douglas HMA and the West Douglas HA is found at A.R. Vol 1 Tab 73, p. 492.  The horses of the Piceance-East Douglas HMA and the West Douglas HA were physically separated by a fence constructed across Highway 139 in 1983.  A.R. Vol. 1 Tab 73 p. 493.

## II.   Early Analysis of the West Douglas Area Demonstrated That West Douglas Was Not Suitable for Management of Wild Horses

6.   In February of 1975, BLM completed a "Unit Resource Analysis" (URA) for wild horse and burro management in the Douglas Creek area. A.R. Vol. 4, Tab 14.  The 1975 URA noted that the most of the wild horse range in Douglas Creek was already dedicated to two other resource uses that would adversely impact the habitat for wild horse use.  First, there were already "twelve grazing allotments within the wild horse range" that did not make allowances for wild horse use. Id. at 378-379.

7.   Second, the 1975 URA also stated that "the primary land use" for the area was "the oil and gas industry," that additional exploration and development was expected, and that oil and gas development would adversely impact wild horse habitat. Id. at 379.  The URA specified that oil and gas development would lead to surface disturbance, erosion, and

degradation of the already limited water sources available for wild horses. Id. Other impacts of surface disturbance from oil and gas production included horses "scared away from water holes and feeding areas" by vehicles, and vegetation loss due large scale oil and gas development. Id. at 380. As a result of oil and gas development, the URA anticipated three potential outcomes: (1) the horses would migrate to other areas of the range not as accessible to humans, but "the areas they will migrate into will probably be less desirable than the areas presently occupied;" (2) horses would migrate into areas already used by horses, which would "result in overuse of the range and possibly increased conflict between horses;" or (3) the horses would remain within the disturbed area, which would somewhat enigmatically "result in horse behavior that would resemble the behavior of black bears in Yellowstone National Park." A.R. Vol. 4, Tab 14, p. 383-384.

### III.  Planning Documents Regarding Wild Horse Management in the WRRA

8.  Under the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701, et seq., (1976) Congress mandated that BLM manage public lands under principles of multiple use and sustained yield, 43 U.S.C. § 1732(a), and conduct a comprehensive land use planning process for lands under BLM's jurisdiction. Id. at § 1712. To comply with these requirements, BLM Field Offices develop and utilize Resource Area-wide management plans to determine resource allocations over the BLM lands under their jurisdiction. The removal of the West Douglas horses has been considered in seven different BLM planning documents since 1975.

#### A.  The 1975 Management Framework Plan

9. In 1975, before FLPMA was passed, the WRRA Field Office drafted the White River Resource Area Management Framework Plan ("MFP") that provided a framework for managing multiple uses in the area, including the management of wild horses. Based on 1974 range inventory data and the analysis of wild horse habitat in the 1975 URA, the 1975 MFP determined that conditions were not suitable for managing a population of wild horses in West Douglas. A.R. Vol. 4, Tab 12, p. 239, 241. The 1975 MFP included a "Management Decision Summary" pertaining to wild horse management, setting forth various management decisions to improve habitat for wild horses, including the construction of watering facilities and the updating of range conditions data.

10. The 1975 MFP specified that "wild horses will be managed in their present range with the exception of that portion of the horse range lying west of Douglas Creek." A.R. Vol. 4, Tab 12, p. 241. Under "Multiple Use Recommendations," the MFP stated that the horses west of Douglas Creek should be removed because "the increase in oil and gas activities in this area warrants removal of the horses…[g]as development activity is causing horses to disperse into areas where they did not exist prior to 1971." Id. at 248.

    **B.    The 1981 Management Framework Plan**

11. BLM updated the 1975 MFP in 1981. The 1981 MFP Summary stated that BLM decided to "[r]emove all horses west of Douglas Creek." A. R. Vol 4, Tab 9, p. 145. The 1981 MFP also stated BLM chose to manage the Douglas and Piceance basin horses on a 148,153 acre area (a reduction of 295,826 acres from the original herd unit areas). Id. BLM determined that this 148,153 acre area, later referred to as the Piceance-East Douglas HMA, was the preferred habitat within the original Herd Unit area for wild

6

        horse management. Id. BLM chose this area because "[i]t has the most concentrated wild horse population (their preferred habitat), has reliable sources of water during late summer, and has a balance between summer and winter range." Id. In addition, 139 of the 152 wild horses observed in WRRA were located in areas now contained by the HMA. A.R. Vol. 1, Tab 5.

12.    The 1981 MFP noted that the dedication of 148,153 acres for wild horse management represented a compromise between wild horses and grazing. A.R. Vol. 4, Tab 9, p. 146. The 1981 MFP decision to create a HMA was based on the need to disperse the wild horse population rather than concentrate it in one area. Id. at 145. The 1981 MFP noted that the acreage would support a herd of 95-140 horses, which would result in "a net loss of this forage to livestock," but that the compromise was necessary in order for BLM to comply with the WFRBHA and BLM policy. Id. at 146.

        **C.    The 1981 Rangeland Program Summary**

13.    In 1981, BLM also prepared a Rangeland Program Summary ("RPS") Environmental Impact Statement ("EIS") to determine grazing management for the WRRA. A.R. Vol. 4, Tab 8. The 1981 RPS reiterated that BLM would manage wild horses on 148,153 acres, but that the grazing management program adopted in the RPS would result in an increase of AUMs available to wild horses, from 1,350 AUMs to 2,101 AUMs. Id. at 107. The RPS stated: "Decisions for wild horse management are aimed at maintaining a viable wild horse population within the best habitat of their present range, while simultaneously satisfying the needs for various other resource considerations." Id.

        **D.    The 1981 Herd Management Area Plan**

14. The decision to manage wild horses on 148,153 acres in Piceance-East Douglas and remove all horses from West Douglas was reiterated in the 1981 Herd Management Area Plan for the WRRA.  See A.R.Vol. 4, Tab 7, p. 76.

  E.   **The 1997 WRRA Resource Management Plan**

15. The 1997 WRRA RMP discussed potential impacts to wild horses from various sources, including oil and gas, livestock grazing and oil shale. A.R. Vol. 4, Tab 5, p. 55.  BLM also addressed management of wild horses in both the Piceance-East Douglas HMA and the West Douglas HA.  BLM stated that the Piceance-East Douglas HMA would be managed to maintain 95-140 animals and the size of the HMA would be increased to 190,130 acres.  A.R. Vol. 4, Tab 5, pp. 52-54.

16. BLM further stated that it would remove all horses from the West Douglas HA within ten years.  A.R. Vol. 4, Tab 5, p. 54 ("the West Douglas [HA] would be managed in the short term (0-10 years) to provide forage for a herd of 0-50 horses…").  In 2001, BLM's Colorado State Office directed the White River Field Office to review the decision in the 1997 RMP regarding management of wild horses in the West Douglas HA.  A.R. Vol 1 Tab 73, p. 493.

  F.   **The 2004 EA**

17. In 2004, BLM prepared an Environmental Assessment ("2004 EA") to determine "whether it was feasible at this time to manage wild horses in the West Douglas [HA]." A.R. Vol 2, Tab 28, p. 311.  The 2004 EA stated that BLM initiated the amendment process in order to develop "detailed analysis of a full range of alternatives" regarding wild horse management in West Douglas, because "such detail and focus may not have

been sufficiently addressed" in the resource-wide 1997 RMP.  Id.

18. The 2004 EA analyzed six alternatives for wild horse management in West Douglas.  Id. at 317-321.  BLM issued a Record of Decision (ROD) for the 2004 EA, selecting Alternative B, which called for total removal of the West Douglas Horses.  Id. at p. 301.  The 2004 EA was the subject of extensive debate within BLM, A.R. Vol. 2 Tabs 4-8, and protests from the public, including Plaintiffs.  A.R.Vol 2 Tabs 9-27.  BLM withdrew the 2004 EA in January 2005, stating: "Based on the comments we have received from the public and our own internal review, BLM will take another look at this document in 2005."  A.R. Vol 2, Tab 1, p. 2.

### G. The 2005 EA

19. In 2005, BLM released a draft of a second EA ("2005 EA") which analyzed whether it was feasible to manage wild horses in the West Douglas Herd Area "while protecting resource values, providing for multiple uses, and improving the health of public lands."  A.R. Vol. 1, Tab 73, p. 490.  The 2005 EA analyzed two alternatives, which were developed from information contained within the 2004 EA and from public input.  Id. at 497.  Alternative A, the no action alternative, called for the total removal of all wild horses from West Douglas, and Alternative B called for BLM to manage West Douglas as an HMA for a herd of between 29-60 wild horses.  Id.

20. The 2005 EA includes extensive analysis of the environmental consequences of both alternatives, including cumulative impacts.  Id. at 535-555.  Like the 2004 EA, the 2005 EA was the subject of extensive discussion within BLM.  Prior to the release of the Draft 2005 EA, BLM resource specialists vigorously debated the contents of the document.

|   |   |
|---|---|
|   | A.R. Vol 1, Tabs 75-78. When the 2005 Draft EA was released to the public, it generated more than 15 public comments. A.R. Vol 1 Tabs 56-72. BLM responded to the public comments in the Final 2005 EA. A.R. Vol 1, Tab 54, pp. 364-389. |
| 21. | The ROD for the 2005 EA determined that BLM would implement the 1997 RMP decision that called for total removal of all wild horses from West Douglas by 2007. A.R. Vol 1 Tab 54, p. 360. The release of the Final 2005 EA generated a series of protests, including protests from the Plaintiffs. Vol 1, Tabs 46-50. In the context of responding to the protests, BLM personnel engaged in extensive discussions, involving both managers and resource specialists in the WRRA Field Office (WRFO), the Colorado State Office (CSO), the White Horse and Burro Program National Program Office (NPO) and BLM Headquarters in Washington, D.C. (WO). See A.R.Vol 1, Tabs 19-44. The Administrative Record contains over 160 pages of documents reflecting BLM's internal deliberations regarding the 2005 EA. The decision was made after extensive debate within BLM and with full opportunity for public review and comment. |

**IV.    History of WRRA Wild Horse Management Actions**

22. The decision to remove all wild horses from West Douglas was initially made based upon an analysis of range conditions conducted in 1974, three years after the passage of the WFRBHA. A.R. Vol 4, Tabs 13 and 14. The decision was first reflected in the 1975 MFP, and carried forward in later planning documents published in 1981, 1997 and 2005. See A.R Vol. 4, Tab 12, p. 241; Vol 4, Tab 9, p. 145; Vol 4, Tab 7, p. 76, Vol 4, Tab 5, pp. 52-54; and Vol. 1, Tab 54, p. 360.

23. In order to determine population levels in West Douglas, BLM conducted nine aerial

wild horse censuses between 1974 and 2005. A.R. Vol 1, Tab 73 p. 501. In order to prevent range degradation, partial removals of the West Douglas horses were conducted in 1981, 1984, 1985, 1989, 1996, 1998, and 2001. Id. One of those removals, in 1985, was a failed attempt by BLM to completely remove wild horses from the West Douglas HA. Walter Decl., ¶ 3. In 2005, West Douglas had an estimated population of 97 wild horses. A.R. Vol. 1, Tab 73, p. 501. The most recent population estimate is 147 horses. See 2008 West Douglas Removal Plan EA, CO-110-2008-052-EA (July 14, 2008) (Attachment I to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment, filed herewith).

24. On July 14, 2008, BLM published the EA and gather plan setting forth the procedures it will follow in carrying out the removal of all wild horses in West Douglas. See id. The gather is scheduled to begin no sooner than October 1, 2008. Id.

Respectfully submitted this 16th day of July, 2008.

    RONALD J. TENPAS,
    Assistant Attorney General
    U.S. Department of Justice
    Environment & Natural Resources Division

    CHARLES FINDLAY, Assistant Chief
    JACOB T. HASEMAN, Trial Attorney
    Natural Resources Section
    601 D Street, N.W.
    Washington, D.C. 20004
    Telephone: (202) 305-0240
    Jacob.Haseman@usdoj.gov

JEAN E. WILLIAMS, Chief
Wildlife and Marine Resources Section
/s/ *Kristen Byrnes Floom*
KRISTEN BYRNES FLOOM
Trial Attorney (DC Bar No. 469615)
Wildlife and Marine Resources Section
601 D Street, N.W.
Washington, D.C.  20004
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov

*Attorneys for Defendants*

OF COUNSEL:

Andrea Gelfuso
Office of the Solicitor
Rocky Mountain Region
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215