U.S. Department of the Interior
Bureau of Land Management
White River Field Office
220 East Market Street
Meeker, CO 81641

# ENVIRONMENTAL ASSESSMENT

**NUMBER**:  CO-110-2008-052-EA

**CASEFILE/PROJECT NUMBER**: Wild Horse Removal Plan; West Douglas Region

**PROJECT NAME**:   West Douglas Wild Horse Removal

**LEGAL DESCRIPTION**:   Township 1 South, Range 101 West
Township 1 South, Range 102 West
Township 1 South, Range 103 West
Township 2 South, Range 101 West
Township 2 South, Range 102 West
Township 2 South, Range 103 West
Township 3 South, Range 101 West
Township 3 South, Range 102 West
Township 3 South, Range 103 West
Township 4 South, Range 102 West
Township 4 South, Range 103 West

**APPLICANT**:  Bureau of Land Management; White River Field Office

## DESCRIPTION OF PROPOSED ACTION AND ALTERNATIVES

***Background/Introduction***:  The West Douglas Herd Area is located in Northwestern Colorado, southwest of the town of Rangely, and approximately 50 miles north of Grand Junction.  The Herd Area encompasses 123,387 acres of federal land managed by the Bureau of Land Management (BLM); White River Field Office (WRFO), and 4,754 acres of private land.  All of the planning area is within the White River Resource Area and within Rio Blanco County.

The protests on the proposed West Douglas Herd Area (WDHA) Plan Amendment to the 1997 White River Resource Management Plan (RMP) in Environmental Assessment (EA) CO-WRFO-05-083-EA were resolved with the decision affirmed and approved on October 10, 2007.

**Proposed Action:**  The WRFO proposes to implement the affirmed decision of October 10, 2007 of CO-WRFO-2005-083-EA which calls for the total removal of all wild horses from areas within and from areas outside the boundaries of the WDHA at the earliest practicable date.  Total removal of the wild

horses will be accomplished by gathers using the Standard Operating Procedures described in Appendix A. The proposed action will continue until all wild horses are removed from within and outside the WDHA, a process which may involve multiple gathers over a period of years. The initial gather may involve larger numbers. As the population becomes smaller, gathers may consist of fewer numbers. The gathers will take place at any time from July through February of each year. Foaling season (March – June) will be avoided except in case of emergencies necessitated by wildfire, drought or other natural causes.

The gathers will commence after October 1, 2008, except in case of emergency. Gather methods may include helicopter drive-trapping, helicopter assisted roping and water and hay trapping. The gather methods described in the Standard Operating Procedures reflect many years of BLM experience with conducting wild horse gathers in the most humane manner possible. There will be no selective removal criteria because all of the wild horses will be gathered and removed.

*No Action Alternative:*  Under the no action alternative, wild horses would not be removed from areas within and adjacent to the WDHA. The no-action alternative would be in non-compliance with the State Director's decision of October 10, 2007, which by regulation (43 CFR 1610.5-2(b) is the final decision of the Department of the Interior. The impacts of the no action alternative are described in CO-WRFO-05-083-EA, dated April 28, 2005, which is hereby incorporated by reference.

**ALTERNATIVES CONSIDERED BUT NOT CARRIED FORWARD**:  Alternatives to the Proposed Action would be to use alternative means of removing the wild horses within and adjacent to the WDHA. Net gunning and darting capture methods were considered, but not carried forward since they are controversial and not as cost effective. If it is found necessary to utilize other capture methods, those methods would be analyzed under a separate Environmental Assessment.

**PURPOSE AND NEED FOR THE ACTION**:  This action addresses how the wild horses are to be removed from areas within and adjacent to the WDHA and is needed to implement both the 1997 White River RMP and the RMP Amendment, CO-WRFO-05-083-EA, both of which call for the total removal of wild horses from the WDHA and areas outside.

**PLAN CONFORMANCE REVIEW**:  The Proposed Action is subject to and has been reviewed for conformance with the following plan (43 CFR 1610.5, BLM Manual 1617.3):

> Name of Plan: White River Record of Decision and Approved Resource Management Plan (ROD/RMP).

> Date Approved:  July 1, 1997

> Decision Number/Page: Page 2-26, Wild Horse Management, "The North Piceance and West Douglas Herd Areas will be managed in the short-term (0-10 years) to provide forage for a herd of 0 – 50 wild horses in each herd area. The long term objective will be removal of all wild horses from these areas...The wild horse herd population will be managed to improve range condition."

Name of Plan:  West Douglas Herd Area Amendment to the White River Resource Management Plan (CO-WRFO-05-083-EA).

Date Approved:  October 10, 2007 by State Director, Sally Wisely.

Decision Number/Page:  Decision Record dated October 10, 2007.


**AFFECTED ENVIRONMENT / ENVIRONMENTAL CONSEQUENCES / MITIGATION MEASURES**:

For a complete description of the affected environment, environmental consequences, and mitigation refer to CO-WRFO-05-083-EA, which is hereby incorporated by reference.  Additional environmental consequences that were not analyzed in CO-WRFO-05-083-EA are addressed below.


**AIR QUALITY**

*Affected Environment*:  The entire White River Resource area has been classified as either attainment or unclassified for all pollutants, and most of the area has been designated prevention of significant deterioration (PSD) class II.  The proposed action is not located within a ten mile radius of any special designation air sheds or non-attainment areas.  The air quality criteria pollutant likely to be most affected by the proposed actions is the level of inhalable particulate matter, specifically particles ten microns or less in diameter ($PM_{10}$) associated with fugitive dust. No air quality monitoring data is available for the survey area.  The Colorado Air Pollution Control Division (APCD) estimates the maximum $PM_{10}$ levels (24-hour average) in rural portions of western Colorado to be near 50 micrograms per cubic meter ($\mu g/m^3$).  This estimate is well below the National Ambient Air Quality Standard (NAAQS) for $PM_{10}$ (24-hour average) of 150 $\mu g/m^3$ (CDPHE-APCD, 2005). No better data is known for this air quality parameter.

*Environmental Consequences of the Proposed Action:*  The actual gather will produce temporary increases in dust that are localized during gathers.  Long-term impacts from removing wild horses will remove wild horse grazing impacts in this area.  As a result, effective ground cover is expected to increase and potentially decrease fugitive dust.  Air quality is expected to benefit from removal of wild horses, but it is not likely to be a measurable improvement and therefore impacts would be similar to the no action alternative.

*Mitigation*:  None


**CULTURAL RESOURCES**

The affected environment, environmental consequences, and mitigation are adequately described in Section 3.17 and 4.17 of CO-WRFO-05-083-EA.  Site specific mitigation measures prior to trap construction are noted below.

**THREATENED, ENDANGERED PLANTS/AREAS OF CRITICAL ENVIRONMENTAL CONCERN**

The affected environment, environmental consequences, and mitigation are adequately described in Section 3.14, 3.22, and 4.14 of CO-WRFO-05-083-EA.  Site specific mitigation measures prior to trap construction are noted below.

**WATER QUALITY, SURFACE AND GROUND**

*Affected Environment*:  The affected environment includes four watersheds; Douglas Creek, Evacuation Creek, Hells Hole, and Cottonwood Creek. Cottonwood Creek, Evacuation Creek and Douglas Creek watersheds were identified in the White River 1997 ROD/RMP as being fragile watersheds because a large amount of the soils present in these watersheds have characteristics of fragile soils (i.e. very high erosion potential, high salt content, slopes greater than 35%, and lack of vegetation cover that protects the watershed from overland flows).

The Section 303(d) list for Water Quality-Limited Segments Requiring TMDLs (CDPHE, 2006), identifies tributaries to the White River within the wild horse herd area.  The following table (Table 1) shows the affected water quality stream segments, area impacted (in acres), as well as any special designations for each of the affected stream segments.

| Stream Segment | Acres Affected | Designated Beneficial Uses | Use Protected (Y/N) | 303(d) listed | M&E listed | Impairment | Priority |
|---|---|---|---|---|---|---|---|
| 22 | 40,328 | Aquatic Life Warm 2, Recreation 1b, Agriculture | Y | West Evacuation Wash, Douglas Creek | Soldier Creek | Sediment | Low |
| 23 | 21,888 | Aquatic Life Cold 1, Recreation 1a, Water Supply, Agriculture | N | N/A | N/A | N/A | N/A |

Stream Segment 22 is defined as all tributaries to the White River, including all wetlands, lakes and reservoirs, from a point immediately above the confluence with Douglas Creek to the Colorado/Utah border, except for specific listings in segment 23.  Stream segment 22 has been designated as use protected. Numeric standards for each stream segment can be found in Regulation No. 37 Classifications and Numeric Standards for Lower Colorado River Basin (CDPHE, 2007).

Stream Segment 23 is defined as the mainstem of East and West Douglas Creek, including all tributaries, from their sources to their confluence.  Stream segment 23 has not been classified as use protected.  An intermediate level of water quality protection applies to waters that have not been designated outstanding waters or use-protected waters.  For these waters, no degradation is allowed unless deemed appropriate following an antidegradation review.

*Environmental Consequences of the Proposed Action:*  Livestock are managed to allow for vegetation rest during the growing season, while wild horses graze year-round.  The removal of wild horses would allow vegetation some rest during the growing season.  With this rest, the removal of wild

horses is expected to improve watershed stability, decreasing sediment and salts which would all indirectly improve water quality.

*Mitigation*:  None

## WILDLIFE, TERRESTRIAL

The affected environment, environmental consequences, and mitigation are adequately described in Sections 3.11 and 4.11 of CO-WRFO-05-083-EA except as noted below.

*Environmental Consequences of the Proposed Action:*  <u>Big Game</u>**:**  It is expected that more extensive and potentially disruptive helicopter operations would generally be conducted during the first year in the late summer through fall months.  This period would not coincide with important seasonal use activities of big game (e.g., post-partum/lactation, severe winter range).  Subsequent trapping may involve helicopter work anytime from July through March.  These efforts would be targeting specific groups of wild horses that avoided earlier capture and would involve more localized and short term gather activity.

Although follow-up helicopter work could occur during important winter/early spring and early summer big game activity periods, the gather window would avoid the months of March through June—those most important for big game winter recovery, gestation, and early care of young.  It is fully expected that the need for helicopter work would rapidly diminish in frequency and extent after the first year or two.  To ensure that BLM plans for follow-up gathers do not unnecessarily compromise important big game activities, BLM will consult with, and gain the concurrence of the Colorado Division of Wildlife prior to finalizing plans for and implementing these measures.

Water or hay trapping operations involve the ground-based capture of individual animals in the fall or winter months.  Although these capture techniques may be used on severe winter ranges during the period of occupation, these operations represent very localized and short-term points of potential disturbance that would have no substantive adverse influence on animal distribution or animal health requirements.

*Mitigation*:  For gathers between July 1 and August 15 surveys of suitable raptor nesting habitat will be conducted by WRFO staff on those trap sites proposed for use or development.  In the event an active raptor nest is found in the vicinity of trapping operations, these sites will be provided a buffer adequate to effectively isolate nesting activity from disruptions generated from wild horse trapping operations.

As a means of ensuring that BLM's plans for follow-up gathers do not unnecessarily compromise important big game activities, BLM will consult with, and gain the concurrence of the Colorado Division of Wildlife prior to finalizing plans for and implementing these measures.

## WILD HORSES

The affected environment, environmental consequences, and mitigation are adequately described in Sections 3.1 and 4.1 of CO-WRFO-05-083-EA except as noted below.

*Affected Environment*:  The current estimate for the number of wild horses that will be in the WDHA by September 1, 2008 is 147.  These wild horses are especially difficult to gather due to rugged terrain and a coniferous canopy throughout much of the area.  Trap sites will be chosen prior to each gather but locations may be changed and additional traps may be required to capture wild horses that have relocated or have become wise to helicopters.

*Environmental Consequences of the Proposed Action*:  All wild horses would be removed from the WDHA.  Wild horses would not occupy private lands and would not relocate outside the WDHA.  These wild horses would not be available for viewing by the public in this specific area.  As the wild horses are removed they would be placed with adopters locally or transported to the Canon City holding facility.

For a description of gather procedures, refer to the Standard Operating Procedures (Appendix A). Winter gathers can be more stressful to wild horses because of snow depth and cold temperatures.  If horses are moved too far by helicopter or too quickly there is a possibility of increased upper respiratory problems.

*Mitigation:*  For winter gathers, distances to trap sites will be reduced to a maximum of five miles when snow depth is greater than one foot.  Animals will be moved slower when snow depth hinders their natural movement.  Wild horses will be monitored by the contracting officer representative (COR) after the first couple of runs to ensure that they are not sweating excessively.  If wild horses are sweating excessively, the speed and/or distance to the trap will be reduced further.  When temperatures are less than ten degrees below zero, wild horses will not be gathered by helicopter, and will not be pushed across icy terrain where sharp turns could cause injuries.

**CUMULATIVE IMPACTS SUMMARY:**  The cumulative impacts were adequately addressed in CO-WRFO-05-083-EA.

**REFERENCES CITED:**  See CO-WRFO-05-083-EA.

**PERSONS/AGENCIES CONSULTED:**  See CO-WRFO-05-083-EA.

Mr. Terry Wygant, Colorado Division of Wildlife, District Wildlife Manager.

Appendix B:  Interested Public.  This is the mailing list of those persons receiving this Environmental Assessment and Finding of No Significant Impact (FONSI).

EAs that are currently being analyzed by WRFO are published monthly, in the local newspaper, Rio Blanco Herald Times.  The WRFO website contains information concerning the White River Resource

Management Plan, ongoing and future planning actions, and environmental analyses required by the National Environmental Policy Act (NEPA). The public may request copies of EAs by phone, by visit, or by internet communication. The public is encouraged to participate in the NEPA process. This EA and FONSI will be mailed to those listed in Appendix B for review and comment for a period of 30 days.

**INTERDISCIPLINARY REVIEW:**

| Name | Title | Area of Responsibility |
|---|---|---|
| Michael Selle | Archeologist | Cultural Resources, Paleontological Resources |
| Ed Hollowed | Wildlife Biologist | Threatened, Endangered and Sensitive Animal Species, Migratory Birds, and Wildlife Terrestrial and Aquatic |
| Bob Lange | Hydrologist | Air Quality, Water Quality, Surface and Ground Hydrology and Water Rights, Soils, Wastes, Hazardous or Solid |
| Tyrell Turner | Rangeland Management Specialist | Wetlands and Riparian Zones, Rangeland Management, Vegetation, and Invasive and Non-Native Species |
| Chris Ham | Outdoor Recreation Planner | Wilderness, Access and Transportation, Recreation, and Visual Resources |
| Ken Holsinger | Botanist | Botanist and Forest Management, Areas of Critical Environmental Concern, and Threatened and Endangered Plant Species |
| James Michels | Natural Resource Specialist | Fire Management |
| Paul Daggett | Mining Engineer | Geology and Minerals |
| Linda Jones | Realty Specialist | Realty Authorizations |
| Melissa J. Kindall | Range Technician | Wild Horses |

# Finding of No Significant Impact
# (FONSI)

## CO-110-2008-052-EA

**<u>FINDING OF NO SIGNIFICANT IMPACT (FONSI:</u>**  I have reviewed the attached environmental assessment analyzing the environmental effects of the proposed action.  I conclude that based on the analysis in this Environmental Assessment, the application of the Standard Operating Procedures described in Appendix A, and implementation of the mitigation measures, that this project will have no significant impact on the human environment. Therefore, an environmental impact statement is not necessary to further analyze the environmental effects of the proposed action.


_____                    _____
Kent E. Walter, Field Manager                       Date

# Appendix A

**Standard Operating Procedures**

The following considerations and guidelines are considered the technical portion of the West Douglas Wild Horse Gather Plan. This appendix outlines the safety considerations involved with the technical aspects of capturing wild horses, transporting the wild horses to temporary holding facilities, handling the captured animals and shipping the wild horses to the BLM Canon City, Colorado holding facility. This appendix defines the roles and responsibilities of individuals directly involved with the planned gather project.

Most of the gathers will be completed through a nationally awarded gather contract. Agency personnel will be directly involved in the completion of the project. The same procedures for capture and handling of wild horses apply to contractors, to agency personnel, and to volunteers. As the population decreases, a BLM gather crew may be utilized to gather small numbers of wild horses.

The following stipulations and procedures will be followed to ensure the welfare, safety and humane treatment of the wild horses in accordance with the provisions of 43 CFR 4700.

## A.    Capture Method Descriptions

### 1.  Helicopter drive trapping

The helicopter drive-trapping method of capture will be the primary method used to capture wild horses. The following stipulations and procedures will be followed during the contract period to ensure the welfare, safety, and humane treatment of the wild horses in accordance with the provisions of 43 CFR 4700 and with the national gather contractor. The captures will be conducted by BLM personnel and the contractor; both of whom are experienced in the humane capture and handling of wild horses. The same rules apply to both the contractor and to BLM personnel.

Helicopter drive-trapping involves using a helicopter to spot and then herd wild horses towards a pre-constructed trap. The trap is constructed of portable, round-pipe steel panels. Funnel-shaped trap wings are built out from the corners of the trap to funnel wild horses into the trap. Trap wings are built with jute or snow fence, which is draped over and tied around trees or steel posts. The wings form a visual barrier to the wild horses and they usually enter the trap without being aware they are being trapped.

The helicopter pilot completes a recon prior to trapping to see where the bands are located. Once the trap and wings are ready for use, the pilot starts moving one or more bands of wild horses toward the trap and into the wings. The number of wild horses/number of bands moved towards a trap at one time depends on a variety of facets including proximity of bands to the trap; the number of wild horses in each band; the distance bands travel to the trap; topography, weather conditions, temperature, time of year, animal condition and trap dimensions.

The pilot herds the wild horses into the wings of the trap and then hovers while a ground crew on foot and/or horseback comes in behind the wild horses, hazes them into the trap corral and closes a gate behind the trapped wild horses. The helicopter remains in the trap wings close enough to keep the wild

horses from running back out of the trap and far enough away to assure safety of the ground crew and the wild horses. Once the gate is closed, or when the pilot sees it is best for him to leave the area, the helicopter leaves the trap site.

A pair of Parada or Judas horses; are often supplied by the contractor to encourage bands of wild horses to run smoothly into the trap corrals. The Judas horses are stable mates and do not like being separated from one another. One Judas horse is lightly tied in the trap corral. The second Judas horse is led into the mid-section of the trap wing and held along the edge of one side of the trap wing. As wild horses are moved by helicopter into the trap the Judas horse being held in the trap wing is released. The Judas horse runs towards the trap corral to be with his stable mate. The wild horses see a horse running free ahead of them. Their instinct tells them this horse is running to freedom; they follow the Judas horse into the trap corral. The Judas horses are familiar with being in close proximity to freshly-captured wild horses. Once trapped in the corral, the Judas horses hold their own but are not overly aggressive with the wild horses.

2.  Helicopter Assisted Roping

Helicopter assisted roping is used when mares and foals become separated, when every wild horse must be captured from an area, and when specific animals are targeted for capture. Helicopter roping will only be used when determined by the COR or PI as the most efficient manner to capture specific wild horses and when the roping can be done in a safe and humane manner.

In helicopter assisted rope capture individual wild horses are herded by helicopter towards ropers who rope the wild horse(s). Once roped, another rider rides alongside the roped wild horse and roper, helping to haze, or herd, the roped wild horse either towards the trap or towards a stock trailer. Once at the trap the rope is flipped away from the roped wild horse's neck and it joins the rest of the trapped wild horses. When hazed to a stock trailer the wild horse is hobbled, laid on its side and then either pulled or slid into the trailer. If the wild horse is slid into the trailer a fabric or wood surface is placed under the wild horse to protect the wild horses' hide as it is pulled into the trailer. Once in the trailer the wild horse is freed of ropes and allowed to quiet down before being transported to the trap site.

3.  Water Trapping

Water trapping will be used when wild horses are not able to be helicopter drive trapped or roped, when every wild horse must be captured from an area, and when specific wild horses are targeted for capture. In the upcoming gather water trapping may be used for both wild horses within the HA and to capture wild horses that have relocated outside HA boundaries. Water trapping will be used when determined by the COR or PI as the most efficient manner to capture specific wild horses and when the helicopter drive trapping and assisted helicopter roping proves to be inadequate means of gathering or can not be done in a safe and humane manner.

In water trapping individual wild horses are allowed to use water sources before, during and after trap construction. The trap is constructed of portable, round-pipe steel panels. Funnel-shaped traps are built which allows wild horses to get deep into the trap so that when the gate release mechanism is activated time is allowed for the gate to close which traps the wild horses inside. Once trapped the captured wild s

will be loaded into an appropriate stock trailer and delivered to the holding facility.  The wild horses are not herded towards the water they simply make use of the water that they frequent naturally or human enhanced water sources.

<u>4.  Hay Trapping</u>

Hay trapping will be used when wild horses are not able to be helicopter drive trapped or roped, when every wild horse must be captured from an area, and when specific wild horses are targeted for capture. In the upcoming gather hay trapping may be used for both wild horses within the HA and to capture wild horses that have relocated outside HA boundaries.  Hay trapping will only be used when determined by the COR or PI as the most efficient manner to capture specific wild horses and when the helicopter drive trapping, assisted helicopter roping, and water trapping prove to be inadequate means of gathering or can not be done in a safe and humane manner.

In hay trapping, individual wild horses are provided with hay during and after trap construction.  The trap is constructed of portable, round-pipe steel panels.  Funnel-shaped traps are built which allows wild horses to get deep into the trap so that the gate release mechanism allows time for the gate to close. Once trapped the captured wild horses will be loaded into an appropriate stock trailer and delivered to the holding facility.  The wild horses are not herded towards the hay but simply make use of the hay as a necessary supplemental feed source.  All hay used will be certified weed free hay.

**B.    <u>Trap Site Selection</u>**

The Authorized Officer will make a careful determination of a boundary line to serve as an outer limit where the wild horses will be herded to each trap.  The Authorized Officer will insure that the pilot is fully aware of all natural and man made barriers that might restrict free movement of wild horses. Topography, distance, and current condition of the wild horses are factors that will be considered to set limits to minimize stress on wild horses.

For winter gathers, distance to trap sites will be reduced to a maximum of five (5) miles when snow depth is greater than one (1) foot.  Animals will be moved slower when snow depth hinders their natural movement.  Wild horses will be monitored by the contracting officer representative (COR) after the first few runs to ensure that they are not sweating excessively.  If wild horses are sweating excessively, the speed and/or distance to the trap will be reduced.  Wild horses will not be gathered by helicopter when temperatures are less than ten (10) degrees below zero and will not be pushed across icy terrain where sharp turns could cause injuries.

Gather operations will be monitored to assure the body condition of the wild horses is compatible with the distances and the terrain over which they must travel.  Pregnant mares, mares with small colts, and other wild horses will be allowed to drop out of bands that are being gathered if required to protect the safety and health of the animals.

All trap and holding facility locations will be approved by the Authorized Officer prior to construction. The situation may require moving of the trap.  All traps and holding facilities not located on public land

must have prior written approval of the landowner.

Trap sites will be located to cause as little injury and stress to the animals, and as little damage to the natural resources of the area, as possible. Sites will mostly be located on or near existing roads. However, additional trap sites may be required, as determined by the Authorized Officer, to relieve stress to the animals caused by specific conditions at the time of the gather (i.e. dust, rocky terrain, temperatures, etc.) or to access wild horses in remote areas.

## C.    Stipulations for Portable Corral Traps/Exclosures

1. Capture traps will be constructed in a fashion to minimize the potential for injury to wild horses and BLM personnel. Trapped wild horses held in traps longer than 10 hours will be fed and watered.

2. The Colorado Division of Wildlife will be notified as soon as possible if any wildlife are injured during capture operations. Wildlife caught inside traps will be released immediately.

3. All traps, wings, and holding facilities shall be constructed, maintained and operated to handle the animals in a safe and humane manner and in accordance with the following:

a. Traps and holding facilities shall be constructed of portable panels, the top of which shall not be less than 72 inches high for wild horses, and the bottom rail of which shall not be more than 12 inches from ground level. All traps and temporary holding facilities shall be without corners; oval or round in design.

b. All loading chute sides shall be fully covered with plywood (without holes) or like material. The loading chute shall also be a minimum of 6 feet high.

c. All runways shall be of sufficient length and height to ensure animal and wrangler safety and may be covered with plywood, burlap, plastic snow fence or like material a minimum of 1 foot to 6 feet for wild horses.

d. If a government furnished portable chute is used to restrain, age, or to provide additional care for animals, it shall be placed in the runway in a manner as instructed by or in concurrence with the Authorized Officer.

e. All crowding pens including the gates leading to the runways will, if necessary to prevent injuries from escape attempts, be covered with a material which prevents the animals from seeing out (plywood, burlap, snow fence etc.) and should be covered a minimum of 2 feet to 6 feet for wild horses.

f. Alternate pens will be constructed at the temporary holding facility to separate mares with newborn foals, sick or injured animals, and domestic strays. Wild horses may also be separated according to age, number, size, temperament, and sex. The pens will be constructed to minimize injury resulting from fighting and trampling.

4. If animals are held in the traps and/or holding facilities, a continuous supply of fresh clean water at a minimum rate of 10 gallons per animal per day will be supplied.  Animals held for 10 hours or more in the traps or holding facilities shall be provided good quality hay at the rate of not less than two pounds of hay per 100 pounds of estimated body weight per day.

5. Water troughs shall be provided at each pen where animals are being held.  Water troughs shall be constructed of such material (e.g. rubber, rubber over metal) so as to avoid injury to animals.

6. When dust conditions occur within or adjacent to the trap or holding facility, the contractor/BLM shall be required to wet down the ground with water.

**D.**    **Capture Stipulations**

1. The contractor/BLM shall attempt to keep bands intact except where animal or human health and safety become considerations that prevent such procedures

2. At least one saddle-horse will be immediately available at the trap site to perform roping if necessary.  Roping shall be done as determined by the Contracting Officer's Representative or Project Inspector. Roping will be performed in such a manner that bands will remain together.
Under no circumstances shall animals be tied down for more than one hour.

3. Domestic saddle horses may be used to assist the helicopter pilot on the ground during the gather operation, by having the domestic horse act as a pilot (or "Judas") horse leading the wild horses into the trap site.  Individual ground hazer(s) and individuals on horseback will be used to assist in the gather.

4. Foals will not be left behind.  If a situation arises where a foal becomes separated from its mare ropers with the help of the pilot will make every attempt to capture either the mare, or the foal and reunite the mare/foal pair keeping the safety of all the horses and gather crew in mind.

**E.**    **Contract Helicopter, Pilot and Communications**

1. The contractor must operate in compliance with Federal Aviation Regulations, Part 91.  Pilots provided by the contractor shall comply with the Contractor's Federal Aviation Certificates, and applicable regulations of the State in which the gather is located.

2. When refueling, the helicopter shall remain a distance of at least 1,000 feet or more from animals, vehicles (other than fuel truck), and personnel not involved in refueling.

3. The COR/PI shall have the means to communicate with the contractor's pilot at all times.  If communications cannot be established, the Government will take steps as necessary to protect the welfare of the animals.  The frequency (ies) used for this contract will be assigned by the COR/PI when the radio is used.  The contractor shall obtain the necessary FCC licenses for the radio system.

4.  The COR or PI will notify dispatch each morning prior to the helicopter leaving the ground to capture wild horses; and at the end of each day's project.  Dispatch will be kept informed of the trap locations

and location inside the HA where the pilot is herding/capturing wild horses. The gather pilot and COR will maintain open communications with dispatch to assure both parties are aware of aircraft other than the gather contractor who may be in the capture vicinity, or who request permission to travel through, or work in the capture vicinity.

5. The proper operation, service, and maintenance of all contractor furnished helicopters is the responsibility of the contractor. The BLM reserves the right to remove from service pilots and helicopters which, in the opinion of the Contracting Officer or COR/PI, violate contract and FAA rules, are unsafe or otherwise unsatisfactory. In this event, the contractor will be notified in writing to furnish replacement pilots or helicopters within 48 hours of notification. All such replacements must be approved in advance of operation by the Contracting Officer or his/her representative.

6. All incidents/accidents occurring during the performance of any delivery order shall be immediately reported to the COR.

### F.    Animal Handling and Care

1. Prior to capturing wild horses, the COR/PI will conduct a pre-capture evaluation of existing conditions in the gather areas. The evaluation will determine whether the proposed activities will require the presence of a veterinarian during the project or if the veterinarian can remain on-call during the gather operation. Animal health, temperature extremes; topography, distance to the traps, and other factors will be considered when deciding between an on-call vet contract and an on-site contract.

2. The contractor will be apprised of all the conditions and will be given instructions regarding the capture and handling of animals to ensure their health and welfare is protected.

3. The Authorized Officer and pilot will identify and discuss natural hazards and man-made hazards on the ground by looking at a topographic map so the helicopter flight crew, ground personnel, and wild horse safety will be maximized. Aerial hazards will be recorded on the project map.

4. No fence modifications will be made without authorization from the Authorized Officer. The contractor/BLM shall be responsible for restoration of any fence modification.

5. If the route the contractor/BLM proposes to herd animals passes through a fence, the opening shall be large enough to allow free and safe passage. Fence material shall be rolled up and fence posts will be removed or sufficiently marked to ensure safety of the animals. The standing fence on each side of the gap will be well flagged and covered with jute or like material.

6. Wings shall not be constructed from materials injurious to animals and must be approved by the Authorized Officer.

7. It is the responsibility of the contractor/BLM to provide security to prevent loss, injury or death of captured animals until delivery to final destination.

8. Animals shall not be allowed to remain standing on trucks while not in transport for a combined

period of greater than three (3) hours.

9. Branded or privately owned animals captured during gather operations will be handled in accordance with state estray laws and existing BLM policy.

10. Capture methods will be identified prior to issuance of delivery orders. Regardless of which methods are selected, all capture activities shall incorporate the following:

## G.    **Treatment of Injured or Sick; Disposition of Terminal Animals**

1. The contractor/BLM shall restrain sick or injured animals if treatment is necessary. A veterinarian may be called to make a diagnosis and final determination. If necessary, destruction shall be done by the most humane method available. Authority for humane destruction of wild horses (or burros) is provided by the Wild Free-Roaming Horse and Burro Act of 1971, Section 3(b)(2)(A), 43 CFR 4730.1, BLM Manual 4730 - Destruction of Wild Horses and Burros and Disposal of Remains, and is in accordance with BLM policy.

2. Any captured wild horses that are found to have the following conditions may be humanely destroyed:

　　a. The animal shows a hopeless prognosis for life.
　　b. Suffers from a chronic disease.
　　c. Requires continuous care for acute pain and suffering.

3. The Authorized Officer will determine if injured animals must be destroyed and provide for destruction of such animals. The contractor/BLM may be required to dispose of the carcasses as directed by the Authorized Officer.

4. The carcasses of the animals that die or must be destroyed as a result of any infectious, contagious, or parasitic disease will be disposed of by burial to a depth of at least 3 feet.

5. The carcasses of animals that must be destroyed as a result of age, injury, lameness, or non-contagious disease or illness will be disposed of by removing them from the capture site or holding corral and placing them in an inconspicuous location to minimize visual impacts. Carcasses will not be placed in drainages regardless of drainage size or downstream destination.

## H.    **Motorized Equipment**

1. All motorized equipment employed in the transportation of captured animals shall be in compliance with appropriate State and Federal laws and regulations applicable to the humane transportation of animals. The contractor shall provide the Authorized Officer with a current safety inspection (less than one year old) of all tractor/stock trailers used to transport animals to final destination.

2. Vehicles shall be in good repair, of adequate rated capacity, and operated so as to ensure that captured animals are transported without undue risk or injury.

3. Only stock trailers with a covered top shall be allowed for transporting animals from trap site(s) to temporary holding facilities. Only stock trailers or single deck trucks shall be used to haul animals from temporary holding facilities to final destination(s). Sides or stock racks of transporting vehicles shall be a minimum height of 6 feet 6 inches from the vehicle floor. Single deck trucks with trailers 40 feet or longer shall have a minimum of two (2) partition gates providing a minimum three (3) compartments within the trailer to separate animals. The compartments shall be of equal size plus or minus 10 percent. Trailers less than 40 feet shall have at least one partition gate providing two (2) compartments within the trailer to separate animals. The compartments shall be of equal size plus or minus 10 percent. Each partition shall be a minimum of 6 feet high and shall have at the minimum a 5 foot wide swinging gate. The use of double deck trailers is unacceptable and will not be allowed.

4. All vehicles used to transport animals to the final destination(s) shall be equipped with at least one (1) door at the rear end of the vehicle, which is capable of sliding either horizontally or vertically. The rear door must be capable of opening the full width of the trailer. All panels facing the inside of all trailers must be free of sharp edges or holes that could cause injury to the animals. The material facing the inside of the trailer must be strong enough, so that the animals cannot push their hooves through the sides. Final approval of vehicles to transport animals shall be held by the Authorized Officer.

5. Floors of vehicles, trailers, and the loading chute shall be covered and maintained with materials sufficient to prevent the animals from slipping.

6. Animals to be loaded and transported in any vehicle or trailer shall be as directed by the Authorized Officer and may include limitations on numbers according to age, size, sex, temperament, and animal condition. The minimum square footage per animal is as follows:

    11 square feet/adult horse (1.4 linear feet in an 8 foot wide trailer)
     8 square feet/adult burro (1.0 linear foot in an 8 foot wide trailer)
     6 square feet/horse foal    (0.75 linear feet in an 8 foot trailer)
     4 square feet/burro foal    (0.50 linear feet in a 8 foot wide trailer)

7. The Authorized Officer shall consider the condition of the animals, weather conditions, type of vehicles, distance to be transported, or other factors when planning for the movement of captured animals. The Authorized Officer shall provide for any brand and/or inspection services required for the captured animals.

8. Communication lines will be established with personnel involved in off-loading the animals to receive feedback on how the animals arrive (condition/injury etc.). Should problems arise, gathering methods, shipping methods and/or separation of the animals will be changed in an attempt to alleviate the problems.

9. If the Authorized Officer determines that dust conditions are such that animals could be endangered during transportation, the contractor/BLM will be instructed to adjust speed and/or use alternate routes.

10. Periodic checks by the Authorized Officer may be made as animals are transported along dirt roads. If speed restrictions are in effect the Authorized Officer will at times follow and/or time trips to ensure

compliance.

**I.    <u>Special Stipulations</u>**.

1. Private landowners or the proper administering agency(s) would be contacted and authorization obtained prior to setting up traps on any lands that are not administered by BLM. Wherever possible, traps would be constructed in such a manner as to not block vehicular access on existing roads.

2. Gathering would be conducted when soils are dry or frozen and conditions are optimal for safety and protection of the wild horses and wranglers. Whenever possible, gathering activities will be scheduled to minimize impacts with big game hunting seasons.

3. Gathers would not be conducted between March 1 and June 30 to reduce the risk of injury or stress to pregnant mares and mares with young foals, except in case of an emergency necessitated by wildlife, drought, etc.

4. The helicopter would avoid eagles and other raptors, and would not be flown repeatedly over any identified active raptor nests. Unnecessary flying would not occur over big game on their winter ranges or active fawning/calving grounds during the period of use.

**J.    <u>Safety</u>**

Safety of BLM employees, contractors, members of the public, and the wild horses will receive primary consideration. The following safety measures will be used by the Authorized Officer and all others involved in the operation as the basis for evaluating safety performance and for safety discussions during the daily briefings:

1. A briefing between all parties involved in the gather will be conducted each morning.

2. All BLM personnel, contractors and volunteers will wear protective clothing suitable for work of this nature. BLM will alert observers of the requirement to dress properly. BLM will assure that members of the public are in safe observation areas.

**K.    <u>Responsibility and Lines of Communication</u>**

1. The Contracting Officer's Representative and Project Inspectors have the direct responsibility to ensure the contractor's compliance with the contract stipulations.

2. The Associate Field Manager and the Field Manager will take an active role to ensure the appropriate lines of communication are established between the Field Office, State Office, and Royal Gorge Field Office.

3. All employees involved in the gathering operations will keep the best interests of the animals and their own safety at the forefront at all times.

4.  The COR will maintain open communications with dispatch to assure both parties are aware of project status; capture locations; and daily aviation activity.

## APPENDIX B- Interested Public

Fran Ackley, BLM, Canon City
Bob Ball, BLM, Delores
Bill Barnard
Jack Barnett, CRBSCF
Patti Barney
Thomas Berry
Mark Bishop, Sombrero Ranches
Geoff Blakeslee, Carpenter Ranch
Board of Commissions, Rio Blanco County
Ronald Bookman, Carbon Energy Corp.
Sharen Branch
Gary Brannon
Dale and Dean Burke
Judy Cady, Friends of the Mustangs
Bonna Caplan, Cultural Rights
Betsy Chapoose
Del Clark, BLM, Vernal
Colorado Cattleman's Association
Jeff Comstock, Moffat County Department of Resources
Ed Coryell, Colorado Brand Inspector
Wade Cox, Cox Brothers Land and Livestock
Jacqui Crews, Camelot Mustangs
Kirk Cunningham
Jimmie and Joy Dearman
Department of the Interior, Office of Public Affairs
Bill deVergie, Colorado Division of Wildlife
T. Wright Dickinson, NW Resource Advisory Council
Jim Dollerschell, BLM, Grand Junction
Craig Downer
Barb Evens, Friends of the Mustangs
Patricia Fennell
Barb Flores, American Mustang and Burro Association
Gail Fox
Tom Fry, Wilderness Society
Jean Gazzie
Andrea Gelfuso, USDI – Solicitor/Rocky Mountain Region
Bill Givan, Encana Oil and Gas (USA) Inc.
Rodeo and Marilyn Harbottle, BLM Volunteers
Marji Herrmann, El Paso Oil and Gs
Jeffrey Hersch
Jon Hill, Cripple Cowboy Cow Outfit, Inc.

Dave Hillberry
Humane Society of America, Wildlife Habitat Protection
John Husband, BLM, Craig
Darynne Anna Jessler
Allison Jones, Wild Utah Project
Suzanne Jones, Wilderness Society
Dr. Alan Kane, USDA/APHIS
Clayton Karran
Ginger Kathrens, The Cloud Foundation
Frank and Ginger Kime, Kime Ranch
Jauson King
Audrey Kipp
Bonnie Kline, Colorado Wool Growers Association
Pete Kolbenschlag, Colorado Environmental Coalition
Tamara Lackey, Political Voice for Animals
Bill Lancaster
Patricia Lane, The Humane Society of the United States
Pat Lane, Humane Society USA
Dawn Lappin,WHOA
Nancy Lindley-Gauthier, The Prancing Pony
Andrea Lococo
Mike Lopez
David Lopez
Tim Mantle
Mike Marinovich, C.E. Brooks & Associates, P.C.
Dawn Martin, Buys & Associates, Inc.
John Marvel, Western Watersheds Project
Tima Mavor, Mile High Mustang Club
Ed Mclain, Encana Oil & Gas (USA) Inc.
Grant Melvin, IPAMS
Cindy Meyer
Jim Miller, Department of Agriculture
Toni Moore, Colorado Wild Horse and Burro Coalition
Reed Morris, Colorado Environmental Coalition
Claire Moseley, Public Lands Advocacy
Maxine Natchees, Tribal Council
Roby Nichols, Debeque Wild Horse Council
Don O'Banion, Friends of the Mustangs
Patience O'Dowd, Wild Horse Observers Association
Michael Palmer
Glen Papez, Papez Outfitting
Christopher Papouchis, API
Wayne Pennell
Leah and Robert Plant
Sharon Potthoff

Rangely Town Government
Dan Rathburn
Timothy Reynolds, Tim & Randy Ecology Company
Rio Blanco Department of Development
Erin Robertson, Center for Native Ecosystems
Own Robertson
Dave Robertson, Twin Buttes Ranch
Scott Robertson
Kate Rogerson, S. Rockies Forest Network
Samantha Rolando, American Humane Association
Ted Rozkuszka
Eleanor Ruchti, Buckles Ranch
Bob Schmidt
Jerry Schmutzler
Mark Schofield, Western Colorado Congress
Mary Schoknecht
Richard Sewing, National Mustang Association
Steve Smith, Western Colorado Congress
Vera Smith, Public Lands Policy
Valerie Stanley, Animal Legal Defense Fund
Matt Sura
Karen Sussman, ISPMB
Patti Temple
Nick Theos
L.R. Pat Thompson, Thompson Ranch
Karen Thymes, Political Voice for Animals
Barbara Warner
Celia Wetherill
Dennis White, HSUS, SW Regional Office
Wild Horse Observes Association
Lonnie Williamson, Wildlife Management Institute
Terry Wygant, Colorado Division of Wildlife
Larry and Jane Yazzie
Ted Zukoski, Earth Justice

# Figure 1: CO-110-2008-052-EA - General Location Map of the West Douglas HA

