*Law Office of Valerie J. Stanley*
*329 Prince George Street*
*Laurel, MD 20707*

**Admitted in Maryland**  (301) 549-3126
**and the District of Columbia**  (301) 549-3228 fax

*Via Email to Melissa_kindall@blm.gov and First Class Mail*

May 25, 2008

Melissa Kindall, Range Technician
Kent Walter, Field Manager
White River Resource Area Office
Bureau of Land Management
Meeker, CO 81641

     Re: West Douglas Wild Horse Removal,
       CO-110-2008-052-EA

Dear Ms. Kindall and Mr. Walter:

  These comments are submitted on behalf of the Colorado Wild Horse and Burro Coalition, the American Mustang and Burro Association, The Cloud Foundation, Front Range Equine Rescue, Inc. and Dr. Don and Mrs. Toni Moore. These comments are postmarked on May 27, 2008 and sent via email in accordance with the direction of Ms. Kindall for the White River Field Office that such comments would be considered timely.

### Introductory Statement

  BLM has illegally determined that its plan to zero out the West Douglas herd involves no significant impacts to the environment and is authorized by law. BLM is the only entity which fails to see the significance of its actions here and fails to appreciate its illegality. Plaintiffs address the legal issues surrounding BLM's proposed action and the procedural issues concerning the logistics of removing the West Douglas wild horses.

### Legal Issues

  Plaintiffs incorporate by reference all legal issues discussed in their protest of the 2005 Amendment and the 2004 Amendment. The undersigned, as well as other commenters, can expect BLM to respond to any comments challenging whether BLM may legally zero out a wild horse herd by stating that such concerns are "beyond the scope of this EA," which deals with removals of wild horses. This is a frequent tactic used by BLM to ensure that its underlying land use planning decisions – not one of which has ever properly implemented the Wild Free Roaming Horses and Burros Act (WFHBA), 16 U.S.C. § 1331 et seq. nor been favorable to wild horses and burros -- are shielded from scrutiny. BLM can be expected to rely on its March, 2005 Land Use

Planning Handbook H-1601-1 concerning wild horse and burro management as authorizing BLM to zero out areas wild horses used at passage of the WFHBA and its own denial of protests of the 2005 West Douglas Herd Area Amendment to the White River Resource Area Plan as the basis for its decision now to round up horses from the West Douglas Herd Area. Finally, BLM can be expected to rely on a Draft Resolution of the Northwest Resource Advisory Council supporting total removal of horses from the West Douglas HA. See Exhibit 1. None of these BLM-authored or BLM-orchestrated "dictates" supersede Congress' declaration in the WFHBA that wild horses are an integral part of the system of public lands and BLM should manage and protect them as such. Instead, it is an amazing example of bureaucratic stubbornness and recalcitrance when one considers how much taxpayer money, human effort and machinations the White River Field Office has gone through to exterminate a small band of wild horses who occupy lands so steep, treacherous and isolated that BLM claims it cannot "manage" them there.

BLM's approach demonstrates that 1) it relies on land use plans created by interests opposed to wild horses and burros on public lands as the rationale for removing wild horses; 2) BLM uses the land use planning process to take the place of monitoring and inventorying of the public lands; 3) BLM relies on the land use planning process to exempt itself from having to undertake the analyses to determine whether, in fact, a thriving natural ecological balance exists on a given area of public land. Why would BLM want to skirt these responsibilities? A major reason, and one present here, is that BLM knows that its decision to manage for cattle in the West Douglas Herd Area (by virtue of its Allotment Management Plans with the Twin Buttes Ranching Company) has caused degradation of the environment and a preference for livestock over wild horses that is contrary to law. BLM also knows that it does not conduct inventorying and monitoring of vegetation and the use of the area by livestock, wildlife and wild horses that would allow it (and the public) to see exactly how one-sided BLM's allowed use of the public lands favors livestock. Persons knowledgeable about the area dispute BLM's findings that wild horses are the cause of any range degradation. See Exhibit 2 (Comment letter from Glen Papez to BLM dated April 29, 2004). Furthermore, despite several removals of wild horses since 1997, BLM has no data to demonstrate that this has improved range conditions. The inability of the BLM to quantify which species are impacting the range seems to be a widespread issue with the BLM. See Testimony of Linda Coates-Markle, Exhibit 3, at 15-16, admitting that in reviewing consumption of forage, BLM is not able to specify which species consumes which forage. In fact, the GAO criticized these very findings when it completed its investigation of the wild horse program and issued its August, 1990 report entitled, "Rangeland Management: Improvements Needed in Federal Wild Horse Program." A copy of this report is attached hereto as Exhibit 4. Specifically, the GAO "found that existing information is insufficient to determine how many wild horses the range can support, the extent of degradation caused by wild horses, or consequently the number of wild horses that should be removed from individual herd areas. . . BLM could not provide GAO with any information demonstrating that federal rangeland conditions have significantly improved because of wild horse removals," GAO, Principal Findings at 3. Similarly here, BLM has

no data to show that despite its previous removals of wild horses that rangeland conditions have improved.

BLM's last "Herd Management Area Plan" for these wild horses is dated 1981, some 27 years ago. Instead of updating this document, which clearly emanated from BLM's early and initial attempt to comply with the WFHBA by providing for, planning for and managing for wild horses, BLM has apparently abandoned this approach, now seeking to fold any plans for wild horse removals and/or eradications, as opposed to management, into general land use planning documents. And even in those major land planning efforts, BLM has chosen to ignore how they will affect wild horses. In fact, the White River Field Office is undergoing a major assessment of oil and gas development in the area. BLM touted this effort by stating that, "The plan amendment and associated EIS will address the potential impacts of significant increases in oil and gas development within the 1.5 million acre field office over the next 20 years. BLM's notice about the scoping comments period for this Oil and Gas EIS provides, "The lifestyles and concerns of area residents, including the activities of grazing and hunting, will be recognized in the RMPA/EIS." The RMP Amendment/EIS does not purport to recognize the concerns of area residents in maintaining wild horse populations, including the interests of area residents in maintaining wild horse populations within the West Douglas Herd Area and the Piceance-East Douglas HMA, the very area to be impacted by significant increases in oil and gas development. BLM's current and future actions threaten to eliminate wild horses from consideration as BLM analyzes oil and gas use in these areas. This is despite BLM's recognition in its 2004 proposed RMP Amendment that without oil and gas stipulations (i.e. the stipulations that oil and gas companies give to preserve area for wild horse use), "critical wild horse habitat would be lost." BLM should hold any roundups of the West Douglas horses in abeyance until it completes its Oil and Gas Amendment so that it may comprehensively plan for the presence of wild horses throughout the WRRA and sufficient habitat for them.

In contrast to this RMP Amendment which will analyze Oil and Gas Development in the area and project the area's needs for the next 20 years, the WRFO has failed to update its 1981 HMAP to include new information and the current status of wild horses and issues affecting wild horses, such as oil and gas development, in the Piceance-East Douglas HMA or the West Douglas Herd Area. This is despite statements from at least one knowledgeable commenter, David Temple, of the National Mustang Association, that wild horses are being zeroed out from West Douglas due to oil and gas development. See Saving the American Wild Horse DVD by James Kleinart, attached hereto as Exhibit 5. The entire DVD is submitted in support of Plaintiffs' request that BLM cancel its plan for this roundup and instead agree to meet with Plaintiffs and other interested members of the public to see if there are practical steps that can be taken to ensure the continued presence of the herd in the area.

BLM's decision to eradicate the West Douglas herd from an area that it occupied at the passage of the Wild Free Roaming Horses and Burros Act violates that Act. Eradicating wild horses is in direct violation of the statute which requires BLM to

consider wild horses as an "integral" part of the system of public lands. Simply put, a use cannot be an "integral" part if it does not exist.

BLM's reliance on the land use planning process as a way around the WFHBA is prohibited by the plain language of FLPMA. FLPMA provides that a land use plan does not trump the statutory command of other laws, such as the WFHBA, which requires BLM to consider wild horses as an integral part of the public lands, FLPMA § 102(b), and mandates that BLM provide wild horses and burros specific protection. Furthermore, BLM's regulations implementing the WFHBA provide that "wild horses and burros shall be considered comparably with other resource values in the formulation of land use plans," 43 C.F.R. §4700.0-6.

BLM s history of treatment of the West Douglas herd demonstrates that the only management actions BLM has taken is by conducting roundups. BLM's stated rationale for zeroing out this herd, i.e. that it cannot "manage" the wild horses in this area rings hollow. It has been "managing" the herd by conducting roundups of them every few years. It has failed to undertake all duties imposed on it by the WFHBA, namely conducting actual censuses of the population, determining what levels of populations of livestock, wild horses and wildlife must be balanced to ensure there is a thriving, natural ecological balance. Nowhere was this more clearly demonstrated than when Toni Moore asked the WRFO for a copy of its most recent census of the WD herd because such data was missing from this EA. The WRFO advised Ms. Moore that it had not conducted a census of the area since before the 2006 roundup. Since BLM has no data on how many wild horses there are in the WRFO, there is no basis upon which it can determine that these horses are "excess" and must be removed to ensure a "thriving, natural, ecological balance," pursuant to 16 U.S.C. §1332.

### Issues Regarding the Roundup and Transport of the West Douglas Wild Horses

BLM's Standard Operating Procedures for Roundups and Transport should offer no consolation to the public that wild horses are going to be protected. In the 2006 roundup of the West Douglas wild horses, a mare and a filly were killed by having their necks broken when they ran into a metal gate. See Exhibit 6, Specific Activity Report for the APHIS/BLM Wild Horse and Burro Partnership, Report of James M. Williams, VMO, on West Douglas Gather from October 10 through October 16, 2006. This is not an isolated incident; wild horses are routinely injured and killed while BLM uses its standard operating procedures. See Exhibit 7, "The Use of Helicopters to Remove Wild Horses and Burros From Public Lands."

The steepness of the terrain and the various seasons during which BLM is planning these roundups should cause it to urge caution if these roundups are in fact allowed to occur. BLM's assurances that it will even consider protections to the horses while it runs them in freezing weather through deep snow demonstrates that it has developed an ill-conceived, and cruel, plan. Any person knowledgeable about horse welfare and the potential for injuries to tendons, ligaments, hocks and fetlocks would

know enough not to run horses in deep snow. While the potential for immediate and long-term injury should be obvious, there is the added difficulty that wild horses are not familiar with or amenable to veterinary treatment. Thus, BLM's planned roundup techniques are particularly thoughtless and cruel.

Appendix A to the EA describes: planned capture methods; trap site selection criteria; transport vehicles; and stipulations for traps and temporary holding facilities. However, the EA fails to address the disposition of the wild horses after they are loaded for transport to their "final destination(s)." The EA is completely devoid of information on these final destinations. It provides no data regarding the location or conditions of the long term holding facilities to which the horses will be transported, or the number of horses already held in those facilities. Nor does the EA discuss the likely ultimate disposition of these wild horses, i.e., when they will be made available for adoption, and what their chances for adoption are based on historical data for similar round-ups.

## Conclusion

Plaintiffs urge BLM to hold its plans for a roundup of these horses in abeyance until it has fully and appropriately developed a Herd Management Area Plan that addresses both the West Douglas Herd Area and the Piceance-East Douglas Herd Management Area.

Very truly yours,

Valerie Stanley

Valerie J. Stanley

Enclosures