# Wild Horse Removals Need to Be Linked to Rangeland Conditions

BLM decisions on how many wild horses to remove from federal rangelands have been made without benefit of solid information concerning range carrying capacity or the impact of wild horses on range conditions. Instead, its decisions have reflected either the desire to achieve perceived historic wild horse population levels or deference to advisory groups largely comprised of livestock permittees. As a result, BLM's wild horse removals have not produced appreciable improvements in range conditions and have exceeded the disposal capacity of BLM's basic adoption program. Future wild horse removal decisions need to be considered in the context of a broader strategy of range improvements based on accurate carrying capacity and range condition data.

## BLM Lacks Adequate Data to Make Informed Wild Horse Removal Decisions

Establishing levels of forage consumption that do not overtax the land (carrying capacity) and measuring actual consumption to ensure that such capacity is not being exceeded are critical steps in prudent range management. When more animals (domestic livestock, wildlife, and wild horses) graze the federal range than the land can sustain, degradation is inevitable. While important to the balanced management of all animals sharing the range's resources, the mandates of the wild horse act make data on carrying capacity and the impact of wild horses on range resources essential to the management of wild horses. Under the act horses are to be removed from the range to "restore a thriving ecological balance"—a condition that cannot be known without these data. Given this mandate and the substantial costs associated with wild horse round-up and disposal, accurate up-to-date information on the range's ability to sustain wild horse grazing must be available for each herd area to make rational wild horse removal decisions. Removing more horses than is necessary wastes federal funds, removing less than is warranted by range conditions contributes to continued resource deterioration and, depending on horse reproduction rates, can lead to higher removal costs in the future.

Reasonably current carrying capacity data are, however, frequently not available within BLM. As we reported in our June 1988 report on range conditions, carrying capacities have not been assessed for 30 percent of BLM grazing allotments in over 20 years. Another 11 percent of the carrying capacity assessments are between 10 and 20 years old. The value of information this old is questionable.

The availability of carrying capacity data in the BLM resource areas we visited with large wild horse populations was consistent with the BLM-

wide picture we reported on earlier. For the 5 BLM resource areas covering 46 herd areas we visited, 3 had not assessed carrying capacities for over 20 years, and 1 had not assessed carrying capacities in over 10 years. The one area where carrying capacity data was only 6 years old did not use the data to set target wild horse population levels and hence the number of horses to be removed to achieve those levels.

One difficulty facing BLM in determining the impact of wild horses is distinguishing among forage consumption by species. While existing rangeland monitoring techniques can measure such things as actual grazing use, percentage consumption of key plant species, and changes in range conditions over time, existing practices did not distinguish forage consumption among wild horses, domestic livestock, and wildlife species. BLM field staff report monitoring techniques are difficult, but not impossible, to practice in many herd areas. Since in many herd areas wild horses coexist with livestock, this distinction is critical in determining the appropriate mix of animals on the range as well as the species-specific actions to be taken in responding to degraded range conditions.

Despite lacking adequate data on the number of wild horses the land can support, BLM has proceeded with removing the horses. For example, on at least two occasions, BLM's Nevada State Office concluded that available data were not adequate to justify removing wild horses; however, in both instances BLM's responsible district and resource area offices chose not to revise their plans to remove horses in their areas. In contrast, BLM has frequently used the lack of detailed carrying capacity and range monitoring data to explain why it has not taken action to reduce widely recognized overgrazing by domestic livestock.

## Basis for BLM's Wild Horse Removals Is Inappropriate

Without accurate and reasonably up-to-date carrying capacity data, BLM has based its wild horse removal decisions on either (1) the desire to achieve perceived historic population levels or (2) recommendations from BLM advisory groups largely comprised of livestock permittees. The first basis was set aside by the Interior Board of Land Appeals as being contrary to the requirements of the wild horse act.[1] The second basis is, at a minimum, not consistent with balanced stewardship of range resources and reinforces the image of undue deference to livestock interests that we have discussed in previous reports and testimonies.

---

[1] The Interior Board of Land Appeals, part of the Office of Hearings and Appeals, has quasi-judicial and appellate responsibilities for the Department of the Interior. The Board of Land Appeals renders decisions on BLM cases.

We found that BLM set the target population levels for wild horses (and thereby the number of horses that should be removed to achieve those levels) in 38 of the 43 herd areas in Nevada and 1 of the 3 herd areas in Wyoming on the basis of herd populations it believed to exist as far back as 1971. None were based on estimated herd populations more recent than 1983.

For example, in a 1987 herd management plan, BLM set the wild horse population in six Nevada herd areas at the estimated 1974 population level of 877 horses, thus reducing the herds by 42 percent from their estimated 1982 population of 1,506 horses. Similarly, the wild horse population level for one Wyoming herd area was set to fluctuate between 90 and 185 horses on the basis of the herd's estimated size in 1971 of 70 horses.

This basis was rejected by Interior's Board of Land Appeals. In 1988, BLM proposed to reduce the combined wild horse herds in 18 areas in Nevada from about 10,000 to less than 3,000 horses. An animal protection group challenged the planned removals claiming that BLM lacked quantitative data linking wild horses to deteriorated range conditions (the required basis for horse removals established in the wild horse act). In June 1989, the Board ruled that in the absence of evidence that wild horse removals would result in a thriving natural ecological balance or avoid further deterioration of the range, a wild horse level "established purely for administrative reasons because it was the level of wild horse use at a particular point in time cannot be justified under the statute."

BLM also sometimes deferred its horse removal decisions to advisory groups comprised primarily of livestock permittees. In Nevada, BLM established target wild horse population levels on this basis in eight herd areas. Since livestock permittees have a vested interest in keeping wild horse populations low to reduce competition for forage for their livestock, setting horse removal levels on the basis of their views may not be appropriate.

The advisory committees' membership sometimes included wild horse advocacy groups but these groups typically had little influence on the committee's ultimate decisions, according to BLM officials and wild horse advocates. For example, in 1982 two groups advocating wild horse interests quit the advisory committee working with BLM to establish target wild horse population levels for six Nevada herd areas. According to one member, she concluded that BLM was predisposed to satisfying domestic

livestock interests and that continued service on the committee served little purpose.

## Wild Horse Removals Have Not Significantly Improved Range Conditions

Despite nearly 2 decades of BLM efforts to remove wild horses from federal rangelands, we reported in June 1988 that about 60 percent of BLM allotments, where conditions were known, were in unsatisfactory condition. Further, nearly 78 percent of the allotments where trend information was available were either stable or declining further. With such a negative picture of overall range conditions, wild horse removals have not been sufficient to restore federal rangelands as a whole to a thriving condition. Further, BLM could not provide us with data to demonstrate where horse removals have materially improved the specific areas from which they have been removed.

Wild horse removals have not demonstrably improved range conditions for several reasons. First, wild horses are vastly outnumbered on federal rangelands by domestic livestock. In fiscal year 1988, about 4.1 million domestic livestock graze BLM allotments compared to an estimated 42,000 wild horses. In total, the domestic livestock consume 20 times more forage than wild horses. Even substantial reductions in wild horse populations will, therefore, not substantially reduce total forage consumption.

Second, wild horse behavior patterns make the horses somewhat less damaging than cattle to especially vulnerable range areas. Available horse behavior studies demonstrate that, unlike cattle which concentrate in lower elevations, wild horses range widely throughout both steep, hilly terrain and lower more level areas. Range conditions in the steeper hillier areas where cattle do not frequent are generally better than in lower areas. Reducing wild horse populations in these areas has been shown by experience to have a negligible effect on the resource. In the lower level areas, especially ecologically important riparian areas adjoining streams and other water sources, cattle do more damage because they tend to "camp" in the areas instead of watering and moving on. As we reported in our June 1988 report on riparian area management, poorly managed domestic livestock grazing is the primary cause of damaged riparian areas. In these areas, wild horse removals can be helpful but without improved domestic livestock management as well, the overgrazing problem cannot be solved.

Third, wild horse removals have taken place in some locations not being damaged by widespread overgrazing. For example, in Wyoming, a horse

**Chapter 2**
**Wild Horse Removals Need to Be Linked to Rangeland Conditions**

protection group wrote BLM in 1983 asking why so many wild horses were being removed from a particular herd area when a BLM draft environmental impact statement showed that the area was not damaged by widespread overgrazing. BLM's 1983 final environmental impact statement for this area agreed that widespread overgrazing was not a problem but stated that the herd reduction from an estimated 1,464 to 470 horses was based on a need to alleviate "isolated" overgrazing around water resources. Other BLM documentation, however, attributed the riparian-area problems in this location to overgrazing by domestic livestock, not wild horses.

Fourth, in many areas where wild horse removals have taken place, BLM authorized livestock grazing levels have either not been reduced or have been increased thereby largely negating any reduction in forage consumption. For example, BLM removed 349 wild horses (or an equivalent of 4,188 AUMs[2]) from one Nevada herd area in 1986 and then approved a temporary increase of 2,266 AUMs for livestock in the same area in 1987. Similarly, a state office technical review of a district's 1988 assessment of another Nevada herd area's range condition showed extensive overgrazing. The state office's technical staff recommended removing 176 wild horses and in addition reducing livestock grazing by almost 80 percent. Although BLM's district office plans to remove the wild horses, it does not plan to make any reduction in the permittee's authorized livestock grazing level since its conclusion is that wild horses caused the resource damage.

In another instance, BLM removed over 2,800 wild horses from a herd area over 4 years based, in part, on a Nevada district court's ruling in favor of a permittee that wild horses were overgrazing the range thus depriving him of his allocated forage and other range resources. After the horses were removed, BLM found that the permittee's authorized livestock grazing level continued to result in damage to the range and stated that livestock grazing should be reduced by 18 percent to correct the problem. However, BLM has no current plans to reduce the permittee's authorized grazing level. Instead more range monitoring data will be collected and analyzed by BLM to strengthen support for negotiating grazing reductions with the permittee sometime in the future.

---

[2]AUM (animal unit month) refers to the amount of forage needed to sustain an adult cow or horse for one month.

It is apparent that wild horse removals alone will not generate the widespread range improvement that is so badly needed. More intensive livestock management and reductions in authorized livestock grazing levels must also be pursued if range conditions are to improve significantly. Moreover, reducing authorized grazing levels would likely be cheaper than wild horse removals to achieve the same reduction in forage consumption. BLM's domestic livestock grazing management program currently operates at a substantial loss. In 1989, livestock operators paid a fee of $1.86 per AUM (reduced to $1.81 in 1990) compared with BLM's program costs of $3.62 per AUM. Reducing the size of the domestic livestock grazing program could, if accompanied by proportionate reductions in management costs, generate significant savings. Further, livestock reductions made in place of wild horse removals would save the substantial expense of rounding up and disposing of the horses.

## Recent Wild Horse Removal Levels Have Exceeded Disposal Capabilities

Between 1973 and 1984, BLM removed from the federal range an average of about 4,300 horses each year. Since this number of horses was routinely disposed of through BLM's Adopt-A-Horse program, few horses remained in holding facilities for extended periods. By 1985, however, horse removal levels quadrupled to 17,400 horses. The adoption program could not handle this many horses and a large backlog of horses in holding facilities began to build, increasing program costs and generating the need to develop mass disposal alternatives, such as fee-waiver adoptions and sanctuaries, that are discussed in subsequent chapters.

In its fiscal year 1991 budget justification, BLM has recognized that in the past it has removed more horses than could be adopted. In 1991, BLM plans to remove only 4,900 adoptable horses from the range, down from 17,400 removed in 1985 and about 8,700 in 1990. It expects 6,100 wild horses to be adopted during the year, up about 1,775 from actual 1989 levels.

## Conclusions

With nearly 60 percent of federal rangelands in unsatisfactory condition, improvements are needed. In this context, wild horse removals based on reliable carrying capacity and range condition data make sense. However, our work during this and several previous reviews demonstrates that reliance on wild horse removals alone to improve range conditions cannot work. Since domestic livestock substantially outnumber wild horses on federal rangelands and are a primary cause of range deterioration, any strategy for rangeland improvement must also include plans for improving the management of livestock to give the

native vegetation more opportunity to grow and as necessary reducing authorized livestock grazing levels.

Since wild horse removal and livestock grazing reduction decisions need to be based on reasonably up to date carrying capacity and range condition data, efforts to develop these data need to move ahead without delay. Moreover, once data are developed, we believe BLM needs to pursue the actions suggested by the data, both for wild horses and domestic livestock. Wild horse removal levels based on these data may be less than historic levels. To this end, we believe BLM's decision to manage wild horse removals on the basis of the number that can be adopted is prudent.

## Recommendations to the Secretary of the Interior

To place BLM's wild horse removal process in the context of a more rational strategy of range improvement, we recommend that the Secretary of the Interior direct the Director of BLM to take the following actions.

- Expeditiously develop carrying capacity and range condition data in wild horse herd areas.
- In locations where these data indicate that grazing-related damage is occurring, BLM should incorporate the requirement for intensive livestock management techniques in permit conditions to reduce the impact of this grazing on the range's resources. Where necessary and appropriate, BLM should also remove wild horses and reduce authorized domestic livestock grazing levels on the basis of the relative numbers of each species on the range.
- After initial population adjustments are made, conduct continued monitoring to maintain wild horse and domestic livestock population levels consistent with what the land can support.

## Agency Comments and GAO Response

BLM agreed with our recommendations to develop range condition data in wild horse herd areas and conduct continued monitoring. BLM disagreed, however, with a recommendation in a draft of this report that wild horses be removed and the levels of authorized domestic livestock grazing be reduced in proportion to the amount of forage each is consuming and the amount of damage each is causing.

BLM commented that (1) there are other reasons for removing wild horses even when overgrazing by them is not indicated and (2) there are other "less drastic" management techniques that can be applied to

domestic livestock (but not wild horses) that can improve resource conditions without reducing authorized grazing levels. Among the techniques BLM cited were installation of range improvements, changes in grazing season, and institution of rest/rotation grazing systems.

We recognize that wild horses may sometimes have to be removed from the range for reasons other than overgrazing. However, wild horse removals have historically been justified by BLM on the basis of reducing the horses' effects on the range. In the areas we examined, removals were generally done to achieve population targets set at historic levels, not to alleviate local range problems. Removals for the alternative reasons cited by BLM have not been a significant factor.

We also recognize that more intensive livestock management can yield important improvements in range conditions and have revised our recommendation to state that more intensive livestock management should be a part of an overall range management strategy and that BLM should use these range improvement techniques as appropriate. However, as BLM staff have noted, many range areas are overstocked; more animals are consuming range resources than the range can support. In these instances, the number of animals consuming the forage needs to be reduced. When wild horses and domestic livestock occupy the same range areas, BLM states that it is often impossible to distinguish between their impacts. While BLM field staff believe that range monitoring techniques can distinguish the different effects of wild horses and livestock on range conditions, we recognize this is difficult to practice. Accordingly, we have revised our recommendations to state that necessary reductions in grazing activity should be accomplished in proportion to total numbers of each species.

# Fee-Waiver Adoptions Led to Inhumane Treatment and Commercial Exploitation

By 1985, BLM was removing thousands more wild horses yearly from the range than its adoption program could absorb. Faced with the escalating costs of maintaining these excess horses in holding facilities, the agency resorted to placing large numbers with individuals and Native American tribes under its so-called fee-waiver program. From 1984 through September 1988, BLM placed about 20,000 wild horses it deemed unadoptable with 79 individuals and 4 Native American tribes each of whom received from 16 to 2,456 wild horses. We found that hundreds of these horses died of starvation and dehydration during the 1-year probation period and that many adopters, primarily ranchers and farmers in the midwestern and Great Plains states, sold thousands more to slaughter after obtaining title from BLM.

BLM terminated the program in September 1988 after negative publicity and pressure from the Congress. It has not, however, rescinded the regulations authorizing such adoptions.

## Increasing the Number of Wild Horses Removed From the Range Led BLM to Authorize Fee-Waiver Program

Until about 1982, adoption demand was sufficient to absorb the wild horses annually removed from public rangelands, and animals were not maintained in holding facilities for long periods of time. However, in 1982 BLM began increasing the number of wild horses removed from public rangelands. By the end of fiscal year 1985, almost 10,000 unadopted wild horses were being maintained in holding facilities after removing about 17,400 wild horses from the range that year. Because horses were remaining, BLM had to contract for more holding facilities and had no expectation that the horses would be adopted in the foreseeable future.

In response to the escalating costs of maintaining excess horses, BLM revised its regulations in 1984[1] to allow BLM's Director to reduce or waive the normal fee of $125 per animal. To qualify for the fee-waiver program, BLM's policy was to require fee-waiver adopters to take a minimum of 100 horses, with a few exceptions.[2] BLM's regulations also allowed individuals to sign powers-of-attorney to enable another individual (the agent) to receive delivery of more horses than he or she would otherwise be entitled.

---

[1] 43 C.F.R. 4750.4-2(b) was an emergency rulemaking in 1984. The rulemaking became final in April 1986 when BLM completed revision of its wild horse and burro regulations (43 C.F.R. 4700).

[2] The wild horse act, as amended in 1978, and BLM's regulations limit adopters to no more than four horses per year unless BLM expressly determines that an individual is capable of humanely caring for more. The legislative history indicates that restricting adopters to four animals per year was to discourage potential commercial exploitation or abuse possible with large groups of horses.

Chapter 3
Fee-Waiver Adoptions Led to Inhumane
Treatment and Commercial Exploitation

## Many Fee-Waiver Horses Treated Inhumanely

Under its regulations, BLM was to screen fee-waiver applicants to assure that they were capable of humanely caring for the horses and understood their responsibility for the horses' welfare. BLM was also required to inspect the applicants' facilities to assure that they could humanely support the horses during a 1-year probation period. After the horses were delivered, BLM was to periodically inspect actual conditions to verify that the horses were receiving humane care and that the titles could appropriately be issued at the end of the 1-year probation period. However, BLM did not always comply with its regulations and internal guidance for approving and monitoring fee-waiver adoptions, resulting in the inhumane treatment and death of over 360 horses during the 1-year probation period.

For example, as part of its required applicant screening process mandated by a 1983 legal settlement, BLM is required to conduct telephone surveys of all individuals signing powers-of-attorney to verify that they are suitable and explain to them their responsibility for the horses' welfare.[3] However, according to a Federal Bureau of Investigation report of a 1987 fee-waiver adoption in Sheyenne, North Dakota, BLM did not conduct the required telephone survey of Native American tribal members who signed blank power-of-attorney forms without knowing what they were signing. BLM terminated this fee-waiver adoption only after over 100 of the horses had died of starvation and dehydration.

In another fee-waiver adoption to three individuals based in Fordyce, Nebraska, 140 to 150 of the wild horses delivered died during the 1-year probation period.[4] Two of the facilities approved by BLM were later found during BLM inspections to lack adequate forage, water, and shelter. Over 30 deaths were reported within 10 weeks after the horses arrived at the two facilities. A veterinarian hired by BLM to autopsy carcasses at one of the facilities reported that the horses had died of starvation and dehydration and that the remaining horses were in immediate jeopardy. Yet, BLM never implemented his recommendation to supply the horses with supplemental hay. Less than 1 month later, 40 more horses were reported dead, but BLM took no action. When the surviving horses were finally gathered so that titles could be issued, about 450 of the original 600 horses remained.

---

[3]American Horse Protection Association, v. Watt, U.S. District Court for the District of Columbia, July 8, 1983. BLM's Washington Office distributed copies of the settlement's detailed steps for conducting large-scale power-of-attorney adoptions to all field offices in July 1983 and revised its program guidance in August 1983 to incorporate these requirements.

[4]BLM's fee-waiver agreement was with the business formed by three individuals. One acted as power-of-attorney for each of the 150 adopters.

We asked BLM officials why they chose to take no corrective action. Explanations ranged from a lack of clear guidance from BLM management, to the expense associated with repossessing the horses, to the belief that BLM had done nothing improper.

## Thousands of Horses Sent to Slaughter After Title Passed

By its very design the fee-waiver program was a prescription for commercial exploitation of wild horses. BLM and U.S. Attorney officials in Montana as well as buyers and state regulators of commercial horse meat business widely agreed that there was no other practical use for large numbers of fee-waivered wild horses than to sell them as soon as possible. As was predicted, our work confirmed that thousands of fee-waivered horses were sent to slaughter soon after title passed.

Four slaughterhouses in Nebraska and Texas provided us 3,751 titles that they obtained when they bought wild horses from fee-waiver agents. From these, we learned that the fee-waiver agents associated with these titles sold up to 99 percent of their wild horses, many within 30 days of title issuance. Although not maintaining records as detailed as the plants we visited, officials and buyers for other plants in the United States and Canada told us that they had also bought and slaughtered thousands of fee-waivered horses.

In July 1987 a federal District Court ruled that BLM could not issue titles to fee-waiver agents who express an intent to sell wild horses for slaughter.[5] BLM made efforts to establish the intent of fee-waiver agents applying for title when it had evidence that the agents intended to sell the horses. These efforts, however, were not effective in preventing the subsequent slaughter of the horses. For example, in November 1987, the son of a Watford City, North Dakota, fee-waiver agent (who kept the 112 wild horses on his ranch) was quoted in North Dakota papers that he planned to turn at least 72 "... into dog food ... or make steak for Europeans." In response, BLM initially planned to deny the agent titles, but after the agent disassociated himself from his son's statements, BLM issued the titles in July 1988. An inspection official and a buyer for a Canadian slaughterhouse stated that the agent and/or his son sold at least 82 of the horses for slaughter by the fall of 1988.

In another instance, BLM learned through bankruptcy court proceedings that a fee-waiver agent in Berthold, North Dakota, intended to sell 296

---

[5] Animal Protection Institute of America v. Hodel (671 F. Supp. 695 D. Nev., 1987). This ruling was upheld on appeal from BLM (U.S. Court of Appeals, Ninth Circuit, October 31, 1988).

wild horses. When faced with the possible denial of titles, the agent wrote BLM stating his intent to use the herd for breeding purposes. However, court records that we obtained from BLM files indicate that as late as December 1987 he intended to sell the horses to slaughter to produce $150,000 in income during 1988 and 1989. In March 1988, BLM's district manager concluded that there was no evidence that the agent intended to sell the horses for slaughter. After the agent obtained the titles in May 1988, he sold at least 122 of the horses for slaughter during the subsequent 8 months.

Two other cases involved a fee-waiver agent in Morrison, Oklahoma, and a Native American tribe in South Dakota. During September through November 1988, we obtained testimonial evidence corroborated by copies of titles from slaughterhouses, buyers, and brand inspection officials that these agents had sold about 678 wild horses for slaughter and had 394 untitled horses remaining in their custody. We provided this information to BLM. However, BLM subsequently issued titles on 385 of these horses between December 1988 and July 1989. Through April 1989, at least 234 of these horses were sold and slaughtered.

Before issuing titles to the agent in Morrison, Oklahoma, Interior's Associate Solicitor for Energy and Resources wrote him on behalf of BLM in December 1988 asking him to inform BLM concerning what he intended to do with the horses after receiving title. The agent wrote BLM in January 1989 that he did "... not intend to use or exploit said horses for commercial purposes," but would market them for personal or ranch use. However, 7 days after BLM issued the titles on February 17, 1989, the agent sold about 140 of the horses to a slaughterhouse. An official from the slaughterhouse contacted us on March 2, 1989, expressing concern over the purchase of these horses (which were at the plant, but still alive). We notified BLM and they conducted a second investigation. BLM directed the plant to proceed with the slaughter of the horses on March 13, 1989, because, according to BLM and Interior officials, the agent did not criminally intend to misrepresent his plans in his letter.

BLM decided to issue the titles to the Native American tribe in South Dakota because the names of tribal members that appeared on the titles we obtained from the slaughterhouses did not match the names of tribal members with untitled horses. BLM officials also told us that there was no power-of-attorney relationship between the tribal members with untitled horses and the tribal government or another tribal member under contract with BLM to perform certain duties relating to the wild horses (and who had sold them for slaughter). In December 1988, BLM

issued title to the horses, at least 101 of which were slaughtered within 3 weeks.

## Conclusions

The fee-waiver adoption program resulted in the abuse and commercial exploitation of thousands of wild horses, contrary to BLM's legislative direction. Recognizing the problems and in the face of considerable criticism from the Congress and the public, BLM terminated this program in 1988 without rescinding the regulations. By its very design and confirmed in practice, this program could have only led to the results it experienced. If this program was reinstituted, we do not believe BLM could prevent identified abuses from happening in the future.

## Recommendation to the Secretary of the Interior

To significantly reduce the likelihood that wild horses removed from public rangeland in the future will experience inhumane treatment and slaughter, we recommend that the Secretary of the Interior direct the Director of BLM to permanently rescind the regulations authorizing fee-waiver adoptions.

## Agency Comments and GAO Response

BLM agrees with the objective of this recommendation, but prefers not to rescind authority to waive the adoption fee. Instead, BLM published a proposed rulemaking in February 1990 to prohibit the use of power-of-attorney to adopt wild horses and burros where more than four will be maintained in one location.

BLM notes that the problems with fee-waiver adoptions stemmed less from the waiver of the fee but from the large numbers of horses controlled by one person. Depending on the market, BLM notes that even a person who paid the full adoption fee could profit after a year of caring for many wild horses. To significantly reduce the profit motive, BLM's proposed rulemaking should make it extremely difficult, if not impossible, for one person to gain control of a large group of wild horses. BLM wants to retain authority to waive the adoption fee in special situations, such as to place older or unsound wild horses and burros with humane groups willing to care for them. We believe BLM's proposed approach, if finalized, would respond substantively to the thrust of our recommendation.

Chapter 4
# Continuing Problems With Wild Horse Disposal Activities

Although the troubled fee-waiver adoption program has been terminated, problems with BLM's other disposal approaches remain. BLM's wild horse sanctuaries are likely to be much more expensive than originally envisioned and may represent only a temporary solution to the disposal of unadoptable horses. Further, BLM's prison halter training program has produced questionable results and needs to be revised to improve its cost-effectiveness. If horse removals above levels that can be handled by private adoptions are reinstituted, other disposal options will have to be considered.

## Sanctuaries More Costly Than Originally Thought

According to BLM, about 20 percent of the wild horses removed from the range are unadoptable due to age or physical imperfections. With the fee-waiver program no longer a viable option for disposing of these horses, BLM authorized the creation of two private sanctuaries where these horses could live out their lives in a natural setting off the public rangelands. While properly run sanctuaries ensure that unadoptable wild horses are protected and cared for, they are expensive. Further, BLM plans to finance sanctuaries for only their first 3 years, after which they are expected to be financially self-supporting through fund-raising and/or charitable donations. However, available information shows that sanctuary operators may never be able to achieve anticipated financial independence from BLM, requiring a long-term commitment of federal resources.

## Sanctuaries Provide Humane Disposal of Unadoptable Horses

The alternative of privately funded sanctuaries for maintaining unadoptable wild horses was first proposed in 1986. With the suspension of the fee-waiver program, through which many unadoptable horses were previously disposed, BLM became more interested in this alternative and the first sanctuary was established in western South Dakota in the summer of 1988. This sanctuary is to serve as a prototype and is intended to encourage tourism and economic development in the area as well as public understanding of BLM's wild horse program.

Unlike the fee-waiver program, BLM will not issue titles on wild horses placed on sanctuaries, thus they will never lose their protected status. Moreover, BLM plans to monitor their care for as long as the horses remain on a sanctuary. These attributes have generated significant congressional interest, and the Congress directed BLM to develop guidelines and establish additional sanctuaries in 1989.[1]

---

[1] In October 1989 BLM started sending unadoptable wild horses to a second sanctuary in Oklahoma.

Chapter 4
Continuing Problems With Wild Horse
Disposal Activities

## BLM's Costs May Exceed the Low Rate Now Being Paid

Under a June 1988 memorandum of understanding, BLM agreed to pay the nonprofit Institute of Range and the American Mustang (IRAM) that runs the South Dakota sanctuary about $1 a day per horse or $602,250 yearly for the 1,650 horses to be maintained on the first sanctuary.[2] A closer look, however, shows that this payment does not fully cover the costs required to operate the sanctuary.

First, the $1 per day per horse was not based on an analysis of sanctuary costs; rather, it was based on an assumption that sanctuary costs would be less than the cost of maintaining a horse on a contract feed lot. During the first year of the sanctuary's operation, this assumption proved to be conservative, and IRAM subsequently requested that the rate be increased to $1.50 per horse per day, which would bring BLM's yearly payment to over $900,000. During the first year BLM also paid for some additional expenses incurred. For example, BLM paid $9,000 for emergency veterinary treatment to control an internal parasite outbreak, bought a squeeze chute for hoof trimming and worming which cost $10,850, and paid $4,752 for supplemental feed for horses delivered in poor health. IRAM continued to request rate increases and additional payments from BLM as recently as November 1989. As of February 1990, BLM plans to revise its agreement with IRAM to increase the $1 a day fee to an effective payment of about $1.35, bringing the annual payment to $883,000.

These additional costs incurred to date may presage even higher costs in the future. In particular, BLM may have to routinely pay for supplemental feed for the horses because the land cannot support them. Much of the land within the sanctuary is leased from the Rosebud Sioux tribe. Under federal law, Interior's Bureau of Indian Affairs is responsible for establishing the land's carrying capacity, and the agency's March 1989 assessment concluded that the land could support only 824 horses for 7 months without supplemental feeding. Since IRAM has refused to accept fewer horses, the future cost of providing supplemental feed may increase substantially.

---

[2]Under the memorandum of understanding, IRAM is designated as an agent for the state of South Dakota which is identified as the provider of the sanctuary services. As of February 1990, the capacity of the South Dakota sanctuary system is 1,800 horses.

## Achieving Financial Independence From BLM May Never Be Possible

Although BLM expected each sanctuary to be financially self-supporting in 3 years, this does not appear feasible at least for the prototype sanctuary established in South Dakota. IRAM's president stated that to be self-sufficient, IRAM needed to raise $7.5 million. As of April 1989, however, IRAM had received less than $16,000 in individual donations and did not have any corporate donors, which the president considered essential to the sanctuary's success.

The $16,000 is not enough to cover the principal and interest on a $194,000 loan IRAM obtained to purchase private land within the sanctuary, much less pay for the feeding and care of the horses and leasing land from the Rosebud Sioux tribe. IRAM has also contracted to buy more land within the sanctuary in 1991 at a cost of $1.4 million. If IRAM's fund raising is not successful, BLM will either have to assess the costs and benefits to continue financing the sanctuary beyond the 3 years envisioned or take back the horses.

## Halter Training Program Can Be Made More Cost-Effective

BLM's efforts to increase the adoptability of wild horses by gentling them in several state prisons has also experienced difficulties. Potential adopters generally prefer horses younger than 5 years of age because of the difficulty in changing the behavior of older horses. To increase their adoptability, BLM has executed cooperative agreements with the New Mexico and Colorado state prison agencies to have older horses (generally ranging in age from 5 to 9 years) gentled by inmates who halter train them.[3] However, because of inefficiencies built into the state programs, many of these horses remain at the prison facilities far longer than necessary, increasing costs and resulting in lost adoption opportunities.

BLM has not established standards for either the length of time the prisons should take to halter train a wild horse or for the number of trained horses the facilities should produce for the adoption program. Such standards would hold down costs for the program and assure an orderly supply of horses to facilitate adoption planning. While no contractual standard exists, BLM's New Mexico and Colorado state offices expect that 26 to 40 horses can be halter trained by each facility in 30 to 60 days. Our review showed that many horses remain at the prison facilities far beyond 30 to 60 days.

---

[3] BLM has similar agreements with Wyoming and California state prison agencies.

Chapter 4
Continuing Problems With Wild Horse
Disposal Activities

For example, as of December 1988, the average length of stay at New Mexico's Los Lunas facility was over 5 months, with 13 percent of the horses there for more than a year. Similarly, our examination of BLM's records for 29 halter trained horses sent for adoption from Colorado's facility in February 1989 showed that the average length of stay was over 9 months and that 10 horses had been at the facility for between 13 and 19 months.

Our review identified a variety of reasons why wild horses remain at the prison facilities for extended periods of time. For example, BLM's earlier cooperative agreement with the state of New Mexico called for 30 inmates to be available daily to work the horses. However, at the time of our visit early in 1989, there were only 10 to 12 inmates available to train up to three horses each. At times there was only one professional trainer to supervise the halter training by the inmates and to perform other duties such as supervising the care of the horses at the facility and construction work by the inmates. Moreover, in 1 year the state prison agency had fired four employees hired to run the program for various reasons, disrupting the pace if not the quality, of the training.

In late 1989, BLM and the state of New Mexico adopted a revised agreement that stipulates that two horse trainers will be at each facility to supervise training activities. However, BLM's new agreement has weakened the state's obligation to supply inmates to actually train the horses. Instead of the mandatory 30 inmates to work the horses on a daily basis, the state is now required only to provide "as many inmates as possible" to train horses. Further, no measurable goal for producing trained horses is stated; rather the state is required to "attempt to produce the maximum number of gentled and trained horses as their resources can support."

In Colorado, where 30 inmates were available to train the horses, some horses languished for over a year because BLM had no way of tracking their progress. We brought this problem to BLM's attention, and in August 1989 BLM's Colorado State Director informed us that they had inventoried all horses at the facility and that each was being individually tracked for training and care.

Although the reasons varied between the two states, we believe that provisions in earlier cooperative agreements created an incentive to keep the horses at the facilities for as long as possible. Although BLM eliminated obvious incentives in the revised agreements, the condition remains that BLM will pay each state on a per-day basis for each horse

regardless of how long the horses remain at a facility since the states are not required to process trained horses in a defined time period. In Colorado, even after the agreement was revised, the state continued to press for more horses in order to improve their revenues and provide opportunities for the inmates.

The inability to halter train the horses in a timely manner has also apparently resulted in lost adoption opportunities. According to adoption staff in BLM's Eastern States Office, to meet popular demand, many more halter trained horses are needed each month adoptions are held; however, they have not been able to obtain enough trained horses from the prison programs.

In New Mexico, until October 1989 BLM also guaranteed the state that the average actual number of horses available to be halter trained would not fall below 400 in any given month. BLM would pay the state $2 a day or about $60 a month for each vacant slot below the 400 horse minimum. For example, if the average actual number of horses for a given month was 300 or 100 short of the 400 horse minimum, BLM would pay the state about $6,000 ($60 times the 100 horse shortfall). BLM sent hundreds of horses younger than 4 years and older than 6 years to be halter trained. BLM's rule of thumb would indicate that the younger horses would be adopted without incurring the cost of halter training while the older horses would be destined for sanctuaries regardless of whether they have been halter trained. Sending horses to the prison facilities that were either too young or too old to have their adoptability increased by such training unnecessarily drove up program costs.

In addition to containing costs, BLM must take steps to assure that the horses are properly trained. BLM has not established agencywide criteria by which a horse can be determined to be halter trained or a strategy for ensuring compliance, choosing instead to leave both to the individual BLM state offices.

New Mexico defines a halter trained horse as one in good condition and, without resistance, can be approached and haltered, led with a rope, have its legs lifted for cleaning and hoof trimming, and groomed. Before a horse is released for adoption, both the trainer and a BLM inspector must certify that it meets this standard. Colorado's training manual states only that a completely halter trained horse is one that can be haltered and led without resistance. While the trainer says that he assures that horses are adequately trained before being released for adoption, BLM's Colorado State Office makes no such determination.

Although difficult to quantify, BLM adoption staff in the Eastern states perceive the quality of halter trained horses from New Mexico to be better than the quality of horses trained in Colorado. BLM's Eastern States Office stated that, although showing improved behavior, some horses from the Colorado facility were not gentle enough to be considered halter trained.

Inconsistencies in the degree of training and oversight by BLM could have legal ramifications. Although no problems have occurred to date, a BLM consultant has noted that improved consistency and oversight could reduce BLM's vulnerability to liability suits by adopters who are injured by wild horses presented by BLM as being halter trained.

## Alternative Disposal Options May Need to Be Considered

With BLM's fee-waiver program terminated and the long-term financial viability of sanctuaries in doubt, BLM may have to consider other horse disposal options in the future if its horse removals exceed the number that have historically been disposed of through BLM's Adopt-A-Horse program—about 4,600 horses a year between 1982 and 1989. In this connection, BLM is establishing an advisory board to examine a variety of issues aimed at enhancing program effectiveness. As this advisory board deliberates and develops its recommendations, it would be appropriate for BLM to have it examine the relative merits of several disposal options not currently in place.

One alternative would be to hold unadoptable wild horses long enough to sterilize and mark them (with brands or other techniques so they would not have to be rounded-up in the future) before returning them to their herd areas. In the past, BLM has cited a 1982 report by the National Academy of Sciences as basis for its conclusion that returning unadoptable wild horses to existing herd areas is not consistent with the "minimum feasible level" of management called for in the wild horse act.[4] However, in its fiscal year 1991 budget justification BLM states that, depending on ongoing research outcomes, sterilization may be worth considering. This alternative may be the most cost-effective alternative to sanctuaries if existing sanctuaries fail to reach financial self-sufficiency after 3 years. In the near future, BLM may have to assess the relative costs and benefits of continuing to pay the sanctuaries to keep the horses or sterilizing and returning the horses to the range.

---

[4]Wild and Free-Roaming Horses and Burros—Final Report of the Committee on Wild and Free-Roaming Horses and Burros, Board on Agriculture and Renewable Resources, National Research Council, National Academy Press, 1982.

Chapter 4
Continuing Problems With Wild Horse
Disposal Activities

The wild horse act also authorizes euthanasia of healthy wild horses if necessary to protect the range from overgrazing. This practice has subsequently been banned by annual appropriations language and has never been used. While currently banned, euthanasia nonetheless constitutes an option that could be reauthorized in the future and, therefore, should appropriately be examined as a measure of last resort.

## Conclusions

Problems with existing horse disposal options need to be addressed. With respect to BLM's halter training program, controls need to be put in place to ensure that only horses at trainable ages enter the training facilities and that horses remain in these facilities no longer than necessary. To do this, BLM needs to establish an average length of time required to halter train a wild horse and adhere to an age range for horses best suited for halter training. Payments to the states should be limited to only those horses that meet both these criteria. Adoptable younger horses should be sent directly to adoption.

BLM also must take steps to assure that horses offered for adoption are properly halter trained. To accomplish this, we believe a standard for determining that a horse has been halter trained as well as an inspection strategy to ensure that the standard is met would assist BLM in ensuring that a horse is properly trained before it is offered for adoption.

Finally, while private sanctuaries offer humane disposal of unadoptable horses, rising costs and the probable need for a long-term commitment of federal resources will require BLM to seek alternative disposal options for unadoptable wild horses removed from public rangeland. In this respect, several options including those allowed under current law (such as sterilization) and others that would require legislative action (including euthanasia) have been proposed but previously rejected for various reasons. As the viability of existing disposal options comes into question, it would be appropriate for BLM to reconsider the merits of these alternatives.

## Recommendations to the Secretary of the Interior

To reduce the costs associated with disposing of wild horses removed from public rangelands, we recommend that the Secretary of the Interior direct the Director of BLM to (1) establish an average length of time required to halter train a wild horse and an age range for horses best suited to be halter trained, and limit payment to the states to only those horses that meet both these criteria; (2) develop a standard for determining that a horse has been halter trained as well as an inspection