strategy to ensure that the standard is met before offering a horse for adoption; (3) send adoptable younger horses directly to adoption instead of sending them to prison facilities for training; and (4) consider a variety of disposal options for unadoptable horses not currently being used and, where necessary, make recommendations for congressional consideration.

## Agency Comments and GAO Response

BLM agrees with our recommendations and has taken various actions to implement them. Regarding the first and third recommendations, BLM is developing bureauwide guidance on prison training facility operations. The guidance will establish a desired training method for all facilities and estimate the period of time to train the wild horses. BLM also issued instructions in February 1990 to classify 5- to 9-year old horses for training. Younger horses are to be sent directly for adoption unless temporary holding at prison facilities is cost-effective. The prisons will not halter-train younger horses and will charge BLM only for feed and daily maintenance. We believe these actions are responsive to our first and third recommendations.

BLM also agrees with the second recommendation. Consistent standards for assuring the quality of halter training were adopted in the fall of 1989 for the Colorado and New Mexico facilities. Once similar standards are applied to the Wyoming and California facilities, we believe BLM will have fully responded to our recommendation.

Finally, BLM agrees with the fourth recommendation and expects to explore disposal options for unadoptable wild horses when the wild horse and burro advisory board convenes, as expected, in 1990. BLM believes that euthanasia is not an option worth considering in light of past history and public reaction opposing it. We concur with BLM's decision pending the board's recommendations.

Appendix I
# Comments From the Department of the Interior

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

MAY 03 1990

Mr. James Duffus III
Director, Natural Resources Management Issues
Resources, Community, and Economic
  Development Division
United States General Accounting Office
Washington, D.C. 20548

Dear Mr. Duffus:

Thank you for your letter of March 26, 1990, providing the draft of the proposed report entitled Rangeland Management: Improvements Needed in Federal Wild Horse Program (GAO/RCED-90-110). The Secretary has asked us to respond.

The enclosed response was prepared by the Bureau of Land Management (BLM), which is responsible for administration of the wild horse program. As the response demonstrates, the BLM has already taken or is initiating steps to remedy most of the problem areas identified in the draft report. While agreeing with many of the report's recommendations, BLM believes that it also reflects some common misunderstandings about the program and has provided clarification on these points under the heading "General Comments."

The Department of the Interior is committed to administering the Wild Free-Roaming Horse and Burro Act humanely and efficiently. The recommendations in this audit will help us to meet that commitment more effectively in the future. If you have any questions about the response to the draft audit, please call Mr. John S. Boyles, Chief of BLM's Division of Wild Horses and Burros, at 653-9215.

Sincerely,

Deputy Assistant Secretary – Land and
         Minerals Management

Enclosure

Appendix I
Comments From the Department of
the Interior

The Bureau of Land Management's Response to
Rangeland Management: Improvements Needed in Federal Wild Horse Program
(GAO/RCED-90-110)

The General Accounting Office (GAO) recommendations to the Secretary of
the Interior are underlined below. Each recommendation is followed by the
response of the Bureau of Land Management (BLM).

<u>Expeditiously develop carrying capacity and range condition data in wild horse herd areas</u>. (p. 32)

Now on p. 27.
See p. 27.

We agree that the carrying capacity and range condition of herd areas
should be established expeditiously. A recent ruling by the Interior
Board of Land Appeals (IBLA) confirms animals should be removed whenever
current resource data shows that the present level of animals is
inconsistent with attainment or maintenance of "a thriving natural
ecological balance" as required by the Wild Free-Roaming Horse and Burro
Act (Act). The BLM recognizes the need to accelerate efforts to collect
current resource data. Where current data show that a thriving natural
ecological balance is being threatened or not being attained, excess
animals will be removed expeditiously.

<u>In locations where this data indicates that overgrazing is occurring, remove wild horses and reduce the levels of authorized domestic livestock grazing in proportion to the amount of forage each is consuming and the amount of range damage each is causing</u>. (pp. 32-33)

Now on p. 27.
See p. 27.

We agree that overall forage usage within a herd area should not
exceed the level of forage production that can be sustained. However,
we disagree with the implication that adjustments depend solely on
carrying capacity data and that they must be carried out proportionately.

There are other reasons requiring removal of wild horses or burros
even when carrying capacity information is not available or there is no
overgrazing. The Act, for example, requires removal of wild horses and
burros from private lands when the landowner requests it. Because of
several challenges to actions by the BLM over the years, judicial and
administrative decisions have established additional removal criteria.
Reasons for removals not based on a "thriving natural ecological balance"
include:

(1) Animals expand outside herd area boundaries.
(2) Animals stray onto private lands and removal is requested by
    the landowner.
(3) Animals' lives are endangered by an emergency, e.g., drought,
    disease, etc.
(4) Animals are part of a research program.
(5) Animals must be removed pursuant to a court order.
(6) Animals must be removed because of overriding provisions in
    other legislation, e.g., the Endangered Species Act.

Appendix I
Comments From the Department of
the Interior

2

In the future we expect that factors such as the Endangered Species Act will require removal of animals even when there is no overgrazing as the term is normally used. Removals will continue on a significant number of herd areas for the reasons listed above irrespective of whether the carrying capacity has been established.

For purposes of our comments, removal and adjustment only refer to situations where the appropriate management level (AML) is to be changed. We will exclude from consideration removal of wild horses done solely for the purpose of removing the excess animals due to herd growth caused by reproduction. While both situations require removal of animals, making adjustments in the number of animals to achieve a new AML will likely require a revision or amendment of land use plans. Removal of animals to reduce the population to a previously determined AML only requires data to show that the number of animals on an area is inconsistent with maintaining a thriving natural ecological balance.

We also disagree with the recommendation that adjustments in use be made in proportion to the forage each is consuming and the amount of damage each is causing. In most herd areas, livestock, wildlife, and wild horses and burros use the same areas, often during the same seasons. With a livestock/wild horse diet similarity of over 90 percent, it is impossible in most areas to determine which animal is overgrazing or causing the "damage." Almost always, damage is the result of the combined effect of all of the grazing species on an area. If reducing the grazing use were the only or preferable tool for undoing the damage, then a proportionate reduction would probably succeed.

Often, however, less drastic tools may be employed to accomplish resource improvement. In most cases, the BLM attempts to determine what resource conditions are deficient and what grazing impacts are causing these conditions. If the condition is caused by one species, as is sometimes the case, management actions are developed to correct this condition. For instance, if on a herd area the primary forage species are deteriorating due to moderate overgrazing caused mostly by livestock, installation of range improvements, a change in grazing season, or installation of a grazing system which provides for periodic rest from grazing may be sufficient to improve the forage conditions. The same remedial actions in an area grazed only by horses or wildlife would be precluded because of statutory and practical problems. In these areas, reducing the number of animals allowed to graze may be the only option.

Unfortunately, many of the management options available for addressing livestock grazing problems are not appropriate or practical for addressing wildlife and wild horse and burro areas. As a result, on areas with both livestock and wild horses, a combination of the actions involving initiation of grazing systems and range improvements would be proposed to improve conditions in areas used by livestock and a reduction in numbers in areas used by wild horses. In this situation, a proportionate adjustment would not be necessary or appropriate.

Appendix I
Comments From the Department of
the Interior

3

Because of the variety of situations found on the public lands, we cannot support adjustment in levels of use made strictly in proportion to the amount of forage consumed and the amount of range damage each species is causing. However, we are committed to improving resource conditions where needed. To this end, the BLM will continue to use the land use planning and public input process as outlined in the Federal Land Policy and Management Act of 1976 for apportioning forage and to assure that subsequent management actions are practical and effective in solving local resource problems.

We believe that this response is sufficient to close out this recommendation.

<u>After initial population adjustments are made, conduct continued monitoring to maintain wild horse and domestic livestock population levels consistent with what the land can support.</u>  (p. 33)

Now on p. 27.
See p. 27.

The BLM concurs with this recommendation. Where grazing use by livestock, wildlife, and wild horses and burros is inconsistent with land use plans or will prevent attainment of "a thriving natural ecological balance," the BLM will make changes in grazing use. In furtherance of this commitment, we intend to place increased emphasis on resource monitoring and completion of herd management area plans. Depending on budget levels, this may require a shifting of resources from other parts of the program.

<u>Permanently rescind the regulations authorizing fee-waiver adoptions.</u>
(p. 40)

Now on p. 33.
See p. 33.

We agree with the objective of this recommendation, which is to "significantly reduce the likelihood that wild horses removed from public rangeland in the future will experience inhumane treatment and slaughter"; however, we are taking steps to achieve the objective through a different approach.

A proposed rulemaking to revise the existing regulation on "Supporting information and certification for private maintenance of more than 4 wild horses or burros" was published in the Federal Register on February 6, 1990 (55 FR 3989). This rulemaking will prohibit the use of power of attorney to adopt wild horses or burros when the adoption will result in the maintenance of more than 4 untitled wild horses or burros in one location. The section of the rules being revised (Section 4750.3-3) regulates approval of adoption applications where the applicant requests to adopt more than 4 animals per year or where more than 4 untitled adopted wild horses or burros are to be maintained in one location. The purpose of the rulemaking is to prohibit an individual from gaining control of more than 4 wild horses or burros by using one or more powers of attorney. Two comments were received on the proposed rulemaking, both favorable. The BLM expects this rulemaking to become final before the end of Fiscal Year (FY) 1990.

Appendix I
Comments From the Department of
the Interior

4

Most of the problems with fee waiver adoptions stemmed not so much from the waiver of the fee but from the large numbers of animals controlled by a single individual. Even at full fee, an individual gaining control of many wild horses could possibly make a profit after a year of care, depending on the market. By making it extremely difficult, if not impossible, for one individual to gain control of a large group of wild horses, the proposed rulemaking significantly reduces the profit motive for adoption.

The BLM prefers not to rescind the regulation authorizing the Director to waive the adoption fee. Even though fee waivers have been terminated by BLM and prohibited in the FY 1990 Appropriations Act, it is conceivable that at some future date the use of the fee waiver could be consistent with the objective of placing wild horses and burros in appropriate private care. For example, there could be situations where the Government might have a need for adopters for older or unsound wild horses and a wild horse or humane group might be willing to provide homes for the animals. Waiving the fee in such circumstances could be beneficial for the Government and for the animals.

We believe that publication of the final rulemaking will be sufficient to close out this recommendation.

<u>To reduce the costs associated with disposing of wild horses removed from public rangelands, we recommend that the Secretary of the Interior direct the Director of BLM to</u>

Now on p. 40.

<u>(1) [E]stablish an average length of time required to halter train a wild horse and an age range for horses best suited to be halter trained, and limit payment to the states to only those horses that meet both these criteria.</u> (p. 50)

See p. 41.

We agree with this recommendation and are working toward implementing it. The BLM's FY 1990 Annual Work Plan assigned the New Mexico State Office the lead role in developing Bureauwide guidance for operation of prison training facilities and a training course for prison facility horse trainers. The desired training method to be implemented at all prison facilities will be established and also the estimated period of time to train the animal. The BLM's Washington Office Instruction Memorandum No. 90-307 dated February 1, 1990, established the policy for classifying excess wild horses into three categories. Horses in the age group of 5 through 9 years old are classified for the prison training program. Horses on either side of this age spread will be shipped to an adoption center or to a sanctuary. However, since the holding facility in Bloomfield, Nebraska, closed early in FY 1990, we anticipate the need to hold some of these horses temporarily at the prisons. We will only be charged for the feed consumed and a daily maintenance cost for each animal maintained but not trained.

Appendix I
Comments From the Department of
the Interior

Now on p. 40.

See p. 41.

(2) [D]evelop a standard for determining that a horse has been halter trained as well as an inspection strategy to ensure that the standard is met before offering a horse for adoption. (pp. 50-51)

We agree with this recommendation. This topic was discussed at the BLM Wild Horse and Burro Workshop in Albuquerque, New Mexico, April 4-7, 1989. As a result, both the New Mexico and Colorado State Offices included similar requirements in amendments of the Cooperative Agreements with both States. In order for the BLM to accept a horse as halter trained, the following requirements must be met:

(a) The trainer is able to walk up to and halter the horse in a pen, with the horse remaining calm and offering limited avoidance.

(b) The horse can be led with slack in the lead rope.

(c) The trainer is able to pick up all four feet without significant resistance. Hooves can be cleaned and trimmed.

(d) The trainer is able to comb and brush the horse on the body, legs, and neck without significant resistance.

Both a BLM and a State prison employee will sign the training certification. These requirements are contained in an Amendment with the New Mexico prison system dated September 26, 1989, and Modification 04 with the Colorado prison dated November 30, 1989. These changes postdate the information in the last paragraph on page 47 of the draft audit report. Although we do not yet have a Bureauwide policy in effect, New Mexico and Colorado prisons now have consistent training standards and inspection certification.

Now on p. 41.

See p. 41.

(3) [S]end adoptable younger horses directly to adoption instead of sending them to prison facilities for training. (p. 51)

We agree with this recommendation. As indicated previously, Instruction Memorandum No. 90-307, dated February 1, 1990, established policy for classification of excess wild horses and burros. The age group of horses to be sent directly to adoptions is weaned horses through the age of 4. Horses age 5-9 go to the prisons for training. The Instruction Memorandum also gave the preparation facilities the option to send horses under the age of 5 to the prison to be held until an adoption event, if space is available and it is cost-effective. The prisons will not halter train these younger horses; they will be held and BLM charged for the feed consumed and for daily maintenance. The New Mexico and Colorado prisons charge a separate fee for each halter trained horse.

We believe that this response is sufficient to close out this recommendation.

Appendix I
Comments From the Department of
the Interior

Now on p. 41.

See p. 41.

(4) [C]onsider a variety of disposal options for unadoptable horses not currently being used and, where necessary, make recommendations for congressional consideration. (p. 51)

We agree with this recommendation. Many alternatives are being explored for the unadoptable horses--such as selective removals, fertility control methods, and use by underdeveloped countries. In a selective removal of excess animals, unsound horses and those 10 years of age and older are released back on the range. This approach can also be combined with fertility control treatments to reduce the rate of population growth of the free-roaming herds. The BLM believes that these management practices hold promise for reducing or eliminating the number of unadoptable wild horses removed from the range. Of course, the BLM will pay close attention to the effect of selective removals and fertility control on herd structure and population dynamics.

Now on p. 40.

On page 50, GAO states that "it would be appropriate for BLM to reconsider the merits of [sterilization and euthanasia]." Despite the provision in the Act for humane destruction of excess wild horses and burros for which there is no adoption demand by qualified individuals, we believe that past history and public reaction preclude euthanasia as an alternative worth considering.

The Wild Horse and Burro Advisory Board, which should be reestablished by the end of this fiscal year, will undoubtedly explore the subject of unadoptable horses. The BLM will wait for the Board's advice before considering any recommendations for congressional action.

Appendix I
Comments From the Department of
the Interior

7

General Comments

In addition to responding to the GAO's specific recommendations, the BLM
believes that some corrections or clarifications in other parts of the
text would be helpful. Problem areas from the text are underlined below,
followed by BLM's position or suggested changes.

1. Since program inception, BLM has rounded up, removed, and disposed of more than 80,000 wild horses from federal rangelands. (p. 1)

   Removals of wild horses since the beginning of the program total about 100,000.

2. This in turn led BLM to implement two mass disposal options that have resulted in either widespread inhumane treatment and commercial exploitation of the horses or committed the government to long-term financial responsibility for the removed horses' welfare. (p. 2)

   On page 2 and elsewhere, the report refers to "commercial exploitation" of wild horses adopted via the fee waiver program. The meaning of the phrase is quite clear in the context of the report, i.e., sale for slaughter of wild horses after title was conveyed to the adopters by the United States. However, the use of this phrase in this sense can be somewhat confusing since "commercial exploitation" has a different meaning as defined in BLM's wild horse regulations at 43 CFR 4700:

   "(c) 'Commercial exploitation' means using a wild horse or burro because of its characteristics of wildness for direct or indirect financial gain. Characteristics of wildness include the rebellious and feisty nature of such animals and their defiance of man as exhibited in their undomesticated and untamed state. Use as saddle or pack stock and other uses that require domestication of the animal are not commercial exploitation of the animals because of their characteristics of wildness."

   The regulatory definition of commercial exploitation applies to animals considered wild horses and burros under the Wild Free-Roaming Horse and Burro Act, not to titled animals, which according to the Act lose their status as wild horses and burros.

   A 1987 court ruling enjoined BLM from transferring title to adopted animals in cases where the adopter has at any time expressed an intent to use the animal for commercial purposes after the passage of title. Elsewhere in the court decision, the expression "put to commercial use" appears. Several other variations on these phrases are used in the court ruling, including "commercially exploited." The court does not define what is meant by the phrase "commercial purposes" or any of the other phrases containing the word "commercial."

   In an adoption handbook released in December 1989, BLM defines commercial purposes as follows:

See p. 2.
See comment 1.

Now on p. 3.
See comment 2.

Appendix I
Comments From the Department of
the Interior

Commercial purposes include slaughtering the animal or selling
it for slaughter and using a wild horse or burro because of its
characteristics of wildness for direct or indirect financial gain.

When the GAO report uses "commercial exploitation," it is actually
referring to sale of wild horses after titling. For clarity, the BLM
suggests that the GAO use the language of the court ruling, that is,
"commercial purposes."

3. <u>Domestic livestock of about 4.2 million vastly outnumber the 42,000 wild horses currently on federal rangelands</u> . . . . . (p. 2)

Now on p. 24.

See comment 3.

While we do not disagree with these figures, their usage certainly
gives a mis-impression of the actual relationship between the
number of livestock and wild horse and burro numbers on the public
lands. By law, wild horses are limited to the areas where they
existed in 1971 (about 34 million acres of BLM-administered land).
The 4.2 million livestock cited are found on 170 million acres of
rangeland.

A more valid comparison between these species would compare forage
consumption only on herd management areas where both types of animals
occur. When considering these areas, the relative difference in
livestock and wild horse use is not nearly so disproportionate.
For instance, in Nevada which has almost 75 percent of the wild
horses, an estimated 40 percent of the total forage available for
wild horses and livestock in herd areas is used by wild horses.
The remaining 60 percent is used by livestock. (See analysis in
Attachment 1.)

4. <u>Wild horses on the western range are descended from horses brought to the North American continent by Spanish explorers in the 16th century</u> . . . . . (p. 8)

Now on p. 8.

See comment 4.

This statement reflects a popular sentiment but one that does not
accord with the conclusions of the scientific community. See quotes
below:

> "Contemporary North American wild horses are variously claimed,
> depending on the claimant and the locale, to be the wild-mustang
> descendants of domestic horses introduced by the Spaniards in the
> sixteenth century, or of miscellaneous cavalry mounts, work
> horses, and saddle animals escaped or abandoned more recently."
> (National Research Council, <u>Final Report of the Committee on Wild and Free-Roaming Horses and Burros</u>, 1982)

> "Dendrograms constructed using pairwise comparisons of
> Nei's distance measurements (D) for the domestic breeds and
> the wild horse populations substantiate anecdotal accounts of the
> origins of Great Basin horses from draft horses, saddle horses of
> American breed origin and Spanish Barbs." (Ann T. Bowling, <u>Wild Horse Parentage and Population Genetics</u>, Final Research Report to
> United States Department of the Interior, Bureau of Land
> Management, January 15, 1988, p. 11.)

9

The BLM suggests rewording the GAO statement along the lines of the sentences below:

> Spanish explorers brought horses to the North American continent in the 16th century. Early horse herds on the western range were composed of horses escaped from or released by the Spanish or Indians who had acquired horses.

5. **In 1985, the Congress authorized BLM to accelerate the removal of wild horses and burros from public rangelands.** (p. 12)

Now on p. 11.

See comment 5.

The BLM suggests that the word "authorized" be replaced with "directed." The President's budget submitted to Congress for FY 1985 requested $5.08 million for the wild horse and burro program and proposed the removal of less than 6,000 animals. Congress increased the funding by $11 million and directed BLM to remove 17,142 excess animals.

6. **In fiscal year 1990, 145 full-time employees were employed to carry out the wild horse and burro program in BLM headquarters and field offices.** (p. 13)

Now on p. 12.

See comment 6.

We suggest rewording as follows:

> In FY 1990, 145 full time equivalents were expected to be available to carry out the wild horse and burro program in BLM headquarters and Field Offices. A full time equivalent is one person working for a year. The actual number of employees working in the program is considerably larger because the majority of employees in the wild horse and burro program also work in one or more other program areas.

7. **To evaluate the treatment of wild horses removed from the range we focused on BLM's fee-waiver adoption program.** (p. 22)

Now on p. 19.

See comment 7.

The BLM believes that by focusing on the fee-waiver program, GAO only evaluated the treatment of wild horses adopted under fee waivers. The treatment of excess horses placed through this segment of the adoption program is not necessarily indicative of the treatment of all excess wild horses. About three-quarters of all wild horses removed from public lands were placed in private care without fee waivers.

8. **[BLM's removal] decisions have reflected either the desire to achieve perceived historic wild horse population levels or deference to advisory groups largely comprised of livestock permittees.** (p. 24)

Now on p. 21.

See comment 8.

This statement reveals a misunderstanding of how BLM arrives at appropriate management levels (AML's) and, subsequently, the decision to remove excess animals. The BLM uses the land use planning process to arrive at AML's for individual herd management areas. Advisory groups "largely comprised of livestock permittees" are certainly among the many groups consulted as part of the planning process.

10

However, to intimate that theirs is the only voice heard is to misrepresent how the process works. There are numerous opportunities for public input provided prior to final decisions, and wild horse interest groups--along with other affected interests--routinely participate in the planning process. Provisions for public participation are contained in BLM's planning regulations at 43 CFR 1610.2.

The BLM has no desire to achieve perceived historic levels, but is instead committed to managing appropriate numbers as identified through the planning process. Nonetheless, there are sound reasons why the planning process could not be expected to arrive at a number many times larger than the population that existed in 1971. The Act prohibits the BLM from managing wild horses in areas where they did not exist in 1971. Wild horses, like most wildlife species, expand their ranges when populations increase. Because of this natural phenomenon and the prohibition on management of the animals outside their 1971 areas, it is not legally possible to manage a total population much greater than the population that existed in 1971.

The Act also requires removal of wild horses from private lands when the private landowner requests it. Many of the herd areas in existence in 1971 have private water sources or contain significant tracts of intermingled private lands. Private landowners have asked the BLM to removal wild horses or burros from many of the these tracts. Under these circumstances, it is not possible to manage populations of wild horses or burros; accordingly, the land use plans required removal of all of the wild horses or burros from a number of herd areas.

Now on p. 21.

See comment 9.

9. <u>Removing more horses than is necessary wastes federal funds, removing less than is warranted by range conditions contributes to continued resource deterioration</u>. (p. 25)

The BLM would add that removal of "less than is warranted by range conditions" also increases Federal expenditures because future removals and management costs will be greater as a result of increased population and high rates of reproduction.

Now on p. 22.

See comment 10.

10. <u>One difficulty facing BLM in establishing carrying capacities for wild horses is distinguishing among forage consumption by species.</u> (p. 25)

We agree distinguishing among forage consumption by species (wild horses, livestock, and wildlife) is difficult, particularly when all species use the same area and during the same periods of the year. Distinguishing use between livestock and wild horses in most situations is virtually impossible because of similar diets, dentition, and grazing methods. However, we disagree that this problem necessarily creates difficulty in establishing a carrying capacity.

Appendix I
Comments From the Department of
the Interior

11

Over the years, the BLM has used two different methods to determine carrying capacity. Because of the limitations of a one-time survey in establishing carrying capacities, the BLM switched several years ago to a policy of monitoring to establish carrying capacities. The primary requirement under this approach is maintenance of a fairly stable and known level of grazing use. Under these conditions, monitoring the level (percent utilization of key forage species) of grazing use by all species over a period of 3 to 5 years, it is possible to determine whether the overall level of grazing use is correct. This information can also be used to establish the total amount of the needed adjustment in use by all ungulates when use is excessive or there is a surplus. However, these studies cannot be used to determine how much each species' grazing use should be adjusted.

Adjustments of use on the public lands, particularly when those uses involve a re-allocation of resources, have a number of legal, environmental, social, economic, and political impacts. The evaluation of impacts and analysis of alternatives are quite complicated and should be subject to public scrutiny and comment. Consequently, the allocation of forage among animal species is more properly determined through the land use planning process.

11. **Further, we were not able to identify data to demonstrate where horse removals have materially improved the specific areas from which they have been removed.** (p. 28)

We question the GAO's underlying assumption here, that wild horse removals should or must materially improve the areas where removals occur. Normally wild horse removals are only made to reestablish a moderate level of grazing use. When this is the case, although the annual utilization of forage species will be reduced, this reduction will seldom result in a measurable improvement in range condition. Measurable changes in range condition normally require 5 to 10 years.

12. **It plans to adopt out 6,100 horses during the year, up about 200 from actual 1989 levels.** (p. 31)

Since 1989 horse adoptions totaled 4,325, the target of 6,100 for FY 1990 is an increase of 1,775, not 200.

13. **According to BLM, about 30 percent of the wild horses removed from the range are unadoptable due to age or physical imperfections.** (p. 41)

This figure was adjusted downward to about 20 percent recently when BLM expanded the age category for adoptable animals. Currently, horses sent to sanctuaries on the basis of age must be 10 or older.

.w on p. 24.
See comment 11.

Now on p. 26.
See comment 12.

Now on p. 34.
See comment 13.

Appendix I
Comments From the Department of
the Interior

---

### Analysis of Forage Use by Livestock and Wild Horses

The GAO report indicates that 4.2 million domestic livestock vastly outnumber the 42,000 wild horses currently on federal rangelands. This comparison implies that there is a drastic inequity between the amount of forage and resources allocated to wild horses and burros as compared to livestock. Although these levels are set in land use plans and arrived at with considerable public input and analysis of the social, economic, political, and environmental impacts, we understand that some interests do not agree with the allocation produced by this process.

However, the figures presented are an apples vs oranges comparison. The area occupied by the 4.2 million livestock is many times larger than the area legally available to WH&B's. A more valid comparison can be obtained by using data published in the FY 1989 Public Land Statistics and the latest census data for Nevada where most of the wild horses are found.

   Livestock Forage Acreage:  42,256,400 Acres

   Livestock Forage Consumption (1989):  1,860,900 AUM's

   Livestock Forage Consumption Rate:  $\frac{42,256,400 \text{ acres}}{1,860,900 \text{ AUM's}} = 24.3$ acres/AUM

Assuming the Livestock Forage Consumption Rate (24.3 acres/AUM) within herd areas is the same as the statewide average, the livestock forage consumption within herd areas can be calculated as follows:

   * $\frac{14,131,200 \text{ acres}}{24.3 \text{ acres/AUM}} = 581,530$ AUM's livestock use

Note: This calculation more than likely considerably overstates the livestock usage within herd areas. This rate of livestock use combined with the WH&B usage would result in an average forage utilization of 14.6 acres/AUM within Nevada herd areas.

   Wild Horse and Burro Acreage:  14,131,200 Acres

   WH&B Forage Consumption (1989):  12 months X 32,067 animals = 384,800 AUM's

Using this data, a more valid comparison between livestock and wild horse and burro use can be made on the areas where both are found.

   Total Forage Consumption:  384,800 AUM's + 581,530 AUM's = 966,330 AUM's

   $\frac{966,330 \text{ total AUM's}}{581,530 \text{ livestock AUM's}} = 60\%$ Livestock forage usage

   $\frac{966,330 \text{ total AUM's}}{384,800 \text{ WH&B AUM's}} = 40\%$ WH&B forage usage

\* Acreage of herd areas designated for long-term management of WH&B's (HMA's).

Attachment 1

Appendix I
Comments From the Department of
the Interior

The following are GAO's comments on the Department of the Interior's letter dated May 3, 1990.

## GAO Comments

1. BLM's report that 100,000 wild horses have been removed since the program's start in 1973 may overcount wild horse removals. In June 1989 BLM told us that, due to poor recordkeeping in the early years, separate data on wild horse and burro removals were not available for those years. Although using these data would add up to 100,000 animals removed since 1973, an unknown number of wild burros is included for 1973-79. Wild horse removals between 1980 and 1989 total about 80,000. We changed the report to reflect the time period when specific data exist on wild horse removals.

2. Phrases such as "commercially exploit" are widely used to concisely describe selling a wild horse for slaughter. Contrary to BLM's suggestion, the 1987 court ruling frequently refers to commercial exploitation. Further, BLM even used the phrase in its August 1987 instructions to field offices regarding the court ruling (for example, "Withhold title in case of any adopter who has expressed an intent to BLM to commercially exploit the animal(s)"). For conciseness, we use "commercially exploit" and similar phrases, rather than "commercial purposes."

3. In citing the total numbers of wild horses and domestic livestock on federal rangelands, we were not attempting to imply that wild horses and domestic livestock share range resources throughout the West. Instead, we cited the data to demonstrate that public lands overgrazing cannot be fully addressed by concentrating exclusively on wild horses.

We agree that specific comparisons between wild horse and livestock use can be made. However, BLM could not provide us such data specific to the herd areas we examined. Rather, BLM could only provide data on a resource areawide basis. These data show that wild horses consume much less than 40 percent of the available forage suggested by BLM in its comments. In the four Nevada resource areas we reviewed, wild horses consumed 19 percent of the available forage compared with 81 percent by domestic livestock.

4. The alternative language suggested by BLM as well as the quotes from other reports on the subject are entirely consistent with the presentation in our report. Accordingly, we have made no changes to reflect BLM's comments.

5. We revised the report to state that the Congress directed BLM to accelerate the removal of wild horses and burros in 1985.

6. We revised the report to state that 145 full-time equivalent employees were expected to carry out the program in fiscal year 1990.

7. We revised the report to state that we did not evaluate the treatment of wild horses and burros adopted under BLM's full-fee adoption program.

8. We do not agree with BLM's position that our statement reveals a misunderstanding about how BLM develops its appropriate management levels. We understand that wild horse levels are prepared as part of the land use planning process mandated by FLPMA. However, we do not believe that a level can be justified as representing a sound management decision merely because it is recorded in a land use plan. If a level is developed without regard to land conditions or wild horse range impact, its inclusion in the land use plan does not make it more useful or appropriate. In this connection, BLM provides no evidence to refute our finding (along with the finding of Interior's Board of Land Appeals) that wild horse levels are being established arbitrarily without a sound factual basis.

With respect to BLM's view that it is not legally possible to maintain wild horse numbers much greater than those existing in 1971, we have revised our report to clarify that the act limits wild horse management to herd areas where they were found at the time the act was enacted in 1971. However, we question BLM's underlying assertion, that removal decisions can appropriately be driven by the desire to achieve any historic population levels. As Interior's Bureau of Land Appeals has ruled, removal decisions must be based on data describing impact on range conditions. As we have demonstrated, such data does not currently exist.

We agree that the act requires BLM to remove wild horses from private lands if they have stayed there. However, none of the 46 herd areas we examined created this predicament. Almost all were isolated from nonfederal lands and removals were done to reach the appropriate management level, not because horses were straying onto private lands.

9. We revised the report to state that removing less horses than is warranted contributes to continued resource deterioration and potentially higher removal costs.

Appendix I
Comments From the Department of
the Interior

10. We revised our report to more clearly link the difficulty in distinguishing forage consumption among species to determining the impact of wild horses on range conditions, not determining carrying capacity.

We agree that public scrutiny and comment obtained in BLM's planning process provide important input in adjusting uses of the public lands. However, by developing and providing appropriate data on range conditions and where practical the relative impacts of different uses, BLM can help ensure that its final decisions are consistent with what the range can support.

11. Where wild horses were part of the overgrazing problem, one reason they have not resulted in apparent range improvements is because the removals have not been accompanied by needed reductions in domestic livestock grazing or more intensive livestock management.

12. We corrected the report to reflect that 4,325 wild horses were adopted in 1989.

13. We revised the report to reflect BLM's expanded age category for adoptable animals.

# Major Contributors to This Report

| | |
|---|---|
| **Resources, Community, and Economic Development Division, Washington, D.C.** | Charles S. Cotton, Assistant Director-In-Charge<br>Bob Robinson, Assistant Director<br>Carolyn Kirby, Evaluator-in-Charge<br>Dennis Richards, Evaluator |
| **San Francisco Regional Office** | David Moreno, Site Senior<br>Eddie Uyekawa, Evaluator |
| **Denver Regional Office** | Yvonne Rodriguez, Site Senior<br>Pamela Jo Timmerman, Evaluator |

Requests for copies of GAO reports should be sent to:

U.S. General Accounting Office
Post Office Box 6015
Gaithersburg, Maryland 20877

Telephone 202-275-6241

The first five copies of each report are free. Additional copies are $2.00 each.

There is a 25% discount on orders for 100 or more copies mailed to a single address.

Orders must be prepaid by cash or by check or money order made out to the Superintendent of Documents.

United States
General Accounting Office
Washington, D.C. 20548

Official Business
Penalty for Private Use $300

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100