```
"Ginger Kathrens" <taurusproductions@mail.com>
05/19/2008 11:10 PM
To
melissa_kindall@blm.gov
cc

Subject
Response to West Douglas EA

Please see attached letter from regarding the West Douglas EA. Thank you.
```

**ATTACHMENT TO E-MAIL**

Bureau of Land Management
White River Field Office
Attention: Melissa Kindall
220 East Market Street
Meeker, Colorado 81641

Dear Ms. Kindall;

On behalf of The Cloud Foundation and our thousands of supporters thank you for the opportunity to submit comments on EA CO-110 (WRFO) 4700 entitled "West Douglas Wild Horse Herd Area Removal". This is an unusual EA. It clearly does not comply with NEPA in that it reveals no data regarding range conditions or herd numbers. It indicates no monitoring of animals or of the forage and no inventorying of anything. Is this data available, and, if so, why was it not presented in this document?  At least this EA is somewhat consistent with earlier EA's for this herd as it remains short on facts supporting a removal of these beleaguered wild animals.

On page 2 you reference the 1997 decision in which horses were to be managed in North Piceance and West Douglas  in a range from 0-50 in order to improve range conditions. Yet, where is the data indicating what the range conditions were at a smaller and larger herd size?  Is this a contention of this EA—that removing the horses will increase the forage? Forage for what other species? Let me guess. . cattle?

After 1997, I recall that your office chose to manage wild horses in East Piceance only, indicating they would be easier to manage than horses in the rugged West Douglas Creek area. Now, you are anticipating removing the East Piceance wild horses as well due to intense oil and gas development. Your plan is transparent. BLM is systematically doing away with wild horses in the entire area even though the public remains opposed.

It appears you continue to curry favor with the livestock permittees in the area, wealthy and well-placed ranchers and business people who lobby to increase their bottom line at the expense of the hardy little West Douglas Creek wild horses.

The West Douglas Herd has been living free in what is now Colorado long before there was a Colorado. Written documentation of horses in this area exists as a result of the travels of the Fathers Escalante and Dominguez who traveled on foot from Mexico into the area in the 1770's. The West Douglas Creek

mustangs may be one of the oldest documented herds in the United States and for that reason alone deserve preservation as a link to our western heritage. This is a significant reason why Congress unanimously passed the Wild Horse and Burro Act in 1971.

The West Douglas horses are noted for their toughness, are dark in color and small in stature. They are known to resist life as domestic horses. Therefore, they are not ideal adoption animals. This is another reason to let them live free rather than subject them to captivity. And, does an adoption demand exist for the West Douglas horses? Doubtful. Removing them then is counter to the intent of the Wild Horse and Burro Act.

Beyond the illegality of the BLM planned removal of all the wild horses in this area, there are clear inhumane aspects to this plan which include rounding up wild horses in winter. Winter is brutal in the West Douglas Creek area and is an inappropriate time to be rounding up wild horses or stressing any wild animals. You allow for running the mustangs "only" 5 miles instead of 10 in a foot of snow or less. Please tell me if you would treat a domestic horse in this way? I doubt that any humane individual would contemplate such a cruel and dangerous act.

Round ups are inherently dangerous. I believe a mare and her foal were killed in 2006 during the last West Douglas round up and this was not in winter. Add the stress of winter and you really have a formula for disaster. You allow for no rounding up when it is 10 below. Horse people know that if it is cold, no horse should be strenuously worked if the temperature is below freezing, let alone 10 below!

Please reconsider this plan and come up with some acceptable alternatives that allow for this hard scrabble little herd to continue their life of freedom. I would appreciate a timely reply to my questions.

Thank you.


Sincerely,
Ginger Kathrens
Volunteer Executive Director
The Cloud Foundation
A Colorado 501(c)3
107 South 7th Street
Colorado Springs, CO 80905
719 633-3842

```
Michel PAILLARD NOULEZ <michel.paillard6@wanadoo.fr>
05/21/2008 01:38 PM
Please respond to
Michel PAILLARD NOULEZ <michel.paillard6@wanadoo.fr>


To
melissa_kindall@blm.gov
cc

Subject
wild cloud horses


From christine Paillard
41 Rue Luce de Lancivaj
F 02410 Saint Gobain
France
```

**ATTACHMENT TO E-MAIL**

Dear Friends of our Wild Horses;

The Cloud Foundation has long supported the preservation of the West Douglas Wild Horse Herd in western Colorado. BLM wants to totally remove this historic little herd and we have on going litigation to try to stop this action. Please take the time to read my letter to the BLM, which follows below. Then send an email or letter to oppose this awful decision which includes rounding up the horses in the dead of winter!

Comments are due by May 25.   Send your email to Melissa_kindall@blm.gov.



Thanks so much for helping us preserve our wonderful wild horses.

Happy Trails!

Ginger

_____

May 19, 2008

Bureau of Land Management

White River Field Office

Attention: Melissa Kindall

220 East Market Street

Meeker, Colorado 81641


Dear Ms. Kindall;

On behalf of The Cloud Foundation and our thousands of supporters thank you for the opportunity to submit comments on EA CO-110 (WRFO) 4700 entitled "West Douglas Wild Horse Herd Area Removal". This is an unusual EA. It clearly does not comply with NEPA in that it reveals no data regarding range conditions or herd numbers. It indicates no monitoring of animals or of the forage and no inventorying of anything. Is this data available, and, if so, why was it not presented in this document? At least this EA is somewhat consistent with earlier EA's for this herd as it remains short on facts supporting a removal of these beleaguered wild animals.


On page 2 you reference the 1997 decision in which horses were to be managed in North Piceance and West Douglas in a range from 0-50 in order to improve range conditions. Yet, where is the data indicating what the range conditions were at a smaller and larger herd size? Is this a contention of this EA—that removing the horses will increase the forage? Forage for what other species? Let me guess. . cattle?


After 1997, I recall that your office chose to manage wild horses in East Piceance only, indicating they would be easier to manage than horses in the rugged West Douglas Creek area. Now, you are anticipating removing the East Piceance wild horses as well due to intense oil and gas development. Your plan is transparent. BLM is systematically doing away with wild horses in the entire area even though the public remains opposed.


It appears you continue to curry favor with the livestock permittees in the area, wealthy and well-placed ranchers and business people who lobby to increase their bottom line at the expense of the hardy little West Douglas Creek wild horses.


The West Douglas Herd has been living free in what is now Colorado long before there was a Colorado. Written documentation of horses in this area exists as a result of the travels of the Fathers Escalante and Dominguez who traveled on foot from Mexico into the area in the 1770's. The West Douglas Creek mustangs

may be one of the oldest documented herds in the United States and for that reason alone deserve preservation as a link to our western heritage. This is a significant reason why Congress unanimously passed the Wild Horse and Burro Act in 1971.

The West Douglas horses are noted for their toughness, are dark in color and small in stature. They are known to resist  life as domestic horses. Therefore, they are not ideal adoption animals. This is another reason to let them live free rather than subject them to captivity. And, does an adoption demand exist for the West Douglas horses? Doubtful. Removing them then is counter to the intent of the Wild Horse and Burro Act.

Beyond the illegality of the BLM planned removal of all the wild horses in this area, there are clear inhumane aspects to this plan which include rounding up wild horses in winter. Winter is brutal in the West Douglas Creek area and is an inappropriate time to be rounding up wild horses or stressing any wild animals. You allow for running the mustangs "only" 5 miles instead of 10 in a foot of snow or less. Please tell me if you would treat a domestic horse in this way? I doubt that any humane individual would contemplate such a cruel and dangerous act.

Round ups are inherently dangerous. I believe a mare and her foal were killed in 2006 during the last West Douglas round up and this was not in winter. Add the stress of winter and you really have a formula for disaster. You allow for no rounding up when it is 10 below. Horse people know that if it is cold, no horse should be strenuously worked if the temperature is below freezing, let alone 10 below!

Please reconsider this plan and come up with some acceptable alternatives that allow for this hard scrabble little herd to continue their life of freedom. I would appreciate a timely reply to my questions. Thank you.

Sincerely,

```
 "Jeff Jeffredo" <jeep_n_jeff@earthlink.net>

05/22/2008 08:27 PM
To
<Melissa_Kindall@blm.gov>
cc
<Mona_Daniels@ca.blm.gov>
Subject
comments on EA CO-110 (WRFO) 4700 entitled "West Douglas Wild Horse Herd
Area Removal".



Hi,

I am writing this to let it be known that I support the comments of
Kathleen Hayden concerning the West Douglas Wild Horse Herd.

Wild horses ARE a part of OUR heritage!

Any real American's left!?

Jeff

Jeff Jeffredo
PO Box 697
Mecca, CA  92254
```

**ATTACMENT TO E-MAIL**


May 22, 2008
Coyote Canyon Caballos d'Anza
POB 236 Santa Ysabel, Ca. 92070
CCCDA@znet.com

Bureau of Land Management
White River Field Office
Attention: Melissa Kindall
220 East Market Street
Meeker, Colorado 81641

Dear Ms. Kindall;

On behalf of Coyote Canyon Caballos d'Anza, thank you for the opportunity to submit comments on EA CO-110 (WRFO) 4700 entitled "West Douglas Wild Horse Herd Area Removal".

The West Douglas Herd was native to Colorado prior to statehood as documented by 1770's Spanish exploration.  The West Douglas Creek Herd Area mustangs as one of the oldest documented herds in the United States  deserve preservation and maintenance as a link to our western heritage.

This unique Herd Area meets National Register Criterion "a" for its associations with the traditions, traditional culture, and traditional values of the equestrian American West, a significant pattern of development in American history.

Please explain how a SEC 106 compliance may be exempt from this gather under the NEPA process in accordance with the National Historic Preservation Act as well as NEPA under the Wild Horse and Burro Act?

The Federal Mandates for preservation, restoration, and maintenance of historic districts, re introduced species, and wild horses and burros overlaps jurisdictions including: The Wild Horse and Burro Act, National Historic Preservation Act (NEPA and 106 Compliance) and US Code Title 16 (Conservation.) The Federal Mandates are carried out in consultation with the wildlife agency of the State wherein such lands are located. Please provide all compliance documents in your possession.

Also, please provide data for monitoring of animals, forage and inventory of anything not presented in this document which is necessary and imperative to implement this gather.

In agreement with Ginger Kathren's statement that "Beyond the illegality of the BLM planned removal of all the wild horses in this area, there are clear inhumane aspects to this plan which include rounding up wild horses in winter. Winter is brutal in the West Douglas Creek area and is an inappropriate time to be rounding up wild horses or stressing any wild animals. " I would add that this inhumane treatment constitutes endangerment/abuse that well might result in death, clearly a criminal violation.

Bases on results, this removal plan is consistent with all others only in its NEPA violations that continue to endanger wild horse herds into extinction. Therefore

I urge you to halt this gather until you can provide a timely reply to my questions.

Thank you.

Sincerely,

Kathleen Hayden
Director Coyote Canyon Caballos d'Anza

----- Forwarded by Melissa Kindall/MEFO/CO/BLM/DOI on 06/05/2008 05:24 PM -----
Neil Relyea <neilrelyea@yahoo.com>
05/23/2008 02:11 AM
To
melissa_kindall@blm.gov
cc

Subject
"West Douglas Wild Horse Herd Area Removal"

Bureau of Land Management
White River Field Office
220 East Market Street
Meeker, Colorado 81641

ATTN: Melissa Kindall

Re: EA CO-110 (WRFO) 4700 "West Douglas Wild Horse
Herd Area Removal"

Dear Ms. Kindall:

I have been made aware of a proposed action to remove all wild horses in
the West Douglas Herd Area (WDHA) beginning this fall.

It is my understanding that the West Douglas Creek mustangs are one of the
oldest documented herds in the United States.

According to Ginger Kathrens, of The Cloud Foundation, written
documentation of horses in this particular area of northwest Colorado
dates back to the 1770s when the territory was under Mexico's rule.

My son-in-law's conquistador ancestors may have well ridden the ancestors
of these same horses.

But they are also a part of US history -- and it's a shame that instead of
preserving this link to our Western heritage, their genetic stock will be
scattered to the winds, if they survive entrapment and disbursement.

Although these horses may not have been in the area as long as the
dinosaurs were in northwest Colorado, it's a shame that they too will
become extinct (and expatriated) in our lifetimes.

And although this herd may have only been there for a few centuries, they
have become an integral part of the Colorado -- and public -- landscape.

These horses are a cultural, historical and genetically finite resource,
and while the plan for removal is meticulously comprehensive in its scope,
its execution would extinguish this genetic and historic treasure.

That a "no-action alternative" would be in non-compliance with the state
director's decision made last year -- who's to say he (or she) is
infallible?

How can he or she make a decision -- that overrides public interest -- without conscience?

In addition, plans to gather even in adverse winter weather conditions shows that the interest of the horses' immediate and long-term welfare and survival is not a priority.

I ask that the plan to remove the West Douglas Creek herd from its historic range be dropped immediately.

I also ask that acceptable alternatives be developed that would allow this herd to continue its existence in its current range -- and that they receive the proper respect and protection to ensure their survival for future generations -- both theirs and ours.

Sincerely,

Neil Relyea

**ATTACHMENT TO E-MAIL**

1346 Teakwood Avenue
Cincinnati, OH 45224
May 23, 2008

Bureau of Land Management
White River Field Office
220 East Market Street
Meeker, Colorado 81641

**ATTN: Melissa Kindall**

**Re: EA CO-110 (WRFO) 4700 "West Douglas Wild Horse Herd Area Removal"**

Dear Ms. Kindall:

I have been made aware of a proposed action to remove all wild horses in the West Douglas Herd Area (WDHA) beginning this fall.

It is my understanding that the West Douglas Creek mustangs are one of the oldest documented herds in the United States.

According to Ginger Kathrens, of The Cloud Foundation, written documentation of horses in this particular area of northwest Colorado dates back to the 1770s when the territory was under Mexico's rule.

My son-in-law's conquistador ancestors may have well ridden the ancestors of these same horses.

But they are also a part of US history -- and it's a shame that instead of preserving this link to our Western heritage, their genetic stock will be scattered to the winds, if they survive entrapment and disbursement.

Although these horses may not have been in the area as long as the dinosaurs were in northwest Colorado, it's a shame that they too will become extinct (and expatriated) in our lifetimes.

And although this herd may have only been there for a few centuries, they have become an integral part of the Colorado -- and public -- landscape.

These horses are a cultural, historical and genetically finite resource, and while the plan for removal is meticulously comprehensive in its scope, its execution would extinguish this genetic and historic treasure.

That a "no-action alternative" would be in non-compliance with the state director's decision made last year -- who's to say he (or she) is infallible? How can he or she make a decision -- that overrides public interest -- without conscience?

In addition, plans to gather even in adverse winter weather conditions shows that the interest of the horses' immediate and long-term welfare and survival is **not** a priority.

I ask that the plan to remove the West Douglas Creek herd from its historic range be dropped immediately.

I also ask that acceptable alternatives be developed that would allow this herd to continue its existance in its current range -- and that they receive the proper respect and protection to ensure their survival for future generations -- both theirs and ours.

Sincerely,

Neil Relyea
Neilrelyea@yahoo.com

"Julianne French" <julianne9@cox.net>
05/23/2008 07:57 AM
To
<Melissa_Kindall@blm.gov>
cc

Subject
public comment EA# CO-110-2008-052-EA

Attached are my public comments for the White River EA

Below is the letter, but you will have to print the documents to obtain
the attachment of the Dave Cattoor conviction.

May 23, 2008


BLM White River Field Office
220 East Market Street
Meeker, CO 81641

Re: EA# CO-110-2008-052-EA

Dear BLM,

This letter is to object to the proposed removal of 147 wild horses from
the West Douglas HMA. I also am opposed to using helicopter removals as
they are inhumane and a frequently used helicopter pilot and wild horse
gatherer, Mr. Dave Cattoor, was convicted of illegally hunting and sending
wild horses to slaughter (see attached conviction). It is malfeasance for
the BLM to continue to use Dave Cattoor, a convicted criminal, to perform
these services and it undermines the public trust.

The BLM claims the herd is too small to be genetically viable, but
Interior Board of Land Appeals just ruled that BLM could supplement herds
if they are too small.
The central focus of BLMs decision to revoke the West Douglas's federally
protected status stemmed from officials determining the 128k-acre habitat
is only capable of supporting 60 wild horses. BLM has decided this
population is too small to be naturally self-sustaining or genetically
viable. However Interior Board of Land Appeals just ruled that BLM could
supplement herds if they were too small.  I would suggest the BLM
reintroduce wild horses from the holding pens. Why should taypayers pay to
have horse removed and warehoused when they can live wild as the Wild
horse and Burro Act intended?

Only 4 herds remain out of 8 with a state "appropriate management level"
of 812 wild horses, which means wild horses are allowed 9,744 Animal Unit
Months (AUM) of forage per year.

For comparison purposes, the State of Colorado authorizes 219,664 head of
livestock annually totaling 573,918 AUMs of forage and their 2007
free-roaming elk population was estimated between 250,000 to 260,000 - elk
herds have been reported at 10-15% above population management objectives

for over 20 years. (2)

Just the White River Field Office alone, who authorized the irrevocable loss of the West Douglas Herd, doles out a generous 118,441 AUMs for exclusive livestock use totaling 41,478 head while the 60 wild horses that were considered too small to be genetically viable and therefore must be removed were issued 720 AUMs.

One of the main livestock allotments occurring in the West Douglas HMA, Twin Buttes, was re-authorized by BLM in 2005 to run over 3,900 head of cattle totaling 11,500 AUMs. The other main livestock allotment in the West Douglas HMA is controlled by Cripple Creek Cowboy Company, proud recipient of over $77k dollars in livestock subsidies between 1996-2006 (3) but public lands statistics reports showing how many cattle are being run on his allotments are mysteriously "unavailable".

Why can the Twin Butte livestock allotment, which spans 140k acres support 3,900 cattle but the West Douglas Herd Management Area, which spans 128k acres can only support 60 wild horses?

I would refer you to BLMs Code of Federal Regulation 43 CFR 4710.5(a) Closure To Livestock Grazing, which states: "If necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury, the authorized officer may close appropriate areas of the public lands to grazing use by all or a particular kind of livestock.

Sincerely,


Julianne French
9920 East Fort Lowell
Tucson, Arizona 85749


**ATTACHMENT TO E-MAIL**

BLM White River Field Office
220 East Market Street
Meeker, CO 81641

Re: EA# CO-110-2008-052-EA

Dear BLM,

This letter is to object to the proposed removal of 147 wild horses from the West Douglas HMA. I also am opposed to using helicopter removals as they are inhumane and a frequently used helicopter pilot and wild horse gatherer, Mr. Dave Cattoor, was convicted of illegally hunting and sending wild horses to slaughter (see attached conviction). It is malfeasance for the BLM to continue to use Dave Cattoor, a convicted criminal, to perform these services and it undermines the public trust.

The BLM claims the herd is too small to be genetically viable, but Interior Board of Land Appeals just ruled that BLM could supplement herds if they are too small.

The central focus of BLMs decision to revoke the West Douglas's federally protected status stemmed from officials determining the 128k-acre habitat is only capable of supporting 60 wild horses. BLM has decided this population is too small to be naturally self-sustaining or genetically viable. However Interior Board of Land Appeals just ruled that BLM could supplement herds if they were too small.  I would suggest the BLM reintroduce wild horses from the holding pens. Why should taypayers pay to have horse removed and warehoused when they can live wild as the Wild horse and Burro Act intended?

Only 4 herds remain out of 8 with a state "appropriate management level" of 812 wild horses, which means wild horses are allowed 9,744 Animal Unit Months (AUM) of forage per year.

For comparison purposes, the State of Colorado authorizes 219,664 head of livestock annually totaling 573,918 AUMs of forage and their 2007 free-roaming elk population was estimated between 250,000 to 260,000 - elk herds have been reported at 10-15% above population management objectives for over 20 years. (2)

Just the White River Field Office alone, who authorized the irrevocable loss of the West Douglas Herd, doles out a generous 118,441 AUMs for exclusive livestock use totaling 41,478 head while the 60 wild horses that were considered too small to be genetically viable and therefore must be removed were issued 720 AUMs.

One of the main livestock allotments occurring in the West Douglas HMA, Twin Buttes, was re-authorized by BLM in 2005 to run over 3,900 head of cattle totaling 11,500 AUMs. The other main livestock allotment in the West Douglas HMA is controlled by Cripple Creek Cowboy Company, proud recipient of over $77k dollars in livestock subsidies between 1996-2006 (3) but public lands statistics reports showing how many cattle are being run on his allotments are mysteriously "unavailable".

Why can the Twin Butte livestock allotment, which spans 140k acres support 3,900 cattle but the West Douglas Herd Management Area, which spans 128k acres can only support 60 wild horses?

I would refer you to BLMs Code of Federal Regulation 43 CFR 4710.5(a) Closure To Livestock Grazing, which states: *"If necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury, the authorized officer may close appropriate areas of the public lands to grazing use by all or a particular kind of livestock.*

Sincerely,

Julianne French
9920 East Fort Lowell
Tucson, Arizona 85749

CAROL C. FITZGERALD
CLERK

BY _____

DEPUTY

MAY 22  4 47 PM '92

RECEIVED
AND FILED

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA

THE UNITED STATES OF AMERICA,     )
                                  )
            Plaintiff,            )      CR-N-92-45-HDM(PHA)
                                  )
        vs.                       )      MINUTES OF THE COURT
                                  )
DAVID L. CATTOOR,                 )      DATE: May 22, 1992
                                  )
            Defendant.            )
                                  )
_____ )

PRESENT:  HONORABLE PHYLLIS HALSEY ATKINS   U.S. MAGISTRATE JUDGE

Deputy Clerk: Jeanne Lange     Reporter/Recorder: Oma Rose

U.S. Attorney by:  Jeffrey B. Setness

Counsel for Defendant:  Dennis (Mike) Evans

Pretrial Services Officer:  None Appearing

Probation Officer:  None Appearing

PROCEEDINGS: Entry of Plea of Guilty to Count 2 of Indictment filed
            March 11, 1992 and Sentencing

Defendant is present.

    The Court reviews the potential conflict of interest of Mr.
Evans' representation of co-defendant Clifford Heaverne.  The Court
finds there to be minimul conflict due to the circumstances.

    Government counsel states essential elements and provable
facts of crime charged.

    Court advises defendant of his rights and consequences of
guilty plea.

    Plea bargain set forth, all parties concur.

    Defendant pleads guilty to count 2 of Indictment filed March
11, 1992.

40

1  LELAND E. LUTFY
   United States Attorney
2  JOHN E. HAM
   Assistant United States Attorney
3  701 E. Bridger Avenue, Suite 800
   Las Vegas, Nevada  89101
4  (702) 388-6336

5

6

7               UNITED STATES DISTRICT COURT

8                    DISTRICT OF NEVADA

9                         -oOo-

10 UNITED STATES OF AMERICA          )   CRIMINAL INDICTMENT
                                     )
11              PLAINTIFF            )   CR-S-91- 64  LDG(LRL)
                                     )
12 VS                                )
                                     )   VIOLATION:  18  U.S.C.  §  371  -
13 RAYMOND D. YOWELL,                )   Conspiracy; 18 U.S.C. § 47 - Use of
   ALLEN MOSS,                       )   Aircraft to Hunt Wild Horses; 18 U.S.C. §
14 IAN D. ZABARTE,                   )   2 - Aiding and Abetting
   DAVE CATTOOR,                     )
15 CLIFF HEAVERNE and                )
   RICHARD HICKS                     )
16                                   )
                DEFENDANTS           )
17

18

19 THE GRAND JURY CHARGES THAT:

20                        **COUNT ONE**
                          Conspiracy
21

22
23 A.         **INTRODUCTION**

24            At all times material herein:

25            1.      The Duckwater Indian Reservation was designated an Indian Reservation

26 for the use and benefit of the Shoshone Indians by Proclamation of the Secretary of the

   Interior, dated November 13, 1940, pursuant to the Indian Reorganization Act of 1934 (Title

U.S. DISTRICT COURT
DISTRICT OF NEVADA
FILED

MAR 1 1 1992

CAROL C. FITZGERALD, CLERK

BY..............................DEPUTY

25, United States Code, Section 461 et. seq.). Said Proclamation particularly described and established the location and boundaries of the Duckwater Indian Reservation.

2.    The Reservation occupies approximately three thousand two hundred forty (3,240) acres within Nye County, Nevada, and has no wild, unbranded horses, mares or colts running at large thereon.

3.    The Secretary of the Interior through the Bureau of Land Management (BLM) administers the public land and ranges and their resources contiguous to the Duckwater Indian Reservation, pursuant to the Federal Land Policy and Management Act of 1976 (Title 43, United States Code, Section 1702 et seq.), and is responsible for the management and protection of wild, unbranded horses running at large on public land and range pursuant to the 1971 Wild, Free Roaming Horse and Burro Act (Title 16, United States Code, Section 1331 - 1340).

4.    The Western Shoshone National Council (hereinafter referred to as the "Council") is an assembly of Western Shoshone Indian communities, bands, organizations, tribes and governments with its principal office at Duckwater, Nevada. The Council is not itself a tribe nor is any land deeded to or held in benefit for the Council by any treaty, proclamation, or executive order of the United States.

5.    The Council consists of a chief, subchief, secretary-treasurer, and a representative from each of the member entities.

6.    The Western Shoshone Wildlife and Plant Resource Commission is an entity established by and which functions under the direction of the Council.

7.    **RAYMOND D. YOWELL** is a resident of Nevada and chief of the Council.

8.    **ALLEN MOSS** is a resident of Nevada, subchief of the Council and a commissioner for the Western Shoshone Wildlife and Plant Resource Commission.

2

1    9.    **IAN D. ZABARTE** is a resident of Nevada and commissioner for the

2  Western Shoshone Wildlife and Plant Resource Commission.

3    10.    **RICHARD HICKS** is a resident of Nevada.

4    11.    **DAVE CATTOOR** is a resident of Utah.

5    12.    **CLIFF HEAVERNE** is a resident of Nevada.

6    13.    The provisions of Title 18, United States Code, Section 47 (Use of

7  Aircraft or Motor Vehicles to Hunt Certain Wild Horses or Burros), and Title 16, United

8  States Code, Sections 1331 through 1340 (Wild Free-Roaming Horse and Burro Act) as

9  administered pursuant to 43 CFR Chapter 11, Sections 4720 through 4740.1 (October 1, 1989

10  Edition) govern the authorized use of helicopters to capture wild, unbranded horses, running

11  at large on public land or ranges. (Title 16, United States Code, Sections 1331 through 1340)

12    14.    On or about August, 1990, and continuing thereafter through on or about

13  December 2, 1990, in the State and Federal District of Nevada,

**RAYMOND D. YOWELL,**
**ALLEN MOSS,**
**IAN D. ZABARTE,**
**RICHARD HICKS,**
**DAVE CATTOOR and**
**CLIFF HEAVERNE**

17  defendants herein, did knowingly, willfully and unlawfully conspire, confederate, combine and

18  agree among themselves and each other to commit the following offense against the United

19  States, to wit:  to use an aircraft for the purpose of capturing and killing wild, unbranded

20  horses, mares and colts running at large on public land or range, in violation of Title 18,

21  United States Code, Section 47.

22  . . .

23  . . .

24  . . .

25  . . .

26

3

B.            **MANNER AND MEANS OF THE CONSPIRACY**

The manner and means by which the objectives of the foregoing conspiracy were to be accomplished included but were not limited to the following:

15.     It was part of the conspiracy that, at the request of the Council, **RICHARD HICKS** devised a plan which the Council adopted, to capture wild, unbranded horses running at large on public land or range, in part by using a helicopter and selling said horses for slaughter.

16.     It was further part of the conspiracy that the Council authorized that a contract be entered into for the services of a helicopter and pilot to be used in capturing said wild, unbranded horses.

17.     It was further part of the conspiracy that **IAN ZABARTE**, acting under the authorization of the Council, entered into a contract with **CLIFF HEAVERNE** and **DAVE CATTOOR** to obtain the services of a helicopter and pilot to be used in capturing said wild, unbranded horses.

18.     It was further part of the conspiracy that **RICHARD HICKS**, **DAVE CATTOOR** and others did act as a ground crew to aid and assist the helicopter operated by **CLIFF HEAVERNE**, in hunting, for purposes of capturing and killing, wild, unbranded horses running at large on the public land and ranges, which were herded onto and held at the Duckwater Indian Reservation.

19.     It was further part of the conspiracy that defendants did cause said wild, unbranded horses to be sold and shipped by truck to Great Western Meats in Morton, Texas, to be slaughtered and processed.

. . .

. . .

4

B.            **OVERT ACTS**

In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the District of Nevada:

20.    On or about August 4, 1990, the Council authorized **ALLEN MOSS** to negotiate with **DAVE CATTOOR** to obtain the services of a helicopter and pilot to round up wild, unbranded horses on public land and ranges.

21.    On or about August, 1990, **ALLEN MOSS**, on behalf of the Council, contacted **DAVE CATTOOR** and requested that **DAVE CATTOOR** enter into an agreement with the Council to provide a helicopter and pilot to assist in the round-up of wild, unbranded horses running at large in areas near the Duckwater Reservation.

22.    On or about August 10, 1990, **IAN D. ZABARTE**, on behalf of the Council and as Commissioner of the Western Shoshone Wildlife and Plant Resource Commission, signed an agreement with **DAVE CATTOOR** and **CLIFF HEAVERNE** to obtain the services of, in part, a helicopter and labor to "capture wild horses from the Duckwater range."

23.    On or about August 11 and 12, 1990, **RICHARD HICKS** and **DAVE CATTOOR** participated in and supervised a ground crew which assisted the helicopter piloted by **CLIFF HEAVERNE**, to hunt for purposes of capturing and killing wild, unbranded horses on public land and range and hold said horses in corrals on the Duckwater Indian Reservation.

24.    On or about August 13, 1990, **RAYMOND D. YOWELL, ALLAN MOSS** and **IAN D. ZABARTE** did instruct **RICHARD HICKS** to load onto trucks, to be shipped for slaughter to Great Western Meats in Morton, Texas, the wild, unbranded horses and mares . . .

5

held in corrals on the Duckwater Reservation, some of which had been captured with the assistance of a helicopter.

25. On or about August 13, 1990, **RICHARD HICKS** did order, supervise and assist in loading onto trucks said wild, unbranded horses and mares to be shipped for slaughter to Great Western Meats in Morton, Texas.

26. On or about August 15, 1990, **IAN D. ZABARTE** sent a telephonic facsimile instructing **Kathy Herns** of Great Western Meats in Morton, Texas, to process the wild, unbranded horses and mares shipped for slaughter to Great Western Meats in Morton, Texas, from the Duckwater Indian Reservation.

27. On or about December 2, 1990, **RAYMOND D. YOWELL** submitted a claim on behalf of the Western Shoshone National Council to the Bureau of Land Management, for costs incurred, including the use of a helicopter and labor, to gather, sell and ship "wild mustang horses in the Duckwater Area."

In violation of Title 18, United States Code, Section 371.

## COUNT TWO
### Use of Aircraft to Capture Wild Horses;
### Aiding and Abetting

28. Paragraphs 1 through 12 of this Indictment are incorporated and realleged as if fully set forth herein.

29. On or about August 11 and 12, 1990, in the State and Federal District of Nevada,

**RAYMOND D. YOWELL,**
**ALLEN MOSS,**
**IAN D. ZABARTE,**
**RICHARD HICKS,**
**DAVE CATTOOR and**
**CLIFF HEAVERNE**

6

defendants herein, did knowingly, intentionally and unlawfully use an aircraft to hunt, for the purpose of capturing and killing, wild, unbranded horses, mares and colts running at large on the public land and ranges, in violation of Title 18, United States Code, Section 47 and Title 18, United States Code, Section 2.

**DATED:** this _11_ day of March, 1992.

**A TRUE BILL:**

FOREPERSON OF THE GRAND JURY

LELAND E. LUTFY
United States Attorney

JOHN E. HAM
Assistant United States Attorney

7

AO 245 (Rev. 8/87) Judgment in a Criminal

# United States District Court

CAROL E. FITZGERALD
CLERK
BY M
DEPUTY

**DISTRICT OF** NEVADA    MAY 22  4 46 PM '92

UNITED STATES OF AMERICA

v.

DAVID L. CATTOOR
P.O. Box 289
Nephi, UT 84648

RECEIVED
AND FILED

**JUDGMENT IN A CRIMINAL CASE**

Case Number: CR-N-92-45-HDM(PHA)

(Name and Address of Defendant)

Dennis (Mike) Evans
Attorney for Defendant

**THE DEFENDANT ENTERED A PLEA OF:**

[X] guilty  ☐ nolo contendere] as to count(s) _two of the Indictment filed 3/11/92_ , and
☐ not guilty as to count(s) _____

**THERE WAS A:**
[X] finding  ☐ verdict] of guilty as to count(s) _two_

**THERE WAS A:**
[☐ finding  ☐ verdict] of not guilty as to count(s) _____
☐ judgment of acquittal as to count _____
The defendant is acquitted and discharged as to this/these count(s).

**THE DEFENDANT IS CONVICTED OF THE OFFENSE(S) OF:**

Use of Aircraft to Hunt Wild Horses in violation of Title 18, U.S.C.,
Section 47 and
Aiding and Abetting in violation of Title 18, U.S.C., Section 2

**IT IS THE JUDGMENT OF THIS COURT THAT:**

Defendant is fined in the amount of $500.00 and a Special Assessment Fee of
$10.00, payable immediately.
Defendant is placed on supervised probation for a period of one year with
a special condition that defendant shall not commit any offense in violation
of Bureau of Land Management law.

ENTERED & SERVED

MAY 2 7 1992

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY _____ DEPUTY

In addition to any conditions of probation imposed above, IT IS ORDERED that the conditions of proba-
tion set out on the reverse of this judgment are imposed.

AO 245 (Reverse)

## CONDITIONS OF PROBATION

Where probation has been ordered the defendant shall:

(1)  refrain from violation of any law (federal, state, and local) and get in touch immediately with your probation officer if arrested or questioned by a law enforcement officer;
(2)  associate only with law-abiding persons and maintain reasonable hours;
(3)  work regularly at a lawful occupation and support your legal dependents, if any, to the best of your ability. (When out of work notify your probation officer at once, and consult him prior to job changes);
(4)  not leave the judicial district without permission of the probation officer;
(5)  notify your probation officer immediately of any changes in your place of residence;
(6)  follow the probation officer's instructions and report as directed.

The court may change the conditions of probation, reduce or extend the period of probation, and at any time during the probation period or within the maximum probation period of 5 years permitted by law, may issue a warrant and revoke probation for a violation occurring during the probation period.

IT IS FURTHER ORDERED that the defendant shall pay a total special assessment of $ __10.00__ pursuant to Title 18, U.S.C. Section 3013 for count(s) __two__ as follows:

IT IS FURTHER ORDERED THAT counts __one of the Indictment__ are DISMISSED on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall pay to the United States attorney for this district any amount imposed as a fine, restitution or special assessment. The defendant shall pay to the clerk of the court any amount imposed as a cost of prosecution. Until all fines, restitution, special assessments and costs are fully paid, the defendant shall immediately notify the United States attorney for this district of any change in name and address.

IT IS FURTHER ORDERED that the clerk of the court deliver a certified copy of this judgment to the United States marshal of this district.

☐  The Court orders commitment to the custody of the Attorney General and recommends:

__May 22, 1992__
Date of Imposition of Sentence

_Phyllis Halsey Atkins_
Signature of Judicial Officer  Phyllis Halsey Atkins

__U.S. Magistrate Judge__
Name and Title of Judicial Officer

__5/22/92__
Date

## RETURN

I have executed this Judgment as follows:

_____
_____
_____

Defendant delivered on _____ to _____ at
                              Date

_____, the institution designated by the Attorney General, with a certified copy of this Judgment in a Criminal Case.

_____
United States Marshal

By _____
Deputy Marshal

CR-N-92-45-PHA                                    page 2
May 22, 1992

     Court accepts guilty plea, finding the plea made freely,
voluntarily and knowledgeable.

     Court finds factual basis for defendant's plea of guilty to
count 2.

     Sentence is imposed. (written order to follow).

11:45 a.m. Court adjourns.


                              CAROL C. FITZGERALD, CLERK

                              *Jeanne Lange*

                              By: Jeanne Lange, Deputy

```
Bob Schmidt <bob_dynaqi@hotmail.com>
05/26/2008 12:23 AM
To
<melissa_kindall@blm.gov>
cc

Subject
FW: Comments on the West Douglas Gather EA
```

Hi Melissa!!

The attached 7 pages are my comments.  I developed the comments as I progressed through the EA and the impacts section of the referenced 2005 EA.  I apologize for the resulting duplication, however, the duplication demonstrates the lack of clarity concerning the  grazing program and the Twin Buttes AMP.

Good Luck!!!

Please call if you have any questions.

Bob

**ATTACHMENT TO E-MAIL**

**May 25, 2008**

**To:        Melissa Kindall  -  White River Field Office - BLM  Colorado**

**From: Bob Schmidt**

**Subject:      West Douglas Wild Horse Herd Area Removal Comments**

**Thank you for the opportunity to comment on the Environmental Assessment relative to the removal of all the wild horses in the West Douglas Herd Management Area (HMA).**

**My assessment of the document finds it to be somewhat incomplete, and confusing.  I believe you have made a significant error by failing to write a full EA and incorporating by reference the 2005 EA with its stale information and confusing format.  In some cases, the write up in the 2005 EA has a single description relating to both alternative A (remove all the animals) and alternative B (manage a herd of up to 60 horses) which makes things very confusing.  With that said, I offer the following comments, first on the current EA, and later on the referenced material found in the 2005 EA:**

1. **Your plan conformance review (page 2) lacks reviews for conformance with Rio Blanco County Plans, and plans of Colorado State Government Agencies, specifically, and most relevant the Colorado Division of Wildlife.**

2. **On page 3 there is a heading for "Cultural Resources" with no text to support it.**

3. **On page 4, Under the heading of Threatened and Endangered Plants/Areas of Critical Environmental Concern" you state "Site specific mitigation measures prior to trap construction are noted below.", and no mitigation measures are in the document.**

4. **On page 4, bottom line, "With this rest, the removal of wild (continuing to page 5) use protected." What are you intending with this sentence and the remainder of the paragraph???**

5. **On pages 5 and 6 you discuss impacts to wildlife, but you limit your analysis to the physical work of catching horses, and you fail totally to discuss the impacts of removing the horses from the landscape. Under the heading of Water Quality you talk about more vegetation to protect the watershed. How will this more vegetation impact the wildlife??? Will it result in more deer? more elk? more of what species? less of what species? If there are more deer and/or elk, how does that fit with the CDOW species population goals?? Will it cause an overpopulation problem to be exacerbated?? This is also not in the referenced EA.**

6. **On page 6 under the heading Wild Horses, you describe removing 147 head; however, earlier you indicate that the removal will be a several year program. How many head do you anticipate removing in the first gather?? At this time there is a holdback on gather funds for fy-2008. How important is completing this gather, compared to other gathers, in the mind of the Field Office Manager, the State Director, and the Washington Office??**

7. **Since you are planning something in the way of a partial removal in the next gather cycle, whenever that might be, what is the anticipated priority of the subsequent gather efforts??  Specifically, gathering the last 20 to 30 horses in this HMA is more costly and time consuming than gathering horses elsewhere; thus, will funding be spent gathering the last few head of West Douglas horses, when money is needed to manage horses in the Spring Creek, Piceance, Sand Wash, and Book Cliffs herds, that is assuming that the dollar allocation is to be made by the Field Office Manager or the Colorado State Director???  In the broader picture, if gather money is to be allocated from Washington, what priority will removal of the last 20 to 30 head of West Douglas horses be compared to removal of horses in Nevada, Utah, Oregon, etc.???**

8. **Your discussion about wild horses fails to discuss the impact of complete removal of 147 head (or some portion there of) on the wild horse program.  Keep in mind that the West Douglas horses are not consider very good, or very pretty.  The adoption market is down as demonstrated by the fact that only 9 or 10 animals were adopted at the recent adoption in Denver, and that was from an offering of some trained animals with a good selection of color and structure.  (Two of the four Department of Corrections trained saddle horses did not get adopted.)  That adoption was well advertized and a special event was held to draw people to the site.  Additionally, the BLM's recent offering to contract for long term holding facilities received no bids.**

9. **Your document fails to discuss the impacts to the Oil and Gas industry/program.  If one assumes that the BLM has made any effort to manage the horses in the HMA, there must be stipulations that apply to preserving and protecting the horses and their habitat.  I am well aware that the leases predate horse management and would have no such stipulations.  However, the oil and gas program is managed day to day through a series of lesser authorizations such as Applications for Permit to Drill, Sundry Notices, and rights-of-ways for pipelines, roads, communication sites, etc.  What stipulations exist for protection of the wild horses and their habitat, and how will the oil and gas**

industry/program be impacted by removing all of the horses and making those stipulations moot??  Again, none of this is in the reference EA.

10. **Your document fails to discuss the impact of the removal on recreation. Specifically, you talk about a lot of helicopter usage, which you plan to limit for lactating elk, but you make no mention of the impacts to Colorado's hunters from helicopter operations.**

11. **Your document fails to discuss the impact of the removal of all of the horses on the livestock industry.  Like the oil and gas industry, the livestock industry has had restrictions and limits due to the presence of the West Douglas wild horses.  What are those restrictions, and what are the impacts of making those restrictions moot by removing all of the horses??**

12.  **The BLM's wild horse program is in an ever shrinking box. Money is currently being held back, preventing gathering of wild horses this year on a bureau wide bases.  This means that this year's foal crop is pushing many HMA's well above appropriate management levels (AML).  Long term holding facilities are full, and no one is willing to contract for new facilities.  The cost of gathering, hauling, processing, and holding horses in short term holding is ever increasing.   This situation is truly a disaster in the making.  The Wild Horse and Burro Act allows euthanization of animals.  Given this, some great minds in the Department of Interior must be thinking about euthanizing wild horses.  Therefore, I strongly suggest that you should add an alternative of euthanizing the West Douglas herd by shooting on site.  I know this is a delicate matter, but someone has to go first, and White River could be a pilot project if not for the whole 147 head, at least for the last 20 to thirty 30 head of uncatchables.   Looking at the full 147 head, I suggest that shooting should be limited to perhaps 25 to 30 head per three months, generally spread over as large an area as possible, so you do not have too many carcasses lying around at one time.  I can see some positive impacts for coyotes and the young deer and elk they prey on.   I can also see positive impacts to the wild horses because they would not have to suffer the stresses of gathering, transporting, processing, possible adoption, or**

possible euthanization when funding shortfalls require it at some future date.  A thorough analysis of this alternative by a highly quality multidisciplinary team may find benefits that do not appear on the surface, and make this alternative more acceptable than currently anticipated.

13.  What will be the impact to vegetation from the gather operation?? Gather contractors and livestock haulers move all over the west and have an opportunity to bring in all kinds of nasty noxious weeds.

14.  Having gone this far in looking at the EA, I reread one section and found that you have incorporated document CO-WRFO-05-083-EA into the document.  After considerable digging I found that document on your website.  It would sure be nice if there was a clear link from the current EA.  I protest this approach to preparing the current EA because the referenced document is out dated and very hard to follow, because Alternative A. is the only part that is relevant, and some sections are written to apply to both alternative A and alternative B.  An example of the out dated problem is found on page 47, "The majority of the horses in the herd would be place with adopters."  Based on the experience cited above, this is clearly a false conclusion.

15.  Under rangeland management it states that the current permitted livestock use would be maintained (9060 AUMS), and the Twin Buttes AMP would be the basis for livestock management.  This seems to imply that the status would not change and removing the horses would free up the 1700 AUMS (147 x 12) that the wild horses are now using for watershed and wildlife benefits.  However, in the vegetation section it states ". . . the Twin Buttes Allotment Management Plan <u>would be implemented.</u>"  This indicates to me that the Twin Buttes AMP has not previously been implemented.  Why has it not been implemented?? What is the specific logic that has delayed its implementation??  Are there legal actions that have prevented the implementation??  Since it has not been implemented, how do the forage allocations in the plan relate to the forage which should be freed up when the horses are removed??  Does the Twin Buttes AMP assume full allocation to

livestock of any increase in vegetation generated by removal of the horses?? Again I protest the incorporation of the 2005 EA. What is current??? How will implementation of the Twin Buttes AMP occur. What happens if the first removal only takes out 100 horses? What happens when the herd is down to the 20 to 30 head of uncatchables, and the priority is to fund the catching of horses elsewhere??? Given this, the vegetation section goes on to have a table that states there will be 2029 acres not achieving public land health standards for plant communities. Is this not due to the fact that all of the vegetation consumed by the horses has already be allocated to the livestock in the unimplemented Twin Buttes AMP???

16. The analysis on page 51 states. "Those acres not achieving the land health standards would be those adjacent to water sources on which livestock concentrate, and those communities in a depressed condition on which physical manipulation would be required for rehabilitation." This seems to imply that there are unacceptable impacts from livestock use in the HMA. What is BLM doing to bring the 2029 acres that are not achieving public land health standards under the alternative of removing all of the horses into a condition of achieving the standards?? How is this issue handled in the Twin Buttes AMP??

17. On page 53 under riparian you have lumped alternatives A and B and the paragraph has no meaning for the current EA. E.g. "No adverse impacts to riparian habitats have been documented or are expected, as a result of grazing use by wild horses." Please make a new document that does not use a reference to the 2005 EA.

18. The section on wilderness seems to understate the amount of helicopter usage over time as attempts are made to gather the uncatchables.

19. The section on geology and minerals is inadequate. Alternatives A and B are lumped. See number 9 above.

20. **Land Status and Realty Authorizations (page 57), again both alternative A and B are lumped and your referencing makes a mess.  Again, like in number 9 above, what current stipulations for all types of realty authorizations will become moot by removal of the horses, and how will that impact the landscape??**

21. **Wildlife, Big game (page57), third paragraph, "Horse removal and implementation of the Twin Buttes livestock grazing program . . ." implies that the Twin Buttes AMP has not been implemented.  Since that seems more and more to be the case, how many AUM's will become available for wildlife and watershed protection as a result of the horses being removed???  Where will any increased AUM's be located relative to wildlife (both big game and grouse) and watershed protection needs??**

22. **Grouse, page 58, will the implementation of the Twin Buttes AMP change the statement "Because cattle are removed by the first week of June . . . "??**

23. **Again suggest that you rewrite the document to forgo the referencing of the 2005 EA.  The wildlife section of the 2005 EA desperately needs editing.  It needs to make clear statements on impacts.**

24. **Socio-Economics, (page 66), starts as an all alternative discussion. Later it gets into an alternative specific discussion of costs which are outdated since the gather was to be done in 2007.   Costs have skyrocketed during the past six months, and adoption demand has dropped greatly.**

25. **The table on page 67 seems to confirm that the Twin Buttes AMP has allocated any new forage which will be generated by the removal of the horses to the Twin Buttes Ranching Operation.   If that is not the case, why would Alternative B result in the loss of 750 AUM's by the Twin Buttes Ranch for the small herd which would be authorized under that alternative???  This being the case, how will removing the horses**

generate the benefits attributable to additional vegetation for watershed, and wildlife since that vegetation is already allocated to livestock????

In summary, you need to rewrite the entire document not using the approach of referencing the outdated, confusing 2005 EA. You need to make a very clear the relationship to the current and future grazing programs and what happens to the forage that should be generated by the removal of the wild horses. Explain how and when you will implement the Twin Buttes AMP under all the possible scenarios of some wild horse remaining in the area. Given the history of the various attempts to remove all of the wild horses from the West Douglas HMA, before you proceed further, you need to establish funding priorities at all levels of the BLM so that it is clear how money will be allocated when the problem is the 20 to 30 uncatchables. If there are not intense commitments at all levels of BLM to gather all of the 20 to 30 uncatchables, this is a fairy tale, and BLM should void out the decision to remove all the wild horses. Additionally, the entire wild horse program is in trouble, and regardless of the anticipated extreme controversy, you must include an additional alternative of on site euthanization of the wild horses in the West Douglas herd.

Sincerely,


Bob Schmidt
303-234-0901

```
"Hilary Wood" <info@frontrangeequinerescue.org>
05/26/2008 12:37 PM
To
<melissa_kindall@blm.gov>
cc

Subject
West Douglas EA comments
```

Please find attached our comments regarding the planned removal of the West Douglas wild horse herd.


**ATTACHMENT TO E-MAIL**


### *FRONT RANGE EQUINE RESCUE*

May 25, 2008

Bureau of Land Management
White River Field Office
ATTN:  Ms. Melissa Kindall
220 East Market Street
Meeker, CO 81641

Dear Ms. Kindall:

Front Range Equine Rescue and its supporters appreciate the opportunity to respond to the EA CO-110 (WRFO) 4700 titled "West Douglas Wild Horse Herd Area Removal".  After review of this document, we believe it is in noncompliance with NEPA because no data is shown regarding range conditions or the herd numbers.  There appears to be no information regarding monitoring of the horses, of available forage or inventory data.

If conditions were to have improved with respect to available forage by the referenced 1997 decision, where are the facts to show whether or not a larger vs. smaller horse herd size achieved  this?  What impact has been shown by cattle grazing or other foraging animals in the herd area?

The West Douglas herd has existed in Colorado before it was even recognized as a state.  This herd is a tremendous part of our history.  Preserving them should be tantamount to the special interests and pressures of wealthy ranchers and the barrage of oil/gas development interests. Public opinion is very strong in opposition to further removal and zeroing out.  The 1971 Wild Free Roaming Horse and Burro Act should take precedence over any current plans and be adhered to.

It is also extremely inhumane to even consider winter round up of any horses – below freezing temperatures and the likelihood of deep snow can only lead to massive stress, injuries and death to any horses.  No domestic horse, any animal or even human athlete would be forced (or asked to attempt) such conditions.

We are more than happy to work together to come up with viable solutions to future management instead of perceived mismanagement of this very special herd of horses.

Sincerely,


Hilary T. Wood, President/Founder


*PO Box 307, Larkspur, CO 80118*
*719-481-1490*
*Email: info@FrontRangeEquineRescue.org*
*www.frontrangeequinerescue.org*

"Chris Heyde" <chris@awionline.org>
05/27/2008 08:28 AM
To
<melissa_kindall@blm.gov>
cc
"Andrea Lococo" <andrea@awionline.org>
Subject
Re: West Douglas Wild Horse Herd Area Removal Environment Assessment,
CO-110-2008-052 EA

Dear Ms. Kindall:

Please find attached comments from the Animal Welfare Institute regarding
the West Douglas Wild Horse Herd Area Removal Environment Assessment,
CO-110-2008-052 EA.

In addition to the attached PDF email version, a hard copy has been
mailed.

Sincerely,
Chris

********************
Christopher J. Heyde
Deputy Director, Government and Legal Affairs
Animal Welfare Institute
PO Box 3650
Washington, DC  20027
Tel:  (703) 836-4300 ~ Fax: (888) 260-2271


**ATTACHMENT TO E-MAIL**



# Animal Welfare Institute

P.O. Box 3650 Washington, DC 20027-0150  www.awionline.org
telephone: (703) 836-4300  facsimile: (703) 836-0400

<u>By Electronic and U.S. Mail</u>

May 27, 2008

Ms. Melissa Kindall
Range Technician
Bureau of Land Management
White River Field Office
220 East Market Street
Meeker, CO  81641

<u>Re: West Douglas Wild Horse Herd Area Removal Environment Assessment, CO-110-
2008-052 EA</u>

Dear Ms. Kindall:

On behalf of the nationwide membership of the Animal Welfare Institute (AWI), including
our members and supporters who reside in the state of Colorado, please accept the
following comments on ***West Douglas Wild Horse Removal Plan Environmental
Assessment, CO-110-2008-052-EA*** (EA)

Let me preface our comments by reaffirming AWI's vehement opposition to the Bureau
of Land Management's (BLM) decision to remove all wild horses from the West Douglas
Herd Area (WDHA) -- in other words, to "zero out" an entire wild horse herd. The BLM's
response to AWI's September 30, 2008 protest was unsatisfactory.  Many of the issues
we raised in our protest were either not addressed whatsoever or were addressed
inadequately, thus opening the door for further legal challenge in order to save one of
the few remaining wild horse herds in the state of Colorado.  The current proposed
action is an abdication of the BLM's legal and ethical responsibility and clearly betrays
the inherent bias that routinely infects the agency's decisions to manage for other
"multiple uses" at the expense of the welfare, and in this case like so many others, the
very survival of an entire wild horse herd.  Sadly, this decision is one more example of
the agency's peculiar version of the popular three "Rs."  Instead of reduce, reuse and
recycle, the BLM elects to reduce, remove and reassure.  The first two prescriptions are
self-explanatory.  The third has required a slick public relations effort to try to convince
the American citizenry that its wild horses and burros are faring well despite massive
removals, dramatic reductions in available habitat and a refusal by the very agency
responsible for their protection to acknowledge the historic, cultural and ecological
significance of these animals in the wild.

According to the cover letter accompanying the current EA, the purpose of the EA is to analyze the proposed implementation of the affirmed decision for the total removal of wild horses within and outside the West Douglas Herd Area (WDHA). However, the EA is vague, deficient, contains conflicting information and fails to meet even minimal requirements mandated by the National Environmental Policy Act (NEPA). More pointedly, the EA cursorily analyzes only two alternatives: the Proposed Action and a "No Action" Alternative, the latter of which, although required by NEPA, is admittedly "in non-compliance with the State Director's decision of October 10, 2007, which by regulation (43 CFR 1610.5-2(b)) is the final decision of the Department of Interior." (EA, p.2) Hence *only one* viable alternative is analyzed -- viz., the Proposed Action, thus pre-determining the outcome of the EA.

The Council on Environmental Quality (CEQ) has promulgated regulations implementing NEPA. These regulations require that the environmental analysis must include information documenting the purpose and need for the proposed action, a description of the affected environment, evaluation of a reasonable range of alternatives, and an analysis of the environmental consequences of the alternatives, including the preferred alternative. In evaluating alternatives, the agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. 4332 (2)(E) (cited in 40 C.F.R. Sec. 1508.9(B) The current EA's analysis of only one alternative, the Proposed Action, undeniably fails to meet the aforementioned mandate requiring an analysis of a reasonable range of alternatives. Furthermore, according to the EA, the purpose and need for the action is to address "how the wild horses are to be removed from areas within and adjacent to the WDHA ...." (EA, p.2) Yet the EA provides little specificity regarding even the Proposed Action, thus making informed comment virtually impossible.

In addition to its failure to provide critical background information and an analysis of a reasonable range of alternatives regarding *how* wild horses will be removed, the EA also fails to provide alternatives to the disposition of wild horses once removed. The BLM specifically informed AWI in its response to our protest that: "The disposition and management of wild horses following removal is an implementation-level decision and will be disclosed in any future NEPA analysis related to the wild horse gather, and will be conducted according to the WFRHBA as amended, applicable regulations and policies." (BLM reply, October 10, 2007) Yet, the EA offers no analysis of environmental consequences of the disposition of the animals in the Proposed Action, stating merely that the animals removed would be placed with local adopters or transported to the Canon City holding facility (EA, .6) Again, the EA does not analyze alternative actions, including, but not limited to, the relocation of some or all of the WDHA wild horses to other Herd Areas or Herd Management Areas, particularly those from which animals have been totally removed in the past, or to specific herds, which due to past management decisions, presently require genetic enhancement to maintain their health and viability. The BLM is recklessly managing several isolated herds at population targets that are genetically nonviable over the long term.

The wild horses in question have not been deemed "excess" animals; rather the BLM has unwarrantedly made an administrative decision to no longer protect and manage wild horses in the WDHA, now or in the future, regardless of habitat conditions and the numbers and/or distribution of the animals. The BLM insists that managing for wild horses in the adjacent Piceance/East Douglas Herd Management Area (HMA) herd somehow conveniently expunges the agency's responsibility to protect and manage wild horses in the WDHA. If this line of reasoning were sound, the BLM could eliminate countless herds throughout the West, leaving only a few token herds for public appreciation. Such a position flies in the face of the both the letter and intent of the 1971 Wild Free-Roaming Horses and Burros Act (WFRHBA), which stipulates that wild horses and burros are to be considered as an ***integral part of the natural system of the public lands*** where they were found at the time of the Act's passage. The express purpose of the WFRHBA was to protect wild horses and burros for both their inherent and instrumental value. Why? The legislation was clear -- because these animals "are fast disappearing from the American scene."

Before 1971, the BLM facilitated wild horse and burro removal and destruction, and sadly, the same agency ironically now charged with their protection is using its authority once again to facilitate their disappearance. If, as the BLM claims, habitat deficiencies and degradation and the health of the wild horses are the primary reasons for the elimination of yet another herd, then the time has come for the BLM to exercise its authority to reduce forage allocation to the two livestock permittees whose allotments overlap the WDHA, to adopt measures that would facilitate better wild horse distribution and/or to expand the boundaries of the WDHA. Based upon the BLM's description of the management concerns within the WDHA, it is clear that the agency failed to consider the year-round biotic needs of a healthy, self-sustaining wild horse herd when originally designating the Herd Area boundaries – a pervasive problem in many Herd Areas throughout the West, acknowledged by agency officials in the past, but one continued to be invariably ignored. Shamefully, the BLM's abject failure to revisit Herd Area boundaries has resulted in the unjustifiable elimination of numerous wild horse and burro herds – the WDHA is the latest casualty in a long list.

While AWI is convinced that the BLM's decision to totally remove wild horses from the WDHA is indefensible and violative of WFRHBA and other pertinent statutes and regulations, we also contend that the current EA does not offer a reasonable range of alternatives addressing the cited purpose and need for the action and fails to provide sufficient background information (including any changes such as oil and gas development that have occurred in the environment since the environmental assessment was conducted in 2005, viz., CO-110-2005-083-EA that may impact the proposed action) for the public to offer informed comment. In fact, the EA mailed to AWI is missing information. For example, there is **no** analysis whatsoever furnished under the heading "Cultural Resources" on p.3, including the cultural significance of wild horses themselves within the WDHA. The preamble of the WFRHBA recognizes that "wild free-roaming horses and burros are ***living symbols of the historic and pioneer spirit of the West***; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people." (Emphasis added) The top of page 5 of the

EA does not follow from the bottom of page 4. These deficiencies only underscore the overall inadequacy of the EA.

AWI offers the following list of particulars that should, at a minimum, be analyzed in the EA:

1. The current health and condition (including pregnancy status) of wild horses inside and outside the WDHA.

2. The numbers of wild horse bands and their distribution within the WDHA.

3. The estimated numbers of animal to be removed during the first year and subsequent years. How many gathers will be necessary to remove all the wild horses in the WDHA? Will gathers occur in consecutive years? What are the costs associated with multiple gathers?

4. An analysis of the timing of gathers and removals and the consequences (both positive and negative) of conducting removals at different times of the year (summer, fall, winter) on wild horses, wildlife, and the overall environment. Furthermore, inconsistencies within the EA must be addressed. For example, the EA states on page 2 that gathers will commence *after October 1, 2008*, except in the case of an emergency. Yet on page 5, the EA states that the more extensive and potentially disruptive helicopter operations would generally be conducted during the first year in the *late summer* through the fall months. Late summer includes August and September. Which is the case -- after October 1st or late summer? What constitutes "follow up" helicopter work as mentioned on p. 5 of the EA? According to the EA, such work could occur during winter/*early spring*; yet, the EA also states that no gathers would occur during March through June, the peak of foaling season for wild horses. (EA, p. 2). Spring does not arrive until March 20th.

5. A detailed discussion of mitigation measures that will be taken to protect nesting raptors and other wildlife species, particularly in light of any changes to the environment over the past three years since the last environmental assessment. The EA should include a current nesting bird survey.

6. The EA must disclose information concerning the numbers and severity of injuries and mortality associated with various capture methods (helicopter drive trapping, helicopter assisted roping, water trapping, and hay trapping), with holding periods and conditions and with transportation methods.

7. An analysis of weather patterns, temperatures and climatic conditions at different times of the year and the resultant impacts on wild horse behavior, distribution and movement patterns.

8. A discussion of the types of terrain to be covered and weather conditions during periods for round-ups. The EA describes the terrain as "rugged" with a "coniferous canopy." (EA, p. 6) How accessible would trap sites be to major roads in the event of injury? How long will it take for a qualified veterinarian to arrive on the scene? What criteria does the BLM use to determine whether a veterinarian should be present during the round-up or merely on-call? Does the White River Field office have a wild horse specialist on staff? If not, will a wild horse specialist be present at the round-up? A specialist was not identified on the Interdisciplinary Review list for this EA. In fact, AWI would be interested in learning how many wild horse and burro *specialists* remain in the BLM's National Wild Horse and Burro program, their level of training and their years of experience.

9. A discussion of the criteria used to "assure the body condition of the wild horses is *compatible* with the distances and terrain over which they must travel." (EA, p. 12)

10. A discussion of anticipated trap locations and the environmental impacts of both construction and operation of traps in various locations.

11. A description of anticipated locations for the use of hay and/or water trapping.

12. A detailed description of handling and care of wild horses once trapped – e.g., ratio of water troughs to horses, how hay will be distributed, the numbers and qualifications of BLM/contract personnel who will handle, care and treat wild horses in traps and holding corrals, etc.

13. A discussion of potential relocation sites for any wild horses removed.

14. A discussion of the current populations of wild horses and burros in holding facilities and an assessment of short-term and long-term holding facility space at the projected time of removals.

15. A detailed analysis of the costs associated with removal, adoption, gentling and holding vs. relocation.

16. An analysis of adoption rates over the last two years and an estimate of adoption demand for wild horses removed.

17. A detailed description of the screening methods used by adoption agents including copies of all application forms, etc.

18. A discussion of how compliance with adoption requirements is monitored and enforced.

19. A discussion of "sale authority" and the estimated numbers of animals eligible for sale. Most members of the public would be outraged to learn that its wild horses are being sold to commercial enterprises intent on turning wild mares into breeding machines in order to produce foals for sale to Third World countries. Not only is such a practice cruel, and will in all likelihood result in countless horses eventually being sold to slaughter, but it is self-defeating because it floods the market with wild horse "offspring," flooding the market with animals in direct competition with the BLM's adoption program.

20. A discussion of the risks associated with helicopter operations – including the record of helicopter accidents, the extent of human injuries/casualties and associated costs. .

21. Maps that identify wild horse distribution, anticipated trap locations, terrain, fences or other obstructions that would require maneuvering if helicopters drive trapping is utilized.

22. A discussion of the impacts (direct, indirect and cumulative) of each alternative developed.

23. The criteria used to determine when Herd Areas no longer managed for wild horses and burros, would, in the opinion of the BLM, again be eligible for management.

In conclusion, in light of the overall deficiency of the current EA, it is incumbent upon the BLM to prepare a new EA that develops a range of alternatives that analyzes comprehensively the aforementioned issues. Moreover, the BLM must provide the public with guidelines for appealing any decision made concerning this action to the Interior Board of Land Appeals. Thank you for the opportunity to submit comments on this proposed action. Please keep us apprised of all developments regarding this matter.


Sincerely,

*Andrea Lococo*

Andrea Lococo
Wildlife Consultant

"cindy & steven" <sacredintent@cox.net>
05/27/2008 01:46 PM
To
<melissa_kindall@blm.gov>
cc

Subject
West Douglas Wild Horse Management - Public Comments

Dear Melissa-

Attached is the electronic version of my comments just faxed to the White
River Field Office and is being provided for BLMs convenience.

Sincerely,
Cindy MacDonald
3605 Silver Sand Court
North Las Vegas, NV 89032


**ATTACHMENT TO E-MAIL**

Bureau of Land Management
White River Field Office
Melissa Kindall
220 East Market Street
Meeker, CO 81641


May 25, 2008


RE:  West Douglas Wild Horses - EA# CO-110-2008-052


Public Comments Submitted by:
Cindy MacDonald
3605 Silver Sand Court
North Las Vegas, NV 89032


Dear Ms. Kindall:

Please accept the following comments and input regarding BLMs plan to remove wild horses from the West Douglas Herd Management Area.

As written, the proposed action is illegal and violates federal laws including the Wild Free-Roaming Horse and Burro Act, the Federal Lands Management Policy Act, the Public Range Improvement Act, the National Environmental Policy Act, the National Historic Preservation Act (Sec 106) and U.S. Code Title 16 (Conservation) as well as legal mandates issued by the Interior Board of Land Appeals including 172 IBLA 128, 88-591, 638, 648 and 679, and BLMs Code of Federal Regulations regarding wild horse and burro management including 43 4700.0-1, 43 CFR 4700.0-2, 43 CFR 4700.0-5(d)(e)(f), 43 4700.0-6 (a)(b)(c), 43 CFR 4710.1, 43 CFR 4710.3-1, 43 CFR 4710.5(a)(c), 43 CFR 4710.6, 43 CFR 4720.1, and 43 CFR 4740.1(a). See Appendix I.

As a result of multiple legal violations, BLM lacks the authority to authorize the proposed action as it fails to conform to mandates required of the Department of the Interior as a managing agency of the resources held in trust for the people of the United States and the Departments actions must conform to established federal laws and a Congressionally declared and valid dedicated public land use within our Nation.

The Department of the Interior does not have superior jurisdiction over the laws of our United States but instead, is charged with upholding those laws as set forth by the United States Congress and must diligently work to be in conformance with both laws and legal rulings that uphold the validity of those laws.

The legal validity of free-roaming wild horses and burros on public lands has been upheld since 1976 as set forth in Kleppe vs New Mexico when it was affirmed that the Secretary of the Interior has been "directed to protect and manage [the animals] as components of the public lands….in a manner that is designed to achieve and maintain a thriving ecological balance on public lands".

Neither the White River Field Office, the BLM Director nor the Secretary of the Interior have been granted the power or authority to override the laws of our Nation, rulings by the Interior Board of Land Appeals or the BLMs own regulations established for the maintenance, management and protection of free-roaming wild horses and burros.

In summary, while there are obvious attempts to implement a proposal that seeks to act above the law, there is no legal authority to do so.

The intent of the Free-Roaming Wild Horse and Burro Act was to preserve and protect wild horses and burros as a natural component of the public lands systems.  If it were not the intent of the United States Congress to direct the Secretary of the Interior and the Secretary of Agriculture to preserve and protect free-roaming wild horses and burros and their habitat, then they would not have established a federal law that mandates the Department of the Interior or the BLM to do so.

The authority granted to the Secretary of the Interior through the BLM authorizing the removal of wild horses and burros from public lands is of a very limited nature and scope requiring strict adherence to established standards, which specifically are - the BLM may not remove them unless they are deemed "excessive" in relation to the thriving ecological balance.

This authority clearly establishes <u>a relationship value</u> to other multiple use authorizations within their habitat and prohibits management actions that favor exclusive use of public resources to the detriment of the American people.

Issuing management proposals that cause the irrevocable loss of protected resources legally affirmed as contributing to the diversity of life forms within our Nation, to enriching the cultural and aesthetic values of our people and were to be managed to preserve and protect them for future generations is a violation of that authority and as such, invalidates any management actions that seek to institute unlawful actions regarding the illegal taking of property belonging to the people of the United States.

BLM regulation 43 CFR 4700.0-1 outlines the purpose of BLM regulations in regards to wild free-roaming horses and burros and that purpose is defined as, "The purpose of these regulations is to implement the laws relating to the protection, management, and control of wild horses and burros under the administration of the Bureau of Land Management."

Therefore, the BLM is allowed to manage and control them in relation to the thriving ecological balance but BLM must also protect them, not eradicate them for exclusive use of public resources.

Additionally, 43 CFR 4700.0-2 states, "The objectives of these regulations are management of wild horses and burros as an integral part of the natural system of the public lands under the principle of multiple use; protection of wild horses and burros from unauthorized capture, branding, harassment or death; and humane care and treatment of wild horses and burros."

In other words, the BLM has the authority to manage them but management actions must include the objective of maintaining them as an integral part of the natural system of public lands. This proposal fails to do that.

The BLM must also issue proposals and decisions in relation to multiple-use. The current management is attempting to institute exclusive use of public lands and resources through allowing the sole authorization of heavy livestock grazing within the protected habitat of wild horses as they have continued to authorize at least 9,500 head of cattle and 18,7530 Animal Unit Months (AUM) in the Twin Buttes and Evacuation Creek grazing allotment affecting the West Douglas HMA while simultaneously maintaining that none of these resources are available for wild horse use.

In order for the White River Field Office to be legally authorized to remove all wild horses from the West Douglas Herd Management Area, the following steps must be taken prior to issuing a decision of this magnitude. These include adherence too:

1) 43 4700.0-6 (a), "Wild horses and burros shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat."
2) 43 4700.0-6 (b) "Wild horses and burros shall be considered comparably with other resource values in the formulation of land use plans."
3) 43 4700.0-6 (c) "Management activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior."
4) 43 CFR 4710.3-1, "Herd management areas shall be established for the maintenance of wild horse and burro herds. In delineating each herd management area, the authorized officer shall consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in §4710.4. The authorized officer shall prepare a herd management area plan, which may cover one or more herd management areas."

In the State of Colorado, the Bureau of Land Management has authorized 573,918 Animal Unit Months (AUM) of forage for the purpose of livestock consumption, which equates to 219,664 head being approved of on an annual basis.

Conversely, the approved population within the entire state of Colorado for wild horses is a paltry 812 with merely 9,744 AUMs set aside for their survival, less than 2% of the available resources.

The White River Field Office alone has authorized over 118k AUMs for exclusive livestock consumption while determining any population that exceeded the previously approved population of 60 wild horses consuming 720 AUMs of forage in the West Douglas Herd Management was "excessive".

While BLM pretends that livestock authorizations protect the range from undue degradation due to controlled cycles of seasonal use, rest and pasture rotations while asserting wild horses graze year-round in an "uncontrolled" manner causes excessive degradation, the state of Colorado is also home to a 2007 estimated free-roaming elk population of 250,000 to 260,000, known to be 10-15% over statewide population objectives for at least twenty years.

There doesn't seem to be a problem with free-roaming elk herds at this current population level, even though elk, native or not, have known habitat destruction issues that parallel wild horses when either population become excessive.

In 2005, the BLM White River Field Office re-authorized over 18,000 AUMs for exclusive livestock use in the Twin Buttes and Evacuation Creek livestock allotments equating to 9,500 head of cattle annually with the majority of these allotments falling within the boundaries of the West Douglas HMA.

Obviously, the habitat is productive enough to sustain a population of healthy wild horses if the BLM believes there is sufficient forage to maintain resource integrity and prevent rangeland degradation through the authorization of 18,000 AUMs and 9,500 head of cattle.

What is also very obvious is that prior management plans have failed to consider the necessary mandate of wild horse management being balanced with other uses as well as failing to consider wild horses comparable to other resource values in the formulation of their land use plans or their relationship to other uses of the public and adjacent private lands.

These obvious factors clearly establish the first strike that BLM has failed to comply with their own regulations outlining how wild horses are to be deemed "excessive" in relation to the thriving ecological balance, as their administration has failed to conform to the foundational requirements of wild horse and burro management on public lands.

Additionally, in relation to 43 4700.0-6(c), prior management activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior.  This is not a regulation set forth for merely aesthetic purposes but a necessary requirement in preserving rangeland integrity to prevent undue degradation through the entrapment of free-roaming populations that prevent proper dispersal of their foraging activities.

Just within the Twin Buttes allotment alone, BLM has established 7 different areas cattle are grazed with pasture control established through fencing prohibiting wild horses from naturally dispersing their own grazing pressures due to this entrapment known as "livestock management".

Furthermore, BLM has set forth regulations that conform and comply to the WFRHBA's mandates to preserve and protect them by considering them the priority species in management considerations as set forth in 43 CFR 4710.5(a), which clearly states, "If necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury, the authorized officer may **close** appropriate areas of the **public lands to grazing use** by all or a particular kind of livestock."

This regulation cannot get any clearer in terms of BLMs responsibilities and priorities in public lands management regarding the protection of wild horses and burros and their habitat.  The West Douglas Herd Management Area must be closed to livestock grazing before BLM can determine a wild horse population at any level in their 128k-acre protected HMA is still excessive and posing risks to public rangelands, resources and the thriving ecological balance.

Why is this regulation established in terms of the priority management consideration? Because both livestock and wildlife have significantly greater latitude on public lands than wild horses and burros and because of this, within their designated and protected habitat, they are the priority management consideration because they exist no where else!

This is strike two regarding the legality of the proposed action as BLM has obviously not closed the area to livestock grazing to protect wild horses and their habitat.

While it is glaringly apparent that the productive capacity of their habitat is sufficient to support a self-sustaining population if the BLM had not attempted to institute exclusive use of public lands to livestock grazing, in relation to balanced multiple-use management proposals, a further consideration that BLM is attempting to totally ignore is the recent ruling by IBLA, 172 IBLA 128, which has affirmed that if the appropriate level of wild horse use to protect the thriving ecological balance is deemed to be insufficient to support a genetically viable herd, the BLM may supplement those herds through the occasional introduction of wild horses to preserve our herds on public lands.

In addition to all the other glaringly apparent management of malfeasance behind this proposal, which should not even make the introduction of IBLAs ruling necessary, IBLA has again affirmed that the intent of Public Law 92-195 is to preserve and protect wild horses and burros on public lands and if BLM must supplement wild herds to accomplish this in order to protect both equids and rangeland integrity alike, then BLM must take the necessary steps, even something as radical as this, to preserve them!

The evidence strongly suggests that implementing this radical approach is completely unnecessary in the West Douglas HMA as more than ample resources are available to support a scientifically established genetically viable herd of 150-200 requiring a mere 2,400 AUMs of forage, less than 15% of what is being doled out for livestock grazing just within the two allotments alone. The facts of the matter remain - BLM is merely not allowing sufficient resources to be allocated to preserve them even though BLM is required to by law, which continues to be affirmed repeatedly, that they are to preserve and protect America's wild horses and burros and their habitat!

IBLA issued this ruling on August 2, 2007, a full two months before the BLM Director dismissed the Protest of the eradication of the West Douglas herds. The failure of the Director to incorporate IBLAs ruling, which binds the actions of the DOI, is unconscionable and counts as strike three.

To reiterate, the Department of the Interior through the BLM does not have the authority to remove these wild horses because they have failed to implement and institute the necessary and legally required mandates of wild horse and burro management on public lands. Therefore, they cannot be deemed excessive in relation to the thriving ecological balance and if they are not excessive through posing risks to environmental integrity, BLM has no authority to remove them.

Because the Department of the Interior through BLM has chosen to operate outside the laws governing public lands stewardship of our resources by attempting to unlawfully seize and destroy public property owned by the citizens of the United States of America, the public has a right and an obligation to demand accountability if the Department and the Bureau continue to pursue this course of action.

While no other discourse on the removal proposal is truly necessary due to the myriad of failed legal compliances as outlined above, the sheer grossness of inhumane treatment and standards BLM is attempting to authorize for the West Douglas wild horses demands comment.

The BLM has outlined specific operating procedures in regards to helicopter driving of wild horses in the West Douglas HMA. These have been cited as,

"These wild horses are especially difficult to gather due to rugged terrain and a coniferous canopy throughout much of the area."

"If horses are moved too far by helicopter or too quickly there is a possibility of increased upper respiratory problems."

"*Mitigation:* For winter gathers, distances to trap sites will be reduced to a maximum of five miles when snow depth is greater than one foot. Animals will be moved slower when snow depth hinders their natural movement. Wild horses will be monitored by the contracting officer representative (COR) after the first couple of runs to ensure that they are not sweating excessively. If wild horses are sweating excessively, the speed and/or distance to the trap will be reduced further. When temperatures are less than ten degrees below zero, wild horses will not be gathered by helicopter, and will not be pushed across icy terrain where sharp turns could cause injuries."

The issue of using helicopters to drive wild horses and burros continues to be a source of controversy and concern for many members of the public, even after all these years. There must be some merit to the reasons for this concern since the use of fixed wing aircraft to "hunt and chase" wild horses was the first law ever established toward the goal of humane treatment and protection of wild horses.

Because of Nevada BLMs failure to take these concerns seriously, the entire affair became incorporated into a report titled, "*The Use of Helicopters to Remove Wild Horses and Burros From Public Lands*" June 2007 and has since been submitted to various BLM offices throughout the West, members of the National Wild Horse & Burro Advisory Board as well as both state and federal legislators.

In this report, a large amount of evidence was presented including eye-witness testimony and photographs of helicopter conducted removals graphically showing less than humane removal methods.

Among the concerns cited were eye-witness testimony of no traps set up with wild horses, including foals, being run straight into trailers, being left in the trailers all day with no water after being driven by the helicopters when temperatures exceeded 90 degrees, wild horses being trapped in panels that broke their legs and necks, failure to properly separate stallions, foals and mares causing severe injuries and death both during the on-site capture operations as well as during transport, rope injuries sustained around necks that collapsed breathing abilities and were left untreated by contractors and personnel resulting in death, a high degree of rope burns and deep cuts, foals being unable to keep up and being lost, some dying out on the range, others being found and hog tied for hours in high temperatures, while others still were estimated as being orphaned on the range for up to 3-4 days,

foals sustaining excessive hoof wear, limb swelling, elevated muscle enzymes consistent with severe over-exertion, testimony from concerned citizens that veterinarians had stated horses and burros not conditions to run long distances can be harmed by helicopter driving and may result in abortion, premature birth, permanent damage to bones, hearts, lungs, joints and death, a wide variety of reported cases of strangles, an upper respiratory infection/disease that can kick in after a horse is stressed – or after, for instance, being run too hard during a helicopter round up with reports from the Animal Welfare Institute that almost every BLM facility had experienced outbreaks of strangles, leading to confirmed deaths of scores of animals (estimated as occurring between 2004-2006), all mares losing their foals after the 2003 Coyote Canyon wild horse round up, as well as the serious safety concern to humans that deeply ingrained psychological terror results from driving wild horses by helicopters, which then poses hidden danger to future riders and has resulted in at least one known death of a young girl due to a helicopter "fly by" while riding a helicopter captured wild horse.

BLM is required to provide humane treatment and care for wild horses and burros placed within their charge as per 43 CFR 4700.0-2, which specifically outlines, "The objectives of these regulations are management of wild horses and burros as an integral part of the natural system of the public lands…. and humane care and treatment of wild horses and burros" and is further reinforced through 43 CFR 4700.0-5(e)(f), which stipulates, "*Humane treatment* means handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro" and "*Inhumane treatment* means any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community."

What documented evidence can BLM provide that is in compliance with these mandates, that the proposed capture plan is in alignment with humane treatment standards, is compatible with accepted veterinarian practices of animal husbandry, that this plan will not cause unnecessary stress or suffering such as accredited, independent scientific journals that are not beholden to BLM in some manner?

The Southwest Washington Wildlife Report issued on April 29, 2004 reported losing seven Columbian White tailed deer due to capture related stress during a transplant operation, an article in the Wildlife Society Bulletin, Vol. 29, No 2 (Summer 2001) by David A. Jessup titled Reducing Capture-Related Mortality and Dart Injury centered around whether or not the Federal Animal Welfare Act applied to captures of free-roaming wildlife through the use of helicopter captures.

The North Dakota Fish & Game Department has issued guidelines for pronghorn antelope captures in a document titled, Capture & Translocation, that both acknowledges the stress placed on the wild animals during helicopter driving as well as seeking to alleviate this stress.  Recommendations include temperatures not to exceed 70F (21C) and have noted that temperatures rising later in the day during transport have had lethal results.

In regards to the actual helicopter driving itself, it was noted that constant pressure applied by the helicopter stressed the pronghorn with extended chases increasing mortality. Workers in Wyoming found mortality rates of animals chased for 40 minutes to be twice as high as those chased for 20 minutes and a maximum chase time was issued not to exceed 20 minutes. Blindfolds were also recommended for males during transport, even if they had been segregated from other animals to reduce stress and potential injuries.

Significant and related material included an examination of net-gun techniques, which included an initial 12 minute hazing limit reduced to 7 minutes due to obvious stress exhibited by the animals during the initial captures as well as deaths attributed to broken legs, necks and post-capture myopathy.

"Barrett et al. (1982) concluded pronghorn are captured easily with a net gun; however, considerable effort may be required to reduce capture myopathy and losses from trauma. Eighteen adult pronghorn were captured successfully using a 3-barreled netgun during 3 capture operations in Colorado (Firchow et al. 1986); two of the 20 pronghorn (10%) captured, or pursued for capture, died; 5 females captured during March and April were pregnant and carried fawns to full term. Initially the authors used 12 minutes as a cut-off point for hazing animals, but changed to a 7 minute maximum after signs of stress were noted in animals during the first capture operation. Fifty pronghorn (16%) died during 311 reported captures in Arizona, more than half from broken necks. Others were destroyed because of broken legs, and two died about two weeks after capture, apparently from capture myopathy."

Pronghorn were cited as "delicate and excitable animals", as many prey species usually are including horses. Due to this excitability, broken necks and legs were cited as common occurrences, with broken legs being noted when pronghorn were herded at high speed over rough country. A more subtle form of mortality was also noted, specifically capture myopathy and was associated with the animal's concerted and vigorous use of muscles during pursuit and capture, chemical immobilization, and transportation.

Additionally, signs of capture myopathy were noted also when, "Using drive traps, Chalmers and Barrett (1977) captured 594 adult pronghorn in Alberta of which 29 succumbed to acute trauma. Some signs of capture myopathy appeared within an hour of capture, but most symptoms were delayed until handling or soon after release. A capture myopathy-like syndrome was associated with an estimated 20 additional deaths as the pronghorn were being processed. Despite the normal appearance of 32 drive-trapped pronghorn that were radio collared and released, 6 were found dead or recumbent within 2-8 days, and within 0.5-5 miles (0.8-8 km) of the trap (Chalmers and Barrett 1977).

Chalmer and Barret (1977) also stated, "Pronghorn are highly susceptible to capture myopathy for a number of reasons: they have highly insulative coats that hold heat; their capture often involves long and occasionally arduous pursuit, which contributes to metabolic acidosis; and their highly excitable nature appears to predispose them to the psychological stresses of capture."

It went on to say because agency personnel did not have control of the actual helicopter capture operations, it was important to have a detailed protocol that addressed the critical aspects of animal treatment. It was suggested that this protocol should include standards for chase time and handling of capture animals. (1)

While the BLM is fond of quoting the percentage of wild horse and burro mortality rates expressed as nationally combined averages of all helicopter captures at .5 to 1%, most often mortalities are reported as "non-gather related" with little supporting evidence for this assertion. Despite almost 40 years of "managing" wild equid populations via helicopter captures and removals, BLM has produced little in terms credible studies or research as to the effects of helicopter driving on wild equids, especially those that may be independently peer-reviewed.

For example, in regards to known reported deaths from individual gather operations, mortality rates were noted as considerably higher that the reported national average. In September 2006, BLM captured 178 wild horses from the Nevada Paymaster HMA reporting 21 deaths, almost 12% and all cited as "no horse was killed as a direct results from the gathers." (2) In November 2007, the Augusta Mountain HMA, also in Nevada, reported a 5% mortality rate though most deaths were also reported as "non gather related". (3)

In February 2005, Alberta Canada adopted Class Protocol #008-Capture of Ungulates, which outlined specific methods for wild animal capture that included capture operations should be avoided when ungulates are pregnant, breeding or tending young, not subjecting animals to heat or cold stress by performing captures during inappropriate seasons or times of day, as well as avoiding areas of rough terrain, fences, active roads, cliffs, thin ice or deep water, and to generally avoid driving animals aerially that appear aged, crippled or in poor body condition.

In bold letters, pursuit of animals at a full run was limited to less **than 1 minute and no more than 2 minutes** and should occur in relatively open areas away from topographic features that may be dangerous to ungulates **with a total handling time of less than 20 minutes and a maximum time limit of 30 minutes** unless complicating factors involving the safety and welfare of the animal arises. (4)

However, when it comes to wild horses and burros, no such restrictions on methods have yet to be established. BLM routinely drives wild horses and burros for extended periods of time with full runs especially noted at the end of the drive, no topographical area is considered "off limits" such as the steep terrain cited in the West Douglas wild horse removals and BLM routinely drives equids in all manner of weather through all seasons and include all classes of wild horses/burros including those tending young, are aged, crippled or in poor body condition with BLM providing little to no follow up reports on pathology, autopsy's to determine cause of death, or capture related myopathy.



Courtesy of Front Range Equine Rescue - All Rights Reserved

In relation to horses specifically, it is common knowledge that exercise induced pulmonary hemorrhage or "bleeding" is a health problem that occurs in horses that work hard such as during racing, steeple chasing, cross-county, hurdles, road and track, stadium jumping, barrel racing and endurance racing. Some studies report that horses bleed even when doing mild exercise such as trotting on a treadmill. A common assumption has been cited that many people tend to believe that if the horse's nostrils are not showing blood, then it is not "bleeding" and no damage has been done but studies have shown this assumption is incorrect. Typically, bleeding is a silent injury that can go undetected because it occurs deep in the lungs and is best detected by lung washes or endoscopy. In addition, blood in the airways has been shown to be an irritant that leads to further bleeding and increases the possibility of inflammatory airway disease and chronic lung damage due to repeated bleeding. [5]

The Equine and Comparative Exercise Physiology (2005), 2:133-138 from Cambridge University Press (MS Davis, EC Mckenzie, CM Royer, KK Williamson, M Payton, SL Nelson) submitted an Abstract with respect to the effects of breathing cold air and strenuous exercise which stated, "Repeated strenuous exercise while breathing cold air is believed to induce chronic airway inflammation and hyperreactivity, a condition referred to in humans as 'ski asthma'. However, the time course of development and resolution of ski asthma is unknown". Studies performed on sled dogs revealed, "In contrast to our hypothesis, our data support the contention that cold weather exercise-induced airway inflammation can persist through seasonal detraining, but that routine training does not cause significant worsening of the condition."

In BLMs Official Newsletter of the Wild Horse and Burro Program, Issue 4, Fall/Winter 2007/2008, a section titled The Vet's Corner by Albert J. Kane, CVM, MPVM, PhD, who works for the United States Department of Agriculture and BLMs main veterinary advisor for the Wild Horse and Burro Program, provided an article titled "Winterizing Your Wild Horse or Burro".

In the article, Dr. Kane states, "The hair coat of a mustang or burro is excellent protection from even the harshest winter elements as long as they can stay dry and out of the wind……When you know you will be riding or driving often in the winter, it may make sense to partially clip your wild horse or burro. With hard work, mustangs and burros will sweat even in winter and the hair coat can quickly become wet. If this is only happening under the saddle or tack it is not a problem as long as you dry the animal off after your ride and before you turn it out. A rubdown with a towel or clean burlap sack

is a great way to dry them off and fluff up their hair so it can again insulate them from the cold and generally say thanks for a good ride. If they are getting very sweaty and staying wet during or after work, they can chill, which can lead to stress, colds, and even pneumonia. To prevent this, consider clipping horses or burros that do a lot of hard work during the winter."

Of course, it is clear that the West Douglas wild horses will not have their long winter coats "clipped", which Dr. Kane acknowledges can "quickly become wet" during the proposed winter helicopter driving standards with limits approved to minus 10 degrees below zero, nor is it likely that BLM will be able to provide a rubdown with a towel or clean burlap sack to fluff up their hair after being driven, as these are wild animals.

As cited, Dr. Kane's prognosis indicates the likely results will be "…chill, which can lead to stress, colds, and even pneumonia."

While BLM continues to assure the public that every effort is made and all possible solutions considered for the humane treatment of America's wild horses and burros, the evidence continues to mount that this is not the case.

A testament to the lack of standards being applied or general concern for humane handling, reduced stress and/or mortality rates by BLM for wild horses and burros placed within their care was readily apparent in the Jackson Mountain wild horses in Nevada throughout the summer and fall of 2007, which resulted in the known deaths of at least 185 wild horses.

Of course, these deaths were certainly the exception to the rule, as surely BLM will tell us. Why? Because BLM actually got caught holding the dead bodies, unlike the usual situations where the public is only allowed in on "approved days", at "approved locations" during "approved times" when BLM conducts removals.

Here is a very recent accounting of how wild horses were "managed" by BLM in Winnemucca. Nevada of wild horses under their jurisdiction and care through the Jackson Mountain Herd Management Area that ultimately resulted in the deaths of 185 wild horses due to blatant disregard for the welfare of these same wild horses.

It took months to piece together what really happened in the Jackson Mountain Herd Management Area and the August gathers. All the following documentation cited in this accounting is presented under Exhibit I.

An article published on January 21, 2008 by Quarter Horse News and author Linda Hussa titled "185 Wild Horses Dead", [6] recounts the story of Ron & Ginger Hopkins as they traveled to the Jackson Mountain area in August where Ron stated, *"The basin was full of horses…hundreds of them…the trough was empty and there were horses standing in it! And all around it"*. According to the article, the Hopkins encounter with hundreds of thin, dead and dying horses was dated August 12, 2007.

While the Hopkins are telling stories of dead and dying horses all around, at the same time in August BLM released their Final Environmental Assessment and FONSI dated on August 8, 2007 and signed by Arlan Hiner on the Jackson Mountain captures. In it, the legally required question was addressed in Appendix C: 1. Is this an emergency? To which the BLM responded, "*No*."

Having personally researched the BLMs Preliminary EA to remove the Jackson Mountain wild horses, I submitted a 22 page "public comment" on June 25, 2007 that challenged the errors, omissions and dangers the EA was riddled with – all of which BLM completely ignored.

My research was done before BLM released the results of their new population census conducted in June, which discovered approximately 700 more wild horses roaming the range than BLM had a clue about. Having removed 661 wild horses in the Jackson Mountain area in February 2003, BLM did not report or notice any "excessive utilization" of forage by hundreds of more horses in the area for the last four years, even as recent as June when they released their Preliminary EA.

Based on BLM reports of what the wild horses would have to endure during helicopter round ups and because of the distance and <u>extremely rough terrain</u> of the Jackson Mountain area (reported by both BLM and the Quarter Horse news article), coupled with the well-documented drought, I lobbied for BLM to utilize water trapping methods to capture the Jackson Mountain wild horses instead of helicopters and this was before I had any idea what was actually occurring out on the range or with the Jackson Mountain wild horses themselves. I had assumed they were still healthy!

While it is now reported that hundreds of wild horses were refusing to move from dried out water sources as early as March and standing in troughs, BLM responded to the public concerns about this very issue with, "it was not <u>feasible</u> to capture horses with water trapping and that driving them by helicopter was in the best interest of the horses".

The Quarter Horse News article reports Arlan Hiner, Assistant Renewable Resource Manager for BLMs Winnecmucca Field Office and authorizing officer who issued the final decision to remove the Jackson Mountain wild horses (merely reported as "field staff" in the article) as saying, "he drove out to the Jackson allotment…<u>twice in June</u> to monitor the water" and *"<u>Both times, there were horses standing in the troughs."</u>*

On June 8, 2007, I sent an email to Nevada Wild Horse and Burro Lead, Susie Stokke with copies to Dean Bolstad of the National Program Office, Nevada State Director Ron Wenker and Battle Mountain Wild Horse & Burro Specialist Shawna Richardson, with an offer to organize and coordinate emergency water supplies as well as possibly paying livestock permittees to leave their wells on for the wild horses and wildlife due to drought.

On June 13, 2007, BLM Director Wenker essentially blew the offer off to help the wild horses by citing BLM **didn't see a need** and stated, generally, BLM didn't like to provide artificial water sources for wild horses (never mind that all livestock and big game are allowed these luxuries) and this was justified by citing if these "mitigation measures" (my words, not his) should fail, wild horses and burros could be "at risk". Copies of Director Wenkers response to me were also sent to all Nevada Field Offices, including the Winnemucca Field Office that oversees the Jackson Mountain wild horses.

While I can't say that due to the magnitude of what was occurring out on the range, the offer to provide help with water would have been significant enough to make a difference in what happened, I can say with absolute certainty that BLM completely failed to consider utilizing this offer for help – even when they knew as early as March that conditions were risky, even in June when Arlan Hiner was reported as observing wild horses standing in troughs and received a copy of BLMs response to this offer during the exact same time frame, and still two more months went by with the wild horses having to endure these range conditions before being driven by the helicopters to the gather pens.

While BLM stated that there was no emergency and no need to consider water trapping, 185 wild horses eventually died at the Palomino Valley Facility due to salmonella that was able to take hold due to the extreme stress placed on their systems through months of drought conditions, lack of water and forage and being driven by the helicopters in their already weakened condition.  The Hopkins stated that wild horses <u>were already dying or dead</u> out on the range during their visit to the area on August 12, 2008 but removals didn't begin until August 28, over two weeks later.

"185 Wild Horses Dead" continues with Nevada Wild Horse & Burro Lead, Susie Stokkes explanation for what happened:

"Here's a good example of the old adage that 'hindsight is better than foresight,' " Stokke said. "Here's what happened, when we gathered that Horse Management Area (HMA) in January 2003, we didn't get to Animal Management Level (AML). Ideally, we would have censused the Jackson Mountains last year and then we would have realized that we had a lot more horses out there than we thought we had. Once we realized we had 1,000 horses there we geared up to haul water."

In fact, though BLM is reporting they went through the process of getting bids and were preparing to haul water out to the Jackson Mountain wild horses, they didn't "because the field staff determined they had enough water".

Though the troughs were known to be empty a full two months prior to when the decision was issued to drive these same wild horses, the troughs continued to stay empty and BLM approved driving them over very rough terrain with helicopters anyway in their already well-documented weakened conditions.

185 Wild Horses Dead also reports that Hedi Hopkins, the Winnemucca Field Offices designated Wild Horse & Burro Specialist is no longer working for the BLM.

So based on past evidence of a very recent "wild horse management catastrophe", the following conclusions are reasonably logical:

- The BLM was NOT monitoring resources properly or adequately, which resulted in extreme hardship, undue suffering, injury and death to the Jackson Mountain wild horses both on and off the range.

- BLM possibly put personnel in charge of wild horses and burros that was not sufficiently qualified to adequately judge wild horse needs, requirements or habitat conditions.

- The BLM did not provide critical habitat requirements despite knowing they were immediately necessary to prevent the wild horses from continuing to die.

- The contractor, Cattoor Livestock Round Ups, though cited by BLM as very knowledgeable and experienced in wild horse and burro removals, either was unable to properly assess the catastrophic loss of life that would occur or failed to sufficiently care as to the net result because as long as the wild horses reached the pens, the contractors get paid.

- The BLM covered the whole thing up by refusing to acknowledge in their EA and FONSI that an emergency was occurring, refused to consider using a trapping method that was both feasible and would have most likely resulted in considerably less physical stress that may have saved lives, and has "promised to do better next time" despite failing to describe just how exactly that will occur.

The relationship to the West Douglas wild horse removal proposal is that past evidence has proven that BLM would not acknowledge emergency conditions publicly, did not concern themselves sufficiently with the condition of the wild horses they chose to drive by helicopter, the helicopter contractor was obviously also insufficiently concerned with the condition of the wild horses they were driving, and at no time, until wild horses started dropping dead, did the issue of just what a terrible condition the wild horses were actually  in came to the public's attention.

And still the BLM continues to deny they had anything to do with any of this – the wild horses just "magically dropped dead" due to range conditions (they knew about), lack of water (they not only knew about but refused help for), highly weakened body conditions that were already causing death (they knew about), refused to haul water to possible sustain them (their exclusive call), allowing helicopter driving instead of water luring methods (still didn't see a problem with the helicopter capture method because it is efficient), over very rugged terrain as cited in the West Douglas capture plan (rugged mountain terrain wasn't considered a problem to BLM in the Jackson Mountain range either), still didn't report it publicly until several horses had already died and it was declared a human public safety hazard, continued to deny their responsibility in the Quarter Horse News article in January 2008 and followed up by a public statement from Wild Horse & Burro Division Chief Don Glen still denying that BLM did anything improper.



Dead Jackson Mountain Foal
BLM Palomino Valley Holding Facility
Courtesy of Wild Horse Spirit, Ltd. 9/28/07
All Rights Reserved

If BLM didn't have a death toll of 185 wild horses, they'd continue to claim, as they have repeatedly done on all the other "unrelated deaths", that the helicopter capture methods employed, BLM personnel, standard operating procedures and the contractors hired to implement these procedures are all above reproach or reform.

As for the contractors themselves, questions have been raised as to BLMs procedures for securing helicopter contractors for gather operations. These questions include possible no-bid contracts being awarded preventing competitive pricing as well as awarding these same no-bid contracts to contractors that have a history of questionable criminal activity related specifically to the harassment and deaths of wild horses through being hired privately for the sole purpose of removing wild horses to commercially process them for horsemeat.

When questions were posed to BLM last year about Cattoor Livestock Round Ups history of criminal activities regarding wild horse captures, BLMs response indicated it was a minor transgression that had been appropriately accounted for. However, further research indicated it was considerably more than minor and that much of the restitution paid was a result of complicated and hidden court proceedings that include over 1,600 pages of legal documentation on the issue – hardly a "minor" situation at all.

Furthermore, the obvious inappropriateness of BLM continuing to award contracts to someone with such a questionable history in relation to wild horse captures for commercial processing continues to be completely unacceptable and implies abuse of both government ethics considerations as well as a betrayal of the public trust.

Additionally, the use of Cattoor Livestock Round Ups is no longer appropriate. Prior history of criminal activities regarding private contracts to capture wild horses for commercial processing, being the contractor responsible for the well-documented footage of wild horse and foal deaths occurring in the Sheldon Wildlife Refuge in June 2006 as well as being the contractor that oversaw the Jackson Mountain wild horse gathers in August 2007, provides ample historical evidence and clear indications that humane handling and accurate assessments of wild horse needs are not being sufficiently incorporated or placed as a priority with this contractor.

The use of Cattoor Livestock Round Ups appears to be nothing more than a long and profitable relationship of exclusive government no bid contracts with no accountability required by BLM to the public or to the wild horse herds they are suppose to be protecting and as previously stated, continued use of this company is completely and totally unacceptable.

**Euthanasia**

While it is understood that BLM has the authority to euthanize wild horses/burros due to specific health conditions, concern is growing as to the validity of BLMs assertions that it is necessary to euthanize X amount of wild horses/burros due to "unrelated" issues from helicopter driving methods.

Conditions cited in prior removal operations that resulted in euthanasia of wild horses/burros include Henneke body class conditions of unacceptable ratings, deformities, prior injuries unrelated to helicopter driving methods, and age classifications determining a wild horse is no longer capable of surviving either in the wild or in captivity.

It is suggested that BLM begin to actually document these conditions through photographic evidence that these euthanasia's are indeed warranted by the conditions cited as well as providing evidence that these wild horse/burro deaths are indeed non-gather related.

Please incorporate the stipulation that all euthanized wild horses will be photographed before and after euthanasia's and available for public inspection to determine the appropriateness of these management activities to public resources.

Additionally, a qualified veterinarian should be the only individual authorized to determine if a condition is untreatable and requires BLM to put a wild horse/burro down and this stipulation should also be incorporated within the removal proposals SOP's.

References:

(1) Capture Techniques for Pronghorn  http://gf.nd.gov/multimedia/pubs/docs/prong-mgmt-pt4.pdf
(2) Silver Peak/Paymaster Final Gather, Letter from Tonopah Field Office, 10/16/06.
(3)BLM Final Gather & Removal Report, Augusta Mountain HMA, November 2007, Courtesy of Nevada Wild Horse & Burro Lead Susie Stokke.
(4) Alberta Canada Wildlife Research Guidelines for Research Protocol 008, Ungulates, http://srd.alberta.ca/fishwildlife/guidelinesresearch/pdf/protocol/ungulate_net_gunning_class_protocol_008.pdf
(5) Exercise Induced Pulmonary Hemorrhage  http://www.flairstrips.com/li-EIPH.htm
(6) "185 Wild Horses Dead" by Linda Hussa, Quarter Horse News, January 2008 http://quarterhorsenews.com/index.php?option=com_content&task=view&id=671&Itemid=92

# Exhibit I

## The Jackson Mountain Wild Horse Tragedy

A.  **Statement From National Wild Horse & Burro Program Division Chief Don Glenn, Quarter Horse News 2/15/08**
B.  **Drought Relief Email Offer – 6/08/07**
C.  **Letter of Refusal – BLM Nevada State Director Ron Wenker 6/13/07**
D.  **Jackson Mountains HMA, FONSI-Arlan Hiner  8/07/07**

**Exhibit I – A.**
**BLMs Response to Dead Wild Horse Article 2/15/08**
**Letter to the Editor- Wild Horse & Burro Division Chief, Don Glenn**
http://quarterhorsenews.com/index.php?option=com_content&task=view&id=1181&Itemid=58

## BLM Response to Dead Wild Horses Article

*Written by Don Glenn*

This letter responds to last month's article about wild horses in the Jackson Mountains of Nevada ("Wild Horses – Waiting for Water," by Linda Hussa, Jan. 15 **Quarter Horse News** and in "Industry News" on quarterhorsenews.com). A quote in the article states that the Bureau of Land Management was supposed to take care of (these wild horses). But they didn't. Actually, the BLM is supposed to manage wild horses as free-roaming wild populations. These animals roam free over millions of acres in 10 Western states, and their populations increase at 15 to 20 percent each year.

Wild horses often migrate many miles seasonally, and the terrain and vegetation make it hard to count them from the ground or the air. It is a formidable job and an imprecise science just to account for how many are in a given area. For 30 years, the BLM has relied on direct counts, monitoring range conditions, and the experience of its field personnel to estimate how many horses are in a given area, along with how many that area can sustain. We are diligently researching better census techniques and are close to a recommendation on more scientifically reliable methods. However, our population estimates are just that – and, for the reasons stated above, sometimes these estimates are off. Such was the case in the Jackson Mountains.

The accuracy of our population estimates aside, the fact is that there are still far more wild horses in some herd management areas than the habitat can support. As stated in the article, the scientific fact is that if the wild horse herds are left to multiply without control, they eat up habitat that puts other wildlife species and livestock at risks. It is true, as the article states, that the BLM was over its appropriate management level in the Jackson Mountains by 850 head; not only that, but as recently as 2001, the Bureau was over its appropriate management level nationally by almost 20,000 animals.

When populations exceed what the habitat can support, and when drought or bad winters occur, Mother Nature will control the population. That is essentially what happened in the Jackson Mountains. As the BLM was using its limited funding and personnel resources in other areas that, in our best judgment, were more critical than the Jackson Mountains, Mother Nature's cruel hand was dealt as it is, at times, with all wild animal populations. From 2001 to 2006, the BLM removed more than 10,000 animals per year from public lands to make progress toward the appropriate management level, which is the level at which horses are in balance with the land's capacity to support them, even in dry years. And while some herd management areas are still significantly over the appropriate management level, the fact is that nationally, as of February 2007, the total wild horse population was within 4 percent of the appropriate management level.

Since wild horse adoption demand has averaged less than 6,000 animals per year, the unadopted animals that have been removed have been placed on private land sanctuaries (the BLM calls them long-term holding facilities) under contract to the BLM.

The BLM currently has about 32,000 horses in its holding facilities, costing American taxpayers more than $23 million last year. We have tried to ease this financial burden by transferring some of these holding costs to the private sector and by increasing wild horse adoptions. Some of the things we have tried include a pilot project where landowners were paid a one-time fee to provide long-term pasture for the animals; a $100 per head incentive payment to nonprofit equine rescue groups to take some of these animals; a direct sales program for animals more than 10 years old; and various marketing efforts aimed at promoting our adoption program.

It is easy to say that the BLM should be forced to come to its appropriate management number, but that costs money, and the agency cannot legally overspend the wild horse and burro budget appropriated by Congress each year. So where and how many horses are gathered from the range each year must be prioritized. Feeding and caring for those in our holding facilities is our number one priority, so what is left is used to manage the free-roaming wild populations through census, monitoring, and gathers. Funding for management of these free-roaming horses on the public rangeland constitutes less than half of the BLM's wild horse and burro budget.

If the BLM were to follow through on what some have called on our agency to do, namely, leave the excess wild horses on the public range, or even put those in our contract holding facilities back onto the range, Mother Nature would step in and control the population in her own unforgiving way. But this "natural control" would occur only after causing severe damage to habitat, resulting in wildlife losses and economic harm to ranchers and rural communities.

It is difficult for some people to consider how a wild horse's life usually ends in its natural setting. The BLM's statistics show that the number of horses living in the wild that are more than 12 years old is less than 8 percent. After the horses have grazed for 12 or so years on the coarse forage and sandy soils where they live, their teeth are usually worn down and broken, which makes it hard for them to eat. When winter or drought comes, they die of starvation and/or hypothermia.

This kind of death is very cruel. First, the animal's body condition declines, and after a while it appears to be almost a walking skeleton with its hip bones, back bone, and ribs becoming very prominent. The horse gets weaker and weaker and eventually lies down. Soon it gets too weak to hold its head up and its nose rests on the ground. The animal may stay that way for several days, with its nose digging a hole in the ground. Finally, it dies. Such was the fate of the two mares and their foals that were missed during the gather and described in your article. A veterinarian I know said that he would rather euthanize a horse a year too early than a day too late.

Wild horses are truly a living piece of American history and they deserve our respect and compassion. The purpose of the BLM's Wild Horse and Burro Program is to manage these magnificent animals in the wild for the enjoyment of the American people, but it must be done in both an ecologically and fiscally responsible Way.  This is an ongoing challenge for the BLM.

Don Glenn, Division Chief
Wild Horse and Burro Program
Bureau of Land Management
Washington, D.C.
EDITOR'S NOTE – This letter was printed as a letter to the editor in the Feb. 15, 2008, issue of *Quarter Horse News.*

Exhibit I – B.
Email Offer to Coordinate Emergency Water Relief
From Cindy MacDonald – 6/08/07

----- Original Message -----

**From:** _

**To:**

**Cc:** '

**Sent:** Friday, June 08, 2007 1:25 PM

**Subject:** Re: Questions

Dear Susie-

Thank you for your response and information.

Since everyone is aware of the looming potential, I would like to be able to coordinate and organize a viable solution and plan, if possible, to prevent "emergency conditions" and the resulting emergency removals that always follow if not properly planned for.

I have been approached by a group who is interested in funding projects to keep wild horses wild and on the range versus being captured and joining the now overburdened adoption system.

One of the options we are considering is paying livestock permittees to keep their wells running after the livestock is removed. We consider this "minimum feasible management" in light of the sky rocketing containment costs of the WH&B program, while still adhering to the intent and main purpose of the 71 Act - preserving and protecting WILD horses and burros within their habitat.

This option also does not violate RAC standards of water hauling that wild horses and burros are excluded from (unlike every other "managed" species on public lands) nor does it cause unnecessary burden to the permittees themselves as they are compensated for their help. This is a reasonable alternative.

So, with this information, I would like BLM to begin identifying what areas they are most concerned now and provide a cost estimate of what they reasonably expect payment would be to the livestock operator(s) during this process.

Since the Battle Mountain HMA's are the ones being postponed, I would suspect these could be the first to inquire about.  Depending on the estimates provided by BLM, funding could be as small as one well or many wells.

Also, I believe that the Paymaster HMA's wild horses current "trouble" today are the result of a livestock operator that had a well running for some time that caused wild horses to move into the area.  Then, when he shut it off, they were forced to begin drinking from the Tonopah sewer ponds.  As a result, they are being closely monitored and it is my understanding that, this situation could possibly lead to the permanent removals of these horses.

Therefore, I would also like to recommend this well and area for consideration for funding and reimbursement to the permittee.

While I know this solution will take a little coordination, it won't take that much, and we have plenty of time to implement it.

Hopefully, you will be as excited as I am in being able to offer the mustangs and burros the assistance they need to keep living free without causing a burden to anyone.

Looking forward to your response and coordinating a working relationship that has positive benefits for everyone.

Sincerely,
Cindy MacDonald


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
~~~~~~~~~~~~~~

**Exhibit I – C.**
**Letter from BLM Nevada State Director**
**Ron Wenker – 6/13/07**



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Nevada State Office
P.O. Box 12000 (1340 Financial Blvd)
Reno, Nevada 89520-0006
http://www.nv.blm.gov



In Reply Refer To:
4700 (NV-930)                    **JUN  1 3 2007**
Cindy McDonald
3605 Silver Sand Court
N. Las Vegas, NV 89032

Dear Ms. McDonald:

Thank you for your interest in working with the Bureau of Land Management (BLM) Nevada to provide water to wild horses during the drought we are currently experiencing. Providing water (on either a temporary or long-term basis) is not a substitute for lack of forage. However, when forage becomes limiting, excess wild horses and burros will continue to need removal in order to protect the range from deterioration in accordance with Section 3(b) (2) of the 1971 Wild Free-Roaming Horses and Burros Act.

BLM generally avoids developing artificial water (such as wells) for wild horses and burros. We try to rely on naturally occurring water instead. When we establish the appropriate management level (AML), we carefully consider the amount of forage and perennial water which is available. We attempt to achieve the goal of establishing a thriving natural ecological balance at the minimum feasible level of management. While we recognize that wild horses and burros do utilize artificially developed water sources, we try to make sure the animals are not dependent on these waters as their only source. This is because if horses depend on artificial water and that source should **fail,** their lives could be at risk. An exception to this is where we develop a spring source which allows water to be maintained at the source while delivering water off site for the animals.

In any event, where wild horses and burros use developed water sources, BLM is required to obtain a water right from the State Engineer which shows wild horses and burros as the beneficial use. Legally, this is the only "guarantee" that the water would be available for the animals. "Purchasing" water from ranchers for wild horses and burros would be a short term solution at best. We do, however, recognize this may be a viable solution in an emergency situation.

Currently, BLM Nevada is at AML on about 80% of the herd management areas. To maintain AML, about 2,600 excess wild horses or burros will need to be removed annually compared to the 5,000-6,000 removed to attain AML over the past several years.  Because BLM Nevada is

currently at AML, the need for removal of large numbers of wild horses (or burros) on an emergency (unplanned) basis due to the current drought is not expected.   Nor do we anticipate the need to provide temporary water to sustain the animals until the next scheduled gather in more than a few locations.

Page 2

With respect to the Paymaster HMA, the well you reference is outside the HMA boundary. The well's location resulted in horses moving outside the HMA boundary.   Developing/maintaining water which encourages wild horses (or burros) to leave their HMA boundary is contrary to regulations (43 CFR 4710.4).

I hope the above information is helpful.

Sincerely,

Ron Wenker
State Director, Nevada

cc:  Field Managers, Nevada

Exhibit I – D.
Jackson Mountain Wild Horse Gather Plan
FONSI – Signature Arlan Hiner – 8/07/07

state, and local laws, regulations and plans.

**Finding of No Significant Impact**

Based on the analysis of potential environmental impacts contained in EA NV-020-07-EA 10, I have determined that implementation of the Proposed Action will not have a significant effect on the human environment. Therefore, in accordance with Section 102(2)(C) of the National Environmental Policy Act, the preparation of an environmental impact statement is not required for the following reasons:

1) Sensitive resource values will not be adversely impacted from implementation of the Proposed Action;
2) There will be no adverse affect on threatened or endangered, or Nevada State sensitive species;
3) The gather will not adversely affect or cause a destruction of significant scientific, cultural, or historic resources;
4) The Proposed Action will not adversely affect public health or safety. The gather and its potential effects on the human environment are not highly uncertain and do not involve unique or unknown risks.

Arlan G. Hiner
Assistant Field Manager, Renewable Resources
Winnemucca Field Office

8-7-07
Date

# Appendix I
## Applicable Legal Requirements, Laws & Regulations

### The Wild Free-Roaming Horse and Burro Act of 1971
### Public Law 92-195

**Section 1331. Congressional Findings and declaration of policy**
"Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene.  It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of public lands."  (*emphasis added*)

**Section 1332  Defintions**
As used in this Act-
"(c) "range" means the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses or burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use concept for the public lands;"  (*emphasis added*)

**Section 1333  Powers and duties of Secretary**
Jurisdiction; management, ranges, ecological balance objectives, scientific recommendations; forage allocations adjustments

"All wild free-roaming horses and burros are hereby declared to be under the jurisdiction of the Secretary for the purposes of management and **protection** in accordance with the provisions of the Act.  The Secretary is authorized and directed to protect and manage wild free-roaming horses and burros as components of the public lands, and he may designate and maintain specific ranges on public lands as sancturaries for their protection and preservation, where the Secretary after consultation with the wildlife agency of the State wherein any such range is proposed and with the Advisory Board established in section 1337 of this Act deems such action desirable.  The Secretary shall manage fee-roaming wild horses and burros in a manner designed to achieve and maintain a thriving natural ecological balance on the public lands.  He shall consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies and may include members of the Advisory

Board established in section 1337 of this Act.  All management activities shall be at the minimum feasible level and shall be carried out in consultation with the wildlife agency of the State wherein such lands are located in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species.  Any adjustments in forage allocations on any such lands shall take into consideration the needs of other wildlife species which inhabit such lands.  (*emphasis added*)

(iv) such additional information as becomes available to him from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (I-iv) above on the basis of all information currently available to him, that an **overpopulation** exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels.  Such action shall be taken, in the following order and priority, until all excess animals have been removed so as to restore a thriving ecological balance to the range, and protect the range from the deterioration associated with **overpopulation.** (*emphasis added*)

# Federal Lands Policy and Management Act of 1976
# Public Law 94-579

**Title 1, Definitions-**
**Sec. 102. [43 U.S.C. 1701] (a)**
"The Congress declares that it is the policy of the United States that–  (b) The policies of this Act shall become effective only as specific statutory authority for their implementation is enacted by this Act or by subsequent legislation and shall then be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law." (*emphasis added*)

**Title 1, Definitions-**
**Section 103 [43 UUSC 1702] (c):**
"The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of theses resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that take into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." (*emphasis added*)

**Title 1, Declaration of Policy, Section 102-(7)**:
"goals and objectives be established by law as guidelines for public land use planning, and that the management be on the basis of multiple use and sustained yield <u>unless otherwise specified by law:</u>" (*emphasis added*)

**Title 1, (4):**
"<u>the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes</u> and that Congress delineate the extent to which the Executive may withdraw lands without legislative action;" (*emphasis added*)

**Title 1, Definitions, Section 103. [43 U.S.C. 1702]:**
"Without altering in any way the meaning of the following terms as used in any other statute, whether or not such statute is referred to in, or amended by, this Act, as used in this Act-"

**Title 1, Definitions, Section 103. [43 U.S.C. 1702] (a):**
"The term "areas of critical environmental concern" means areas within the public lands <u>where special management attention is required</u> (when such areas are developed or used or where no development is required) <u>to protect and prevent irreparable damage to important historic, cultural,</u> or scenic values, fish and wildlife resources or <u>other natural systems or processes,</u> or to protect life and safety from natural hazards" (*emphasis added*)

**Title 2, Land Use Planning, Section 201 [43 U.S.C. 1711] (a):**
"The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern."

**Title 3, Administration, Section 302. [43 U.S.C. 1732] (a):**
"The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 202 of this Act when they are available, <u>except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law.</u>" (*emphasis added*)

**Title 4, Grazing Leases and Permits, Section 402. [43 U.S.C. 1752] (h):**
"Nothing in this Act shall be construed as modifying in any way law existing on the date of approval of this Act with respect to the creation of right, title, interest or estate in or to public lands or lands in National Forests by issuance of grazing permits or leases."

**Title 7, Effect on Existing Rights; Section 701. [43 U.S.C. 1701 note] (a):**
"<u>Nothing in this Act, or in any amendment made by this Act, shall be construed as terminating any valid</u> lease, permit, patent, right-of-way, <u>or other land use right or authorization existing on the date of approval of this Act</u>." (*emphasis added*)

**Title 7, Effect on Existing Rights; Section 701. [43 U.S.C. 1701] (f):**
"<u>Nothing in this Act shall be deemed to repeal any existing law by implication.</u>" (*emphasis added*)

**Title 7, Effect on Existing Rights; Section 701. [43 U.S.C. 1701] 6 (h) states:**
"<u>All actions</u> by the Secretary concerned under this Act <u>shall be subject to valid existing rights</u>."
(*emphasis added*)

# Code of Federal Regulations
## Title 43 Public Lands: Interior  Part 4700
## Protection Management and Control of Wild
## Free-Roaming Horses and Burros

**Subpart 4700—General  §4700.0–1 Purpose.**
"The purpose of these regulations is to implement the laws relating to <u>the protection,</u> management, and control of wild horses and burros <u>under the administration of the Bureau of Land Management."</u> (*emphasis added*)

**§4700.0–2 Objectives.**
"The objectives of these regulations are management of wild horses and burros as an integral part of the natural system of the public lands under the principle of multiple use;"
(*emphasis added*)

**§4700.0–5 Definitions.**
"As used in this part, the term:

(d) *Herd area* means the geographic area identified as having been used by a herd as its habitat in 1971.

(e) *Humane treatment* means handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro.

(f) *Inhumane treatment* means any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community.

**§4700.0–6 Policy.**
(a) <u>Wild horses and burros shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat.</u>  (*emphasis added*)

(b) <u>Wild horses and burros shall be considered comparably with other resource values in the formulation of land use plans.</u>  (*emphasis added*)

(c) Management activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior.

**§4710.1 Land use planning.**
Management activities affecting wild horses and burros, including the establishment of herd management areas, shall be in accordance with approved land use plans prepared pursuant to part 1600 of this title. (Land Use Plans must be in accordance with laws established in FLMPA)

**§4710.3–1 Herd management areas.**
Herd management areas shall be established for **the maintenance** of wild horse and burro herds. In delineating each herd management area, the authorized officer shall consider the appropriate management level for the herd, **the habitat requirements of the animals**, the relationships with other uses of the public and adjacent private lands, and the constraints contained in §4710.4…. (*emphasis added*)

**§4710.5 Closure to livestock grazing.**
(a) If necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury, the authorized officer may close appropriate areas of the public lands to grazing use by all or a particular kind of livestock. (*emphasis added*)

(c) Closure may be temporary or permanent. After appropriate public consultation, a Notice of Closure shall be issued to affected and interested parties.

**§4710.6  Removal of unauthorized livestock in or near areas occupied by wild horses or burros.**
The authorized officer may establish conditions for the removal of unauthorized livestock from public lands adjacent to or **within areas occupied by wild horses or burros to prevent undue harassment of the wild horses or burros**. Liability and compensation for damages from unauthorized use shall be determined in accordance with subpart 4150 of this title. (*emphasis added*)

**§4720.1 Removal of excess animals from public lands.**
Upon examination of current information and a determination by the authorized officer that an excess of wild horses or burros exists, the authorized officer shall remove the excess animals immediately in the following order. (This does not authorize ALL animals being deemed by the BLM as excessive for exclusive use authorizations.)

**§4740.1 Use of motor vehicles or aircraft.**
(a) Motor vehicles and aircraft may be used by the authorized officer in all phases of the administration of the Act, except that no motor vehicle or aircraft, other than helicopters, shall be used for the purpose of herding or chasing wild horses or burros for capture or destruction. All such use shall be conducted in a humane manner.

```
"Toni Moore" <toni_cwhbc@msn.com>
05/27/2008 04:01 PM
To
<Mary_Taylor@blm.gov>
cc
<Melissa_Kindall@blm.gov>
Subject
Comments for CO-110-2008-052
```

Dear Melissa and Mary:

Here are my comments which are supplemental to those submitted by Valerie
Stanley on CWHBC and behalf of the Moore's.

Thanks,

Toni Moore

**ATTACHMENT TO E-MAIL**


May 25, 2008

                            Delivered via Email: Mary_Taylor@blm.gov
                            And Melissa_Kindall@blm.gov

Kent Walter
Field Office Manager
White River Field Office
Bureau of Land Management
220 East Market Street
Meeker, CO 81641

Dear Mr. Walter:
The following comments are submitted in response to EA CO-110-2008-052 on behalf of the
Colorado Wild Horse and Burro Coalition.

The description and background of the proposed action neglects to state the wild horse herd
use area is predominately unfenced and wild horses have utilized the areas west and south of
the stated boundaries before and after the passage of the 1971 Wild Free Roaming Horses and
Burros Act. BLM arbitrarily chose this "boundary" to be in conjunction with grazing allotment
boundary lines. Livestock do not honor this boundary (as evidenced in numerous allegations
between the Cripple Cowboy and Twin Buttes Allotments) as do wild horses which continue to
utilize the unfenced areas adjacent to the "herd area boundary" as they have done for
hundreds of years. WRFO has chosen to reduce or remove the original herd use areas utilized
by all wild horses within their jurisdiction. CWHBC has repeatedly brought concerns over this
misstatement to no avail nor any real explanation from BLM as to why artificial management
boundaries were                                              chosen. Public comments
taken during the scoping process in the late 1970s were examples of this lack of inclusion of
actual herd habitat. We assert there is and has been a flagrant disregard for the original herd
use area of the West Douglas Creek Wild Horse Herd since the beginning of the planning
process in the 1970s.

We also take exception to the statement that the proposed West Douglas Herd Area Plan Amendment to the 1997 White River Resource Management Plan (EA CO-WRFO-05-083) was resolved with the decision affirmed and approved on October 10, 2007.  BLM neglected to state there was a pending court case and was merely affirming its own decision.

The WRFO BLM proposes to "remove all wild horses from areas within and from areas outside the boundaries of the WDHA at the earliest practicable date" with this document, yet has not included any census data (numbers, age, sex and locations) for the horses.  BLM has granted themselves an unrestricted, unplanned pass lasting for an undetermined time to remove, harass wild horses in the West Douglas Creek Herd Area.  BLM does not define what type of emergency would need to occur for the roundup to begin prior to October 1, 2008.  Nor does it include a process that would advise the public of this emergency and the pending immediate removal.

This document does not analyze nor provide the information required to adequately discuss "net gunning and darting capture methods", yet advises these and other methods could be analyzed under a separate Environmental Assessment.  If wild horses are intended to be removed from the West Douglas Creek Area permanently, as this document states, all potential methods of removal must be discussed, analyzed, and the ability for public comments must be provided for in the document.  While BLM points to the 1997 RMP as the originating document which calls for removal and affirms it with the 2007 RMP Amendment decision, it fails to note **that a land use plan may not supersede a federal law.**  Locally derived decisions such as this have had significant impact on all wild horse and burro herds located within the United States. On a national scale, BLM has utilized locally derived land use plans to avoid the required monitoring and inventorying process.

While other natural resources and vested interests are guided by a management plan (grazing allotment management plan, oil and gas management plan, travel management plan, etc.) the wild horse management plan only contains information in regard to removal of wild horses and is grossly outdated (1996).  It does not contain what is needed for continued successful management, such as biotic needs, discussions concerning self sustaining populations, impacts from vested interests and co-existence with other resources.  Instead, all documents relating to wild horses discuss the impacts wild horses will have on other natural resources and how they will affect vested interests leasing our public lands.  Documents such as the WRFO Fire Management Plan Environmental Assessment (CO-017-WR-99-99-EA), page 67; relates that wild horse movement is heavily influenced by livestock fences which occur in 10 overlapping allotments.  This document further states that lack of a boundary fence and "large population increases have fostered horse movement into areas **not recently occupied**".   In this document, BLM does not elaborate on the term "recently occupied", in fact, BLM has systematically reduced the habitat available to wild horses, via land use plans, since passage of the Wild Horse and Burro Act.  Again we assert this action is arbitrary and capricious. When habitat reduction is compounded with pressures from vested interests such as livestock grazing, wild horses will be removed under the guise of overpopulation and/or migration out of boundary areas.  Yet, these scenarios and impacts are not mentioned in the outdated HMAP. While the Bureau of Land Management is charged with maintaining current monitoring and inventorying data this document is lacking all such information, relying strictly on a land use plan amendment for direction.

In a telephone call to Melissa Kindall, Range Technician for Wild Horses on Friday, May 23, 2008, I was advised the current estimated census data was derived from the 2006 WDC wild horse removal. That data only indicates what was removed from the wild horse range, not what is on the range at the time of compiling the environmental assessment. Extrapolation of data is the mode of identifying and establishing numbers in West Douglas Creek. BLM has not reviewed the ages, sex and number of animals on the range to ascertain a pattern of what is actually there. BLM in previous documents advises there is not a sufficient number of animals to be genetically self sustaining, therefore they must be removed, yet this document advises there are approximately 142 animals in the herd area, just 8 short of being what is required to maintain a genetically self-sustaining population. While we are aware a mark-remark system is the best available methodology for census, our requests for this type of census has been consistently denied by BLM over the course of the past 18 years.

This document makes assumptions without providing for review of the science methodology. For example, on page 4, Water Quality, Surface and Ground, states "Livestock are managed to allow for vegetation rest during the growing season, while wild horses graze year-round. The removal of wild horses would allow vegetation some rest during the growing season. With this rest, the removal of wild horses is expected to improve watershed stability, decreasing sediment and salts which would all indirectly improve water quality."

This document does not provide the information gathered from monitoring water quality (surface and/or ground) after livestock are removed and when wild horses are present. With numerous water sources only being seasonal it lacks identification of these specific areas. The document lacks data indicating how previous removals of wild horses have improved watershed stability, decreased sediment and salts and overall improve water quality. If a major goal is to improve water quality, why not remove livestock or at the very least reduce numbers? The Twin Buttes Allotment has approximately 1200 mother cows along with calves from late February through October, yet discussion of those impacts are absence in this document and the HMAP. There is no discussion concerning impacts from vehicle traffic by energy interests and recreational uses. Without including the science behind BLM's assertions of impacts to water quality, it is impossible to accurately assess a benefit from any wild horse removal, much less a complete wild horse removal. This would be the only reason to remove any wild horses from a given area, and that would be if they could be named as the source of the impact. Only the number of animals which are causing the impact is the number of animals which can legally be removed. The same is true for the section concerning Air Quality. The lack of improvement of range conditions following wild horse removals has been discussed in a GAO report with no major changes in policy among BLM offices to correct these concerns.

We find it less than amusing that BLM will ensure that plans for follow up roundups will not unnecessarily compromise "important" big game activities, meaning hunting. Wild horses, while having a specific law to protect and manage them, have consistently been treated as less than equal with other terrestrial wildlife.

Environmental Assessment CO-110-2008-052 is completely void of any monitoring data required to remove any wild horses from public lands and thereby should be considered void, the same as the previous environmental assessment presented in 2005 which was removed from consideration as it indicated energy development necessitated the removal of wild horses from this area. BLM must find a consistent story and stick to it. Wild horses are being removed to make way for livestock grazing or they are a road block for energy development on public

lands. Either way, both of these lines of reasoning exceed the statutory authority granted to BLM to manage and protect wild horses on public lands. BLM must be directed to manage wild horses within their entire original habitat in self sustaining populations in accordance with applicable laws and regulations.

This document does not discuss the merits or impacts of water and hay trapping as a method of capture. BLM does not mention current range conditions in this document. Thereby we are unable to offer extensive or meaningful comments in the areas of hay or water trapping. If extended hay trapping is chosen, we have concerns that the range could be severely impacted by this action. BLM does not offer solutions as to keeping elk, deer, and livestock out of the traps. Water trapping this year will not be an effective process as many of the springs and streams will be flowing or have water in them well into the fall due to heavy snow pack from the past winter. If BLM chooses to pursue either method, a detailed plan must be included in the removal plan for public comment.

The WRFO has not adequately discussed the merits or impacts of a winter roundup to the overall health and safety of the animals. Will bands with foals under the age of one year be subjected to the same protocol as bands without foals in deep snow and frigid temperatures? Helicopter drive trapping wild horses during the winter has been avoided in previous roundups in Colorado as being counterproductive to the overall health and safety of the horses. Why the change to expeditiously remove the animals without regard to what was considered standard removal practices? BLM does not have capacity to accurately access each animal's individual health prior to and following a roundup during this time of year.

Ten hours is too long for domestic horses to be without water, much less wild horses that have been challenged with the stress of a roundup, potential parasite involvement (which is an integer predisposing horses to colic). This protocol knowingly neglects the wild horse's needs and is therefore, considered abusive treatment as defined by law in Colorado. BLM has conflicting information has to the length of duration animals will be left on trailers not in transport and provided with food and water. Again if this roundup or future roundups are permitted, intermediate transport to the Yellow Creek Facility is most humane and acceptable treatment of these animals.

This leads us to concern about appropriate feed and water. If the animals are immediately hauled directly to Canon City, how will they be feed and watered in less than an eight or nine hour period? If this roundup(s) is/are allowed to occur, animals must be hauled to the Yellow Creek Facility located approximately one hour away in the Piceance-East Douglas Creek Herd Use Area to be held, treated and assessed for travel. We strongly recommend these animals be tested for Equine Infectious Anemia prior to transport from a 90 mile area from the Herd Area to be in compliance with laws and regulations mandated for domestic equine travel. Accordingly, we insist that all contractor's horses possess a current (less than 6 months old) Coggins Test, for Equine Infectious Anemia and be recently dewormed and all core vaccinations performed as recommended by the AAEP (American Association of Equine Practioners), this includes influenza and rabies. We also are strongly urging the contractor's horses be examined daily for strangles (subtle or more evident of the disease, snotty noses, swollen lymph nodes, etc.) before, during, and after the roundup so as to adequately advise the Canon City facility and potential adopters of exposure. If the contractor's horses exhibit any one of the above symptoms, they must not be allowed in the herd area or near the wild horses.

This leads us to our next concern, of lack of oversight for humane treatment of the animals during the capture process.  There have been no trained observers to validate distance of travel, depth of snow, and pace of travel of the animals on previous roundups.

We can refer to the 1996 WDC roundup where a helicopter roping directly resulted in the death of a young mare.  Toni Moore from CWHBC and Judy Cady, Friends of the Mustang, witnessed this incident where the helicopter ran the young mare over a ledge where she was chased by two mounted horseman who roped her head and rear leg  which forcefully threw the mare to the ground, stretching her and promptly fracturing her rear leg.  She was then dragged into a trailer (not on a trap or piece of wood) near the trap and hauled to the holding facility, some thirty minutes away.  She was not seen by the BLM contract veterinarian, Paul Neilson, DVM from Meeker, Colorado.   She was forced to stand in a pen with other horses from the roundup until her examination some 24 hours later. The young mare was euthanized upon examination by Dr. Neilson.

During this same roundup Toni Moore adopted a young filly, without a fee attached, who was approximately 4 months old who had apparent injuries to her front legs.  This filly was placed in leg braces for approximately one week by Dr. Donald Moore.  She was able to walk with the braces, radiographs confirmed no fractures.  She was examined by Dr. Jack Muller, a race track veterinarian who advised her condition was one seen on young racehorses who were ran too far, too fast, at too young of an age.  Dr. Muller and Dr. Moore further advised the only humane recourse was to euthanize the filly, which was done as she undoubtedly suffered ruptured tendons.  BLM indicated this filly was only moved a "very short distance".

The 2006 roundup, also utilized existing barbed wire fencing covered with jute as wings leading into the trap site.  This action was confirmed upon receipt of the information by then State Director, Bob Abbey.  WRFO BLM has not allowed humane advocates advance notice and location of subsequent roundups and we can only assume similar tactics were employed in subsequent roundups.

With reference to trap dimensions, size or configuration, we can only rely on what occurred during the most recent roundup in, October, 2006.  Dr. Donald Moore, a practicing veterinarian and previous BLM contract veterinarian for roundups, went into the herd area with the intent to photograph the trap and horses, only to be denied access to the trap (on the other side of a horse trailer) by BLM official Mark Hafkenshield and the Contractor's Representative.  Dr. Moore then asked Mr. Hafkenshield to take a picture of the trap with his personal camera.  That request was denied.  Dr. Moore noted it appeared the animals were being hazed (ran) directly into a horse trailer with wings comprising of panels covered with jute absent any "trap corral".  If this apparent mode of nonconforming trapping method is to be utilized again to expeditiously remove wild horses from public lands, we can only come to the assumption that wild horse safety and health is not as much a priority as complete removal from public lands in the West Douglas Creek Herd Area.

Only recently was CWHBC made aware of APHIS Veterinarian James Williams presence at the WDC roundup on 10-12-06 and observance of the fatal injuries sustained by two wild horses. The modification of the capture facility by adding additional jute screening material would not make the barrier more visible to the

animals, in fact, it would camouflage the barrier.  CWHBC concerns of a lack of initial and appropriate set up of facilities is evidenced by this report.

We are recommending that the WRFO have a contract veterinarian or APHIS veterinarian (with actual practice experience with horses) be in the helicopter during all helicopter drive trapping as well as to be available to treat and monitor animals at the trap facility. BLM will not be able to distinguish a chronic disease or accurately access the need for continuous care for acute pain and suffering at the trap site and this must be done by a licensed veterinarian.

Previously, in 1994 the Bureau of Land Management presented to the Animal Welfare Committee of the Colorado Veterinary Medical Association (which comprised of small and large animal veterinarians) along with representatives from the American Mustang and Burro Association and CWHBC their proposal for net gun trapping. Following a presentation by the contractor, James Innes and discussion by the group, the committee did not recommend the use of this method of capture and BLM advised they would not seek approval or use of this "tool" in further roundups. We are alarmed that BLM would again seek such an inhumane "tool" to remove wild horses from public lands. The information associated with this type of removal must be included in this origination document to adequately discuss the methods in a timely fashion, especially if this would be the only available method to completely remove animals from the herd use area. Lack of inclusion of any discussion on this method prohibits meaningful and thoughtful discussion of the issue and depicts a lack of planning on the part of the WRFO.

Darting of wild horses for removal on public lands is another "tool" BLM may consider at a later date. Again we would prefer to review in the type of drugs which would be utilized, recovery times, means of transportation to a holding facility, time of year the darting would occur, etc.

Upon review of the list of interested public and the interdisciplinary review team we are unable to locate experts in the field of net gun trapping or darting procedures as they would relate to wild horses.

While this document begins to mention capture method descriptions on page 10, it does not begin to discuss the methodology used to measure the overall health status of a band, how weather conditions, temperature, the time of the year will affect or impact the animals being removed. We are, however, treated on page 11, to a paragraph written in a romantic novel style concerning Judas horses. While amusing, there is little science associated with this paragraph, which is our

main concern. Science and the data implicating a removal are needed, but is lacking throughout this entire environmental assessment.

BLM is not planning on having these animals available for viewing by the public prior to transportation to the Canon City facility, yet describes that they can place animals with "adopters locally". We are concerned an adoption market does not exist for these animals (evidenced by the current number of animals in BLM holding facilities, lower adoption fees, and sale authority for WDC horses sent to a sanctuary and were subsequently sold from the 2001 removal). With current fuel prices, hay prices and the lack of facilities to house horses in the closest major population area (Grand Junction), we believe that combined with their size and disposition there is virtually no adoption market for these animals. While we have seen successful domestication of young foals from this area. Horses which are older resist domestication which eventually leads to a trip to the sale barn, meaning a certain death, following the one year adoption period.

The White River Field Office has and will continue to have tremendous impacts from energy developments.  The WRFO RMP Oil and Gas Plan Amendment is in the planning stages.  While BLM denies this scope of the plan amendment will address nothing beyond energy development, it is unlikely that will be the case.  A subcommittee was sanctioned by the NW Resource Advisory Council.  It met in late February, 2008; its purpose was to offer comments to the RAC for inclusion to the proposed amendment.  There have been no further meetings or contact to the subcommittee members since that time, but the subcommittee members representing livestock, wild horses, and environmental issues agreed the impacts from energy development would severely impact these uses and resources and recommended the scope of the plan amendment be broaden to encompass these concerns.  The Bureau of Land Management, WRFO forcing removal of the West Douglas Creek Wild Horse Herd without reviewing the impacts to the Piceance-East Douglas Creek Herd.  BLM has stated they only "want" to have one "quality" wild horse herd in the resource area.  While we take exception to their stated desires, the PEDC Herd will possibly face extinction if the proposed energy development increases in and around their habitat, leaving the WRFO without any wild horse herds.  It appears this could be the goal of the WRFO, not to manage any wild horses within their field office.

In fact, BLM has not begun to gather follow up data from the 2006 Piceance East Douglas roundup where they injected several mares with PZP birth control (conversation with Melissa Kindall, May 23, 2008).  While HSUS allowed the use of this drug in a "trial" setting, one can only image they would like to have the data to see if the drug applications were successful.  The lack of protocol for management of wild horses within an area BLM states they "choose" to manage

them in is extremely similar to that of the area which they "choose" not to manage them.  While the Act states the authority agency has the ability to

remove wild horses under certain circumstances, such a broad interpretation and statutory authority was not granted in the Act nor subsequent laws, regulations, or amendments.  Since the inception of management plans within the WRFO, beginning with the (Unit Resource Analysis, Management Framework Plans, Resource Management Plans), various allotment management plans, permits for drilling, wildlife management plans, all have one common theme.  They do not recognize the 1971 Wild Free Roaming Horses and Burros Act as an equal document.  CWHBC review of these historical documents and those more recent documents all point to the wild horse as the reason for range degradation, substandard water quality, substandard air quality, and the list continues.  What these documents do not acknowledge for is the legal right granted to wild horses to remain in areas they occupied at passage of the Act in genetically, self sustaining numbers.


Very Truly Yours,


Toni H. Moore
Colorado Wild Horse and Burro Coalition
1787 K 6/10 Road
Fruita, CO 81521