UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
**COLORADO WILD HORSE**             )
**AND BURRO COALITION, INC.,**      )
**et al.**,                         )
                                   )
      **Plaintiffs**     )
                                   )
                                   )
v.                                 )     Civil No. 06-1609 (RMC)
                                   )
**DIRK KEMPTHORNE,**                )
in his official capacity as Secretary,  )
United States Department of Interior )
1849 C Street, N.W.                )
Washington, D.C. 20240,             )
**et al.**,                         )
_____)

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

                Valerie J. Stanley
                D.C. Bar No. 384882
                329 Prince George Street
                Laurel, MD 20707
                (301) 549-3126
                (301) 549-3228 fax

                Mara C. Hurwitt
                D.C. Bar No. 482409
                Dewey & LeBoeuf LLP
                1101 New York Ave. N.W.
                Suite 1100
                Washington, D.C. 20005-4213
                (202) 346-8094
                (202) 956-3280 fax

                Counsel for Plaintiffs

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

I.   BLM's Decision to Zero Out the West Douglas Herd of Wild Horses is a Final Agency Action ............................................................................................... 1

II.  BLM's Management of Wild Horses in the Piceance/East Douglas Herd Management Area Does Not Absolve the Agency of its Duties to the West Douglas Herd Under the WFHBA ........................................................................... 4

III. BLM's Reliance on the Absence of a Statutory Prohibition Against Zeroing Out a Wild Horse Herd is Contrary to Law and Precedent ........................ 5

IV.  BLM's Interpretation of its Authority Under the WFHBA is Not Entitled to Chevron Deference ............................................................................................. 7

V.   BLM is Required to Notify Congress of Its Plans to Zero out the West Douglas Herd ........................................................................................................ 11

VI.  BLM's Plans to Zero Out the West Douglas Herd Requires Preparation of an EIS ..................................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Aid Ass'n for Lutherans v. USPS,
   321 F.3d 1166 (D.C. Cir. 2003) ..................................................................................8

American Horse Protection Ass'n v. Watt,
   694 F.2d 1310 (D.C. Cir. 1982) ................................................................................12

American Petroleum Institute v. EPA,
   52 F.3d 1113 (D.C. Cir. 1995) ....................................................................................7

Arlington Central School District Board of Education v. Murphy,
   548 U.S. 291 (2006) ....................................................................................................7

Bennett v. Spear,
   520 U.S. 154 (1997) ....................................................................................................4

Chevron U.S.A., Inc. v. NRDC,
   467 U.S. 837 (1984) ....................................................................................................7

Circuit City Stores v. Adams,
   532 U.S. 105 (2001) ....................................................................................................7

Domestic Securities, Inc. v. SEC,
   333 F.3d 239 (D.C. Cir. 2003) ....................................................................................3

FAG Italia S.p.A. v. United States,
   291 F.3d 806 (Fed. Cir. 2002) ................................................................................ 6-7

Lousiana Public Service Commission v. FCC,
   476 U.S. 355 (1986) ....................................................................................................7

Mountain States Legal Foundation v. Hodel,
   799 F.2d 1423 (10th Cir. 1986) ................................................................................13

Pennsylvania Department of Public Welfare v. Davenport,
   495 U.S. 552 (1990) ....................................................................................................7

Railray Labor Executives' Ass'n v. National' Mediation Board,
   308 U.S. App. D.C. 9, 29 F.3d 655 (D.C. Cir. 1994) .................................................8

Southern California Edison Co. v. FERC,
   195 F.3d 17 (D.C. Cir. 1999) ......................................................................................7

University of the District of Columbia Faculty Ass'n v. District of
Columbia Financial Responsibility & Management Assistance
Authority,
　　163 F.3d 616 (D.C. Cir. 1998) ..................................................................................6

Varity Corp. v. Howe,
　　516 U.S. 489 (1996) ...............................................................................................7

**STATUTES**

16 U.S.C. § 1331 ..................................................................................................1, 5, 8, 11

16 U.S.C. § 1333(b)(2) ..............................................................................................6, 7

16 U.S.C. § 1334 ..................................................................................................................9

16 U.S.C. § 1339 ..................................................................................................................9

43 U.S.C. § 1712(e)(2) .................................................................................................12, 13

**REGULATIONS**

43 C.F.R. § 4700.0-5 ..........................................................................................................9

43 C.F.R. § 4700.0-5(d) ....................................................................................................9

43 C.F.R. § 4710.4 ..............................................................................................................9

43 C.F.R. § 4750.3 ..............................................................................................................9

Revision of Existing Regulations on Protection, Management, and Control
of Wild Free-Roaming Horses and Burros,
　　51 Fed. Reg. 7410 (1986) ......................................................................................9

**MISCELLANEOUS**

Velma B. Johnston, *The Fight to Save a Memory*,
　　50 Tex. L. Rev. 1055 (1972) ...................................................................................9

**INTRODUCTION**

In support of their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, Bureau of Land Mangement ("BLM") sets forth numerous internally inconsistent arguments and a whole array of straw-man arguments that do not specifically counter any of the assertions Plaintiffs have made. In response to the issue in this case, whether BLM may zero out wild horses in an area that those horses occupied at the passage of the Wild Free-Roaming Horses and Burros Act ("WFHBA" or "Act"), 16 U.S.C. §§ 1331, et seq., BLM contends that it is not zeroing out the area, that the area is not a herd area, that it only began referring to the area as a herd area in 1986, that its purpose in eliminating 259,826 acres of the horses' habitat is to limit the horses to their "preferred habitat," that the decision to zero out the herd is a creature of at least seven different planning documents, and that the decision to zero out has been made, alternatively, due to oil and gas development, livestock grazing and "cultural values" throughout the years.

**ARGUMENT**

**I.   BLM's Decision to Zero Out the West Douglas Herd of Wild Horses is a Final Agency Action**

Defendants claim that the final decision to zero out the West Douglas herd is not reviewable as a final agency action. Def. Br. at 9-10. Instead, they assert, Plaintiffs should be required to limit their challenge to the July 14, 2008 West Douglas Herd Area Wild Horse Removal ("2008 WDHA Gather Plan") EA. Id. However, as Defendants acknowledge, the scope of the 2008 WDHA Gather Plan EA is limited to "the actual method to be used to remove horses from the West Douglas Herd Area ("WDHA")." Id. See also Supplemental AR, Doc. 7-18 (BLM Response 1 to public comments on the 2008

1

WDHA Gather Plan: "Your comments concern the decision to remove the horses, which is beyond the scope of this environmental assessment."). Under Defendants' logic, BLM's decision to eradicate the herd is not, never was and never can be subject to judicial review. This argument is preposterous on its face and should be rejected as such.

This case concerns not merely <u>how</u> BLM will remove the remaining members of the West Douglas herd, but the illegality of BLM's decision to eradicate the herd in violation of the WFHBA, as well as Defendants' failure to comply with the requirements of the National Environmental Policy Act ("NEPA"), the Federal Land Policy Management Act ("FLPMA"), the Administrative Procedure Act ("APA") and associated federal regulations. Plaintiffs' Second Amended Compl., ¶¶ 1-2, 19-42, 68-90. Defendants have previously argued that this Court did not have jurisdiction to review BLM's proposed amendment to the 1997 White River Resource Management Plan ("White River RMP") until BLM issued a final decision in response to protests lodged against the proposed amendment. Memorandum in Support of Defendants' Motion to Dismiss at 16. That final decision was issued by the Secretary of the Interior on October 10, 2007, implementing the Record Decision on the 2005 Amendment to the White River RMP—a newly issued reaffirmation of the 1997 RMP—that directs "the total removal of the wild horses in the West Douglas Herd Area at the earliest practicable date." AR Vol. 1, Tab 12, pp. 70-71. That decision to eradicate the West Douglas herd is now ripe for review by this Court because, on July 14, 2008, BLM published the Final Decision Record ("Final DR") on the EA for the 2008 WDHA Gather Plan. Supplemental AR, Court Doc. 73-18, and BLM has hired a contractor to round-up the last of the West

2

Douglas horses during the period October 1–7, 2008.  Third Declaration of Kent Walters, Field Manager for the BLM White River Field Office.

Defendants' October 10, 2007 decision on the 2005 Amendment to the White River RMP is a final agency action subject to judicial review under the APA because it "marks the consummation" of the Department of the Interior's decision-making process with regard to the zeroing out of the West Douglas herd.  Domestic Secs., Inc. v. SEC, 333 F.3d 239, 246 (D.C. Cir. 2003) (internal citation omitted).  BLM's issuance of the Final DR on the 2008 WDHA Gather Plan, coupled with BLM's specific scheduling of and contracting for the round-up of the remaining West Douglas horses, makes it clear that the decision to eliminate the West Douglas herd is not a "tentative recommendation," but a "final and binding determination" "from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 178 (1997).  As such, it satisfies the conditions of a final agency action and is subject to review by this Court.  Id.

Plaintiffs do not believe it is necessary for the Court to consider the narrow matters addressed in the 2008 WDHA Gather Plan EA, i.e., the methods to be used in rounding up the West Douglas horses, in order to decide the issues before it in this action. The 2008 WDHA Gather Plan EA discusses neither the decision to eliminate the West Douglas herd, nor even the planned disposition of the wild horses following the round-up.  However, if the Court determines that the issues relating to the 2008 WDHA Gather Plan EA should be fully briefed by the parties, those issues should be addressed in supplemental briefings, as the EA was issued well after Plaintiffs filed their brief-in-chief and was first filed as an attachment to Defendants' Cross-Motion for Summary Judgment.

**II.    BLM's Management of Wild Horses in the Piceance/East Douglas Herd Management Area Does Not Absolve the Agency of its Duties to the West Douglas Herd Under the WFHBA**

Defendants' assertion that BLM can eradicate the West Douglas herd because other wild horses will remain (at least for the present) in the adjacent Piceance-East Douglas Herd Management Area ("HMA") is of no avail.  See Def. Br. at 14-15.  Defendants concede that the West Douglas horses are "geographically separated in scope and purpose from other wild horses . . . in Colorado," and, further, that the West Douglas and East Douglas herds are "two geographically isolated wild horse herds with little to no relation."  Def. Br. at 28, citing AR Vol. 1, Tab 73, 503.  In fact, BLM notes that, "claims have been made that the West Douglas herd includes some of our remaining truly wild horses.  The horses have a reputation of possessing high levels of self-preservation.  They flee the moment they sense human presence. The herd's tendency towards aggression and acute awareness of human presence is likely an adaptation to their environment."  2004 EA, Vol. 2, Tab 28, p. 328.

BLM maintains that it can ignore the mandates of the WFHBA, managing wild horses for its own administrative convenience and eliminating them from areas of their historic habitat as it so chooses.  Def. Br. at 13.  Defendants acknowledge that BLM's own regulations define a herd area as "the geographic area identified as having been used by a herd as its habitat in 1971."  Id. (quoting 43 C.F.R. § 4700.0-5(d)).  But Defendants offer the spurious argument that the West Douglas Herd Area ("WDHA") was not a herd area in 1971, because, although the term identifies areas occupied by wild horses in 1971, it was first defined in BLM's implementing regulations issued several years later.  Def. Br. at 13.  Nonetheless, this does not alter the fact that wild horses were indeed present in the WDHA at the time of the passage of the WFHBA, that BLM recognized them as

4

being present there, see Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts ¶¶ 1 and 2, and, therefore, the wild horses of the WDHA are to be maintained as an integral part of that geographic range. See 16 U.S.C. § 1331.

Defendants state that "[t]he West Douglas Herd Area does not reflect where wild horses were found in 1971." Plaintiffs are unsure of what this statement is intended to convey, because Defendants do not claim that wild horses did not occupy the WDHA in 1971. Rather they acknowledge that, for the purposes of the WFHBA, the historical wild horse habitat includes the West Douglas Herd Area. Def. Br. at 14-15 ("The area of wild horse use at the passage of the Act was an area of 187,970 acres . . . encompassing the present-day West Douglas HA and the Piceance-East Douglas HMA.").

### III.  BLM's Reliance on the Absence of a Statutory Prohibition Against Zeroing Out a Wild Horse Herd is Contrary to Law and Precedent

Defendants do not assert that the WFHBA—or any statute—expressly authorizes BLM to zero out a herd. Rather, BLM contends that it may base its alleged authority solely on the "absence of any clear statutory prohibition." Def. Br. at 16. This argument is easily disposed of. The D.C. Circuit has repeatedly held that an agency may not rely on the absence of an express statutory withholding of the power to engage in certain conduct as an implicit grant of such authority. See, e.g., Univ. of the Dist. of Columbia Faculty Ass'n v. Dist. of Columbia Fin. Responsibility & Mgmt. Assistance Auth., 163 F.3d 616, 621 (D.C. Cir. 1998) (rejecting premise that an agency "has the authority to do anything that is not expressly prohibited" by statute as requiring a "tortured statutory interpretation") (internal citations omitted). Accord FAG Italia S.p.A. v. United States,

5

291 F.3d 806, 816 (Fed. Cir. 2002) ("It is indeed well established that the absence of a statutory prohibition cannot be the source of agency authority.").

Similarly, Defendants misread the WFHBA in regard to the removal of wild horses from their recognized historical habitat in the absence of an identified overpopulation. Def. Br. at 20-21. As Plaintiffs discussed in their opening brief, the WFHBA authorizes BLM to remove wild horses from a herd area after determining that "an overpopulation exists" and may remove only that number of horses necessary to "to restore a thriving natural ecological balance to the range" and, secondarily, to "protect the range from the deterioration associated with overpopulation." 16 U.S.C. § 1333(b)(2). If Congress had intended to empower BLM to remove healthy wild horses from the public lands in the absence of an identifiable overpopulation, it would have listed the other circumstances under which BLM was authorized to remove horses. See 291 F.3d at 816 ("the Supreme Court has noted that 'an agency literally has no power to act . . . unless and until Congress confers power upon it") (quoting La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)). See also S. Cal. Edison Co. v. FERC, 195 F.3d 17, 24 (D.C. Cir. 1999) ("the court has repeatedly rejected the notion that the absence of an express prohibition allows an agency to ignore a proscription implied by the limiting language of a statute, reasoning that such an approach . . . is based on the unlikely circumstance as to congressional intent giving agencies 'virtually limitless hegemony'") (internal citations omitted). To interpret the WFHBA otherwise is to render the statutory language of 16 U.S.C. § 1333(b)(2) superfluous, and "[i]t is a 'well-settled rule of statutory construction . . . that courts should disfavor interpretations of statutes that render language superfluous.'" Varity Corp. v. Howe, 516 U.S. 489, 522 (1996) (internal citation

omitted). See also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 299 (2006) ("it is generally presumed that statutory language is not superfluous"); Circuit City Stores v. Adams, 532 U.S. 105, 113 (2001) ("Our cases express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment") (quoting Pa. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 562 (1990)).

IV.  **BLM's Interpretation of its Authority Under the WFHBA is Not Entitled to Chevron Deference**

Defendants ask this Court for a degree of deference to their interpretation of the WFHBA well-beyond that permitted under Chevron. Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984); see Am. Petroleum Inst. v. EPA, 52 F.3d 1113, 1120 (D.C. Cir. 1995) ("To suggest . . . 'that Chevron step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.* when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law …, and refuted by precedent.'") (internal citation omitted). See also Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd., 308 U.S. App. D.C. 9, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) ("Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well.") (quoted in Aid Ass'n for Lutherans v. USPS, 321 F.3d 1166, 1174-75 (D.C. Cir. 2003) (emphasis in original).

Defendants would read the WFHBA to place no limitations whatsoever on BLM's authority to eliminate habitat occupied by wild horses in 1971 or to eliminate entire herds of wild horses. See Def. Br. at 17 ("nothing in the statutory language limits BLM's discretion to choose not to maintain a particular range"; "There is no indication that

7

Congress intended to preclude BLM from removing wild horses in an area where they were found in 1971."). Under Defendant's tortured reading of the statute, BLM could eliminate every remaining wild horse herd from its historical habitat—and, sadly, with more wild horses now in BLM long term holding facilities then are left in the wild, Defendants' Response to Plaintiffs' Statement of Undisputed Fact ¶ 1—BLM is inching ever closer to implementing such a strategy. Congress expressly declined to let BLM determine the number of wild horse ranges it would choose to maintain in the entire United States – a mere *five* – and, instead, unequivocally directed BLM that wild horses "are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

Defendants misrepresent the language of the WFHBA in asserting that the Act states that wild horse habitat will not expand beyond the area occupied in 1971 at the passage of the Act. Def. Br. at 23. Rather, the Act prohibits the Secretary of the Interior from taking affirmative action to "relocate wild free-roaming horses to areas of the public lands where they [did not exist in 1971]." 16 U.S.C. § 1339. Removal of horses that stray outside their herd areas is required only if the horses stray onto private land and the landowners demand their removal. 16 U.S.C. § 1334; 43 C.F.R. § 4750.3. Further, as Plaintiffs discussed in their opening brief, no federal regulations require BLM to remove wild horses outside their herd area. Indeed, BLM has itself interpreted the final language of 43 C.F.R. 4710.4 as intended "to make it clear that management [of wild horses] will not be restricted to herd areas." Revision of Existing Regulations on Protection, Management, and Control of Wild-Free Roaming Horses and Burros, 51 Fed. Reg. 7410, 7412 (1986).

8

BLM regulations adopted in 1986 define a herd area as "the geographic area identified as having been used by a herd as its habitat in 1971." 43 C.F.R. § 4700.0-5(d); 51 Fed. Reg. at 7415. Whether or not BLM had issued regulations defining a "herd area" until 1986, it is clear that BLM knew, understood and was following the intent of the plain language of the statute by attempting to learn what areas the wild horses occupied, how many were present, etc., when it undertook its census of the wild horse population in 1974.[1] BLM drew the boundaries of the WDHA based on single recorded aerial snapshots of the horses taken in 1974, not seasonal use studies. See AR Vol. 4, Tab 14, page 373. Yet Defendants note that <u>every</u> census of the West Douglas horses conducted by the BLM since the early 1980s has found members of the herd outside of the area that BLM designated as the WDHA based on their limited 1974 findings. Def. Br. at 23-24, citing AR Vol. 1, Tab 13, p. 74. Defendants point to BLM's Land Use Planning Handbook which allows for the possibility that boundaries of a herd area may be changed if found to be in error. Def. Br. at 14. Because there is ample reason to conclude that the areas in which the West Douglas horses have been found but which is outside the recognized HA are in fact parts of the horses' natural migratory range and historical habitat that were erroneously omitted from the HA due to inadequate surveys and lack of seasonal migratory census, BLM could—in accordance with the WFHBA and its own regulations—change the boundaries of the West Douglas herd area to include these areas.

Defendants claim that the "one of the fundamental premises of the entire West Douglas EA/RMP Amendment is to improve the health of public lands." Def. Br. at 38-

---

[1] Congress did not fund the Act for the first three years after its passage; when BLM obtained the funding in 1974, it began analyzing where it found wild horses. See Velma B. Johnston, *The Fight to Save a Memory*, 50 Tex. L. Rev. 1055, 1057-63 (1972).

39.  Besides the fact that this is a post-hoc rationalization of counsel, found nowhere in the AR,  Defendants have failed to  explain why BLM limited its alternatives in the 2005 EA for the WDHA Amendment to the White River Resource Management Plan to those that allotted the greatest amount of forage to livestock, while eliminating those alternatives included in the withdrawn 2004 EA that would have reduced livestock AUMs and, thereby, improved rangeland health.  Def. Br. at 33.  Still, Defendants argue that this Court should be "particularly deferential" to its decision to eradicate the West Douglas herd because it reflects BLM's "scientific and technical expertise."  Def. Br. at 8.  However, the Record is woefully devoid of anything to indicate that the decision to eliminate the West Douglas herd was based on scientific or technical expertise.  Rather, the Record demonstrates that the agency deferred to the wants of grazing permittees, placing their interests above BLM's statutory responsibility to consider wild horses "as an integral part of the natural system of public lands."  16 U.S.C. § 1331.  See, e.g., Supplemental AR, Court Doc. 73-13, Rangeland Management: Improvements Needed in Federal Wild Horse Program, GAO Report, August 1990, page 18 ("BLM has been more concerned with the immediate needs of livestock interests or budget reductions than with ensuring the long-term health of the range."); AR Vol. 2, Tab 13, p. 177, Letter from BLM White River Office Field Director to Senator Wayne Allard ("Thank you for your note relating to wild horses and [co-owner of Twin Buttes Ranching Company] Davie Robertson's concerns.  Frankly, it is easy to see the issue from Davie's perspective.")  In 1999, the Decision Record on the EA for the 10-year renewal of the Twin Buttes livestock grazing permit implemented a grazing program that increased livestock grazing in areas of the WDHA "which were previously used by horses almost exclusively."

10

Supplemental AR Court Doc. 65-8, pp. 43, 59-60.  Furthermore, the Record suggests that BLM would allocate any new forage generated by the zeroing out of the West Douglas herd to Twin Buttes.  Supplemental AR Court Doc. 75-2, pp. 31-32 of 78.

Defendants also maintain that imposing oil and gas stipulations on unleased parcels in the WDHA would be insufficient to adequately protect wild horse habitat because only 7% of the parcels are unleased.  Def. Br. at 34.  However, Defendants can point to nothing in the Record that explains if or how oil and gas development damages wild horse habitat or interferes with wild horses in those areas.  To the contrary, BLM stated in January 2005 that "93% of the West Douglas area is leased for oil and gas development" and "[w]ild horses and natural gas development can co-exist, as evidenced by the current herd, which continues to grow."  AR Vol. 2, Tab 1, p. 3.

**V.    BLM is Required to Notify Congress of Its Plans to Zero out the West Douglas Herd**

Defendants contend that FLPMA does not require the Secretary to report to Congress BLM's decision to completely eliminate wild horses from the WDHA, an area of public land greater than 100,000 acres in size.  Def. Br. at 41.  Defendants first argue that 43 U.S.C. § 1712(e)(2) does not apply to the elimination of the West Douglas herd because wild horses are not "wildlife."  Id. at 41-42.  Defendants would dismiss as *dicta* the Supreme Court's holding in Kleppe v. New Mexico, 426 U.S. 529 (1976), that wild horses and burros are wildlife.  However, this Circuit also holds wild horses to be wildlife, distinguishing them from "other wildlife."  Am. Horse Protection Ass'n v. Watt, 694 F.2d 1310, 1319 n. 41 (D.C. Cir. 1982).  In addition, the Tenth Circuit has expressly held that wild horses are wildlife:

> [I]t is important to note that wild horses and burros are no less "wild" animals than are the grizzly bears that roam our national parks and

11

>forests. Indeed, in the definitional section of the Act, Congress has explicitly declared "all unbranded and unclaimed horses and burros on public lands" to be "*wild* horses and burros.

Mountain States Legal Foundation v. Hodel, 799 F.2d 1423, 1426-28 (10th Cir. 1986) (internal citation omitted) (holding that Congress enacted the Wild Free-Roaming Horses and Burros Act "to ensure the survival of a particular species of wildlife"). In contrast, Defendants cite no law explicitly states that wild horses are not wildlife.

Defendants then assert that, "even if wild horses were considered to be wildlife," the 2005 Amendment to the White River RMP is not subject to FLPMA's reporting requirements, because it is a land use plan, rather than "a management decision implementing such a plan." Def. Br. at 41-42. Because the Record Decision on the 2005 Amendment is the final agency decision on the elimination of the West Douglas herd, Plaintiffs maintain that it is, in fact, an implementing decision. However, even if it were not, then clearly the 2008 WDHA Gather Plan is a management decision implementing BLM's plan to eliminate the herd and must be submitted to Congress in accordance with 43 U.S.C. § 1712(e)(2).

### VI.     BLM's Plans to Zero Out the West Douglas Herd Requires Preparation of an EIS

Defendants claim the zeroing out of the West Douglas herd is not a significant agency action and, therefore, no Environmental Impact Statement ("EIS") is required under NEPA. Def. Br. at 39-40. But Defendants misconstrue the meaning of "significant." They argue that the number of horses concerned is too few for their removal to have a significant impact; however, the measure of the impact of this removal on the human environment hinges not on the number of horses to be rounded up, but on the fact that they are the last remaining members of a American wild horse herd—living

12

symbols of the historic and pioneer spirit of the West—"with little or no relation" to any other herds.  Regardless of how many wild horses are at issue, once the West Douglas herd is gone, it is gone forever, and the significance of forever cannot be overstated.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court enter summary judgment for plaintiffs, deny summary judgment for defendants, set aside the 2005 Amendment to the White River RMP, and issue a declaratory judgment that defendants may not zero out the West Douglas herd or any other herd of wild horses. Dated this 30th day of July, 2008.

Respectfully submitted,

/s/ Valerie J. Stanley
Valerie J. Stanley
D.C. Bar No. 384882
329 Prince George Street
Laurel, MD 20707
(301) 549-3126
(301) 549-3228 fax

/s/ Mara C. Hurwitt
Mara C. Hurwitt
D.C. Bar No. 482409
Dewey & LeBoeuf LLP
1101 New York Ave. N.W.
Suite 1100
Washington, D.C. 20005-4213
(202) 346-8094
(202) 956-3280 fax

Counsel for Plaintiffs