UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

| | |
|---|---|
| **COLORADO WILD HORSE** ) | |
| **AND BURRO COALITION, INC.,** ) | |
| <u>et al.</u>, ) | |
| ) | |
| **Plaintiffs** ) | |
| ) | |
| ) | |
| v. ) | Civil No. 06-1609 (RMC) |
| ) | |
| **DIRK KEMPTHORNE,** ) | |
| **in his official capacity as Secretary,** ) | |
| **United States Department of Interior** ) | |
| **1849 C Street, N.W.** ) | |
| **Washington, D.C. 20240,** ) | |
| <u>et al.</u>, ) | |
| _____) | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.      Undisputed that these statements were included in the Declaration of Kent Walter. Plaintiffs maintain that the information at AR[1] Vol. 1, Tab 5, p. 26 speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed. Plaintiffs dispute the accuracy of the statements made by Jim Cagney in this post-litigation email dated October 14, 1999, AR Vol. 1, Tab 5, p. 26, concerning the geographic scope of the areas referenced and the historical areas of use by wild horses over the previous 25-28 years. Plaintiffs contend that documents created during the years immediately after passage of the Wild Free-Roaming Horses and Burros

---

[1]      "AR" refers to the Administrative Record.

1

Act ("WFHBA" or "Act"), 16 U.S.C. §§ 1331, et seq., more accurately and more reliably describe the geographic scope of the areas and historical areas of wild horse use.

Plaintiffs dispute the accuracy of the statements set forth at AR Vol. 1, Tab 73, p. 491 as those statements directly contradict earlier pre-litigation documents in the AR. The statements contained in this paragraph apparently are set forth to support Defendants' litigation contentions that the Piceance/East Douglas Herd Management Area and the West Douglas Herd Area were both part of a single area which the Bureau of Land Management ("BLM") decided to manage separately and that the horses located in each area were not separate and distinct herds. Documents in the AR closer in time to passage of the WFHBA demonstrate the fallacy of this contention. See, e.g., "examination of the individual types for each of the herds in the White River Resource Area and West Douglas does not reveal any evidence of direct relationship," AR Vol. 4, Tab 1, p. 5; BLM conducted separate censuses of these two herds, AR Vol. 4, Tab 7, p. 73; that the herds had different migration and seasonal use patterns, AR Vol. 4, Tab 7, p. 79, and noting there "some interaction between the Piceance Basin and the Douglas Creek herds does exist;" the dietary patterns of the two herds were different, AR Vol. 4, Tab 7, p. 80; a "Herd Management Area Plan will be developed for the Piceance Basin and Douglas Creek wild horse *herds*, AR Vol. 4, Tab 8, p. 104 (emphasis added); BLM considered and counted the foal crops for each of the two herds separately, AR Vol. 4, Tab 14, p. 383. In response to the last sentence of Paragraph 1, Plaintiffs state that BLM is required to manage horses where they were found in 1971 and not in accordance with artificial designations such as "herd units."

2.      The first sentence is undisputed. Plaintiffs dispute that the document referenced at Tab 15 contains any analysis of "key horse habitat." In addition, "key horse habitat," is nowhere defined in the statute or regulations and appears to be a phrase BLM has coined to justify previous management decisions. In response to the remaining sentences of Paragraph 2, Plaintiffs repeat their response to Defendants' contention that the Piceance/East Douglas and West Douglas herds were one and the same. The statements contained in this paragraph apparently are set forth to support Defendants' litigation contentions that the Piceance/East Douglas Herd Management Area and the West Douglas Herd Area were both part of a single area which BLM decided to manage separately and that the horses located in each area were not separate and distinct herds. Documents in the AR closer in time to passage of the WFHBA demonstrate the fallacy of this contention. See, e.g., "examination of the individual types for each of the herds in the White River Resource Area and West Douglas does not reveal any evidence of direct relationship," AR Vol. 4, Tab 1, p. 5; BLM conducted separate censuses of these two herds, AR Vol. 4, Tab 7, p. 73; that the herds had different migration and seasonal use patterns, AR Vol. 4, Tab 7, p. 79, and noting there "some interaction between the Piceance Basin and the Douglas Creek herds does exist;" the dietary patterns of the two herds were different, AR Vol. 4, Tab 7, p. 80; a "Herd Management Area Plan will be developed for the Piceance Basin and Douglas Creek wild horse *herds*, AR Vol. 4, Tab 8, p. 104 (emphasis added); BLM considered and counted the foal crops for each of the two herds separately, AR Vol. 4, Tab 14, p. 383. In response to the last sentence of Paragraph 1, Plaintiffs state that BLM is required to manage horses where they were found in 1971 and not in accordance with artificial designations such as "herd units."

3.  Plaintiffs dispute that the BLM found that the "primary resource use of the Douglas Creek area was for oil and gas development" and that this is the reason wild horses were slated for complete removal from this area.  Even if this statement were true at the time, BLM has since found that, "Currently 93% of the West Douglas area is leased for oil and gas development. . . . Wild horses and natural gas development can co-exist, as evidenced by the current herd which continues to grow. . . ."  AR Vol. 2, Tab 1, p. 3.  The Rangeland Program Summary completed in 1981, which contained plans for intensive livestock grazing within the White River Resource Area, states that, "the present wild horse population of 450 to 550 head would be reduced during implementation, as would the areas they presently inhabit.  A minimum of 90 (short term) and a maximum of 140 wild horses (long term) would be maintained on 148,153 acres of public land, a reduction of 295,826 acres."  AR Vol. 4, Tab 8, p. 107.  The cited page does not contain any support for Defendants' statement that, "as a result of range analysis reflecting that the primary resource use of the Douglas Creek area was for oil and gas development."  Undisputed that the page cited references 148,153 acres but disputed that this resulted from the combination of areas cited by Defendants.  Plaintiffs point out that the referenced page discusses removal of wild horses and a reduction of their acreage in the amount of 295,826 acres.  Plaintiffs dispute that a reduction of this magnitude can result in the "best wild horse habitat" or that BLM is authorized to make such reductions.

4.  Plaintiffs respond by stating that BLM understood since passage of the WFHBA that a herd area encompassed those public lands that wild horses occupied at the passage of the Act.  That BLM did not develop specific regulations defining herd area until 1986 is immaterial.  The term "herd management area" cannot legally encompass areas smaller

than that of herd areas. Defendants' statement regarding "ranges" is a conclusion of law to which no response is necessary. BLM has not stated the basis for its conclusion that the area contained the "best wild horse habitat," as that term is not used in the statute or regulations and is therefore subject to various, subjective determinations.

5. Undisputed that these terms appear at the cited page. Plaintiffs dispute that when these terms were first used in public is material, and incorporate by reference Plaintiffs' response to Paragraph 4. Plaintiffs dispute that the fence across Highway 139 formed a complete barrier; Plaintiffs contend that the complete barrier was not completed until 1996. Plaintiffs dispute that the horses in each area were part of one large herd, as explained in Paragraph 2, above.

6. Plaintiffs dispute that it is material that the grazing allotments within the wild horse range "did not make allowances for wild horse use."

7. Plaintiffs dispute that development for oil and gas was the reason for reduction of wild horse numbers and habitat acreage. Six years after the Unit Resource Analysis of 1975, BLM stated in its Herd Management Area Plan (1981–1984) that as part of its Planned Action, it would "attempt to mitigate habitat loss due to energy development." AR Vol. 4, Tab 7, p. 86.

8. The sentences referencing statutory provisions are conclusions of law to which no response is necessary. The fact that removal of the West Douglas horses has been considered in seven different planning documents is immaterial; the decision to remove wild horses was reexamined and remade in October 2007 and is subject to challenge in this litigation.

9.      Disputed that BLM's decision was based upon BLM's own considerations of multiple uses with strict adherence to legal restraints but was in large part motivated by public opposition to wild horse presence. AR Vol. 4, Tab 9, p. 151 ("[The recommendation] to discontinue or reduce livestock grazing in order to establish a wild horse range.  This would be adverse to the multiple use concept and the livestock industry.  It would also have an impact on the local economy.  [The recommendation] to increase forage for wild horses by vegetative manipulation.  This would be detrimental to the watershed unless the horses could be removed for sufficient time for new plant growth.  It could also be adverse to cultural values.")  These recommendations to benefit wild horses were ignored by BLM.  See AR Vol. 4, Tab 12, p. 240, which states "Public response as a result of the meetings, came from a variety of people ranging from recreation and wildlife interests to mining and livestock people.  The third MFP step consisted of preparation of land use decisions.  Comments received from the public were considered in making the decisions.  The decisions will be used as guidelines for future land management in the White River Resource Area."

10.     The documents referred to in this paragraph, which reference past rationales for removing the West Douglas herd, speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed. Plaintiffs state that even if this statement were true at the time, BLM has since found that, "Currently 93% of the West Douglas area is leased for oil and gas development. . . . Wild horses and natural gas development can co-exist, as evidenced by the current herd which continues to grow."  AR Vol. 2, Tab 1, p. 3.

6

11.     Plaintiffs do not dispute that the 1981 White River Management Framework Plan ("MFP") continued the earlier decision to remove the West Douglas herd.  Plaintiffs do not dispute that BLM determined it would manage wild horses in an area that had been decreased by 295,826 acres.  Plaintiffs dispute Defendants' historical and current interpretation that the reduction of this acreage was done for the purpose of giving wild horses their "preferred habitat."  Furthermore, Plaintiffs dispute the accuracy of the statements made by Jim Cagney in this post-litigation email dated October 14, 1999, AR Vol. 1, Tab 5, p. 26, concerning the geographic scope of the areas referenced and the historical areas of use by wild horses over previous 25-28 years.  Plaintiffs contend that documents created during the years immediately after passage of the WFHBA more accurately and more reliably describe the geographic scope of the areas and historical areas of wild horse use.

12.     The document references a compromise between wild horse use and grazing. Plaintiffs dispute that the compromise was necessary in order for BLM to comply with the WFHBA and BLM policy and dispute that the document states this.

13.     The document referred to in this paragraph speaks for itself and is the best evidence of its contents, and any statements contrary to their plain meaning and context are disputed.

14.     The document referred to in this paragraph speaks for itself and is the best evidence of its contents, and any statements contrary to their plain meaning and context are disputed.

15.     The documents referred to in this paragraph speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

16.     The documents referred to in this paragraph speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

17.     The document referred to in this paragraph speaks for itself and is the best evidence of its contents, and any statements contrary to their plain meaning and context are disputed.

18.     The documents referred to in this paragraph speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

19.     The documents referred to in this paragraph speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

20.     Plaintiffs dispute that the 2005 Environmental Assessment ("EA") included extensive analysis of the environmental consequences of both alternatives, including cumulative impacts.  The documents referred to in the remainder of this paragraph are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

21.     The documents referred to in this paragraph speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

22.     Plaintiffs dispute that the decision to remove the West Douglas wild horses was based upon an analysis of range conditions. AR Vol. 4, Tab 13, pp. 366-67 states, for example, that, "Distinctive summer and winter ranges have not been identified . . . cover requirements for horses has not been determined at this time. . . . Additional study should be made to update this information."

23.     Plaintiffs do not dispute that the chart at AR Vol. 1, Tab 73, p. 501 lists aerial censuses. Plaintiffs dispute that the censuses are taken before the decision is made to remove wild horses. Plaintiffs dispute that the removals were conducted to prevent range degradation. BLM has stated in its Herd Management Area Plan that, "during the periods when livestock and wild horses are using the same area, actual use cannot be differentiated." AR Vol. 4, Tab 7, p. 89. Despite recognizing this, BLM stated that wild horses needed to be removed from areas grazed by both wild horses and livestock as support for its need to conduct gathers in West Douglas as recently as 1998 and 2001. In the 1998 Removal EA, out of nine pastures, horses were only listed as being identified as a causative factor for not meeting the standards for soil or plant health in three pastures (one pasture the wild horses were only listed as causing an impact on plant health). Of those three pastures, two were listed as presenting "private land issues." See 1998 Removal EA at 11. Of the three pastures where wild horses were "identified as a causative factor," livestock were also noted to be a causative factor. See 1998 Removal EA at 15-17. Apparently, the removal of wild horses in 1998 did not improve conditions. The same exact charts set forth in the 1998 Removal EA are present in the 2000 Removal

9

EA and the 2001 Removal EA.  See 2000 Removal EA at 15, 19, 20[2] and 2001 Removal EA at 21, 23, 24 & 26.

Dated this 30th day of July, 2008.

        Respectfully submitted,

        /s/ Valerie J. Stanley
        Valerie J. Stanley
        D.C. Bar No. 384882
        329 Prince George Street
        Laurel, MD 20707
        (301) 549-3126
        (301) 549-3228 fax

        /s/ Mara C. Hurwitt
        Mara C. Hurwitt
        D.C. Bar No. 482409
        Dewey & LeBoeuf LLP
        1101 New York Ave. N.W.
        Suite 1100
        Washington, D.C. 20005-4213
        (202) 346-8094
        (202) 956-3280 fax

        Counsel for Plaintiffs

---

[2] No wild horses were removed in 2000.