RONALD J. TENPAS,
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

CHARLES FINDLAY, Assistant Chief
JACOB T. HASEMAN, Trial Attorney
Natural Resources Section
601 D Street, N.W.
Washington, D.C. 20004
Telephone: (202) 305-0240
Jacob.Haseman@usdoj.gov

JEAN E. WILLIAMS, Chief
Wildlife and Marine Resources Section
KRISTEN BYRNES FLOOM
Trial Attorney (DC Bar No. 469615)
Wildlife & Marine Resources Section
601 D Street, N.W.
Washington, D.C. 20004
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COLORADO WILD HORSE AND BURRO COALITION, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> DIRK KEMPTHORNE, et al., <br><br> Defendants. | Civ. No. 06-1609 RMC <br><br> **DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

ARGUMENT ..................................................................................... 2

I.    THE SPECIFIC RESOURCE MANAGEMENT PLANNING GOALS
      CHALLENGED IN THE WEST DOUGLAS RMP AMENDMENT
      ARE NOT REVIEWABLE "FINAL AGENCY ACTIONS" FOR
      PURPOSES OF THE WFRHBA AND FLPMA .................................. 2

II.   THE BLM'S DECISION TO REMOVE ALL WILD HORSES
      FROM THE WEST DOUGLAS HA IS A REASONABLE
      EXERCISE OF THE AGENCY'S DISCRETION UNDER THE
      WFRHBA AND SHOULD BE UPHELD BY THE COURT .............. 6

      A.    Plaintiffs' Argument Must Fail As A Factual Matter
            Because The BLM Is Not Eliminating All Wild Horses
            From The Area Where They Were Found At The
            Passage Of The WFRHBA ........................................... 6

      B.    The BLM's Decision To Remove All Wild Horses
            From The West Douglas HA Is Based On A
            Permissible Construction Of The Statute And Is
            Entitled To Deference ................................................ 8

III.  THE BLM COMPLIED WITH THE NATIONAL
      ENVIRONMENTAL POLICY ACT ................................................. 12

      A.    The BLM Adequately Addressed The Potential
            Impacts Of Removing West Douglas Wild Horses
            And Appropriately Concluded That No Significant
            Impacts Were Likely To Occur ................................... 13

      B.    The Environmental Assessment Appropriately
            Addressed Reasonable Alternatives ............................. 14

IV.   THE BLM IS NOT REQUIRED TO NOTIFY CONGRESS
      OF ITS PLANS TO REMOVE WEST DOUGLAS HORSES ......... 18

CONCLUSION ................................................................................ 22

- i -

## **TABLE OF AUTHORITIES**

CASES                                                                                                    PAGE

Alaska Ctr. For Env't v. U.S. Forest Serv., 189 F.3d 851 (9th Cir. 1999) ...................... 14

American Horse Protection, Inc., 134 IBLA 24 (Oct. 3, 1995) ....................................... 21

American Horse Protection Inst. v. Watt, 694 F.2d 1310 (D.C. Cir. 1982) ................... 19

American Mustang & Burro Ass'n, Inc., 144 IBLA 148 (May 28, 1998) ...................... 21

American Petroleum Inst. v. EPA, 52 F.3d 1113 (D.C. Cir. 1995) .................................. 9

Animal Prot. Inst., 124 IBLA 231 (Oct. 28, 1992) ......................................................... 20

Animal Prot. Inst., 131 IBLA 175 (Nov. 2, 1994) .......................................................... 20

Audubon Society of Portland, 128 IBLA 370 (Mar. 11, 1994) ...................................... 20

Biodiversity Conservation Alliance v. BLM, 404 F. Supp. 2d 212 (D.D.C. 2005) ......... 15

Blake v. Babbitt, 837 F. Supp. 458 (D.D.C. 1993) ......................................................... 20

Blancett v. BLM, No. Civ. A. 04-2152 (JDB), 2006 WL 696050
(D.D.C. Mar. 20, 2006) .................................................................................................. 12

Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984) ................................................. 8, 12

Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. 1991) ............. 15, 16

City of Alexandria, Va. v. Slater, 198 F.3d 862 (D.C. Cir. 1999) .................................. 15

Coal. On Sensible Transp. v. Dole, 642 F. Supp. 573 (D.D.C. 1986) ....................... 15, 17

Commission for the Preservation of Wild Horses,
139 IBLA 327 (July 14, 1997) ................................................................................. 20, 21

Commission for the Preservation of Wild Horses,
145 IBLA 343 (Sept. 23, 1998) ..................................................................................... 20

Friends of the Ompompanoosuc v. FERC, 968 F.2d 1549 (2d Cir. 1992) ..................... 17

Fund for Animals, Inc. v. BLM, 460 F.3d 13 (D.C. Cir. 2006) ............................... 4-6, 20

Sierra Club v. Espy, 38 F.3d 792 (5th Cir. 1994). ......................................................... 17

Karst Envtl. Educ. & Prot., Inc. v. EPA, 475 F.3d 1291 (D.C. Cir. 2007) ...................... 4

Kleppe v. New Mexico, 426 U.S. 529 (1976)  ................................................... 18

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990)  ......................................... 4

Mobile Communications Corp. v. FCC, 77 F.3d 1399 (D.C. Cir. 1996) ........................ 10

Mountain States Legal Found. v. Hodel, 799 F.2d 1423 (10th Cir. 1986)  ............... 19, 20

Natural Resources Defense Council, Inc. v. Hodel, 618 F. Supp. 848 (E.D. Cal. 1985)  21

Nevada Division of Wildlife v. BLM, 145 IBLA 237 (Aug. 25, 1998)  ......................... 21

Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004) ............................... 12

Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998) ......................................... 5

Public Citizen v. FTC, 869 F.2d 1541 (D.C. Cir. 1989) .................................................... 8

Railway Labor Executives' Ass'n v. Nat'l Mediation Board, 29 F.3d 655 (D.C. Cir. 1994) ............................................................................................................................. 9

Rainer Huck, 168 IBLA 365 (Apr. 18, 2006)  .................................................... 21

Slope Borough v. Andrus, 642 F.2d 589 (D.C. Cir. 1980)  .............................................. 15

Southern Company Servs. v. FCC, 313 F.3d 574 (D.C. Cir. 2002) ................................... 9

Texas Rural Legal Aid, Inc. v. Legal Services Corp., 940 F.2d 685 (D.C. Cir. 1991)  8, 10

Thomas M. Berry, 162 IBLA 221 (July 27, 2004)  ......................................................... 20

TOMAC v. Norton, 433 F.3d 852 (D.C. Cir. 2006)  ....................................................... 15

Toni Hutcheson Moore, 146 IBLA 168 (Oct. 29, 1998)  ................................................. 20

Uintah Mountain Club, 112 IBLA 287 (Jan. 5, 1990) ..................................................... 21

Wild Horse Organized Assistance Commission for the Preservation of Wild Horses, 141 IBLA 202 (Nov. 13, 1997) ........................................................................................ 20

STATUTES                                                           PAGE

5 U.S.C. § 704 .................................................................................. 2
16 U.S.C. § 1331 .............................................................................. 1
16 U.S.C. § 1333(a) ......................................................... 9, 11-13
16 U.S.C. § 1333(b)(2) ..................................................................... 9
42 U.S.C. § 4321 .............................................................................. 1
43 U.S.C. § 1701 et .......................................................................... 1
43 U.S.C. § 1702(l) ........................................................................ 18
43 U.S.C. § 1712(e)(2) .................................................................... 19
43 U.S.C. § 1712(a) ........................................................................ 12
43 U.S.C. § 1712(e)(2) ............................................................. 18, 22

H.R. Rep. 95-1122 ......................................................................... 10
H.R. Rep. No. 92-681 ....................................................................... 9
H.R. Rep. No. 95-1737 ................................................................... 20

REGULATIONS                                                        PAGE

40 C.F.R. § 1502.13 ........................................................................ 15
40 C.F.R. § 1508.27 ........................................................................ 13
40 C.F.R. § 1508.27(b) .................................................................... 13
43 C.F.R. § 1610.5-3 ...................................................................... 17
43 C.F.R. Part 4100 ........................................................................ 20
43 C.F.R. § 4100.0-5 ...................................................................... 21
43 C.F.R. § 4120.3-8(b) .................................................................. 21
43 C.F.R. § 4720.2-1 ...................................................................... 11
45 C.F.R. § 1508.27 ........................................................................ 13

## __INTRODUCTION__

Plaintiffs' combined opposition to Defendants' motion for summary judgment and reply in support of their motion for summary judgment ("Pl. Opp.") suffers from the same flaws as their opening brief, and similarly fails to establish that the Bureau of Land Management's ("BLM") decision to remove all wild horses from the West Douglas Herd Area ("HA") in Colorado violates the Wild Free-Roaming Horses and Burros Act ("WFRHBA"), 16 U.S.C. § 1331 et seq., National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 et seq.

Plaintiffs have failed to counter Defendants' showing that the decision to remove all wild horses from the West Douglas HA is a reasonable exercise of the BLM's discretion under the WFRHBA. Plaintiffs also make no attempt to refute the proposition that the BLM properly considered the WFRHBA while performing its land management duties under FLPMA. Additionally, Plaintiffs fail to establish that the NEPA process for the West Douglas Herd Area Amendment to the White River Resource Management Plan Environmental Assessment ("West Douglas EA/RMP Amendment") was arbitrary and capricious. Thus, the Court should uphold the BLM's decision to remove all wild horses from the West Douglas HA, grant Defendants' cross-motion for summary judgment, and dismiss Plaintiffs' Second Amended Complaint.

**ARGUMENT**

I.   **THE SPECIFIC RESOURCE MANAGEMENT PLANNING GOALS CHALLENGED IN THE WEST DOUGLAS RMP AMENDMENT ARE NOT REVIEWABLE "FINAL AGENCY ACTIONS" FOR PURPOSES OF THE WFRHBA AND FLPMA.**

In their opening memorandum, Defendants explained that Plaintiffs' challenge to the October 10, 2007 West Douglas RMP Amendment is not reviewable as a "final agency action" within the meaning of the Administrative Procedure Act ("APA"), FLPMA, and WFRHBA.  See Def. Mem. at 9-10.  Rather than remedying this defect by challenging the appropriate document – the 2008 West Douglas Herd Area Wild Horse Removal Environmental Assessment, CO-110-2008-052 (July 14, 2008) ("2008 Gather EA") – Plaintiffs maintain that their challenge to the West Douglas RMP Amendment is "ripe for review."  Plaintiffs misconstrue Defendants' argument, conflating the principle of ripeness with general standards for judicial review under the APA.  See Pl. Opp. at 2-3.  Defendants have not raised a ripeness argument pertaining to Plaintiffs' Second Amended Complaint.  Rather, Defendants argue that the specific resource management planning goals challenged by Plaintiffs are not subject to judicial review because they do not constitute "final agency actions" under the APA.  See 5 U.S.C. § 704.

On July 14, 2008, the BLM released the 2008 Gather EA and Final Decision Record, which implements the decision in the West Douglas RMP Amendment and provides further environmental review on the gather and removal of wild horses from the West Douglas HA.  Second Supplemental ("Supp.") A.R., 2008 Gather EA at 1.  Although Plaintiffs now object to the fact that the 2008 Gather EA was issued after they filed their opening brief, see Pl. Opp. at 3, Plaintiffs jointly proposed the briefing

2

schedule which was adopted by this Court.  See April 17, 2008 Minute Entry (adopting

parties' Joint Proposed Briefing Schedule calling for Defendants to "file an opposition

and/or a cross-motion for summary judgment and supplement the administrative record

with final environmental assessment and gather plan no later than July 16, 2008").  The

briefing schedule proposed by the parties contemplated that the 2008 Gather EA would

be before the Court so that any challenge to the EA could be brought in the context of the

parties' cross-motions for summary judgment, to avoid delaying the case.  Defendants

filed the supporting documents for the 2008 Gather EA, to allow Plaintiffs to raise any

claims based on those documents in their July 30, 2008 brief.  See Dkt. Nos. 73-75.  Yet

Plaintiffs chose to raise no claims related to the 2008 Gather EA.  See Pl. Opp. at 3

(arguing that it is not "necessary for the Court to consider the narrow matters addressed

in the 2008 Gather EA, i.e., the methods to be used in rounding up the West Douglas

horses, in order to decide the issues before it in this action").[1/]

        Having failed to raise any complaint as to the 2008 Gather EA, Plaintiffs have

waived the right to raise such claims in supplemental briefing.  Contra Pl. Opp. at 3.

Supplemental briefing is inappropriate in this case because Plaintiffs had an opportunity

to raise any claims regarding the additional documents in their opposition brief and

deliberately chose not to do so.  Further, any delay in resolution of Plaintiffs' claims

threatens the BLM's ability to carry out its planned gather in 2008.  At the Court's

---

[1/]  Plaintiffs greatly misstate Defendants' characterization of the 2008 Gather EA.  See Pl. Opp. at
1.  Defendants did not argue that the scope of the 2008 Gather EA was limited to "the actual
method to be used to remove horses from the West Douglas [HA];" rather, Defendants
merely noted that the actual methods of removal were documented and analyzed.  See id.; Def. Mem. at
10.  The 2008 Gather EA not only analyzes "how wild horses would be removed from the West
Douglas [HA]," but also "implements both the 1997 White River Resource Management Plan []
and the [West Douglas RMP Amendment]."  Second Supp. A.R., 2008 Gather EA at 1; see also
Def. Mem. at 24 n. 4.

request, the BLM postponed the gather from September 1, 2008 to October 1, 2008, to give the Court an opportunity to consider the parties' cross-motions prior to commencement of the gather. See Dkt. No. 62 (April 30, 2008). The BLM does not have the ability to further postpone the gather beyond the first week of October in light of contractor availability and anticipated weather conditions. See Dkt. No. 62-2 at ¶¶ 4-5. Plaintiffs may not deliberately forego the opportunity to raise their claims in the context of the schedule negotiated by the parties and approved by the Court and then seek to raise such claims at a later date, at the risk of disrupting the gather in the eleventh hour.[2]

In light of Plaintiffs' decision to challenge the West Douglas RMP Amendment, rather than the 2008 Gather EA, their claims must fail because the RMP Amendment is not a "final agency action" sufficient for judicial review under the APA. As discussed in Defendants' opening memorandum, to adequately allege a claim under the APA a plaintiff "must direct its attack against some particular 'agency action' that causes it harm." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 891 (1990). Additionally, "[c]ourts may intervene in the administration of laws only when, and to the extent that, a specific 'final agency action' has an 'actual or immediately threatened effect.'" Fund for Animals, Inc. v. BLM, 460 F.3d 13, 20 (D.C. Cir. 2006) (quoting Lujan, 497 U.S. at 894). Nor may courts "entang[le] themselves in abstract disagreements over administrative policies . . . until an administrative decision has been formalized and its

---

[2] Defendants note that Plaintiffs' waiver of any claims regarding the 2008 Gather EA applies equally to claims that could have been raised under NEPA, as well as the WFRHBA and FLPMA. While Defendants concede that the 2005 West Douglas EA is a final agency action for purposes of judicial review under NEPA and the APA, Plaintiffs' challenge to that EA is meritless for the reasons stated infra at Section III and in Defendants' opening memorandum. See Karst Envtl. Educ. & Prot., Inc. v. EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (recognizing that challenges to agency compliance with NEPA must be brought under the APA).

4

effects felt in a concrete way. . . ." <u>Ohio Forestry Ass'n, Inc. v. Sierra Club</u>, 523 U.S. 726, 732-33 (1998) (citation omitted).

Here Plaintiffs, though long on allegations, have failed to target any specific "final agency action" for review.  Rather, Plaintiffs challenge the West Douglas RMP Amendment – a planning document that provides guidance and authorization for <u>future</u> action in the West Douglas HA.  It does not "command anyone to do anything or to refrain from doing anything . . . [and it] create[s] no legal rights or obligations."  <u>See</u> <u>Fund for Animals</u>, 460 F.3d at 22 (citation omitted).  The West Douglas RMP Amendment merely announces and reaffirms the management decision that wild horses should not be managed in the West Douglas HA.  The document does not itself proscribe or authorize the actual, physical removal of wild horses from West Douglas.  The D.C. Circuit has consistently refused to review orders "that do[] not [themselves] adversely affect complainant[s] but only affect [their] rights adversely on the contingency of future administrative action."  <u>See</u> <u>id.</u>  The long standing practice is "to require the complaining party to challenge the specific implementation of the broader agency policy."  <u>Id</u>.  As such, Plaintiffs' assertion that the general wild horse management planning goals in the West Douglas RMP Amendment are, standing alone, reviewable "final agency actions" is unfounded.  Thus, Plaintiffs' claims challenging wild horse management planning goals are not claims for which this Court can grant relief, and Counts Two, Three, and Six of their Second Amended Complaint should be dismissed.

II.  **THE BLM'S DECISION TO REMOVE ALL WILD HORSES FROM THE WEST DOUGLAS HA IS A REASONABLE EXERCISE OF THE AGENCY'S DISCRETION UNDER THE WFRHBA AND SHOULD BE UPHELD BY THE COURT.**

Plaintiffs have failed to refute Defendants' showing that the factual premise for their argument is flawed.  The BLM is not eliminating all wild horses from the area where they were found in 1971, when the WFRHBA was passed.  Nor have Plaintiffs adequately supported the claim that the WFRHBA precludes the BLM from removing horses from the West Douglas HA.[3/]

A.  **Plaintiffs' Argument Must Fail As A Factual Matter Because The BLM Is Not Eliminating All Wild Horses From The Area Where They Were Found At The Passage Of The WFRHBA.**

The BLM's decision to remove horses from the West Douglas HA will not eliminate all wild horses from the area where they were found at the passage of the WFRHBA.  The BLM will continue to manage wild horses in the Piceance-East Douglas Herd Management Area ("HMA"), a portion of the historic range contained within the Douglas Creek herd unit.

Plaintiffs do not dispute that there will be horses remaining in the Piceance-East Douglas HMA.  See Pl. Opp. at 4.  However, Plaintiffs dismiss this crucial fact on the basis that the West Douglas and Piceance-East Douglas herds are geographically isolated and genetically distinct.  See id.  Although Defendants do not dispute this statement, it is irrelevant for purposes of Plaintiffs' argument under the WFRHBA.  The basis for Plaintiffs' claim under the WFRHBA is not the herd's genetic composition, but the land

---

[3/] As explained supra, Plaintiffs erroneously challenge the October 2007 West Douglas RMP Amendment, rather than the 2008 Gather EA.  Because Plaintiffs' WFRHBA claims are based on a flawed factual premise and an incorrect reading of the statute, their claims are equally meritless whether they are viewed as directed toward the October 2007 decision or the 2008 Gather EA.

that the horses occupied in 1971.  <u>See</u> Pl. Opp. at 1 (characterizing "the issue in this case" as "whether BLM may zero out wild horses in an area that those horses occupied at the passage of the [WFRHBA]").  The Piceance-East Douglas HMA contains a portion of the land where horses were found in the 1974 census, and that area will continue to be occupied by wild horses after the gather in the West Douglas HA.  <u>See</u> Def. Mem. at 13-15.

Defendants do not dispute that the administrative record reflects that some wild horses were present in 1974 in the area now known as the West Douglas HA.  <u>See</u> A.R. Vol. 1, Tab 73, pp. 491, 492.  However, Defendants dispute that the boundaries of the West Douglas HA accurately reflect the full extent of the area identified by the BLM as having been occupied by wild horses in 1971.  <u>See</u> Def. Mem. at 14-15.  Rather, West Douglas is merely a portion of the area occupied by horses at the passage of the WFRHBA, the Douglas Creek herd unit.  Plaintiffs ignore the fact that, under their theory of the case, they should focus not on the present-day herd area but on the full extent of the horses' historical habitat.  <u>See</u> Pl. Mem. at 21 (arguing that Congress has "mandat[ed] that wild horses be maintained in the areas in which they were found on the public lands in 1971"); <u>see also</u> Pl. Opp. at 1.  This historical habitat includes not only the West Douglas HA, but also the land presently included in the Piceance-East Douglas HMA.

Even accepting, <u>arguendo</u>, Plaintiffs' view that the BLM is prohibited from removing all wild horses from any area that they occupied in 1971, Plaintiffs cannot state a claim under the WFRHBA because the BLM is not removing all horses from this historical range.  Wild horses will remain in the Piceance-East Douglas HMA, which includes approximately 56,500 acres from the original 187,970 acres that comprised the

7

Douglas Creek herd unit.  See A.R. Vol 4, Tab 10, p. 228; Vol. 4, Tab 14, p. 373.  This is the portion of the Douglas Creek area that the BLM has determined is best suited for managing wild horses in harmony with the WFRHBA's command to maintain a thriving natural ecological balance ("TNEB").  See Def. Mem. at 19-20.

> **B.      The BLM's Decision To Remove All Wild Horses From The West Douglas HA Is Based On A Permissible Construction Of The Statute And Is Entitled To Deference.**

The BLM's view that the WFRHBA permits the total removal of horses from the West Douglas HA is consistent with the statutory language and legislative history, and is entitled to deference under Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984).  Here, Congress has not directly spoken to the precise question at issue: whether BLM has the discretion to remove all horses from a herd area.  Thus, the Court must consider whether the agency's interpretation "is based on a permissible construction of the statute."  Id. at 843.  See also Texas Rural Legal Aid, Inc. v. Legal Services Corp., 940 F.2d 685, 690 (D.C. Cir. 1991) ("[U]nder Chevron, statutory silence or ambiguity on a particular question means that 'a court may assume that Congress implicitly delegated the interpretive function to the agency . . . ."), quoting Public Citizen v. FTC, 869 F.2d 1541, 1553 (D.C. Cir. 1989).  Here, the BLM's decision is a proper exercise of the broad discretion granted to it by Congress to manage wild horses.

The BLM's interpretation relies not on the absence of an express statutory prohibition, as Plaintiffs argue in their reply, but on Congress' express delegation of broad authority to BLM to manage wild horses.  The WFRHBA clearly grants BLM authority to manage wild horses, including the authority to designate and maintain specific ranges on public lands for their protection and preservation.  See Def. Mem. at

17; see also 16 U.S.C. § 1333(a). This reflects Congressional intent to delegate authority

to the BLM to determine whether to manage wild horses in a particular area, and BLM's

interpretation of the WFRHBA should be upheld as long as it is reasonable. See

Southern Company Servs. v. FCC, 313 F.3d 574, 579 (D.C. Cir. 2002).

The cases cited by Plaintiffs are distinguishable. Pl. Opp at 5-6. In those cases

the agencies overreached by taking actions that were contrary to their specific statutory

authority and Congressional intent. See, e.g., American Petroleum Inst. v. EPA, 52 F.3d

1113, 1119-1120 (D.C. Cir. 1995) (EPA relied on general rulemaking power in Clean Air

Act to impose requirements that went beyond specific Congressional mandate); Railway

Labor Executives' Ass'n v. Nat'l Mediation Board, 29 F.3d 655, 664-669 (D.C. Cir.

1994) (rejecting agency's interpretation where there was no ambiguity in relevant

statutory provision, Congress provided a "tightly confined role" for agency, and agency's

interpretation was contrary to Congressional intent reflected in legislative history).

The legislative history of the WFRHBA makes clear that Congress intended for

the BLM to exercise broad discretion in carrying out its duties under the statute. See

Def. Mem. at 17-18; see also H.R. Rep. No. 92-681, at 2160 (1971) (Conf. Rep.)

(Secretary of the Interior granted "a high degree of discretionary authority for the

purposes of protection, management, and control of wild free-roaming horses and burros

on the public lands"). The only express limitation that Congress placed on the BLM's

discretion to remove wild horses from a range is the requirement set forth in 16 U.S.C. §

1333(b)(2) (The BLM must "immediately remove excess animals from the range so as to

achieve appropriate management levels" where it determines that an overpopulation

exists). Congress added this provision through an amendment to the WFRHBA to

9

address the fact that the success of the WFRHBA had resulted in excess numbers of wild horses, "pos[ing] a threat to wildlife, livestock, the improvement of range conditions, and ultimately, to their own survival."  H.R. Rep. 95-1122, at 21 (1978).  This provision does not limit the BLM's authority to remove horses under other circumstances, absent a finding that such horses are "excess."  <u>See</u> Def. Mem. at 20-21.

Plaintiffs essentially argue that, because the WFRHBA contains a specific provision addressing removal of "excess" wild horses, Congress intended to deprive the BLM of the authority to remove horses under other circumstances.  <u>See</u> Pl. Opp. at 6.  As the D.C. Circuit has recognized, this type of argument is not persuasive in the context of agency action:

> Although they do not explicitly cite it, appellees appear to rely on the canon of statutory interpretation, *expressio unius est exclusio alterius* ("the expression of one is the exclusion of others").  Whatever its usefulness in other circumstances, however, this canon has little force in the administrative setting.  Under <u>Chevron</u>, we normally withhold deference from an agency's interpretation of a statute only when Congress has "directly spoken to the precise question at issue," and the *expressio* canon is simply too thin a reed to support the conclusion that Congress has clearly resolved this issue.  Having decided that, we must defer to [the agency's] refusal to read the Act in the manner suggested by the *expressio* canon if its interpretation is otherwise reasonable.

<u>Texas Rural Legal Aid</u>, 940 F.2d at 694 (internal citations omitted).  <u>See</u> <u>also</u> <u>Mobile Communications Corp. v. FCC</u>, 77 F.3d 1399, 1404-1405 (D.C. Cir. 1996).

Nor does the BLM's interpretation render superfluous any of the terms of the statute.  <u>See</u> Pl. Opp. at 6.  Section 1333(b)(2) provides that, where the Secretary determines an overpopulation exists, he must take action to immediately remove excess animals to achieve appropriate management levels.  This language can be harmonized with the BLM's interpretation that not only <u>must</u> the agency remove horses where it

determines that an overpopulation exists, but it <u>may</u> remove horses under other circumstances as well, in furtherance of the statutory purpose to "achieve and maintain a [TNEB]."  16 U.S.C. § 1333(a).

Plaintiffs speculate that Defendants' view of the BLM's discretion under the WFRHBA could lead to a situation where BLM could "eliminate every remaining wild horse herd from its historical habitat."  Pl. Opp. at 8.  This argument ignores the fact that BLM's discretion under the WFRHBA is not limitless.  The BLM's authority to remove horses is limited by the requirement that management measures be designed to achieve TNEB.  <u>See</u> 16 U.S.C. § 1333(a).  TNEB must be maintained not within a particular "herd area" or other parcel of land, but "on the public lands" generally.  <u>See id.</u>  Here BLM's decision to manage wild horses in the Piceance-East Douglas HMA rather than the West Douglas HA furthers this statutory purpose.  <u>See</u> Def. Mem. at 19-20.

Defendants demonstrated in their opening memorandum that the BLM's decision to remove all horses from the West Douglas HA is a reasonable exercise of the agency's broad discretion under the WFRHBA.  <u>See</u> Def. Mem. at 21-24.[4]  Because the BLM's decision is based on a reasonable construction of the WFRHBA, and the record reflects that the agency had a rational basis for its decision, Defendants are entitled to summary

---

[4] Plaintiffs challenge one of the BLM's justifications for removing wild horses from the West Douglas HA: that the horses consistently stray outside of the herd area.  <u>See</u> Pl. Opp. at 8; <u>see also</u> Def. Mem. at 23-24.  Although the BLM's regulations do not expressly require removal of horses that have strayed outside of a herd area – except upon written request from a private landowner, <u>see</u> 43 C.F.R. § 4720.2-1 – the BLM is required to manage wild horses "with the objective of limiting the animals' distribution to herd areas."  <u>Id.</u> at § 4710.4.  <u>See also</u> 51 Fed. Reg. 7410 (Mar. 3, 1986) ("management will not be restricted to herd areas, but will rather be undertaken with the objective of limiting animal distribution to herd areas by controlling herd size to prevent habitat from becoming overpopulated").

judgment on Plaintiffs' claims under the WFRHBA.[5]

## III.    THE BLM COMPLIED WITH THE NATIONAL ENVIRONMENTAL POLICY ACT.

As explained supra at Section I and demonstrated in Defendants' opening memorandum, the decision to remove wild horses from the West Douglas HA is non-justiciable, as Plaintiffs have failed to establish a "final agency action" sufficient to warrant judicial review under the APA.  Further, Plaintiffs have waived any NEPA claims they may have regarding the 2008 Gather EA by not raising them in their opposition brief.  See supra Section I.  To the extent Plaintiffs challenge the 2005 West Douglas EA, their claims lack merit because the BLM, in a five-year process, appropriately performed the necessary NEPA analysis in a comprehensive EA evaluating the environmental impacts of both the removal and continued management of wild horses

---

[5]  Plaintiffs argue in Section IV of their reply brief, which discusses the Chevron doctrine, that the decision analyzed in the West Douglas EA/RMP Amendment is not entitled to deference.  See Pl. Opp. at 9-11.  This argument reflects a fundamental misunderstanding of the Chevron doctrine.  Chevron applies to an agency's interpretation of a statute, not to the environmental review conducted pursuant to NEPA.  See Chevron, 467 U.S. at 842-843.  Defendants have not argued that their NEPA analysis is entitled to Chevron deference.  Rather, Defendants properly noted, in discussing the applicable standard of review, that a reviewing court must be particularly deferential to the judgment of the agency where scientific and technical expertise is involved in the decision.  See Def. Mem. at 8-9.  To the extent that Plaintiffs raise specific allegations relating to their NEPA claim, those allegations are addressed in Section III, infra.

To the extent that Plaintiffs raise allegations related to FLPMA in Section IV of their reply brief, Defendants thoroughly examined these issues in their opening memorandum.  See Def. Mem. at 40-41.  Specifically, FLPMA requires the BLM to balance competing demands and utilize RMPs to guide and control future management actions.  See 43 U.S.C. § 1712(a); Norton v. Southern Utah Wilderness Alliance ("SUWA"), 542 U.S. 55, 59, 71 (2004).  It does not require the BLM to manage all lands for all purposes.  See SUWA, 542 U.S. at 59.  Rather, the BLM may favor some purposes on particular lands while limiting or prohibiting other purposes on those same lands.  Id.; see also Blancett v. BLM, No. Civ. A. 04-2152 (JDB), 2006 WL 696050, at *2 (D.D.C. Mar. 20, 2006).  The BLM developed the West Douglas EA/RMP Amendment to achieve and maintain a TNEB on public lands, and carried out its wild horse management duties under the WFRHBA in consonance with its land use planning responsibilities under FLPMA.  See Def. Br. at 12-24.  As such, the BLM's decision to remove all wild horses from the West Douglas HA is within its authority under the WFRHBA and FLPMA.

in the West Douglas HA.  See Def. Mem. at 35 (citing A.R. Vol. 3, Tab 7, p. 568; A.R.

Vol. 2, Tab 28, pp. 299-405; A.R. Vol. 1, Tab 73, pp. 485-555; A.R. Vol. 1, Tab 54, pp.

360-63; A.R. Vol. 1, Tab 12, pp. 70-71).  In doing so, the BLM took the requisite "hard

look" at removal of the West Douglas herd's potential impacts and alternatives, and

reasonably determined the project would not have a significant effect on the

environment.  See Def. Mem. at 24-40.  As such, an Environmental Impact Statement

("EIS") was not required.

> ### A.    The BLM Adequately Addressed The Potential Impacts Of Removing West Douglas Wild Horses And Appropriately Concluded That No Significant Impacts Were Likely To Occur.

In their opposition, Plaintiffs present no new argument or authority to rebut any

of Defendants' contentions.  See Pl. Opp. at 12-13.  Rather, Plaintiffs' only argument,

albeit brief, is that Defendants misconstrue the meaning of "significant."  Id.  Plaintiffs

are wrong.  Defendants specifically noted that a determination on significance must

consider, by regulation, both the context and intensity of any potential environmental

impacts.  Def. Mem. at 37-38 (citing 45 C.F.R. § 1508.27).  As noted and defined by

regulation, "context" means the setting of the proposed action to help determine whether

local, regional or nationwide impacts are relevant.  40 C.F.R. § 1508.27.  Further, the

regulatory definition of "intensity" of potential impacts includes the evaluation of

beneficial and adverse impacts, cumulative impacts, and any impacts on endangered or

threatened species.  40 C.F.R. § 1508.27(b).  Based on these regulatory definitions and

the purpose and need of the West Douglas EA, the BLM's hard look at the proposed

action fully considered both context and intensity in making a determination of

significance.

Within this framework, consistent with the BLM's delegated authority under FLPMA, the WFRHBA, and the stated purposes and need of the West Douglas EA, the BLM appropriately considered impacts of wild horse management on a multitude of resources, including wild horses, wildlife, livestock, human development, and vegetation, within the West Douglas HA.  See Def. Mem. at 37; see also A.R. Vol. 1, pp. 500-02, 519-20. The BLM also fulfilled its obligation under NEPA to identify, analyze, and discuss any potential adverse environmental impacts and cumulative impacts and, further, identified beneficial impacts that will result from the proposed action.  Def. Mem. at 25-29 (direct, secondary, and cumulative impacts analysis discussion), 37-38; see generally A.R. Vol. 1, Tab 73, pp. 535-55.  As such, based on NEPA's regulatory definition of "significant," the BLM appropriately concluded that significant adverse impacts were unlikely and that an EIS was not required.  See A.R. Vol. 1, Tab 12, pp. 70-71; A.R. Vol. 1, Tab 54, pp. 360-63; see generally Alaska Ctr. For Env't v. U.S. Forest Serv., 189 F.3d 851, 859 (9th Cir. 1999) ("Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference.").

**B.      The Environmental Assessment Appropriately Addressed Reasonable Alternatives.**

To the extent Plaintiffs' fundamental misunderstanding of the Chevron doctrine raises a NEPA issue, see Pl. Opp. at 9-11,[g] their only real complaint appears to be that the BLM did not select an alternative with which Plaintiffs agree.  See Pl. Opp. at 9-11.

---

[g]See supra, note 5.  It is unclear exactly what Plaintiffs aver; however, to the extent it raises a potential NEPA question, Defendants fully examined the issues in their opening brief.  See Def. Mem. at 24-40.

14

As clearly stated in Defendants' opening memorandum, an appropriate range of

alternatives is defined by the statement of purpose and need in the EA.  40 C.F.R. §

1502.13; City of Alexandria, Va. v. Slater, 198 F.3d 862, 867-69 (D.C. Cir. 1999).

Further, the agency determines the range of alternatives in the first instance, and that

range is only overturned if unreasonable.  N. Slope Borough v. Andrus, 642 F.2d 589,

601 (D.C. Cir. 1980); Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195

(D.C. Cir. 1991); Coal. On Sensible Transp. v. Dole, 642 F. Supp. 573 (D.D.C. 1986),

aff'd, 826 F.2d 60 (D.C. Cir. 1987).  Additionally, an agency's analysis in an EA is

expected to be "less detailed" than that in an EIS.  TOMAC v. Norton, 433 F.3d 852, 857

(D.C. Cir. 2006).  As this Court has explained, an EA must include "brief discussions" of

the alternatives to be considered, and its consideration of alternatives is examined under

the "rule of reason."  Biodiversity Conservation Alliance v. BLM, 404 F. Supp. 2d 212,

218 (D.D.C. 2005).

Plaintiffs appear to greatly misunderstand the fundamental purpose and need of

the entire NEPA planning process for the West Douglas HA.  See Pl. Opp. at 9-10

("Defendants claim that the [sic] 'one of the fundamental premises of the entire West

Douglas EA/RMP Amendment is to improve the health of the public lands.' Def. Br. at

38-39.").  The stated purpose of the West Douglas EA/RMP Amendment is "to identify

whether it is feasible at this time to manage wild horses in the West Douglas [HA], while

protecting resource values, providing for multiple uses, and improving the health of

public lands." A.R. Vol. 1, Tab 73, pp. 489-90 (emphasis added).  Although Plaintiffs

claim that this rationale is "found nowhere in the AR," Pl. Opp. At 10, it appears

throughout.  See A.R. Vol. 1, Tab 73, pp. 489-90 (2005 West Douglas EA/RMP); A.R.

Vol. 1, Tab 54, p. 360 (BLM Response to public comments on 2005 EA - July 6, 2005);

A.R. Vol. 2, Tab 28, p. 311 (2004 EA and decision record – July 8, 2004); A.R. Vol. 3,

Tab 3, p. 515 (Update to West Douglas HA Amendment to White River RMP - February

19, 2004); A.R. Vol. 3, Tab 6, p. 565 (Planning Bulletin #1 for West Douglas HA

amendment - July 8, 2002).  Indeed, the BLM represented at the earliest opportunity that

one of the fundamental purposes of the West Douglas EA/RMP Amendment would be,

along with evaluation of wild horse management, protection of resource values, and

providing for multiple uses, "improving the health of the public lands."  A.R. Vol. 3, Tab

7, p. 568 (June 25, 2002 Federal Register notice).

Within the parameters set by the purpose and need, the BLM identified and

considered a sufficient number of alternatives – nine –  in the NEPA process.  Def. Mem.

at 31; see also A.R. Vol. 1, Tab 73, pp. 497-98; A.R. Vol. 1, Tab 74, pp. 556-58; A.R.

Vol. 2, Tab 28, pp. 319-22.  These alternatives focused on a wide range of management

options, including zero horses, 29 to 50 horses, 100 to 207 horses, and 310 to 643 horses,

as well as their manageability with other ongoing land uses and resources, including

range, grazing, and oil and gas development.  See generally A.R. Vol. 1, Tab 73, p. 497,

537; A.R. Vol. 1, Tab 74,  pp. 556-58; A.R. Vol. 2, Tab 28, pp. 319-22; A.R. Vol. 1, Tab

54, p. 360.  Further, Plaintiffs do nothing to establish that the BLM's discussion of

alternatives is anything but reasonable.  See Busey, 938 F.2d at 196 (Courts will uphold

an agency's "discussion of alternatives so long as the alternatives are reasonable and the

agency discusses them in reasonable detail.").   Accordingly, the BLM's alternatives

analysis satisfies NEPA, because the BLM identified a range of reasonable alternatives

consistent with the statement of purposes and needs in the EA and it took the requisite

"hard look" at the alternatives.

Plaintiffs' allegation that the BLM "failed to explain why . . . [it] limited its alternatives in the 2005 EA" also must fail.  Pl. Opp. at 10.  An EA does not need to examine as broad a range of alternatives as an EIS because the necessary range of alternatives diminishes as the expected impacts diminish.  See Friends of the Ompompanoosuc v. FERC, 968 F.2d 1549, 1558 (2d Cir. 1992); Sierra Club v. Espy, 38 F.3d 792, 803 (5th Cir. 1994).  Here, the BLM took the requisite "hard look," in both the draft 2004 EA and the West Douglas EA, at all alternatives and explained the reasons for the rejection of any alternatives.  See Def. Mem. at 33-35 (citing A.R. Vol. 2, Tab 1, pp. 2-3; A.R. Vol. 2, Tab 2, p. 5; A.R. Vol. 2, Tab 29 (public comments and responses); A.R. Vol. 2, Tabs 9-27 (protests of 2004 EA)); see also Coal. On Sensible Transp., 642 F. Supp. at 593 (citing Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, 462 U.S. 87, 97-98 (1983)).  This "hard look" included an explanation and evaluation of particular methods of forage allocation, see A.R. Vol. 1, Tab 54, pp. 370; A.R. Vol. 1, Tab 73, pp. 497, 537-38; A.R. Vol. 2, Tab 41, p. 598; see generally 43 C.F.R. §§ 1610.5-3, 4110.3-3, as well as the utility of oil and gas development lease stipulations in the West Douglas EA, A.R. Vol. 1, Tab 54, pp. 379-80, 382, 387-89; A.R. Vol. 1, Tab 73, p. 489, 519; A.R. Vol. 2, Tab 1, p. 3; A.R. Vol. 2, Tab 28, p. 345.  As such, the BLM provided a reasonable explanation for its elimination of alternatives, and the practicable alternatives analysis was therefore valid.

Ultimately, Plaintiffs' issue with the West Douglas EA is unfounded.  Indeed, the BLM's "hard look" at the appropriateness of wild horse management in the West Douglas HA would be sufficient in the eyes of the Plaintiffs only if the EA was

comprised of the exact positions relied upon by Plaintiffs in their Complaint. However, Plaintiffs' claim lacks merit because the record supports the BLM's decision that the removal of wild horses from the West Douglas HA was not likely to have significant environmental effects. The BLM is thus entitled to summary judgment as to Count One of Plaintiffs' Second Amended Complaint.

## IV.    THE BLM IS NOT REQUIRED TO NOTIFY CONGRESS OF ITS PLANS TO REMOVE WEST DOUGLAS HORSES.

Plaintiffs continue to aver that the "BLM is required to notify Congress of its plans" to remove wild horses from the West Douglas HA. Pl. Opp. at 11-12. This argument is incorrect. FLPMA requires the BLM to notify Congress of any management decision that eliminates a principal or major use with respect to a tract of public land 100,000 acres in size or larger, for a period of two or more years. See 43 U.S.C. § 1712(e)(2). A "principal or major use," in turn, is defined to include "fish and wildlife development and utilization." 43 U.S.C. § 1702(l). Plaintiffs' reliance on Kleppe v. New Mexico, 426 U.S. 529 (1976) to argue that "wild horses" are a "principal or major use" is misplaced because the proper inquiry is whether the BLM's decision was a proper exercise of the broad discretion afforded its management of the public lands under FLPMA and the WFRHBA. The BLM was not required to notify Congress of its plans, because "wild horses" are not "wildlife" and, thus, are not subject to Section 1712(e)(2)'s notification requirement.

Contrary to Plaintiffs' assertions, Kleppe did not expressly hold that "wild horses and burros are wildlife;" rather, it simply upheld the constitutionality of the WFRHBA. Kleppe, 426 U.S. at 546. The Court's focus in Kleppe was narrow; it only evaluated the

18

elasticity of the Property Clause. <u>Kleppe</u> and the other cases cited by Plaintiffs do not address the issue here: whether, under FLPMA and the WFRHBA, wild horses are "wildlife" for purposes of 43 U.S.C. 1712(e)(2). <u>American Horse Protection Inst. v. Watt</u>, 694 F.2d 1310 (D.C. Cir. 1982), did not hold that wild horses are wildlife. Rather, in a footnote the court summarized the requirements of the WFRHBA, stating that the Secretary must accommodate the competing uses of "cattle," "wild horses," and "other wildlife." <u>Id</u>. at 1319 n. 41. Plaintiffs' argument construing this dictum as precedent vastly overreaches – the court did not reach the issue of whether the BLM violated the WFRHBA, and it cannot be construed as a "holding" that wild horses are wildlife. This is particularly true because the text and legislative history of the WFRHBA (as well as FLPMA) demonstrate that Congress distinguished between wild horses and wildlife. <u>See</u> Def. Mem. at 42-43.

Additionally, Plaintiffs' reliance on <u>Mountain States Legal Found. v. Hodel</u>, 799 F.2d 1423 (10th Cir. 1986), is unfounded. In that case, private landowners claimed that BLM's failure to manage wild horses violated the WFRHBA and resulted in an unconstitutional taking of forage on their lands. <u>Id</u>. In characterizing "wildlife" the Tenth Circuit relied on <u>Kleppe</u>. <u>See</u> <u>Mountain States Legal Found.</u>, 799 F.2d at 1426, n. 4. As explained <u>supra</u>, <u>Kleppe</u> is not properly construed as a holding that wild horses should be viewed as wildlife for all purposes, including FLPMA. The Tenth Circuit's conclusion that the WFRHBA is a "land-use regulation enacted by Congress to ensure the survival of a particular species of wildlife," <u>id</u>. at 1428, is inconsistent with the statutory language and legislative history of the WFRHBA, which differentiate between wild horses and wildlife.

Ultimately, the question in this case is more circumscribed than whether a court has ever tangentially referred to horses as "wildlife" in a constitutional inquiry (as in Kleppe), or whether other courts, citing Kleppe, have treated wild horses as wildlife (as in Mountain States Legal Foundation). Rather, the question is whether, under FLPMA and the WFRHBA, wild horses are best understood as "wildlife" for purposes of determining the BLM's land management obligations. Kleppe and its progeny do not answer that inquiry, as that decision preceded the enactment of FLPMA. Conversely, neither the WFRHBA nor FLPMA identify wild horses as wildlife and, ultimately, both statutes treat wild horses as a discrete and distinct resource value. See Def. Mem. at 42-43.[7] In fact, under its FLPMA land management authority, the BLM recognizes the unique niche created by Congress for wild horses and burros and manages them as a unique resource as part of its larger land use planning responsibility. Id.; see generally Fund for Animals, 460 F.3d at 15.

In addition to the authority cited by Defendants in their opening memorandum, the BLM's grazing administration regulations identify wild horses as a disparate resource value. See generally 43 C.F.R. Part 4100. For example, rangeland "utilization" is

---

[7] For example, a Congressional committee report specifically recognized a distinction between "wild horses" and "wildlife" for purposes of the WFRHBA, stating: "[t]he goal of wild horses and burros management . . . should be to maintain a thriving ecological balance between wild horse and burro populations, wildlife, livestock, and vegetation . . . ." H.R. Rep. No. 95-1737 at 15 (1978), reprinted in 1978 U.S.C.C.A.N. 4127, 4131. This statement has been cited by courts and administrative tribunals in cases arising under the WFRHBA. See, e.g., Blake v. Babbitt, 837 F. Supp. 458, 460 (D.D.C. 1993); Animal Prot. Inst., 124 IBLA 231, 235 (Oct. 28, 1992); Thomas M. Berry, 162 IBLA 221, 224 (July 27, 2004); Animal Prot. Inst., 151 IBLA 396, 400-401 (Feb. 15, 2000), Toni Hutcheson Moore, 146 IBLA 168, 170 (Oct. 29, 1998); Commission for the Preservation of Wild Horses, 145 IBLA 343, 347 (Sept. 23, 1998); Wild Horse Organized Assistance Commission for the Preservation of Wild Horses, 141 IBLA 202, 205-206 (Nov. 13, 1997); Commission for the Preservation of Wild Horses, 139 IBLA 327, 329 (July 14, 1997); Audubon Society of Portland, 128 IBLA 370, 374 (Mar. 11, 1994); Animal Prot. Inst., 131 IBLA 175, 178 (Nov. 2, 1994).

defined as "the portion of forage that has been consumed by livestock, <u>wild horses and burros</u>, wildlife and insects during a specified period."  43 C.F.R. § 4100.0-5 (emphasis added).  Additionally, the regulations provide that funds appropriated for range improvements must be spent on items that "benefit rangeland resources[,] including . . . fish and wildlife habitat improvement or protection, soil and water resource improvement, <u>wild horse and burro habitat</u> management facilities, vegetation improvement and management, and livestock grazing management."  43 C.F.R. § 4120.3-8(b) (emphasis added).  Indeed, the BLM's FLPMA regulations demonstrate an intended difference between wild horses and wildlife by consistently identifying them as separate and distinct resources.  Ample administrative and judicial authority also confirms the legal distinction between "wild horses" and "wildlife."  <u>See</u> <u>Rainer Huck</u>, 168 IBLA 365, 375 (Apr. 18, 2006) (distinguishing between "wildlife habitat, including desert bighorn sheep, mule deer and elk, and pronghorn antelope habitat" and "wild horses and burros" in discussing "resources and uses"); <u>Nevada Division of Wildlife v. BLM</u>, 145 IBLA 237, 239 (Aug. 25, 1998) ("[T]he plan directed BLM to adjust livestock, wild horses, and wildlife proportionately based on forage availability."); <u>American Horse Protection, Inc.</u>, 134 IBLA 24, 25 (Oct. 3, 1995) ("The area is administered primarily for the protection and management of wild horses, wildlife, recreation, watershed, archeological, and scenic values."); <u>see also</u> <u>Natural Resources Defense Council, Inc. v. Hodel</u>, 618 F. Supp. 848, 877 (E.D. Cal. 1985); <u>American Mustang & Burro Ass'n, Inc.</u>, 144 IBLA 148, 149 (May 28, 1998); <u>Commission for the Preservation of Wild Horses</u>, 139 IBLA 327, 329 (July 14, 1997); <u>Uintah Mountain Club</u>, 112 IBLA 287, 291 (Jan. 5, 1990).

In managing the West Douglas HA under its FLPMA and WFRHBA authority, the BLM has consistently treated wild horses and wildlife as separate resources and evaluated them as such.  See 2006 West Douglas Wild Horse Gather Plan, CO-110-2006-166-EA, pp. 28-35, 42-48;[9] A.R. Vol. 1, Tab 73, pp. 499-504, 521-28, 535-37, 545-50 (2005 West Douglas EA/RMP); A.R. Vol. 2, Tab 28, pp. 325-30, 346-53, 365-69, 386-96 (2004 EA); Supp. AR, 2001 Gather EA at 34-41; Supp. A.R., 2000 Gather EA at 34-39; Supp. A.R., 1998 Gather EA at 25-27; AR Vol. 4, Tab 5, pp. 52-56 (1997 White River RMP/EIS); A.R. Vol. 4, Tab 7, pp. 76-83 (1981 Herd Management Area Plan); A.R. Vol. 4, Tab 8, pp. 106-107 (1981 Rangeland Program Summary for White River Resource Area ("WRRA")); A.R. Vol. 4, Tab 9, p. 144, 148, 151 (1981 Management Framework Plan Revision for WRRA ); A.R. Vol. 4, Tab 12, pp. 241, 244-45, 262, 279, 308 (1975 Management Framework Plan for WRRA).  Because wild horses do not constitute "wildlife" for purposes of FLPMA and the WFRHBA, wild horses are not a "principal or major use" subject to the notification requirement under 43 U.S.C. § 1712(e)(2).  Thus, the BLM is not required to notify Congress of its decision to remove wild horses from the West Douglas HA.

## CONCLUSION

For the foregoing reasons, and those set forth in Defendants' opening brief, Defendants respectfully request that Plaintiffs' motion for summary judgment be denied and that summary judgment be entered in Defendants' favor dismissing Plaintiffs'

---

[9]In Defendants' opposition to Plaintiffs' motion to supplement the administrative record, Defendants noted that the 2006 West Douglas Wild Horse Gather Plan is available at: http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/white_river_field/FY_2006.Par.75702.File.dat/co11006166_final_ea.pdf.  See Dkt. No. 64.

Second Amended Complaint in its entirety.


Respectfully submitted this 13th day of August, 2008.


RONALD J. TENPAS,
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

CHARLES FINDLAY, Assistant Chief
JACOB T. HASEMAN, Trial Attorney
Natural Resources Section
601 D Street, N.W.
Washington, D.C.  20004
Telephone: (202) 305-0240
Jacob.Haseman@usdoj.gov

JEAN E. WILLIAMS, Chief
Wildlife and Marine Resources Section
*/s/ Kristen Byrnes Floom*
KRISTEN BYRNES FLOOM
Trial Attorney (DC Bar No. 469615)
Wildlife and Marine Resources Section
601 D Street, N.W.
Washington, D.C.  20004
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov


OF COUNSEL:

Andrea Gelfuso
Office of the Solicitor
Rocky Mountain Region
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215

*Attorneys for Defendants*

23