UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COLORADO WILD HORSE AND BURRO COALITION, INC., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-1609 (RMC) |
| KEN SALAZAR, Secretary, U.S. Department of the Interior,[1] *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION**

Plaintiffs challenge the decision of the Bureau of Land Management ("BLM"), an agency of the U.S. Department of the Interior, to remove all wild horses from the West Douglas Herd Area in Colorado. They argue, *inter alia*, that the decision violates the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act" or "Act"), 16 U.S.C. § 1331 *et seq.* Defendants counter that BLM's decision to remove the West Douglas Herd is a reasonable exercise of BLM's discretion and is entitled to *Chevron*[2] deference. Before the Court are cross motions for summary judgment.[3] For the reasons explained herein, the Court finds that BLM's decision to remove the West Douglas Herd exceeds the scope of authority that Congress delegated to it in the Wild Horse Act. The Court will grant in part Plaintiffs' motion for summary judgment, deny Defendants' cross motion for summary judgment, and set aside BLM's decision.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Ken Salazar is substituted for his predecessor, Dirk Kempthorne, Secretary of the U.S. Department of the Interior.

[2] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[3] Oral argument on the motions was heard on January 16, 2009.

## I.  FACTS[4]

The West Douglas Herd Area encompasses 123,387 acres of federal land managed by BLM and 4,754 acres of private land in Northwestern Colorado, southwest of the town of Rangely and approximately 50 miles north of Grand Junction.  It is located within the White River Resource Area.  In the first census conducted by BLM in 1974, it counted 9 wild horses in the West Douglas Herd Area.[5]  BLM estimates that there are now 147 wild horses in the herd area.

In 1975, BLM drafted a White River Resource Area Management Framework Plan[6] that provided a framework for managing multiple uses in the area, including the management of the wild horses.  In 1980, BLM issued an updated Management Framework Plan which recommended that all horses west of Douglas Creek (later designated as the West Douglas Herd Area) be removed because other resource activities in this area (namely, energy exploration) were causing the horses to disperse into areas where they did not roam in 1971, when the Wild Horse Act was enacted.  In 1985, for reasons not fully explained, BLM unsuccessfully attempted to completely remove wild horses from the West Douglas Herd Area.

On July 1, 1997, the Colorado State Director of BLM signed a Record of Decision for the White River Resource Area Management Plan that called for the total removal of wild horses in the West Douglas Herd Area by 2007.  However, BLM decided to reconsider its decision and to

---

[4] The facts are mostly taken from the Second Declaration of Kent E. Walter, Field Manager for BLM's White River Field Office.  *See* Defs.' Status Report on West Douglas Herd Area [Dkt. # 47].

[5] BLM counted 45 wild horses in the Douglas Creek herd unit but 36 were located east of the highway on land that is presently included in the Piceance-East Douglas Herd Management Area.

[6] A Management Framework Plan is the equivalent of what is now known as a Resource Management Plan.

conduct further analysis before commencing the removal of the West Douglas Herd.

On April 28, 2005, BLM published an environmental assessment that considered two alternatives: Alternative A, removing all wild horses from the West Douglas Herd Area by 2007; and Alternative B, managing a small herd of 29-60 wild horses in this area. On August 29, 2005, Kent E. Walter, Field Manager for BLM's White River Field Office, issued a proposed Decision Record and a Finding of No Significant Impact with respect to his decision to implement Alternative A, removing all wild horses from the West Douglas Herd Area. Mr. Walter's proposed decision was protested by five parties, including counsel for Plaintiffs in this case.

By letters dated October 10, 2007, Bud Cribley, BLM's Acting Assistant Director for Renewable Resources and Planning, denied each of the five protests to Mr. Walter's proposed decision to remove all wild horses from the West Douglas Herd Area. Mr. Cribley concluded that the White River Field Office and the Colorado State Director followed the appropriate planning procedures and complied with applicable laws in reaching their decisions. Thereafter, but also on October 10, 2007, the Colorado State Director issued a Decision Record approving Mr. Walter's proposed decision to remove all of the wild horses in the West Douglas Herd Area "at the earliest date."

On July 14, 2008, BLM released its 2008 West Douglas Herd Area Wild Horse Removal Final Decision Record and Environmental Assessment ("2008 Gather Plan"), authored by Mr. Walter, which provided that "[a]ll wild horses will be removed from within and outside the [West Douglas Herd Area] beginning no sooner than October 1, 2008" and that "[t]he gather methods used will include helicopter drive trapping, helicopter assisted roping, water trapping, or bait trapping." *See* Defs.' Combined Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Cross-

Mot. for Summ. J. [Dkt. # 71], Ex. 1 at 1. However, the gather never occurred due to a lack of funding. *See* Defs.' Notice of Postponement of West Douglas Gather [Dkt. # 87]. BLM currently plans to remove 100 horses from the West Douglas Herd Area pursuant to the 2008 Gather Plan beginning on September 27, 2009. *See* Defs.' Notice of Intent to Conduct Partial Removal [Dkt. # 97].

Plaintiffs are four associations organized to protect wild horses and one equine veterinarian, a former contract veterinarian for BLM, who frequently visits the West Douglas Herd Area to see and enjoy the wild horses. Plaintiffs filed their Third Amended Complaint on March 24, 2009, seeking, *inter alia*, a declaration that the 2008 Gather Plan exceeds BLM's discretion in the Wild Horse Act and an order setting aside the 2008 Gather Plan as *ultra vires*. Pending before the Court are cross motions for summary judgment.

## II. LEGAL STANDARDS

### A. Standard of Review

Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."[7] *Id.* § 704. The APA provides that the reviewing court *shall* "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C). "To determine

---

[7] Defendants admit that the 2008 Gather Plan is a "final agency action" within the meaning of the APA. *See* Defs.' Combined Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Cross-Mot. for Summ. J. ("Defs.' Mem.") [Dkt. # 69] at 10; Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply") [Dkt. # 80] at 2. Because "the requirement of 'final agency action' is not jurisdictional[,]" the Court treats the admission as a waiver. *John Doe, Inc. v. DEA*, 484 F.3d 561, 565 (D.C. Cir. 2007).

if the Secretary has exceeded his statutory authority under 5 U.S.C. § 706(2)(C), the Court must engage in the two-step inquiry required by *Chevron*." *Anna Jacques Hosp. v. Leavitt*, 537 F. Supp. 2d 24, 29-30 (D.D.C. 2008). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

### B. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.* In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III. ANALYSIS

A.   **Standing**[8]

Associational Plaintiffs Colorado Wild Horse and Burro Coalition, Inc., American Mustang and Burro Association, Inc., the Cloud Foundation, Inc., and Front Range Equine Rescue, Inc. "have representational standing if: (1) at least one of their members has standing to sue in his

---

[8] While Defendants do not argue that Plaintiffs lack standing, the Court reaches the issue *sua sponte* because it is jurisdictional. *E.g., Lee's Summit, MO. v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000) ("When there is doubt about a party's constitutional standing, the court must resolve the doubt, *sua sponte* if need be.").

or her own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). Individual Plaintiff Dr. Don Moore and the associational Plaintiffs' members have constitutional standing to sue if "(1) [they] ha[ve] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). They have prudential standing if their injury "arguably falls within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

The only real issue is whether Plaintiffs will suffer an injury in fact if the West Douglas Herd is removed.[9] "It is clear that the person who observes . . . a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist." *Lujan*, 504 U.S. at 566. Such is the case here with respect to individual Plaintiff Dr. Don Moore and associational Plaintiffs Colorado Wild Horse and Burro Coalition, Inc., and American Mustang and Burro Association, Inc. *See* Pls.' Mot. for Summ. J. [Dkt. # 68], Ex. 1 (Decl.

---

[9] One purpose of each of the associational Plaintiffs is to protect wild horses and burros, *see* 3d Am. Compl. ¶¶ 4-9, and the Court finds that neither the claims asserted nor the relief requested require the participation of an individual member. To the extent BLM's removal of the West Douglas Herd constitutes an injury in fact, the injury is caused by BLM's decision to remove the herd and is redressable by an order setting aside that decision. Plaintiffs have prudential standing because the removal of the West Douglas Herd clearly falls within the zone of interests protected or regulated by the Wild Horse Act.

of Donald E. Moore) ¶ 2 ("Seeing [the West Douglas Herd] in their natural surroundings and running free is essential to the aesthetic enjoyment of these [horseback] trips, which I have been taking for the past 55 years."); *id.*, Ex. 3 (Decl. of Toni Hutcheson Moore on behalf of Colorado Wild Horse and Burro Coalition, Inc.) ¶ 12 ("Further removals will have a significant impact on me and my family to observe wild horses in the White River Field Office."); *id.*, Ex. 4 (Decl. of Barbara Flores on behalf of American Mustang and Burro Association, Inc.) ¶ 1 ("An area so rich in wild horse and native American history in such a beautiful setting makes my spirit soar to visit it and catch the now isolated glimpse of the last remaining wild horses in West Douglas."). Therefore, Plaintiffs have standing to challenge the 2008 Gather Plan.[10]

    **B.**    **The Wild Horse Act**

The Wild Horse Act provides that "Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. § 1331. The Act further provides that "[i]t is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system

---

[10] The Court need not decide whether associational Plaintiffs the Cloud Foundation, Inc. and Front Range Equine Rescue, Inc. also have standing. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) ("if constitutional and prudential standing can be shown for at least one plaintiff, [the court] need not consider the standing of the other plaintiffs to raise that claim").

of the public lands."[11]  *Id.*  It is a federal crime to remove a wild free-roaming horse or burro from public lands, convert a wild free-roaming horse or burro to private use, or kill or harass a wild free-roaming horse or burro.  *See id.* § 1338(a)(1)-(3).

Congress delegated to the Secretary of Agriculture and the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros "for the purpose of management and protection in accordance with the provisions of this chapter."[12]  *Id.* § 1333(a).  Section 1333(a) provides that "[t]he Secretary is authorized and directed to protect and manage wild free-roaming horses and burros as components of the public lands, and he may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation . . . ."  *Id.*  It further provides that "[t]he Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands" and that "[a]ll management activities shall be at the minimal feasible level . . . in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species."  *Id.*

Section 1333(b)(1) requires BLM to maintain a current inventory of wild horses and burros so that it can "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels

---

[11]  BLM has interpreted the term "where presently found" to mean "the geographic area identified as having been used by a herd as its habitat in 1971." 43 C.F.R. § 4700.0-5(d) (definition of "herd area").

[12]  As used in the Wild Horse Act, "Secretary" "means the Secretary of the Interior when used in connection with public lands administered by him through the BLM and the Secretary of Agriculture in connection with public lands administered by him through the Forest Service."  16 U.S.C. § 1332(a).  In this case the public lands are administered by the Secretary of the Interior through BLM.

of wild free-roaming horses and burros on these areas of public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." *Id.* § 1333(b)(1). Section 1333(b)(2) provides that when BLM determines "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [the Secretary] shall immediately remove excess animals from the range so as to achieve appropriate management levels." *Id.* § 1333(b)(2). The term "excess animals" is defined as "wild free-roaming horses or burros (1) which have been removed from an area by the Secretary pursuant to applicable law or, (2) which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id.* § 1332(f).

Section 1333(b)(2) specifically provides an "order and priority" for removal of excess animals "until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation."[13] *Id.* § 1333(b)(2). Specifically, it first provides that BLM "shall order old, sick, or lame animals to be destroyed in the most humane manner possible." *Id.* § 1333(b)(2)(A). Second, BLM "shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which [the Secretary] determines an adoption demand exists by qualified individuals . . . ." *Id.* § 1333(b)(2)(B). Third, and as a last resort, BLM "shall cause additional excess wild free-roaming horses and burros for which an adoption demand by

---

[13] The term "range" is defined as "the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands." 16 U.S.C. § 1332(c).

qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible." *Id.* § 1333(b)(2)(C). In § 1333(e), Congress also gave BLM authority to sell any excess animal that is more than 10 years old or that has been offered unsuccessfully for adoption at least three times. *See id.* § 1333(e)(1).

Congress stipulated five conditions upon which the animals "shall lose their status as wild free-roaming horses or burros and shall no longer be considered as falling within the purview of this chapter." *Id.* § 1333(d). The first is if title to an excess animal has passed to a qualified individual for adoption or private maintenance. *See id.* § 1333(d)(1). The second is if an excess animal has been transferred for private maintenance or adoption and "die[s] of natural causes before passage of tile." *Id.* § 1333(d)(2). The third is if an excess animal is destroyed by BLM "pursuant to subsection (b) of this section." *Id.* § 1333(d)(3). The fourth is if a wild free-roaming horse or burro dies of natural causes on public lands or private lands where the animal was maintained and BLM has authorized disposal of the animal. *See id.* § 1333(d)(4). And the fifth is if a wild free-roaming horse or burro is destroyed or dies "for purposes of or incident to the program authorized in this section."[14] *Id.* § 1333(d)(5). Any excess animal that is sold by BLM pursuant to § 1333(e) also is no longer "considered to be a wild free-roaming horse or burro for the purposes of this chapter." *Id.* § 1333(e)(4).

Finally, § 1339, entitled "Limitation of authority," provides that "[n]othing in this chapter shall be construed to authorize the Secretary to relocate wild free-roaming horses or burros to areas of the public lands where they do not presently exist." *Id.*

---

[14] While the statute does not define "program" or even reference it elsewhere in § 1333, the only plausible "program" that is "authorized" in the section is the removal of excess animals. It cannot be said that § 1333 authorizes a "program" to remove non-excess animals.

### B. BLM's Authority to "Manage" Wild Free-Roaming Horses and Burros

Against this backdrop, Defendants take the extreme position that it is within BLM's discretion to remove the entire West Douglas Herd, a herd comprised of wild free-roaming horses that Defendants conceded at oral argument BLM has not determined to be "excess animals."[15] *See* Tr. at 6 ("THE COURT: Well, are you saying that the 147 horses in the West Douglas area are excess? MS. FLOOM: No, Your Honor. BLM has – our position is that BLM is not required to make a determination that those horses are excess before removing them from the herd area."). Defendants assert that implicit in BLM's authority to "manage" wild free-roaming horses and burros in § 1333(a) is the discretion to remove the very animals that Congress intended to protect in the Wild Horse Act. *See id.* at 6-7 ("THE COURT: Where do you find authority to remove horses that are not excess? MS. FLOOM: Your Honor, that authority is inherent within BLM's broad authority to manage horses. . . . Under Section 1333 of the statute, BLM is given broad authority to manage wild horses."). The Court declines to afford BLM's interpretation deference. *E.g., Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1319 (D.C. Cir. 1982) (noting that under the Wild Horse Act "the Secretary's discretion remains bounded" and that "[h]is orders are subject to review and may be overturned if his action is arbitrary").

---

[15] Defendants initially took the position that BLM had determined that the horses in West Douglas were "excess animals." *See* Defs.' Memorandum at 21. However, Defendants conceded the point by abandoning it at oral argument. *See* Tr. at 6-7. Further, the record reflects that "[t]he principal problem in maintaining wild horses in the West Douglas Herd Area is a major shift in wild horse grazing use patterns that has occurred since the early 1980's." A.R. Vol. 4, p. 14. "It is probable that intense energy exploration and development occurring in the northern part of the herd area has concentrated use in the south." *Id.* "This change of use has resulted in overgrazing the Texas Creek drainage, and horse use in Missouri and Evacuation Creeks that are not a part of the 1971 herd area." *Id.* Accordingly, it is this shift in the West Douglas Herd's grazing patterns, likely caused by human development, and not overpopulation, that formed the basis for BLM's decision to remove the West Douglas Herd.

The initial inquiry under *Chevron* is "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The "specific issue" here is not whether BLM may remove an entire herd of wild free-roaming horses and burros, as Defendants assert; the "specific issue" is whether BLM may remove an entire herd of wild free-roaming horses and burros that BLM concededly has not determined to be "excess animals" within the meaning of the Wild Horse Act.[16] For the following reasons, the Court finds that Congress clearly intended to protect non-excess wild free-roaming horses and burros from removal, and that BLM's removal authority is limited to those wild free-roaming horses and burros that it determines to be "excess animals" within the meaning of the Wild Horse Act.[17]

BLM's authority to "manage" wild free-roaming horses and burros is expressly made subject to "the provisions of this chapter[,]" 16 U.S.C. § 1333(a), including the provision that "[i]t is the policy of Congress that wild free-roaming horses and burros shall be protected from capture . . . ." *Id.* § 1331. It would be anomalous to infer that by authorizing the custodian of the wild free-roaming horses and burros to "manage" them, Congress intended to permit the animals' custodian

---

[16] The Court expresses no opinion about whether BLM has the authority to remove an entire herd that it has determined, in accordance with the Wild Horse Act, to be "excess animals."

[17] Alternatively, and for the same reasons, the Court finds that BLM's decision to remove an entire herd of concededly non-excess wild free-roaming horses and burros is an impermissible construction of the of the Wild Horse Act under step two of *Chevron*.

to subvert the primary policy of the statute by capturing and removing from the wild the very animals that Congress sought to protect *from* being captured and removed from the wild.

Defendants argue that the horses will not be "eradicated" or "eliminated" inasmuch as BLM intends to continue to manage the horses *not* in the wild but through private adoption or long-term care. *See* Answer to 3d Am. Compl. ¶ 2. But BLM's directive is "to protect and manage *wild free-roaming* horses and burros *as components of the public lands* . . . ." 16 U.S.C. § 1333(a) (emphasis added). Congress did not authorize BLM to "manage" the wild horses by corralling them for private maintenance or long-term care as *non*-wild free-roaming animals *off* of the public lands. Upon removal for private adoption and/or long-term care, the West Douglas Herd would forever cease to be "wild free-roaming" horses "as components of the public lands" contrary to Congress's intent to protect the horses from capture.

.          Moreover, the statute expressly provides that BLM's "management activities *shall* be at the *minimal* feasible level . . . ." *Id.* (emphasis added). It is difficult to think of a "management activity" that is farther from a "minimal feasible level" than removal. While Congress did not specifically define "manage," it did provide a list of the "management activities" it envisioned. The management activities that Congress had in mind were for BLM to "make determinations as to whether and where an overpopulation exists and whether action should be taken to *remove excess animals*; determine appropriate management levels of wild free-roaming horses and burros on these areas of public lands; and determine whether appropriate management levels should be achieved by the *removal or destruction of excess animals*, or other options (such as sterilization, or natural controls on population levels)." *Id.* § 1333(b)(1) (emphasis added). Conspicuously omitted from this list is any reference to a determination by BLM to remove non-excess animals.

Further, Congress prescribed a detailed statutory procedure for removing excess animals. *See id.* § 1333(b)(2)(A)-(C). Congress "specified both the circumstances under which BLM may determine that an overpopulation of wild horses exists and the means the Agency may use to control horse populations." *Am. Horse Protection Ass'n*, 694 F.2d at 1316. Yet there is no procedure in the statute for removing non-excess animals. While it is true, as Defendants argue, that nothing in the statute expressly precludes BLM from removing non-excess animals, it would make no sense for Congress to provide detailed procedures for removing excess animals but no procedure at all for removing non-excess animals.[18] For this reason, the Court rejects Defendants' proposed construction that § 1333(b) *requires* the removal of excess animals whereas § 1333(a) *permits* the removal of non-excess animals. In light of the statute's purpose to protect wild free-roaming horses and burros, the Court finds that the only plausible inference to be drawn from the omission of any procedure for removing non-excess animals is that Congress did not intend for BLM's management authority to be so broad.

This inference is bolstered by the fact that Congress specifically excluded from the Act's coverage those excess animals that are adopted, sold, or destroyed following removal by BLM pursuant to § 1333(b), *see* 16 U.S.C. § 1333(d) & (e)(4), but the Act contains no exclusion for the adoption, sale, or destruction of non-excess animals removed by BLM pursuant to § 1333(a), the provision of the statute authorizing BLM to "manage" wild free-roaming horses and burros. In

---

[18] While the Court is aware that the absence of an express limitation on BLM's authority to remove non-excess animals could be interpreted to mean that Congress intended to allow BLM that authority, the Court rejects that statutory interpretation. *See Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1120 (D.C. Cir. 1995) ("we will not presume a delegation of power based solely on the fact that there is not an express withholding of such power").

addition, Congress expressly limited BLM's authority "to relocate wild free-roaming horses or burros to areas of the public lands where they do not presently exist." *Id.* § 1339. Given the policy expressed in the statute, it would make no sense to prohibit BLM from relocating wild horses to public lands where they did not historically exist but permit BLM to take the more drastic measure of removing non-excess animals from the public lands altogether.

        Finally, the Court notes that the original 1971 Act contained a provision that empowered the Secretary to destroy wild free-roaming horses or burros "when in his judgment such action is necessary to preserve and maintain the habitat in a suitable condition for continued use." Pub. L. No. 92-195, § 3(c), 85 Stat. 649, 650 (Dec. 15, 1971). Congress repealed that provision in 1978 and replaced it with the current provision which speaks only to BLM's authority to remove and destroy *excess* animals. *See* Pub. L. No. 95-514, § 14(a), 92 Stat. 1803, 1808 (Oct. 25, 1978); *see also* H.R. Rep. No. 95-1737, at 14 (1978) ("The conferees further agreed to retain the House bill's mandate to the Secretaries to remove *excess* wild horses and burros from the public lands.") (emphasis in original). The Court infers from that repeal that Congress intended to eliminate BLM's discretion to destroy non-excess animals. Insofar as BLM's decision to remove the West Douglas Herd makes the horses eligible for eventual destruction,[19] the decision is contrary to Congress's intent in the 1978 amendments to preclude BLM from destroying non-excess animals in order to maintain the habitat.

---

[19] As already noted, Defendants aver that "the horses will be removed from West Douglas but BLM will manage the horses elsewhere, through adoption or long-term care." Answer to 3d Am. Compl. ¶ 2. However, given Defendants' broad interpretation of BLM's management authority, Defendants' averment is of little comfort that BLM will not later decide to destroy the West Douglas Herd, should adoption prove unsuccessful and long-term care too expensive.

Defendants protest that because wild free-roaming horses will continue to inhabit the Piceance-East Douglas Herd Management Area, BLM's decision to remove the West Douglas Herd will not result in the removal of all of the horses historically found in the Douglas Creek wild horse herd unit.  *See* Defs.' Reply at 7 (Plaintiffs cannot state a claim under the Wild Horse Act "because the BLM is not removing all horses from this historical range").  The argument misses the point. Defendants admit that "[t]he area of wild horse use at the passage of the Act was an area of 187,970 acres known as the 'Douglas Creek wild horse herd unit,'" and that the herd unit encompassed the area that the West Douglas Herd now inhabits.  Defs.' Mem. at 14-15; *see also* Defs.' Reply at 7 ("Defendants do not dispute that the administrative record reflects that some wild horses were present in 1974 in the area now known as the West Douglas H[erd] A[rea].").  That "BLM will continue to manage horses in the Douglas Creek herd unit because wild horses will be maintained in the Piceance-East Douglas HMA," Defs.' Mem. at 15, does nothing to remedy BLM's lack of statutory authority to remove non-excess animals historically found in the Douglas Creek herd unit, including the West Douglas Herd Area.

### IV.  CONCLUSION

For the foregoing reasons, the Court finds that the 2008 Gather Plan was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[20]  5 U.S.C. § 706(2)(C). A prerequisite to removal under the Wild Horse Act is that BLM first determine that an overpopulation exists and that the wild free-roaming horses and burros slated for removal are "excess animals."  BLM concededly has not made such a determination with respect to the horses

---

[20] The Court expresses no opinion on the lawfulness of any other BLM action challenged by Plaintiffs.  Nor does the Court opine on whether BLM violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, or the Federal Land Policy Management Act, 43 U.S.C. § 1701 *et seq.*

in the West Douglas Herd Area. Accordingly, Plaintiffs' motion for summary judgment will be granted in part, Defendants' cross motion for summary judgment will be denied, and the 2008 Gather Plan will be set aside. A memorializing Order accompanies this Memorandum Opinion.


DATE: August 5, 2009                              /s/
                                         ROSEMARY M. COLLYER
                                         United States District Judge